**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| TONYA MANGELS | ) | |
| | ) | |
| | ) | Case No. 19-834-CV-W-BP |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| AMERICAN MULTI-CINEMA, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Tonya Mangels ("MANGELS"), by and through her undersigned counsel, and for her First Amended Complaint against Defendant American Multi-Cinema, Inc. ("AMC"), states, alleges, and avers as follows:

### PARTIES

1.     Plaintiff MANGELS is a female resident of Platte County, Missouri.

2.     Defendant AMC is a Missouri for-profit corporation with its principal place of business located at 11500 Ash Street, Leawood, Kansas 66211.

3.     Defendant AMC's Registered Agent, Corporate Creations Network, Inc., can be served with process at the address set forth in the caption above

### JURISDICTION AND VENUE

4.     This action is brought to remedy unlawful discrimination and retaliation in violation of the Equal Pay Act at 29 U.S.C. § 206, *et seq*., and in violation of 29 U.S.C. § 215(a)(3), a provision of the Fair Labor Standards Act ("FLSA") that establishes a cause of action for retaliation against employees who assert rights under the Equal Pay Act (collectively referred to herein as the "Equal Pay Act").

WA 3122281.1

5.      As it concerns the Equal Pay Act claims alleged herein, Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

6.      The discriminatory and retaliatory conduct discussed herein is also the subject of charges of discrimination that were previously filed with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, ("Title VII").

7.      Plaintiff has received Right to Sue letters from the EEOC pertaining to those charges of discrimination, and as such, Plaintiff has also satisfied all private, administrative, and judicial prerequisites to the institution of this action.

8.      Venue and jurisdiction are properly laid in this Court because this is a judicial district in which defendant resides within the meaning of 28 U.S.C. § 1391, and because this is a judicial district in which defendant (a Missouri corporation) is subject to the Court's personal jurisdiction with respect to this action pursuant to 28 U.S.C. § 1391.  *See also*, *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014) (a corporation's place of incorporation is a "paradigm" basis general jurisdiction).  In addition, and because Plaintiff was authorized to work for Defendant periodically in Kansas City, Missouri from her home office, venue is also appropriate pursuant to 42 U.S.C. Section 2000e–5(f)(3) because this is a judicial district in Plaintiff would have worked but for the unlawful employment practices alleged herein.

**FACTS COMMON TO ALL COUNTS**

9.      At all times material hereto, the employees of AMC were acting in the course and scope of their employment with AMC, or were otherwise acting as agents of AMC, and their conduct was authorized and ratified by AMC.

10.      Plaintiff is female.

2

11. Plaintiff has more than 25 years of professional experience in the field of marketing.

12. Plaintiff began her employment with AMC in 2009, and she was elevated to become a Vice President in 2013.

13. Plaintiff reported to AMC's Executive Vice President & Chief Marketing Officer, Stephen Colanero, between 2010 and 2019 before she was unlawfully terminated on September 30, 2019 with an effective date of October 3, 2019.

14. Plaintiff's job title immediately prior to her termination was Vice President, Product Marketing.

15. At all relevant times, Plaintiff performed substantially equal work with one or more of the following Vice Presidents in the AMC organization prior to her termination:

    a. Vice President, Programming Promotion;

    b. Vice President, Guest Engagement;

    c. Vice President, Food & Beverage;

    d. Vice President, Communication and Events; and,

    e. Vice President, Pricing.

16. At all relevant times, all of the above positions were held by male employees.

17. The male Vice Presidents in the positions identified above were being paid between approximately 56% and 72% more than Plaintiff, including their base salaries and bonuses (which are based in part on base salary).

18. That difference amounts to between $117,000 and $149,000 more dollars per year paid to the male Vice Presidents compared to what AMC paid Plaintiff.

19. AMC also awarded larger stock grants to the male Vice Presidents.

3

20.     At the time the stock grants were awarded, the male Vice Presidents received approximately $20,000 more in annual RSU/PSU stock grant targets.

21.     At all relevant times, Plaintiff's job as Vice President, Product Marketing required substantially equal skill, effort, and responsibility as the male Vice President jobs identified above.

22.     Plaintiff performed substantially equal work to each of the male Vice Presidents identified above for more than the past three years, and Plaintiff had more seniority at AMC than four of the five male Vice Presidents identified above.

23.     On the AMC organization chart, Plaintiff's position was equal to the male positions identified above.

24.     Plaintiff managed the second largest budget, and had the second highest number of employees on her team.

25.     Similar to her male peers, Plaintiff's responsibilities were extremely broad and consistently required her to perform at a highly strategic and innovative level, and to generate revenue for AMC.

26.     After she was elevated to become a Vice President in 2013, Plaintiff was consistently rated as one of AMC's highest performing executives in annual reviews prior to requesting to have her compensation increased and equalized with male counterparts.

27.     For example, in her 2014 review, Plaintiff received an overall "S+ Successful (Plus)" rating from AMC, and Mr. Colanero commented that "Tonya continues to grow and improve as an executive officer for the company, while delivering ongoing excellent results along the way."

28.     In her 2015 review, Plaintiff received an overall "S+ Successful (Plus)" rating from AMC, and Mr. Colanero commented that "Tonya continues to grow as a leader and an executive at AMC.  …Tonya continues to be a key contributor to a major area of the business that has continued an impressive series of growth years."

29.     In her 2016 review, Plaintiff received an overall "Exceeds Expectations" rating from AMC, and Mr. Colanero commented: "Really excellent performance for Tonya in 2016. As she points out, her area of responsibility continues to grow outside of Food & Beverage Marketing, and her contributions in these new areas has been strong.  …To recap, a very nice year for Tonya, where she was able to keep core activities going in a positive way, while delivering on multiple key initiatives over-and-above [her] day-to-day responsibilities."

30.     During each of those years, Plaintiff also received the CEO "Playing Offense" High Performance Recognition and bonus at AMC, which is described internally as "the highest form of recognition and reward to a select few who went above and beyond in playing offense, delivering extra-ordinary results through discretionary effort, and/or advancing the business with innovative thought leadership."

31.     Prior to her termination, Plaintiff made numerous requests to have her compensation increased and equalized to an amount commensurate with her duties and responsibilities.

32.     For example, when Plaintiff's position was expanded in October 2016, Plaintiff requested and received a written commitment from Human Resources ("HR") and Stephen Colanero, and a verbal commitment from Mr. Colanero, that her compensation would be reviewed and increased during the year-end review process for 2017.

33. In her 2017 review, Plaintiff received the highest possible overall rating at AMC: "Outstanding." She also received ratings of "Exceeds Expectations" in the areas of "Decision Making & Judgement" and "Integrity & Ethics."

34. Mr. Colanero also commented: "Tonya is an integral part of the senior leadership team in the Marketing department. Reflecting on 2017, which was a disappointing year for the industry, and AMC in particular, it is hard not to be impressed with the volume of accomplishments Tonya achieved. She brought to fruition several key initiatives from 2016 … as well as creating new contributors to benefit AMC…. These are huge initiatives that drive profit for AMC, and wouldn't be what they are without Tonya's significant leadership/contributions. Additionally, she contributed in many other meaningful ways - from daily, unappreciated work (e.g. inventory risk management) to high-profile, cross-functional assignments…."

35. Despite receiving AMC's highest possible rating during her 2017 review, and the additional accolades referenced above, Plaintiff's compensation was not increased, and it continued to lag behind comparable male Vice Presidents.

36. When Plaintiff's responsibilities were expanded again in April 2018, Plaintiff met with Carla Sanders-Chavarria (Senior Vice President, HR) on April 11, 2018 to discuss her request to equalize her compensation with male counterparts, and to seek additional advice on how to tactfully approach that issue with Mr. Colanero.

37. Plaintiff followed up with an email stating: "I greatly appreciate the conversation about the evolution of my position and your advice on how to tactfully approach the ongoing dialogue which is increasingly important to me at this stage in my career."

38.     In May 2018, during a meeting with Mr. Colanero, Plaintiff again requested that her compensation be increased and equalized with comparable male Vice Presidents, and Mr. Colanero acknowledged that "AMC knows that it needs to make an adjustment."

39.     In October 2018, Plaintiff also met with Mr. Colanero and Ms. Sanders-Chavarria regarding internal restructuring issues, new positions, and promotions for her team and others. During that discussion, Ms. Sanders-Chavarria acknowledged that AMC was "getting hit with" employee complaints related to gender equity and compliance with the Equal Pay Act.

40.     In November 2018, Plaintiff specifically requested in writing—to Mr. Colanero and Ms. Sanders-Chavarria—that the "Company review and equalize [her] compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work."

41.     In late 2018, Mr. Colanero took all of his direct reports out for individual dinner for the holidays but excluded Plaintiff.

42.     All of Plaintiff's requests for increased compensation were deflected, and Mr. Colanero suggested that Plaintiff should not ask for more, and should instead be happy with what she gets.

43.     Mr. Colanero also expressed frustration about Plaintiff asking for her compensation to be equalized with her male counterparts.

44.     On one occasion, Mr. Colanero falsely stated to Plaintiff that her compensation was within "equal range" of the comparable male Vice Presidents.

45.     At the time Mr. Colanero made that false statement, he was not aware that Plaintiff already knew about the compensation paid to the comparable male Vice Presidents.

7

46. After receiving and deflecting Plaintiff's continued requests for increased compensation throughout 2018, Mr. Colanero performed Plaintiff's next, year-end performance review in February 2019.

47. In that review, Mr. Colanero rated Plaintiff as "exceed[ing] expectations" and "meet[ing] expectations" in all performance-related categories, but Mr. Colanero and AMC gave Plaintiff an overall review rating of "does not meet expectations."

48. That was the lowest performance review given to any employee in the entire marketing department, and it is perceived as a highly negative rating capable of justifying adverse employment actions.

49. Mr. Colanero's and AMC's purported basis for the negative review related to an HR issue involving a male co-worker who was a Vice President, and an anonymous, false allegation that Plaintiff consumed too much alcohol at a non-sponsored event at an off-site location after business hours during a business trip to New Orleans in January of 2018.

50. These purported issues—which were never raised or "investigated" by AMC or Mr. Colanero until *after* Plaintiff began requesting compensation comparable to her male counterparts, and were never raised or "investigated" by AMC or Mr. Colanero until nearly six months after they allegedly occurred—were fully addressed by AMC in the spring of 2018, and there was no reason for re-visiting the same issues once again during Plaintiff's 2018 year-end review in February of 2019.

51. During AMC's original "investigation" into those false allegations, Human Resources conducted a very open and personally damaging investigation calculated to smear Ms. Mangels' reputation with leading questions and related efforts to intimidate and bully fellow co-workers.

52.     Plaintiff was also held to a different standard than her male counterparts, and Plaintiff was forced to undergo EAP counseling unlike any of the male co-workers allegedly involved in the same or similar conduct.

53.     To compound matters further, Plaintiff was also placed on a final, written warning at that time because Plaintiff received a previous warning in <u>2015</u> for an accounting mistake that was caused by Mr. Colanero.

54.     In particular, Mr. Colanero incorrectly budgeted some expenses as "marketing" expenses instead of calling them "capital expenditures," and he instructed Plaintiff to sign off on his characterization of the expenses in 2015.

55.     The 2015 accounting issues also involved expense violations by other employees of AMC that reported to Mr. Colanero, and that did not report to Plaintiff.

56.     Upon information and belief, AMC intentionally blamed Plaintiff and three other employees for the above issues in 2015—with no accountability from Mr. Colanero—because any blame attributable to Mr. Colanero would have required reporting to the Board of Directors given Mr. Colanero's Executive Vice President status, which in turn may have required disclosure in AMC's public filings.

57.     AMC ultimately acknowledged the impropriety of blaming Plaintiff for the above issues in 2015 when it later *reversed* its decision to reduce her bonus by 50%, and when it awarded Ms. Mangels her full company bonus at 121.5% of the target and also awarded Plaintiff the prestigious CEO award.

58.     Nevertheless, Mr. Colanero relied on that additional, false accusation from 2015 in order to justify his retaliatory decision to place Plaintiff on a "final" written warning in June of 2018.

9

59.     Regardless of what occurred in June of 2018, Mr. Colanero's and AMC's decision to re-raise the same issues in February 2019 was additionally discriminatory and retaliatory because Plaintiff was once again treated differently from her male counterparts in relation to her 2018 year-end review.

60.     For example, unlike Plaintiff, the male Vice President involved in the issues referenced above was not penalized *once again* during his 2018 year-end review.

61.     The issues were never discussed or re-hashed during his 2018 year-end review.

62.     In addition, and unlike Plaintiff, the same male Vice President referenced above also received an overall rating of "meets expectations" in his 2018 year-end review.

63.     Plaintiff's highly negative rating in her 2018 year-end review was also contradicted by the increased level of trust and responsibility Plaintiff held in the company *after* the spring of 2018 when the above issues were originally addressed and resolved in June of 2018.

64.     For example, after the issues were resolved, Plaintiff was promoted with the assignment of additional team members, an expanded budget, and additional responsibilities. Plaintiff was also tasked with leading more strategic initiatives.

65.     Plaintiff was also trusted with the highest-level responsibilities in the organization, including presenting to AMC's Chief Executive Officer, the leadership team, and AMC's top clients on numerous occasions.

66.     Plaintiff was also selected to the "LEAP promotion-ready officers group" in the second quarter of 2018.

67.     Despite the above, Mr. Colanero gave Plaintiff an overall 2018 review rating of "does not meet expectations" in February 2019.

68. Mr. Colanero acknowledged that Plaintiff's performance was "superior," but he explained that he needed to "send a message to [Plaintiff]."

69. Mr. Colanero's desire to "send a message to [Plaintiff]" was discriminatory and retaliatory, and it was motivated by views that women should behave differently than men.

70. After Plaintiff learned that she was receiving an overall rating of "does not meet expectations," she asked Mr. Colanero how the rating was going to affect her salary review.

71. She explained her belief that "we have a pay equity issue and we need to address it."

72. She also confronted Mr. Colanero with knowledge she gained from a compensation spreadsheet Mr. Colanero shared with her in March of 2018.

73. Mr. Colanero became upset when he learned that Plaintiff knew about the information reflected in that spreadsheet, and he told Plaintiff that he "did not intend" to send her that information.

74. Despite that frank conversation, nothing was ever done about the wage disparities, and no productive dialogue ever occurred on the issue.

75. Mr. Colanero and AMC also relied on the discriminatory and retaliatory "does not meet expectations" rating as a plausible (but false) reason for refusing to equalize Plaintiff's compensation in 2019.

76. Mr. Colanero and AMC also relied on the discriminatory and retaliatory "does not meet expectations" rating to decrease Plaintiff's bonus by 50% and limit her cost-of-living increase to 2% (well below the company average that year).

77. Based on the unlawful conduct outlined above, Plaintiff filed a Charge of Discrimination on May 2, 2019 with the EEOC, and complained in good faith about perceived violations of the Equal Pay Act and Title VII.

78. In response, AMC immediately denied the allegations, misrepresented Plaintiff's job duties, skills, supervision, effort, and responsibilities, provided incomplete and inaccurate information regarding Plaintiff's job performance to the EEOC, and embarked on a campaign to continue retaliating against Plaintiff for engaging in protected activity.

79. For example, on August 20, 2019, AMC announced a reduction in force ("RIF"), and Plaintiff **did not have prior knowledge of the RIF**.

80. Despite her lack of prior knowledge of the RIF, AMC falsely accused her of providing advance knowledge of the RIF to her team.

81. Thereafter, AMC's HR department began an "investigation" and interviewed several members of her team.

82. The brand new RIF "investigation" was unfounded, and only served as further evidence of AMC's retaliation, and its continuing effort to generate a pretextual basis for terminating Plaintiff, for the following reasons:

    a. Prior to the August 20, 2019 RIF announcement, AMC announced a formal Profit Improvement Plan in its August 8, 2019 Quarter 2 earnings call including the targeting of $50 million in cost savings (a transcript of which is posted online) and John McDonald, AMC's Executive Vice President of Operations, had internally posted several company-wide "calls to action" about expense reduction efforts. Public industry resources also reported 2020 as a soft year for the box office, significantly down versus 2019. In addition, AMC's stock, once over $33

per share, began trading between $8.86-$11.38 per share over the couple months prior to the announcement. In other words, significant public information existed that revealed a challenging business climate for AMC, and the publicly available information sparked general long-term concerns about a RIF within AMC and rumors were widespread.

b. AMC conducted its "investigation" into the RIF matter in an intimidating manner by bullying interviewees on Plaintiff's team and when interviewing Plaintiff, in a manner designed to instill fear versus encourage a trusting dialogue.

c. The questioning of Plaintiff was badgering, threatening, and confrontational.

d. AMC also made further attempts to damage Plaintiff's credibility with repeated interviews of her team conducted in a manner designed to scare her team and others in the department the week of the RIF, which was already a highly stressful time.

e. During her interview with Human Resources on August 26, 2019, Plaintiff confirmed that she had no prior knowledge of the RIF and could not have provided advance knowledge of RIF to her team. She did confirm, however, that she demonstrated authenticity and leadership to her team when she advised them to focus on their great work, key business contributions, approved budgets and matters within their control.

f. Prior to her August 26, 2019 interview, Plaintiff also heard directly from Mr. Colanero that HR was planning to contact her in order to discuss the RIF issue generally.

g. Plaintiff emailed Ms. Sanders-Chavarria on August 22, 2019—in advance of the August 26 meeting—in order to preempt the issues and explain that there should be no reason for concern.

h. In her email, Plaintiff invited Ms. Sanders-Chavarria to take 10-15 minutes in order "to briefly touch base with a couple of folks on [her] team about the agenda and [her] communications, such as Lauren Doyle, Ellen Blanner, Ryan Davis, who were in [her] staff meeting [the previous] week." Plaintiff also suggested that Ms. Sanders-Chavarria was "[c]ertainly welcome to speak to any others as well…."

i. Plaintiff also explained that the "closing of [her] meeting was all in positive intention and encouraging the team. [Plaintiff] recognized many peoples good work, the workloads, results, some new projects like NFL and the tough climate ahead which would make our efforts important to deliver. [Plaintiff] spoke about [AMC's] budget review going smoothly due in part to all of their work with [Plaintiff] on the planning, being strategic and thinking bottom-up. We didn't inflate estimates, were supporting many key revenue drivers and it served us well as we got most everything approved. [Plaintiff] went on to suggest they be aware and sensitive to others, because some had significant cuts or maybe didn't have as many growth or revenue initiatives going on. [Plaintiff] said something to the effect that it could cause potential jealousies and anxiety given the business climate so consider being overly understanding and considerate in the coming weeks."

j.  Plaintiff also explained that she "suggested [to her team] not to get caught up in speculation, rumors, [to] keep their heads down, [to] focus on the work, [to] stay out of the 'fray.'"  Plaintiff explained that she told her team to "be confident and feel grateful they were working on key efforts which should position them well regardless of the business climate in [Plaintiff's] own opinion.  Plaintiff also explained that "[her] intent was to be authentic in [her] communication, shift focus to what was in their control, laser in on the results but encourage compassion for others given the stressful times."  Plaintiff also explained that "[she] didn't have any details about lay-offs and did not tell the team lay-offs were happening."

k.  On the same day Plaintiff sent the above email to Ms. Sanders-Chavarria, Plaintiff attended a photoshoot with members of her team.  One of Plaintiff's team members approached Plaintiff to explain that someone from Human Resources had already been calling members of Plaintiff's team multiple times.  The team member described the contact with HR as very scary, harassing, and doubling back with questions.  Plaintiff chose not to engage any further with the team member at that time.

l.  Within the next couple days, another team member also affirmatively commented to Plaintiff, in essence, "I don't know what is going on (with HR), but it seems like some sort of witch hunt or something."  The team member's facial expressions were grim when they shared the information.  Plaintiff also advised that team member that it was probably best to not discuss the issue any further.

83.     In the midst of AMC's unsupported RIF "investigation," the parties also participated in a voluntary mediation on September 20, 2019 related to Plaintiff's May 2, 2019 Charge of Discrimination filed with the EEOC.

84.     Upon information and belief, AMC delayed action on its unsupported RIF "investigation" until after the mediation in order to determine whether or not it could utilize the mediation process in order to force Plaintiff to sever her employment relationship with AMC.

85.     After the mediation failed, Plaintiff became concerned that AMC had no interest in resolving the pay equity issues addressed in her May 2, 2019 Charge of Discrimination.

86.     Plaintiff also became concerned that AMC was only interested in finding a way to eliminate Plaintiff.

87.     Plaintiff had no intention of terminating her career at AMC, however, and on September 23, 2019, Plaintiff sent an email to Mr. Colanero and Carla Sanders-Chavarria explaining her sincere desire to remain working at AMC.

88.     Plaintiff explained that she raised the pay equity issues in good faith, and she appealed to AMC's sense of fairness in resolving those issues.

89.     Plaintiff explained that, "[i]f you are open to it, I would welcome a discussion on how to move forward" by remaining with AMC.

90.     Plaintiff explained: "I have always put my heart and soul into my work at AMC and remain committed to that endeavor.  I have continuously grown as an executive and leader in this Company, and, together with my team, have delivered very strong results consistently over the years with increasing breadth of impact. In addition, I continue to spearhead strategic innovations and explorations for the future growth of AMC.  My relationships with internal cross-functional partners, dotted line support to Programming/F&B and key vendor partners are

incredibly strong. The engagement and teamwork within my group has never been more solid. We are achieving some phenomenal accomplishments and realizing incredible synergies. I'm completely invested and have a great deal of equity built up over the last 10 years."

91.     Despite the above, Plaintiff was summoned to a meeting with Mr. Colanero and Carla Sanders-Chavarria on September 30, 2019, and she was informed of her immediate termination effective on October 3, 2019.

92.     Ms. Sanders-Chavarria read from a script in order to explain the pretextual basis for Plaintiff's termination, which related back to the unfounded and retaliatory RIF "investigation" referenced above.

93.     Plaintiff was actually fired because of her sex, female, and because AMC retaliated against her for engaging in protected activity on multiple occasions.

94.     As a direct and proximate result of the wrongful, unlawful, retaliatory, and discriminatory policies, practices, and conduct described above and in the following paragraphs, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, economic damages, emotional distress, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and reputational harm, and will continue to suffer the same unless and until this Court grants the requested relief.

95.     Defendant's conduct was wanton, malicious, willful, or outrageous, was done with reckless disregard of its consequences, or was done with reckless indifference to Plaintiff's federally protected rights, thereby entitling Plaintiff to punitive damages in an amount that will serve to punish Defendant, and will serve to deter Defendant and others, from like conduct in the future.

96. Plaintiff also seeks compensatory damages, lost wages, back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest, punitive damages, equitable relief in the form of front pay, and reasonable attorneys' fees.

97. To the extent any back pay or lost wages are awarded, Plaintiff also seeks an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b).

98. Plaintiff also seeks an award of three years of back pay or lost wages based on Defendant's willful violations of the Equal Pay Act.

## COUNT I—DISCRIMINATION (EQUAL PAY ACT)

99. Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

100. Defendant employed the Plaintiff and one or more members of the opposite sex in positions requiring substantially equal skill, effort, and responsibility.

101. Plaintiff and one or more members of the opposite sex performed their positions under similar working conditions.

102. Plaintiff was paid a lower wage than the members of the opposite sex who were performing substantially equal work under similar working conditions.

103. Plaintiff is now suffering and will continue to suffer irreparable injury and damages as a result of Defendant's discriminatory practices unless and until this Court grants relief.

104. As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

105. As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has suffered past and future pecuniary losses, humiliation, emotional pain, distress, suffering,

inconvenience, mental anguish, loss of enjoyment of life, related compensatory damages, and the additional damages alleged in the preceding paragraphs.

106.　Plaintiff is entitled to recover from Defendant reasonable attorneys' fees, as provided in 29 U.S.C. § 216(b).

107.　To the extent any back pay or lost wages are awarded, Plaintiff also seeks an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b).

108.　Plaintiff also seeks an award of three years of back pay or lost wages based on Defendant's willful violations of the Equal Pay Act.

109.　Defendant acted with malice, willfulness, or reckless indifference to the federally protected rights of Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendant on this Count of her Complaint, for a finding that Plaintiff has been subjected to unlawful discrimination prohibited by the Equal Pay Act; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of an additional, equal amount of back pay as liquidated damages pursuant to 29 U.S.C. § 216(b); for an award of three years of back pay and liquidated damages based on Defendant's willful violations of the Equal Pay Act; for an award of additional lost wages or back pay calculated from the date of Plaintiff's unlawful termination through the date of trial; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for equitable relief including reinstatement to a non-hostile, offensive, or intimidating work environment where Plaintiff is not subjected to discriminatory conduct and/or other hostile, offensive, or intimidating treatment; for Plaintiff's costs expended; for Plaintiff's reasonable attorneys' fees and expert's fees; for all other statutory or common law damages available to Plaintiff for a finding of liability on this count; for damages

in such an amount as shall be fair and reasonable in excess of $75,000 for all injuries and damages alleged in the preceding paragraphs; and for such other and further relief the Court deems just and equitable under the circumstances.

## COUNT II—RETALIATION (EQUAL PAY ACT)

110. Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

111. Plaintiff complained to Defendant that she was being discriminated against on the basis of sex, and Plaintiff filed an EEOC charge asserting rights under the Equal Pay Act and Title VII.

112. Plaintiff reasonably believed that she was being discriminated against on the basis of sex.

113. Plaintiff was subjected to materially adverse actions and was later discharged after she complained to her employer and filed an EEOC charge.

114. The Plaintiff's treatment and discharge might well dissuade a reasonable worker in the same or similar circumstances from making or supporting a charge of discrimination.

115. There was a causal connection between Plaintiff's activity (i.e. her informal complaints to her employer and her EEOC charge) and the materially adverse actions and discharge imposed by Defendant.

116. Plaintiff is now suffering and will continue to suffer irreparable injury and damages as a result of Defendant's discriminatory practices unless and until this Court grants relief.

117. As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

118.    As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has suffered past and future pecuniary losses, humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, related compensatory damages, and the additional damages alleged in the preceding paragraphs.

119.    Plaintiff is entitled to recover from Defendant reasonable attorneys' fees, as provided in 29 U.S.C. § 216(b).

120.    To the extent any back pay or lost wages are awarded, Plaintiff also seeks an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b).

121.    Plaintiff also seeks an award of three years of back pay or lost wages based on Defendant's willful violations of the Equal Pay Act.

122.    Defendant acted with malice, willfulness, or reckless indifference to the federally protected rights of Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendant on this Count of her Complaint, for a finding that Plaintiff has been subjected to unlawful discrimination prohibited by the Equal Pay Act; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of an additional, equal amount of back pay as liquidated damages pursuant to 29 U.S.C. § 216(b); for an award of three years of back pay and liquidated damages based on Defendant's willful violations of the Equal Pay Act; for an award of additional lost wages or back pay calculated from the date of Plaintiff's unlawful termination through the date of trial; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for equitable relief including reinstatement to a non-hostile, offensive, or intimidating work environment where Plaintiff is not subjected to discriminatory conduct and/or other hostile, offensive, or intimidating treatment; for Plaintiff's

costs expended; for Plaintiff's reasonable attorneys' fees and expert's fees; for all other statutory or common law damages available to Plaintiff for a finding of liability on this count; for damages in such an amount as shall be fair and reasonable in excess of $75,000 for all injuries and damages alleged in the preceding paragraphs; and for such other and further relief the Court deems just and equitable under the circumstances.

## COUNT III—DISCRIMINATION (TITLE VII)

123.    Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

124.    Defendant employed the Plaintiff and one or more members of the opposite sex in positions requiring substantially equal skill, effort, and responsibility.

125.    Plaintiff and one or more members of the opposite sex performed their positions under similar working conditions.

126.    Plaintiff was paid a lower wage than the members of the opposite sex who were performing substantially equal work under similar working conditions.

127.    Defendant discriminated against Plaintiff with respect to her compensation, promotion, terms, conditions, or privileges of her employment because of her sex in violation of Title VII and/or otherwise adversely affected her status as an employee because of her sex in violation of Title VII.

128.    Plaintiff is now suffering and will continue to suffer irreparable injury and damages as a result of Defendant's discriminatory practices unless and until this Court grants relief.

129.    As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

130. As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has suffered past and future pecuniary losses, humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, related compensatory damages, and the additional damages alleged in the preceding paragraphs.

131. Plaintiff is entitled to recover from Defendant reasonable attorneys' fees, as provided in Section 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

132. Defendant acted with malice, willfulness, or reckless indifference to the federally protected rights of Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendant on this Count of her Complaint, for a finding that Plaintiff has been subjected to unlawful discrimination prohibited by the Equal Pay Act; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of an additional, equal amount of back pay as liquidated damages pursuant to 29 U.S.C. § 216(b); for an award of three years of back pay and liquidated damages based on Defendant's willful violations of the Equal Pay Act; for an award of additional lost wages or back pay calculated from the date of Plaintiff's unlawful termination through the date of trial; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for equitable relief including reinstatement to a non-hostile, offensive, or intimidating work environment where Plaintiff is not subjected to discriminatory conduct and/or other hostile, offensive, or intimidating treatment; for Plaintiff's costs expended; for Plaintiff's reasonable attorneys' fees and expert's fees; for all other statutory or common law damages available to Plaintiff for a finding of liability on this count; for damages in such an amount as shall be fair and reasonable in excess of $75,000 for all injuries and

damages alleged in the preceding paragraphs; and for such other and further relief the Court deems just and equitable under the circumstances.

## COUNT IV—RETALIATION (TITLE VII)

133.    Plaintiff hereby incorporates each preceding paragraph as though fully set forth herein.

134.    Plaintiff complained to Defendant that she was being discriminated against on the basis of sex, and Plaintiff filed an EEOC charge asserting rights under the Equal Pay Act and Title VII.

135.    Plaintiff reasonably believed that she was being discriminated against on the basis of sex.

136.    Plaintiff was subjected to materially adverse actions and was later discharged after she complained to her employer and filed an EEOC charge.

137.    The Plaintiff's treatment and discharge might well dissuade a reasonable worker in the same or similar circumstances from making or supporting a charge of discrimination.

138.    There was a causal connection between Plaintiff's activity (i.e. her informal complaints to her employer and her EEOC charge) and the materially adverse actions and discharge imposed by Defendant.

139.    Plaintiff is now suffering and will continue to suffer irreparable injury and damages as a result of Defendant's discriminatory practices unless and until this Court grants relief.

140.    As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has been deprived of income and other monetary and non-monetary benefits.

24

141.     As a direct and proximate result of Defendant's actions and/or inactions, Plaintiff has suffered past and future pecuniary losses, humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, related compensatory damages, and the additional damages alleged in the preceding paragraphs.

142.     Plaintiff is entitled to recover from Defendant reasonable attorneys' fees, as provided in Section 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

143.     Defendant acted with malice, willfulness, or reckless indifference to the federally protected rights of Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendant on this Count of her Complaint, for a finding that Plaintiff has been subjected to unlawful discrimination prohibited by the Equal Pay Act; for an award of back pay, including lost fringe benefits, bonuses, costs of living increases and other benefits including interest; for an award of an additional, equal amount of back pay as liquidated damages pursuant to 29 U.S.C. § 216(b); for an award of three years of back pay and liquidated damages based on Defendant's willful violations of the Equal Pay Act; for an award of additional lost wages or back pay calculated from the date of Plaintiff's unlawful termination through the date of trial; for an award of front pay in a reasonable amount; for an award of compensatory and punitive damages; for equitable relief including reinstatement to a non-hostile, offensive, or intimidating work environment where Plaintiff is not subjected to discriminatory conduct and/or other hostile, offensive, or intimidating treatment; for Plaintiff's costs expended; for Plaintiff's reasonable attorneys' fees and expert's fees; for all other statutory or common law damages available to Plaintiff for a finding of liability on this count; for damages in such an amount as shall be fair and reasonable in excess of $75,000 for all injuries and

damages alleged in the preceding paragraphs; and for such other and further relief the Court deems just and equitable under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues.

Respectfully submitted,

**BEAVER LAW FIRM, LLC**

/s/ Chad C. Beaver
_____
Chad C. Beaver          MO Bar No. 54141
Beaver Law Firm, LLC
(816) 226-7750 | Office
(816) 817-0540 | Fax
cbeaver@beaver-law.com
1600 Genessee Street, Suite 920
Kansas City, Missouri 64102
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2019, a copy of the above and foregoing document was served by:

(__) Filing it with the Court's CM/ECF system;
(__) U.S. Mail, postage-prepaid;
(__) Facsimile;
(_X_) Email;
(__) Federal Express; and/or,
(__) Hand delivery, upon:

Kerri S. Reisdorff
Chris R. Pace
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, MO 64111
kerri.reisdorff@ogletree.com
chris.pace@ogletree.com
*Attorneys for Defendant*
*American Multi-Cinema, Inc.*

/s/ Chad C. Beaver_____
ATTORNEY FOR PLAINTIFF