## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

TONYA MANGELS,               )
                                          )
           **Plaintiff,**         )
                                          )
          **v.**               )     **Case No. 4:19-cv-00834-BP**
                                          )
**AMERICAN MULTI-CINEMA, INC.,**    )
                                          )
          **Defendant.**        )

## DEFENDANT AMERICAN MULTI-CINEMA, INC.'S SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ *Kerri S. Reisdorff*
Kerri S. Reisdorff     MO #51423
Chris R. Pace         MO #47344
Michael L. Matula     MO #47568
AnnRene Coughlin    MO #67962
4520 Main Street, Suite 400
Kansas City, MO 64111
(816) 471-1301
(816) 471-1303 (*facsimile*)
kerri.reisdorff@ogletree.com
chris.pace@ogletree.com
annrene.coughlin@ogletree.com
michael.matula@ogletree.com

**ATTORNEYS FOR DEFENDANT**

# TABLE OF CONTENTS

INTRODUCTIONp .................................................................................... 1

I.     STATEMENT OF UNCONTROVERTED FACTS .................................. 3

II.    SUMMARY JUDGMENT STANDARD ............................................... 48

III.   ARGUMENT AND AUTHORITIES .................................................... 50

     A.   Mangels' Intentional Discrimination and Retaliation Claims Fail as a Matter of Law .................................................................................. 50

     i.   Summary of Undisputed Material Facts ...................................... 50

     ii.   Mangels' Title VII Gender Discrimination Claim Contained in Count III should be Dismissed as a Matter of Law for Multiple Reasons ........... 57

         a.   Mangels cannot Meet Her Prima Facie Burden .......................... 57

         b.   Mangels cannot Show AMC's Legitimate, Non-discriminatory Reasons for Her Termination are Pretext for Unlawful Gender Discrimination ................................................... 60

         c.   Mangels cannot Meet her Burden of Demonstrating a Material Question of Fact as to Pretext ..................................... 60

     iii.   Mangels' Retaliation Claims in Counts II and IV should be Dismissed as a Matter of Law .............................................. 66

     B.   Mangels' Equal Pay Act Claim for Discrimination Must be Dismissed ........... 71

     i.   Mangels Cannot Establish a *Prima Facie* Case Under the EPA ............ 73

     C.   Mangels Title VII Wage Discrimination Claim Fails as a Matter of Law ........... 81

CONCLUSION .......................................................................................... 83

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................49

*Beasley v. Warren Unilube, Inc.*,
    933 F.3d 932 (8th Cir. 2019) ....................................................................................59

*Berg v. Norand Corp.*,
    169 F.3d 1140 (8th Cir. 1999) .............................................................................73, 79

*Bone v. G4S Youth Servs., LLC*,
    686 F.3d 948 (8th Cir. 2012) ..............................................................................60, 62

*Buettner v. Arch Coal Sales Co., Inc.*,
    216 F.3d 707 (8th Cir. 2000) .....................................................................................81

*Canning v. Creighton Univ.*,
    995 F.3d 603 (8th Cir. 2021) .....................................................................................61

*Carrington v. City of Des Moines, Iowa*,
    481 F.3d 1046 (8th Cir. 2007) ............................................................................67, 68

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548 (1986)...................................................................48, 49

*Day v. Cole County Comm'n*,
    No. 12-4051-CV-C-BP, 2013 WL 1189505 (W.D. Mo. March. 22, 2013)............................59

*E.E.O.C. v. Affiliated Foods, Inc.*,
    No. 81-6066-CV-SJ, 1984 WL 980 (W.D. Mo. Apr. 5, 1984).........................................71, 72

*EEOC v. Port Auth. of New York and New Jersey*,
    768 F.3d 247 (2d. Cir. 2014)..........................................................71, 72, 73, 77, 78

*Equal Emp. Opportunity Comm'n v. Universal Underwriters Ins. Co.*,
    653 F.2d 1243 (8th Cir. 1981) ..........................................................71, 72, 77, 81

*Evans v. Int'l Paper Co.*,
    936 F.3d 183 (4th Cir. 2019) .....................................................................................72

*Fields v. Shelter Mut. Ins. Co.*,
    520 F.3d 859 (8th Cir. 2008) .....................................................................................58

Case 4:19-cv-00834-BP   Document 98   Filed 07/20/21   Page 3 of 91

*Forrest v. Kraft Foods, Inc.*,
  285 F.3d 688 (8th Cir. 2002) ............................................... 59

*Fosen v. N.Y. Times*,
  2006 WL 2927611 (S.D.N.Y. Oct.11, 2006) .......................... 63

*Freeman v. Ace Tel. Ass'n.*,
  467 F.3d 695 (8th Cir. 2006) ............................................... 70

*Fry v. Parcelite Solutions*,
  2012 WL 12895682 (W.D. Mo. Aug. 6, 2012) .................... 62, 64

*Gagnon v. Sprint Corp.*,
  284 F.3d 839 (8th Cir. 2002) ............................................... 66

*Garang v. Smithfield Farmland Corp.*,
  439 F.Supp.3d 1073 (N.D. Ia. 2020) ................................... 58

*Gibson v. Concrete Equip. Co., Inc.*,
  960 F.3d 1057 (8th Cir. 2020) ............................................. 57

*Greene v. Dalton*,
  164 F.3d 671 (D.C. Cir. 1999) ............................................. 49

*Griffith v. City of Des Moines, IA*,
  387 F.3d 733 (8th Cir. 2004) ....................................... 2, 67, 68

*Harris v. Colvin*,
  2013 WL 12074969 (W.D. Mo. Nov. 26, 2013) ..................... 58

*Hennick v. Schwans Sales Enters. Inc.*,
  168 F. Supp. 2d 938 (S.D. Iowa 2001) ................................. 82

*Herr v. Airborne Freight Corp.*,
  130 F.3d 359 (8th Cir. 1997) ............................................... 66

*Hill v. City of Pine Bluff, Arkansas*,
  696 F.3d 709 (8th Cir. 2012) ............................................... 66

*Hodgson v. Corning Glass Works*,
  474 F.2d 226 (2d Cir. 1973), *Aff'd,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1
  (1974) .............................................................................. 71

*Horner v. Mary Inst.*,
  613 F.2d 706 (8th Cir. 1980) ................................... 71, 72, 73, 80

*Hutchins v. Int'l Bhd. of Teamsters*,
  177 F.3d 1076 (8th Cir. 1999) ......................................... 73, 80

Case 4:19-cv-00834-BP   Document 98   Filed 07/20/21   Page 4 of 91

*Kasper v. Federated Mut. Ins. Co.*,
425 F.3d 496 (8th Cir. 2005) .......................................................................68

*Kiel v. Select Artificials, Inc.*,
169 F.3d 1131 (8th Cir. 1999) .......................................................................70

*Kight v. Auto Zone, Inc.*,
494 F.3d 727 (8th Cir. 2007) .......................................................................59

*Kneibert v. Thomson Newspapers, Michigan, Inc.*,
129 F.3d 444 (8th Cir. 1997) .......................................................................62

*Lake v. Yellow Transp., Inc.*,
596 F.3d 871 (8th Cir. 2010) .......................................................................57

*Lawrence v. CNF Tramp., Inc.*,
340 F.3d 486 (8th Cir. 2003) .......................................................................73

*Lenzen v. Workers Comp. Reinsurance Ass'n*,
705 F.3d 816 (8th Cir. 2013) .......................................................................70

*Lewis v. Honeywell*,
No. 19-00017-CV-W-BP (W.D. Mo. Apr. 21, 2020) ............................................57

*Littleton v. Pilot Travel Ctrs., LLC*,
568 F.3d 641 (8th Cir. 2009) .......................................................................71

*Ma v. Missouri State Univ.*,
2014 WL 11512555 (W.D. Mo. Sept. 3, 2014) ...................................................58

*Marshall v. Building Maint. Corp.*,
587 F.2d 567 (2d Cir. 1978)..........................................................................71

*McCullough v. Univ. of Ark. for Med. Servs*,
, 559 F.3d 855 (8th Cir. 2009) .................................................................60, 61

*McLaughlin v. Esselte Pendaflex Corp.*,
50 F.3d 507 (8th Cir. 1995) .......................................................................79

*Muor v. U.S. Bank Nat. Ass'n*,
716 F.3d 1072 (8th Cir. 2013) .......................................................................58

*Orahood v. Bd. of Trustees of Univ. of Arkansas*,
645 F.2d 651 (8th Cir. 1981) .................................................................72, 73

*Price v. N. States Power Co.*,
664 F.3d 1186 (8th Cir. 2011) .................................................................71, 81

*Reed v. City of St. Charles, Mo.*,
  561 F.3d 788 (8th Cir. 2009) ........................................................................50

*Rinchuso v. Brookshire Grocery Co.*,
  944 F.3d 725 (8th Cir. 2019) ........................................................................59

*Riser v. Target Corp.*,
  458 F.3d 817 (8th Cir. 2006) ........................................................................59

*Robinson v. American Red Cross*,
  753 F.3d 749 (8th Cir. 2014) ........................................................................57

*Rothmeier v. Investment Advisers, Inc.*,
  85 F.3d 1328 (8th Cir. 1996) ........................................................................66

*Satcher v. Bd. of Trustees of Univ. of Ark.*,
  2008 WL 906692 (E.D. Ark. Apr. 1, 2008), aff'd 558 F.3d 731 (8th Cir. 2009) ..................63

*Scarborough v. Federated Mut. Ins. Co.*,
  996 F.3d 499 (8th Cir. 2021) ........................................................................61

*Shirrell v. Saint Francis Med. Ctr.*,
  24 F.Supp.3d 859 (E.D. Mo. 2014).................................................................57

*Smith v. Ashland, Inc.*,
  250 F.3d 1167 (8th Cir. 2001) ......................................................................68

*Stopka v. Alliance of Am. Insurers*,
  141 F.3d 681 (7th Cir. 1998) ...................................................................77, 78

*Stuart v. Gen. Motors, Corp.*,
  217 F.3d 636 (8th Cir. 2000) ...................................................................70, 71

*Taylor v. White*,
  321 F.3d 715 (8th Cir. 2003) ...................................................................79, 80

*Tenkku v. Normandy Bank*,
  348 F.3d 737 (8th Cir. 2003) ...............................................................79, 81, 82

*Tolen v. Ashcroft*,
  377 F.3d 879 (8th Cir. 2004) ........................................................................58

*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) (en banc) ...............................................49, 60, 61

*Univ. of Tex. Southwestern Med. Ctr v. Nassar*,
  133 S.Ct. 2517 (2013)...................................................................................66

*Williams v. United Parcel Serv., Inc..*,
 963 F.3d 803 (8th Cir. 2020) .......................................................................................58, 61

*Yearns v. Koss Constr. Co.*,
 964 F.3d 671 (8th Cir. 2020) .................................................................................................66

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e ...............2, 50, 57, 66, 71, 81, 82, 83

Equal Pay Act, 29 U.S.C. § 206(d)(1) ..........................2, 66, 71, 72, 73, 77, 78, 79, 80, 81, 82, 83

**Other Authorities**

29 C.F.R. § 1620.13(e)(1998) ........................................................................................................73

Fed. R. Civ. P. 56 ......................................................................................................................3, 48

Local Rule 56.1 ................................................................................................................................3

# INTRODUCTION

Plaintiff Tonya Mangels ("Mangels") admits it is reasonable for an employer: to expect employees to be truthful, candid and forthright during an internal investigation; to rely on information provided by employees during an investigation; to expect officers of a company not to disclose non-public information related to a layoff before it is announced; and to expect officers to exercise good business judgment. With respect to the latter, Mangels acknowledges her impression of what constitutes good business judgment may not be the same as another's impression. American Multi-Cinema, Inc. ("AMC") certainly agrees with Mangels' admissions—especially given Mangels' prior position as an officer of AMC. Despite her admissions, Mangels seeks in this lawsuit to inappropriately usurp AMC's business judgment with her own.

Mangels first takes issue with a disciplinary warning she received in June 2018—inferring that, in her opinion, the discipline was too harsh. Mangels was disciplined after an internal investigation found Mangels (and another officer) engaged in inappropriate touching in front of subordinate employees at an AMC event and misused business expenses. Mangels was also found to have engaged in other behavior that violated AMC's expectations for officers. Mangels cannot dispute what witnesses (mostly women) told AMC during its investigation. Undeterred, Mangels asserts the discipline was motivated by her gender—but offers no evidence to support that theory. Mangels also frivolously asserts a comment she made after she was made aware of the accusations against her was the "but for" reason for the disciplinary warning (as opposed to her serious misconduct). The Eighth Circuit has specifically rejected such an argument and found that "complaining of discrimination in response to a charge of workplace misconduct is an abuse of

the anti-retaliation remedy." *Griffith v. City of Des Moines, IA*, 387 F.3d 733, 738-39 (8th Cir. 2004).[1]

A little over a year after her disciplinary warning (and after AMC invested time and resources into helping Mangels meet its expectations), AMC unexpectedly received complaints regarding Mangels from two female officers on the same day. Like in 2018, the unbiased witnesses' version of the events differed materially from Mangels'. All but one witness was female and they had no knowledge of any prior complaints (internal or external) made by Mangels. Again, Mangels cannot dispute what witnesses told AMC. Nor can she empanel a jury to substitute her own judgment for AMC's. Faced with an officer who repeatedly violated its expectations for officers, and was unwilling to accept any responsibility or acknowledge she could have behaved better, AMC separated Mangels. Mangels' assertion that her separation was motived by her gender or that her prior complaints was the "but for" reason for her separation is directly belied by her own female colleagues and team (as well as Eighth Circuit jurisprudence). Put simply, Mangels cannot demonstrate that AMC's business decisions were not honest or reasonable and the real reason for AMC's decisions was to unlawfully discriminate and retaliate against Mangels. Accordingly, Mangels' claims of unlawful gender discrimination and retaliation fail as a matter of law.

Mangels also asserts claims of unequal pay under the Equal Pay Act, 29 U.S.C. § 215(d) and Title VII of the Civil Rights Act, 42 U.S.C. §2000e, but these also fail as a matter of law. Mangels hand picks five male vice presidents ("VPs")—all of whom held distinctly different roles with distinctly different responsibilities—and complains they were compensated at a higher rate.

---

[1] Mangels also seeks to usurp AMC's business judgment by arguing that AMC should not have considered her June 2018 disciplinary warning in her overall performance review score for 2018 (or should have given her an overall score one level up).

But Mangels' wage discrimination claims fail because she cannot demonstrate they performed "equal work." The uncontroverted facts show they did not, and the functions these five hand-picked males performed for AMC were valued more highly than the functions Mangels performed. Mangels' wage discrimination claims are further undermined by AMC's 2017 study demonstrating that female employees at its headquarters (where Mangels worked) were not paid less than male employees, and its more contemporary analysis demonstrating there is no statistically significant difference in compensation between male and female VPs. This, coupled with the undisputed fact that AMC's highest paid VP in 2016, 2017, and 2019 was female, and three of the five highest paid VPs in 2019 were female, renders Mangels' wage discrimination claims meritless.

AMC simply did not discriminate or retaliate against Mangels in any way. AMC's decisions in relation to Mangels were reasonabe, and certainly not unlawful. For the reasons set forth herein, Mangels' lawsuit should be dismissed in its entirety and judgment entered in favor of AMC.

## I.  STATEMENT OF UNCONTROVERTED FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, AMC submits the following statement of uncontroverted material facts ("SOF") in support of its Motion for Summary Judgment.[2]

---

[2] An index of the exhibits identified by Defendant is attached as Ex. 63.

**Introduction**

1.      AMC's headquarters—known as the Theatre Support Center (TSC)—is located in Leawood, Kansas. (Ex. 1, Deposition of Carla Chavarria ("Chavarria Dep.") at 100:20-25; 101:1-3[3].)

2.      Mangels was hired by AMC as a Director in AMC's Marketing Department in 2009.[4] (Ex. 2, Deposition of Tonya Mangels ("Mangels Dep."), at 173:6-8; Ex. 3, Declaration of Carla Chavarria ("Chavarria Dec."), ¶ 3.)

3.      In December 2009, Stephen Colanero was hired by AMC as an Executive Vice President ("EVP") and Chief Marketing Officer. Colanero became Mangels' direct supervisor in November 2010 and remained her supervisor until her separation in September 2019. (Ex. 4, Deposition of Stephen Colanero ("Colanero Dep.") at 22:6-7; 30:9-12; 100:6-8; Ex. 2, Mangels Dep., at 174:1-8; Ex. 5, Declaration of Stephen Colanero ("Colanero Dec."), at ¶¶ 2, 3.)

4.      In June 2013, Colanero promoted Mangels to Vice President ("VP") and she remained a VP for the remainder of her employment. Upon her promotion, AMC's Compensation Department awarded Mangels a 12½% increase to her base salary. (Ex. 4, Colanero Dep., at 101:1-3; 186:6-25; 187:14-18; Ex. 5, Colanero Dec., at ¶ 4.)

5.      At no time during her employment as VP did anyone hold the same position as Mangels (concurrently). (Ex. 2, Mangels Dep., at 191:5-17.)

---

[3] For economy and efficiency purposes, AMC is only attaching the deposition excerpts relied upon herein. In the event the Court would like a full transcript of any of the depositions, AMC would be happy to provide.

[4] Jennifer Douglass was Mangels' first supervisor. Douglass was promoted by AMC in 2018 to SVP, Food & Beverage. (Ex. 2, Mangels Dep., at 173:9-12, 21-25; 174:1-4.)

**AMC's Compensation, Responsibilities, and Job Content**

6.     Like most publicly traded companies, AMC maintains a workforce of employees who occupy different "levels" of job, including hourly employees who assist with clerical functions; exempt employees in individual contributor roles; managers who oversee those employees; directors who supervise managers and below; vice presidents, who are officers of the corporation, who generally supervise directors and below; senior vice presidents who supervise vice presidents and below and report to either an executive vice president or the CEO; and executive vice presidents who supervise vice presidents and senior vice presidents and report to the CEO. (Ex. 3, Chavarria Dec., ¶ 34.)

7.     At AMC, VPs lead an organization that has unique responsibilities and functions. No two VPs at AMC have the same portfolio of responsibilities. Each VP is charged with a unique set of responsibilities to deliver on performance metrics that are tailored to their position. AMC's shareholders expect the company to structure its management ranks efficiently, and it would be inefficient and cause organizational confusion if more than one VP was responsible for the same set of duties and responsibilities. (Ex. 3, Chavarria Dec., ¶ 35.)

8.     AMC reviews compensation on an annual basis for all officers (VPs and above). This is referred to as the annual merit review. (Ex. 1, Chavarria Dep., at 93:3-6.)

9.     All requests for review of compensation are submitted to AMC's Compensation Department. Ex. 56, Deposition of Michael Giuseffi ("Giuseffi Dep.") at 16:18-21:1.)

10.    At no time did Colanero (or any manager) have the authority to unilaterally increase the salary or compensation of a member of the Marketing Department. Colanero would make a recommendation to the Compensation Department and ultimately, the Chief Executive Officer

reviewed and approved all changes recommended by the Compensation Department for officers. (Ex. 56, Giuseffi Dep., at 16:18-21:1; Ex. 4, Colanero Dep., at 90:5-15.)

11.     As with his peers, Colanero was not provided, nor did he have access to, the compensation of any AMC associate outside of the Marketing Department. Put, simply, Colanero had no knowledge as to what any VP made at AMC who was not in the Marketing Department. (Ex. 4, Colanero Dep., at 176:15-25; 177:1-8; 314:5-23; Ex. 2, Mangels Dep., at 69:9-24; Ex. 54, audio recording, and audio transcript at 23:13-24:15.)

12.     In 2017, AMC engaged Willis Towers Watson, an HR consulting firm, to conduct an analysis of AMC's compensation practices and procedures to assess whether there were any differences in compensation between male and female employees. (Ex. 1, Chavarria Dep., at 94, 97.)  The analysis did not identify any pay disparities between male and female employees among AMC's TSC employees (Ex. 1, Chavarria Dep., at 98.)

13.     AMC engaged Dr. Thornton, a Ph.D. economist specializing in econometrics and statistical analysis, to conduct an analysis of compensation paid to male and female VPs at AMC. (Ex. 6, Janet Thornton Expert Report, ¶¶ 1-10.)

14.     Dr. Thornton analyzed compensation paid to AMC VPs between 2016 and 2019, controlling for the department in which the VP was employed, their level of experience, and their job level. She also performed the same analysis, this time controlling for performance rating history. (*Id.*)

15.     Dr. Thornton did not identify any statistically significant differences in compensation paid to male and female VPs during any of the years she studied. (Ex. 6, Thornton Report, ¶ 10.)

16.     While there were no statistically significant compensation disparities between men and women, in each year, there were statistically insignificant compensation differences between men and women. Those disparities favored women in at least half the years, and sometimes more depending on the controls employed. (Ex. 6, Thornton Report, Table 1.)

17.     Each VP has unique and very specific Key Performance Metrics (KPMs) that are identified each performance year. Mangels is unaware of anyone else who had the same KPMs as she did. (Ex. 1, Chavarria Dep., at 36:16-23; Ex. 2, Mangels Dep., at 211:11-21.)

18.     While each VP has unique KPMs, all VPs are also reviewed based upon a set of common behavioral expectations, including decision making/judgment and integrity/ethics. (Ex. 2, Mangels Dep., at 212:9-23.)

19.     VPs are leaders of their respective functions. Each VP is charged with a unique set of responsibilities to deliver on performance metrics that are tailored to their position. (Ex. 3, Chavarria Dec., at ¶ 35.)

20.     To this end, as a VP, Mangels held a "unique" role within AMC in that it was not "single focused." (Ex. 2, Mangels Dep., at 299:20-300:10; 372:4-373:3.)

21.     From 2016 to April 2018, Mangels was located in the Marketing Department and spent most of her time as the VP, Food & Beverage Marketing and Brand Strategy, directing the creation and overseeing implementation of marketing programs for AMC's food and beverage brands and AMC's dine-in theatre concepts. Her core responsibilities included:

    a.    providing marketing support to several groups across AMC, including food and beverage, pricing, programming, and some discrete aspects of guest engagement;

    b.    designing the appearance of the menu and supporting the planning of new menu items that were developed by the Food and Beverage organization, *e.g.*, suggesting trending foods/toppings and considering the erosion a new item could have on existing items;

      c.      leading AMC's side of a joint marketing relationship with key food and beverage vendors (e.g., Coca-Cola), overseeing vendors providing marketing services, and leading marketing integration for other theatre brands AMC acquired.

(Ex. 8 (Dep. Ex. 66), Job Questionnaire for VP, Food and Beverage Marketing and Brand Strategy;

Ex. 2, Mangels Dep., 191:22-193:3.)

      22.     In fall 2018, Mangels prepared a "Job Questionnaire" (AMC's version of a job description), after she traded some job duties with Carrie Trotter and her job title changed to "Vice President, Product Marketing." According to Mangels' Job Questionnaire, her job duties in the "Product Marketing" role involved:

      a.      Providing marketing support for the film department and digital merchandising strategy (35%);

      b.      supervisory authority over marketing of food and beverage products (15%);

      c.      management of the Coca-Cola joint marketing partnership (10%);

      d.      management of AMC's dine-in and MacGuffin's Bar concepts and menus (15%);

      e.      leading digital merchandising strategy (menu boards, box office, auditorium) and managing relationship with digital signage vendors (10%); and

      f.      leading marketing efforts for various technology-based initiatives, such as mobile food and beverage ordering, kiosk ordering, AMC's digital retail on-demand storefront, studio retail merchandise, and e-commerce flash sales (15%).

(Ex. 9 (Dep. Ex. 86), Job Questionnaire for VP, Product Marketing; Ex. 2, Mangels Dep., at

298:11-300:10.)

      23.     Mangels was not responsible for any of the following: the redesign or overhaul of AMC Stubs; preparing and responding to corporate internal or external communications on behalf of AMC; food and beverage operations; leading contract negotiations with movie studios; negotiating contracts for movie trailers; or determining ticket pricing. (Ex. 2, Mangels Dep., at 369:20-371:6; Ex. 5, Colanero Dec., ¶¶ 28, 34, 35.)

24.     Mangels also did not have regular or frequent contact with AMC's Chief Executive

Officer. (Ex. 10, Deposition of Adam Aron ("Aron Dep."), at 99:5-100:6.)

**<u>Mangels' Alleged Comparators</u>**

25.     During the relevant time-period, there were 53 AMC VPs. (Ex. 3, Chavarria Dec.,

at ¶ 37.)

26.     Mangels identifies five of these VPs, each of whom is male, as alleged comparators:

Julius Lai, Frank Ybarra, Michael Pursell, Rob Kim, and Robert Lane. None of these comparators

had all of the same "Key Performance Metrics" as Mangels. (Ex. 2, Mangels Dep., at 40:22-25,

43:7-11, 55:10-12, 56:2-11.)

27.     Julius Lai was hired by AMC in November 2015 as the VP, Guest Engagement.

(Ex. 11, Deposition of Julius Lai ("Lai Dep.") at 25:2-19.)

   a.     Lai has over 10 years of experience in designing and/or managing customer loyalty
          programs. Lai was recruited by AMC because of his demonstrated experience with
          the dynamics of consumers and their needs, and his understanding of how that
          translates to the consumer's repeated consumption of a product. (Ex. 5, Colanero
          Dec., at ¶¶ 30; Ex. 11, Lai Dep., 9:3-14:13.)

   b.     Lai reported to Stephen Colanero. He was responsible for formulating and
          implementing strategies to directly engage with guests by way of two primary
          channels: (1) AMC's guest loyalty program (AMC Stubs); and (2) AMC's digital
          properties (website, mobile app, and social media platforms). Lai spent most of his
          time restructuring and redesigning AMC's guest loyalty program, AMC Stubs. (Ex.
          5, Colanero Dec., at ¶¶ 31, 33.)

   c.     After Lai's redesign of the AMC Stubs program, the number of members of AMC
          Stubs increased from 5 million in 2015 to approximately 24 million by 2018. In the
          first quarter of 2019, AMC Stubs members represented 44% of all AMC attendees.
          Members of this program drove an average of 2.1 times the amount of gross revenue
          compared to non-members of this program. Additionally, the data AMC is able to
          gain about its AMC Stubs members because of Lai's work provides it with
          significant market insight into movie-goer preferences and allows AMC to broaden
          and refine its effort to support Hollywood studio partners, which provides it with
          value with which to negotiate with the studios for return value to AMC. (Ex. 5,
          Colanero Dec., at ¶ 33.)

d.　According to AMC's CEO, Lai's job duties were radically different from Mangels'; Lai was far more senior and far more important to the business, and his job duties impacted the business far more than Mangels'. Because of Lai's success as VP, Guest Engagement, he was promoted to a senior vice president ("SVP") role in fall 2018. (Ex. 10, Aron Dep. at 82:6-83:7; Ex. 5, Colanero Dec., at ¶ 32.)

e.　Mangels claims Lai is a comparator only from October 2016 to fall 2018 (i.e., prior to his promotion to SVP). (Ex. 2, Mangels Dep., at 45:3-14.)

28.　Francisco ("Frank") Ybarra was the VP, Communications. He entered this role when he began working for AMC in July 2014. Including his time at AMC, Ybarra has over 25 years' experience in public and/or internal communications. (Ex. 12, Deposition of Frank Ybarra ("Ybarra Dep."), at 7:4-5, 10:12-13:7.)

a.　From October 2016 to October 2019, Ybarra's primary job function was to create and manage internal and formerly external communications on AMC's behalf. Internally, Ybarra crafted communications from the CEO, other senior leaders, and administrative departments to update associates on policy changes, upcoming events, and key initiatives (among others). Externally, Ybarra was responsible for crafting not only the substantive response to media outlets seeking comment from AMC, but also the strategy behind media communications. (Ex. 5, Colanero Dec., at ¶ 26.)

b.　Ybarra was also responsible for organizing significant internal employee events throughout the year, including AMC's annual "Connections" event and other large employee meetings. (Ex. 12, Ybarra Dep., at 37:16-40:2.)

c.　It was Ybarra's job to respond, on AMC's behalf, to internal and formerly external crises as they arise. This required him to be available and responsive to the CEO on a "24/7" basis, and required him to office very close to the CEO. According to AMC's CEO, Ybarra's job was radically different from Mangels'; Ybarra was far more senior and far more important to the business, and his job duties impacted the organization far more than Mangels'. (Ex. 5, Colanero Dec., at ¶ 27; Ex. 10, Aron Dep., at 82:6-83:7.)

29.　Michael Pursell was hired by AMC in 2015 as its VP, Food & Beverage, and held this role through at least October 2019. Pursell has over 20 years of experience in food and beverage industry, including prior experience as a director of food and beverage, and had former

training in culinary arts. (Ex. 13, Deposition of Michael Pursell ("Pursell Dep."), at 11:3-15:21, 20:8-21:2.)

a. Pursell worked on food and beverage, mobile ordering for food and beverage products, and food and beverage merchandising. He was responsible for the operations of the food and beverage side of AMC's business. Two thirds of AMC's revenue is associated with its food and beverage products. (Ex. 2, Mangels Dep., at 372:4-373:3; Ex. 13, Pursell Dep., at 65:2-66:4; Ex. 14, Audio and Transcript of May 30, 2018 Meeting[5].)

b. Pursell sourced new products, determined whether he was getting the best price, assessed the financial viability of the product, and created the business case for them. He led a team that implemented new product offerings and then managed them. This process involved ensuring each theatre had the resources necessary to prepare and serve the products and that the products were served fresh. (Ex. 15, Declaration of Jennifer Douglass ("Douglass Dec."), at ¶ 8.)

c. Pursell was also responsible for food and beverage packaging, preparation, and safety. He was also focused on the customer experience with food and beverage products, including the ordering process and overall guest satisfaction. Pursell's role required good relationships and consistent communication with AMC's "field associates," the theatre management team and associates working at the food and beverage counter, to ensure expectations related to supply chain, inventory management, and quality control of the food and beverage items were met. (Ex. 15, Douglass Dec., at ¶¶ 9-10.)

d. On a recording Mangels took on May 30, 2018, she states she had "different responsibilities" than Pursell. She adds that he was leading "operational strategy" of the food and beverage division, while she was leading the "marketing strategy." (Ex. 14, Audio and Transcript of May 30, 2018 Meeting.)

30. Rob Kim began working for AMC in 1995. He became a director in 2006, and later became a VP. From at least October 2016 to his separation in August 2019, his job title was VP, Programming Promotion. (Ex. 16, Deposition of Rob Kim ("Kim Dep."), at 15:13-17:11.)

A. Mangels claims Kim is a comparator for only the April 2018 to September 2019 time period, when she took on the "Product Marketing" function. (Ex. 2, Mangels Dep., at 40:22-42:6.)

a. Kim only worked on film-related tasks. He was responsible for business development and shaping AMC's relationship with over 15 movie studios.

---

[5] For the convenience of the Court, AMC is providing both the audio recording produced by Plaintiff and also a transcript of the recording that was prepared by a court reporter.

Specifically, Kim was tasked with proposing new agreements with studios under which the studio pays AMC for certain products, and then negotiating those agreements to execution. (Ex. 2, Mangels Dep., 372:4-373:3; Ex. 17, Declaration of Elizabeth Frank ("Frank Dec."), ¶ 7.)

b.  A large portion of Kim's job involved negotiating a payment from the studios in exchange for granting studios movie trailer space during the "previews" that air before the main picture is shown. Kim's 25-year tenure with AMC and the rapport he established with several studios and their executives during that time allowed him to become a "face" of AMC in many respects to the studios and uniquely positioned him for the VP, Programming Promotion role. Mangels admits Kim had "very good" relationships with the studios. (Ex. 16, Kim Dep., at 19:2-21:15; Ex. 2, Mangels Dep., at 369:4-19; Ex. 17, Frank Dec., ¶¶ 8, 10.)

c.  Kim spent a smaller portion of his time on other, non-movie trailer film marketing projects. These involved, for example, cardboard cutouts promoting a new movie placed in a prominent location in the theatres and direct emails to AMC Stubs members. Mangels created a "menu" of these and other various film marketing options that Kim could then offer the studios in exchange for a fee. Kim and his team then pitched and negotiated the contract associated with the product, down to the final price of the products or services provided. (Ex. 16, Kim Dep., at 26:20-27:9; Ex. 17, Frank Dec., ¶¶ 8, 9.)

31.  Robert Lane was hired by AMC in July 2016 as its VP, Pricing, a newly created role. Lane has a degree in Finance and has worked in Finance roles for over 15 years, including having held corporate officer-level role at a publicly-traded company prior to joining AMC. Mr. Lane was recruited by AMC because of his extensive background in financial analysis for publicly traded companies. (Ex. 18, Deposition of Robert Lane ("Lane Dep."), at 11:4-13:9; Ex. 17, Frank Dec., ¶ 12, 14.)

a.  Lane developed pricing models and analyzed consumer and financial analytics to determine the price of AMC's products. He was responsible for in-depth financial analysis, advanced financial analytics, and the creation of pricing models that allow AMC to attractively and profitably price its product offerings. Lane was ultimately responsible for the success or potential repercussions on profitability for the prices he determined. (Ex. 17, Frank Dec., ¶¶ 12-13.)

b.  During the relevant time period, Lane primarily focused on effectively pricing movie tickets and food and beverage items, among other products, to increase AMC's margins. His duties also included involvement in AMC's monthly subscription service (AMC Stubs - A List) and providing analytics to movie studios,

which aided contract negotiations, to prove the programs AMC had in place were beneficial to the movie studios. Lane's responsibilities involved "major analytics" leading up to a pricing strategy change and after the change was effective to ensure the strategy met or would meet AMC's expectations. (Ex. 18, Lane Dep., at 32:22-34:13; Ex. 17, Frank Dec., ¶ 12.)

     c.     Given the nature of Mr. Lane's position, AMC's CEO spoke with him "frequently." (Ex. 10, Aron Dep., at 99:5-100:6.)

32.     AMC sets the compensation paid to its VPs based on a variety of factors, including the uniqueness of the skills necessary to perform the role and the consequent difficulty of filling the position, and the VP's performance history. (Ex. 3, Chavarria Dec., at ¶ 38.)

33.     Mangels performed a marketing function that AMC valued differently than the functions performed by Lai, Pursell, Ybarra, Kim, and Lane. The role performed by Mangels required experience in the discipline of marketing, and individuals with skills and experience in this area are more plentiful than those performed by the others identified in this paragraph. (Ex. 3, Chavarria Dec., at ¶ 39.)

34.     In light of AMC's view of the overall value of the function performed by Mangels at AMC, and the relatively common marketing skills an employee in this position needed for the role, AMC at all times relevant concluded that she was properly compensated. (Ex. 3, Chavarria Dec., at ¶ 40.)

**Mangels' Relevant Performance/Conduct History Pre-May 2018**

35.     While Mangels was viewed as a solid performer in her day-to-day marketing functions, Mangels struggled in leadership and professional judgment. (Ex. 4, Colanero Dep., at 161:4-25; 162; see also SOFs 11-19.)

36.     In her performance review for 2014, Mangels was specifically counseled regarding her unwillingness to "contribute to work as a group that doesn't result in immediate and/or direct success for her."  Colanero also revisited prior constructive feedback from 2014 relating to her

leadership and judgment. (Ex. 4, Colanero Dep., at 110:5-10; Ex. 19 (Dep. Ex. 103), Mangels' 2014 Performance Review, p. 5.)

37.     With the support and guidance of Carla Chavarria, AMC's SVP and Chief Human Resources Officer, Mangels was asked to draft a development plan outlining her strengths and areas for improvement/opportunity. In March 2015, Mangels submitted her plan and identified ten (10) areas of development, including improving her response to constructive feedback or differing opinions and being more collaborative, helpful, and inclusive. (Ex. 1, Chavarria Dep., at 5:10-19; Ex. 3, Chavarria Dec., at ¶ 4.)

38.     At or around this same time, AMC's Human Resources Department was made aware of the results of an investigation conducted by AMC's Internal Audit Department which identified expenditures (totaling approximately $240,000) by the Marketing Department in violation of AMC's policies. Mangels had been the Controller for the Marketing Department since November 2014. (Ex. 20, Deposition of Rosalind Reeves ("Reeves Dep.") at 81:8-20; 91:1-9, 13-25; 92-93:1-4; SOF 40.)

39.     Human Resources, and more specifically, Chavarria and another female VP (Rosalind Reeves) conducted an investigation. Based on the results of their investigation, they determined that five employees were culpable for failing to adhere to expectations and recommended that each be disciplined, including Mangels, Colanero, and another male VP in Marketing. (Ex. 3, Chavarria Dec., at ¶ 5.)

40.     On May 6, 2015, Mangels received a written warning based on AMC's determination that she did not exercise the oversight and leadership expected of department Controllers. Ex. 2, Mangels Dep., at 195:18-25; Ex. 21 (Dep. Ex. 67), Mangels' Disciplinary

Warning May 6, 2015; Ex. 20, Reeves Dep., at 100:15-25; 101:1-7; Ex. 1, Chavarria Dep., at 43:18-25; 51:4-7; SOF 39.)

41.     At the same time, and as a result of the same investigation, one male was involuntarily terminated and three males were also issued written warnings. Colanero was also counseled and his incentive bonus for 2015 was also significantly reduced. (Ex. 2, Mangels Dep., at 197:8-16; Ex. 4, Colanero Dep., at 42:23-25; 43:1-18; Ex. 20, Reeves Dep., at 104:18-21; Ex. 1, Chavarria Dep., at 55:23-25; 56:1-5; SOF 39.)

42.     Thereafter, in late May 2015, AMC invested in an outside executive coach to assist Mangels in addressing and improving in her areas of development. (Ex. 3, Chavarria Dec., at ¶ 6.)

43.     In 2016, Mangels requested to have her VP title changed (in terms of the description of her function) and her position reviewed by AMC's Compensation Department. In October 2016, the Compensation Department conducted its review and issued a letter to Mangels approving the title change and stating that her compensation remained unchanged but that her compensation would next be reviewed in connection with the 2017 annual merit review process (to take place in the next couple of months). (Ex. 4, Colanero Dep., at 151:12-25; 152-154:1-15; 276:15-18; Ex. 22 (Dep. Ex. 111), letter to Mangels October 26, 2016.)

44.     Mangels' overall performance improved and for calendar year 2016 Colanero gave Mangels an overall Exceeds Expectations score (up one level from Successful the year prior). (Ex. 4, Colanero Dep., at 136:16-25; 156:6-16; Ex. 2, Mangels Dep., at 205:20-25; Ex. 23 (Dep. Ex. 72), Mangels' Performance Review 2016.)

45.     In recognition of her overall improved performance and assumption of new projects and responsibilities in 2016, Colanero recommended and received approval for a 7% merit increase

for Mangels and her individual component for her incentive bonus was computed at 110%.[6] Mangels' target under AMC's long-term incentive plan (LTIP) was also increased from $36,000 to $60,000 and she received an additional $10,000 special bonus. (Ex. 2, Mangels Dep., at 166:7-15; 208:6-11; 213:2-20; Ex. 24 (Dep. Ex. 73), Mangels' compensation memo February 22, 2017; Ex. 5, Colanero Dec., at ¶ 6.)

46. In Colanero's opinion, Mangels' overall performance continued to improve in 2017 and Colanero awarded Mangels an overall Outstanding score in her annual performance review. Colanero did, however, specifically note the low score Mangels' team received in AMC's annual associate engagement survey (referred to internally as "AEI") and her scores for behavioral competencies were lower than her scores for her individual KPMs. (Ex. 4, Colanero Dep., at 172:7-23; Ex. 2, Mangels Dep., at 219:3-12; Ex. 25 (Dep. Ex. 116), Mangels' 2017 Performance Review.)

47. AMC had a very disappointing financial year in 2017 and, as a result, VPs were only eligible for a maximum 2% merit increase (regardless of individual performance). (Ex. 3, Chavarria Dec., at ¶ 7.)

48. Colanero was, however, able to successfully advocate on behalf of Mangels for another increase in her target LTIP from $60,000 to $80,000 and the individual component of her annual incentive bonus was computed at 120%. (Ex. 4, Colanero Dep., at 242:10-25; 243:1-20; Ex. 5, Colanero Dec., at ¶ 7.)

49. Based on Colanero's support and advocacy, in early 2018 Mangels was invited to participate in AMC's internal 2-year LEAP leadership program. (Ex. 3, Chavarria Dec., at ¶ 8.)

**50.** In May 2018 Mangels received the results of a Hogan 360 Review. Mangels' overall score (5.3) was in the bottom 25th benchmarking percentile. (Ex. 1, Chavarria Dep., at

---

[6] The highest increase Mangels ever received (other than when she was promoted) was 3.5%. (Ex. 2, Mangels Dep., at 213:12-20.)

123:4-18; Ex. 4, Colanero Dep., at 190:5-15; Ex. 26 (Dep. Ex. 122), Hogan 360 Report, pp. 1-3.)

**April 2018 Marketing Department Reorganization**

51.    In the fourth quarter of 2017, Colanero directed Mangels and Carrie Trotter, another VP in the Marketing Department[7], to reassess and realign their individual and team functions. (Ex. 2, Mangels Dep., at 221:8-25; 222:21-25; 223-225:1-11; Ex. 27, Declaration of Carrie Trotter ("Trotter Dec."), at ¶ 8.)

52.    Those discussions ultimately resulted in the announcement of a reorganization effective mid-April 2018 in the Marketing Department which directly impacted both Mangels' and Trotter's functions and teams. (Ex. 2, Mangels Dep., at 221:8-25; 222:21-25; 223-225:1-11; 226:14-25; 227:1-3; Ex. 28 (Dep. Ex. 77), April 16, 2018 e-mail; Ex. 27, Trotter Dec., at ¶ 12.)

53.    Prior to the reorganization, Trotter was responsible for providing marketing support to the Film Department and digital signage (along with other responsibilities).  (Ex. 2, Mangels Dep., at 42:2-6; Ex. 27, Trotter Dec., at ¶ 10.)

54.    As a result of the April 2018 reorganization, Mangels and Trotter "traded" certain functions. Mangels became responsible for supporting the Film Department and digital signage (previously performed by Trotter) and Trotter took on new responsibilities related to initiatives from the Pricing Department and took over dine in marking and marketing of grand openings (along with other responsibilities). (Ex. 2, Mangels Dep., at 221:8-25; 222:21-25; 223-225:1-11; 226:14-25; 227:1-3; Ex. 28 (Dep. Ex. 77); Ex. 27, Trotter Dec., at ¶¶ 9-10.)

55.    Following the April 2018 reorganization, Mangels was either performing work she performed prior to April 2018, or performing work previously performed by Trotter. (SOFs 52-54;  Ex. 4, Colanero Dep., at 266:24-25; Ex. 27, Trotter Dec., at ¶ 10.)

---

[7] Colanero hired Trotter as a Director in November 2010 and promoted her to VP in April 2016. (Ex. 27, Trotter Dec., at ¶ 3.)

56.     In conjunction with the April 2018 reorganization, Trotter and Mangels and nine (9) other employees on their two teams received title changes and two positions were eliminated. None of the individuals receiving title changes received a salary increase as a result of the reorganization. (Ex. 2, Mangels Dep., at 225:12-14; 243:5-25; 244:1-9; Ex. 27, Trotter Dec. at ¶ 12.)

57.     On May 5, 2018, Mangels spoke to Colanero requesting his support to have her position reviewed by AMC's Compensation Department. Colanero was supportive and intended to ask the Compensation Department to review both Mangels' and Trotter's positions given the trading of responsibilities between the two. (Ex. 4, Colanero Dep., at 199:18-21; 201:17-24; 238:16-25; 239-240:1-6; 266:21-25; 267:1-4; Ex. 5, Colanero Dec., at ¶ 8.)[8]

**Reports of Inappropriate Conduct Against Mangels**

58.     On May 8 & 9, 2018, AMC's Senior Leadership Team (SVPs and EVPs) held an internal Talent Summit.  The purpose of the Talent Summit was to identify and discuss VPs and Directors for purposes of succession and other internal talent development. Colanero and Chavarria were both in attendance. (Ex. 4, Colanero Dep., at 199:10-25; 200:1-18; Ex. 1, Chavarria Dep., at 133:18-25.)

59.     At the Talent Summit, two separate SVPs (one male and one female) expressed concern regarding unprofessional behavior they claimed to have witnessed by Mangels, relating to over intoxication at AMC events that year (Connections and CinemaCon). Chavarria had a follow-up discussion with one of the SVPs. (Ex. 4, Colanero Dep., at 199:5-17; 201:12-25; 202-204:1-24; 206:3-14; 232:12-25; 347:11-14; Ex. 1, Chavarria Dep., at 141:15-25; 142-145:1-22.)

---

[8] In April 2018, Mangels met with Chavarria for advice regarding how best to advocate with Colanero for a wage increase. In that discussion, Chavarria specifically told Mangels that Colanero was an advocate for her. (Ex. 2, Mangels Dep., at 229:24-25; 230:1-7; 238:14-18; Ex. 29 (Depo Ex. 75), April 11, 2018 e-mail.)

60.     Colanero was caught off guard by the feedback regarding Mangels and he was "embarrassed" and "disappointed" given his internal advocacy and support for Mangels and her career.  While Colanero was aware that Mangels had been verbally counseled regarding over-intoxication at AMC events, he personally believed she had corrected her behavior. (Ex. 4, Colanero Dep., at 197:4-25; 198:1-10; 201:17-24; 206:8-25; 207:1; 208:4-14; Ex. 1, Chavarria Dep., at 128:4-8; 141:15-18; 143:10-16; Ex. 5, Colanero Dec., at ¶ 9.)

61.     Redacted

62.     Redacted

63.     Redacted

64.     Redacted

65.     Redacted

66.     Redacted

67.     Redacted

68.     Redacted

---

[9] Redacted

)

69. Redacted

70. Redacted

71. Redacted

72. Redacted

73. Redacted

74. Redacted

75. Redacted

[11]

---

[10] Redacted

[11] Redacted

76.     Redacted

77.     Redacted

---

78.     Redacted

79.     Redacted

80.     Redacted

---

[13] Redacted

81.     Unbeknownst to AMC until discovery in this case, Mangels secretly recorded this private discussion—and fifteen (15) additional private discussions while employed by AMC. Mangels admits this conduct violated a written AMC policy in effect during her employment. (Ex. 2, Mangels Dep. at 14:9-25; 15:1-8; 142:3-11; 144:16-25; 145:1-14; 148:5-11; 151:14-25; 153:5-23; 269:25-270:1-6;  Ex. 41 (Dep. Ex. 55), List of Recordings.)

82.     Redacted

---

14 Redacted

15 Redacted

16 Redacted

83.     Redacted

84.     Redacted

85.     Redacted

86.   Redacted

87.     Redacted

88.     Redacted

89.    Redacted

90.    Mangels admitted that she has no information to dispute Colanero's testimony that he subjectively and honestly believed in the appropriateness of the determinations based on the information available to AMC. (Ex. 2, Mangels Dep., at 288:18-25; 289:1-5.)

91.    Mangels admitted that she has no evidence/information that Helen, Jason, Alicia, or Jannie knew of any request she had made to AMC to have her compensation reviewed. (Ex. 2, Mangels Dep., at 293:25; 294:1-15.)

92.    Following its factual determinations, Colanero, Patterson, and Chavarria made the decision that AMC would offer both Mangels and Pursell the option of accepting and agreeing to adhere to performance expectations and consequences set forth in formal disciplinary warnings. Or, if they did not want to agree to abide by the expectations and consequences set forth in their warnings, they could voluntarily separate with a severance payment equal to the amount they would be eligible to receive had their positions been eliminated. (Ex. 5, Colanero Dec., at ¶ 13.)

93.    On June 5, 2018, Colanero and Chavarria met with Mangels. Chavarria detailed the determinations reached and Mangels' two options. Mangels chose to accept the expectations and consequences set forth in a Final Disciplinary Warning. Pursuant to that acceptance, Mangels

agreed: (1) to undergo an EAP assessment and compliance training, (2) that her individual component of her eligible 2018 incentive bonus would be reduced by 25%, and (3) that the Final Written Warning would be considered when determining her 2018 overall performance rating. (Ex. 4, Colanero Dep., at 198:11-20; Ex. 2, Mangels Dep. at 296:6-12; Ex. 45 (Depo Ex. 161), Mangels' final disciplinary warning June 5, 2018; Ex. 46, Audio & Transcript of June 5, 2018 Meeting.)

94.     During the meeting Colanero explained that he and AMC have been behind her, supporting her growth—but his and AMC's expectations for officers go to the "whole person" including the example she sets in judgment and leadership for others. Colanero also explained to Mangels that their trust had been damaged and to repair that trust would take time (and would not be rebuilt in 2-3 months).  (Ex. 2, Mangels Dep., at 296:6-12; Ex. 46, audio recording, and audio transcript at 5:5-20, 20:4-7.)

95.     Pursell also voluntarily chose to accept the expectations and consequences set forth in a Disciplinary Warning, which included, but was not limited to, an agreement that his individual component of his eligible 2018-incentive bonus would be reduced by 25%. This was Pursell's first discipline warning. Colanero did not review and has not seen Pursell's written warning. (Ex. 4, Colanero Dep., at 257:21-25, 258:1-7; Ex. 20, Reeves Dep. at 196:6-10; Ex. 1, Chavarria Dep. at 189:23-25; 190:1-6; Ex. 2, Mangels Dep. at 295:20-25; 296:1-6; Ex. 47 (Dep. Ex. 84), Pursell disciplinary warning June 5, 2018.

96.     Colanero and Chavarria allowed Mangels to continue in AMC's LEAP program and Mangels worked directly with AMC's Director, Leadership Development, on professional development, in which Colanero actively participated. AMC also provided Mangels with another

outside executive coach. (Ex. 2, Mangels Dep., at 123:9-22; 124:3-22; Ex. 5, Colanero Dec., at ¶ 15.)

97.     Prior to the investigation, Colanero and Chavarria had discussed submitting both Mangels' and Trotter's positions to the Compensation Department for review before the investigation had "derailed" that intent. During and after that investigation, Colanero and Chavarria decided that it would be "inappropriate" to review Mangels' position for a while as the investigation "complicated things dramatically." (Ex. 4, Colanero Dep., at 238:13-25; 239-241:1-6; 263:15-19; Ex. 48 (Depo Ex. 158), email May 31, 2018.

98.     In September 2018, Mangels attended a trade conference with other AMC associates, including Alicia, the Marketing Department associate who had been interviewed by Reeves in May 2018. Mangels confronted Alicia while out one evening and repeatedly asked her to disclose what information she had provided to AMC/Reeves during the spring 2018 investigation. The associate found Mangels' tone to be accusatory and unfriendly and made her uncomfortable given Mangels' status as an AMC officer. (Ex. 39, Cook Dec., at ¶¶ 7-15.)

**Relevant Events Post-2018 Investigation Through Spring 2019**

99.     On November 19, 2018, Mangels asked to speak with Colanero. In a brief exchange, Mangels stated that she is following-up on prior discussions in April and July 2018[17] related to having her positions reviewed by the Compensation Department. Colanero immediately responded that he was supportive of the Compensation Department reviewing Mangels and Trotter's position and affirmatively asked Mangels to send him her updated Job Questionnaire

---

[17] In July 2018, Colanero had asked both Mangels and Trotter to send updated Job Questionnaires to him and in response, Mangels had asked for Colanero to submit her position to the Compensation Department. (Ex. 2, Mangels Dep., at 298:11-24; Ex. 5, Colanero Dec. at ¶ 16.)

(commonly known as a job description). In this discussion, Mangels never mentioned gender or discussed or identified position(s) she subjectively believed were comparable.[18] (SOFs 57, 97; Ex. 4, Colanero Dep., at 268:1-24; Ex. 49, Audio & Transcript of November 19, 2018 meeting[19].)

100.    On November 20, 2018, Mangels sent Colanero an email. In the sixth paragraph of the email Mangels stated: "…I am that asking the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill set, position responsibilities, and quality of work." Mangels then stated that she believes comparable positions include the VP positions held by Ybarra, Lai, Pursell, and Kim.[20]   (Ex. 4, Colanero Dep., at 270:11-17; Ex. 50 (Dep. Ex. 172), Job Questionnaire.)

101.    While Mangels premised her request for a job review on the changes related to the April 2018 Marketing Department reorganization, she did not name Trotter as an individual in a comparable VP position. (*See* SOFs 51-56.)

102.    Colanero sent both Mangels' and Trotter's updated Job Questionnaires to Chavarria with a request to have the positions reviewed by the Compensation Department. Colanero followed up with Chavarria in December when he had not heard back regarding his request. (Ex. 51 (Dep. Ex. 173), email January 10, 2019; Ex. 4, Colanero Dep., at 275:18-23; Ex. 1, Chavarria Dep., at 211:16-25; 212:1-6; Ex. 5, Colanero Dec., at ¶ 16.)

---

[18] Unknown to Colanero, Mangels secretly intercepted/recorded this discussion. (SOF 81.)

[19] Per stipulation of the parties, the correct date of this audio recording is November 19, 2018, although it is reflected in the file name and reporter's transcript as November 18, 2018.

[20] Mangels referenced a request she made in 2016 to have her position reviewed by the Compensation Department. As stated in the letter she received, her compensation was reviewed in relation to her performance and work performance by AMC as part of its annual merit review process. As part of that review, Mangels received a 7% increase, which was double any percentage increase Mangels received apart from her promotion in 2013. (SOF 43-45.)

103. Chavarria assigned the review to Mike Giuseffi, AMC's VP Compensation (See infra ¶¶ 115-119. (Ex. 1, Chavarria Dec., at 211:16-25; 212:1-21; Ex. 5, Colanero Dec., at ¶ 16.)

104. The Marketing Department's AEI scores were shared with Colanero's direct reports in January 2019. The Department's scores were poor, especially in the category of accountability. One anonymous associate wrote: *"I love working at AMC. However, my enthusiasm suffered a major blow this year as I watched an officer of the company be discovered abusing the privileges bestowed on her. Her lack of integrity and moral standards were treated with no visible repercussions and instead, increasing responsibility and purview."* Mangels and Colanero both assumed the comment related to Mangels. (Ex. 4, Colanero Dep., at 294:4-25; 295:1-22; Ex. 5, Colanero Dec., at ¶ 17.)

105. Due to the poor AEI scores in the Marketing Department, in early 2019 Colanero asked VP Pamela Sandler to lead a task force to analyze the concerns reflected in the AEI survey and propose proactive strategies to address the concerns. (Ex. 5, Colanero Dec. at ¶ 18; Ex. 52, Declaration of Pamela Sandler ("Sandler Dec."), at ¶ 9.)

106. A female AMC associate (Carly)—who previously worked under Mangels until November 2018 but was still part of the Marketing Department—asked to speak to Sandler to provide feedback in relation to the AEI task force. On February 28, 2019, Carly told Sandler the following:

    a. She believed the Marketing Department's low AEI scores are due to Mangels.

    b.    Redacted

    c.    Redacted

d.   After the 2017 AEI scores were released for Mangels' team, Mangels confronted the team and asked who had provided which comments/scores. Mangels told the team that their feelings/memories were wrong and indicated that a KPM for each member of the team would be to increase the team's AEI score. Lauren spoke up and said that associates should be allowed to speak truthfully and Mangels responded something to the effect of "well that's really fucking immature."

e.   When she applied for and was offered a position on Julius Lai's team in late 2018, Mangels stated something to the effect of: "I got you in here. Your resume was on the loser pile and I was the only one willing to take a chance on you." She described Mangels' tone as raw, unfiltered, and cruel. Shortly thereafter, Mangels unfriended her on social media channels.

(Ex. 52, Sandler Dec., at ¶¶ 10, 11.)

107.   Redacted


108.   On February 12, 2019, Colanero presented Mangels with her 2018 annual performance review. Colanero gave Mangels a "Does Not Meet" score (the second to lowest overall score). Colanero determined in his business judgment that while Mangels met the KPMs that were identified at the beginning of 2018, Mangels fell far short of his and AMC's expectations related to Behavioral Competencies. Mangels, in contrast, gave herself an Exceeds Expectations overall score. (Ex. 4, Colanero Dep., at 283:1-21; 286:11-22; 288:5-14; 305:14-23; Ex. 2, Mangels Dep., at 309:23-25; 310:1-4; 318:2-7; Ex. 53 (Depo Ex. 181), Mangels' 2018 Performance Review.)

109.   Colanero's written comments in Mangels' review include:

*"As an officer, expectations for Tonya include subject matter expertise and tactical proficiency, as well as soft skills relating to integrity, collaboration, building trust, etc. Unfortunately, Tonya's tactical success was undermined by inappropriate behavior for an executive that resulted in a Final Disciplinary Warning being issued in June ... These actions are clearly unacceptable and dictate her score for Fostering Integrity and Trust. They also undermine her ability to either Lead with Purpose or Collaborate and Build Alignment. Finally, general awareness of this activity has led to negative perceptions of Tonya and detracted from the engagement of others impacted by her unprofessional behavior. It remains to be*

*seen that Tonya has fully turned the corner on choosing to consistently act in a professional, executive manner, consistent with her role at AMC. AMC has, and continues to invest in Tonya through coaching, counseling and participation in the LEAP program. This is because we truly want her to succeed, as she can be a highly productive contributor to the growth of AMC."*

(SOF 108.)

110.    Unbeknownst to Colanero, Mangels secretly intercepted/recorded the meeting she had with Colanero regarding her performance review. The conversation included the following:

a.    In reference to Mangels' final written warning (and the investigation), Colanero noted that the "cost" to AMC in terms of time and effort was high.

b.    Colanero told Mangels that he was having a hard time trusting her because he did not believe she was forthright in the May/June 2018 investigation.

c.    Colanero stated to Mangels: "your talent is extraordinary and I love having you on the team for your contributions; but for your judgment and behavior on being a model of integrity for how others should act, it's not it …as an executive you need to be a role model of integrity and I don't think you carry yourself as a model of integrity and you may think that you do … that's a disconnect."

d.    When Mangels referred to the events leading to the June 2018 warning as a "personal event," Colanero replied that there were multiple events that led to the warning and further explained: "As a leader to do those things undermines the integrity of the company, it's stealing money from the company, it still undermines the company and makes it very challenging to enforce integrity and honor on a regular basis … I would trade off some of the [] work volume for better behavior."

e.    Mangels specifically acknowledged that she understood Colanero personally and honestly felt she deserved the overall review score stating: "Well I know you feel I deserve it so it's not for you to be sorry."

f.    Colanero offered to set another meeting to discuss the review. And he told Mangels that if she felt the review was unfair Mangels could follow-up with Chavarria.

(Ex. 2, Mangels Dep., at 310:23-25; 311:1-8; Ex. 54, Audio & Transcript of February 12, 2019 recording.)

111.    In the meeting, Mangels also disclosed to Colanero for the first time that she possessed confidential compensation data for the entire department and had for a "long time."

When Mangels suggested that she was "compensated 60% less than my male counterparts in marketing, who are VPs, Colanero responded "that's not true." (Ex. 4, Colanero Dep., at 176:15-25; 177:1-8; 314:5-23; Ex. 2, Mangels Dep., at 69:9-24; Ex. 54, audio recording, and audio transcript at 23:13-24:15.)

112.    Mangels did not request a follow-up meeting with Colanero regarding her performance review and she did not contact Chavarria or anyone in AMC leadership to assert a concern about her performance review. (Ex. 5, Colanero Dec., at ¶ 19; Ex. 3, Chavarria Dec., at ¶ 19.)

113.    In 2018 and until September 2019, Colanero had 7 direct reports (4 females and 3 males). (Ex. 5, Colanero Dec., at ¶ 24.)

114.    On or about May 6, 2019, Mangels filed a charge of discrimination with the Equal Employment Opportunity Commission alleging that she was discriminated against on the basis of her gender and subjected to unlawful retaliation. (Ex. 2, Mangels Dep., at 31:14-22.)

**The Compensation Department's Review of Mangels' Position in 2019**

115.    Giuseffi conducted a review of Mangels' position in 2019. (Ex. 56, Giuseffi Dep., at 59:20-61:25; 64:24-65:9; Ex. 55, Declaration of Michael Giuseffi ("Giuseffi Dec."), at ¶ 7.)

116.    As part of that review, the compensation team asked AON, a third-party compensation consulting firm, to review their database to see how similar jobs were compensated at other companies. (Ex. 55, Giuseffi Dec., at ¶ 7.)

117.    AON identified one position in their database that was more similar to Mangels' position than the others in its database. AON then reported that the compensation range for that similar position started at $184,000 per year. (Ex. 55, Giuseffi Dec., at ¶ 7; Ex. 56, Giuseffi Dep., at 70, 73.)

118.    AMC did not view this information as the "minimum compensation" that such a position at AMC should be paid. Instead, AMC considered a variety of factors in setting compensation, including how that role fit into AMC's overall organization. (Ex. 56, Giuseffi Dep. at 73-74; Ex. 55, Giuseffi Dec., at ¶ 8.)

119.    In light of AMC's view of the overall value of the function performed by Mangels at AMC and the relatively common marketing skills an employee in this position needed for the role, AMC concluded that she was properly compensated. Ex. 3, Chavarria Dec., at ¶ 40.)

**Mangels' Inappropriate Behavior in August/September 2019 and AMC's Investigation into the Same.**

120.    In late summer 2019, AMC made the difficult decision that it needed to reduce its workforce at the TSC ("2019 RIF"). The 2019 RIF was announced and implemented on Tuesday August 20, 2019. (Ex. 1, Chavarria Dep., at 238:7-13; Ex. 3, Chavarria Dec., at ¶ 20.)

121.    AMC's Senior Leadership Team (SLT) (comprised of EVPs and SVPs) were informed of the decision and all were instructed to maintain the decision in the strictest of confidences and to only discuss with others outside the SLT on a strict need to know basis. For example, a SLT member may need to discuss with a direct report in order to ensure business needs can and could be met with a position elimination. (Ex. 4, Colanero Dep., at 337:9-15; 338:4-9; 343:11-16; 239:19-25; 240:1-13.)

122.    Mangels was not made aware of the 2019 RIF in advance by Colanero. (Ex. 4, Colanero Dep., at 338:10-14.)

123.    Mangels had a meeting with her direct reports on August 14, 2019. Mangels was the only officer present. All other attendees were non-officers. (Ex. 2, Mangels Dep., at 326:15-25; 327:1-2; Ex. 3, Chavarria Dec., at ¶ 21.)

124.    Colanero did inform Trotter of the 2019 RIF shortly before it occurred to discuss and assess business impacts to Trotter's team. (Ex. 4, Colanero Dep., at 338:24-25; 339:1-12; 342:13-25; 343:1.)

125.    On Monday August 19, 2019, SVP Cynthia Pierce reported to Colanero that a female VP, Alice Rogers, had called her over the weekend "very upset."  According to Pierce, Rogers claimed she had overheard AMC associates discussing impending changes to Mangels' team—which led Rogers to be concerned for her own job. Pierce, while maintaining the confidentiality of the imminent RIF which Pierce was aware of, as part of the Senior Leadership Team but Rogers was not, tried to calm Rogers down. Based on the information provided by Rogers, Pierce concluded that Mangels was the likely source (either directly or indirectly). (Ex. 4, Colanero Dep., at 349:11-23; Ex. 5, Colanero Dec., at ¶ 20.)

126.    Colanero received a second, unsolicited complaint relating to Mangels and the imminent layoff from another female officer, Trotter, on the same day (August 19, 2019). (Ex. 4, Colanero Dep., at 349:11-23; Ex. 27, Trotter Dec., at ¶ 19.)

127.    Trotter reported to Colanero that on Thursday August 15, 2019, a female associate (Sarah) on her team had reported to Trotter that she heard associates on Mangels' team discussing a team meeting Mangels held the day prior (August 14, 2019) wherein Mangels allegedly made comments that led the associates to believe a layoff was possible and that Mangels was crying. According to Trotter, Sarah stated that she then spoke to a female associate (Jillian) on Mangels' team and Jillian confirmed to Sarah that Mangels had cried in the meeting and had made statements that led Jillian to infer a layoff could be imminent. Trotter told Colanero that Sarah expressed concerns for her own job based on what she had heard. (Ex. 27, Trotter Dec., at ¶¶ 17, 19.)

128. Colanero reported the concerns he received to Chavarria and was told Human Resources would conduct an investigation. (Ex. 4, Colanero Dep., at 355:24-25; 356:1-8; Ex. 1, Chavarria Dep., at 256:10-21.)

129. On August 20, 2019, after the layoff was formally announced, Colanero met with Mangels and informed her that he had received complaints related to comments she may have made prior to the August 2019 layoff relating to the potential for a layoff. Colanero informed Mangels that Human Resources would conduct an investigation and would be in touch. (Ex. 4, Colanero Dep., at 353:4-12; 354:17-25; 356:16-24.)

130. All interviews during AMC's investigation were conducted by Chavarria, Sharlynn Mutzbauer, and/or Mary Melton-Miller. Neither Mutzbauer nor Melton-Miller were aware that Mangels had filed a charge of discrimination in May 2019. Colanero was not present for any witness interviews. (Ex. 3, Chavarria Dec., at ¶ 22; Ex. 5, Colanero Dec. at ¶ 21; Ex. 57, Deposition of Sharlynn Mutzbauer ("Mutzbauer Dep."), at 75:22-25; 76:1-16.)

131. On August 22, 2019, AMC interviewed four (4) associates: Marti, Jordan, Sarah, and Lauren D.[21] All were Mangels' direct reports, except for Sarah (who reported to Trotter). (Ex. 3, Chavarria Dec., at ¶ 23.)

132. Marti told AMC that she was off work on August 14, 2019. However, she heard from colleagues who were present for the August 14 team meeting that Mangels was "teary" and visibly upset and that comments made by Mangels in the meeting had led two colleagues—Jordan and Lauren M.—to reach out to her and express concerns. Marti stated that Jordan said the comments by Mangels were "awkward" and made him uncomfortable and Marti stated that she

---

[21] AMC also spoke briefly with a female Director, Ellen, on August 22, 2019. Ellen had a longer discussion with AMC on August 27, 2019. (Ex. 58, Declaration of Ellen Blanner, at ¶ 3.)

and Jordan had exchanged text messages. (Ex. 59, Declaration of Mary Melton-Miller ("Melton-Miller Dec."), at ¶ 3.)

133.    Jordan was interviewed twice on August 22, 2019 (due to inconsistent statements he made regarding text messages with Marti). Jordan was present for the August 14 team meeting. He also told AMC that Mangels had told him that someone had reported her to Human Resources and that she asked him to tell her what he recalled she said (and how he had interpreted her comments) in the August 14 team meeting. Jordan provided AMC with copies of the text messages between himself and Marti. (Ex. 1, Chavarria Dep., at 274:22-25; 275:1-21; 276:20-25; 277:1-3; 279:5-25; 280:1-20; Ex. 3, Chavarria Dec., at ¶ 24.)

134.    In the text messages between Marti and Jordan, Jordan called the August 14 team meeting "bizarre" and both Jordan and Marti expressed concern they may be laid off. Jordan stated Mangels "was crying" and that she "prefaced her speech by saying there's a lot of rumors going around" and Jordan added: "but I feel like she created even more rumors????" and later stated Mangels "worried the entire team."  (Ex. 3, Chavarria Dec., at ¶ 24.)

135.    Sarah told AMC that Jillian came to her after the August 14 team meeting and was visibly upset, shook. Sarah stated that Jillian told her that Mangels was crying in the meeting and said words that led Jillian to believe that there would be a layoff the following the week. Sarah stated that Jillian asked for her advice on whether Jillian should cancel her vacation scheduled for the following week based on Mangels' comment/conduct. Sarah told AMC that she did not believe Jillian should have been placed in that position by Mangels and that is why she reported it to Trotter (along with Sarah's concerns for her own job security). (Ex. 60, Declaration of Sarah Powers ("Powers Dec."), at ¶ 3.)

136.     Lauren D. told AMC that she recalled Mangels was choked up during the August 14 team meeting. Lauren D. further stated that Mangels had asked Lauren D. and her (Lauren D's) direct reports to come to Mangels' office sometime before August 22 and after the layoff announcement on August 20, 2019. Mangels then asked Lauren D. and the others what they recalled her saying during the August 14 team meeting and whether they recall her saying there would be a layoff or implied there would be a layoff. (Ex. 3, Chavarria Dec., at ¶ 25.)

137.     On Monday August 26, 2019, Chavarria and Mutzbauer met with Mangels. Mangels made the following statements:

    a.    Mangels stated that she was not aware of anything she said or did in the August 14 team meeting that led her team to worry about their jobs.

    b.    Mangels admitted she made a reference to the "next couple of weeks being tough" but stated the reference was to personal news, and not to AMC. Mangels also denied crying but said she was "rattled" and "emotional," due to the personal news.

    c.    Mangels did admit "layoffs" were brought up in the August 14 team meeting, but claimed her team brought the topic up.

    d.    Mangels denied having any information about the layoff prior to the August 20, 2019 announcement. She did admit to being worried about layoffs because another officer, Rob Kim, had told her that conference rooms were booked for August 20 and because Colanero was slow on approving upcoming travel. Mangels stated that she could not recall speculating about a potential layoff with anyone other than Kim.

    e.    Mangels admitted that on August 20, 2019, Colanero made her aware that Human Resources would be conducting an investigation relating to a complaint he received regarding the August 14 team meeting.

    f.    After learning this, Mangels admitted she spoke to every member of her team and asked if they reported her to Human Resources or knew who did. When asked why she did this Mangels stated that she needed to know who to trust and because Colanero had not specifically told her not to.

(Ex. 2, Mangels Dep., at 338:16-25; 339:1-7; Ex. 3, Chavarria Dec., at ¶ 26.)

138.     In addition to meeting with Mangels, AMC met with and interviewed four females on August 26, 2019—Pierce, Kaleigh, Rogers, and Trotter. (Ex. 3, Chavarria Dec., at ¶ 27.)

139.     AMC met with Pierce and she reconfirmed the information she provided to Colanero on August 19, 2019. (Ex. 3, Chavarria Dec., at ¶ 28.)

140.     Ms. Mutzbauer conducted the interview of Kaleigh. Ms. Mutzbauer reported to Ms. Chavarria that Kaleigh told her that she was present during the August 14 team meeting, she stated that Mangels became emotional and appeared to choke up with tears in her eyes (causing Kaleigh to look away). Ms. Mutzbauer also reported that Kaleigh told her that after the meeting others on the team (not her) were speculating about whether Mangels' comments meant there would be a layoff. (Ex. 3, Chavarria Dec., at ¶ 30.)

141.     During AMC's discussion with Rogers, she confirmed that she called Pierce the weekend before the layoff concerned about her job security. Rogers stated that she overheard two associates (not Directors or above) on August 16, 2019, discussing that Mangels was worried that she would be laid off because Mangels' travel had not been approved and contracts Mangels oversaw were being requested. Based on what Rogers heard, she assumed the information the non-management level associates were discussing had come from Mangels (who was specifically referenced/named by the associates).[22]  (Ex. 3, Chavarria Dec., at ¶ 29.)

142.     In AMC's discussion with Trotter, she reconfirmed the information she provided to Colanero on August 19, 2019. Trotter also provided the following additional information to AMC:

    a.     On the same day (August 15, 2019) that Sarah had come to her regarding Mangels' conduct, Sandler had also asked to speak to Trotter. Sandler told Trotter that that day Mangels had suggested to her that there was going to be a restructure or layoffs

---

[22] During Ms. Mangels' interview on August 26, she admitted that Mr. Colanero had been slow to approve her travel requests (which led to her speculating she may be laid off prior to the August 20, 2019 announcement). *See* SOF 148.

the following week. Trotter told AMC that Sandler was worried about her job based on Mangels' comments.

b. Trotter told AMC that she had also seen a LinkedIn post from Mangels (on the evening of August 16, 2019) that stated something to the effect of "ever feel like there's a lot going on behind the scenes at work… focused." When Trotter went back to Mangels' LinkedIn site to take a screenshot the week of the layoffs, it had been deleted.

c. Based on the reports from Sarah and Sandler and the LinkedIn post Trotter told AMC she knew she needed to report what she knew to Colanero.

d. She also told AMC that on August 21, 2019, she received a text message from Sandler stating that Mangels had just accused Sandler of reporting Mangels to Colanero and that Mangels told Sandler that she (Mangels) had called every member of her team in to find out who reported her.

e. She volunteered that she personally felt Mangels should be terminated based on the seriousness of her conduct.

(Ex. 27, Trotter Dec., at ¶ 22.)

143. AMC spoke to three additional female witnesses on August 27, 2019—Ellen, Jillian, and Sandler. (Ex. 3, Chavarria Dec., at ¶ 31.)

144. Ellen told AMC that Mangels' comments during the August 14 team meeting surprised her. Ellen stated that Mangels had referenced "rumors," that people had "heard things" and Mangels further stated that while she (Mangels) does not have any specific information, it's going to be a "rough couple of weeks." Ellen told AMC that while Mangels made these comments she teared up. Ellen explained that while she did not believe her direct reports had been speculating regarding a potential layoff before the August 14 team meeting, she recalled anticipating (after hearing Mangels' comments) that her direct reports in the meeting would now speculate about a layoff and be concerned about their jobs. Ellen said that did happen and team members came to her with concerns based on Mangels' behavior. Ellen added that Mangels' behavior made her "uncomfortable." Ellen also reported that she was present for a meeting where Mangels informed

Ellen's team that Mangels had been reported to Human Resources regarding the August 14 team meeting. And in a separate meeting between Mangels and Ellen, Mangels asked Ellen if she knew who reported Mangels and Mangels further told Ellen that Mangels thought it was Trotter. (Ex. 58, Blanner Dec., at ¶ 3.)

145. Jillian told AMC the following:

a. During the August 14 team meeting, Mangels started crying (she reported seeing actual tears) and then Mangels stated that she wanted to acknowledge the rumors out there and, after a "really" long pause, Mangels said something to the effect of "next week will be a difficult week." Jillian also reported that Mangels also said that she was not part of any discussions and doesn't know what will happen but that she just wanted to acknowledge the rumors.

b. Mangels' behavior led Jillian to consider cancelling her vacation scheduled for the next week and that the team appeared confused and anxious after the meeting.

c. On the evening of August 21, 2019, Mangels sent Jillian a text and asked for a call (while Jillian was on vacation). Jillian described Mangels as "interrogating" her regarding what Jillian believed Mangels said during the August 14 team meeting and who reported her to Human Resources. Jillian stated that she was very uncomfortable and felt Mangels pointed the finger at her with respect to the report to Human Resources.

d. Mangels asked Jillian to tell her what she recalled Mangels saying during the August 14 team meeting, and then Mangels spent several minutes telling Jillian what Mangels felt she had said (and did not say) during the August 14 team meeting.

e. Mangels then told Jillian that she had talked to everyone else and they denied reporting her to Human Resources. Mangels told Jillian that she suspected that Trotter had reported her and at one point Mangels (in response to something she thought Jillian had said) snapped, "See you just told me you told Carrie!"— which Jillian denied.

f. Mangels "dominated" the conversation.

g. Jillian stated that Mandy (her direct report) had told her that Mangels had spoken to her individually as well regarding the August 14 team meeting.

(Ex. 57, Mutzbauer Dep., at 152:5-25; 153:1-6; Ex. 61, Declaration of Jillian Knippelmeyer, at ¶¶ 6-17.)

146.     Sandler told AMC the following:

a.      Mangels and Sandler had a private discussion on August 15, 2019. Mangels asked Sandler something to the effect of "you know what's happening next week" to which Sandler said yes (as Sandler thought Mangels was referring to a work project). As Mangels continued speaking Sandler realized she did not know what Mangels was referring to and said so—to which Mangels asked Sandler if she did not know about the layoffs next week. When Sandler inquired of Mangels how she knew about layoffs (because Sandler did not know) Mangels replied that "not everyone is as tight lipped as Stephen." Sandler and Mangels then agreed that because Colanero had not spoken to either of them about the layoff they must both be "on the chopping block."

b.      As a result of the information from Mangels, Sandler reached out to Trotter that day and told her of her concerns for her job based on what Mangels had shared. Trotter denied knowing anything about a layoff.

c.      On August 21, 2019, Mangels came into Sandler's office and shut the door. Mangels asked Sandler if she had reported her to Colanero and Mangels stated that she had just asked every single member of her team and they denied reporting her. While Sandler repeatedly denied reporting Mangels, Sandler described the encounter as Mangels "let me have it," she was "mad," "pointed in her words," and used "exaggerated motions." Mangels then went through in detail what she claimed she said during the August 14 team meeting, specifically denying that she was "emotional" (saying she was passionate) and claiming that her comments were about the budget and telling her team not to get cocky.

d.      Sandler shared that people treat Mangels cautiously because of her "retaliatory behaviors." Sandler also mentioned that she had heard negative feedback about Mangels during follow-up discussions related to the AEI survey—specifically from Carly. Sandler reported that she was reluctant to share the feedback with Mangels because of Mangels' anticipated reaction to the same.

(Ex. 52, Sandler Dec., at ¶¶ 13, 14, 17, 19.)

147.     Following her interview, Sandler sent AMC a summary of the concerns Carly reported to her about Mangels earlier that year. (Ex. 52, Sandler Dec., at ¶ 20.)

148.     On September 11, 2019, AMC met with Mangels and she made the following statements:

a.      When asked if she had a discussion with Sandler on August 15, 2019, wherein Mangels told or implied to Sandler a layoff would occur the following week, Mangels responded that in theory she did not know about the layoff.

46

b. When asked if she made the comment "not everyone is as tight lipped as Stephen [Colanero]," Mangels, after an extended pause, denied making the comment.

c. When asked about the LinkedIn post Trotter reported she saw on Mangels' page the week before the layoff, Mangels admitted she had posted something about things being out of your control but denied that the post had anything to do with AMC/work. Mangels admitted that she intentionally deleted the post at or around the time of the layoff announcement due to the layoff announcement.

d. Mangels admitted to having a discussion with Sandler on August 21, 2019. She described the discussion as "super casual" and stated that the discussion was about comments Sandler made to Jordan. Mangels denied making any accusatory comments to Sandler about reporting her to.

(Ex. 2, Mangels Dep., at 355:18-25; 356; 362:12-24; 363:25; 364:1-18.)

149. <u>None</u> of the witnesses interviewed during the investigation—other than Mangels— had knowledge of Mangels' charge of discrimination, the allegations she made in May 2018, or any requests by Mangels to AMC to have her compensation reviewed or increased. (Ex. 2, Mangels Dep., at 81:5-11; 327:3-25; 326-328-329; Ex. 27, Trotter Dec., at ¶ 23; Ex. 52, Sandler Dec., at ¶ 22; Ex. 58, Blanner Dec., at ¶ 5; Ex. 60, Powers Dec., at ¶ 6.)

150. Based on the information learned in its investigation, AMC concluded that Mangels had violated its expectations for officers. Specifically, AMC concluded that Mangels: (1) led others to reasonably fear for their jobs; (2) interfered with AMC's investigation by conducting her own investigation and confronting multiple individuals in an effort to determine who reported her to Human Resources; (3) provided incorrect or misleading information to AMC; and (4) failed to acknowledge that anything she did was inappropriate or, at a minimum, was misguided. (Ex. 3, Chavarria Dec., at ¶ 32; Ex. 62, Audio & Transcript of September 30, 2019 recording).

151. Colanero did not participate in witness interviews. He was advised of the determinations reached by AMC as a result of the investigation. (Ex. 4, Colanero Dep., at 351:17-19; 360:7-24.)

152.     AMC considered the determinations reached in the recent investigation, Mangels' prior final written warning in 2018 that also addressed poor judgment and lack of candor during an internal investigation, and concluded that it had lost trust that Mangels could/would meet its expectations for officers. (Ex. 3, Chavarria Dec., at ¶ 33; Ex. 62.)

153.     Mangels agreed that it is reasonable for an employer: to expect employees to be truthful; to expect candor and forthrightness from employees during an internal investigation; to rely on information provided by employees during an investigation; to expect officers not to disclose non-public information related to a layoff before it is announced; and to expect VPs to exercise good business judgment. Mangels has admitted that "professional judgement" can be subjective and "people have varying impressions …"  (Ex. 2, Mangels Dep., at 17:20-25; 18:1-2; 126:4-24; 127:12-15; 133:17-25; 134:1-3.)

154.     Mangels was terminated on September 30, 2019 and was provided a summary of the reasons supporting AMC's decision. (Ex. 4, Colanero Dep., at 20:23-25; Ex. 1, Chavarria Dep., at 307:5-22; Ex. 2, Mangels Dep., at 13:19-24; 364:22-25; Ex. 62.)

155.     Following Mangels' termination, she was not replaced by AMC. Rather, Sandler took on most of the responsibilities previously performed by Mangels (and an existing female director took on the remaining responsibilities). (Ex. 7, Jennifer Douglass Dep., at 49:16-25; 50:1-14; Ex. 52, Sandler Dec., at ¶ 23; Ex. 17, Frank Dec., at ¶ 4.)

## II.     SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See Celotex*, 477 U.S. at 325. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See id.*; *Celotex*, 477 U.S. at 322.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present admissible evidence that would enable a reasonable jury to find in its favor. *See id.* at 675-76. As the Eighth Circuit has clarified:

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).[23] Additionally, a district court "is not required to 'accept unreasonable

---

[23] Notably, the Eighth Circuit has reiterated, based on U.S. Supreme Court precedent, that "district courts should not 'treat discrimination differently from other ultimate questions of fact'" and there is "no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson*, 643 F.3d at 1043 (citations omitted).

inferences or sheer speculation as fact.'" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (citation omitted).

## III. ARGUMENT AND AUTHORITIES

### A. Mangels' Intentional Discrimination and Retaliation Claims Fail as a Matter of Law

Mangels speculates that her gender (female) was a motivating factor in AMC's decisions to discipline her and terminate her employment in violation of Title VII. She also claims that her internal assertions of gender discrimination (first made near the conclusion of AMC's 2018 investigation into her own misconduct) were the "**but for**" reason for her June 5, 2018 discipline and her termination in September 2019 in violation of Title VII's and the EPA's anti-retaliation provisions. Despite substantial written and oral discovery, there is no probative evidence supporting Mangels' claims. Although Mangels speculates as to the motive behind AMC's decisions, AMC's actions toward Mangels were a lawful matter of business judgment based on its reasonable and honest belief that Mangels violated its expectations for officers—a belief based on information largely provided to AMC *by other female employees who did not know about Mangels' protected activity*. While Mangels may subjectively believe that AMC should have ignored her misconduct and poor judgement or implemented a lesser sanction, Mangels' own personal opinions do not create a triable issue, as a matter of law.

#### i. Summary of Undisputed Material Facts

In 2013, Mangels was promoted by Colanero[24] to VP. While Mangels was generally solid in her marketing skills, Mangels fell short as early as 2014 in AMC's expectations related to professional judgment and leadership. Mangels' short-comings were significant enough that AMC

---

[24] In the relevant timeframe, Colanero hired and promoted at least two other females to VP (Trotter and Sandler). (SOF 51; Ex. 52, Sander Dec., at ¶ 3.)

invested in an external executive coach for her in 2015. In 2015 Mangels was also formally disciplined by AMC (at the recommendation of two female officer) for her part in an investigation relating to inappropriate business expenses and lack of oversight of the same.[25] (SOFs 4, 35-40, 42.)

In 2016, Mangels began requesting that AMC's Compensation Department approve a title change (in terms of the description of her function) and review her position (with respect to her compensation). Each time, Colanero submitted Mangels' request to the Compensation Department ("Compensation") and in October 2016, Compensation approved a title change but determined that her compensation should remain unchanged. (SOF 43.)

Immediately after Mangels' request to have her position reviewed, Colanero (who Mangels would later accuse of gender discrimination) awarded Mangels her highest overall review score for 2016 and successfully advocated for a <u>significant</u> increase to her base salary and overall compensation in AMC's merit review process. The following year Colanero raised Mangels' performance review score again. Despite AMC's poor financial year and 2% limit on raises for VPs, Colanero was still able to secure approval for a $20,000 increase to Mangels' target long-term incentive plan. Colanero's advocacy resulted in Mangels' invitation to be part of AMC's LEAP leadership class in early 2018. Despite Colanero's support, Mangels continued to be made aware of ongoing concerns within AMC regarding her leadership. (SOFs 43-50.)

Effective April 20, 2018, Mangels traded certain responsibilities with female VP Trotter resulting in a formal reorganization of Mangels' and Trotter's marketing teams. While eleven employees received title changes from Compensation (reflecting changes to their primary

---

[25] Mangels claims in her lawsuit that this warning was motivated by her gender. Mangels has no evidence supporting that assertion. Mangels was the only female (of the five) disciplined. (SOFs 38-41.)

Redacted

# Redacted

Case 4:19-cv-00834-BP   Document 98   Filed 07/20/21   Page 60 of 91

actively participated in internal leadership activities with Mangels. (SOFs 87, 89, 93-94, 96, 108-110.)

Colanero supported Mangels' efforts to improve and repair their relationship. That, however, did not negate the conduct that led to Mangels' receiving a final written warning. While Mangels believed her conduct in 2018 "Exceeds Expectations" and that there was no reason to consider the warning in her 2018 performance review, Colanero honestly (and reasonably) simply disagreed, giving Mangels a "Does Not Meet Expectations" overall score.[28] (*Id.*)

Six months later, on August 19, 2019, allegations that Mangels exhibited poor professional judgment landed on Colanero's desk again. This time, the allegations were raised by two female officers (Trotter and Pierce—both of whom had no knowledge of Mangels' prior complaints or Charge). Again, and like the investigation in 2018, Mangels cannot dispute the information witnesses provided AMC during its investigation. Nor can she dispute her behavior caused other employees to unnecessarily fear the loss of their jobs. Indeed, multiple subordinate employees who attended Mangels' August 14 meeting reported to AMC that Mangels' comments and behavior led them to believe a layoff was imminent—and those employees shared that concern with other employees who also then feared for their jobs. (SOFs 125-147.)

The conduct attributed to Mangels during the August 14 meeting was certainly questionable and lacking of good judgment; her behavior during AMC's investigation (as admitted by Mangels and as reported by others) was unacceptable. Mangels admitted to asking each member of her team about whether they reported her to Human Resources ("HR") because she needed to

---

[28] Mangels admitted during their candid February 12, 2019 discussion that she knew Colanero honestly believed she deserved a "does not meet expectations" score. It is also undisputed that Mangels' conduct with and relating to Pursell significantly and negatively affected her relationships within the marketing department in 2018 and beyond. (SOFs 90, 104-106, 109-110.)

know "who to trust."[29]  Multiple witnesses confirmed not only being asked by Mangels if they knew who reported her, but also several reported being asked to tell Mangels what they recalled her saying in the August 14 meeting and/or Mangels telling them her version of what was (and was not) said. Mangels also openly accused a fellow female VP (Trotter) of reporting her to at least two subordinate employees. Each of these discussions—very notably—occurred before Mangels was interviewed and before the witnesses were interviewed by AMC. Mangels was attempting to learn information that could influence what information she provided AMC—and was a transparent attempt to influence what subordinate employees shared with AMC or to change their recollections, or both. Jillian's report to AMC of her call with Mangels is illustrative. In that call, Mangels "interrogated" a subordinate employee (and witness) regarding: who reported her to HR, whether Jillian reported her , what Jillian recalled Mangels' saying in the August 14 meeting, and attempting to change/influence Jillian's recollection of Mangels' comments. Mangels also told Jillian she thought Trotter reported her. (SOFs 133-146.)

Also concerning, and not in dispute, is the fact that the information provided by Mangels during AMC's investigation directly contradicted (a)  information provided by several of Mangels' direct reports, and (b) two female VPs (Trotter and Sandler). With respect to Trotter, she reported that she had seen a LinkedIn® post by Mangels the week prior to AMC's layoff that clearly referenced "work" and that it had been deleted by Mangels. In contrast, while Mangels admitted to deleting the post after she learned of the layoff, she denied the post referenced work or had anything to do with AMC or her own speculation there would be a layoff (an apparent

---

[29] Mangels claimed in her deposition that she did not ask each of her direct reports if they "reported her" but only asked if they told anyone about her conduct/comments in the August 14 meeting. Mangels' account now is immaterial. Chavarria was present in Mangels' interview and understood Mangels to be admitting that she asked each of her direct reports if they reported her. In addition, multiple witnesses told AMC that she asked if they reported her or knew who did. (SOFs 133, 136, 137, 144, 145, 146.)

contradiction—why would she delete the post in response to a layoff if it did not relate to AMC or the layoff?). With respect to Sandler, Mangels described her interaction with Sandler on August 21, 2019 as "super casual." Sandler described Mangels' tone as accusatory, aggressive, and pointed—in relation to Mangels' accusation that Sandler reported Mangels. Mangels was attempting to bully and intimidate even her own peer - so much so that Sandler felt compelled to send a warning text to Trotter. Sandler's report to AMC of her discussion with Mangels on August 15, 2019—wherein Mangels told Sandler that a layoff/reorganization was occurring the next week—also directly contradicted Mangels' claim that she only speculated about a layoff with Rob Kim and further buttressed the allegation that Mangels' comments in the August 14 meeting did relate to a potential layoff (contrary to Mangels' denials during the investigation). (*Id.*)

Considering the information learned in its investigation, AMC concluded that Mangels had violated its expectations for officers in the following ways: (1) leading others to reasonably fear for their jobs; (2) interfering with AMC's investigation by confronting multiple individuals in an effort to determine who reported her to HR and influence what they would report; (3) providing incorrect or misleading information to AMC; and (4) failing to acknowledge that anything she did was inappropriate or, at a minimum, was misguided. Colanero was advised of the results of the investigation and its conclusions. (SOFs 150, 151.)

In sum, Colanero and Chavarria were presented with an officer who:

(a)   just the previous year had been found to have engaged in serious misconduct, which included not being forthright during an internal investigation;

(b)   admitted to behavior which AMC determined interfered with its investigation (which she saw no problem with);

(c)   denied comments and conduct that was substantiated by other officer(s) and/or other employees; and

(d)   appeared to accept no responsibility for the concerns and disruption her behavior caused.

They concluded termination was the appropriate outcome. (SOFs 150-154.)

### ii. Mangels' Title VII Gender Discrimination Claim Contained in Count III should be Dismissed as a Matter of Law for Multiple Reasons

Because Mangels has no direct evidence of discrimination, to carry her Title VII *prima facie* burden for unlawful gender discrimination, Mangels must prove: (1) she is female; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *See Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1062 (8th Cir. 2020). Only if Mangels meets her initial evidentiary burden does the burden shift to AMC to "rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action." *See id.* Once AMC has articulated a legitimate, non-discriminatory reason, any inference of discrimination or retaliation disappears, and Mangels must demonstrate through probative evidence that AMC's real reason is pretext for intentional gender discrimination. *See id.*

#### a. Mangels cannot Meet Her Prima Facie Burden

AMC does not dispute that Mangels is a female or that she suffered the adverse action of termination. As to whether Mangels was meeting AMC's reasonable (and clearly communicated) expectations, it is quite clear she was not able/willing to meet AMC's expectations with respect to integrity and judgment—a necessary skill and qualification of an AMC officer. The Eighth Circuit has recognized that a plaintiff is only qualified if, setting aside the reason for their termination, she "was *otherwise* meeting expectations or *otherwise* qualified." *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (emphasis original).[30] Mangels was given an "unacceptable"

---

[30] AMC acknowledges this Court's decision in *Lewis v. Honeywell*, No. 19-00017-CV-W-BP (W.D. Mo. Apr. 21, 2020) and the application of the "basic skills" articulation. However, given the ongoing Eighth Circuit inconsistency regarding the second element of the *prima facie* case, AMC believes this is still a viable argument. As noted by the Eastern District of Missouri in *Shirrell v. Saint Francis Med. Ctr.*, "The Eighth Circuit's recent decision in *Robinson v. American Red Cross*, 753 F.3d 749, 755 (8th Cir. 2014) appears to conflict with the Court's view in *Haigh*." 24 F.Supp.3d 851, 859 (E.D. Mo. 2014). However, in this instance, the particular articulation applied is immaterial, because Mangels is not qualified under either articulation, as she neither possessed the basic skills necessary for the position nor was she meeting AMC's minimum expectations. "[B]oth articulations are interrelated, and, fundamentally share the same purpose: helping determine whether a presumption that the defendant discriminated against the

rating under Foster Integrity and Trust in her 2018 performance review (which was always a qualification of her job as an officer). (SOF 108.) And as detailed herein, she failed to heed the warnings contained in both her June 2018 final disciplinary warning and performance review and again displayed an inability or unwillingness to meet AMC's expectations. For the reasons set forth herein, Mangels cannot establish this required element of her *prima facie* case. *See Harris v. Colvin*, 2013 WL 12074969, at *8 (W.D. Mo. Nov. 26, 2013) (finding plaintiff failed to establish she was meeting the legitimate expectations of her employer).

Mangels also cannot meet her evidentiary burden of creating a genuine issue of material fact as to whether a similarly situated male employee was treated better. The test to determine whether other employees are similarly situated is "*rigorous*" for a plaintiff. *Williams v. United Parcel Serv., Inc..*, 963 F.3d 803, 808-09 (8th Cir. 2020) (*citations omitted*). Before a plaintiff can introduce evidence comparing herself to another employee, she is required to show through probative evidence that the employee(s) she seeks to compare herself to "be similarly situated in all relevant respects." *See Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). The Eighth Circuit and this Court have held that in order to be similarly situated in all relevant respects "*the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances*." *See Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004).[31] Mangels must proffer "specific, tangible evidence" that her alleged comparator was "similarly situated in all relevant

---

plaintiff is appropriate. If the plaintiff has not shown that [s]he was qualified for the position, or that [s]he was meeting the employer's minimum expectations, 'the inference that [s]he would not have been fired had [s]he not been a member of a protected group is very weak—so weak that the factfinder should not be allowed to speculate on the motive for termination.'" *Garang v. Smithfield Farmland Corp.*, 439 F.Supp.3d 1073, 1086-87 (N.D. Ia. 2020).

[31] *See also Ma v. Missouri State Univ.*, 2014 WL 11512555, at *8 n. 2 (W.D. Mo. Sept. 3, 2014) (*quoting Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1078 (8th Cir. 2013).

respects, including that the offenses were of the same or comparable seriousness." *See Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 730 (8th Cir. 2019).

Substantial discovery failed to identify anyone who would meet this "rigorous" burden of proof. There is certainly no AMC employee who was supervised by Colanero who had the same performance/conduct history as Mangels in September 2019 that was not terminated by AMC. *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019) (plaintiff was not similarly situated to alleged comparator who did not have same supervisor, were not subject to the same standards, and had not engaged in the same conduct); *Riser v. Target Corp.*, 458 F.3d 817, 822 (8th Cir. 2006) (co-workers are not similarly situated where, among other things, they have different management and job duties).

Mangels appears to imply in her First Amended Complaint ("Lawsuit") (Doc. 5) that Pursell is an appropriate comparator. Pursell certainly would not be a comparator for purposes of AMC's decision to terminate Mangels.[32] He had a different supervisor and did not engage in the same conduct as Mangels that led to her termination. Pursell would also not be a comparator, as a matter of law, with respect to Mangels' 2018 warning[33] and performance review. *See Kight v. Auto Zone, Inc.*, 494 F.3d 727, 734 (8th Cir. 2007) ("Employees are not similarly situated if they have engaged in differing degrees of misconduct."); *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691-92

---

[32] During Jennifer Douglass' (Pursell's supervisor) deposition, she testified that she learned shortly after the August 20, 2019 layoff announcement that Pursell had sent an instant message to a fellow VP (a few days before the layoff) stating something to the effect of it was "nice knowing you"—apparently in speculation of a layoff. When Douglass met with Pursell, he admitted he exercised poor judgment and he told Douglass that he learned about the layoff before the announcement from Mangels and Rob Kim. (Ex. 7, Douglass Dep. at 45:9-25; 46:47:1-17; Ex. 15, Douglass Dec., at ¶ 12.) *See Day v. Cole County Comm'n*, No. 12-4051-CV-C-BP, 2013 WL 1189505 at *4 (W.D. Mo. March. 22, 2013) ("[T]o be similarly situated employees must be alike in all relevant respects, *including by being accused of the same misconduct*.") (emphasis added). Kim was separated from AMC in the August 20, 2019 layoff. (Ex. 16, Kim Dep., at 17:2-4.)

[33]

## Redacted

(8th Cir. 2002) (plaintiff not similarly situated where plaintiff's disciplinary record was more serious than the compared employees). Notably, these events are not pleaded as separate adverse actions. (*See* Doc. 5); (SOFs 66, 92-95, 110, 150, 152.)

Mangels can neither prove that she was meeting the reasonable expectations of AMC for officers or that a similarly situated male was treated differently. As such, Mangels cannot establish a *prima facie* case.

### b. Mangels cannot Show AMC's Legitimate, Non-discriminatory Reasons for Her Termination are Pretext for Unlawful Gender Discrimination

AMC's burden is simply one of production and "is not onerous." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). AMC has presented ample evidence that it terminated Mangels based on its legitimate, non-discriminatory findings that Mangels violated AMC's expectations for officers on multiple occasions. Moreover, AMC only reached the conclusion that separation was warranted after giving Mangels a formal warning and an opportunity to improve and meet AMC's expectations. (SOFs 88-90, 93, 108-110, 150-154.) AMC has met its burden of production—and the burden of proof passes to Mangels to demonstrate a genuine material dispute as to pretext. *McCullough v. Univ. of Ark. for Med. Services*, 559 F.3d 855, 863-64 (8th Cir. 2009) (an employer's stated reliance on the findings of an internal investigation was legitimate, non-discriminatory reason for termination).

### c. Mangels cannot Meet her Burden of Demonstrating a Material Question of Fact as to Pretext

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). First, "[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason

more likely motivated the employer." *See id*. In this sense, Mangels' burden of establishing pretext would merge "with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination." *See id*. at 1046.

Mangels' separation was principally driven by two internal investigations led by AMC's HR Department—one in May 2018 and another beginning in August 2019. Based on a review of Mangels' lawsuit, it appears Mangels may personally believe that she should not have received any discipline as a result of her conduct (or perhaps she will eventually concede to this Court that some discipline was appropriate). Mangels' subjective judgment or belief is irrelevant. So, too, is whether Mangels actually engaged in some or all of the conduct she was accused of engaging in. "The critical inquiry in discrimination cases … is not whether the employee actually engaged in the conduct for which [s]he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough,* 559 F.3d at 861-862 (citations omitted). Moreover, "even if [a plaintiff] could show that [the employer's] explanation for the demotion was false, h[er] burden is higher than that – [s]he must show that [the employer's] decision was motivated by [gender] discrimination." *See Williams*, 963 F.3d at 809.

Employer investigations and business decisions made in good faith have long been afforded deference in the Eighth Circuit. "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021). It is the plaintiff's duty to show and offer plausible evidence that the decision makers did not in good faith believe the results of any such investigation, and a plaintiff's failure to do so is detrimental to any possible showing of pretext. *See Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 507 (8th Cir. 2021). "So long as [the employer] had a 'good faith'

basis for [the adverse employment action]," AMC's decision may not be second-guessed. *Bone,* 686 F.3d at 955.

In *Fry v. Parcelite Solutions*, this Court granted summary judgment to the employer, expressly finding the plaintiff failed to present evidence suggesting that the employer did *not* hold a good faith belief the plaintiff committed misconduct and the actions warranted termination. 2012 WL 12895682, at *3 (W.D. Mo. Aug. 6, 2012). Like AMC, the employer in *Fry* opened an investigation into the plaintiff's conduct, which included interviews of the plaintiff and other employees. *Id.* at *2. Like AMC, the employer found that interviews with other employees corroborated the allegations of misconduct against the plaintiff. And like AMC, based on the results of the investigation, the employer in *Fry* made the decision to terminate the plaintiff. *See id.* In granting summary judgment to the employer, the Court held: "To be clear, the Court is also not deciding whether, as a matter of fact, Plaintiff either did or did not stare at and make noises and facial expressions towards Ms. Ramsey. Instead, the only issue for the Court to decide is whether Defendant had a *good faith belief that Plaintiff committed these actions and that they warranted termination.*" *See id.* at *3 (citations omitted).[34]

Here, the following facts are undisputed with respect to both AMC's 2018 investigation and 2019 investigation:

- Mangels was interviewed; so too were a number of <u>neutral</u> witnesses;
- Multiple <u>neutral</u> witnesses substantiated and corroborated the allegations against Mangels;
- Multiple <u>neutral</u> witnesses materially disputed information provided by Mangels; and

---

[34] *See also Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 454 (8th Cir. 1997) (it is not a court's purview to review business decisions or practices).

Redacted

Redacted

happening but also infers everyone knew.[37]  *(Id.,* ¶¶ 79, 82(a), (e).)  As set forth above, Mangels'
denials regarding what she did and did not say in the August 14 meeting are immaterial. As for her
claim everyone knew (but she didn't know?), there is no basis to believe that any member of her
team knew a layoff was actually happening <u>and</u> the timing of the layoff. Jordan's texts to Marti
sums it up perfectly. In reference to Mangels, Jordan stated: ***"…I feel like she created even more***
***rumors????...and "worried the entire team."***  (SOFs 127-146.)  Mangels then claims she was
"bullied" by Chavarria in her first interview[38] and claims or infers her team was bullied or
intimidated. There is no evidence supporting Mangels' subjective feelings related to her first
interview. And there is absolutely no evidentiary support for Mangels' hearsay testimony relating
to unnamed third party interviews. Inexplicably, Mangels all but ignores the more serious
allegations investigated by AMC—her own conduct during the investigation.

Put simply, Mangels has no evidence of pretext. She has no evidence that would allow a
reasonable juror to find that AMC did not in fact have a reasonable and honest belief in the
conclusions it reached in its internal investigations. And—perhaps most importantly—there is
certainly no evidence of unlawful gender bias by anyone. To the contrary, Colanero promoted
Mangels in 2013, gave her an 'Outstanding' performance review, advocated for pay increases and
for Mangels in general, and was responsible for Mangels' invitation in early 2018 into AMC's
LEAP program. (SOFs 44-49.) Colanero's and AMC's support for Mangels is undisputed and

---

[37] Mangels points to a profit improvement plan that was part of a detailed SEC quarterly filing by AMC. (Doc. 5, ¶ 82(a). She has
presented no evidence that any member of her team read AMC's SEC filing.

[38] Mangels testified that the person she was referring to in Paragraph 82(c) was Chavarria. Mangels made no claim that Mutzbauer
bullied or intimidated her. (Ex. 2, Mangels Dep., at 48:6-25; 49:1-7.)  Mutzbauer interviewed all of Mangels' team members alone
(with the exception of Jordan, where Chavarria also participated). (Ex. 3, Chavarria Dec., at ¶ 25, 27; Ex. 1, Chavvaria Dep., at
259:1-5.)

undermines any inference that Mangels' gender was a motivating factor in AMC's actions.[39] However, a supervisor's (and company's) support is never unconditional. And Mangels' misconduct in 2018 had a damaging (but not fatal) impact on Colanero's support and her misconduct (and failure to accept any responsibility) for her behavior in August/September 2019 made clear that Mangels could not meet AMC's expectations for officers.

### iii. Mangels' Retaliation Claims in Counts II and IV should be Dismissed as a Matter of Law

To establish a *prima facie* case of retaliation under either Title VII or the EPA,[40] Mangels must establish: (1) that she engaged in statutorily protected activity, (2) an adverse employment action caused injury that would "chill a person of ordinary firmness" from continuing the activity, and (3) a causal connection exists between the two events. *Hill v. City of Pine Bluff, Arkansas*, 696 F.3d 709, 715 (8th Cir. 2012). The Eighth Circuit has held that more than temporal connection between the protected conduct and the adverse action is required to present a genuine factual issue on retaliation. *Gagnon v. Sprint Corp.*, 284 F.3d 839, 851-52 (8th Cir. 2002) (one month's time between protected activity and adverse action did not establish causation). Only if Mangels can establish a *prima facie* case does the burden switch to AMC to articulate its legitimate, nondiscriminatory reason (which it has). Ultimately, Mangels must present evidence that retaliatory bias was the "but for" cause of the adverse action. *See Hill*, 696 F.3d at 715; *see also Univ. of Tex. Southwestern Med. Ctr v. Nassar*, 133 S.Ct. 2517 (2013).

---

[39] Colanero's undisputed support and advocacy for Mangels up until notice of her misconduct belies any claim of gender bias. *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996) (where person who hired and then fired plaintiff several years later was the same person this fact cuts directly against a finding of unlawful discrimination). As the Eighth Circuit has noted, "…it is unlikely that the same supervisor would hire a woman, only to turn around and discharge her for that reason." *See Herr v. Airborne Freight Corp.*, 130 F.3d 359, 363 (8th Cir. 1997).

[40] Courts apply the analysis used in federal employment claims to lawsuits brought under the EPA. *See Yearns v. Koss Constr. Co.*, 964 F.3d 671 at 674 (8th Cir. 2020).

Mangels first engaged in statutorily protected activity in her May 23, 2018 email. This email was sent during AMC's investigation into allegations of serious misconduct by Mangels and Pursell, **and after** she was advised by AMC of those serious accusations. In her May 30, 2018 meeting with Reeves, Mangels alleged that she was paid less than three males in different but similar jobs (Pursell, Lai and Ybarra).[41]  Mangels made the same accusation in an email to Colanero in November 2018, and made a similar statement in her extended discussion with Colanero on February 12, 2019.[42]  She filed a charge of discrimination in May 2019. (SOFs 61-84, 100, 110, 114.)

**June 5, 2018 Warning**:  Mangels' attempt to connect her June 5, 2018 warning to her 11th hour complaint is frivolous. AMC's investigation began weeks **before** Mangels' assertion she was paid less than 3 males and **after** Mangels was first interviewed and asked for a detailed written response to certain trips with Pursell expensed to AMC. It also occurred <u>after</u> every witness interview. (SOFs 61, 62, 82.)

Post-hoc complaints of discrimination "do no insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *See Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1051 (8th Cir. 2007) (*quoting Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004)). In *Griffith*, the plaintiff made complaints of discrimination days after receiving notice of pre-disciplinary hearings that ultimately led to disciplinary action. 387 F.3d at 738-39. The *Griffith* court found no causal connection between the plaintiff's protected activity and discipline because "complaining of discrimination in response to a charge of workplace

---

[41] Reeves advised Chavarria of Mangels' accusations after the meeting but not Colanero.

[42] While Chavarria was provided a copy of Mangels' November 2018 email, she was not aware of Mangels' comment to Colanero in the February 12, 2019, discussion.

misconduct is an abuse of the anti-retaliation remedy." *See id.* The Eight Circuit has repeatedly reached the same conclusion when presented with an employee who engaged in protected activity only after being confronted with their own bad behavior or performance flaws. *See, e.g., Carrington*, 481 F.3d at 1051 (no causal connection where employee complained of discrimination after supervisors began investigating his job performance).[43]

**2018 Performance Review:** Mangels next attempts to connect her May 30, 2018 complaint and her email to Colanero in November 2018 to her 2018 annual performance review score.[44] Each of the following facts is undisputed: (a) in the review period (2018) Mangels received a final written warning for serious misconduct; (b) Colanero, reasonably and honestly, believed she lied to him and AMC in that investigation; and (c) on June 5, 2018, Mangels was advised in writing that the conduct resulting in the warnings "**will be** considered when determining your 2018 overall performance" and she was also told by Colanero that it would take time to repair their relationship. It is also undisputed Colanero immediately took tangible and meaningful steps to assist Mangels in bringing her conduct in line with his and AMC's reasonable expectations. And, just like in *Griffith*, the conduct that resulted in Mangels' poor review score occurred **before** any protected activity by Mangels. (SOFs 89, 92, 93, 96, 108-110; Ex. 45; Ex. 46.)

Mangels cannot establish a causal relationship. Mangels' assertion that her serious misconduct was "fully addressed by AMC in the spring of 2018, and there was no reason for re-

---

[43] *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) (no causal connection where employer's concerns about employee's performance predate employee's protected activity); *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001) (same).

[44] Notably, Mangels is fine with Colanero's grades related to her Key Performance Metrics ("KPMs"). However, she does not like the scores he gave her for integrity and trust and other competencies. (SOF 108, 110.)

visiting the same issues once again during [her] year-end review"[45] is simply her subjective opinion. (Doc. 5, ¶ 50.) Mangels' judgment does not create a triable fact. Her opinion also squarely contradicts what AMC told her in June. And it certainly has no bearing on Colanero's good faith belief and his own business judgment as an executive VP of AMC.

Mangels, again, points to Pursell's review score—which was only one grade higher than hers—as alleged evidence of pretext. For all the reasons cited herein (including n. 15), Pursell is a not a proper comparator because Colanero did not review Pursell (or play any role in his review) and there were significant distinctions between Mangels' and Pursell's past conduct. In his discussion with Mangels on February 12, 2019 (when Colanero did not know he was being recorded)[46] Colanero directly and honestly responded to Mangels' statement related to Pursell's score. First, Colanero told Mangels he did not know what score Pursell received because he does not "manage" Pursell and "that's for somebody else." Next, he explained that not all of the conduct Mangels was disciplined for involved Pursell (and referenced the feedback he received at the Talent Summit). (Ex. 54, pp. 13-16.)

**September 30, 2019 Termination:** After receiving her 2018 performance review, Mangels does not point to any other event she believes was motived by retaliatory bias until her termination on September 30, 2019 (and the preceding investigation). In other words, Mangels continued working with Colanero and for AMC and AMC continued to employ Mangels (without incident). Notably, she was not selected for layoff on August 20, 2019 (when a number of

---

[45] Here, Mangels appears to be tacitly admitting that discipline in 2018 was warranted.

[46] On the recording Mangels acknowledged, "I know there's a situation about a personal event that happened, you know, I get that" (in reference to June 2018 warning) and Colanero responds: "Well there were multiple situations…that led to that." Mangels replied: "None of them were to ever hurt the company…" and Colanero responded: "As a leader, to do those things undermines the integrity of the company, its stealing money from the company, it still undermines the company and makes it very challenging to enforce integrity and honor .. if people can point and say, well, …one of your most senior leaders … in marketing [Mangels] …I would trade off some of the work volume for better behavior." (Ex. Ex. 54, p. 13-14.)

employees and officers were, including one of her comparators, Kim). This fact <u>directly belies</u> any causal connection between Mangels' May 2019 EEOC charge—and her inference that AMC was simply lying in wait for an opportunity to separate her.[47]

Trotter's and Pierce's separate and unexpected complaints to Colanero—both on August 19, 2019—erode any inference of a link between Mangels' protected activity. As does the fact that information reported by others, including Jordan, Ellen, Alice Rogers, Pamela Sandler, and Jillian (and Mangels' own denials and admissions) reasonably and honestly informed the determinations reached by AMC. (SOFs 125-153.) Intervening acts of unprotected conduct serve to "erode[] any causal connection that was suggested by the temporal proximity of protected conduct" and adverse employment action. *See Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999). Poor performance, dishonesty, and other bad behavior "intervening acts" that belied causation. *See, e.g., Lenzen v. Workers Comp. Reinsurance Ass'n,* 705 F.3d 816, 821–22 (8th Cir. 2013); *Freeman v. Ace Tel. Ass'n.,* 467 F.3d 695, 698 (8th Cir. 2006). "[T]he anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *See Kiel,* 169 F.3d at 1136.

Not only were the complaints received by AMC an unexpected intervening event, but neither of the female officers who initially reported the behavior nor the witnesses who provided information relied upon by AMC had any knowledge of prior protected activity by Mangels. (SOF 149.) Thus, they could have no retaliatory bias. The facts are akin to *Stuart v. Gen. Motors Corp.,* where the Eighth Circuit concluded the plaintiff's allegations of retaliation were unpersuasive

---

[47] Mangels makes a strange inference in her Lawsuit that AMC was waiting to terminate her until after a voluntary mediation relating to her EEOC charge. (Doc. 5, ¶¶ 83-84.) In July 2019, Mangels' lawyers and AMC's lawyers mutually scheduled a mediation to occur in late September 2019. Of course, neither AMC (nor Mangels) had any idea in July 2019 that Trotter and Pierce would walk into Colanero's office on August 19, 2019, and both independently report inappropriate conduct by Mangels when that mediation was scheduled.

because, in part, the individual who reported the plaintiff's conduct had no knowledge of her prior protected activity. 217 F.3d 621, 636 (8th Cir. 2000). Specifically, a security guard witnessed the plaintiff engaging in an indecent act. *See id.* The guard, who was unaware of the plaintiff's protected activity, reported the conduct to the plaintiff's supervisor. *See id.* The employer investigated the unbiased complaint, and ultimately terminated the plaintiff based on its reasonable belief she had engaged in the reported inappropriate conduct. *See id.* The Eight Circuit reaffirmed that where the complainant has no knowledge of the plaintiff's protected activity, and an investigation is launched based on the complaint, any inference of retaliation is diminished.[48] *See id.* at 636-37.

   Put simply, Mangels cannot establish a causal connection to any protected activity and therefore, her retaliation claim fails as a matter of law. Even if she could establish a causal connection (which she cannot) she cannot meet her "but for" burden of proof. Mangels' retaliation claims under both Title VII and the EPA fail as a matter of law.

### B.   Mangels' Equal Pay Act Claim for Discrimination Must be Dismissed

   The Equal Pay Act ("EPA") prohibits gender-based discrimination resulting in unequal pay for *equal* work. *See Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011).

> "From the first, the EPA concerned equal pay for— emphatically—equal work. To that end, Congress rejected statutory language encompassing 'comparable work' to instead mandate equal pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"[49]

---

[48] *See also Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (8th Cir. 2009) (no retaliatory motive where complaint was initiated by customer who was unaware of plaintiff's protected activity).

[49] *EEOC v. Port Authority of New York and New Jersey,* 768 F.3d 247, 254 (2d. Cir. 2014)(citations omitted). Both the Eighth Circuit and Western District of Missouri have looked to the Second Circuit's analysis in EPA cases. *See Horner*, 613 F.2d at 715 (quoting *Hodgson v. Corning Glass Works*, 474 F.2d 226, 231 (2d Cir. 1973), *Aff'd*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *E.E.O.C. v. Affiliated Foods, Inc.*, No. 81-6066-CV-SJ, 1984 WL 980, at *14 (W.D. Mo. Apr. 5, 1984) (*citing Marshall v. Building Maint. Corp.*, 587 F.2d 567 (2d Cir. 1978)).

As the leaders of their respective functions, VPs at AMC each are charged with a unique set of responsibilities to deliver on performance metrics that are their own.[50] (SOF 19.) No two VPs at AMC have the same job duties. Their officer-level jobs are, inherently, *un*equal in content. Even Mangels agrees; she testified her work was "unique" from the identified male comparators. (SOF 20.)

"[T]he consideration of equal pay standards is based on actual job requirements and performance, not [] classifications or titles." *See Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980). In other words, the relevant inquiry under the EPA is whether a female and identified male comparator perform the same job content. *See Orahood v. Bd. of Trustees of Univ. of Arkansas*, 645 F.2d 651, 655 (8th Cir. 1981).

The "equal work" standard has been described as "demanding," and "broad generalizations drawn from job titles, classifications, or divisions" have been deemed insufficient.[51] *See Port Auth.*, 768 F.3d at 255-56. This is because the EPA has always concerned equal pay for *equal* work—not similar work. *See Orahood*, 645 F.2d at 654-55. To survive summary judgment, the work performed by an alleged comparator of the plaintiff must be "essentially equal." *E.E.O.C. v. Affiliated Foods, Inc.*, No. 81-6066-CV-SJ, 1984 WL 980, at *13–14 (W.D. Mo. Apr. 5, 1984). It is not enough to show that a plaintiff and comparator hold positions that both require a similar

---

[50] AMC is a publicly traded company subject to strict oversight by its board of directors and investors; such scrutiny necessitates efficiency in its management. The scrutiny simply does not permit—even if AMC preferred it—two VPs, who are officers of the company, to be responsible for the same portfolio of duties. (SOF 6, 7.)

AMC assesses each VP job based upon the scope of work, the person in the job, how the work is done, and the value of the role in the organization. (SOFs 32-34.) Each VP has a unique job description, and is subject to annual review based upon their execution of their individualized KPMs". While the VP job descriptions reflect the general function the individual in the role performs, the KPMs reflect specific projects, goals, and initiatives the VP was tasked with in the relative year. (SOF 17.)

[51] The Fourth Circuit requires the plaintiff to prove she held "virtually identical jobs" to her identified comparators *Evans v. Int'l Paper Co.*, 936 F.3d 183 (4th Cir. 2019) (the plaintiff and alleged comparators "must have virtually identical jobs.")

skillset, like problem solving, preparing reports, and/or ability to coordinate and supervise subordinates, or that they have the same job code or title. *See Orahood*, 645 F.2d at 654. Such "bland abstractions" do not render positions "equal" under the EPA. *See Port Auth.*, 768 F.3d at 257. Rather, the key is equality of actual job content between a plaintiff and alleged comparator. *See* 29 C.F.R. § 1620.13(e)(1998) ("Job content controlling"). Notably, Mangels bears "the burden of proving that the jobs involve equal work."[52] *Lawrence v. CNF Tramp., Inc.*, 340 F.3d 486, 491 (8th Cir. 2003). She cannot do so here.

### i. Mangels Cannot Establish a *Prima Facie* Case Under the EPA

To establish a *prima facie* case under the EPA, Mangels is required to prove (1) AMC paid male employees higher wages than it paid her; (2) for a job performing equal work; and (3) that equal work is performed under similar working conditions. *See Berg v. Norand Corp.*, 169 F.3d 1140, 1145–46 (8th Cir. 1999).

Of the scores of VPs at AMC, Mangels has cherry-picked five men with whom she seeks to compare herself under the EPA: Robert Lane, Michael Pursell, Rob Kim, Frank Ybarra, and Julius Lai. (SOF 26.) The Eight Circuit has expressly "cautioned that comparisons with specifically chosen employees" like those curated by Mangels here, "should be scrutinized closely to determine their usefulness." *See Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1081 (8th Cir. 1999). But even ordinary scrutiny, much less the "close" scrutiny required by the Eighth Circuit, shows the five male comparators each had jobs with different content than that performed by Mangels.

---

[52] If the plaintiff cannot meet the "equal work" standard, "the amount by which [a comparator's] salary exceeds [plaintiff's] is not relevant under the Equal Pay Act." *See Horner*, 613 F.2d at 715. Indeed, "Congress did not intend to put either the Secretary (of Labor) or the courts in the business of evaluating jobs and determining what constituted a proper differential for unequal work." *See id.*

| Name | Responsibilities, Experience, & Job Content |
|------|---------------------------------------------|
| Tonya Mangels<br>*VP, Product Marketing* | Mangels marketed AMC's products by providing marketing support to several groups across AMC, including food and beverage, pricing, programming, and some discrete aspects of guest engagement. (SOF 21-22.) Mangels spent most of her time during the relevant time period directing the creation and overseeing implementation of marketing programs for AMC's food and beverage brands and AMC's dine-in theatre concepts. (SOF 21-22.) In April 2018, Mangels traded some responsibilities with Trotter, and as a result, took on additional responsibility for film marketing.[53] As Mangels puts it, she held a "unique" role within AMC; it was not "single focused." (SOF 20.) And while Mangels may have, at times, coordinated or conferred with various departments (*e.g.*, Pricing) across AMC, each of those organizations' VPs had responsibilities unique to their specific group, and none hold the same core responsibilities. (SOF 21-23, 27-31.) |
| Julius Lai<br>*VP, Guest Engagement* | Lai is a customer loyalty and engagement expert with approximately 15 years' experience in the field. Lai was recruited by AMC because of his demonstrated experience with the dynamics of consumers and their needs, and how that translates to the consumer's repeated consumption of a product. While Mangels focused on the marketing of AMC's various products, Lai was responsible for formulating and implementing strategies to directly engage with guests. He did so through two primary channels: (1) AMC's guest loyalty program (AMC Stubs); and (2) AMC's digital properties (website, mobile app, and social media platforms). The design and operation of these properties was critical for AMC and the functions performed by Lai were extremely important to the company. As guests increasingly sought to engage with AMC on-line and the significance of repeat, high-value guests grew, the importance of Lai's functions increased further and, coupled with his excellent performance, led to his promotion to SVP in fall 2018.[54] (SOF 27.)<br><br>Lai spent the bulk of his time in this role restructuring and redesigning AMC's guest loyalty program, AMC Stubs. Lai's efforts increased the number of AMC Stubs members from 5 to approximately 24 million. Not only did this increase AMC's revenue, but it also led to new financial opportunities for AMC. Specifically, the data AMC is able to gain about its AMC Stubs members provides it with significant market insight into movie-goer preferences and allows AMC to broaden and refine its effort to support Hollywood studio partners. Unlike Lai, Mangels was not responsible for the overhaul of AMC Stubs—the largest portion of Lai's responsibilities. She did not have 15 years' experience in customer loyalty programs. (SOFs 23, 27.) |
| Frank Ybarra<br>*VP, Communications* | Ybarra was AMC's internal and external public relations expert. His primary responsibilities were to create and issue internal and, formerly, external communications on AMC's behalf. Internally, Ybarra crafted communications from the CEO, other senior leaders, and administrative departments to update associates on policy changes, upcoming events, and key initiatives (among others). Externally, Ybarra was responsible |

---

[53] The dynamics of Mangels' role in "film/programming marketing" and Kim's role as VP, Programming and Promotions, are set forth in more detail below.

[54] Mangels concedes Lai was not a comparator after his promotion to SVP. (SOF 27(e).)

| Name | Responsibilities, Experience, & Job Content |
|------|---------------------------------------------|
| | for developing the response and strategy for the same to media outlets seeking comment from AMC.[55] Ybarra also organized special employee events throughout the year, including AMC's annual "Connections" event and other large employee meetings. It was also Ybarra's job to respond, on AMC's behalf, to internal and external crises as they arose. This required him to be available and responsive to the CEO on a "24/7" basis, and required him to office very close to the CEO. (SOF 28.) <br><br> Unlike Ybarra, Mangels did not have crisis management responsibilities and was not responsible for the strategy behind or content of internal or external public relations communications. She did not office next to the CEO nor have the responsibility to be accessible to him on a 24/7 basis. (SOF 23, 28.) |
| Michael Pursell <br> *VP, Food & Beverage* | Pursell was responsible for AMC's food and beverage operations and financial performance. Pursell had over 20 years of experience in the food and beverage industry when he came to AMC and had former training in culinary arts. AMC valued Pursell's role, given that food and beverage sales account for two-thirds of AMC's revenue. (SOF 29.) <br><br> Specifically, Pursell sourced new products, determined whether he was getting the best price, assessed their financial viability, and created the business case for them. He was responsible for: leading a team that implemented new product offerings; food and beverage packaging, preparation, and safety; and the customer experience with food and beverage products. Not surprisingly, Pursell's role required good relationships and consistent communication with AMC's "field associates," *i.e.*, the theatre management team and associates working at the food and beverage counter, to ensure expectations related to supply chain, inventory management, and quality control of the food and beverage items were met. (SOF 29.) <br><br> Mangels had no responsibility over these tasks. Rather, according to Mangels, Pursell led "the operational strategy," while she led "the marketing strategy." (SOF 29(d).) Even Mangels agrees; on a secret recording she took on May 30, 2018, that she and Pursell had "different responsibilities." (SOF 23, 29.) |
| Rob Kim <br> *VP, Programming*[56] | Kim's specialty was derived from his long-standing relationships with movie studios, which he used to negotiate trailer space and other advertisement services. Kim began working for AMC in 1995, became a director in 2006, and became a VP in 2010.[57] Kim also received a certification in negotiation from Harvard. During the time at issue in this case, Kim was responsible for business development and shaping AMC's relationship with over 15 movie studios. Specifically, Kim was tasked with proposing new |

---

[55] In mid-2019, Ybarra's responsibilities for external communications were outsources to a third party.

[56] Mangels claims Kim is a comparator for only the April 2018 to September 2019 time period, when she took on the "Product Marketing" function. According to the job description Mangels prepared, 35% of her responsibilities were allocated to "Product Marketing." (SOF 30(a).)

[57] Mangels was hired in 2009 and became a VP in 2013.

| Name | Responsibilities, Experience, & Job Content |
|------|---------------------------------------------|
| | agreements with studios under which the studio pays AMC for certain products, and then negotiating those agreements to execution. (SOF 30.)<br><br>A large portion of Kim's job involved negotiating a payment from the studios in exchange for granting studios movie trailer space during the "previews" that air before the main picture is shown. As one of the primary "faces" of the company to studios, this was a highly responsible, and critically strategic, function for the company, which Kim was uniquely qualified for given his 25 year tenure with AMC and the rapport he established with several studios and their executives during that time. (SOF 30.) Even Mangels admits Kim had "very good" relationships with the studios. (SOF 30(c).)<br><br>Mangels did not negotiate new contracts with movie studios, nor did she rely on her long-standing relationship with their leaders to do so. She also did not negotiate contracts related to movie trailers. Rather, Mangels prepared a "menu" of other viable marketing products—for example, emails to AMC Stubs members—that *Kim* could then offer the studios in exchange for a fee. Their roles were distinctly different in that Mangels created the marketing service options while Kim used his contacts at the studios and negotiating skills to convince them to purchase these services. Kim then negotiated the final contract price. (SOFs 23, 30.) |
| Robert Lane<br>*VP, Pricing* | Lane developed pricing models and analyzed consumer and financial analytics to determine the price of AMC's products. He has a degree in Finance and has worked in Finance roles for over 15 years (including corporate officer-level roles). He was recruited to AMC for his extensive background in financial analysis for publicly traded companies. AMC's CEO spoke with him "frequently." (SOF 31.)<br><br>Lane was responsible for in-depth financial analysis, advanced financial analytics, and the creation of pricing models that allow AMC to attractively and profitably price its product offerings. During the relevant time period, Lane primarily focused on effectively pricing movie tickets and concession items to increase AMC's margins. (SOF 31.) While Mangels collaborated with Lane on some projects, the two had different responsibilities and skills. Lane's job was to build models to define profitable prices of products, while Mangels identified, in light of various market conditions, those products consumers may be interested in buying. As Mangels admits, she was not responsible for defining ticket pricing. She does not have a background in Finance, nor did she perform Lane's modeling, forecasting, and analysis related to AMC's pricing strategies. (SOF 23, 31.) Although she claims she had "influence" on pricing strategies for flash sales, promotions, ticket pricing, and menu items, *i.e.*, she could suggest or recommend pricing, "influence" does not equate to responsibility for preparing a financial model to determine the final price of these items, and bearing responsibility for the potential repercussions. |

The core tasks of these six jobs vary widely, require different skill, effort, and responsibility, and are not comparable to the jobs held by Mangels in either of her VP roles.

Significantly, none of these positions are fungible with the other, and none of the five male comparators assumed any of Mangels' job duties after her separation in September 2019 (instead, another female marketing VP, Pam Sandler, took over almost all of Mangels' responsibilities). (SOF 155.)

Mangels cannot contest this. Instead, she urges the Court to reimagine, and dilute, the EPA's requirement of "equal job content." These five male VPs are comparators, she claims, based on "abstractions" like they each managed a team of direct reports, worked on internal task forces, managed a budget, travelled for work, and performed a role that required, at a minimum, a bachelor's degree. But Mangels admits that her responsibilities were "unique" and that none of the comparators were responsible for all (or even most) of her job duties. While she claims they "shared part" of her job duties (meaning that their roles/objectives occasionally intersected), the EPA looks at the job in its totality—not segments. *See Equal Emp. Opportunity Comm'n v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1248 (8th Cir. 1981) ("For purposes of the Equal Pay Act, the overall job, not individual segments of the job, determine whether two groups of employees perform substantially equal work."). And courts look to the actual duties of employees, not the type of "abstractions" Mangels focuses upon here to assess whether two jobs perform work with "equal job content." *Port Auth.*, 768 F.3d at 257.

For example, the Seventh Circuit affirmed dismissal of a female vice-president's EPA claims where the plaintiff alleged her and the male VP comparators' roles required "substantially equal skill" because they each managed a division, supervised a team of employees, and managed a budget. *See Stopka v. Alliance of Am. Insurers*, 141 F.3d 681 (7th Cir. 1998). The court rejected the claim these shared tasks amount to "equal work," and instead concluded the five male VPs she identified as comparators performed "substantially different" jobs because the plaintiff's

responsibilities involved oversight and management of administrative functions for the employer's home and regional offices, whereas the male VPs' jobs primarily involved skills in insurance policymaking. *See id.* at 685-86. Here, Mangels essentially makes the same argument merely because the male VPs she cherry-picked have the same titles, are generally responsible for managing budgets and teams, etc. But that is not the law.

Consider also *Port Auth.,* a case involving attorneys working "in house" in the legal department of the Port Authority of New York and New Jersey. In that case, the EEOC argued to the Second Circuit that "all lawyers perform the same or similar function(s) and that most legal jobs involve the same skill" because lawyers have the same professional degree, work under time pressures and deadlines, and use "analytical" and "legal skills." *See EEOC v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 257 (2d Cir. 2014). In rejecting this argument, the Second Circuit noted the difference between "handl[ing] complex commercial matters or minor slip-and-falls, negotiate[ing] sophisticated lease and financing arrangements or respond[ing] to employee complaints, conduct[ing] research for briefs or draft[ing] multimillion dollar contracts," and explained that "accepting such sweeping generalization as adequate to state a claim under the EPA might permit lawsuits against any law firm—or conceivably, any type of employer—that does not employ a lockstep pay model." *See id.* In *Port Auth.,* the court rejected the plaintiff's suggestion that "a lawyer is a lawyer" because while all lawyers have similar skills and perform legal functions, the *content* of each lawyer's job varies by practice area and responsibilities. *See id.* at 251-52.

Again, Plaintiff makes a similar argument: because she and the five male comparators managed budgets, had relevant experience in their fields, supervised direct reports, and had college degrees and/or masters, they should have been paid equal amounts. But Courts in the Eighth Circuit

consistently reject arguments premised on the assumption that all members of a given profession, regardless of subject matter expertise, perform the same core duties. *See, e.g., Berg v. Norand Corp.*, 169 F.3d 1140, 1145–46 (8th Cir. 1999) (rejecting EPA claim where alleged male comparators encompassed many disciplines, including finance, production, and manufacturing); *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003) (rejecting EPA claim where the plaintiff did not demonstrate male VPs performed "equal work"). Like department supervisors or lawyers, AMC's VPs work in diverse fields that entail unique skills and varying degrees of responsibility. Because Mangels cannot identify a male comparator who was paid more for substantially equal work, her equal pay claim fails.

### ii. Mangels' Pay Differential was Based on a Factor Other Than Sex

Even if Plaintiff could prove she performed "equal work" to the male comparators, her EPA claim would still fail because AMC values VP roles differently based on the skills and experience necessary to effectively perform the role, as well as how AMC internally values the services provided by discreet roles. Additionally, Mangels' disciplinary history created circumstances unique from the purported male comparators, which was another reason why she was paid less.

Even where a plaintiff carries her *prima facie* burden of proof (which Mangels cannot do), a defendant will defeat an EPA claim by demonstrating a pay disparity was based on either (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality; or (4) a factor other than sex. *See McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 513 (8th Cir. 1995); *see also* 29 U.S.C. § 206(d)(1). "The last of the statutory affirmative defenses set forth in the EPA is a catch-all provision that excuses pay discrepancies 'based on any other factor other than sex . . .'" *Taylor v. White*, 321 F.3d 715 (8th Cir. 2003) (*citing* 29 U.S.C. § 206(d)(1)(iv)). The EPA does not impose any limitations to the broad catch-all "factor other than sex" affirmative

defense, and "legislative history supports a broad interpretation." *See id.* at 717-18. Further, "a court's concern is not related to the wisdom or reasonableness of the asserted defense"; rather, "[i]t is related solely to the issue of whether the asserted defense is based on a 'factor other than sex.'" *See id.* at 719. If the defendant proves the pay differential was based on a factor other than sex, summary judgment is appropriate. The Eight Circuit has established that varying pay based on skill, ability, and experience is a "factor other than sex" under the EPA. *See Horner*, 613 F.2d at 714.

The evidence establishes that, as compared to Mangels, AMC placed a higher value on the positions occupied by each of the alleged male comparators because of the skills and experience necessary to perform those roles. To that end, AMC considered Mangels' role more fungible; in other words, it was easier to find a replacement for Mangels' duties than it would be to replace Lai, Ybarra, Pursell, Kim, or Lane. Moreover, and as set forth in the above chart, the purported male comparators also possessed significantly more qualifications, skills, and ability than Mangels in each of their respective fields.

In *Hutchins v. Int'l Bhd. of Teamsters*, the Eighth Circuit has affirmed summary judgment where the plaintiff and 12 alleged comparators had varying experience. 177 F.3d 1076, 1081-82 (8th Cir. 1999). The *Hutchins* court examined the employer's proffered reasons for unequal pay, *i.e.*, their experience and education, and concluded both were well-settled "factors other than sex" under the EPA. *See id.* Because the plaintiff did not context the experience and education of the alleged comparators, the court determined summary judgment was appropriate. *See id. Hutchins* is analogous here. Each of the purported male comparators had vastly different experiences, and in some cases, educations, from Mangels which shaped their skills and rendered them suitable candidates for their distinct VP roles. These are facts Mangels cannot dispute. And each was

ultimately paid differently because AMC valued their experiences and skills differently based on the responsibilities each performed.

Plaintiff's compensation after May 2018 was also impacted because of the "final warning" discipline she received at that time—discipline that, in the words of her supervisor, "derailed" any discussion of compensation adjustments, resulted in a low performance rating for the 2018 year, and negatively impacted the compensation adjustment she ultimately received in 2019. Discipline is inarguably a "reasonable factor other than sex." Plaintiff's compensation was a function of the relative value AMC placed on the function she performed and behavioral issues that ultimately resulted in discipline in mid-2018. The Court should find that AMC has identified multiple reasons other than sex for Mangels' compensation and grant summary judgment on her compensation discrimination claim.

## C.     Mangels Title VII Wage Discrimination Claim Fails as a Matter of Law

The premise of Mangels' Title VII wage discrimination claim is AMC paid her less *because* she is a woman. But her Title VII claim fails for the same reason that her EPA claim fails: she had different responsibilities, measurements, and job content than those to whom she seeks comparison. Her Title VII claim also fails for another reason: she has not, and cannot, offer any evidence that she was paid differently *because* she is female.

"Title VII wage discrimination claims based on unequal pay for equal work are analyzed under Equal Pay Act standards." *Tenkku*, 348 F.3d at 741. So, to articulate a *prima facie* claim for compensation discrimination under Title VII, Mangels must show that AMC paid male employees more for *equal* work. *See Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 719 (8th Cir. 2000). Thus, if summary judgment is, as it is here, warranted under an "EPA claim, it was also proper on . . . [a parallel] Title VII claim[]." *Price v. Northern States Power Co.,* 664 F.3d 1186, 1191 (8th Cir. 2011). But unlike the EPA, a plaintiff asserting a compensation discrimination claim under

81

Title VII has the additional burden of proving that the employer "*intentionally* depresse[d] wages on account of sex and there were no employees of the opposite sex doing equal work for more pay." *Tenkku,* 348 F.3d at 741. Mangels' Title VII wage discrimination claim fails for the same reasons her EPA claim does: she did not have the same responsibilities as her hand-picked alleged male comparators. Regardless, Mangels cannot carry her additional burden where she has no evidence she was *intentionally* paid less *because* she is a woman, and the evidence is overwhelmingly to the contrary.[58]

First, AMC proactively monitored whether the compensation paid to male and female employees was meaningfully different. In 2017, AMC commissioned a study of its pay practices conducted by Human Resources Consulting Firm Willis Towers Watson to ensure the company did not have any pay equity concerns. That firm found that the company did not have any pay equity concerns in its headquarters organization.

Similarly, AMC commissioned an analysis conducted by a Ph.D. labor economist to test Plaintiff's claims in this case that AMC intentionally discriminated against her in connection with compensation on the basis of her gender.[59] The study shows that there are no statistically meaningful differences in male and female compensation during the relevant time period. And while there are statistically *irrelevant* differences in male and female VP compensation each year, those differences usually favor *females.* Nor is this result surprising. The uncontroverted evidence

---

[58] A very small number of district courts within the Eighth Circuit sometimes analyze the intent element of a Title VII discrimination claim in a fashion similar to the pretext analysis courts employ to assess other types of discrimination claims. *See, e.g., Hennick v. Schwans Sales Enterps. Inc.,* 168 F. Supp. 2d 938, 949 (S.D. Iowa 2001). In this case, however, Plaintiff has not offered any evidence that AMC's reasonable factors other than gender for paying her differently than her alleged male comparators are a pretext for intentional discrimination against her and the evidence, discussed *supra,* is to the contrary.

[59] Plaintiff may claim that she is asserting only that AMC discriminated against her, not *other* women, on the basis of her gender. But approximately one-third of AMC's VPs are female and if the company only discriminated *her,* not other women, then it necessarily did *not* do so on the basis of her gender.

shows that between 2017 and 2019, the time period at issue in this case, the highest paid VP at AMC was female, and that in 2019, three out of the top five most highly-paid VPs were female.

Mangels' Title VII compensation discrimination claim fails for the same reason her EPA claim fails, but it suffers from the additional defect that Plaintiff has not offered any evidence of *intent.* She has not done so because there is none. The evidence is starkly inconsistent with the notion that the company discriminated against any VP because of their gender. AMC monitored its compensation practices to guard against pay disparities, female and male VP average compensation is statistically equal, and many of the highest paid VP are female. The Court should grant summary judgment on Mangels' claims of compensation discrimination under Title VII.

## CONCLUSION

Mangels' EPA and Title VII claims fail at every stop. She cannot establish a *prima facie* case. Even if she could, AMC's decisions were based on legitimate, non-discriminatory, non-retaliatory reasons, and there is no evidence that AMC's stated reasons are pretextual. For the reasons stated above, Defendant American Multi-Cinema, Inc. requests the Court enter summary judgment in its favor on all claims asserted in the Complaint, dismiss Mangels' claims, and award any other appropriate relief.

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that on the 6th day of July 2021, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Chad C. Beaver
Beaver Law Firm, LLC
1600 Genessee Street, Suite 920
Kansas City, MO 64102
(816) 226-7750
(816) 817-0540 (*Facsimile*)
cbeaver@beaver-law.com

**ATTORNEY FOR PLAINTIFF**

/s/ *Kerri S. Reisdorff*_____
   **ATTORNEY FOR DEFENDANT**

47731366.1