**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **TONYA MANGELS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:19-cv-00834-BP** |
| | ) | |
| **AMERICAN MULTI-CINEMA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT**
**AMC'S MOTION FOR SUMMARY JUDGMENT**


Respectfully submitted,

**BEAVER LAW FIRM, LLC**

/s/ Chad C. Beaver

Chad C. Beaver          MO Bar No. 54141
Beaver Law Firm, LLC
(816) 226-7750 | Office
(816) 817-0540 | Fax
cbeaver@beaver-law.com
1600 Genessee Street, Suite 920
Kansas City, Missouri 64102
**ATTORNEY FOR PLAINTIFF**

**TABLE OF CONTENTS**

Page(s)

I. INTRODUCTION ................................................................7

II. PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS .................................................11

III. PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS.......................168

IV. SUMMARY JUDGMENT STANDARD ....................................262

V. ARGUMENT AND AUTHORITIES............................................262

    A. Mangles Exercised Sound Leadership and Professional Judgment at AMC, and Did Not Fail To Meet Her Performance Expectations............................262

    B. Mangels Alleges Valid Equal Pay Act Claims (Count I). ...............265

        1. AMC Has Mischaracterized Tonya's Role. ...........................272

        2. Michael Pursell is a Valid Comparator for Purposes of Defeating Summary Judgment. ................................................275

        3. Robert Kim is a Valid Comparator for Purposes of Defeating Summary Judgment. ................................................285

        4. Genuine Issues of Fact Also Preclude AMC from Asserting One of the Defenses Listed in 29 U.S.C. § 206(d)(1). ...........................290

    C. Mangels Alleges Valid Retaliation Claims Under the Equal Pay Act and Title VII (Counts II and IV).................................................303

        1. Plaintiff Can Establish a Prima *Facie Case* of Retaliation. ...............303

        2. AMC's Pretextual Arguments Also Fail..................................314

            a. AMC's Pretextual Reliance on the May/June 2018 Investigation and Discipline. ......................................315

            b. AMC's Pretextual "RIF investigation".......................319

    D. Mangels Alleges Valid, Gender-Based Wage Discrimination Claims Pursuant to Title VII (Count III). ................................................329

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................262

*Arrington v. Cobb County*,
139 F.3d 865 (11th Cir. 1998) ...............................................................285, 290

*Bassett v. City of Minneapolis*,
211 F.3d 1097 (8th Cir. 2000) .....................................................................314

*Bearden v. International Paper Co*.,
628 F.Supp.2d 984 (E.D. Ark. 2007).............................................................267

*Bennett v. Riceland Foods, Inc*.,
721 F.3d 546 (8th Cir. 2013) ......................................................................314

*Buettner v. Arch Coal Sales Co., Inc.*,
216 F.3d 707 (8th Cir. 2000) ......................................................................267

*Chavez-Lavagnino v. Motivation Educ. Training, Inc.*,
767 F.3d 744 (8th Cir. 2014) ......................................................................314

*Corning Glass Works v. Brennan*,
417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)........................................330

*County of Washington v. Gunther*,
452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)..........................333, 334

*Donathan v. Oakley Grain*, Inc.,
861 F.3d 735 (8th Cir. 2017) ...............................................................303, 314

*Drum v. Leeson Elec. Corp.*,
565 F.3d 1071, (8th Cir. 2009) ............................................................270, 336

*Dindinger v. Allsteel, Inc.*,
853 F.3d 414 (8th Cir. 2017) ...............................................................266, 270

*Dindinger v. Allsteel, Inc*.,
Case No. 3:11-cv-00126, 2015 WL 11143144 (S.D. Iowa 2015) .....................270

*EEOC v. Delaware Dept. of Health and Social Services*,
865 F.2d 1408 (3d Cir. 1989)......................................................................266

*EEOC v. Delight Wholesale Co.*,
973 F.2d 664 (8th Cir. 1992) ...............................................................266, 330

3

*Equal Emp. Opportunity Comm'n v. Universal Underwriters Ins. Co.*,
   653 F.2d 1243 (8th Cir. 1981) ................................................................268

*Ewald v. Royal Norwegian Embassy*,
   82 F.Supp.3d 871 (D. Minn. 2014)..........................................................267

*Fitzgerald v. Action, Inc.*,
   521 F.3d 867 (8th Cir. 2008) ..................................................................314

*Fjelsta v. Zogg Dermatology*,
   488 F.3d 804 (8th Cir. 2007) .........................................................304, 313

*Griffith v. City of Des Moines, IA*,
   387 F.3d 733 (8th Cir. 2004) ..................................................................303

*Grover v. Smarte Carte, Inc.*,
   836 F.Supp.2d 860 (D. Minn. 2011)......................................268, 269, 285, 290

*Hennick v. Schwans Sales Enters. Inc.*,
   168 F. Supp. 2d 938 (S.D. Iowa 2001) ........................270, 302, 330, 336

*Herndon v. Wm. A. Straub, Inc.*,
   17 F.Supp.2d 1056 (E.D. Mo. 1998) .......................................................267

*Hill v. City of Pine Bluff, Arkansas*,
   696 F.3d 709 (8th Cir. 2012) ..................................................................266

*Horner v. Mary Inst.*,
   613 F.2d 706 (8th Cir. 1980) ..................................................................272

*Hunt v. Nebraska Pub. Power Dist.*,
   282 F.3d 1021 (8th Cir. 2002) ...............................................266, 267, 270

*Jones v. Nat'l Am. Univ.*,
   608 F.3d 1039 (8th Cir. 2010) ................................................................314

*Keys v. Lutheran Family and Children's Servs. of Mo.*,
   668 F.2d 356 (8th Cir. 1981) ..................................................................314

*Lawrence v. CNF Tramp., Inc.*,
   340 F.3d 486 (8th Cir. 2003) ..................................................................270

*Mathews v. Trilogy Communications, Inc.*,
   143 F.3d 1160 (8th Cir.1998) ..................................................................314

*Miranda v. B & B Cash Grocery Store, Inc.*,
   975 F.2d 1518 (11th Cir.1992) ...............................................284, 285, 289

4

*Musolf v. J.C. Penney Co.*,
  773 F.3d 916 (8th Cir. 2014) ....................................................................304

*Orahood v. Bd. of Trustees of Univ. of Arkansas*,
  645 F.2d 651 (8th Cir. 1981) ....................................................................267

*Price v. N. States Power Co.*,
  664 F.3d 1186 (8th Cir. 2011) ..................................................................262

*Pye v. Nu Aire, Inc.*,
  641 F.3d 1011 (8th Cir. 2011) ...........................................................303, 304

*Sellner v. MAT Holdings, Inc.*,
  859 F.3d 610, 615 (8th Cir. 2017) ............................................................314

*Simmons v. New Pub. Sch. Dist. No. 8*,
  251 F.3d 1210 (8th Cir. 2001) ...........................................................266, 330

*Simpson v. Merchants & Planters Bank*,
  441 F.3d 572 (8th Cir. 2006) ........................267, 269, 270, 284, 285, 289

*Sowell v. Alumina Ceramics, Inc.*,
  251 F.3d 678 (8th Cir. 2001) .............................................................330, 331

*Tenkku v. Normandy Bank*,
  348 F.3d 737 (8th Cir. 2003) .............................................................332, 333

*Thomas v. Heartland Emp't Servs. LLC*,
  797 F.3d 527 (8th Cir. 2015) .............................................................303, 313

*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) (en banc) .........................................303, 314

*Turner v. Gonzales*,
  421 F.3d 688 (8th Cir. 2005) ....................................................................314

*Wabun-Inini v. Sessions*,
  900 F.2d 1234 (8th Cir. 1990) ......................................................................7

*Wilson v. Arkansas Dep't of Human Servs.*,
  850 F.3d 368 (8th Cir. 2017) ....................................................................314

*Wood v. SatCom Mktg., LLC*,
  705 F.3d 823, 828 (8th Cir. 2013) ............................................................303

*Woodsmith Publ'g Co. v. Meredith Corp.*,
  904 F.2d 1244 (8th Cir. 1990) ..................................................................262

5

*Yearns v. Koss Constr. Co.*,
   964 F.3d 671 (8th Cir. 2020) ...........................................................303

*Younts v. Fremont Cnty., Iowa*,
   370 F.3d 748 (8th Cir. 2004) ...........................................................267

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e ......................................266

Equal Pay Act, 29 U.S.C. § 206(d)(1) ...........................................8, 266, 290, 302, 331, 334, 336

**Other Authorities**

29 C.F.R. § 1620.13(e)(1998) .............................................................267

29 C.F.R. § 1620.14(a) ....................................................................267

29 C.F.R. §§ 800.114–.132 ................................................................268

Fed. R. Civ. P. 56 ...........................................................................11

Local Rule 56.1 ...........................................................................7, 11

Eighth Circuit Model Jury Instruction (Civil) 7.40 ............................................266, 271

Eighth Circuit Model Jury Instruction (Civil) 7.20 ................................................271

# I. INTRODUCTION

"[S]ummary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990) (citation omitted). This Court should be very circumspect of any summary judgment brief that references more than 300 separate statements of "uncontroverted" fact in order to prevail.[1] AMC addresses Plaintiff's claims out of the order in which they appear in Plaintiff's First Amended Complaint. Plaintiff addresses them below in their original order, beginning with Plaintiff's Equal Pay Act claims. Prior to addressing her individual claims, however, Plaintiff also addresses AMC's false argument that Tonya struggled with leadership and professional judgment at AMC, and failed to meet performance expectations. That argument is adamantly refuted, and it should be rejected regardless of where it appears in Defendant's brief. Some of the background relevant to that analysis is also relevant to the Court's Equal Pay Act and retaliation analysis.

This case is first and foremost an Equal Pay Act ("EPA") case. The EPA does not require proof of intent to discriminate. Plaintiff is required to prove that the defendant paid different wages to employees of different sexes for substantially equal work. The law is clear that jobs need not be identical to be considered "equal" under the EPA, but must be "substantially equal." It is the specific, day-to-day content of the jobs that determines substantial equivalence.

---

[1] While Defendant only purports to include 155 separately numbered statements of fact in its brief, Defendant presents an additional 83 sub-paragraphs within its 155 separately numbered statements of fact. In addition, the vast majority of Defendant's numbered paragraphs and sub-paragraphs also contain multiple sentences aimed at presenting multiple assertions of fact rather than a single assertion of fact. Defendant's brief contravenes Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact."). See Scheduling Order [Doc. 41] at ¶ 6.

In its brief, AMC seems to incorrectly suggest that every EPA case should be decided as a matter of law. The truth is that, in instances in which the parties submit conflicting evidence on the issue of "substantial similarity," that issue should be presented to the jury. Plaintiff references at least six (6) cases below—and the Eighth Circuit Model Jury Instructions—that follow that very process.

Now that discovery has concluded in this case, Tonya is electing to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane in order to streamline the issues for the Court and focus her EPA claims on her two closest comparators: Michael Pursell and Robert Kim. As discussed at length below, Tonya shared extensive cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Critical issues of disputed fact remain on the issue of substantial similarity between their roles, and those issues should be presented to a jury.

Genuine issues of fact also preclude AMC from asserting the EPA defenses listed in 29 U.S.C. § 206(d)(1) because AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs. There is no set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC since 2014— Carla Chavarria—exhibits a willful indifference toward compliance with the Equal Pay Act. These issues are also discussed at great length below.

Plaintiff also alleges valid retaliation claims under the EPA and Title VII. Both claims are evaluated under the same framework. To survive summary judgment on a retaliation claim, the plaintiff must offer direct evidence of retaliation or create an inference of retaliation under the

*McDonnell Douglas* burden-shifting framework. As set forth below, Plaintiff is capable of doing both. AMC acknowledges that Tonya engaged in protected activity on multiple occasions, and that she suffered a materially adverse employment action (termination), but AMC mischaracterizes the extent of Tonya's protected activity and the relevant interactions.

Tonya complained in very clear terms about gender discrimination and pay equity **on at least 5 separate occasions** to the very same people that ultimately decided to terminate her employment—Chavarria and Colanero. Each time she complained, Chavarria and Colanero did nothing about it, and they investigated nothing (despite AMC's policy of "promptly" launching investigations). Colanero and Chavarria were both specifically named in Tonya's charge of discrimination, and both of them had good reason to be upset about being accused of discriminatory and retaliatory conduct in a document filed with the EEOC.

By the time Tonya filed her charge, there were also two instances of Chavarria exhibiting a willful indifference toward compliance with the Equal Pay Act. For his part, Colanero disregarded, ignored, or "dropped the ball" on Tonya's requests to increase her compensation **at least 14 separate times**. After he accidentally sent Tonya a spreadsheet demonstrating that she was underpaid relative to other, comparable male Vice Presidents, he consistently lied to her, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents. When an outside expert determined that Tonya was being underpaid in March 2019, Colanero did nothing about it. Critically, and even though Adam Aron is the *only* person that can adjust the compensation of a Vice President or higher within AMC, Colanero never made Adam Aron aware of a single request by Tonya.

The **conduct** and **statements** from Chavarria and Colanero leading up to Tonya's termination arguably provide the Court with **direct, circumstantial evidence** of their

discriminatory and retaliatory animus in deciding to terminate Tonya after she filed her charge of discrimination. Alternatively, however, and even if that evidence is not considered "direct," it still creates a compelling inference of AMC's discriminatory and retaliatory animus, and it satisfies Plaintiff's obligation to make a *prima facie* showing under the *McDonnell Douglas* framework—especially when that evidence is coupled with the fact that Chavarria and Colanero terminated Tonya within ten (10) days of unsuccessfully mediating her EEOC claims (an additional act of protected activity).

AMC also spends more than 35 paragraphs discussing the June 5, 2018 discipline administered to Tonya in an effort to attack her credibility, and to manufacture a pretextual narrative that she simply couldn't be trusted in 2019. AMC also spends more than 60 paragraphs and sub-paragraphs discussing its August 2019 "RIF investigation" related to Tonya—after she filed her charge of discrimination—in an additional effort to attack her credibility, and to manufacture a pretextual basis for her termination. Plaintiff explains at great length below why both of those arguments, and the other proffered reasons for Tonya's termination, are "unworthy of credence" and constitute pretext. At a minimum, genuine issues of fact remain on that issue.

Finally, the Court should also deny summary judgment because Plaintiff alleges valid, gender-based wage discrimination claims pursuant to Title VII. Those claims are evaluated according to the exact same standards used to evaluate Plaintiff's Equal Pay Act claims. In an effort to streamline the issues on summary judgment, and to simplify the remaining issues for trial, Plaintiff also confirms below that those are the *only* Title VII gender-based discrimination claims Plaintiff is pursuing in this case; Plaintiff has agreed to forego any other gender-based discrimination claims she may have (i.e., non-retaliation claims) under Title VII.

## II. PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS ("DSOF")[2]

### Introduction

1. AMC's headquarters—known as the Theatre Support Center (TSC)—is located in Leawood, Kansas. (Ex. 1, Deposition of Carla Chavarria ("Chavarria Dep.") at 100:20-25; 101:1-3.)

**RESPONSE: Uncontroverted.**

2. Mangels was hired by AMC as a Director in AMC's Marketing Department in 2009. (Ex. 2, Deposition of Tonya Mangels ("Mangels Dep."), at 173:6-8; Ex. 3, Declaration of Carla Chavarria ("Chavarria Dec."), ¶ 3.)

**RESPONSE: Uncontroverted.**

---

[2] The record in this case is voluminous. Local Rule 56.1 makes clear that, "if a [responding] party relies on any facts not contained in the movant's suggestions [in order to controvert the moving party's statements of fact], the [responding] party must add a concise listing of material facts … in separately numbered paragraph[s] [that are] properly supported in accordance with Fed. R. Civ. P. 56(c)." Plaintiff has done this in the next section of this brief, and the facts discussed in that section also contain detailed references to the record on which those facts are based in accordance with Fed. R. Civ. P. 56(c).

In the instances in which Plaintiff relies on the newly asserted factual information in the next section of this brief in order to controvert the movant's statements of fact in this section, Plaintiff explains the basis for her denial(s) in this section, and then specifically references the additional statements of fact set forth in the next section which are, in turn, supported in the manner required by Fed. R. Civ. P. 56(c). All references in this brief to "DSOF" are references to Defendant's original Statements of Uncontroverted Fact set forth in this section, and all references to "PSOF" are references to Plaintiff's Additional Statements of Fact set forth in the next section.

Plaintiff believes the procedure followed herein is consistent with Local Rule 56.1 and Fed. R. Civ. P. 56(c), and it also avoids the process of burdening the Court with lengthy, identical citations in two different sections of this brief. If the Court disagrees with the procedure for any reason, however, Plaintiff respectfully requests leave to re-file this brief in a manner consistent with the Court's expectations.

3.      In December 2009, Stephen Colanero was hired by AMC as an Executive Vice President ("EVP") and Chief Marketing Officer. Colanero became Mangels' direct supervisor in November 2010 and remained her supervisor until her separation in September 2019. (Ex. 4, Deposition of Stephen Colanero ("Colanero Dep.") at 22:6-7; 30:9-12; 100:6-8; Ex. 2, Mangels Dep., at 174:1-8; Ex. 5, Declaration of Stephen Colanero ("Colanero Dec."), at ¶¶ 2, 3.)

**RESPONSE: Uncontroverted.**

4.      In June 2013, Colanero promoted Mangels to Vice President ("VP") and she remained a VP for the remainder of her employment. Upon her promotion, AMC's Compensation Department awarded Mangels a 12½% increase to her base salary. (Ex. 4, Colanero Dep., at 101:1-3; 186:6-25; 187:14-18; Ex. 5, Colanero Dec., at ¶ 4.)

**RESPONSE: Uncontroverted.**

5.      At no time during her employment as VP did anyone hold the same position as Mangels (concurrently). (Ex. 2, Mangels Dep., at 191:5-17.)

**RESPONSE: Uncontroverted that no one at AMC held the exact same title as Tonya when she served as VP, Product Marketing, VP of Marketing-Food & Beverage and Brand Strategy, and VP, Food and Beverage Marketing, but the deposition testimony cited by Defendant does not support any broader inference. As set forth *at length* in response to DSOF ¶¶ 29 and 30, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim.**

**<u>AMC's Compensation, Responsibilities, and Job Content</u>**

6.      Like most publicly traded companies, AMC maintains a workforce of employees who occupy different "levels" of job, including hourly employees who assist with clerical functions; exempt employees in individual contributor roles; managers who oversee those employees; directors who supervise managers and below; vice presidents, who are officers of the corporation, who generally supervise directors and below; senior vice presidents who supervise vice presidents and below and report to either an executive vice president or the CEO; and

executive vice presidents who supervise vice presidents and senior vice presidents and report to

the CEO. (Ex. 3, Chavarria Dec., ¶ 34.)

**RESPONSE:  Uncontroverted that the listed positions generally exist at AMC, but controverted to the extent this paragraph suggests that Vice President positions at AMC operated as independent "siloes" with no cross-functional reporting or cross-functional sharing of joint responsibilities.**

**AMC has a highly complex structure with a national brand footprint in nearly every state in the United States; throughout its roughly 600 theaters, it offers 3 different brand experiences, and there are additional concept and amenity variances within each different brand experience.  PSOF ¶ 99.  There are also numerous menus, roughly twenty or more different pricing tiers,  multiple sales channels, and other business considerations related to the ever-changing studio film content and geographic/demographic variances one would expect with a national brand footprint in nearly every state.  PSOF ¶ 100.  Based on this reality, AMC operated under a hybrid or matrix structure in several departments, which is well suited for work environments that are dynamic and tend to shift from project to project.  PSOF ¶ 101. A matrix organizational structure is a workplace format in which employees report or partner indirectly or directly to multiple managers/teams rather than one manager overseeing every aspect of a project.  PSOF ¶ 102.  One advantage of the matrix organizational structure is that people across different functional areas have a better understanding of their co-workers in other areas.  PSOF ¶ 103.  Best practices and key learnings are brought to light more effectively, and the synergies developed through this process leads to more well-rounded thought leadership and the ability to execute.  PSOF ¶ 104. A disadvantage is that employees are responsible to their project team as well as to their functional areas.  PSOF ¶ 105.  In the end, cross-functional members collaborate on many aspects of the business.  PSOF ¶ 107.**

**During the final 3 years of her employment (and in some respects earlier), Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food & Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain.  PSOF ¶ 108.  Tonya was responsible for driving AMC product revenue, traffic, units, and attendance related to film/programming/events, Food & Beverage/menu/concept experiences, the Studio and Food & Beverage monetized partnership programs, the DINE-IN brand, Macguffin's Bars, Mobile Preorder/Kiosk, Retail Merchandise Sales, E-commerce Flash Sales, Digital Signage strategy and vendor relationship oversight, the Coca-Cola Ring of Honor marketing partnership, targeted teen marketing, packaging, digital retail streaming movies, and test initiatives as they evolved such as NFL Sports Programming.  PSOF ¶ 109.  Essentially, her team was responsible for end-to-end collaborative planning and execution of all aspects of strategic direction, product/menu development, pricing recommendations, packaging, consumer insights, promotions, marketing, partnership management/negotiations, and sales of most products and services AMC offers to the public, and the methods or channels through which those**

Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 13 of 337

products and services were most effectively sold to consumers (e.g., digital signage, kiosk, online ordering, mobile, in-theater, 3rd party off-site, 1:1). PSOF ¶ 110. In addition, and because of Tonya's growing leadership role, her broadening expertise, and her strong performance, Tonya was frequently selected to serve on special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions. PSOF ¶ 111.

Tonya's role at AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP). PSOF ¶ 391. Tonya primarily reported to Colanero, but she also maintained "dotted-line" responsibility to the Senior Vice Presidents that oversaw the three groups referenced above: Food & Beverage (George Patterson and Jennifer Douglas, Sr. VPs), Film Marketing/Programming (Elizabeth Frank, Sr. VP), and Pricing (Elizabeth Frank, Sr. VP). PSOF ¶ 392. As set forth *at length* in response to DSOF ¶¶ 29 and 30, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim.

       7.     At AMC, VPs lead an organization that has unique responsibilities and functions.

No two VPs at AMC have the same portfolio of responsibilities. Each VP is charged with a unique

set of responsibilities to deliver on performance metrics that are tailored to their position. AMC's

shareholders expect the company to structure its management ranks efficiently, and it would be

inefficient and cause organizational confusion if more than one VP was responsible for the same

set of duties and responsibilities. (Ex. 3, Chavarria Dec., ¶ 35.)

**RESPONSE: Uncontroverted that the listed positions generally exist at AMC, but controverted to the extent this paragraph suggests that Vice President positions at AMC operated as independent "siloes" with no cross-functional reporting or cross-functional sharing of joint responsibilities.**

**AMC has a highly complex structure with a national brand footprint in nearly every state in the United States; throughout its roughly 600 theaters, it offers 3 different brand experiences, and there are additional concept and amenity variances within each different brand experience. PSOF ¶ 99. There are also numerous menus, roughly twenty or more different pricing tiers, multiple sales channels, and other business considerations related to the ever-changing studio film content and geographic/demographic variances one would expect with a national brand footprint in nearly every state. PSOF ¶ 100. Based on this reality, AMC operated under a hybrid or matrix structure in several departments, which is well suited for work environments that are dynamic and tend to shift from project to project. PSOF ¶ 101. A matrix organizational structure is a workplace format in which employees report or partner indirectly or directly to multiple managers/teams rather than one manager**

overseeing every aspect of a project. PSOF ¶ 102. One advantage of the matrix organizational structure is that people across different functional areas have a better understanding of their co-workers in other areas. PSOF ¶ 103. Best practices and key learnings are brought to light more effectively, and the synergies developed through this process leads to more well-rounded thought leadership and the ability to execute. PSOF ¶ 104. A disadvantage is that employees are responsible to their project team as well as to their functional areas. PSOF ¶ 105. In the end, cross-functional members collaborate on many aspects of the business. PSOF ¶ 107.

During the final 3 years of her employment (and in some respects earlier), Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food & Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain. PSOF ¶ 108. Tonya was responsible for driving AMC product revenue, traffic, units, and attendance related to film/programming/events, Food & Beverage/menu/concept experiences, the Studio and Food & Beverage monetized partnership programs, the DINE-IN brand, Macguffin's Bars, Mobile Preorder/Kiosk, Retail Merchandise Sales, E-commerce Flash Sales, Digital Signage strategy and vendor relationship oversight, the Coca-Cola Ring of Honor marketing partnership, targeted teen marketing, packaging, digital retail streaming movies, and test initiatives as they evolved such as NFL Sports Programming. PSOF ¶ 109. Essentially, her team was responsible for end-to-end collaborative planning and execution of all aspects of strategic direction, product/menu development, pricing recommendations, packaging, consumer insights, promotions, marketing, partnership management/negotiations, and sales of most products and services AMC offers to the public, and the methods or channels through which those products and services were most effectively sold to consumers (e.g., digital signage, kiosk, online ordering, mobile, in-theater, 3rd party off-site, 1:1). PSOF ¶ 110. In addition, and because of Tonya's growing leadership role, her broadening expertise, and her strong performance, Tonya was frequently selected to serve on special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions. PSOF ¶ 111.

Tonya's role at AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP). PSOF ¶ 391. Tonya primarily reported to Colanero, but she also maintained "dotted-line" responsibility to the Senior Vice Presidents that oversaw the three groups referenced above: Food & Beverage (George Patterson and Jennifer Douglas, Sr. VPs), Film Marketing/Programming (Elizabeth Frank, Sr. VP), and Pricing (Elizabeth Frank, Sr. VP). PSOF ¶ 392. As set forth *at length* in response to DSOF ¶¶ 29 and 30, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim.

8.      AMC reviews compensation on an annual basis for all officers (VPs and above).

This is referred to as the annual merit review. (Ex. 1, Chavarria Dep., at 93:3-6.)

**RESPONSE: Controverted. The testimony cited by AMC does not support the assertions in this paragraph; it refers to an "annual process of reviewing, how [unspecified] people are paid…," but it does not reference annual merit reviews or the categories of employees that receive them.**

9.      All requests for review of compensation are submitted to AMC's Compensation

Department. Ex. 56, Deposition of Michael Giuseffi ("Giuseffi Dep.") at 16:18-21:1.)

**RESPONSE: Controverted. AMC does not have a one-size-fits-all compensation review process. According to Adam Aron, the only person that can adjust the compensation of a Vice President or higher within AMC is Adam Aron. PSOF ¶¶ 47-48. Adam Aron became the Chief Executive Officer of AMC in January 2016, and Stephen Colanero has directly reported Mr. Aron since that time. PSOF ¶ 43. Carla Chavarria—AMC's highest-ranking Human Resources employee at AMC since 2014—also directly reports to Adam Aron, and she has done so throughout the entire time Adam Aron has been the CEO at AMC. PSOF ¶¶ 45-46. Mike Giuseffi is AMC's Director of Compensation; he has served in that role, and has directly reported to Carla Chavarria, since 2006. PSOF ¶ 49. Giuseffi directly supervises everyone else in the compensation department that falls under Chavarria. PSOF ¶ 50.**

**According to Giuseffi, whenever a position materially changes in scope, content, expectations, or job specifications, his group works with the relevant department head in order to begin the process of evaluating whether the employee's compensation should be adjusted. PSOF ¶ 51. That process begins with an evaluation of the job content and specifications listed in the "job questionnaire" designed to summarize the employee's role within the company, and it also necessitates conversations with the supervisor of that role in order to "really understand" their job specifications. PSOF ¶ 52. In the case of Tonya, the expectation was for Tonya to initially address the relevant job changes and the need for increased compensation with Colanero, and for Colanero to present the issue to the compensation group for an evaluation. PSOF ¶ 53. In the case of an officer (such as Tonya), the compensation group also "looped in" Chavarria on the process of evaluating the position and any pay adjustment recommendations. PSOF ¶ 54.**

**Giuseffi also made clear that any recommendations from his group are not presented on a take-it-or-leave-it basis; when his group is dealing with someone at the VP level, the process is supposed to be a "collaborative effort" between Giuseffi's team, the supervisor of the role (i.e., Colanero), Chavarria, and the supervisor's supervisor, i.e., Adam Aron in this case. PSOF ¶ 55. If the compensation group fails to present satisfactory recommendations to the supervisor in charge (i.e., Colanero), the parties are expected to continue working through the process in order to reach an agreement that makes sense for the organization, and the supervisor also has the authority to "push back" on any failure of Giuseffi's group to present satisfactory recommendations. PSOF ¶ 56. Colanero agrees that, as the employee's**

supervisor, he always has the right to reject the recommendation of Giuseffi's group, and the right to take the position that his employee "deserves more." PSOF ¶ 57. Guiseffi's group spends 5% or less of its time analyzing specific employees in order to assess whether their job needs to be revalued within the organization. PSOF ¶ 58.

10. At no time did Colanero (or any manager) have the authority to unilaterally increase the salary or compensation of a member of the Marketing Department. Colanero would make a recommendation to the Compensation Department and ultimately, the Chief Executive Officer reviewed and approved all changes recommended by the Compensation Department for officers.

(Ex. 56, Giuseffi Dep., at 16:18-21:1; Ex. 4, Colanero Dep., at 90:5-15.)

**RESPONSE: Controverted. AMC does not have a one-size-fits-all compensation review process. According to Adam Aron, the only person that can adjust the compensation of a Vice President or higher within AMC is Adam Aron. PSOF ¶¶ 47-48. Adam Aron became the Chief Executive Officer of AMC in January 2016, and Stephen Colanero has directly reported Mr. Aron since that time. PSOF ¶ 43. Carla Chavarria—AMC's highest-ranking Human Resources employee at AMC since 2014—also directly reports to Adam Aron, and she has done so throughout the entire time Adam Aron has been the CEO at AMC. PSOF ¶¶ 45-46. Mike Giuseffi is AMC's Director of Compensation; he has served in that role, and has directly reported to Carla Chavarria, since 2006. PSOF ¶ 49. Giuseffi directly supervises everyone else in the compensation department that falls under Chavarria. PSOF ¶ 50.**

**According to Giuseffi, whenever a position materially changes in scope, content, expectations, or job specifications, his group works with the relevant department head in order to begin the process of evaluating whether the employee's compensation should be adjusted. PSOF ¶ 51. That process begins with an evaluation of the job content and specifications listed in the "job questionnaire" designed to summarize the employee's role within the company, and it also necessitates conversations with the supervisor of that role in order to "really understand" their job specifications. PSOF ¶ 52. In the case of Tonya, the expectation was for Tonya to initially address the relevant job changes and the need for increased compensation with Colanero, and for Colanero to present the issue to the compensation group for an evaluation. PSOF ¶ 53. In the case of an officer (such as Tonya), the compensation group also "looped in" Chavarria on the process of evaluating the position and any pay adjustment recommendations. PSOF ¶ 54.**

**Giuseffi also made clear that any recommendations from his group are not presented on a take-it-or-leave-it basis; when his group is dealing with someone at the VP level, the process is supposed to be a "collaborative effort" between Giuseffi's team, the supervisor of the role (i.e., Colanero), Chavarria, and the supervisor's supervisor, i.e., Adam Aron in this case. PSOF ¶ 55. If the compensation group fails to present satisfactory recommendations to the supervisor in charge (i.e., Colanero), the parties are expected to continue working through the process in order to reach an agreement that makes sense for the organization, and the**

**supervisor also has the authority to "push back" on any failure of Guiseffi's group to present satisfactory recommendations. PSOF ¶ 56. Colanero agrees that, as the employee's supervisor, he always has the right to reject the recommendation of Giuseffi's group, and the right to take the position that his employee "deserves more." PSOF ¶ 57. Guiseffi's group spends 5% or less of its time analyzing specific employees in order to assess whether their job needs to be revalued within the organization. PSOF ¶ 58.**

11.     As with his peers, Colanero was not provided, nor did he have access to, the compensation of any AMC associate outside of the Marketing Department. Put, simply, Colanero had no knowledge as to what any VP made at AMC who was not in the Marketing Department. (Ex. 4, Colanero Dep., at 176:15-25; 177:1-8; 314:5-23; Ex. 2, Mangels Dep., at 69:9-24; Ex. 54, audio recording, and audio transcript at 23:13-24:15.)

**RESPONSE: Controverted. The testimony and transcript cited by AMC does not support the assertion that Colanero knew nothing about the compensation of other VPs at AMC.**

12.     In 2017, AMC engaged Willis Towers Watson, an HR consulting firm, to conduct an analysis of AMC's compensation practices and procedures to assess whether there were any differences in compensation between male and female employees. (Ex. 1, Chavarria Dep., at 94, 97.) The analysis did not identify any pay disparities between male and female employees among AMC's TSC employees (Ex. 1, Chavarria Dep., at 98.)

**RESPONSE: Controverted that a relevant, comprehensive, or valid analysis was ever generated by Willis Towers Watson for purposes of this single-plaintiff Equal Pay Act case because the Willis Towers Watson analysis did not involve a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶¶ 97-98.**

13.     AMC engaged Dr. Thornton, a Ph.D. economist specializing in econometrics and statistical analysis, to conduct an analysis of compensation paid to male and female VPs at AMC. (Ex. 6, Janet Thornton Expert Report, ¶¶ 1-10.)

**RESPONSE: Uncontroverted.**

14.     Dr. Thornton analyzed compensation paid to AMC VPs between 2016 and 2019, controlling for the department in which the VP was employed, their level of experience, and their job level. She also performed the same analysis, this time controlling for performance rating history. (*Id.*)

**RESPONSE:  Uncontroverted that Dr. Thornton conducted an analysis, but controverted that a relevant, comprehensive, or valid analysis was ever generated by Dr. Thornton for purposes of this single-plaintiff Equal Pay Act case.  Dr. Thornton's analysis did not involve a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity.  PSOF ¶ 506.  Dr. Thornton never compared Tonya's Vice President role to any other male Vice President role at AMC in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Dr. Thornton never analyzed whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility.  PSOF ¶ 507.**

15.     Dr. Thornton did not identify any statistically significant differences in compensation paid to male and female VPs during any of the years she studied. (Ex. 6, Thornton Report, ¶ 10.)

**RESPONSE:  Uncontroverted that Dr. Thornton conducted an analysis, but controverted that a relevant, comprehensive, or valid analysis was ever generated by Dr. Thornton for purposes of this single-plaintiff Equal Pay Act case.  Dr. Thornton's analysis did not involve a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity.  PSOF ¶ 506.  Dr. Thornton never compared Tonya's Vice President role to any other male Vice President role at AMC in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Dr. Thornton never analyzed whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility.  PSOF ¶ 507.**

16.     While there were no statistically significant compensation disparities between men and women, in each year, there were statistically insignificant compensation differences between men and women. Those disparities favored women in at least half the years, and sometimes more depending on the controls employed. (Ex. 6, Thornton Report, Table 1.)

**RESPONSE:  Uncontroverted that Dr. Thornton conducted an analysis, but controverted that a relevant, comprehensive, or valid analysis was ever generated by Dr. Thornton for purposes of this single-plaintiff Equal Pay Act case.  Dr. Thornton's analysis did not involve**

a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶ 506. Dr. Thornton never compared Tonya's Vice President role to any other male Vice President role at AMC in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Dr. Thornton never analyzed whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶ 507.

17. Each VP has unique and very specific Key Performance Metrics (KPMs) that are identified each performance year. Mangels is unaware of anyone else who had the same KPMs as she did. (Ex. 1, Chavarria Dep., at 36:16-23; Ex. 2, Mangels Dep., at 211:11-21.)

**RESPONSE: Controverted. The testimony cited by AMC does not support the assertion that no two employees at AMC have overlapping KPMs; the inference should be just the opposite in light of the cross-functional nature of many employees' joint responsibilities. As discussed above, Tonya's role at AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP). PSOF ¶ 391.**

**Tonya is unaware of how KPMs were specifically worded on other employees' performance reviews at AMC, but that does not mean that those employees did not share joint responsibilities or joint goals with Tonya or others—regardless of how their KPMs were described internally on their performance reviews. PSOF ¶ 508. There was no common method or procedure at AMC for how KPMs were worded, structured, or characterized for each individual department or position at AMC; AMC's KPM description process was disjointed, and tended to vary from manager to manager and employee to employee throughout the organization. PSOF ¶ 509. Typically it was up to each person to author their own KPMs and measurement targets in their own words and structure; it was then approved by that person's primary supervisor. PSOF ¶ 510. Immediately adjacent to the passage cited by AMC, Tonya also confirms that there were instances in which KPMs were shared by entire departments. (Ex. 1, Mangels depo., at 211:22-212:8).**

18. While each VP has unique KPMs, all VPs are also reviewed based upon a set of common behavioral expectations, including decision making/judgment and integrity/ethics. (Ex. 2, Mangels Dep., at 212:9-23.)

**RESPONSE: Controverted that each VP has unique KPMs. The testimony cited by AMC does not support the assertion that no two employees at AMC have overlapping KPMs; the inference should be just the opposite in light of the cross-functional nature of many employees' joint responsibilities.**

Tonya is unaware of how KPMs were specifically worded on other employees' performance reviews at AMC, but that does not mean that those employees did not share joint responsibilities or joint goals with Tonya or others—regardless of how their KPMs were described internally on their performance reviews. PSOF ¶ 508. There was no common method or procedure at AMC for how KPMs were worded, structured, or characterized for each individual department or position at AMC; AMC's KPM description process was disjointed, and tended to vary from manager to manager and employee to employee throughout the organization. PSOF ¶ 509. Typically it was up to each person to author their own KPMs and measurement targets in their own words and structure; it was then approved by that person's primary supervisor. PSOF ¶ 510. Immediately adjacent to the passage cited by AMC, Tonya also confirms that there were instances in which KPMs were shared by entire departments. (Ex. 1, Mangels depo., at 211:22-212:8).

Also controverted "all VPs are also reviewed based upon a set of common behavioral expectations, including decision making/judgment and integrity/ethics." The testimony cited by AMC does not support that assertion; it involves one isolated review specific to Tonya and no one else.

19.    VPs are leaders of their respective functions. Each VP is charged with a unique set

of responsibilities to deliver on performance metrics that are tailored to their position. (Ex. 3,

Chavarria Dec., at ¶ 35.)

RESPONSE:  Controverted.  Vice Presidents at AMC did not operate as independent "siloes" with no cross-functional reporting or cross-functional sharing of joint responsibilities.  AMC has a highly complex structure with a national brand footprint in nearly every state in the United States; throughout its roughly 600 theaters, it offers 3 different brand experiences, and there are additional concept and amenity variances within each different brand experience.  PSOF ¶ 99.  There are also numerous menus, roughly twenty or more different pricing tiers,  multiple sales channels, and other business considerations related to the ever-changing studio film content and geographic/demographic variances one would expect with a national brand footprint in nearly every state.  PSOF ¶ 100.  Based on this reality, AMC operated under a hybrid or matrix structure in several departments, which is well suited for work environments that are dynamic and tend to shift from project to project.  PSOF ¶ 101.  A matrix organizational structure is a workplace format in which employees report or partner indirectly or directly to multiple managers/teams rather than one manager overseeing every aspect of a project.  PSOF ¶ 102.  One advantage of the matrix organizational structure is that people across different functional areas have a better understanding of their co-workers in other areas.  PSOF ¶ 103.  Best practices and key learnings are brought to light more effectively, and the synergies developed through this process leads to more well-rounded thought leadership and the ability to execute.  PSOF ¶ 104.  A disadvantage is that employees are responsible to their project team as well as to their functional areas.  PSOF ¶ 105.  In the end, cross-functional members collaborate on many aspects of the business.  PSOF ¶ 107.

During the final 3 years of her employment (and in some respects earlier), Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food & Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain. PSOF ¶ 108. Tonya was responsible for driving AMC product revenue, traffic, units, and attendance related to film/programming/events, Food & Beverage/menu/concept experiences, the Studio and Food & Beverage monetized partnership programs, the DINE-IN brand, Macguffin's Bars, Mobile Preorder/Kiosk, Retail Merchandise Sales, E-commerce Flash Sales, Digital Signage strategy and vendor relationship oversight, the Coca-Cola Ring of Honor marketing partnership, targeted teen marketing, packaging, digital retail streaming movies, and test initiatives as they evolved such as NFL Sports Programming. PSOF ¶ 109. Essentially, her team was responsible for end-to-end collaborative planning and execution of all aspects of strategic direction, product/menu development, pricing recommendations, packaging, consumer insights, promotions, marketing, partnership management/negotiations, and sales of most products and services AMC offers to the public, and the methods or channels through which those products and services were most effectively sold to consumers (e.g., digital signage, kiosk, online ordering, mobile, in-theater, 3rd party off-site, 1:1). PSOF ¶ 110. In addition, and because of Tonya's growing leadership role, her broadening expertise, and her strong performance, Tonya was frequently selected to serve on special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions. PSOF ¶ 111. As set forth *at length* in response to DSOF ¶¶ 29 and 30, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim.

Also controverted that no two employees at AMC have overlapping KPMs; the inference should be just the opposite in light of the cross-functional nature of many employees' joint responsibilities. As discussed above, Tonya's role at AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP). PSOF ¶ 391. Tonya is unaware of how KPMs were specifically worded on other employees' performance reviews at AMC, but that does not mean that those employees did not share joint responsibilities or joint goals with Tonya or others—regardless of how their KPMs were described internally on their performance reviews. PSOF ¶ 508. There was no common method or procedure at AMC for how KPMs were worded, structured, or characterized for each individual department or position at AMC; AMC's KPM description process was disjointed, and tended to vary from manager to manager and employee to employee throughout the organization. PSOF ¶ 509. Typically it was up to each person to author their own KPMs and measurement targets in their own words and structure; it was then approved by that person's primary supervisor. PSOF ¶ 510.

Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 22 of 337

20.     To this end, as a VP, Mangels held a "unique" role within AMC in that it was not "single focused." (Ex. 2, Mangels Dep., at 299:20-300:10; 372:4-373:3.)

**RESPONSE: Controverted in its assertion that Tonya's use of the word "unique" in her deposition somehow equates to Tonya's agreement that she operated as a "silo" with no cross-functional reporting or cross-functional sharing of joint responsibilities with other employees. Her testimony demonstrates just the opposite. As discussed above, Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food & Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain. PSOF ¶ 108. Tonya testified that her role at AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP). PSOF ¶ 391. As set forth *at length* in response to DSOF ¶¶ 29 and 30, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim.**

21.     From 2016 to April 2018, Mangels was located in the Marketing Department and spent most of her time as the VP, Food & Beverage Marketing and Brand Strategy, directing the creation and overseeing implementation of marketing programs for AMC's food and beverage brands and AMC's dine-in theatre concepts. Her core responsibilities included:

a.      providing marketing support to several groups across AMC, including food and beverage, pricing, programming, and some discrete aspects of guest engagement;

b.      designing the appearance of the menu and supporting the planning of new menu items that were developed by the Food and Beverage organization, *e.g.*, suggesting trending foods/toppings and considering the erosion a new item could have on existing items;

c.      leading AMC's side of a joint marketing relationship with key food and beverage vendors (e.g., Coca-Cola), overseeing vendors providing marketing services, and leading marketing integration for other theatre brands AMC acquired.

(Ex. 8 (Dep. Ex. 66), Job Questionnaire for VP, Food and Beverage Marketing and Brand Strategy;

Ex. 2, Mangels Dep., 191:22-193:3.)

**RESPONSE: Uncontroverted that Tonya generally worked in the Marketing Department between 2016 and April 2018, and that her title for most of that time was "Vice President,**

Marketing – Food & Beverage and Brand Strategy" (as reflected on Defts. Ex. 8), *see also* PSOF ¶ 76, but controverted that the activities listed in sub-paragraphs (a) through (c) somehow represent a complete listing of Tonya's "core responsibilities" during that period of time, and also controverted in its attempt to create the inference that Tonya operated as an independent "silo" with a unique set of "core responsibilities" that were shared by no one else.

The testimony cited by AMC does not contain any agreement from Tonya that the activities listed in sub-paragraphs (a) through (c) represent a complete listing of her responsibilities during the time period referenced (much less her "core responsibilities"); Tonya simply authenticates the Job Questionnaire exhibit. In addition, sub-paragraphs (a) through (c) represent a very small fraction of the activities, responsibilities, and initiatives listed on Defts. Ex. 8 (Depo. Ex. 66). Setting those two deficiencies aside, however, AMC's factual statements are also belied by the record.

Vice Presidents at AMC did not operate as independent "siloes" with no cross-functional reporting or cross-functional sharing of joint responsibilities. AMC has a highly complex structure with a national brand footprint in nearly every state in the United States; throughout its roughly 600 theaters, it offers 3 different brand experiences, and there are additional concept and amenity variances within each different brand experience. PSOF ¶ 99. There are also numerous menus, roughly twenty or more different pricing tiers, multiple sales channels, and other business considerations related to the ever-changing studio film content and geographic/demographic variances one would expect with a national brand footprint in nearly every state. PSOF ¶ 100. Based on this reality, AMC operated under a hybrid or matrix structure in several departments, which is well suited for work environments that are dynamic and tend to shift from project to project. PSOF ¶ 101. A matrix organizational structure is a workplace format in which employees report or partner indirectly or directly to multiple managers/teams rather than one manager overseeing every aspect of a project. PSOF ¶ 102. One advantage of the matrix organizational structure is that people across different functional areas have a better understanding of their co-workers in other areas. PSOF ¶ 103. Best practices and key learnings are brought to light more effectively, and the synergies developed through this process leads to more well-rounded thought leadership and the ability to execute. PSOF ¶ 104. A disadvantage is that employees are responsible to their project team as well as to their functional areas. PSOF ¶ 105. In the end, cross-functional members collaborate on many aspects of the business. PSOF ¶ 107.

During the final 3 years of her employment (and in some respects earlier), Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food & Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain. PSOF ¶ 108. Tonya was responsible for driving AMC product revenue, traffic, units, and attendance related to film/programming/events, Food & Beverage/menu/concept experiences, the Studio and Food & Beverage monetized partnership programs, the DINE-IN brand, Macguffin's Bars, Mobile Preorder/Kiosk, Retail Merchandise Sales, E-commerce Flash Sales, Digital Signage strategy and vendor

relationship oversight, the Coca-Cola Ring of Honor marketing partnership, targeted teen marketing, packaging, digital retail streaming movies, and test initiatives as they evolved such as NFL Sports Programming. PSOF ¶ 109. [3]

Essentially, her team was responsible for end-to-end collaborative planning and execution of all aspects of strategic direction, product/menu development, pricing recommendations, packaging, consumer insights, promotions, marketing, partnership management/negotiations, and sales of most products and services AMC offers to the public, and the methods or channels through which those products and services were most effectively sold to consumers (e.g., digital signage, kiosk, online ordering, mobile, in-theater, 3rd party off-site, 1:1). PSOF ¶ 110. In addition, and because of Tonya's growing leadership role, her broadening expertise, and her strong performance, Tonya was frequently selected to serve on special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions. PSOF ¶ 111. Some examples of this included serving on the CEO's Marketshare Taskforce, the Carmike and Starplex acquisition and integration teams, IT Digital Prioritization Roadmap, and the Initiative Guest Committee. PSOF ¶ 112.

AMC is also incorrect in its attempt to create the inference that Tonya operated as an independent "silo" with a unique set of "core responsibilities" that were shared by no one else. Between 2015 and the end of her employment, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell. Michael Pursell was a Vice President of Food & Beverage at AMC between February 2015 and July 2020, and his role within the company required an extensive amount of overlap and collaboration with Tonya and her team. PSOF ¶ 399.

According to his position description, Pursell was required to "partner[ ] with other departments and key organization leaders to gain a better understanding of how they can assist in achieving department goals." PSOF ¶ 413. Pursell developed his department's strategy in conjunction with Tonya's marketing team and the purchasing group; they created a strategic plan with common objectives and tactics, and they collectively made sure that their shared initiatives were appropriately staffed. PSOF ¶ 414. Tonya's food and beverage team was tasked with developing unique strategies, programs, menu innovations, offers, and concept experiences across three (3) different brands to profitably drive Food & Beverage revenue growth, to increase transactions, to sell more units/items, and to ensure guest satisfaction with the overall Food & Beverage experience. PSOF ¶ 415. The Food & Beverage guest experience includes areas such as the appeal of the menu offering (i.e., improving taste, quality, or execution of an existing product category or adding a new product offering), understanding of ordering processes by brand (mobile, kiosk, counter, or server ordering), packaging (in terms of presentation and maintaining quality prior to consumption), packaging branding, and third-party party monetized commitments or specialty packaging vessels that were sold to guests for higher prices or creating loyalty through refillable options. PSOF ¶ 416.

---

[3] Tonya's responsibilities associated with film marketing, digital streaming, and digital retail were not added until 2018 as discussed *infra* at PSOF ¶¶ 139-151, 238.

Tonya and Pursell's teams directly collaborated on food and alcohol menu pricing, bundling of menu items, discounted "Limited Time Offers," product size/portion offerings, product and vendor recommendations, and ensuring that all offerings were aligned with the unique brand strategy for each of the three (3) brands. PSOF ¶ 417. AMC's central business involved entertainment, food, and service with a very high volume of attendees, and it was very attractive for vendors to be selected for AMC's menu/product offerings, to be featured on menus, digital signage, and other merchandising elements due to the sheer volume of sales. PSOF ¶ 418. This presented AMC (and Tonya and Pursell's teams) with a unique opportunity to monetize the opportunity for inclusion in the menus, and to further monetize direct monies or product rebates if vendors were featured or highlighted in Limited Time Offers or other bundle programs. PSOF ¶ 419. Tonya worked closely with Pursell to jointly approach vendors with potential partnership plans, to suggest sales forecasts, and to negotiate Food & Beverage partnerships for incremental funding. PSOF ¶ 420.

Tonya's team members had weekly meetings with members of the Food & Beverage team, and Tonya additionally met multiple times per week with Pursell directly. PSOF ¶ 421. Given the level of Tonya's integration into the Food & Beverage business, Tonya also frequently met with Pursell's supervisor, either George Patterson or Jennifer Douglass. PSOF ¶ 422. Tonya also interacted directly with members of Pursell's team, typically the Director of Alcohol, and she frequently met with John Macdonald, i.e, the supervisor to George Patterson and Jennifer Douglass when they served in their roles. PSOF ¶ 423. Tonya's 1:1 time with Pursell was typically focused on strategic priorities, developing presentations for upcoming project and result updates, reviewing analytics, reviewing guest and theater team feedback, monetizing vendor opportunities, resource implications, calendar planning, developing special AMC Stubs loyalty offers, considering how to drive more sales with initiative guests, brainstorming, reviewing creative or digital signage, coaching their collective team members, and addressing periodic issues that created additional challenges for their collective teams. PSOF ¶ 424. Tonya and Pursell also served on several working groups and committees together, including the POPS Committee (or Food & Beverage "Prices, Offers, Portions and Sizes"), the Food & Beverage Mobile Ordering Working Group and Steering Committee, the Food & Beverage Digital Signage Working Group, and the Initiative Guest Taskforce. PSOF ¶ 425.

Tonya and Pursell's teams jointly held a variety of weekly, bi-weekly, monthly, or periodic vendor summits and meetings with Coca-Cola, ICEE, Tyson, Weaver Popcorn, Conagra, Mars, Promotion in Motion, Pepsi/Frito Lay, Hershey, Taste of Nature, FunNacho, Allure Global, Gold Medal Products, AICP, Constellation Brands, MillerCoors, Nestle, PCI Packaging, Vistar, Marketeam, Culinary Edge Consultants, Lagunitas, Infinium Spirits, Boston Beer, Patron Spirits, Promixo, American Beverage Marketers, Brown-Forman, Barcardi USA, Tito's Handmade Vodka, Crown Imports, Southern Glazers Wine & Spirits, Beam Suntory, Stone Brewing Company, Pernod Ricard, Jackson Family Wines, and Francis Ford Coppola wines. PSOF ¶ 426. Frequently, other members of their respective teams would also join these meetings in addition to other AMC employees from purchasing (supply chain) or operations. PSOF ¶ 427. The meetings included a range of general, project status updates, discussing upcoming products or specification changes, plan product tests,

discussing menu or pricing changes, discussing celebrity integrations, sharing new strategies or capabilities, discussing consumer insights, reviewing results, conducting menu or liquor tastings, conducting innovation lab visits, and discussing monetization proposals and planning. PSOF ¶ 428. Pursell was required to negotiate contracts in his role, but there were "lots" of instances in which Tonya was involved in negotiating the very same contracts with Coca-Cola and "a lot" of other liquor vendors. PSOF ¶ 429.

Tonya and Pursell also frequently travelled together for industry conferences, events, market visits, theater visits and grand openings, menu innovation lab sessions, competitor visits, and general business meetings; many of those meetings were followed by social outings, lunches, dinners, events, suites, client entertainment outings, cocktail parties, and so forth. PSOF ¶ 430. Joint travel to AMC theater locations was particularly necessary when new concepts, menus, product tests, merchandising/offers, packaging, incentive contests, vendor activations, or Food & Beverage service amenities were being launched such as Feature Fare Menu, CLASSIC Value Menu Test, mobile ordering, bar openings, kiosk ordering, LTO's, Coke Freestyle or Teen Program, new film/studio themed retail, refill tests, digital signage configuration or content changes, and when the guest ordering experience changed. PSOF ¶ 431. Joint travel was also necessary throughout AMC's acquisition of other cinema chains (e.g., Carmike Cinemas, Starplex, Keresotes, etc.) because Tonya and Pursell's teams were jointly involved in the process of evaluating and modifying the branding, signage, menus, staffing, and other characteristics associated with the legacy locations. PSOF ¶ 432.

Throughout all of this ongoing interaction between Tonya, Pursell, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC, and new methods for streamlining existing strategies. PSOF ¶ 433. According to Pursell, the "key three" groups in his line of the business were Food & Beverage, Food & Beverage marketing, and the supply chain, and it is "critical that all three of those work[ ] together very succinctly and tightly" in order to achieve collective success. PSOF ¶ 434.

### Other Major Strategic Initiatives

In addition to their shared responsibility of driving Food & Beverage Sales (which encompasses the numerous, shared activities described above), Tonya also shared leadership responsibility with Pursell on several strategic initiatives within AMC. PSOF ¶ 435.

- **Food & Beverage Mobile Ordering/Pre-Order:** This was a joint, strategic initiative lead by Tonya and Pursell's teams, and it started before Pursell began working at AMC. PSOF ¶ 436.

  The mobile ordering initiative allowed guests to order food and beverages in advance of a movie and have it delivered to their seat. PSOF ¶ 437. As a result of their initial, combined efforts, AMC is now operating the mobile ordering program in more than 350 locations. PSOF ¶ 438. Originally, Tonya spearheaded the effort to gather consumer insights, food concepts, and technical requirements. PSOF ¶ 439. Tonya initially partnered with George Patterson and others in the marketing group, but

when Pursell joined, Tonya and Pursell were asked to transition this into a joint initiative lead by the two them; the initiative was partially intended as a learning experience for Pursell as his first real AMC project and cross-functional effort. PSOF ¶ 440.

Tonya collaborated with Pursell on the "proof of concept," "test markets," and "soft launches" associated with introducing the mobile ordering service to market, and both of them were equally responsible for presenting updates to Stephen Colanero, George Patterson, Adam Aron, John MacDonald, Ed Moyer, Michael Czinege, and other members of the executive committee on this important initiative that had "tremendous visibility in the company." PSOF ¶ 441. They jointly established a Mobile Ordering Work Group and a Mobile Ordering Steering Committee given the project's high visibility, complexity, and work demands. PSOF ¶ 442.

Tonya and Pursell worked very closely on all aspects of understanding the mobile ordering opportunity, modeling numerous business cases, fee structures, UX development, organization of products, recommending participating theaters for tests and launches, guest messaging and marketing, packaging, offers, timing, determining the execution path (i.e., guest pick-up versus delivery to reserved seats), measurement of guest satisfaction, prioritization of technology features against IT cost considerations, working through unique tax implication differences by state, guest order notification procedures, and discount and cash equivalents participation. PSOF ¶ 443.

- New Retail Merchandise program: This program featured movie-themed items and convenience "grab-and-go" impulse purchases, and Tonya and Pursell handled it as a joint initiative. PSOF ¶ 444.

  Tonya's team originally worked on the initiative with Programming Promotions and Senior Vice President Elizabeth Frank (initial program design and expectations), but Tonya quickly transitioned to partnering with Pursell and the Food & Beverage team. PSOF ¶ 445. Tonya and Pursell worked together to prioritize which films they wanted carry merchandise for, to review potential, licensed product categories (toys, collectibles, wearables, concession vessels, etc), and to consider additional decisions related to expanding merchandise, vendor considerations, costs, pricing, activation plans, procedures, and communications surrounding the initiative. PSOF ¶ 446. When they began testing the initiative, Tonya and Pursell analyzed results and broader Food & Beverage impacts such as average sale, erosion to other product sales, labor costs, supply chain impacts, theft, timing of offerings, and changes in results by brand or theater location in order to determine profitability and incrementality. PSOF ¶ 447. They also collected and reviewed guest and theater team feedback. PSOF ¶ 448.

- Delivery to home/To-Go: Tonya originally suggested this program as a potential opportunity to expand AMC's Food & Beverage sales with the home delivery of

AMC's menu offerings through third-party aggregators such as Uber Eats, Grub Hub, and Door Dash. PSOF ¶ 449.

The idea became more appealing in light of the general growth in home delivery, and Tonya's separate efforts on AMC's digital streaming/VOD initiative. PSOF ¶ 450. Tonya believed there were further opportunities to serve guests with movie foods while consuming movies at home. PSOF ¶ 451. Tonya and Pursell jointly worked on developing and presenting a business case for the executive leadership team. PSOF ¶ 452. This included reaching out to several of the third-party aggregators to determine service areas, financial terms, learnings, and trends. PSOF ¶ 453. They also partnered to gather insights from AMC's "sister" brands Hoyts and Cineplex that already conducted limited testing on a similar program. PSOF ¶ 454. They also jointly developed an AMC Stubs loyalty survey to understand guest interest. PSOF ¶ 455. They also jointly explored execution questions such as operations, packaging, menu, pricing, potential technology integrations with third parties and AMC's website and mobile app, and financial models for multiple scenarios. PSOF ¶ 456. They also jointly presented to the executive team with a comprehensive recommendation for testing the program with several different roadmap possibilities for consideration. PSOF ¶ 457.

- **Feature Fare:** Pursell and Tonya also travelled together in order to collaborate on Feature Fare—which Pursell described as "the largest overhaul in the company's history on [Food & Beverage]." PSOF ¶ 458.

  Feature Fare "was a 75 million dollar investment" that involved AMC putting "small kitchens in 300 theaters and really elevat[ing] the entire guest experience;" it "…generated a tremendous amount of revenue for the company and a lot of EBITDA as well." PSOF ¶ 459.

- **Field support, "0411" Field email management, AEI Scores, and Field Communications:** Because Tonya and Pursell's teams were so intertwined, members of their teams also took turns responding to the Food & Beverage "0411" email inbox in which theater team members would submit questions related to Food & Beverage operations, menus, promotions, products, offers, digital signage, etc. PSOF ¶ 461.

  Their teams also collectively reviewed AEI (Annual Engagement Index) survey scores every year together, and they discussed and developed joint action plans on how to improve. PSOF ¶ 462. Their teams also co-authored several field communications for joint programs such as LTO's, digital signage, promotions, merchandising, mobile ordering, and more. PSOF ¶ 463.

- **Federal Regulations and Menu Labeling:** This was also a joint and shared priority between Tonya's team and Pursell's team. PSOF ¶ 464.

  Food, beverages, and alcohol are uniquely impacted by the FDA and national laws— especially for multi-unit restaurant/bar operators. PSOF ¶ 465. The landscape is

29

constantly changing, and Tonya was responsible for working with the Food & Beverage team, vendors, and a national trade organization in order to remain aware of legislation impacts, to ensure compliance as necessary, and to consider/adapt to challenging menu changes related calorie labeling, sugary drink size regulations, taxes, and unique food menu requirements mandated when offering alcohol.  **PSOF ¶ 466.**

- **Prescriptive Team Building:  The Food & Beverage group (headed by George Patterson and later Jennifer Douglass) typically held quarterly or biannual team-building, off-site events or activities.  PSOF ¶ 467.  Almost always, Tonya's Food & Beverage team also attended and even helped plan those off-site collaboration sessions.  PSOF ¶ 468.  Sometimes the business planning meetings were followed by a fun/collaborative social activities.  PSOF ¶ 469.  Recent examples during the last few years of Tonya's employment included: Top Golf, ice skating/hockey at Linn Creek, Royals suites, Breakout KC, Pickleball, bowling, happy hours, and dinners.  PSOF ¶ 470.**

22.     In fall 2018, Mangels prepared a "Job Questionnaire" (AMC's version of a job description), after she traded some job duties with Carrie Trotter and her job title changed to "Vice President, Product Marketing." According to Mangels' Job Questionnaire, her job duties in the "Product Marketing" role involved:

a.     Providing marketing support for the film department and digital merchandising strategy (35%);

b.     supervisory authority over marketing of food and beverage products (15%);

c.     management of the Coca-Cola joint marketing partnership (10%);

d.     management of AMC's dine-in and MacGuffin's Bar concepts and menus (15%);

e.     leading digital merchandising strategy (menu boards, box office, auditorium) and managing relationship with digital signage vendors (10%); and

f.     leading marketing efforts for various technology-based initiatives, such as mobile food and beverage ordering, kiosk ordering, AMC's digital retail on-demand storefront, studio retail merchandise, and e-commerce flash sales (15%).

(Ex. 9 (Dep. Ex. 86), Job Questionnaire for VP, Product Marketing; Ex. 2, Mangels Dep., at 298:11-300:10.)

**RESPONSE:** Uncontroverted that Defts. Ex. 9 is a Job Questionnaire completed by Tonya in 2018, but controverted that the activities listed in sub-paragraphs (a) through (f) somehow represent a complete listing of Tonya's job duties after her responsibilities once again increased in 2018, and also controverted that Tonya simply "traded some job duties with Carrie Trotter" in 2018.

The testimony cited by AMC does not contain any agreement from Tonya that she simply "traded some job duties with Carrie Trotter" in 2018, and it does not contain any agreement from Tonya that the activities listed in sub-paragraphs (a) through (f) represent a complete listing of her duties after her responsibilities once again increased in 2018; Tonya simply authenticates the Job Questionnaire exhibit. In addition, sub-paragraphs (a) through (f) represent a very small fraction of the activities, responsibilities, and initiatives listed on Defts. Ex. 9 (Depo. Ex. 86). Setting those two deficiencies aside, however, AMC's factual statements are also belied by the record.

### Tonya Did Not Simply "Trade Some Job Duties with Carrie Trotter" in 2018

On April 13, 2018, Tonya's position was re-titled to "Vice President, Product Marketing" effective April 20, 2018. PSOF ¶ 139. On April 20, 2018, there was a re-organization that resulted in two additional reports getting added to Tonya's team for a total of six direct reports after two others were moved to different positions. PSOF ¶ 140. Tonya assumed film marketing responsibilities from Carrie Trotter. PSOF ¶ 141. The re-organization was by no means an equal splitting or switching of responsibilities with Carrie Trotter. PSOF ¶ 142. Trotter was struggling to manage her areas of responsibility and the team was significantly under plan for film marketing at the time of the transition; the pace and complexity were too much for Trotter, and she desperately sought a slower role with less pressure. PSOF ¶ 143. The bottom line was that Trotter's group was "getting by," but they were certainly not hitting their goals or growing the more complex film marketing opportunities. PSOF ¶ 144. For comparison, Tonya's team lead 27 loyalty point campaigns in 2018 as compared with the 18 that occurred under Trotter in 2017. PSOF ¶ 145. Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue. PSOF ¶ 146. Tonya's team also added an entirely new monetization and studio marketing program, and when she partnered with the film group, AMC secured a two-year retainer (STX) for $4M ($2M annually), and AMC executed ten test title data initiatives in 2018. PSOF ¶ 147.

In 2018, Tonya also assumed responsibility for developing a major new initiative called AMC On Demand (digital streaming/rent or buy movies online). PSOF ¶ 148. Tonya and her team worked with consultants, programming, IT and studio partners to learn a new business, to define the technical requirements, user experience, and integration within AMC channels, and Tonya advocated for features, functionality, and benefits to position AMC for a successful launch. PSOF ¶ 149. In 2018, Tonya and her team also assumed responsibility for creating and managing a new digital Flash Sales program that generated over $5M in gross revenue. PSOF ¶ 150. In 2018, Tonya and her team also assumed partial responsibility for AMC's Merchandise Program, and partnered with other groups internally to advance that initiative. PSOF ¶ 151.

31

<center>**Tonya's New Cross-Functional Relationship With Robert Kim[4]**</center>

Between 2018 and the end of her employment, Tonya also shared *extensive* cross-functional job responsibilities and reporting obligations with Robert Kim. PSOF ¶ 238 (assumed digital retail responsibilities in 2018). Robert Kim was a Vice President of Programming Promotions at AMC between September 30, 2016 through August 22, 2019, and his role within the company required overlap and collaboration with Tonya and her team. PSOF ¶ 484. Kim's job, "in a nutshell," was to sell AMC's "marketing assets" to film studios. PSOF ¶ 484. This initially included "on-screen advertising" (i.e. trailers or previews), but it also included other assets such as opportunities to hang posters or display cardboard advertisements within AMC theaters in order to market movies. PSOF ¶ 485.

Over time, however, "AMC began to evolve [in] how [they] marketed movies, [and they] saw an opportunity to monetize [their] member data [from their loyalty program] and [their] social online digital marketing capabilities." PSOF ¶ 486. For example, AMC was able to capture data through its loyalty program in order to understand which customers attended a particular movie, and AMC could then leverage that information by selling studios the right to participate in the use of that data in order to narrowly target advertising or promotions to the same customers in order to market the sequel to that movie. PSOF ¶ 487.

The digital marketing idea was to "pitch to the studios [ ] a smarter way to spend their marketing dollars," and this is the area in which Kim and Tonya "worked together." PSOF ¶ 488.

Tonya's team was very intertwined with Rob Kim and his Programming Promotions team, particularly on securing incremental studio funding and film rent reduction with effective marketing, analytics, and media promotions. PSOF ¶ 490. Tonya's team worked closely with the Programming Promotions team and studios to aggressively market films, to create monetization opportunities, to develop engaging activations, and to increase AMC's sales. PSOF ¶ 491. Tonya's team members had weekly meetings with members of the Programming Promotions team, and Tonya also met weekly with Rob Kim directly. PSOF ¶ 492. Tonya's 1:1 time with Rob Kim was typically focused on strategic priorities, budget reviews, monetization goals, results, resource implications, calendar planning, coaching feedback/recognition of their team members, and sometimes addressing other challenges. PSOF ¶ 493. Tonya and Kim's teams jointly held weekly, bi-weekly, monthly, and periodic meetings with Disney, Paramount, Sony, Warner Brothers, Universal, 20th Century Fox, Lionsgate, A24, Annapurna, and STX. PSOF ¶ 494. These meetings included a range of general project status updates, discussing specific upcoming films, sharing new strategies or

---

[4] As set forth above in response to DSOF ¶ 21—at great length—Tonya also continued to share extensive, cross-functional job responsibilities and reporting obligations with Michael Pursell through the end of her employment. Due to the length of that response, however, Plaintiff will not repeat the same explanation here, and instead incorporates that additional discussion as if fully set forth herein.

<center>Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 32 of 337</center>

capabilities, consumer insights, reviewing results, general planning, and discussing monetization proposals. PSOF ¶ 495. Tonya and Kim would also occasionally travel together for industry conferences, events, market visits, visits to AMC's Los Angeles office, and visits to studio offices, and these business meetings were often followed up with social outings, lunches, dinners, events, cocktail parties, watching movie screenings, and other social activities. PSOF ¶ 496.

Tonya's team lead development of the proposals to the studios for the most effective strategies and activations within AMC's owned channels (email, MPN, social, website, mobile app) and theaters, loyalty member database, and supplemental paid media. PSOF ¶ 497. From there, the process of aligning final details with the studio took place, including monetization amounts. PSOF ¶ 498. Throughout all of this ongoing interaction between Tonya, Kim, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC and finding new methods for streamlining proven strategies. PSOF ¶ 499. Tonya and Kim also "[came] up with new menu items for [Kim] to go and sell to the studios." PSOF ¶ 500. Tonya and Kim were also members of AMC's digital retail/streaming task force. PSOF ¶ 501. Tonya and Kim were also participants AMC's LEAP program. PSOF ¶ 502.

23.     Mangels was not responsible for any of the following: the redesign or overhaul of AMC Stubs; preparing and responding to corporate internal or external communications on behalf of AMC; food and beverage operations; leading contract negotiations with movie studios; negotiating contracts for movie trailers; or determining ticket pricing. (Ex. 2, Mangels Dep., at 369:20-371:6; Ex. 5, Colanero Dec., ¶¶ 28, 34, 35.)

**RESPONSE:  Uncontroverted that Tonya did not have responsibility for handling corporate communications on behalf of AMC, negotiating contracts for movie trailers (as her testimony indicates at 370:11), or that she "was not responsible or reviewed on her ability to effectively determine the price of AMC's tickets" (as specifically stated in Colanero's Declaration at ¶ 35).  The corporate communications and ticket pricing issues are germane to the issue of whether or not Frank Ybarra and Robert Lane are valid comparators in this case, but now that discovery has concluded, Tonya has elected to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane in order to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators in this case: <u>Michael Pursell</u> and <u>Robert Kim</u>.  The issues germane to Julius Lai, Frank Ybarra, and Robert Lane are therefore immaterial to summary judgment.**

**All other statements of fact in the above paragraph are controverted.**

## FOOD & BEVERAGE OPERATIONS
### (Cross-functional Responsibility with Michael Pursell)

Between 2015 and the end of her employment, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell. Michael Pursell was a Vice President of Food & Beverage at AMC between February 2015 and July 2020, and his role within the company required an extensive amount of overlap and collaboration with Tonya and her team. PSOF ¶ 399.

According to his position description, Pursell was required to "partner[ ] with other departments and key organization leaders to gain a better understanding of how they can assist in achieving department goals." PSOF ¶ 413. Pursell developed his department's strategy in conjunction with Tonya's marketing team and the purchasing group; they created a strategic plan with common objectives and tactics, and they collectively made sure that their shared initiatives were appropriately staffed. PSOF ¶ 414. Tonya's food and beverage team was tasked with developing unique strategies, programs, menu innovations, offers, and concept experiences across three (3) different brands to profitably drive Food & Beverage revenue growth, to increase transactions, to sell more units/items, and to ensure guest satisfaction with the overall Food & Beverage experience. PSOF ¶ 415. The Food & Beverage guest experience includes areas such as the appeal of the menu offering (i.e., improving taste, quality, or execution of an existing product category or adding a new product offering), understanding of ordering processes by brand (mobile, kiosk, counter, or server ordering), packaging (in terms of presentation and maintaining quality prior to consumption), packaging branding, and third-party party monetized commitments or specialty packaging vessels that were sold to guests for higher prices or creating loyalty through refillable options. PSOF ¶ 416.

Tonya and Pursell's teams directly collaborated on food and alcohol menu pricing, bundling of menu items, discounted "Limited Time Offers," product size/portion offerings, product and vendor recommendations, and ensuring that all offerings were aligned with the unique brand strategy for each of the three (3) brands. PSOF ¶ 417. AMC's central business involved entertainment, food, and service with a very high volume of attendees, and it was very attractive for vendors to be selected for AMC's menu/product offerings, to be featured on menus, digital signage, and other merchandising elements due to the sheer volume of sales. PSOF ¶ 418. This presented AMC (and Tonya and Pursell's teams) with a unique opportunity to monetize the opportunity for inclusion in the menus, and to further monetize direct monies or product rebates if vendors were featured or highlighted in Limited Time Offers or other bundle programs. PSOF ¶ 419. Tonya worked closely with Pursell to jointly approach vendors with potential partnership plans, to suggest sales forecasts, and to negotiate Food & Beverage partnerships for incremental funding. PSOF ¶ 420.

Tonya's team members had weekly meetings with members of the Food & Beverage team, and Tonya additionally met multiple times per week with Pursell directly. PSOF ¶ 421. Given the level of Tonya's integration into the Food & Beverage business, Tonya also frequently met with Pursell's supervisor, either George Patterson or Jennifer Douglass. PSOF ¶ 422. Tonya also interacted directly with members of Pursell's team, typically the

Director of Alcohol, and she frequently met with John Macdonald, i.e, the supervisor to George Patterson and Jennifer Douglass when they served in their roles. PSOF ¶ 423. Tonya's 1:1 time with Pursell was typically focused on strategic priorities, developing presentations for upcoming project and result updates, reviewing analytics, reviewing guest and theater team feedback, monetizing vendor opportunities, resource implications, calendar planning, developing special AMC Stubs loyalty offers, considering how to drive more sales with initiative guests, brainstorming, reviewing creative or digital signage, coaching their collective team members, and addressing periodic issues that created additional challenges for their collective teams. PSOF ¶ 424. Tonya and Pursell also served on several working groups and committees together, including the POPS Committee (or Food & Beverage "Prices, Offers, Portions and Sizes"), the Food & Beverage Mobile Ordering Working Group and Steering Committee, the Food & Beverage Digital Signage Working Group, and the Initiative Guest Taskforce. PSOF ¶ 425.

Tonya and Pursell's teams jointly held a variety of weekly, bi-weekly, monthly, or periodic vendor summits and meetings with Coca-Cola, ICEE, Tyson, Weaver Popcorn, Conagra, Mars, Promotion in Motion, Pepsi/Frito Lay, Hershey, Taste of Nature, FunNacho, Allure Global, Gold Medal Products, AICP, Constellation Brands, MillerCoors, Nestle, PCI Packaging, Vistar, Marketeam, Culinary Edge Consultants, Lagunitas, Infinium Spirits, Boston Beer, Patron Spirits, Promixo, American Beverage Marketers, Brown-Forman, Barcardi USA, Tito's Handmade Vodka, Crown Imports, Southern Glazers Wine & Spirits, Beam Suntory, Stone Brewing Company, Pernod Ricard, Jackson Family Wines, and Francis Ford Coppola wines. PSOF ¶ 426. Frequently, other members of their respective teams would also join these meetings in addition to other AMC employees from purchasing (supply chain) or operations. PSOF ¶ 427. The meetings included a range of general, project status updates, discussing upcoming products or specification changes, plan product tests, discussing menu or pricing changes, discussing celebrity integrations, sharing new strategies or capabilities, discussing consumer insights, reviewing results, conducting menu or liquor tastings, conducting innovation lab visits, and discussing monetization proposals and planning. PSOF ¶ 428. Pursell was required to negotiate contracts in his role, but there were "lots" of instances in which Tonya was involved in negotiating the very same contracts with Coca-Cola and "a lot" of other liquor vendors. PSOF ¶ 429.

Tonya and Pursell also frequently travelled together for industry conferences, events, market visits, theater visits and grand openings, menu innovation lab sessions, competitor visits, and general business meetings; many of those meetings were followed by social outings, lunches, dinners, events, suites, client entertainment outings, cocktail parties, and so forth. PSOF ¶ 430. Joint travel to AMC theater locations was particularly necessary when new concepts, menus, product tests, merchandising/offers, packaging, incentive contests, vendor activations, or Food & Beverage service team amenities were being launched such as Feature Fare Menu, CLASSIC Value Menu Test, mobile ordering, bar openings, kiosk ordering, LTO's, Coke Freestyle or Teen Program, new film/studio themed retail, refill tests, digital signage configuration or content changes, and when the guest ordering experience changed. PSOF ¶ 431. Joint travel was also necessary throughout AMC's acquisition of other cinema chains (e.g., Carmike Cinemas, Starplex, Keresotes, etc.) because Tonya and Pursell's teams were

jointly involved in the process of evaluating and modifying the branding, signage, menus, staffing, and other characteristics associated with the legacy locations. PSOF ¶ 432.

Throughout all of this ongoing interaction between Tonya, Pursell, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC, and new methods for streamlining existing strategies. PSOF ¶ 433. According to Pursell, the "key three" groups in his line of the business were Food & Beverage, Food & Beverage marketing, and the supply chain, and it is "critical that all three of those work[ ] together very succinctly and tightly" in order to achieve collective success. PSOF ¶ 434.

### Other Major Strategic Initiatives

In addition to their shared responsibility of driving Food & Beverage Sales (which encompasses the numerous, shared activities described above), Tonya also shared leadership responsibility with Pursell on several strategic initiatives within AMC. PSOF ¶ 435.

- **Food & Beverage Mobile Ordering/Pre-Order:** This was a joint, strategic initiative lead by Tonya and Pursell's teams, and it started before Pursell began working at AMC. PSOF ¶ 436.

   The mobile ordering initiative allowed guests to order food and beverages in advance of a movie and have it delivered to their seat. PSOF ¶ 437. As a result of their initial, combined efforts, AMC is now operating the mobile ordering program in more than 350 locations. PSOF ¶ 438. Originally, Tonya spearheaded the effort to gather consumer insights, food concepts, and technical requirements. PSOF ¶ 439. Tonya initially partnered with George Patterson and others in the marketing group, but when Pursell joined, Tonya and Pursell were asked to transition this into a joint initiative lead by the two them; the initiative was partially intended as a learning experience for Pursell as his first real AMC project and cross-functional effort. PSOF ¶ 440.

   Tonya collaborated with Pursell on the "proof of concept," "test markets," and "soft launches" associated with introducing the mobile ordering service to market, and both of them were equally responsible for presenting updates to Stephen Colanero, George Patterson, Adam Aron, John MacDonald, Ed Moyer, Michael Czinege, and other members of the executive committee on this important initiative that had "tremendous visibility in the company." PSOF ¶ 441. They jointly established a Mobile Ordering Work Group and a Mobile Ordering Steering Committee given the project's high visibility, complexity, and work demands. PSOF ¶ 442.

   Tonya and Pursell worked very closely on all aspects of understanding the mobile ordering opportunity, modeling numerous business cases, fee structures, UX development, organization of products, recommending participating theaters for tests and launches, guest messaging and marketing, packaging, offers, timing, determining the execution path (i.e., guest pick-up versus delivery to reserved seats), measurement

36

of guest satisfaction, prioritization of technology features against IT cost considerations, working through unique tax implication differences by state, guest order notification procedures, and discount and cash equivalents participation. PSOF ¶ 443.

- **New Retail Merchandise program:** This program featured movie-themed items and convenience "grab-and-go" impulse purchases, and Tonya and Pursell handled it as a joint initiative. PSOF ¶ 444.

  Tonya's team originally worked on the initiative with Programming Promotions and Senior Vice President Elizabeth Frank (initial program design and expectations), but Tonya quickly transitioned to partnering with Pursell and the Food & Beverage team. PSOF ¶ 445. Tonya and Pursell worked together to prioritize which films they wanted carry merchandise for, to review potential, licensed product categories (toys, collectibles, wearables, concession vessels, etc), and to consider additional decisions related to expanding merchandise, vendor considerations, costs, pricing, activation plans, procedures, and communications surrounding the initiative. PSOF ¶ 446. When they began testing the initiative, Tonya and Pursell analyzed results and broader Food & Beverage impacts such as average sale, erosion to other product sales, labor costs, supply chain impacts, theft, timing of offerings, and changes in results by brand or theater location in order to determine profitability and incrementality. PSOF ¶ 447. They also collected and reviewed guest and theater team feedback. PSOF ¶ 448.

- **Delivery to home/To-Go:** Tonya originally suggested this program as a potential opportunity to expand AMC's Food & Beverage sales with the home delivery of AMC's menu offerings through third-party aggregators such as Uber Eats, Grub Hub, and Door Dash. PSOF ¶ 449.

  The idea became more appealing in light of the general growth in home delivery, and Tonya's separate efforts on AMC's digital streaming/VOD initiative. PSOF ¶ 450. Tonya believed there were further opportunities to serve guests with movie foods while consuming movies at home. PSOF ¶ 451. Tonya and Pursell jointly worked on developing and presenting a business case for the executive leadership team. PSOF ¶ 452. This included reaching out to several of the third-party aggregators to determine service areas, financial terms, learnings, and trends. PSOF ¶ 453. They also partnered to gather insights from AMC's "sister" brands Hoyts and Cineplex that already conducted limited testing on a similar program. PSOF ¶ 454. They also jointly developed an AMC Stubs loyalty survey to understand guest interest. PSOF ¶ 455. They also jointly explored execution questions such as operations, packaging, menu, pricing, potential technology integrations with third parties and AMC's website and mobile app, and financial models for multiple scenarios. PSOF ¶ 456. They also jointly presented to the executive team with a comprehensive recommendation for testing the program with several different roadmap possibilities for consideration. PSOF ¶ 457.

37

- **Feature Fare:** Pursell and Tonya also travelled together in order to collaborate on Feature Fare—which Pursell described as "the largest overhaul in the company's history on [Food & Beverage]." PSOF ¶ 458.

  Feature Fare "was a 75 million dollar investment" that involved AMC putting "small kitchens in 300 theaters and really elevat[ing] the entire guest experience;" it "…generated a tremendous amount of revenue for the company and a lot of EBITDA as well." PSOF ¶ 459.

- **Field support, "0411" Field email management, AEI Scores, and Field Communications:** Because Tonya and Pursell's teams were so intertwined, members of their teams also took turns responding to the Food & Beverage "0411" email inbox in which theater team members would submit questions related to Food & Beverage operations, menus, promotions, products, offers, digital signage, etc. PSOF ¶ 461.

  Their teams also collectively reviewed AEI (Annual Engagement Index) survey scores every year together, and they discussed and developed joint action plans on how to improve. PSOF ¶ 462. Their teams also co-authored several field communications for joint programs such as LTO's, digital signage, promotions, merchandising, mobile ordering, and more. PSOF ¶ 463.

- **Federal Regulations and Menu Labeling:** This was also a joint and shared priority between Tonya's team and Pursell's team. PSOF ¶ 464.

  Food, beverages, and alcohol are uniquely impacted by the FDA and national laws—especially for multi-unit restaurant/bar operators. PSOF ¶ 465. The landscape is constantly changing, and Tonya was responsible for working with the Food & Beverage team, vendors, and a national trade organization in order to remain aware of legislation impacts, to ensure compliance as necessary, and to consider/adapt to challenging menu changes related calorie labeling, sugary drink size regulations, taxes, and unique food menu requirements mandated when offering alcohol. PSOF ¶ 466.

- **Prescriptive Team Building:** The Food & Beverage group (headed by George Patterson and later Jennifer Douglass) typically held quarterly or biannual team-building, off-site events or activities. PSOF ¶ 467. Almost always, Tonya's Food & Beverage team also attended and even helped plan those off-site collaboration sessions. PSOF ¶ 468. Sometimes the business planning meetings were followed by a fun/collaborative social activities. PSOF ¶ 469. Recent examples during the last few years of Tonya's employment included: Top Golf, ice skating/hockey at Linn Creek, Royals suites, Breakout KC, Pickleball, bowling, happy hours, and dinners. PSOF ¶ 470.

## LEADING CONTRACT NEGOTIATIONS WITH MOVIE STUDIOS
### (Cross-functional Responsibility with Robert Kim)

Between 2018 and the end of her employment, Tonya also shared *extensive* cross-functional job responsibilities and reporting obligations with Robert Kim. PSOF ¶ 238 (assumed digital retail responsibilities in 2018). Robert Kim was a Vice President of Programming Promotions at AMC between September 30, 2016 through August 22, 2019, and his role within the company required overlap and collaboration with Tonya and her team. PSOF ¶ 484. Kim's job, "in a nutshell," was to sell AMC's "marketing assets" to film studios. PSOF ¶ 484. This initially included "on-screen advertising" (i.e. trailers or previews), but it also included other assets such as opportunities to hang posters or display cardboard advertisements within AMC theaters in order to market movies. PSOF ¶ 485.

Over time, however, "AMC began to evolve [in] how [they] marketed movies, [and they] saw an opportunity to monetize [their] member data [from their loyalty program] and [their] social online digital marketing capabilities." PSOF ¶ 486. For example, AMC was able to capture data through its loyalty program in order to understand which customers attended a particular movie, and AMC could then leverage that information by selling studios the right to participate in the use of that data in order to narrowly target advertising or promotions to the same customers in order to market the sequel to that movie. PSOF ¶ 487.

The digital marketing idea was to "pitch to the studios [ ] a smarter way to spend their marketing dollars," and this is the area in which Kim and Tonya "worked together." PSOF ¶ 488.

Tonya's team was very intertwined with Rob Kim and his Programming Promotions team, particularly on securing incremental studio funding and film rent reduction with effective marketing, analytics, and media promotions. PSOF ¶ 490. Tonya's team worked closely with the Programming Promotions team and studios to aggressively market films, to create monetization opportunities, to develop engaging activations, and to increase AMC's sales. PSOF ¶ 491. Tonya's team members had weekly meetings with members of the Programming Promotions team, and Tonya also met weekly with Rob Kim directly. PSOF ¶ 492. Tonya's 1:1 time with Rob Kim was typically focused on strategic priorities, budget reviews, monetization goals, results, resource implications, calendar planning, coaching feedback/recognition of their team members, and sometimes addressing other challenges. PSOF ¶ 493. Tonya and Kim's teams jointly held weekly, bi-weekly, monthly, and periodic meetings with Disney, Paramount, Sony, Warner Brothers, Universal, 20th Century Fox, Lionsgate, A24, Annapurna, and STX. PSOF ¶ 494. These meetings included a range of general project status updates, discussing specific upcoming films, sharing new strategies or capabilities, consumer insights, reviewing results, general planning, and discussing monetization proposals. PSOF ¶ 495. Tonya and Kim would also occasionally travel together for industry conferences, events, market visits, visits to AMC's Los Angeles office, and visits to studio offices, and these business meetings were often followed up with social outings, lunches, dinners, events, cocktail parties, watching movie screenings, and other social activities. PSOF ¶ 496.

Tonya's team lead development of the proposals to the studios for the most effective strategies and activations within AMC's owned channels (email, MPN, social, website, mobile app) and theaters, loyalty member database, and supplemental paid media. PSOF ¶ 497. From there, the process of aligning final details with the studio took place, including monetization amounts. PSOF ¶ 498. Throughout all of this ongoing interaction between Tonya, Kim, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC and finding new methods for streamlining proven strategies. PSOF ¶ 499. Tonya and Kim also "[came] up with new menu items for [Kim] to go and sell to the studios." PSOF ¶ 500. Tonya and Kim were also members of AMC's digital retail/streaming task force. PSOF ¶ 501. Tonya and Kim were also participants AMC's LEAP program. PSOF ¶ 502.

24. Mangels also did not have regular or frequent contact with AMC's Chief Executive Officer. (Ex. 10, Deposition of Adam Aron ("Aron Dep."), at 99:5-100:6.)

**RESPONSE: Uncontroverted but immaterial.**

**Mangels' Alleged Comparators**

25. During the relevant time-period, there were 53 AMC VPs. (Ex. 3, Chavarria Dec., at ¶ 37.)

**RESPONSE: Uncontroverted but immaterial.**

26. Mangels identifies five of these VPs, each of whom is male, as alleged comparators: Julius Lai, Frank Ybarra, Michael Pursell, Rob Kim, and Robert Lane. None of these comparators had all of the same "Key Performance Metrics" as Mangels. (Ex. 2, Mangels Dep., at 40:22-25, 43:7-11, 55:10-12, 56:2-11.)

**RESPONSE: Now that discovery has concluded, Tonya has elected to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane in order to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators in this case: <u>Michael Pursell</u> and <u>Robert Kim</u>. The issues germane to Julius Lai, Frank Ybarra, and Robert Lane are therefore immaterial to summary judgment.**

**All other statements of fact in this paragraph are controverted. The testimony cited by AMC does not support the assertion that no two employees at AMC have overlapping KPMs; it does not even address the issue of KPMs. In addition, the inference should be just the opposite in light of the cross-functional nature of many employees' joint responsibilities and reporting obligations. *See,* Pltfs, Resp. to DSOF ¶ 23. As discussed above, Tonya's role at**

AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP). PSOF ¶ 391.

Tonya is unaware of how KPMs were specifically worded on other employees' performance reviews at AMC, but that does not mean that those employees did not share joint responsibilities or joint goals with Tonya or others—regardless of how their KPMs were described internally on their performance reviews. PSOF ¶ 508. There was no common method or procedure at AMC for how KPMs were worded, structured, or characterized for each individual department or position at AMC; AMC's KPM description process was disjointed, and tended to vary from manager to manager and employee to employee throughout the organization. PSOF ¶ 509. Typically it was up to each person to author their own KPMs and measurement targets in their own words and structure; it was then approved by that person's primary supervisor. PSOF ¶ 510.

27.     Julius Lai was hired by AMC in November 2015 as the VP, Guest Engagement.

(Ex. 11, Deposition of Julius Lai ("Lai Dep.") at 25:2-19.)

    a.    Lai has over 10 years of experience in designing and/or managing customer loyalty programs. Lai was recruited by AMC because of his demonstrated experience with the dynamics of consumers and their needs, and his understanding of how that translates to the consumer's repeated consumption of a product. (Ex. 5, Colanero Dec., at ¶¶ 30; Ex. 11, Lai Dep., 9:3-14:13.)

    b.    Lai reported to Stephen Colanero. He was responsible for formulating and implementing strategies to directly engage with guests by way of two primary channels: (1) AMC's guest loyalty program (AMC Stubs); and (2) AMC's digital properties (website, mobile app, and social media platforms). Lai spent most of his time restructuring and redesigning AMC's guest loyalty program, AMC Stubs. (Ex. 5, Colanero Dec., at ¶¶ 31, 33.)

    c.    After Lai's redesign of the AMC Stubs program, the number of members of AMC Stubs increased from 5 million in 2015 to approximately 24 million by 2018. In the first quarter of 2019, AMC Stubs members represented 44% of all AMC attendees. Members of this program drove an average of 2.1 times the amount of gross revenue compared to non-members of this program. Additionally, the data AMC is able to gain about its AMC Stubs members because of Lai's work provides it with significant market insight into movie-goer preferences and allows AMC to broaden and refine its effort to support Hollywood studio partners, which provides it with value with which to negotiate with the studios for return value to AMC. (Ex. 5, Colanero Dec., at ¶ 33.)

    d.    According to AMC's CEO, Lai's job duties were radically different from Mangels'; Lai was far more senior and far more important to the business, and his job duties

impacted the business far more than Mangels'. Because of Lai's success as VP, Guest Engagement, he was promoted to a senior vice president ("SVP") role in fall 2018. (Ex. 10, Aron Dep. at 82:6-83:7; Ex. 5, Colanero Dec., at ¶ 32.)

  e.  Mangels claims Lai is a comparator only from October 2016 to fall 2018 (i.e., prior to his promotion to SVP). (Ex. 2, Mangels Dep., at 45:3-14.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").** *See* **Scheduling Order [Doc. 41] at ¶ 6. Setting that deficiency aside, Tonya has elected to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane now that discovery has concluded in order to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators in this case:** <u>Michael Pursell</u> **and** <u>Robert Kim</u>**. The issues germane to Julius Lai, Frank Ybarra, and Robert Lane are therefore immaterial to summary judgment.**

**As explained** *at length* **in response to DSOF ¶¶ 29 and 30 below, Tonya shared** *extensive* **cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Given Defendant's significant departure from the requirements specified above, Plaintiff relies on her discussion in response to DSOF ¶¶ 29 and 30 below in order to controvert any inconsistent (and immaterial) matters referenced above.**

28.  Francisco ("Frank") Ybarra was the VP, Communications. He entered this role when he began working for AMC in July 2014. Including his time at AMC, Ybarra has over 25 years' experience in public and/or internal communications. (Ex. 12, Deposition of Frank Ybarra ("Ybarra Dep."), at 7:4-5, 10:12-13:7.)

  a.  From October 2016 to October 2019, Ybarra's primary job function was to create and manage internal and formerly external communications on AMC's behalf. Internally, Ybarra crafted communications from the CEO, other senior leaders, and administrative departments to update associates on policy changes, upcoming events, and key initiatives (among others). Externally, Ybarra was responsible for crafting not only the substantive response to media outlets seeking comment from AMC, but also the strategy behind media communications. (Ex. 5, Colanero Dec., at ¶ 26.)

  b.  Ybarra was also responsible for organizing significant internal employee events throughout the year, including AMC's annual "Connections" event and other large employee meetings. (Ex. 12, Ybarra Dep., at 37:16-40:2.)

    c.      It was Ybarra's job to respond, on AMC's behalf, to internal and formerly external crises as they arise. This required him to be available and responsive to the CEO on a "24/7" basis, and required him to office very close to the CEO. According to AMC's CEO, Ybarra's job was radically different from Mangels'; Ybarra was far more senior and far more important to the business, and his job duties impacted the organization far more than Mangels'. (Ex. 5, Colanero Dec., at ¶ 27; Ex. 10, Aron Dep., at 82:6-83:7.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").** ***See*** **Scheduling Order [Doc. 41] at ¶ 6. Setting that deficiency aside, Tonya has elected to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane now that discovery has concluded in order to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators in this case:** <u>**Michael Pursell**</u> **and** <u>**Robert Kim**</u>**. The issues germane to Julius Lai, Frank Ybarra, and Robert Lane are therefore immaterial to summary judgment.**

**As explained** ***at length*** **in response to DSOF ¶¶ 29 and 30 below, Tonya shared** ***extensive*** **cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Given Defendant's significant departure from the requirements specified above, Plaintiff relies on her discussion in response to DSOF ¶¶ 29 and 30 below in order to controvert any inconsistent (and immaterial) matters referenced above.**

    29.     Michael Pursell was hired by AMC in 2015 as its VP, Food & Beverage, and held this role through at least October 2019. Pursell has over 20 years of experience in food and beverage industry, including prior experience as a director of food and beverage, and had former training in culinary arts. (Ex. 13, Deposition of Michael Pursell ("Pursell Dep."), at 11:3-15:21, 20:8-21:2.)

    a.      Pursell worked on food and beverage, mobile ordering for food and beverage products, and food and beverage merchandising. He was responsible for the operations of the food and beverage side of AMC's business. Two thirds of AMC's revenue is associated with its food and beverage products. (Ex. 2, Mangels Dep., at 372:4-373:3; Ex. 13, Pursell Dep., at 65:2-66:4; Ex. 14, Audio and Transcript of May 30, 2018 Meeting.)

    b.      Pursell sourced new products, determined whether he was getting the best price, assessed the financial viability of the product, and created the business case for them. He led a team that implemented new product offerings and then managed them. This process involved ensuring each theatre had the resources necessary to

prepare and serve the products and that the products were served fresh. (Ex. 15, Declaration of Jennifer Douglass ("Douglass Dec."), at ¶ 8.)

c.  Pursell was also responsible for food and beverage packaging, preparation, and safety. He was also focused on the customer experience with food and beverage products, including the ordering process and overall guest satisfaction. Pursell's role required good relationships and consistent communication with AMC's "field associates," the theatre management team and associates working at the food and beverage counter, to ensure expectations related to supply chain, inventory management, and quality control of the food and beverage items were met. (Ex. 15, Douglass Dec., at ¶¶ 9-10.)

d.  On a recording Mangels took on May 30, 2018, she states she had "different responsibilities" than Pursell. She adds that he was leading "operational strategy" of the food and beverage division, while she was leading the "marketing strategy." (Ex. 14, Audio and Transcript of May 30, 2018 Meeting.)

**RESPONSE:  This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").  *See* Scheduling Order [Doc. 41] at ¶ 6.**

**Setting that deficiency aside, it is uncontroverted that:**

- **Michael Pursell was hired by AMC in 2015 as its VP, Food & Beverage, and held this role through at least October 2019.**

- **Former experience:  Pursell worked at Aramark for approximately eleven years; he served as a director of development, a group director, and he spent the last six years as their Vice President of Marketing for their education division.  PSOF ¶ 405 (specifically tracking the deposition testimony at 12:9-14:2).  Pursell also worked as a Director of Food & Beverage at a company called Wawa for approximately two years immediately prior to joining AMC; in that role, he reported up through the marketing chain, and his job entailed menu strategy, managing contracts, research and development, supply chain management, and partnership with other people in the marketing department to develop offers and promotions.  PSOF ¶ 406 (specifically tracking the deposition testimony at 14:3-15:5).**

- **Education:  Pursell has a bachelor's degree in Marketing, an associate's degree in culinary arts, and a master's degree in Business Administration; Pursell agrees, however, that his position only required a bachelor's degree.  PSOF ¶ 403 (specifically tracking the deposition testimony at 10:3-14, 34:4-36:21).**

**All other statements of fact in AMC's "paragraph" are controverted because AMC is either directly stating, or seeking to create the inference, that the responsibilities referenced above**

were attributable to Michael Pursell only, and that they were not shared by anyone else. Notably, the Declaration supplied by Jennifer Douglas discusses the above-referenced responsibilities *generically*, and there is no attempt to state that they were *exclusive* to Mr. Pursell or his role. They were not. Just like Tonya, Mr. Pursell did not operate as an independent "silo" with a unique set of "core responsibilities" that were shared by no one else.

Between 2015 and the end of her employment, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell. According to his position description, Pursell was required to "partner[ ] with other departments and key organization leaders to gain a better understanding of how they can assist in achieving department goals." PSOF ¶ 413. Pursell developed his department's strategy in conjunction with Tonya's marketing team and the purchasing group; they created a strategic plan with common objectives and tactics, and they collectively made sure that their shared initiatives were appropriately staffed. PSOF ¶ 414. Tonya's food and beverage team was tasked with developing unique strategies, programs, menu innovations, offers, and concept experiences across three (3) different brands to profitably drive Food & Beverage revenue growth, to increase transactions, to sell more units/items, and to ensure guest satisfaction with the overall Food & Beverage experience. PSOF ¶ 415. The Food & Beverage guest experience includes areas such as the appeal of the menu offering (i.e., improving taste, quality, or execution of an existing product category or adding a new product offering), understanding of ordering processes by brand (mobile, kiosk, counter, or server ordering), packaging (in terms of presentation and maintaining quality prior to consumption), packaging branding, and third-party party monetized commitments or specialty packaging vessels that were sold to guests for higher prices or creating loyalty through refillable options. PSOF ¶ 416.

Tonya and Pursell's teams directly collaborated on food and alcohol menu pricing, bundling of menu items, discounted "Limited Time Offers," product size/portion offerings, product and vendor recommendations, and ensuring that all offerings were aligned with the unique brand strategy for each of the three (3) brands. PSOF ¶ 417. AMC's central business involved entertainment, food, and service with a very high volume of attendees, and it was very attractive for vendors to be selected for AMC's menu/product offerings, to be featured on menus, digital signage, and other merchandising elements due to the sheer volume of sales. PSOF ¶ 418. This presented AMC (and Tonya and Pursell's teams) with a unique opportunity to monetize the opportunity for inclusion in the menus, and to further monetize direct monies or product rebates if vendors were featured or highlighted in Limited Time Offers or other bundle programs. PSOF ¶ 419. Tonya worked closely with Pursell to jointly approach vendors with potential partnership plans, to suggest sales forecasts, and to negotiate Food & Beverage partnerships for incremental funding. PSOF ¶ 420.

Tonya's team members had weekly meetings with members of the Food & Beverage team, and Tonya additionally met multiple times per week with Pursell directly. PSOF ¶ 421. Given the level of Tonya's integration into the Food & Beverage business, Tonya also frequently met with Pursell's supervisor, either George Patterson or Jennifer Douglass. PSOF ¶ 422. Tonya also interacted directly with members of Pursell's team, typically the Director of Alcohol, and she frequently met with John Macdonald, i.e, the supervisor to

George Patterson and Jennifer Douglass when they served in their roles. PSOF ¶ 423. Tonya's 1:1 time with Pursell was typically focused on strategic priorities, developing presentations for upcoming project and result updates, reviewing analytics, reviewing guest and theater team feedback, monetizing vendor opportunities, resource implications, calendar planning, developing special AMC Stubs loyalty offers, considering how to drive more sales with initiative guests, brainstorming, reviewing creative or digital signage, coaching their collective team members, and addressing periodic issues that created additional challenges for their collective teams. PSOF ¶ 424. Tonya and Pursell also served on several working groups and committees together, including the POPS Committee (or Food & Beverage "Prices, Offers, Portions and Sizes"), the Food & Beverage Mobile Ordering Working Group and Steering Committee, the Food & Beverage Digital Signage Working Group, and the Initiative Guest Taskforce. PSOF ¶ 425.

Tonya and Pursell's teams jointly held a variety of weekly, bi-weekly, monthly, or periodic vendor summits and meetings with Coca-Cola, ICEE, Tyson, Weaver Popcorn, Conagra, Mars, Promotion in Motion, Pepsi/Frito Lay, Hershey, Taste of Nature, FunNacho, Allure Global, Gold Medal Products, AICP, Constellation Brands, MillerCoors, Nestle, PCI Packaging, Vistar, Marketeam, Culinary Edge Consultants, Lagunitas, Infinium Spirits, Boston Beer, Patron Spirits, Promixo, American Beverage Marketers, Brown-Forman, Barcardi USA, Tito's Handmade Vodka, Crown Imports, Southern Glazers Wine & Spirits, Beam Suntory, Stone Brewing Company, Pernod Ricard, Jackson Family Wines, and Francis Ford Coppola wines. PSOF ¶ 426. Frequently, other members of their respective teams would also join these meetings in addition to other AMC employees from purchasing (supply chain) or operations. PSOF ¶ 427. The meetings included a range of general, project status updates, discussing upcoming products or specification changes, plan product tests, discussing menu or pricing changes, discussing celebrity integrations, sharing new strategies or capabilities, discussing consumer insights, reviewing results, conducting menu or liquor tastings, conducting innovation lab visits, and discussing monetization proposals and planning. PSOF ¶ 428. Pursell was required to negotiate contracts in his role, but there were "lots" of instances in which Tonya was involved in negotiating the very same contracts with Coca-Cola and "a lot" of other liquor vendors. PSOF ¶ 429.

Tonya and Pursell also frequently travelled together for industry conferences, events, market visits, theater visits and grand openings, menu innovation lab sessions, competitor visits, and general business meetings; many of those meetings were followed by social outings, lunches, dinners, events, suites, client entertainment outings, cocktail parties, and so forth. PSOF ¶ 430. Joint travel to AMC theater locations was particularly necessary when new concepts, menus, product tests, merchandising/offers, packaging, incentive contests, vendor activations, or Food & Beverage service amenities were being launched such as Feature Fare Menu, CLASSIC Value Menu Test, mobile ordering, bar openings, kiosk ordering, LTO's, Coke Freestyle or Teen Program, new film/studio themed retail, refill tests, digital signage configuration or content changes, and when the guest ordering experience changed. PSOF ¶ 431. Joint travel was also necessary throughout AMC's acquisition of other cinema chains (e.g., Carmike Cinemas, Starplex, Keresotes, etc.) because Tonya and Pursell's teams were jointly involved in the process of evaluating and modifying the branding, signage, menus, staffing, and other characteristics associated with the legacy locations. PSOF ¶ 432.

Throughout all of this ongoing interaction between Tonya, Pursell, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC, and new methods for streamlining existing strategies. PSOF ¶ 433. According to Pursell, the "key three" groups in his line of the business were Food & Beverage, Food & Beverage marketing, and the supply chain, and it is "critical that all three of those work[ ] together very succinctly and tightly" in order to achieve collective success. PSOF ¶ 434.

### Other Major Strategic Initiatives

In addition to their shared responsibility of driving Food & Beverage Sales (which encompasses the numerous, shared activities described above), Tonya also shared leadership responsibility with Pursell on several strategic initiatives within AMC. PSOF ¶ 435.

- **Food & Beverage Mobile Ordering/Pre-Order:** This was a joint, strategic initiative lead by Tonya and Pursell's teams, and it started before Pursell began working at AMC. PSOF ¶ 436.

  The mobile ordering initiative allowed guests to order food and beverages in advance of a movie and have it delivered to their seat. PSOF ¶ 437. As a result of their initial, combined efforts, AMC is now operating the mobile ordering program in more than 350 locations. PSOF ¶ 438. Originally, Tonya spearheaded the effort to gather consumer insights, food concepts, and technical requirements. PSOF ¶ 439. Tonya initially partnered with George Patterson and others in the marketing group, but when Pursell joined, Tonya and Pursell were asked to transition this into a joint initiative lead by the two them; the initiative was partially intended as a learning experience for Pursell as his first real AMC project and cross-functional effort. PSOF ¶ 440.

  Tonya collaborated with Pursell on the "proof of concept," "test markets," and "soft launches" associated with introducing the mobile ordering service to market, and both of them were equally responsible for presenting updates to Stephen Colanero, George Patterson, Adam Aron, John MacDonald, Ed Moyer, Michael Czinege, and other members of the executive committee on this important initiative that had "tremendous visibility in the company." PSOF ¶ 441. They jointly established a Mobile Ordering Work Group and a Mobile Ordering Steering Committee given the project's high visibility, complexity, and work demands. PSOF ¶ 442.

  Tonya and Pursell worked very closely on all aspects of understanding the mobile ordering opportunity, modeling numerous business cases, fee structures, UX development, organization of products, recommending participating theaters for tests and launches, guest messaging and marketing, packaging, offers, timing, determining the execution path (i.e., guest pick-up versus delivery to reserved seats), measurement of guest satisfaction, prioritization of technology features against IT cost considerations, working through unique tax implication differences by state, guest

order notification procedures, and discount and cash equivalents participation. PSOF ¶ 443.

- **New Retail Merchandise program:** This program featured movie-themed items and convenience "grab-and-go" impulse purchases, and Tonya and Pursell handled it as a joint initiative. PSOF ¶ 444.

  Tonya's team originally worked on the initiative with Programming Promotions and Senior Vice President Elizabeth Frank (initial program design and expectations), but Tonya quickly transitioned to partnering with Pursell and the Food & Beverage team. PSOF ¶ 445. Tonya and Pursell worked together to prioritize which films they wanted carry merchandise for, to review potential, licensed product categories (toys, collectibles, wearables, concession vessels, etc), and to consider additional decisions related to expanding merchandise, vendor considerations, costs, pricing, activation plans, procedures, and communications surrounding the initiative. PSOF ¶ 446. When they began testing the initiative, Tonya and Pursell analyzed results and broader Food & Beverage impacts such as average sale, erosion to other product sales, labor costs, supply chain impacts, theft, timing of offerings, and changes in results by brand or theater location in order to determine profitability and incrementality. PSOF ¶ 447. They also collected and reviewed guest and theater team feedback. PSOF ¶ 448.

- **Delivery to home/To-Go:** Tonya originally suggested this program as a potential opportunity to expand AMC's Food & Beverage sales with the home delivery of AMC's menu offerings through third-party aggregators such as Uber Eats, Grub Hub, and Door Dash. PSOF ¶ 449.

  The idea became more appealing in light of the general growth in home delivery, and Tonya's separate efforts on AMC's digital streaming/VOD initiative. PSOF ¶ 450. Tonya believed there were further opportunities to serve guests with movie foods while consuming movies at home. PSOF ¶ 451. Tonya and Pursell jointly worked on developing and presenting a business case for the executive leadership team. PSOF ¶ 452. This included reaching out to several of the third-party aggregators to determine service areas, financial terms, learnings, and trends. PSOF ¶ 453. They also partnered to gather insights from AMC's "sister" brands Hoyts and Cineplex that already conducted limited testing on a similar program. PSOF ¶ 454. They also jointly developed an AMC Stubs loyalty survey to understand guest interest. PSOF ¶ 455. They also jointly explored execution questions such as operations, packaging, menu, pricing, potential technology integrations with third parties and AMC's website and mobile app, and financial models for multiple scenarios. PSOF ¶ 456. They also jointly presented to the executive team with a comprehensive recommendation for testing the program with several different roadmap possibilities for consideration. PSOF ¶ 457.

- **Feature Fare:** Pursell and Tonya also travelled together in order to collaborate on Feature Fare—which Pursell described as "the largest overhaul in the company's history on [Food & Beverage]." PSOF ¶ 458.

  Feature Fare "was a 75 million dollar investment" that involved AMC putting "small kitchens in 300 theaters and really elevat[ing] the entire guest experience;" it "…generated a tremendous amount of revenue for the company and a lot of EBITDA as well." PSOF ¶ 459.

- **Field support, "0411" Field email management, AEI Scores, and Field Communications:** Because Tonya and Pursell's teams were so intertwined, members of their teams also took turns responding to the Food & Beverage "0411" email inbox in which theater team members would submit questions related to Food & Beverage operations, menus, promotions, products, offers, digital signage, etc. PSOF ¶ 461.

  Their teams also collectively reviewed AEI (Annual Engagement Index) survey scores every year together, and they discussed and developed joint action plans on how to improve. PSOF ¶ 462. Their teams also co-authored several field communications for joint programs such as LTO's, digital signage, promotions, merchandising, mobile ordering, and more. PSOF ¶ 463.

- **Federal Regulations and Menu Labeling:** This was also a joint and shared priority between Tonya's team and Pursell's team. PSOF ¶ 464.

  Food, beverages, and alcohol are uniquely impacted by the FDA and national laws—especially for multi-unit restaurant/bar operators. PSOF ¶ 465. The landscape is constantly changing, and Tonya was responsible for working with the Food & Beverage team, vendors, and a national trade organization in order to remain aware of legislation impacts, to ensure compliance as necessary, and to consider/adapt to challenging menu changes related calorie labeling, sugary drink size regulations, taxes, and unique food menu requirements mandated when offering alcohol. PSOF ¶ 466.

- **Prescriptive Team Building:** The Food & Beverage group (headed by George Patterson and later Jennifer Douglass) typically held quarterly or biannual team-building, off-site events or activities. PSOF ¶ 467. Almost always, Tonya's Food & Beverage team also attended and even helped plan those off-site collaboration sessions. PSOF ¶ 468. Sometimes the business planning meetings were followed by a fun/collaborative social activities. PSOF ¶ 469. Recent examples during the last few years of Tonya's employment included: Top Golf, ice skating/hockey at Linn Creek, Royals suites, Breakout KC, Pickleball, bowling, happy hours, and dinners. PSOF ¶ 470.

AMC is also incorrect in its suggestion that Tonya admitted to having "different responsibilities" from Pursell in a May 30 recording. Tellingly, AMC never secured that statement from Tonya in a sworn deposition meeting the requirements of Fed. R. Civ. P. 56.

**Even if the recording is considered, however, Tonya did not state in the relevant passage that her responsibilities were "different" from Pursell in all respects. She stated: "Food and beverage, like we share a lot of projects, right? So similar but different responsibilities. They're leading the operational strategy, I'm leading the marketing strategy." (Defts. Ex. 14, Audio and Transcript of May 30, 2018 Meeting, at 30:23-31:1). Nothing in Tonya's brief, offhand comment—that was not explained any further—contradicts the essential point that both of them shared *extensive* cross-functional job responsibilities and reporting obligations in the area of Food & Beverage. Critical issues of disputed fact remain on the issue of substantial similarity between their roles.**

30. Rob Kim began working for AMC in 1995. He became a director in 2006, and later became a VP. From at least October 2016 to his separation in August 2019, his job title was VP, Programming Promotion. (Ex. 16, Deposition of Rob Kim ("Kim Dep."), at 15:13-17:11.)

A. Mangels claims Kim is a comparator for only the April 2018 to September 2019 time period, when she took on the "Product Marketing" function. (Ex. 2, Mangels Dep., at 40:22-42:6.)

    a. Kim only worked on film-related tasks. He was responsible for business development and shaping AMC's relationship with over 15 movie studios. Specifically, Kim was tasked with proposing new agreements with studios under which the studio pays AMC for certain products, and then negotiating those agreements to execution. (Ex. 2, Mangels Dep., 372:4-373:3; Ex. 17, Declaration of Elizabeth Frank ("Frank Dec."), ¶ 7.)

    b. A large portion of Kim's job involved negotiating a payment from the studios in exchange for granting studios movie trailer space during the "previews" that air before the main picture is shown. Kim's 25-year tenure with AMC and the rapport he established with several studios and their executives during that time allowed him to become a "face" of AMC in many respects to the studios and uniquely positioned him for the VP, Programming Promotion role. Mangels admits Kim had "very good" relationships with the studios. (Ex. 16, Kim Dep., at 19:2-21:15; Ex. 2, Mangels Dep., at 369:4-19; Ex. 17, Frank Dec., ¶¶ 8, 10.)

    c. Kim spent a smaller portion of his time on other, non-movie trailer film marketing projects. These involved, for example, cardboard cutouts promoting a new movie placed in a prominent location in the theatres and direct emails to AMC Stubs members. Mangels created a "menu" of these and other various film marketing options that Kim could then offer the studios in exchange for a fee. Kim and his team then pitched and negotiated the contract associated with the product, down to the final price of the products or services provided. (Ex. 16, Kim Dep., at 26:20-27:9; Ex. 17, Frank Dec., ¶¶ 8, 9.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such**

motion may refer specifically to a genuine issue of material fact."). *See* Scheduling Order [Doc. 41] at ¶ 6.

Setting that deficiency aside, it is uncontroverted that:

- Rob Kim began working for AMC in 1995. He became a director in 2006, and later became a VP. From at least October 2016 to his separation in August 2019, his job title was VP, Programming Promotion.

- Kim started as a theater manager in Philadelphia, served as a general manager in multiple theater locations between 1996 and 2006, and later became a director of operations and a film buyer before he eventually became a Vice President of Programming operations. PSOF ¶ 478 (specifically tracking the deposition testimony at 15:16-16:21).

- Mangels claims Kim is a comparator for only the April 2018 to September 2019 time period, when she took on the "Product Marketing" function.

All other statements of fact in AMC's "paragraph" are controverted because AMC is either directly stating, or seeking to create the inference, that the responsibilities referenced above were attributable to Robert Kim only, and that they were not shared by anyone else. Notably, the Declaration supplied by Elizabeth Frank discusses the above-referenced responsibilities *generically*, and there is no attempt to state that they were *exclusive* to Mr. Kim or his role. They were not. Just like Tonya, Mr. Kim did not operate as an independent "silo" with a unique set of "core responsibilities" that were shared by no one else. Notably, AMC never produced a copy of any job descriptions applicable Kim's position throughout the discovery phase of this case. PSOF ¶ 476.

Between 2018 and the end of her employment, Tonya also shared *extensive* cross-functional job responsibilities and reporting obligations with Robert Kim. PSOF ¶ 238 (assumed digital retail responsibilities in 2018). Kim's job, "in a nutshell," was to sell AMC's "marketing assets" to film studios. PSOF ¶ 484. This initially included "on-screen advertising" (i.e. trailers or previews), but it also included other assets such as opportunities to hang posters or display cardboard advertisements within AMC theaters in order to market movies. PSOF ¶ 485.

Over time, however, "AMC began to evolve [in] how [they] marketed movies, [and they] saw an opportunity to monetize [their] member data [from their loyalty program] and [their] social online digital marketing capabilities." PSOF ¶ 486. For example, AMC was able to capture data through its loyalty program in order to understand which customers attended a particular movie, and AMC could then leverage that information by selling studios the right to participate in the use of that data in order to narrowly target advertising or promotions to the same customers in order to market the sequel to that movie. PSOF ¶ 487.

The digital marketing idea was to "pitch to the studios [ ] a smarter way to spend their marketing dollars," and this is the area in which Kim and Tonya "worked together." PSOF ¶ 488.

Tonya's team was very intertwined with Rob Kim and his Programming Promotions team, particularly on securing incremental studio funding and film rent reduction with effective marketing, analytics, and media promotions. PSOF ¶ 490. Tonya's team worked closely with the Programming Promotions team and studios to aggressively market films, to create monetization opportunities, to develop engaging activations, and to increase AMC's sales. PSOF ¶ 491. Tonya's team members had weekly meetings with members of the Programming Promotions team, and Tonya also met weekly with Rob Kim directly. PSOF ¶ 492. Tonya's 1:1 time with Rob Kim was typically focused on strategic priorities, budget reviews, monetization goals, results, resource implications, calendar planning, coaching feedback/recognition of their team members, and sometimes addressing other challenges. PSOF ¶ 493. Tonya and Kim's teams jointly held weekly, bi-weekly, monthly, and periodic meetings with Disney, Paramount, Sony, Warner Brothers, Universal, 20th Century Fox, Lionsgate, A24, Annapurna, and STX. PSOF ¶ 494. These meetings included a range of general project status updates, discussing specific upcoming films, sharing new strategies or capabilities, consumer insights, reviewing results, general planning, and discussing monetization proposals. PSOF ¶ 495. Tonya and Kim would also occasionally travel together for industry conferences, events, market visits, visits to AMC's Los Angeles office, and visits to studio offices, and these business meetings were often followed up with social outings, lunches, dinners, events, cocktail parties, watching movie screenings, and other social activities. PSOF ¶ 496.

Tonya's team lead development of the proposals to the studios for the most effective strategies and activations within AMC's owned channels (email, MPN, social, website, mobile app) and theaters, loyalty member database, and supplemental paid media. PSOF ¶ 497. From there, the process of aligning final details with the studio took place, including monetization amounts. PSOF ¶ 498. Throughout all of this ongoing interaction between Tonya, Kim, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC and finding new methods for streamlining proven strategies. PSOF ¶ 499. Tonya and Kim also "[came] up with new menu items for [Kim] to go and sell to the studios." PSOF ¶ 500. Tonya and Kim were also members of AMC's digital retail/streaming task force. PSOF ¶ 501. Tonya and Kim were also participants AMC's LEAP program. PSOF ¶ 502. Critical issues of disputed fact remain on the issue of substantial similarity between their roles.

31.     Robert Lane was hired by AMC in July 2016 as its VP, Pricing, a newly created role. Lane has a degree in Finance and has worked in Finance roles for over 15 years, including having held corporate officer-level role at a publicly-traded company prior to joining AMC. Mr. Lane was recruited by AMC because of his extensive background in financial analysis for publicly

traded companies. (Ex. 18, Deposition of Robert Lane ("Lane Dep."), at 11:4-13:9; Ex. 17, Frank

Dec., ¶ 12, 14.)

    a.    Lane developed pricing models and analyzed consumer and financial analytics to determine the price of AMC's products. He was responsible for in-depth financial analysis, advanced financial analytics, and the creation of pricing models that allow AMC to attractively and profitably price its product offerings. Lane was ultimately responsible for the success or potential repercussions on profitability for the prices he determined. (Ex. 17, Frank Dec., ¶¶ 12-13.)

    b.    During the relevant time period, Lane primarily focused on effectively pricing movie tickets and food and beverage items, among other products, to increase AMC's margins. His duties also included involvement in AMC's monthly subscription service (AMC Stubs - A List) and providing analytics to movie studios, which aided contract negotiations, to prove the programs AMC had in place were beneficial to the movie studios. Lane's responsibilities involved "major analytics" leading up to a pricing strategy change and after the change was effective to ensure the strategy met or would meet AMC's expectations. (Ex. 18, Lane Dep., at 32:22-34:13; Ex. 17, Frank Dec., ¶ 12.)

    c.    Given the nature of Mr. Lane's position, AMC's CEO spoke with him "frequently." (Ex. 10, Aron Dep., at 99:5-100:6.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").** *See* **Scheduling Order [Doc. 41] at ¶ 6. Setting that deficiency aside, Tonya has elected to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane now that discovery has concluded in order to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators in this case:** <u>Michael Pursell</u> **and** <u>Robert Kim</u>**. The issues germane to Julius Lai, Frank Ybarra, and Robert Lane are therefore immaterial to summary judgment.**

**As explained** *at length* **in response to DSOF ¶¶ 29 and 30 above, Tonya shared** *extensive* **cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Given Defendant's significant departure from the requirements specified above, Plaintiff relies on her discussion in response to DSOF ¶¶ 29 and 30 above in order to controvert any inconsistent (and immaterial) matters referenced above.**

    32.    AMC sets the compensation paid to its VPs based on a variety of factors, including

the uniqueness of the skills necessary to perform the role and the consequent difficulty of filling

the position, and the VP's performance history. (Ex. 3, Chavarria Dec., at ¶ 38.)

**RESPONSE: Controverted.** AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs, there is no set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC since 2014—Carla Chavarria—exhibits a willful indifference toward compliance with the Equal Pay Act.

Chavarria, i.e. the person that signed the Declaration supporting AMC's statements of fact in this paragraph, is AMC's Senior Vice President and Chief Human Resource Officer; she has been the highest-ranking Human Resources employee at AMC since 2014. PSOF ¶ 45. Chavarria directly reports to Adam Aron. PSOF ¶ 46. On October 5, 2018, Tonya secretly recorded a conversation between herself, Chavarria, Colanero, and David Codding. PSOF ¶ 232. During a discussion about various, anticipated changes with subordinate employees, Chavarria began asking the group general questions "about any protected category issues [she needs] to be aware of and that kind of thing." PSOF ¶ 233. At one point during the secretly recorded conversation, Chavarria commented, "One of the things we're getting hit with is a lot of Equal Pay Act." PSOF ¶ 234. Chavarria also commented during the secretly recorded conversation about her concern "<u>that women generally start off making less than men, and if that carries all the way through, the gap just gets bigger.</u>" PSOF ¶ 235 (emphasis added).

Chavarria denies in this case that she was complaining about AMC-specific concerns after she learned about the secretly recorded conversation, and she takes the position that she was commenting about the HR industry in general. PSOF ¶ 236. Tonya adamantly disagrees with Chavarria's characterization, however, because when those comments were made, Tonya understood them to specifically relate to AMC based on the context in which Chavarria described them, and because Chavarria made no effort to characterize her comments as applying to anything other than AMC. PSOF ¶ 237. One need not look any further than the facts of this case, however, to understand that Chavarria was talking about AMC.

Tonya began her employment with AMC in 2009 as an *individual* Director, PSOF ¶¶ 1-2, and her departmental budget was less $1 million annually. PSOF ¶ 390. Tonya was elevated to her Vice President Role in June 2013, and she had two people on her team at that time. PSOF ¶¶ 7, 9. Over the course of the next 6+ years, Tonya's team grew to a total of eleven (11) direct reports, her portfolio of responsibilities grew exponentially, and her departmental budget grew to $10 million annually. PSOF ¶ 286 (11 reports); PSOF ¶ 390 (budget growth); PSOF ¶¶ 3, 7-8, 10, 15-16, 37, 38, 59-61, 141-142, 147-151, 238, 251-252, and 264 (increases in responsibilities).

After she became a Vice President, Colanero described Tonya in her 2013 review as "a strong contributor to a growing part of the business," as someone that supported "a wide range of initiatives that were in various stages of development," as someone that showed "strong leadership in her development of her team," and as "overall a valuable member of both the marketing team and the food and beverage team." PSOF ¶¶ 9, 12-14. In her 2014 review,

Colanero described Tonya as someone that "continues to grow and improve as an executive officer for the company while delivering ongoing *excellent results* along the way," and as someone that was showing "early leadership and vision" in her recently added responsibilities.  PSOF ¶¶ 17-20 (emphasis added).

In her 2016 review, Colanero rated Tonya with an overall rating of "exceeds expectations." PSOF ¶¶ 78-79.  He commented about Tonya's "excellent performance" in 2016, he observed that "her area of responsibility continues to grow outside of food and beverage marketing and her contribution in these new areas has been strong," he observed that her "core food and beverage marketing remains strong," he observed that she assumed added responsibility for "print production for the company" which "has gone pretty well with no significant issues," he recognized her for her "major accomplishment" in transitioning to Nvision, he recognized her as the "point person within marketing for all mergers and acquisitions activity" and commented on her positive performance in handling the Carmike and Starplex acquisitions, and he recapped the entire year by saying: "a very nice year for Tonya where she was able to keep core activities going in a positive way while delivering on multiple key initiatives over and above these day-to-day responsibilities."  PSOF ¶ 80.

Beginning in May 2016 (i.e. three years after her promotion to Vice President), Tonya began requesting an increase in her compensation consistent with her updated job description and her increased job responsibilities.  PSOF ¶¶ 62-63.  At the time of that initial request, Colanero agreed that Tonya's "responsibilities had continued to grow and her team was getting bigger."  PSOF ¶ 65.  Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any adjustments in Tonya's pay.  PSOF ¶ 64.

### AMC's Ad-Hoc Compensation Process

Adam Aron became AMC's CEO in January 2016.  PSOF ¶ 43.  According to Adam Aron, the only person that can adjust the compensation of a Vice President or higher within AMC is Adam Aron.  PSOF ¶¶ 47-48.  Mike Giuseffi, AMC's Director of Compensation, reports to Chavarria, and he directly supervises everyone else in the compensation department that falls under Chavarria.  PSOF ¶¶ 49-50.  According to Giuseffi, whenever a position materially changes in scope, content, expectations, or job specifications, his group works with the relevant department head in order to begin the process of evaluating whether the employee's compensation should be adjusted.  PSOF ¶ 51.  That process begins with an evaluation of the job content and specifications listed in the "job questionnaire" designed to summarize the employee's role within the company, and it also necessitates conversations with the supervisor of that role in order to "really understand" their job specifications. PSOF ¶ 52.

In the case of Tonya, the expectation was for Tonya to initially address the relevant job changes and the need for increased compensation with Colanero, and for Colanero to present the issue to the compensation group for an evaluation.  PSOF ¶ 53.  In the case of an officer (such as Tonya), the compensation group also "looped in" Chavarria on the process of evaluating the position and any pay adjustment recommendations.  PSOF ¶ 54.  Giuseffi also

made clear that any recommendations from his group are not presented on a take-it-or-leave-it basis; when his group is dealing with someone at the VP level, the process is supposed to be a "collaborative effort" between Giuseffi's team, the supervisor of the role (i.e., Colanero), Chavarria, and the supervisor's supervisor, i.e., Adam Aron in this case. PSOF ¶ 55. If the compensation group fails to present satisfactory recommendations to the supervisor in charge (i.e., Colanero), the parties are expected to continue working through the process in order to reach an agreement that makes sense for the organization, and the supervisor also has the authority to "push back" on any failure of Giuseffi's group to present satisfactory recommendations. PSOF ¶ 56. Colanero agrees that, as the employee's supervisor, he always has the right to reject the recommendation of Giuseffi's group, and the right to take the position that his employee "deserves more." PSOF ¶ 57.

<div align="center">

**AMC's Ad-Hoc Compensation Process**
**Consistently Fails Tonya Over the Next 3+ Years**

</div>

So what happened to Tonya's first request to increase her compensation in May 2016? Colanero has no memory of what happened after he submitted it, and he does not recall any conversations with Giuseffi or Chavarria about it. PSOF ¶ 66. Colanero does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya. Where does that stand?" PSOF ¶ 67. When Chavarria was asked about the email exchange during her deposition, she said that she "didn't see this as a request for adjusting compensation," and she does not recall whether anyone evaluated Tonya's compensation in relation to this request. PSOF ¶ 68. Finally, and perhaps most importantly, no one ever made Adam Aron (i.e. the only person with authority to adjust her compensation) aware of the request. PSOF ¶ 66. The net result is that Tonya's first request disappeared through the cracks. PSOF ¶ 70.

Unfortunately for Tonya, this cycle continued for the next three (3) years. Tonya once again raised the issue of increasing her compensation at least 13 more times—ultimately culminating in her Charge of Discrimination filed with the EEOC in May 2019—and in each instance, nothing ever happened. PSOF ¶¶ 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296. Critically, no one ever made Adam Aron aware of a single request. PSOF ¶¶ 130, 137, 156, 221, 228, 247, 274, 284.

Highly summarized, this is what happened in each relevant year:

<div align="center">

**2016**

</div>

- **In October 2016, Tonya once again requested to increase her compensation, and Colanero believes he informed her that there would be no increase in her compensation because he was going to "challenge her and reward her later," and because she would have to "prove her openness and her ability" to be recognized down the road. PSOF ¶¶ 73-77.**

<div align="center">

**2017**

</div>

- **In early 2017, Chavarria exhibited additional indifference toward compliance with the Equal Pay Act. Elizabeth Frank is a Senior Vice President at AMC, and she is the highest-ranking female in the company. PSOF ¶ 92. In February 2018, a member of Elizabeth Frank's team named Melissa Wallen raised a concern about gender pay equity at AMC, and it caused Frank to send Chavarria the email attached hereto in Exhibit 48. PSOF ¶ 93. In her report of the pay equity complaint from her subordinate, Ms. Frank said: "One of the female associates on my team stopped in last week to express concern about gender pay equity at AMC. A long-tenured AMC associate with broad social network in the company, she stated that it is 'commonly understood' that AMC compensates men higher than women for similar results in similar positions. PSOF ¶ 94. Exhibit 28 hereto is a true and accurate copy of AMC's nondiscrimination and harassment policy, and it obligates AMC to "promptly launch an investigation" into workplace allegations of discrimination, harassment, and retaliation. PSOF ¶ 95. Chavarria sent Frank the vague response reflected in Exhibit 48, but Chavarria never inquired to understand the identity of the complaining employee, never conducted any further investigation into the issue, never instructed anyone else to investigate the issue, and testified that she did not interpret Frank's email as containing a gender-based pay equity complaint sufficient to merit an investigation under AMC's non-discrimination policy. PSOF ¶ 96. In her response to Frank, Chavarria also referred to a formal assessment of pay equity that was conducted in 2017, (Ex. 48, Depo. Ex. 115), but Chavarria does not know whether that analysis involved a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶ 97. It did not. PSOF ¶ 98.

**2018**

- **In early 2018, Tonya received her 2017 review, and Colanero rated Tonya with an overall rating of "outstanding," i.e., the highest possible rating. PSOF ¶¶ 114-115. Colanero commented that "Tonya is an integral part of the senior leadership team in the marketing department," that "it is hard not to be impressed with the volume of accomplishments Tonya achieved" during a difficult year in the movie industry, and that "she brought to fruition several key initiatives from 2016…" including the "…Carmike transition, Coca-Cola teen marketing program, as well as creating new contributors to benefit AMC, Feature Fare and movie feature drinks;" he also observed that "these are huge initiatives that drive profit for AMC and wouldn't be what they are without Tonya's significant leadership/contributions." PSOF ¶ 116. Colanero also commented that Tonya "contributed in many other meaningful ways from daily unappreciated work like inventory risk management to high profile cross-functional assignments such as the market share task force;" Colanero agrees that this was a "glowing" annual performance review for Tonya. PSOF ¶ 117.

- **On March 12, 2018, shortly after rating Tonya as an "outstanding" employee, Colanero mistakenly emailed a spreadsheet to Tonya reflecting compensation data (salary and bonus information) applicable to other Vice Presidents on Colanero's team (Exhibit 19 hereto). PSOF ¶¶ 118-119. This was the first time—to Colanero's

knowledge—that anyone ever shared with Tonya that Julius Lai's and Frank Ybarra's salaries were $█████/year and $█████/year, respectively, as opposed to Tonya's salary of $153,500 according to the same document. PSOF ¶ 120. Colanero never realized that he mistakenly sent the spreadsheet to Tonya until she later confronted him with it *nearly a year later* on February 12, 2019. PSOF ¶ 121. Prior to that time, Colanero consistently lied to Tonya, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents. PSOF ¶ 122 (emphasis added).

- **In March 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 126-131.**

- **In April 2018, Tonya spoke with Chavarria on April 11, 2018 in order to seek advice on the best manner in which to "tactfully" address the subject of increasing her compensation with Colanero in light of the fact that her role at AMC continued to expand in depth and breadth after becoming a Vice President in 2013. PSOF ¶ 133-134. Chavarria testified to her awareness that Tonya wanted her position to be "assessed" during the April 11 conversation, her awareness that Tonya wanted advice on how to tactfully address the issue with Colanero, and her memory of previous discussions in which Colanero discussed "revaluing" Tonya's position, but Chavarria inexplicably denies learning that Tonya wanted to increase her pay during their April 11, 2018 discussion. PSOF ¶ 135. Colanero does not recall any conversations with Chavarria about Tonya's interest in adjusting her compensation in the April 2018 timeframe. PSOF ¶ 136. Nothing happened as a result of the conversation with Chavarria. PSOF ¶ 138.**

- **Tonya had another conversation with Colanero around May 4, 2018 in which she once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities. SOF ¶ 152. Colanero does not disagree that he met with Tonya once again on May 4, 2018 in order to discuss Tonya's request to increase her compensation, but he does not recall the discussion, and the conversation resulted in nothing. PSOF ¶¶ 156-157.**

- **During a May 30, 2018 meeting with Rosalind Reeves, Tonya complained to Human Resources Vice President Rosalind Reeves about pay equity issues within AMC, and Reeves agrees that Tonya's pay equity complaints merited an investigation. PSOF ¶ 210. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." PSOF ¶ 211. Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following**

up with Tonya to discuss the results of an investigation into that issue. PSOF ¶ 212. The complaints went nowhere.

- On July 24, 2018, Tonya once again raised the issue of her compensation in an email with Colanero. PSOF ¶ 224. In her email, Tonya reminded Colanero that her position had not been properly reviewed-for purposes of adjusting her compensation-since her promotion to Vice President in 2013. PSOF ¶ 225. Colanero agrees that this request "kind of fell through the cracks" because he was "busy" and "must have missed it." PSOF ¶ 226. Chavarria does not recall ever being made aware of this request, and no adjustment ever occurred. PSOF ¶¶ 227-229. It went nowhere.

- On August 8, 2018, Tonya met with Colanero and Jane Hermstedt (a leadership development employee within AMC) to discuss her Individual Development Plan ("IDP") with the company, and she mentioned during the meeting that one of her goals was to achieve a compensation level that was consistent with her experience, responsibilities, contributions, and value within the company. PSOF ¶ 230. Nothing happened as a result of this request. PSOF ¶ 231.

- In November 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 239-248. After a brief in-person exchange, Tonya followed up in a very clear email in which she made the following statements:

  "I would like to request my updated Job Questionnaire be reviewed and follow up on our prior direct discussions and those with human resources as I am concerned that my compensation continues to lag in relation to the changes [in my role]."

  "Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment."

  "Yet my responsibilities and contributions to the company have grown exponentially."

  "We have had several past discussions about increasing my compensation to align with my increased responsibility, strategic influence, external benchmarks, and equity with internal positions of comparable scope, leadership, oversight, and revenue contributions."

  "I have been passive in prior conversations, believing my compensation would be fairly addressed and equalized in due time."

  "My position and team continues to expand, I am asking that the Company review and equalize my compensation and bonus target with male colleagues

in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work. As examples, I believe comparable positions include: (1) VP, Communication & Events; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Programming Promotions. It is my understanding that the individuals holding these positions receive significantly higher compensation and bonus packages. And, that the Company has precedent of adjusting compensation to reflect changes in position breadth and depth or in cases of known wage gaps for similar scope roles."

PSOF ¶¶ 239-243. Colanero eventually forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. PSOF ¶ 244. Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself. PSOF ¶ 246. The request went nowhere—even after Tonya asked Colanero about it again on December 13, 2018. PSOF ¶¶ 248-250.

### 2019

- On February 12, 2019—in the context of a performance review—Tonya told Colanero for the very first time about the spreadsheet that he mistakenly sent to her in March 2018 containing the compensation data for other Vice Presidents, and she also complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. PSOF ¶¶ 262, 271. Despite AMC's policy of promptly launching an investigation into complaints of discrimination (Exhibit 28 hereto), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." PSOF ¶ 272. Chavarria does not recall Colanero ever making her aware of the details of his conversation with Tonya, his inadvertent mistake in sending her the compensation spreadsheet, or Tonya's complaints about wage/gender discrimination. PSOF ¶ 273. The conversation went nowhere.

- In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Guiseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.

- **On May 6, 2019, Tonya filed a Charge of Discrimination with the EEOC, and Chavarria agrees that the May 6 Charge contains very clear complaints of gender discrimination and complaints of violations of the Equal Pay Act. PSOF ¶¶ 287, 290. Colanero agrees that, by the time of the May 6 Charge, Tonya had already engaged in multiple attempts to communicate with him about asking to have her compensation adjusted. PSOF ¶ 289. Colanero and Chavarria both understood that the comparator positions identified in her charge corresponded to Robert Kim, Julius Lai, Michael Pursell, Frank Ybarra, and Robert Lane. PSOF ¶ 291. Chavarria never performed her own factual investigation into the claims referenced in the May 6 Charge, and she is not aware of any conclusions that were ever reached by AMC regarding whether or not there was any merit to the claims referenced in the May 6 Charge. PSOF ¶ 295. Tonya's compensation was never increased as result of filing her May 6 Charge. PSOF ¶ 296.**

**In addition to the above, no one at AMC ever analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶¶ 216-220.**

33.     Mangels performed a marketing function that AMC valued differently than the functions performed by Lai, Pursell, Ybarra, Kim, and Lane. The role performed by Mangels required experience in the discipline of marketing, and individuals with skills and experience in this area are more plentiful than those performed by the others identified in this paragraph. (Ex. 3, Chavarria Dec., at ¶ 39.)

**RESPONSE: Controverted. With respect to Lai, Ybarra, and Lane, Tonya has elected to abandon any Equal Pay Act claims premised on their positions now that discovery has concluded in order to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators in this case: <u>Michael Pursell</u> and <u>Robert Kim</u>. The issues germane to Julius Lai, Frank Ybarra, and Robert Lane are therefore immaterial to summary judgment.**

**As explained *at length* in response to DSOF ¶¶ 29 and 30 above, Tonya shared *extensive* cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Critical issues of disputed fact remain on the issue of substantial similarity between their roles, and Plaintiff relies on her discussion in response to DSOF ¶¶ 29 and 30 above in order to controvert any inconsistent statements above about the roles of Tonya, Pursell, and Kim.**

**Plaintiff also controverts AMC's purported process of "valuing" the "marketing function" performed by Tonya. As explained *at length* in response to DSOF ¶¶ 32 above, AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs, there is no**

set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC since 2014—Carla Chavarria—exhibits a willful indifference toward compliance with the Equal Pay Act. Plaintiff relies on her lengthy explanation in response to DSOF ¶ 32 in order to address that issue.

It is also clear that no one at AMC ever analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶¶ 216-220.

34.     In light of AMC's view of the overall value of the function performed by Mangels

at AMC, and the relatively common marketing skills an employee in this position needed for the

role, AMC at all times relevant concluded that she was properly compensated. (Ex. 3, Chavarria

Dec., at ¶ 40.)

**RESPONSE: Controverted. AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs, there is no set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC since 2014—Carla Chavarria—exhibits a willful indifference toward compliance with the Equal Pay Act.**

**Chavarria, i.e. the person that signed the Declaration supporting AMC's statements of fact in this paragraph, is AMC's Senior Vice President and Chief Human Resource Officer; she has been the highest-ranking Human Resources employee at AMC since 2014. PSOF ¶ 45. Chavarria directly reports to Adam Aron. PSOF ¶ 46. On October 5, 2018, Tonya secretly recorded a conversation between herself, Chavarria, Colanero, and David Codding. PSOF ¶ 232. During a discussion about various, anticipated changes with subordinate employees, Chavarria began asking the group general questions "about any protected category issues [she needs] to be aware of and that kind of thing." PSOF ¶ 233. At one point during the secretly recorded conversation, Chavarria commented, "One of the things we're getting hit with is a lot of Equal Pay Act." PSOF ¶ 234. Chavarria also commented during the secretly recorded conversation about her concern "that women generally start off making less than men, and if that carries all the way through, the gap just gets bigger." PSOF ¶ 235 (emphasis added).**

**Chavarria denies in this case that she was complaining about AMC-specific concerns after she learned about the secretly recorded conversation, and she takes the position that she was commenting about the HR industry in general. PSOF ¶ 236. Tonya adamantly disagrees with Chavarria's characterization, however, because when those comments were made, Tonya understood them to specifically relate to AMC based on the context in which**

Chavarria described them, and because Chavarria made no effort to characterize her comments as applying to anything other than AMC. PSOF ¶ 237. One need not look any further than the facts of this case, however, to understand that Chavarria was talking about AMC.

Tonya began her employment with AMC in 2009 as an *individual* Director, PSOF ¶¶ 1-2, and her departmental budget was less $1 million annually. PSOF ¶ 390. Tonya was elevated to her Vice President Role in June 2013, and she had two people on her team at that time. PSOF ¶¶ 7, 9. Over the course of the next 6+ years, Tonya's team grew to a total of eleven (11) direct reports, her portfolio of responsibilities grew exponentially, and her departmental budget grew to $10 million annually. PSOF ¶ 286 (11 reports); PSOF ¶ 390 (budget growth); PSOF ¶¶ 3, 7-8, 10, 15-16, 37, 38, 59-61, 141-142, 147-151, 238, 251-252, and 264 (increases in responsibilities).

After she became a Vice President, Colanero described Tonya in her 2013 review as "a strong contributor to a growing part of the business," as someone that supported "a wide range of initiatives that were in various stages of development," as someone that showed "strong leadership in her development of her team," and as "overall a valuable member of both the marketing team and the food and beverage team." PSOF ¶¶ 9, 12-14. In her 2014 review, Colanero described Tonya as someone that "continues to grow and improve as an executive officer for the company while delivering ongoing *excellent results* along the way," and as someone that was showing "early leadership and vision" in her recently added responsibilities. PSOF ¶¶ 17-20 (emphasis added).

In her 2016 review, Colanero rated Tonya with an overall rating of "exceeds expectations." PSOF ¶¶ 78-79. He commented about Tonya's "excellent performance" in 2016, he observed that "her area of responsibility continues to grow outside of food and beverage marketing and her contribution in these new areas has been strong," he observed that her "core food and beverage marketing remains strong," he observed that she assumed added responsibility for "print production for the company" which "has gone pretty well with no significant issues," he recognized her for her "major accomplishment" in transitioning to Nvision, he recognized her as the "point person within marketing for all mergers and acquisitions activity" and commented on her positive performance in handling the Carmike and Starplex acquisitions, and he recapped the entire year by saying: "a very nice year for Tonya where she was able to keep core activities going in a positive way while delivering on multiple key initiatives over and above these day-to-day responsibilities." PSOF ¶ 80.

Beginning in May 2016 (i.e. three years after her promotion to Vice President), Tonya began requesting an increase in her compensation consistent with her updated job description and her increased job responsibilities. PSOF ¶¶ 62-63. At the time of that initial request, Colanero agreed that Tonya's "responsibilities had continued to grow and her team was getting bigger." PSOF ¶ 65. Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any adjustments in Tonya's pay. PSOF ¶ 64.

## AMC's Ad-Hoc Compensation Process

Adam Aron became AMC's CEO in January 2016. PSOF ¶ 43. According to Adam Aron, the only person that can adjust the compensation of a Vice President or higher within AMC is Adam Aron. PSOF ¶¶ 47-48. Mike Giuseffi, AMC's Director of Compensation, reports to Chavarria, and he directly supervises everyone else in the compensation department that falls under Chavarria. PSOF ¶¶ 49-50. According to Giuseffi, whenever a position materially changes in scope, content, expectations, or job specifications, his group works with the relevant department head in order to begin the process of evaluating whether the employee's compensation should be adjusted. PSOF ¶ 51. That process begins with an evaluation of the job content and specifications listed in the "job questionnaire" designed to summarize the employee's role within the company, and it also necessitates conversations with the supervisor of that role in order to "really understand" their job specifications. PSOF ¶ 52.

In the case of Tonya, the expectation was for Tonya to initially address the relevant job changes and the need for increased compensation with Colanero, and for Colanero to present the issue to the compensation group for an evaluation. PSOF ¶ 53. In the case of an officer (such as Tonya), the compensation group also "looped in" Chavarria on the process of evaluating the position and any pay adjustment recommendations. PSOF ¶ 54. Giuseffi also made clear that any recommendations from his group are not presented on a take-it-or-leave-it basis; when his group is dealing with someone at the VP level, the process is supposed to be a "collaborative effort" between Giuseffi's team, the supervisor of the role (i.e., Colanero), Chavarria, and the supervisor's supervisor, i.e., Adam Aron in this case. PSOF ¶ 55. If the compensation group fails to present satisfactory recommendations to the supervisor in charge (i.e., Colanero), the parties are expected to continue working through the process in order to reach an agreement that makes sense for the organization, and the supervisor also has the authority to "push back" on any failure of Guiseffi's group to present satisfactory recommendations. PSOF ¶ 56. Colanero agrees that, as the employee's supervisor, he always has the right to reject the recommendation of Giuseffi's group, and the right to take the position that his employee "deserves more." PSOF ¶ 57.

## AMC's Ad-Hoc Compensation Process
## Consistently Fails Tonya Over the Next 3+ Years

So what happened to Tonya's first request to increase her compensation in May 2016? Colanero has no memory of what happened after he submitted it, and he does not recall any conversations with Giuseffi or Chavarria about it. PSOF ¶ 66. Colanero does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya. Where does that stand?" PSOF ¶ 67. When Chavarria was asked about the email exchange during her deposition, she said that she "didn't see this as a request for adjusting compensation," and she does not recall whether anyone evaluated Tonya's compensation in relation to this request. PSOF ¶ 68. Finally, and perhaps most importantly, no one ever made Adam Aron (i.e. the only person with authority to adjust her compensation) aware of the request. PSOF ¶ 66. The net result is that Tonya's first request disappeared through the cracks. PSOF ¶ 70.

Unfortunately for Tonya, this cycle continued for the next three (3) years. Tonya once again raised the issue of increasing her compensation at least 13 more times—ultimately culminating in her Charge of Discrimination filed with the EEOC in May 2019—and in each instance, nothing ever happened. PSOF ¶¶ 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296. Critically, no one ever made Adam Aron aware of a single request. PSOF ¶¶ 130, 137, 156, 221, 228, 247, 274, 284.

Highly summarized, this is what happened in each relevant year:

### 2016

- In October 2016, Tonya once again requested to increase her compensation, and Colanero believes he informed her that there would be no increase in her compensation because he was going to "challenge her and reward her later," and because she would have to "prove her openness and her ability" to be recognized down the road. PSOF ¶¶ 73-77.

### 2017

- In early 2017, Chavarria exhibited additional indifference toward compliance with the Equal Pay Act. Elizabeth Frank is a Senior Vice President at AMC, and she is the highest-ranking female in the company. PSOF ¶ 92. In February 2018, a member of Elizabeth Frank's team named Melissa Wallen raised a concern about gender pay equity at AMC, and it caused Frank to send Chavarria the email attached hereto in Exhibit 48. PSOF ¶ 93. In her report of the pay equity complaint from her subordinate, Ms. Frank said: "One of the female associates on my team stopped in last week to express concern about gender pay equity at AMC. A long-tenured AMC associate with broad social network in the company, she stated that it is 'commonly understood' that AMC compensates men higher than women for similar results in similar positions. PSOF ¶ 94. Exhibit 28 hereto is a true and accurate copy of AMC's nondiscrimination and harassment policy, and it obligates AMC to "promptly launch an investigation" into workplace allegations of discrimination, harassment, and retaliation. PSOF ¶ 95. Chavarria sent Frank the vague response reflected in Exhibit 48, but Chavarria never inquired to understand the identity of the complaining employee, never conducted any further investigation into the issue, never instructed anyone else to investigate the issue, and testified that she did not interpret Frank's email as containing a gender-based pay equity complaint sufficient to merit an investigation under AMC's non-discrimination policy. PSOF ¶ 96. In her response to Frank, Chavarria also referred to a formal assessment of pay equity that was conducted in 2017, (Ex. 48, Depo. Ex. 115), but Chavarria does not know whether that analysis involved a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶ 97. It did not. PSOF ¶ 98.

### 2018

- In early 2018, Tonya received her 2017 review, and Colanero rated Tonya with an overall rating of "outstanding," i.e., the highest possible rating. PSOF ¶¶ 114-115. Colanero commented that "Tonya is an integral part of the senior leadership team in the marketing department," that "it is hard not to be impressed with the volume of accomplishments Tonya achieved" during a difficult year in the movie industry, and that "she brought to fruition several key initiatives from 2016…" including the "…Carmike transition, Coca-Cola teen marketing program, as well as creating new contributors to benefit AMC, Feature Fare and movie feature drinks;" he also observed that "these are huge initiatives that drive profit for AMC and wouldn't be what they are without Tonya's significant leadership/contributions." PSOF ¶ 116. Colanero also commented that Tonya "contributed in many other meaningful ways from daily unappreciated work like inventory risk management to high profile cross-functional assignments such as the market share task force;" Colanero agrees that this was a "glowing" annual performance review for Tonya. PSOF ¶ 117.

- On March 12, 2018, shortly after rating Tonya as an "outstanding" employee, Colanero mistakenly emailed a spreadsheet to Tonya reflecting compensation data (salary and bonus information) applicable to other Vice Presidents on Colanero's team (Exhibit 19 hereto). PSOF ¶¶ 118-119. This was the first time—to Colanero's knowledge—that anyone ever shared with Tonya that Julius Lai's and Frank Ybarra's salaries were $███████/year and $███████/year, respectively, as opposed to Tonya's salary of $153,500 according to the same document. PSOF ¶ 120. Colanero never realized that he mistakenly sent the spreadsheet to Tonya until she later confronted him with it *nearly a year later* on February 12, 2019. PSOF ¶ 121. Prior to that time, Colanero consistently lied to Tonya, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents. PSOF ¶ 122 (emphasis added).

- In March 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 126-131.

- In April 2018, Tonya spoke with Chavarria on April 11, 2018 in order to seek advice on the best manner in which to "tactfully" address the subject of increasing her compensation with Colanero in light of the fact that her role at AMC continued to expand in depth and breadth after becoming a Vice President in 2013. PSOF ¶ 133-134. Chavarria testified to her awareness that Tonya wanted her position to be "assessed" during the April 11 conversation, her awareness that Tonya wanted advice on how to tactfully address the issue with Colanero, and her memory of previous discussions in which Colanero discussed "revaluing" Tonya's position, but Chavarria inexplicably denies learning that Tonya wanted to increase her pay during their April 11, 2018 discussion. PSOF ¶ 135. Colanero does not recall any conversations with Chavarria about Tonya's interest in adjusting her compensation in the April 2018

timeframe. PSOF ¶ 136. Nothing happened as a result of the conversation with Chavarria. PSOF ¶ 138.

- **Tonya had another conversation with Colanero around May 4, 2018 in which she once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities. SOF ¶ 152. Colanero does not disagree that he met with Tonya once again on May 4, 2018 in order to discuss Tonya's request to increase her compensation, but he does not recall the discussion, and the conversation resulted in nothing. PSOF ¶¶ 156-157.**

- **During a May 30, 2018 meeting with Rosalind Reeves, Tonya complained to Human Resources Vice President Rosalind Reeves about pay equity issues within AMC, and Reeves agrees that Tonya's pay equity complaints merited an investigation. PSOF ¶ 210. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." PSOF ¶ 211. Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue. PSOF ¶ 212. The complaints went nowhere.**

- **On July 24, 2018, Tonya once again raised the issue of her compensation in an email with Colanero. PSOF ¶ 224. In her email, Tonya reminded Colanero that her position had not been properly reviewed-for purposes of adjusting her compensation-since her promotion to Vice President in 2013. PSOF ¶ 225. Colanero agrees that this request "kind of fell through the cracks" because he was "busy" and "must have missed it." PSOF ¶ 226. Chavarria does not recall ever being made aware of this request, and no adjustment ever occurred. PSOF ¶¶ 227-229. It went nowhere.**

- **On August 8, 2018, Tonya met with Colanero and Jane Hermstedt (a leadership development employee within AMC) to discuss her Individual Development Plan ("IDP") with the company, and she mentioned during the meeting that one of her goals was to achieve a compensation level that was consistent with her experience, responsibilities, contributions, and value within the company. PSOF ¶ 230. Nothing happened as a result of this request. PSOF ¶ 231.**

- **In November 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 239-248. After a brief in-person exchange, Tonya followed up in a very clear email in which she made the following statements:**

"I would like to request my updated Job Questionnaire be reviewed and follow up on our prior direct discussions and those with human resources as I am concerned that my compensation continues to lag in relation to the changes [in my role]."

"Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment."

"Yet my responsibilities and contributions to the company have grown exponentially."

"We have had several past discussions about increasing my compensation to align with my increased responsibility, strategic influence, external benchmarks, and equity with internal positions of comparable scope, leadership, oversight, and revenue contributions."

"I have been passive in prior conversations, believing my compensation would be fairly addressed and equalized in due time."

"My position and team continues to expand, I am asking that the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work. As examples, I believe comparable positions include: (1) VP, Communication & Events; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Programming Promotions. It is my understanding that the individuals holding these positions receive significantly higher compensation and bonus packages. And, that the Company has precedent of adjusting compensation to reflect changes in position breadth and depth or in cases of known wage gaps for similar scope roles."

PSOF ¶¶ 239-243. Colanero eventually forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. PSOF ¶ 244. Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself. PSOF ¶ 246. The request went nowhere—even after Tonya asked Colanero about it again on December 13, 2018. PSOF ¶¶ 248-250.

## 2019

- On February 12, 2019—in the context of a performance review—Tonya told Colanero for the very first time about the spreadsheet that he mistakenly sent to her in March 2018 containing the compensation data for other Vice Presidents, and she also complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. PSOF ¶¶ 262, 271. Despite AMC's policy of promptly

launching an investigation into complaints of discrimination (Exhibit 28 hereto), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." PSOF ¶ 272. Chavarria does not recall Colanero ever making her aware of the details of his conversation with Tonya, his inadvertent mistake in sending her the compensation spreadsheet, or Tonya's complaints about wage/gender discrimination. PSOF ¶ 273. The conversation went nowhere.

- In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Guiseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.

- On May 6, 2019, Tonya filed a Charge of Discrimination with the EEOC, and Chavarria agrees that the May 6 Charge contains very clear complaints of gender discrimination and complaints of violations of the Equal Pay Act. PSOF ¶¶ 287, 290. Colanero agrees that, by the time of the May 6 Charge, Tonya had already engaged in multiple attempts to communicate with him about asking to have her compensation adjusted. PSOF ¶ 289. Colanero and Chavarria both understood that the comparator positions identified in her charge corresponded to Robert Kim, Julius Lai, Michael Pursell, Frank Ybarra, and Robert Lane. PSOF ¶ 291. Chavarria never performed her own factual investigation into the claims referenced in the May 6 Charge, and she is not aware of any conclusions that were ever reached by AMC regarding whether or not there was any merit to the claims referenced in the May 6 Charge. PSOF ¶ 295. Tonya's compensation was never increased as result of filing her May 6 Charge. PSOF ¶ 296.

In addition to the above, no one at AMC ever analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶¶ 216-220.

**Mangels' Relevant Performance/Conduct History Pre-May 2018**

35. While Mangels was viewed as a solid performer in her day-to-day marketing functions, Mangels struggled in leadership and professional judgment. (Ex. 4, Colanero Dep., at 161:4-25; 162; see also SOFs 11-19.)

**RESPONSE: Controverted. The testimony cited by AMC does not support these factual statements, and it does not describe Colanero's overall assessment of Tonya. AMC's factual statements are also belied by the record.**

Tonya began her employment with AMC in 2009 as an *individual* Director charged with building a new role aimed at growing AMC's Food & Beverage business, PSOF ¶¶ 1-2, and over the course of the next ten years, Tonya's team grew to a total of eleven (11) direct reports, her portfolio of responsibilities grew exponentially, and her departmental budget grew from less than $1 million to $10 million annually. PSOF ¶ 286 (11 reports); PSOF ¶ 390 (budget growth); PSOF ¶¶ 3, 7-8, 10, 15-16, 37, 38, 59-61, 141-142, 147-151, 238, 251-252, and 264 (increases in responsibilities).

After she became a Vice President, Colanero described Tonya in her 2013 review as "a strong contributor to a growing part of the business," as someone that supported "a wide range of initiatives that were in various stages of development," as someone that showed "strong leadership in her development of her team," and as "overall a valuable member of both the marketing team and the food and beverage team." PSOF ¶¶ 9, 12-14.

In her 2014 review, Colanero described Tonya as someone that "continues to grow and improve as an executive officer for the company while delivering ongoing *excellent results* along the way," and as someone that was showing "early leadership and vision" in her recently added responsibilities. PSOF ¶¶ 17-20 (emphasis added).

In her 2015 review, Colanero gave Tonya an overall rating of "successful," but he did not include any other comments in her review. PSOF ¶¶ 40-42; (Ex. 6, Depo. Ex. 107). In her 2016 review, however, Colanero rated Tonya with an overall rating of "exceeds expectations." PSOF ¶¶ 78-79. He commented about Tonya's "excellent performance" in 2016, he observed that "her area of responsibility continues to grow outside of food and beverage marketing and her contribution in these new areas has been strong," he observed that her "core food and beverage marketing remains strong," he observed that she assumed added responsibility for "print production for the company" which "has gone pretty well with no significant issues," he recognized her for her "major accomplishment" in transitioning to Nvision, he recognized her as the "point person within marketing for all mergers and acquisitions activity" and commented on her positive performance in handling the Carmike and Starplex acquisitions, and he recapped the entire year by saying: "a very nice year for Tonya where she was able to keep core activities going in a positive way while delivering on multiple key initiatives over and above these day-to-day responsibilities." PSOF ¶ 80.

In her 2017 review, Colanero rated Tonya with an overall rating of "outstanding," i.e., the highest possible rating. PSOF ¶¶ 114-115. Colanero commented that "Tonya is an integral part of the senior leadership team in the marketing department," that "it is hard not to be impressed with the volume of accomplishments Tonya achieved" during a difficult year in the movie industry, and that "she brought to fruition several key initiatives from 2016…" including the "…Carmike transition, Coca-Cola teen marketing program, as well as creating new contributors to benefit AMC, Feature Fare and movie feature drinks;" he also observed

that "these are huge initiatives that drive profit for AMC and wouldn't be what they are without Tonya's significant leadership/contributions." PSOF ¶ 116. Colanero also commented that Tonya "contributed in many other meaningful ways from daily unappreciated work like inventory risk management to high profile cross-functional assignments such as the market share task force;" Colanero agrees that this was a "glowing" annual performance review for Tonya. PSOF ¶ 117.

Despite being written up in June 2018 for issues related to Michael Pursell and the conference in New Orleans, PSOF ¶¶ 187-188, Colanero and AMC still selected Tonya for participation in AMC's "LEAP promotion-ready officers group" during the second quarter of 2018 (i.e., a program designed to develop employees that were identified as future leaders within the company). PSOF ¶ 113. Colanero also added one more person to her team in November 2018 (a 7th direct report), and gave Tonya additional responsibility for handling:

- **Film marketing;**
- **A major new initiative called AMC On Demand;**
- **A new digital Flash Sales program that generated over $5M in gross revenue; and,**
- **Partial responsibility for AMC's Merchandise Program.**

PSOF ¶¶ 141, 147-151 (new responsibilities); PSOF ¶ 238 (7th direct report).

Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue. PSOF ¶ 146. Her team also added an entirely new monetization and studio marketing program. PSOF ¶ 147. Colanero also identified Tonya as an employee with "high potential" in 2018 prior to any of her complaints about wage discrimination. PSOF ¶ 158 (high potential); PSOF ¶¶ 202-205, 210-212 (initial complaints between May 23-30, 2018).

**In 2019, AMC and Colanero still added _four more employees_ to Tonya's team**. PSOF ¶¶ 251-252, 261, 286. Colanero testified that he does not recall Tonya ever declining a single assignment, and he agrees that Tonya is one of the hardest working employees that ever worked for him at AMC. PSOF ¶ 5. Colanero also believes that Tonya wanted AMC to succeed, that she demonstrated a positive and willing work ethic, and that she was willing to take on ambitious initiatives similar to other Vice Presidents in the organization. PSOF ¶ 6.

It defies logic for AMC to argue that Tonya struggled with leadership and professional judgment when the record in this case demonstrates that AMC and Colanero consistently trusted Tonya with _more employees_ and _more responsibilities_ in each passing year of her employment, awarded her multiple times with the CEO's playing offense award in 2014, 2015, and 2016,[5] selected her for participation in AMC's "LEAP" program, and tapped her

---

[5] The award is described internally as "the highest form of recognition and reward to a select few who went above and beyond in playing offense, delivering extra-ordinary results through discretionary effort, and/or advancing the business with innovative thought _leadership_." PSOF ¶ 20 (emphasis added).

to serve on multiple, special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions such as the CEO's Marketshare Taskforce, the Carmike and Starplex acquisition and integration teams, the IT Digital Prioritization Roadmap group, and the Initiative Guest Committee. PSOF ¶¶ 20, 36, 81 (CEO awards); PSOF ¶¶ 111, 112 special committees and advisory teams).

36. In her performance review for 2014, Mangels was specifically counseled regarding her unwillingness to "contribute to work as a group that doesn't result in immediate and/or direct success for her." Colanero also revisited prior constructive feedback from 2014 relating to her leadership and judgment. (Ex. 4, Colanero Dep., at 110:5-10; Ex. 19 (Dep. Ex. 103), Mangels' 2014 Performance Review, p. 5.)

**RESPONSE: Uncontroverted that those words appear on page 5 of Defts. Ex. 19 next to the additional statements that Tonya "[represents AMC well, and works according to the culture and principles." Controverted that Tonya was counseled on any issues. The deposition testimony cited by AMC does not address that issue.**

37. With the support and guidance of Carla Chavarria, AMC's SVP and Chief Human Resources Officer, Mangels was asked to draft a development plan outlining her strengths and areas for improvement/opportunity. In March 2015, Mangels submitted her plan and identified ten (10) areas of development, including improving her response to constructive feedback or differing opinions and being more collaborative, helpful, and inclusive. (Ex. 1, Chavarria Dep., at 5:10-19; Ex. 3, Chavarria Dec., at ¶ 4.)

**RESPONSE: Uncontroverted.**

38. At or around this same time, AMC's Human Resources Department was made aware of the results of an investigation conducted by AMC's Internal Audit Department which identified expenditures (totaling approximately $240,000) by the Marketing Department in violation of AMC's policies. Mangels had been the Controller for the Marketing Department since November 2014. (Ex. 20, Deposition of Rosalind Reeves ("Reeves Dep.") at 81:8-20; 91:1-9, 13-25; 92-93:1-4; SOF 40.)

**RESPONSE: Uncontroverted that AMC's Human Resources Department was made aware of the results of an investigation conducted by AMC's Internal Audit Department which identified expenditures (totaling approximately $240,000) by the Marketing Department in violation of AMC's policies. Controverted that Tonya held the duties of "controller." Colanero agrees that Tonya's job description never listed her as a "controller," and Tonya was never compensated for any duties associated with being a "controller." PSOF ¶ 31.**

39.     Human Resources, and more specifically, Chavarria and another female VP (Rosalind Reeves) conducted an investigation. Based on the results of their investigation, they determined that five employees were culpable for failing to adhere to expectations and recommended that each be disciplined, including Mangels, Colanero, and another male VP in Marketing. (Ex. 3, Chavarria Dec., at ¶ 5.)

**RESPONSE: Uncontroverted that an investigation was conducted, uncontroverted that Colanero and another male VP bore culpability for the failures, and uncontroverted that Tonya was written-up in relation to the expense violations, but controverted that Tonya bore any responsibility for the failures. Justin Gardner, i.e., the employee accused of the expense violations, reported to an AMC Director named Shane Adams, and Shane Adams reported to a different Vice President named Brent Cooke—who ultimately reported to Colanero. PSOF ¶ 23.**

**Justin Garner was not in Tonya's chain of command, and Colanero acknowledges that he never gave Tonya an instruction indicating that she could direct Brent Cooke in the way that he or his employees were spending money within the budget. PSOF ¶ 24. Colanero agrees there was no ordinary business channel through which Justin Gardner's actual expense reports would have gone up the chain to Tonya. PSOF ¶ 25. Tonya did not have access to expense reports in order to reach determinations on the propriety of any specific expenditures that were within Colanero's budget. PSOF ¶ 26.**

**Colanero acknowledges that he failed in his "lack of oversight," and that he failed in trusting "[his] team to be following correct policies and procedures," in relation to the Justin Gardner expenditures that were the subject of Tonya's May 2015 write-up. PSOF ¶ 27. Despite his own professed failures, Colanero was never written up for any issues related to the Justin Gardner expenditures. PSOF ¶ 28. According to Tonya, the May 2015 write-up was a "bogus" written warning issued by Colanero to avoid responsibility for his own mistakes, and to avoid reporting the issue to AMC's board. PSOF ¶ 29. Colanero apologized to Tonya for the May 2015 warning, and he justified his effort to avoid written accountability by referring to the fact that he had three kids, college expenses, and a family for which to provide. PSOF ¶ 30. In addition to the above, a different employee named Letha Steffy was responsible for budgeting (or G&A certification) between 2010 and the fall of 2014 before Tonya assumed some of her duties. PSOF ¶ 33. Tonya's May 2015 write-up concerned Justin Gardner's expense violations between January 2013 and March 2015 (which were**

repeat violations from 2012), and Colanero acknowledges that Tonya had no responsibility for anything that occurred in 2013 or 2014 until she ultimately assumed a portion of Letha Steffy's duties in the fall of 2014. PSOF ¶ 34.

40. On May 6, 2015, Mangels received a written warning based on AMC's determination that she did not exercise the oversight and leadership expected of department Controllers. Ex. 2, Mangels Dep., at 195:18-25; Ex. 21 (Dep. Ex. 67), Mangels' Disciplinary Warning May 6, 2015; Ex. 20, Reeves Dep., at 100:15-25; 101:1-7; Ex. 1, Chavarria Dep., at 43:18-25; 51:4-7; SOF 39.)

**RESPONSE: Uncontroverted that Tonya was written-up in relation to the expense violations, but controverted that Tonya bore any responsibility for the failures.**

**Justin Gardner, i.e., the employee accused of the expense violations, reported to an AMC Director named Shane Adams, and Shane Adams reported to a different Vice President named Brent Cooke—who ultimately reported to Colanero. PSOF ¶ 23. Justin Garner was not in Tonya's chain of command, and Colanero acknowledges that he never gave Tonya an instruction indicating that she could direct Brent Cooke in the way that he or his employees were spending money within the budget. PSOF ¶ 24. Colanero agrees there was no ordinary business channel through which Justin Gardner's actual expense reports would have gone up the chain to Tonya. PSOF ¶ 25. Tonya did not have access to expense reports in order to reach determinations on the propriety of any specific expenditures that were within Colanero's budget. PSOF ¶ 26.**

**Colanero acknowledges that he failed in his "lack of oversight," and that he failed in trusting "[his] team to be following correct policies and procedures," in relation to the Justin Gardner expenditures that were the subject of Tonya's May 2015 write-up. PSOF ¶ 27. Despite his own professed failures, Colanero was never written up for any issues related to the Justin Gardner expenditures. PSOF ¶ 28. According to Tonya, the May 2015 write-up was a "bogus" written warning issued by Colanero to avoid responsibility for his own mistakes, and to avoid reporting the issue to AMC's board. PSOF ¶ 29. Colanero apologized to Tonya for the May 2015 warning, and he justified his effort to avoid written accountability by referring to the fact that he had three kids, college expenses, and a family for which to provide. PSOF ¶ 30. In addition to the above, a different employee named Letha Steffy was responsible for budgeting (or G&A certification) between 2010 and the fall of 2014 before Tonya assumed some of her duties. PSOF ¶ 33. Tonya's May 2015 write-up concerned Justin Gardner's expense violations between January 2013 and March 2015 (which were repeat violations from 2012), and Colanero acknowledges that Tonya had no responsibility for anything that occurred in 2013 or 2014 until she ultimately assumed a portion of Letha Steffy's duties in the fall of 2014. PSOF ¶ 34.**

41.    At the same time, and as a result of the same investigation, one male was involuntarily terminated and three males were also issued written warnings. Colanero was also counseled and his incentive bonus for 2015 was also significantly reduced. (Ex. 2, Mangels Dep., at 197:8-16; Ex. 4, Colanero Dep., at 42:23-25; 43:1-18; Ex. 20, Reeves Dep., at 104:18-21; Ex. 1, Chavarria Dep., at 55:23-25; 56:1-5; SOF 39.)

**RESPONSE:  Controverted that "Colanero was also counseled."  None of the testimony cited by AMC discusses any instance in which he was counseled on this issue by any person for any reason.  The record is also clear that, despite his own professed failures, Colanero was never written up for any issues related to the Justin Gardner expenditures.  PSOF ¶ 28. Uncontroverted in all other respects.**

42.    Thereafter, in late May 2015, AMC invested in an outside executive coach to assist Mangels in addressing and improving in her areas of development. (Ex. 3, Chavarria Dec., at ¶ 6.)

 **RESPONSE:  Uncontroverted.**

43.    In 2016, Mangels requested to have her VP title changed (in terms of the description of her function) and her position reviewed by AMC's Compensation Department. In October 2016, the Compensation Department conducted its review and issued a letter to Mangels approving the title change and stating that her compensation remained unchanged but that her compensation would next be reviewed in connection with the 2017 annual merit review process (to take place in the next couple of months). (Ex. 4, Colanero Dep., at 151:12-25; 152-154:1-15; 276:15-18; Ex. 22 (Dep. Ex. 111), letter to Mangels October 26, 2016.)

**RESPONSE:  Uncontroverted that Tonya requested to have her position reviewed and her compensation increased in 2016, and uncontroverted that Stephen Colanero (not the Compensation Department) issued the memorandum to Tonya reflected in Defts. Ex. 22, but controverted that this paragraph accurately describes the actual events as they occurred in 2016.  Beginning in May 2016 (i.e. three years after her promotion to Vice President), Tonya began requesting an increase in her compensation consistent with her updated job description and her increased job responsibilities.  PSOF ¶¶ 62-63.  At the time of that initial request, Colanero agreed that Tonya's "responsibilities had continued to grow and her team was getting bigger."  PSOF ¶ 65.  Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any**

adjustments in Tonya's pay. PSOF ¶ 64. Colanero has no memory of what happened after he submitted his May request, and he does not recall any conversations with Giuseffi or Chavarria about it. PSOF ¶ 66. Colanero does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya. Where does that stand?" PSOF ¶ 67. When Chavarria was asked about the email exchange during her deposition, she said that she "didn't see this as a request for adjusting compensation," and she does not recall whether anyone evaluated Tonya's compensation in relation to this request. PSOF ¶ 68. Finally, and perhaps most importantly, no one ever made Adam Aron (i.e. the only person with authority to adjust her compensation) aware of the request. PSOF ¶ 66. The net result is that Tonya's first request disappeared through the cracks. PSOF ¶ 70. In October 2016, Tonya once again requested to increase her compensation, and Colanero believes he informed her that there would be no increase in her compensation because he was going to "challenge her and reward her later," and because she would have to "prove her openness and her ability" to be recognized down the road. PSOF ¶¶ 73-77.

44.     Mangels' overall performance improved and for calendar year 2016 Colanero gave Mangels an overall Exceeds Expectations score (up one level from Successful the year prior). (Ex. 4, Colanero Dep., at 136:16-25; 156:6-16; Ex. 2, Mangels Dep., at 205:20-25; Ex. 23 (Dep. Ex. 72), Mangels' Performance Review 2016.)

**RESPONSE: Uncontroverted.**

45.     In recognition of her overall improved performance and assumption of new projects and responsibilities in 2016, Colanero recommended and received approval for a 7% merit increase for Mangels and her individual component for her incentive bonus was computed at 110%. Mangels' target under AMC's long-term incentive plan (LTIP) was also increased from $36,000 to $60,000 and she received an additional $10,000 special bonus. (Ex. 2, Mangels Dep., at 166:7-15; 208:6-11; 213:2-20; Ex. 24 (Dep. Ex. 73), Mangels' compensation memo February 22, 2017; Ex. 5, Colanero Dec., at ¶ 6.)

**RESPONSE: Uncontroverted that Tonya received a 6.97% merit increase (as the document actually reflects), uncontroverted that the individual component for her incentive bonus was computed at 110% (as the document reflects), uncontroverted that her equity incentive increased to $60,000, and uncontroverted that Tonya received the CEO's playing offense award in 2014, 2015, and 2016, which is described internally as "the highest form of recognition and reward to a select few who went above and beyond in playing offense,**

delivering extra-ordinary results through discretionary effort, and/or advancing the business with innovative thought leadership" and included a $10,000 bonus. PSOF ¶¶ 20, 36, 81.

Controverted, however, to the extent AMC seeks to suggest, or create the inference, that AMC or Colanero actually revalued Tonya's compensation—at any time—in a manner commensurate with her updated job description and her increased job responsibilities. That never happened, and in the same section of the testimony cited by AMC, Tonya makes clear that the merit increase she received in 2017 was in "the range of standard increases" and was not an "adjustment that properly reflected ... [her] additional job responsibilities." Defts. Ex. 2, Mangels Dep., at 215:18-216:7.

The truth is that, beginning in May 2016 (i.e. three years after her promotion to Vice President), Tonya began requesting an increase in her compensation consistent with her updated job description and her increased job responsibilities. PSOF ¶¶ 62-63. At the time of that initial request, Colanero agreed that Tonya's "responsibilities had continued to grow and her team was getting bigger." PSOF ¶ 65. Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any adjustments in Tonya's pay. PSOF ¶ 64. Colanero has no memory of what happened after he submitted his May request, and he does not recall any conversations with Giuseffi or Chavarria about it. PSOF ¶ 66. Colanero does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya. Where does that stand?" PSOF ¶ 67. When Chavarria was asked about the email exchange during her deposition, she said that she "didn't see this as a request for adjusting compensation," and she does not recall whether anyone evaluated Tonya's compensation in relation to this request. PSOF ¶ 68. Finally, and perhaps most importantly, no one ever made Adam Aron (i.e. the only person with authority to adjust her compensation) aware of the request. PSOF ¶ 66. The net result is that Tonya's first request disappeared through the cracks. PSOF ¶ 70.

This cycle continued for the next three (3) years. Tonya once again raised the issue of increasing her compensation at least 13 more times—ultimately culminating in her Charge of Discrimination filed with the EEOC in May 2019—and in each instance, nothing ever happened. PSOF ¶¶ 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296. Critically, no one ever made Adam Aron aware of a single request. PSOF ¶¶ 130, 137, 156, 221, 228, 247, 274, 284.

46.     In Colanero's opinion, Mangels' overall performance continued to improve in 2017 and Colanero awarded Mangels an overall Outstanding score in her annual performance review. Colanero did, however, specifically note the low score Mangels' team received in AMC's annual associate engagement survey (referred to internally as "AEI") and her scores for behavioral competencies were lower than her scores for her individual KPMs. (Ex. 4, Colanero Dep., at 172:7-23; Ex. 2, Mangels Dep., at 219:3-12; Ex. 25 (Dep. Ex. 116), Mangels' 2017 Performance Review.)

**RESPONSE: Uncontroverted that the document says: "AEI scores from her team were lower than hoped, so a KPI for 2018 should be added for people management. Going forward, there is still much to do, and I am particularly optimistic about F&B Pre-order. Well done Tonya." Controverted that it says anything else, and the deposition testimony cited by AMC does not address AEI scores.**

47.     AMC had a very disappointing financial year in 2017 and, as a result, VPs were only eligible for a maximum 2% merit increase (regardless of individual performance). (Ex. 3, Chavarria Dec., at ¶ 7.)

**RESPONSE: Controverted. Exhibit 52 hereto is a true and accurate copy of a spreadsheet that was produced by AMC in this case reflecting the compensation data and performance ratings of AMC's Vice Presidents in 2016, 2017, 2018, and 2019 (as of October 1 each year). PSOF ¶ 511. Based on that spreadsheet alone, there are at least four (4) examples of AMC VPs receiving upward salary adjustments ranging between 8% and 17%.[6]**

48.     Colanero was, however, able to successfully advocate on behalf of Mangels for another increase in her target LTIP from $60,000 to $80,000 and the individual component of her annual incentive bonus was computed at 120%. (Ex. 4, Colanero Dep., at 242:10-25; 243:1-20; Ex. 5, Colanero Dec., at ¶ 7.)

**RESPONSE: Uncontroverted that the individual component for her incentive bonus was computed at 120%, and uncontroverted that her equity incentive increased to $80,000.**

**Controverted, however, to the extent AMC seeks to suggest, or create the inference, that AMC or Colanero actually revalued Tonya's compensation—at any time—in a manner commensurate with her updated job description and her increased job responsibilities. That never happened. Beginning in May 2016 (i.e. three years after her promotion to Vice President), Tonya began requesting an increase in her compensation consistent with her updated job description and her increased job responsibilities. PSOF ¶¶ 62-63. At the time of that initial request, Colanero agreed that Tonya's "responsibilities had continued to grow and her team was getting bigger." PSOF ¶ 65. Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any adjustments in Tonya's pay. PSOF ¶ 64. Colanero has no memory of what happened after he submitted his May request, and he does not recall any conversations with Giuseffi**

---

[6] Jason Cole received a salary increase from $████████ ████ ██ increase). Kathy Weekley received a salary increase from $████████ ███ ██ increase). Jonathan Greer received a salary increase from $████████ ██ % increase). Robert Lane received a salary increase from $████ ██ % increase).

or Chavarria about it. PSOF ¶ 66. Colanero does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya. Where does that stand?" PSOF ¶ 67. When Chavarria was asked about the email exchange during her deposition, she said that she "didn't see this as a request for adjusting compensation," and she does not recall whether anyone evaluated Tonya's compensation in relation to this request. PSOF ¶ 68. Finally, and perhaps most importantly, no one ever made Adam Aron (i.e. the only person with authority to adjust her compensation) aware of the request. PSOF ¶ 66. The net result is that Tonya's first request disappeared through the cracks. PSOF ¶ 70.

This cycle continued for the next three (3) years. Tonya once again raised the issue of increasing her compensation at least 13 more times—ultimately culminating in her Charge of Discrimination filed with the EEOC in May 2019—and in each instance, nothing ever happened. PSOF ¶¶ 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296. Critically, no one ever made Adam Aron aware of a single request. PSOF ¶¶ 130, 137, 156, 221, 228, 247, 274, 284.

49.    Based on Colanero's support and advocacy, in early 2018 Mangels was invited to participate in AMC's internal 2-year LEAP leadership program. (Ex. 3, Chavarria Dec., at ¶ 8.)

RESPONSE: Uncontroverted that Colanero and AMC selected Tonya for participation in AMC's "LEAP promotion-ready officers group" during the second quarter of 2018 (i.e., a program designed to develop employees that were identified as future leaders within the company). PSOF ¶ 113. Controverted in relation to AMC's omission of Tonya's own performance scores as a factor in her selection; Chavarria's Declaration also acknowledges that her "performance scores" were a factor at ¶ 8.

50.    In May 2018 Mangels received the results of a Hogan 360 Review. Mangels' overall score (5.3) was in the bottom 25th benchmarking percentile. (Ex. 1, Chavarria Dep., at 123:4-18; Ex. 4, Colanero Dep., at 190:5-15; Ex. 26 (Dep. Ex. 122), Hogan 360 Report, pp. 1-3.)

RESPONSE: Uncontroverted that Tonya received an overall score of 5.3 based on the feedback of 12 anonymous raters, and that her score was in the 25th percentile (as reflected on the document). Controverted that this document has any relevance to the case or the decisionmakers involved in terminating Tonya. In the same areas of testimony cited by AMC, Chavarria confirms that she does not recall giving any feedback on Tonya in relation to this review, and Colanero testified that he was "not familiar with Hogan ratings and interpreting these results," and that he "[does] not have an opinion" on how this particular review went for Tonya. Defts. Ex. 1, Chavarria Dep., at 123:10-21; Defts. Ex. 4, Colanero Dep., at 190:5-21.

**April 2018 Marketing Department Reorganization**

51.     In the fourth quarter of 2017, Colanero directed Mangels and Carrie Trotter, another VP in the Marketing Department, to reassess and realign their individual and team functions. (Ex. 2, Mangels Dep., at 221:8-25; 222:21-25; 223-225:1-11; Ex. 27, Declaration of Carrie Trotter ("Trotter Dec."), at ¶ 8.)

**RESPONSE:  Uncontroverted.**

52.     Those discussions ultimately resulted in the announcement of a reorganization effective mid-April 2018 in the Marketing Department which directly impacted both Mangels' and Trotter's functions and teams. (Ex. 2, Mangels Dep., at 221:8-25; 222:21-25; 223-225:1-11; 226:14-25; 227:1-3; Ex. 28 (Dep. Ex. 77), April 16, 2018 e-mail; Ex. 27, Trotter Dec., at ¶ 12.)

**RESPONSE:  Uncontroverted.**

53.     Prior to the reorganization, Trotter was responsible for providing marketing support to the Film Department and digital signage (along with other responsibilities).  (Ex. 2, Mangels Dep., at 42:2-6; Ex. 27, Trotter Dec., at ¶ 10.)

**RESPONSE:  Uncontroverted that Trotter was responsible for providing marketing support to the Film Department prior to the reorganization, but controverted that Tonya did not have digital signage responsibilities until she received them from Trotter.  Tonya began assuming digital signage responsibilities as early as 2013 and 2014.  PSOF ¶¶ 10, 15.**

54.     As a result of the April 2018 reorganization, Mangels and Trotter "traded" certain functions. Mangels became responsible for supporting the Film Department and digital signage (previously performed by Trotter) and Trotter took on new responsibilities related to initiatives from the Pricing Department and took over dine in marking and marketing of grand openings (along with other responsibilities). (Ex. 2, Mangels Dep., at 221:8-25; 222:21-25; 223-225:1-11; 226:14-25; 227:1-3; Ex. 28 (Dep. Ex. 77); Ex. 27, Trotter Dec., at ¶¶ 9-10.)

**RESPONSE:  Controverted.  The testimony cited by AMC does not contain any agreement from Tonya that she simply "traded some job duties" with Carrie Trotter" in 2018.  In the testimony cited by AMC, Tonya explains that it was by no means an equal splitting or**

switching of responsibilities with Carrie Trotter. Defts Ex. 2, Mangels Dep., at 223:6-20 (stating "Yes I would clarify that those were not equitable trades in terms of the workload or the stress and pressure; but yes, we made some changes and my understanding was for strategic reasons that Stephen wanted to do that for better synergies and also because it was just a very high workload in film marketing and [Trotter] was not happy with the stress of that.").

Tonya assumed film marketing responsibilities from Carrie Trotter. PSOF ¶ 141. The re-organization was by no means an equal splitting or switching of responsibilities with Carrie Trotter. PSOF ¶ 142. Trotter was struggling to manage her areas of responsibility and the team was significantly under plan for film marketing at the time of the transition; the pace and complexity were too much for Trotter, and she desperately sought a slower role with less pressure. PSOF ¶ 143. The bottom line was that Trotter's group was "getting by," but they were certainly not hitting their goals or growing the more complex film marketing opportunities. PSOF ¶ 144. For comparison, Tonya's team lead 27 loyalty point campaigns in 2018 as compared with the 18 that occurred under Trotter in 2017. PSOF ¶ 145. Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue. PSOF ¶ 146. Tonya's team also added an entirely new monetization and studio marketing program, and when she partnered with the film group, AMC secured a two-year retainer (STX) for $4M ($2M annually), and AMC executed ten test title data initiatives in 2018. PSOF ¶ 147.

In 2018, Tonya also assumed responsibility for developing a major new initiative called AMC On Demand (digital streaming/rent or buy movies online). PSOF ¶ 148. Tonya and her team worked with consultants, programming, IT and studio partners to learn a new business, to define the technical requirements, user experience, and integration within AMC channels, and Tonya advocated for features, functionality, and benefits to position AMC for a successful launch. PSOF ¶ 149. In 2018, Tonya and her team also assumed responsibility for creating and managing a new digital Flash Sales program that generated over $5M in gross revenue. PSOF ¶ 150. In 2018, Tonya and her team also assumed partial responsibility for AMC's Merchandise Program, and partnered with other groups internally to advance that initiative. PSOF ¶ 151.

      55.    Following the April 2018 reorganization, Mangels was either performing work she performed prior to April 2018, or performing work previously performed by Trotter. (SOFs 52-54; Ex. 4, Colanero Dep., at 266:24-25; Ex. 27, Trotter Dec., at ¶ 10.)

RESPONSE: Controverted. On April 13, 2018, Tonya's position was re-titled to "Vice President, Product Marketing" effective April 20, 2018. PSOF ¶ 139. On April 20, 2018, there was a re-organization that resulted in two additional reports getting added to Tonya's team for a total of six direct reports after two others were moved to different positions. PSOF ¶ 140. Tonya assumed film marketing responsibilities from Carrie Trotter. PSOF ¶ 141. The re-organization was by no means an equal splitting or switching of responsibilities with Carrie Trotter. PSOF ¶ 142. Trotter was struggling to manage her areas of responsibility

**and the team was significantly under plan for film marketing at the time of the transition; the pace and complexity were too much for Trotter, and she desperately sought a slower role with less pressure. PSOF ¶ 143. The bottom line was that Trotter's group was "getting by," but they were certainly not hitting their goals or growing the more complex film marketing opportunities. PSOF ¶ 144. For comparison, Tonya's team lead 27 loyalty point campaigns in 2018 as compared with the 18 that occurred under Trotter in 2017. PSOF ¶ 145. Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue. PSOF ¶ 146. Tonya's team also added an entirely new monetization and studio marketing program, and when she partnered with the film group, AMC secured a two-year retainer (STX) for $4M ($2M annually), and AMC executed ten test title data initiatives in 2018. PSOF ¶ 147.**

**In 2018, Tonya also assumed responsibility for developing a major new initiative called AMC On Demand (digital streaming/rent or buy movies online). PSOF ¶ 148. Tonya and her team worked with consultants, programming, IT and studio partners to learn a new business, to define the technical requirements, user experience, and integration within AMC channels, and Tonya advocated for features, functionality, and benefits to position AMC for a successful launch. PSOF ¶ 149. In 2018, Tonya and her team also assumed responsibility for creating and managing a new digital Flash Sales program that generated over $5M in gross revenue. PSOF ¶ 150. In 2018, Tonya and her team also assumed partial responsibility for AMC's Merchandise Program, and partnered with other groups internally to advance that initiative. PSOF ¶ 151.**

56.     In conjunction with the April 2018 reorganization, Trotter and Mangels and nine (9) other employees on their two teams received title changes and two positions were eliminated. None of the individuals receiving title changes received a salary increase as a result of the reorganization. (Ex. 2, Mangels Dep., at 225:12-14; 243:5-25; 244:1-9; Ex. 27, Trotter Dec. at ¶ 12.)

**RESPONSE: Uncontroverted.**

57.     On May 5, 2018, Mangels spoke to Colanero requesting his support to have her position reviewed by AMC's Compensation Department. Colanero was supportive and intended to ask the Compensation Department to review both Mangels' and Trotter's positions given the trading of responsibilities between the two. (Ex. 4, Colanero Dep., at 199:18-21; 201:17-24; 238:16-25; 239-240:1-6; 266:21-25; 267:1-4; Ex. 5, Colanero Dec., at ¶ 8.)

**RESPONSE: Controverted. This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact."). *See* Scheduling Order [Doc. 41] at ¶ 6.**

**In March 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 126-131.**

**In April 2018, Tonya spoke with Chavarria on April 11, 2018 in order to seek advice on the best manner in which to "tactfully" address the subject of increasing her compensation with Colanero in light of the fact that her role at AMC continued to expand in depth and breadth after becoming a Vice President in 2013. PSOF ¶ 133-134. Chavarria testified to her awareness that Tonya wanted her position to be "assessed" during the April 11 conversation, her awareness that Tonya wanted advice on how to tactfully address the issue with Colanero, and her memory of previous discussions in which Colanero discussed "revaluing" Tonya's position, but Chavarria inexplicably denies learning that Tonya wanted to increase her pay during their April 11, 2018 discussion. PSOF ¶ 135. Colanero does not recall any conversations with Chavarria about Tonya's interest in adjusting her compensation in the April 2018 timeframe. PSOF ¶ 136. Nothing happened as a result of the conversation with Chavarria. PSOF ¶ 138.**

**Tonya had another conversation with Colanero around May 4, 2018 in which she once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities. SOF ¶ 152. Colanero does not disagree that he met with Tonya once again on May 4, 2018 in order to discuss Tonya's request to increase her compensation, but he does not recall the discussion, and the conversation resulted in nothing. PSOF ¶¶ 156-157.**

**<u>Reports of Inappropriate Conduct Against Mangels</u>**

58.     On May 8 & 9, 2018, AMC's Senior Leadership Team (SVPs and EVPs) held an internal Talent Summit. The purpose of the Talent Summit was to identify and discuss VPs and Directors for purposes of succession and other internal talent development. Colanero and Chavarria were both in attendance. (Ex. 4, Colanero Dep., at 199:10-25; 200:1-18; Ex. 1, Chavarria Dep., at 133:18-25.)

**RESPONSE: Uncontroverted.**

59.     At the Talent Summit, two separate SVPs (one male and one female) expressed

concern regarding unprofessional behavior they claimed to have witnessed by Mangels, relating

to over intoxication at AMC events that year (Connections and CinemaCon). Chavarria had a

follow-up discussion with one of the SVPs. (Ex. 4, Colanero Dep., at 199:5-17; 201:12-25; 202-

204:1-24; 206:3-14; 232:12-25; 347:11-14; Ex. 1, Chavarria Dep., at 141:15-25; 142-145:1-22.)

**RESPONSE: Controverted. The statements from the unnamed employees are hearsay, and should not be considered when ruling on summary judgment.[7]  AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speakers in support of their own statements referenced above.  In addition, Terry Crawford was never identified by AMC in its Rule 26 disclosures, and it would be inappropriate for the Court to consider information from any witnesses that were never properly or fairly identified throughout the discovery phase of this case pursuant to the requirements of Rule 26.[8]**

**AMC also fails to acknowledge the inconsistent testimony of Colanero.  Around May 8-12, 2018, Colanero attended a "Talent Summit" at AMC in which two AMC employees named Terry Crawford and Cynthia Pierce allegedly shared allegations of unprofessional conduct by Tonya.  PSOF ¶ 159.  According to Colanero, one of the employees—Terry Crawford—allegedly described a situation in which Tonya was observed in the act of "wild," "suggestive," or "an unprofessional level of" dancing during a rock concert.  PSOF ¶ 160. Colanero recalls that the other employee—Cynthia Pierce—allegedly "shared some comments that were negative about other events," but Colanero could not recall any of the specifics that were shared by Cynthia Pierce.  PSOF ¶ 161.**

60.     Colanero was caught off guard by the feedback regarding Mangels and he was

"embarrassed" and "disappointed" given his internal advocacy and support for Mangels and her

---

[7] Rule 56 mandates that a party asserting a fact in support of summary judgment must assert it "in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); *see also*, *Brooks v. Tri-Systems, Inc.*, 425 F. 3d 1109, 1111 (8th Cir. 2005) (deposition testimony must [ ] be admissible to be considered in ruling on a motion for summary judgment) (citation omitted); *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986) (When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment).

[8] Pursuant to 28 U.S.C. § 1746, the undersigned officer of this Court signing this pleading below on behalf of the Plaintiff, declares under penalty of perjury that this individual was never identified by AMC in its Rule 26 disclosures, that this statement is true and correct, and that the undersigned has personal knowledge of this information.

career. While Colanero was aware that Mangels had been verbally counseled regarding over-intoxication at AMC events, he personally believed she had corrected her behavior. (Ex. 4, Colanero Dep., at 197:4-25; 198:1-10; 201:17-24; 206:8-25; 207:1; 208:4-14; Ex. 1, Chavarria Dep., at 128:4-8; 141:15-18; 143:10-16; Ex. 5, Colanero Dec., at ¶ 9.)

**RESPONSE: Uncontroverted that Colanero was caught off guard by the feedback regarding Mangels and he was "embarrassed" and "disappointed," but controverted that Colanero had any valid, personal knowledge of Tonya being counseled for "over-intoxication at AMC events." Colanero is unaware of any other instance in which Tonya Mangels was written-up for an alcohol-related issue prior to her June 2018 write-up for alcohol-related issues, and Colanero does not recall who counseled her on those issues previously (including whether or not it was him), does not recall on how many occasions it occurred, does not recall speaking to any other managers about those issues, never witnessed any of those issues himself, and does not recall the identity of any other person(s) who allegedly witnessed those events if they occurred. PSOF ¶ 512. Whatever those alcohol-related issues were with Tonya Mangels, Colanero agrees that they "were probably in the rear window" after December 2013. PSOF ¶ 513.**

- 

**All other statements of fact asserted by AMC in this paragraph are controverted, and unsupported by the deposition testimony cited by AMC.**



**RESPONSE: Uncontroverted.**

63.     Throughout Reeves' investigation, and based on her normal practices, Reeves took contemporaneous handwritten notes during her interviews. These handwritten notes were maintained by AMC in the normal course of its business. (Ex. 3, Chavarria Dec., at ¶ 10; SOFs 64-65, 67, 77.)

**RESPONSE: Uncontroverted.**



Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 88 of 337











Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 93 of 337



79.     AMC immediately paused its investigation and Chavarria directed Reeves to meet with Mangels to obtain details regarding her allegations. (Ex. 1, Chavarria Dep., at 168:22-25; 169:1-18; Ex. 2, Mangels Dep., at 267:15-25; 268:1-19.)

**RESPONSE: Uncontroverted.**

80.     Reeves and Mangels met on May 30, 2018. Chavarria, Patterson, and Colanero were not present. (Ex. 20, Reeves Dep., at 155:19-22; Ex. 2, Mangels Dep., at 267:15-25; 268:1-19.)

**RESPONSE: Uncontroverted.**

81.     Unbeknownst to AMC until discovery in this case, Mangels secretly recorded this private discussion—and fifteen (15) additional private discussions while employed by AMC. Mangels admits this conduct violated a written AMC policy in effect during her employment. (Ex. 2, Mangels Dep. at 14:9-25; 15:1-8; 142:3-11; 144:16-25; 145:1-14; 148:5-11; 151:14-25; 153:5-23; 269:25-270:1-6;  Ex. 41 (Dep. Ex. 55), List of Recordings.)

**RESPONSE:  Uncontroverted that Tonya secretly recorded 16 meetings for her own protection beginning in May 2018, and uncontroverted that she testified that after reviewing some of the "discovery materials" in this case she noticed that "there was a policy that said that you should not record meetings at work and obviously [she] did record some meetings in protection of what I believed were, you know, issues not being addressed at work, so, I would say that would be a policy violation officially.  Not one that I was aware of at the time." Defts. Ex. 2, Mangels Dep. at 14:8-15:8.**

82.     During the May 30, 2018 interview:

a.     Mangels stated that she may have been "kitchen-sinking it" in reference to her May 23, 2018 email.

b.     Mangels stated several times that she was not making a complaint and did not want AMC to take any steps to resolve the claims she made in her email.

c.     Mangels stated that she was not aware of any instances of harassment towards others. With respect to the alleged harassment towards herself, she refused to provide Reeves with any facts.

d.   Mangels claimed men and women were treated differently with respect to alcohol consumption (referencing her verbal counseling from Colanero earlier in her career). When Reeves asked for details the only individual named by Mangels who was overly intoxicated at an AMC event was a female VP (detailing two instances for Reeves).

e.   Mangels stated that she believed there were "discrepancies in pay for similar positions." Mangels further stated that while Lai, Pursell, and Ybarra had different jobs, she thought they were similar.

f.   Reeves told Mangels that she had not given her much (in terms of what could be followed up on) and told Mangels that if she wanted to share anything else to reach out to her or Carla.

g.   Mangels asked Reeves about the pending investigation regarding her own conduct and Reeves stated that the accusations are "serious." Mangels asked for more clarity as to the specific accusations against her.

Reeves found Mangels to not be forthright, at times, during this interview. Reeves was not aware of any other discussions Mangels had with anyone else regarding Mangels' compensation. (Ex. 20, Reeves Dep., at 150:17-25; 151:1-10; 170:11-24; Ex. 2, Mangels Dep., at 269:25-270:1-6; Ex. 14, Audio and Transcript of May 30, 2018 Meeting.)

**RESPONSE:  This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact."). *See* Scheduling Order [Doc. 41] at ¶ 6.  Setting that issue aside, controverted.**

**Reeves held a meeting with Tonya on May 30, 2018—which was recorded by Tonya—and Reeves agrees that Tonya "very clearly rais[ed] her own internal complaints about the fact that she believes men and women are treated differently within AMC in certain respects." PSOF ¶ 204.  Tonya complained to Reeves that women are judged more harshly than men in relation to how they consume alcohol, she complained that she felt targeted and treated differently from males, and she mentioned the examples of male AMC employees inappropriately consuming alcohol at a golf tournament, male AMC employees being sent home in Ubers without consequence, a male AMC employee named George Patterson consuming alcohol inappropriately, and the example of male AMC employees engaging in pool parties in Las Vegas during a work conference.  PSOF ¶ 205.  Reeves failed to ask Tonya for any names, or for any other further specificity, that would have been necessary in order to investigate the examples Tonya shared on the issue of men and women being treated differently in relation to their consumption of alcohol.  PSOF ¶ 206.**

**During the May 30, 2018 meeting, Tonya also complained to Reeves about pay equity issues within AMC, and** <u>**Reeves agrees that Tonya's pay equity complaints merited an investigation**</u>**. PSOF ¶ 210. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." PSOF ¶ 211. Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue. PSOF ¶ 212.**

83.    Reeves summarized what she believed were the relevant portions of her meeting with Mangels, and her follow-up, in an email to Chavarria on May 30, 2018 (Colanero was not cc'd). In a verbal discussion, Reeves also made Chavarria aware of the accusations Mangels raised regarding the female VP's over-intoxication at two AMC events. Chavarria confirmed for Reeves that the female executive had been verbally counseled. (Ex. 20, Reeves Dep., at 163:9-25; 164:1-2; 171:5-22; Ex. 2, Mangels Dep., at 277:3-6; Ex. 42 (Dep. Ex. 153), email May 30, 2018; Ex. 3, Chavarria Dec., at ¶ 16.)

**RESPONSE: Uncontroverted that Defts. Ex. 42 is an email that was sent by Reeves to Chavarria on May 30, 2018 immediately after Reeves' May 30 conversation with Tonya., PSOF ¶ 213 (also marked by Plaintiff as Exhibit 31 hereto), and uncontroverted that Reeves summarized her 1:00 p.m. discussion the same day with Tonya in her 5:58 p.m. email to Chavarria. PSOF ¶ 214.**

**Controverted, however, that "Reeves summarized what she believed were the relevant portions of her meeting with Mangels … in an email to Chavarria." Reeves' testimony does not confirm that she summarized everything she believed to be relevant. Her email touches on some of the subjects mentioned above in response to DSOF ¶ 82, but it does not discuss all of those subjects in great detail.**

**This paragraph is also controverted to the extent AMC seeks to create the inference that it properly investigated Tonya's gender discrimination complaints related to alcohol consumption. As discussed above, Tonya complained to Reeves that women are judged more harshly than men in relation to how they consume alcohol, she complained that she felt targeted and treated differently from males, and she mentioned the examples of male AMC employees inappropriately consuming alcohol at a golf tournament, male AMC employees being sent home in Ubers without consequence, a male AMC employee named George Patterson consuming alcohol inappropriately, and the example of male AMC employees**

engaging in pool parties in Las Vegas during a work conference. PSOF ¶ 205. Reeves failed to ask Tonya for any names, or for any other further specificity, that would have been necessary in order to investigate the examples Tonya shared on the issue of men and women being treated differently in relation to their consumption of alcohol. PSOF ¶ 206.

Chavarria does not recall whether Reeves ever shared of any of the above information with her. PSOF ¶ 207. AMC never investigated any of the issues referenced above after Tonya complained about them on May 30, 2018. PSOF ¶ 208. Chavarria is not aware of anyone at AMC ever following up with Tonya in relation to the complaints referenced above—even though Chavarria acknowledges that, as an HR professional, it is a "best practice" to follow up with the complaining employee when conducting a workplace investigation. PSOF ¶ 209.

In addition, and despite Tonya's specific complaints to Reeves on May 30, 2018 about pay equity and gender discrimination, and despite Tonya's willingness to share specific examples, Tonya was written up on June 5, 2018 because she "made allegations involving others regarding bullying, sexual harassment, and gender discrimination" and because she "declined to provide pertinent details to allow for further investigation." PSOF ¶ 222.

84.    Reeves also advised AMC's Compensation Department of Mangels' accusation with respect to her pay. The Compensation Department advised Reeves that Mangels' position was paid equitably based on her responsibilities and scope of her role. (Ex. 20, Reeves Dep., at 79:6-25; 80:1-4; 168:2-25; 169:1.)

RESPONSE: Controverted. No one ever investigated Tonya's pay equity complaints on May 30.

During the May 30, 2018 meeting, Tonya complained to Reeves about pay equity issues within AMC, and Reeves agrees that Tonya's pay equity complaints merited an investigation. PSOF ¶ 210. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." PSOF ¶ 211. Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue. PSOF ¶ 212.

According to Reeves, she told Chavarria about Tonya's belief that her pay was 45-60% lower than Frank Ybarra, Julius Lai, and Michael Pursell, and Reeves told Chavarria that Stephen Colanero and Martin Stallbaumer "confirmed that [Tonya's] job is slotted lower than theirs." PSOF ¶ 215.

98

Mike Giuseffi supervised Martin Stallbaumer in 2018, and Giuseffi testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "[a]ny request by Plaintiff to increase her compensation prior to Plaintiff filing a charge of discrimination on May 2, 2019," the identity of all persons interviewed in relation to that issue, and the general process through which AMC investigated that issue. PSOF ¶ 216. Mike Giuseffi never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility, and he is not aware of *anyone else* at AMC that engaged in that analysis prior to Tonya's termination. PSOF ¶ 217.

Steven Colanero never compared Tonya's Vice President role to any other male Vice President role at AMC—at any time—in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Colanero never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶ 218.

Chavarria never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility, and Chavarria is not aware of anyone else at AMC that engaged in that analysis. PSOF ¶ 219.

Rosalind Reeves never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶ 220.

In addition, and despite Tonya's specific complaints to Reeves on May 30, 2018 about pay equity and gender discrimination, and despite Tonya's willingness to share specific examples, Tonya was written up on June 5, 2018 because she "made allegations involving others regarding bullying, sexual harassment, and gender discrimination" and because she "declined to provide pertinent details to allow for further investigation." PSOF ¶ 222.

85.    On May 30, 2018, Mangels sent Colanero an email stating that she needed "to apologize" and that she "understood that I've had an impact on you and others …I value your leadership, support and mentorship over the last nearly 9 years." She further stated that she was sorry for putting Colanero in this situation and that he would "help [her] more than ever to make repair." (Ex. 4, Colanero Dep., at 229:15-21; Ex. 43 (Dep. Ex. 147), email May 29, 2018.)

**RESPONSE: Uncontroverted.**









Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 103 of 337





**Colanero and Chavarria's Feigned Concern
About Tonya's Sexual Harassment Complaints**

Plaintiff also disagrees that Chavarria and Colanero ever legitimately cared about her sexual harassment accusations based on the manner in which they completely disregarded—and failed to investigate—her gender discrimination and pay equity complaints.

**Gender Discrimination**

As discussed above, Tonya complained to Reeves that women are judged more harshly than men in relation to how they consume alcohol, she complained that she felt targeted and treated differently from males, and she mentioned the examples of male AMC employees inappropriately consuming alcohol at a golf tournament, male AMC employees being sent home in Ubers without consequence, a male AMC employee named George Patterson consuming alcohol inappropriately, and the example of male AMC employees engaging in pool parties in Las Vegas during a work conference. PSOF ¶ 205. Reeves failed to ask Tonya for any names, or for any other further specificity, that would have been necessary in order to investigate the examples Tonya shared on the issue of men and women being treated differently in relation to their consumption of alcohol. PSOF ¶ 206.

Chavarria does not recall whether Reeves ever shared of any of the above information with her. PSOF ¶ 207. AMC never investigated any of the issues referenced above after Tonya complained about them on May 30, 2018. PSOF ¶ 208. Chavarria is not aware of anyone at AMC ever following up with Tonya in relation to the complaints referenced above—even though Chavarria acknowledges that, as an HR professional, it is a "best practice" to follow up with the complaining employee when conducting a workplace investigation. PSOF ¶ 209.

**Pay Equity**

During the May 30, 2018 meeting, Tonya also complained to Reeves about pay equity issues within AMC, and Reeves agrees that Tonya's pay equity complaints merited an investigation. PSOF ¶ 210. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." PSOF ¶ 211. Chavarria agrees that Tonya raised pay equity complaints with Reeves

on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue. PSOF ¶ 212.

According to Reeves, she told Chavarria about Tonya's belief that her pay was 45-60% lower than Frank Ybarra, Julius Lai, and Michael Pursell, and Reeves told Chavarria that Stephen Colanero and Martin Stallbaumer "confirmed that [Tonya's] job is slotted lower than theirs." PSOF ¶ 215.

Mike Giuseffi supervised Martin Stallbaumer in 2018, and Giuseffi testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "[a]ny request by Plaintiff to increase her compensation prior to Plaintiff filing a charge of discrimination on May 2, 2019," the identity of all persons interviewed in relation to that issue, and the general process through which AMC investigated that issue. PSOF ¶ 216. Mike Giuseffi never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility, and he is not aware of *anyone else* at AMC that engaged in that analysis prior to Tonya's termination. PSOF ¶ 217.

Steven Colanero never compared Tonya's Vice President role to any other male Vice President role at AMC—at any time—in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Colanero never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶ 218.

Chavarria never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility, and Chavarria is not aware of anyone else at AMC that engaged in that analysis. PSOF ¶ 219.

Rosalind Reeves never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶ 220.

In addition, and despite Tonya's specific complaints to Reeves on May 30, 2018 about pay equity and gender discrimination, and despite Tonya's willingness to share specific examples, Tonya was written up on June 5, 2018 because she "made allegations involving others regarding bullying, sexual harassment, and gender discrimination" and because she "declined to provide pertinent details to allow for further investigation." PSOF ¶ 222.

Based on the above, there is good reason to believe that Chavarria and Colanero never legitimately cared about Tonya's sexual harassment accusations. They completely disregarded—and failed to investigate—her gender discrimination and pay equity complaints. The only fair inference is that they shared the same lack of concern about her sexual harassment complaints.

## Alcohol Use

Plaintiff also disagrees that Chavarria and Colanero ever "honestly and reasonably concluded" that Mangels had been observed by multiple individuals overly intoxicated at AMC events.

Prior to June 5, 2018, Tonya was never written up by anyone at AMC, at any time, for any alcohol-related issues, and Colanero never witnessed Tonya consume alcohol at a work-related function in an unprofessional manner. PSOF ¶ 197. Colanero is unaware of any other instance in which Tonya Mangels was written-up for an alcohol-related issue prior to her June 2018 write-up for alcohol-related issues, and Colanero does not recall who counseled her on those issues previously (including whether or not it was him), does not recall on how many occasions it occurred, does not recall speaking to any other managers about those issues, never witnessed any of those issues himself, and does not recall the identity of any other person(s) who allegedly witnessed those events if they occurred. PSOF ¶ 512. Whatever those alcohol-related issues were with Tonya Mangels, Colanero agrees that they "were probably in the rear window" after December 2013. PSOF ¶ 513.

There was also good reason to question the quality of the investigation into the Connections conference. The events at issue occurred between 11:00 p.m. and 12:00 a.m. in New Orleans. PSOF ¶¶ 166, 169. The principal witness—Jason Banks— ███████████████████████████ ███████████. PSOF ¶ 167. Helen Miller could not identify Tonya's companion on the evening in question. PSOF ¶ 168. Neither Chavarria nor Reeves asked Jason Banks or Helen Miller whether they were also drinking the night they allegedly witnessed the inappropriate conduct. PSOF ¶ 172. Reeves interviewed eight additional employees; none of them reported anything about Tonya appearing to be intoxicated, and none of the additional witnesses who observed Tonya and Pursell together reported seeing any inappropriate touching. PSOF ¶ 171.

90.     Mangels admitted that she has no information to dispute Colanero's testimony that he subjectively and honestly believed in the appropriateness of the determinations based on the information available to AMC. (Ex. 2, Mangels Dep., at 288:18-25; 289:1-5.)

RESPONSE: Controverted. Plaintiff testified to her belief that Colanero should have good reason to question the quality of the investigation. In the passage cited by AMC, Tonya testified: "Yeah, I can't – I don't know for sure what he believes or doesn't believe. What I would say is I thought that the investigation was handled poorly and it was very open and, like, very odd way to handle an investigation and, so, I don't agree with the investigation, but whether or not he does, I can't comment on whether or not he does."

91.     Mangels admitted that she has no evidence/information that Helen, Jason, Alicia, or Jannie knew of any request she had made to AMC to have her compensation reviewed. (Ex. 2, Mangels Dep., at 293:25; 294:1-15.)

**RESPONSE: Uncontroverted.**

92.     Following its factual determinations, Colanero, Patterson, and Chavarria made the decision that AMC would offer both ███████████ the option of accepting and agreeing to adhere to performance expectations and consequences set forth in formal disciplinary warnings. Or, if they did not want to agree to abide by the expectations and consequences set forth in their warnings, they could voluntarily separate with a severance payment equal to the amount they would be eligible to receive had their positions been eliminated.  (Ex. 5, Colanero Dec., at ¶ 13.)

 **RESPONSE: Uncontroverted.**

93.     On June 5, 2018, Colanero and Chavarria met with Mangels. Chavarria detailed the determinations reached and Mangels' two options. Mangels chose to accept the expectations and consequences set forth in a Final Disciplinary Warning. Pursuant to that acceptance, Mangels agreed: (1) to undergo an EAP assessment and compliance training, (2) that her individual component of her eligible 2018 incentive bonus would be reduced by 25%, and (3) that the Final Written Warning would be considered when determining her 2018 overall performance rating. (Ex. 4, Colanero Dep., at 198:11-20; Ex. 2, Mangels Dep. at 296:6-12; Ex. 45 (Depo Ex. 161), Mangels' final disciplinary warning June 5, 2018; Ex. 46, Audio & Transcript of June 5, 2018 Meeting.)

**RESPONSE:  It is uncontroverted that Tonya was required to complete "[m]andatory counseling for alcoholism through the Employee Assistance Program (EAP)," and it is uncontroverted that AMC punished her by reducing her individual bonus by 25%.  Exhibit 23 hereto is a true and accurate copy of the written discipline that was ultimately administered by Colanero to Tonya on June 5, 2018, and those items are on the document. PSOF ¶ 188 (Ex. 23, Depo. Ex. 161).**

It is controverted, however, that Tonya agreed to this phrase: that "<u>the Final Written Warning</u> would be considered when determining her 2018 overall performance rating." AMC's document actually states that "[t]he above listed behaviors will be considered when determining your 2018 overall performance."



94.     During the meeting Colanero explained that he and AMC have been behind her, supporting her growth—but his and AMC's expectations for officers go to the "whole person" including the example she sets in judgment and leadership for others. Colanero also explained to Mangels that their trust had been damaged and to repair that trust would take time (and would not be rebuilt in 2-3 months).  (Ex. 2, Mangels Dep., at 296:6-12; Ex. 46, audio recording, and audio transcript at 5:5-20, 20:4-7.)

**RESPONSE:  Uncontroverted that Colanero made the following statements during the June 5 meeting, but controverted that he said anything else because it is not supported by the record:**

**MR. COLANERO:  "Tonya, you are a, a tremendous worker, you deliver great results for the company.  The company has benefitted from your contributions and we have been behind you wanting to develop your career and help you to continue to grow because we think the company can benefit from your continued growth, but it's not just what you deliver here, it's the whole person and what else you bring to the table and what type of an example you set for others and -- and the judgment that you exhibit and the leadership that you show, and this recent group of activities has caused all --brought all that into concern.  So we want you do well, we've wanted you do well but these activities have made it difficult which brings us to today."**
**…**

**MR. COLANERO:  Make no mistake, it will take time.  It's -- this is not a 60 or 90 day, now it's forgotten, it's going to take time.  That's with any relationship and trust.**

*See*, Defts. Ex. 46 at 5:5-20, 20:4-7.

95.     Pursell also voluntarily chose to accept the expectations and consequences set forth in a Disciplinary Warning, which included, but was not limited to, an agreement that his individual component of his eligible 2018-incentive bonus would be reduced by 25%. This was Pursell's first discipline warning. Colanero did not review and has not seen Pursell's written warning. (Ex. 4, Colanero Dep., at 257:21-25, 258:1-7; Ex. 20, Reeves Dep. at 196:6-10; Ex. 1, Chavarria Dep. at 189:23-25; 190:1-6; Ex. 2, Mangels Dep. at 295:20-25; 296:1-6; Ex. 47 (Dep. Ex. 84), Pursell disciplinary warning June 5, 2018.

**RESPONSE:  Uncontroverted that "Pursell also voluntarily chose to accept the expectations and consequences set forth in a Disciplinary Warning, which included, but was not limited to, an agreement that his individual component of his eligible 2018-incentive bonus would be reduced by 25%.  This was Pursell's first discipline warning."**

**Controverted, however, that "Colanero did not review and has not seen Pursell's written warning."  Colanero testified that he has never "seen a copy of Michael Pursell's 2018 performance review," but he also testified that "[he] believe[s] [he] did know that it was a [meets expectations] at some point[;]" he also confirmed that he does not know when he learned that information.  PSOF ¶ 514.**

96.     Colanero and Chavarria allowed Mangels to continue in AMC's LEAP program and Mangels worked directly with AMC's Director, Leadership Development, on professional development, in which Colanero actively participated. AMC also provided Mangels with another outside executive coach. (Ex. 2, Mangels Dep., at 123:9-22; 124:3-22; Ex. 5, Colanero Dec., at ¶ 15.)

**RESPONSE:  Uncontroverted.**

97.     Prior to the investigation, Colanero and Chavarria had discussed submitting both Mangels' and Trotter's positions to the Compensation Department for review before the investigation had "derailed" that intent. During and after that investigation, Colanero and Chavarria decided that it would be "inappropriate" to review Mangels' position for a while as the

investigation "complicated things dramatically." (Ex. 4, Colanero Dep., at 238:13-25; 239-241:1-6; 263:15-19; Ex. 48 (Depo Ex. 158), email May 31, 2018.

**RESPONSE: Uncontroverted in all respects except for the fact that Colanero testified that they decided not to regrade Tonya's position "particularly until after [they] resolved [the May/June investigation." Defts. Ex. 4, Colanero Dep., at 240:10-19.**

98. In September 2018, Mangels attended a trade conference with other AMC associates, including Alicia, the Marketing Department associate who had been interviewed by Reeves in May 2018. Mangels confronted Alicia while out one evening and repeatedly asked her to disclose what information she had provided to AMC/Reeves during the spring 2018 investigation. The associate found Mangels' tone to be accusatory and unfriendly and made her uncomfortable given Mangels' status as an AMC officer. (Ex. 39, Cook Dec., at ¶¶ 7-15.)

**RESPONSE: Controverted. On the date of September 2018 discussion with Alicia Cook, Tonya and Alicia Cook were "hanging out" all day in a friendly manner. PSOF ¶ 524. The discussion occurred at nighttime after Tonya, Alicia Cook, and others decided to go out as a small group to a nightclub (or similar venue). PSOF ¶ 525. It was late at night, and people were consuming alcohol. PSOF ¶ 525. Alicia and Tonya were talking and the topic came up organically during their conversation. PSOF ¶ 526. There was no unfriendliness. PSOF ¶ 526. Alicia shared information about the experience of being interviewed by Human Resources with Tonya. PSOF ¶ 527. The group had fun that night, and Alicia came out with the group on her own free will. PSOF ¶ 528. There was no incident or difficult interaction. PSOF ¶ 528. Tonya and Alicia were with the small group the entire time, and they took an Uber back to the hotel together. PSOF ¶ 529.**

**Tonya also explained in her deposition what she learned from Alicia Cook. According to Ms. Cook, the Human Resources interview was "uncomfortable," "intimidating," and "scary," and the interviewer was attempting to "plant the seed" of purported acts of wrongdoing on Tonya' behalf rather than simply asking questions in good faith to learn what Ms. Cook witnessed in her own words. (Ex. 1, Mangels depo., at 290:16-293:9).**

**<u>Relevant Events Post-2018 Investigation Through Spring 2019</u>**

99. On November 19, 2018, Mangels asked to speak with Colanero. In a brief exchange, Mangels stated that she is following-up on prior discussions in April and July 2018 related to having her positions reviewed by the Compensation Department. Colanero immediately

responded that he was supportive of the Compensation Department reviewing Mangels and Trotter's position and affirmatively asked Mangels to send him her updated Job Questionnaire (commonly known as a job description). In this discussion, Mangels never mentioned gender or discussed or identified position(s) she subjectively believed were comparable. (SOFs 57, 97; Ex. 4, Colanero Dep., at 268:1-24; Ex. 49, Audio & Transcript of November 19, 2018 meeting.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact."). *See* Scheduling Order [Doc. 41] at ¶ 6. Setting that issue aside, uncontroverted that "Mangels never mentioned gender or discussed or identified position(s) she subjectively believed were comparable" during this brief discussion. Controverted in all other respects.**

**On July 24, 2018, Tonya raised the issue of her compensation in an email with Colanero. PSOF ¶ 224. In her email, Tonya reminded Colanero that her position had not been properly reviewed—for purposes of adjusting her compensation—since her promotion to Vice President in 2013. PSOF ¶ 225. Colanero agrees that this request "kind of fell through the cracks" because he was "busy" and "must have missed it." PSOF ¶ 226. Chavarria does not recall ever being made aware of this request, and no adjustment ever occurred. PSOF ¶¶ 227-229. It went nowhere.**

**On November 19, 2018, Tonya stopped by Colanero's office to discuss—once again—her ongoing interest in having her position reviewed and her compensation adjusted. PSOF ¶ 239. She reminded him that she had not heard back from him in response to the July 24, 2018 email discussed above. PSOF ¶ 240. Colanero agrees that she was polite and diplomatic when she sought to raise the subject with him once again. PSOF ¶ 241.**

**There is nothing in the transcript of the recorded conversation indicating that "Colanero immediately responded that he was supportive of the Compensation Department reviewing Mangels and Trotter's position." Colanero did nothing but respond curtly during the conversation with a series "yeps," "okays," and "uh-huhs."**

100.    On November 20, 2018, Mangels sent Colanero an email. In the sixth paragraph of the email Mangels stated: "…I am that asking the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill set, position responsibilities, and quality of work." Mangels then stated that she believes

comparable positions include the VP positions held by Ybarra, Lai, Pursell, and Kim.   (Ex. 4, Colanero Dep., at 270:11-17; Ex. 50 (Dep. Ex. 172), Job Questionnaire.)

**RESPONSE:  This paragraph (and its accompanying footnote) violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").  *See* Scheduling Order [Doc. 41] at ¶ 6.  Setting that issue aside, controverted.**

**On November 20, 2018, Tonya sent Colanero the email attached hereto as Exhibit 34 in a further effort to follow up on the November 19 discussion, and to explicitly request an increase in compensation.  PSOF ¶ 242.**

**In her email, Tonya made the following statements:**

- **"I would like to request my updated Job Questionnaire be reviewed and follow up on our prior direct discussions and those with human resources as I am concerned that my compensation continues to lag in relation to the changes [in my role]."**

- **"Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when I was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment."**

- **"Yet my responsibilities and contributions to the company have grown exponentially."**

- **"We have had several past discussions about increasing my compensation to align with my increased responsibility, strategic influence, external benchmarks, and equity with internal positions of comparable scope, leadership, oversight, and revenue contributions."**

- **"I have been passive in prior conversations, believing my compensation would be fairly addressed and equalized in due time."**

- **"My position and team continues to expand, I am asking that the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work.  As examples, I believe comparable positions include: (1) VP, Communication & Events; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Programming Promotions.  It is my understanding that the individuals holding these positions receive significantly higher compensation and bonus packages.  And, that the Company has precedent of adjusting compensation to reflect changes in position breadth and depth or in cases of known wage gaps for similar scope roles."**

113

**PSOF ¶ 243**

101.     While Mangels premised her request for a job review on the changes related to the

April 2018 Marketing Department reorganization, she did not name Trotter as an individual in a

comparable VP position. (*See* SOFs 51-56.)

**RESPONSE:   Uncontroverted that Tonya did not list Trotter as a comparator, but controverted that Tonya "premised her request for a job review on the changes related to the April 2018 Marketing Department reorganization."**

**As the email set forth above in response to DSOF ¶ 100 makes clear, Tonya said: "Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when I was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment. … Yet my responsibilities and contributions to the company have grown exponentially."  PSOF ¶ 243.  In other words, Tonya premised her request on the manner in which her responsibilities and contributions to the company grew exponentially from 2013 forward (not from 2018 forward as AMC contends).**

102.     Colanero sent both Mangels' and Trotter's updated Job Questionnaires to Chavarria

with a request to have the positions reviewed by the Compensation Department. Colanero followed

up with Chavarria in December when he had not heard back regarding his request. (Ex. 51 (Dep.

Ex. 173), email January 10, 2019; Ex. 4, Colanero Dep., at 275:18-23; Ex. 1, Chavarria Dep., at

211:16-25; 212:1-6; Ex. 5, Colanero Dec., at ¶ 16.)

**RESPONSE:  Controverted.  Colanero eventually forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. PSOF ¶ 244.  Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself.  PSOF ¶ 246. The request went nowhere—even after Tonya asked Colanero about it again on December 13, 2018.  PSOF ¶¶ 248-250.**

103.     Chavarria assigned the review to Mike Giuseffi, AMC's VP Compensation (See

infra ¶¶ 115-119. (Ex. 1, Chavarria Dec., at 211:16-25; 212:1-21; Ex. 5, Colanero Dec., at ¶ 16.)

**RESPONSE:  Controverted.  Colanero eventually forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. PSOF ¶ 244.  Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself.  PSOF ¶ 246.**

**The request went nowhere—even after Tonya asked Colanero about it again on December 13, 2018. PSOF ¶¶ 248-250.**

104.   The Marketing Department's AEI scores were shared with Colanero's direct reports in January 2019. The Department's scores were poor, especially in the category of accountability. One anonymous associate wrote: *"I love working at AMC. However, my enthusiasm suffered a major blow this year as I watched an officer of the company be discovered abusing the privileges bestowed on her. Her lack of integrity and moral standards were treated with no visible repercussions and instead, increasing responsibility and purview."* Mangels and Colanero both assumed the comment related to Mangels. (Ex. 4, Colanero Dep., at 294:4-25; 295:1-22; Ex. 5, Colanero Dec., at ¶ 17.)

**RESPONSE:  Controverted to the extent AMC seeks to create the inference that these scores were discussed internally in an innocuous manner.  They were not.  Colanero disparaged Tonya and perpetuated negative rumors about her after getting mad about these AEI scores.**

**On January 23, 2019, Colanero was in a meeting with Tonya and four of his direct reports discussing the feedback received on his Marketing Department's annual associate engagement survey (referred to internally as "AEI" scores), and he read the disparaging remark referenced above that was an obvious reference to Tonya even though her name was not specifically mentioned.  PSOF ¶ 256.  Tonya and Colanero both assumed the comment related to Tonya.  PSOF ¶ 257.**

**Immediately after that meeting, Tonya told Colanero that she thought it was inappropriate to read the detail because everyone in the room knew the identity of the "officer" in question, that it was a "sucker punch" in front of her peers, and that his actions were unnecessarily perpetuating speculation and rumors.  PSOF ¶ 258.  Colanero admitted that he was disappointed in his AEI scores because all (or almost all) of his scores went down, and he told Tonya that he had a feeling "that there was someone real unhappy with [him]" that contributed to his lower scores.  PSOF ¶ 259.  Colanero also testified that he "thought it was likely" Tonya that made the negative comments about him on his own AEI report.  PSOF ¶ 260.**

105.   Due to the poor AEI scores in the Marketing Department, in early 2019 Colanero asked VP Pamela Sandler to lead a task force to analyze the concerns reflected in the AEI survey

and propose proactive strategies to address the concerns. (Ex. 5, Colanero Dec. at ¶ 18; Ex. 52, Declaration of Pamela Sandler ("Sandler Dec."), at ¶ 9.)

**RESPONSE: Uncontroverted.**

106. A female AMC associate (Carly)—who previously worked under Mangels until November 2018 but was still part of the Marketing Department—asked to speak to Sandler to provide feedback in relation to the AEI task force. On February 28, 2019, Carly told Sandler the following:

a. She believed the Marketing Department's low AEI scores are due to Mangels.

b. She believed Mangels was having an "affair" with another AMC employee and that she had personally witnessed inappropriate behavior between the two.

c. She believed Mangels was holding the team back in an effort to hide the affair and gave the example of business trips that she (and others) were not allowed to go on when she was on Mangels' team.

d. After the 2017 AEI scores were released for Mangels' team, Mangels confronted the team and asked who had provided which comments/scores. Mangels told the team that their feelings/memories were wrong and indicated that a KPM for each member of the team would be to increase the team's AEI score. Lauren spoke up and said that associates should be allowed to speak truthfully and Mangels responded something to the effect of "well that's really fucking immature."

e. When she applied for and was offered a position on Julius Lai's team in late 2018, Mangels stated something to the effect of: "I got you in here. Your resume was on the loser pile and I was the only one willing to take a chance on you." She described Mangels' tone as raw, unfiltered, and cruel. Shortly thereafter, Mangels unfriended her on social media channels.

(Ex. 52, Sandler Dec., at ¶¶ 10, 11.)

**RESPONSE: Controverted. The statements described herein from a person identified as "Carly" (last name not provided) are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above. In addition, this person was never identified by AMC in its Rule 26 disclosures, and it would be inappropriate for the Court to consider information from any**

witnesses that were never properly or fairly identified throughout the discovery phase of this case pursuant to the requirements of Rule 26.[9]

107.     Sandler shared with Colanero a summary of Carly's feedback related to an alleged affair. (Ex. 52, Sandler Dec., at ¶ 12.)

**RESPONSE:  Controverted.  The statements described herein from a person identified as "Carly" (last name not provided) are textbook hearsay, and should not be considered when ruling on summary judgment.  AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above.  In addition, this person was never identified by AMC in its Rule 26 disclosures, and it would be inappropriate for the Court to consider information from any witnesses that were never properly or fairly identified throughout the discovery phase of this case pursuant to the requirements of Rule 26.**

108.     On February 12, 2019, Colanero presented Mangels with her 2018 annual performance review. Colanero gave Mangels a "Does Not Meet" score (the second to lowest overall score). Colanero determined in his business judgment that while Mangels met the KPMs that were identified at the beginning of 2018, Mangels fell far short of his and AMC's expectations related to Behavioral Competencies. Mangels, in contrast, gave herself an Exceeds Expectations overall score. (Ex. 4, Colanero Dep., at 283:1-21; 286:11-22; 288:5-14; 305:14-23; Ex. 2, Mangels Dep., at 309:23-25; 310:1-4; 318:2-7; Ex. 53 (Depo Ex. 181), Mangels' 2018 Performance Review.)

**RESPONSE:  Uncontroverted that, "On February 12, 2019, Colanero presented Mangels with her 2018 annual performance review," that "Colanero gave Mangels a "Does Not Meet" score (the second to lowest overall score)," that "Mangels met the KPMs that were identified at the beginning of 2018," and that "Mangels … gave herself an Exceeds Expectations overall score."  Controverted in all other respects, especially in relation to Colanero using appropriate business judgment in his assessment of Tonya's behavioral competencies at the time of that review.**

---

[9] Pursuant to 28 U.S.C. § 1746, the undersigned officer of this Court signing this pleading below on behalf of the Plaintiff, declares under penalty of perjury that this individual was never identified by AMC in its Rule 26 disclosures, that this statement is true and correct, and that the undersigned has personal knowledge of this information.

In the June 5 discipline issued to Tonya, AMC's document states that "[t]he above listed behaviors will be considered when determining your 2018 overall performance." PSOF ¶ 188; (Ex. 23, Depo. Ex. 161). This fact is significant because, as the record demonstrates, no one at AMC ever reported, investigated, or dealt with any other issue involving Tonya's use of alcohol or her relationship with Pursell between the date of the June 5, 2018 discipline and the date of Tonya's termination on September 30, 2019 (i.e., a period of more than 15 months). PSOF ¶ 199. In other words, Tonya immediately resolved all of the allegedly problematic behaviors discussed in the June 5 warning. Thus, there was no reason to re-punish Tonya at the end of 2018 for the same behavioral issues for which she was already punished.

Unfortunately, the opposite happened. Colanero met with Tonya on February 12, 2019 for her 2018 performance review and gave her an overall rating of "does not meet" expectations for 2018—despite Tonya having rectified all problematic behaviors listed in the June 5 document, and despite Tonya having met or exceeded every KPM associated with her job. PSOF ¶ 262-270. Tonya's identically-situated male counterpart, Michael Pursell, received the opposite treatment when he was reviewed for 2018. PSOF ¶¶ 275-276.

### 2018 Reviews of Tonya and Pursell

Exhibit 36 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero on February 12, 2019 for the calendar year 2018. PSOF ¶ 262; (Ex. 36, Depo. Ex. 181). Colanero agrees that Tonya worked hard in 2018. PSOF ¶ 263. Colanero observed in his overall comments that Tonya "[t]ook on additional areas of responsibility with Film Marketing, On Demand, Flash Sales, Retail Merchandise and all digital signage," that she "[h]elped plan our team restructure, managed out under-performers, [and is] now leading a significantly larger team and promoted (3) members." PSOF ¶ 264. Colanero commented in his overall comments that Tonya "was able to effectively complete her KPMs and she continues to grow her span of responsibility," and that her efforts "resulted in significant accomplishments in Film Marketing Programming Promotions support, Food partnerships and McGuffins marketing." PSOF ¶ 265. Colanero rated Tonya with an "exceeds expectations" or "meets expectations" in every category of the KPMs (key performance metrics) on which her job was measured in 2018. PSOF ¶ 266.

Despite her hard work and her obvious successes throughout 2018, Colanero rated Tonya with an overall rating of "does not meet expectations" due to behavioral considerations alone. PSOF ¶ 267. The only behavioral issue mentioned in Tonya's 2018 review was Colanero's revisiting of the discipline that was already administered to Tonya on June 5, 2018. PSOF ¶ 268. According to Colanero, that single issue brought down her entire overall rating to "does not meet expectations," and she was not faulted for any other behavioral issues in 2018. PSOF ¶ 269.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



109. Colanero's written comments in Mangels' review include:

*"As an officer, expectations for Tonya include subject matter expertise and tactical proficiency, as well as soft skills relating to integrity, collaboration, building trust, etc. Unfortunately, Tonya's tactical success was undermined by inappropriate behavior for an executive that resulted in a Final Disciplinary Warning being issued in June … These actions are clearly unacceptable and dictate her score for Fostering Integrity and Trust. They also undermine her ability to either Lead with Purpose or Collaborate and Build Alignment. Finally, general awareness of this activity has led to negative perceptions of Tonya and detracted from the engagement of others impacted by her unprofessional behavior. It remains to be seen that Tonya has fully turned the corner on choosing to consistently act in a professional, executive manner, consistent with her role at AMC. AMC has, and continues to invest in Tonya through coaching, counseling and participation in the LEAP program. This is because we truly want her to succeed, as she can be a highly productive contributor to the growth of AMC."*

(SOF 108.)

**RESPONSE: Uncontroverted that those excerpts are contained in Tonya's 2018 review, but controverted that Colanero used appropriate business judgment in his assessment of Tonya's behavioral competencies at the time of that review for the same reasons discussed in response to DSOF ¶ 108 above.**

110. Unbeknownst to Colanero, Mangels secretly intercepted/recorded the meeting she had with Colanero regarding her performance review. The conversation included the following:

a. In reference to Mangels' final written warning (and the investigation), Colanero noted that the "cost" to AMC in terms of time and effort was high.

b. Colanero told Mangels that he was having a hard time trusting her because he did not believe she was forthright in the May/June 2018 investigation.

119

c.    Colanero stated to Mangels: "your talent is extraordinary and I love having you on the team for your contributions; but for your judgment and behavior on being a model of integrity for how others should act, it's not it …as an executive you need to be a role model of integrity and I don't think you carry yourself as a model of integrity and you may think that you do … that's a disconnect."

d.    When Mangels referred to the events leading to the June 2018 warning as a "personal event," Colanero replied that there were multiple events that led to the warning and further explained: "As a leader to do those things undermines the integrity of the company, it's stealing money from the company, it still undermines the company and makes it very challenging to enforce integrity and honor on a regular basis … I would trade off some of the [] work volume for better behavior."

e.    Mangels specifically acknowledged that she understood Colanero personally and honestly felt she deserved the overall review score stating: "Well I know you feel I deserve it so it's not for you to be sorry."

f.    Colanero offered to set another meeting to discuss the review. And he told Mangels that if she felt the review was unfair Mangels could follow-up with Chavarria.

(Ex. 2, Mangels Dep., at 310:23-25; 311:1-8; Ex. 54, Audio & Transcript of February 12, 2019 recording.)

**RESPONSE:  Uncontroverted that most of those excerpts referenced above are contained in the conversation that occurred on February 12, 2019, but controverted that Colanero ever offered to set another meeting to discuss the performance review or told Tonya that she could follow up with Chavarria.  Those statements are not on the transcript, and AMC has not cited any materials demonstrating that they occurred.**

**This paragraph is also controverted to the extent AMC seeks to create the inference that Colanero used appropriate business judgment in his assessment of Tonya's behavioral competencies at the time of Tonya's 2018 review for the same reasons discussed in response to DSOF ¶ 108 above.**

111.    In the meeting, Mangels also disclosed to Colanero for the first time that she possessed confidential compensation data for the entire department and had for a "long time." When Mangels suggested that she was "compensated 60% less than my male counterparts in marketing, who are VPs, Colanero responded "that's not true."  (Ex. 4, Colanero Dep., at 176:15-25; 177:1-8; 314:5-23; Ex. 2, Mangels Dep., at 69:9-24; Ex. 54, audio recording, and audio transcript at 23:13-24:15.)

**RESPONSE: Uncontroverted** that these subjects were discussed, and **uncontroverted** that Colanero denied that Tonya was underpaid in comparison to her male counterparts, but **controverted** that the discussion is characterized correctly.

In this discussion, for the very first time, Tonya told Colanero about the spreadsheet that he mistakenly sent to her in March 2018 containing the compensation data for other Vice Presidents, and she also complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. PSOF ¶ 271. Despite AMC's policy of promptly launching an investigation into complaints of discrimination (Exhibit 28), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." PSOF ¶ 272.

112. Mangels did not request a follow-up meeting with Colanero regarding her performance review and she did not contact Chavarria or anyone in AMC leadership to assert a concern about her performance review. (Ex. 5, Colanero Dec., at ¶ 19; Ex. 3, Chavarria Dec., at ¶ 19.)

**RESPONSE: Uncontroverted** that "Mangels did not request a follow-up meeting with Colanero regarding her performance review and she did not contact Chavarria or anyone in AMC leadership to assert a concern about her performance review," but **controverted** to the extent AMC seeks to create the inference that *Tonya* was required to take any further action in order to complain in good faith about wage and gender discrimination. The ball was in AMC's court.

Exhibit 28 hereto is a true and accurate copy of AMC's nondiscrimination and harassment policy, and it obligates AMC to "promptly launch an investigation" into workplace allegations of discrimination, harassment, and retaliation. PSOF ¶ 95. In the February 12 discussion, Tonya clearly told Colanero about the spreadsheet that he mistakenly sent to her in March 2018 containing the compensation data for other Vice Presidents, and she clearly complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. PSOF ¶ 271. Despite AMC's policy of promptly launching an investigation into complaints of discrimination (Exhibit 28), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." PSOF ¶ 272. Chavarria does not recall Colanero ever making her aware of the details of his conversation with Tonya, his inadvertent mistake in sending her the compensation spreadsheet, or her complaints about wage/gender discrimination. PSOF ¶ 273. No one ever made Adam Aron aware of this request to adjust Tonya's compensation, the heated conversation about her 2018 review, Colanero's inadvertent mistake in sending Tonya the compensation spreadsheet, or Tonya's complaints about wage/gender discrimination during her February 2019 discussion with Colanero. PSOF ¶ 274. It was disregarded just like Tonya's previous complaints about gender discrimination and pay equity were disregarded in May 2018. PSOF ¶¶ 202-222.

113.    In 2018 and until September 2019, Colanero had 7 direct reports (4 females and 3 males). (Ex. 5, Colanero Dec., at ¶ 24.)

**RESPONSE:  Uncontroverted.**

114.    On or about May 6, 2019, Mangels filed a charge of discrimination with the Equal Employment Opportunity Commission alleging that she was discriminated against on the basis of her gender and subjected to unlawful retaliation. (Ex. 2, Mangels Dep., at 31:14-22.)

**RESPONSE:  Uncontroverted that Mangels filed a charge of discrimination on or about May 6, 2019 with the Equal Employment Opportunity Commission, but controverted that it simply alleged discrimination "on the basis of her gender and [that she was] subjected to unlawful retaliation."  The charge was more detailed that that.**

**Exhibit 38 hereto is a true and accurate copy of the Charge of Discrimination Tonya filed with the EEOC on or around May 6, 2019.  PSOF ¶ 287.  Colanero was surprised and disappointed that Tonya engaged a federal agency to report what she believed was discrimination based on sex, and retaliation for having complained about wage disparities and sex-based discrimination.  PSOF ¶ 288.  Colanero agrees that, by the time of the May 6 Charge, Tonya had already engaged in multiple attempts to communicate with him about asking to have her compensation adjusted.  PSOF ¶ 289.  In her May 6 Charge, Tonya included the following allegations:**

- **"I have claims for violations of the Equal Pay Act, gender/sex discrimination, and claims for retaliation under Title VII and the Equal Pay Act based on AMC's actions in response to my numerous requests that my compensation be equalized with similarly situated males who perform substantially equal work."**

- **"I perform substantially equal work with the following VPs in the AMC organization: (1) VP, Programming Promotion; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Communication and Events; (5) VP, Pricing.  Each of these positions is held by a male employee. My job requires substantially equal skill, effort, and responsibility as the jobs of the male VPs identified above.  I have performed substantially equal work to each of these male VP for more than the past three years and have more seniority at AMC than four of these VPs.  On the AMC organization chart, my position is equal to the positions identified above."**

- **"I recently learned that the male VPs in the positions identified above are paid between 58% and 68% more than I am, including their base salaries and bonuses (which are based in part on base salary). This difference amounts to between $117,000 and $140,000 more dollars per year that is paid to the male employees compared to what AMC pays me."**

- "Among comparable VPs, I am currently responsible for managing the second largest budget and have the second highest number of employees on my team. My responsibilities are extremely broad and consistently require me (like my male peers) to perform at a highly strategic and innovative level, and to generate revenue for the company."

- "I have made numerous requests that my compensation be increased in line with my duties and responsibilities."

- "In November 2018, I specifically requested that the 'Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work.' All of my requests for increased compensation have been deflected and Mr. Colanero has suggested that I should not ask for more and should be happy with what I get. On one occasion, Mr. Colanero falsely told me that my compensation was 'equal range' to the comparable male VPs. At the time he made the statement, he was not aware that I had been informed of the compensation paid to comparable male VPs."

- "My most recent performance review was conducted by my supervisor, Stephen Colanero, after he received and deflected several of my requests for increased compensation. In my most recent performance review I received ratings of 'exceeds expectations' and 'meets expectations' in all performance related categories. However Mr. Colanero gave me an overall review rating of 'does not meet expectations.' This was the lowest performance review in the entire marketing department and the only 'does not meet expectations' review. Mr. Colanero's and AMC's alleged basis for the negative review relates to an HR issue involving a male coworker who is also a VP and an anonymous allegation that I had consumed too much alcohol during a work related event. These allegations are themselves discriminatory and retaliatory for [several listed reasons]."

- "As a result of the unfair review, Mr. Colanero and AMC have now created a plausible (but false) reason for refusing to equalize my compensation."

- "When discussing this performance review, Mr. Colanero acknowledged that my performance was 'superior' but he felt that he needed to 'send a message' to me. Mr. Colanero's desire to send a message to me is both retaliatory and motivated by views that women should behave differently than men."

PSOF ¶ 290; (Ex. 38, Depo. Ex. 184, at 1-2). Colanero and Chavarria were both aware of Tonya's pending May 6 Charge before she was terminated, and they understood that the comparator positions identified in her charge corresponded to Robert Kim, Julius Lai, Michael Pursell, Frank Ybarra, and Robert Lane. PSOF ¶ 291. Colanero and Chavarria were both identified by name in the May 6 Charge, and Chavarria clearly understood that they were both individually referenced in the charge. PSOF ¶ 292. Chavarria read it, and she agrees that the May 6 Charge contains very clear complaints of gender discrimination and complaints of violations of the Equal Pay Act. PSOF ¶ 294. Chavarria never performed

her own factual investigation into the claims referenced in the May 6 Charge, and she is not aware of any conclusions that were ever reached by AMC regarding whether or not there was any merit to the claims referenced in the May 6 Charge. PSOF ¶ 295. Tonya's compensation was never increased as a result of Tonya filing her May 6 Charge. PSOF ¶ 296.

**The Compensation Department's Review of Mangels' Position in 2019**

115. Giuseffi conducted a review of Mangels' position in 2019. (Ex. 56, Giuseffi Dep.,

at 59:20-61:25; 64:24-65:9; Ex. 55, Declaration of Michael Giuseffi ("Giuseffi Dec."), at ¶ 7.)

**RESPONSE: Controverted. In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Giuseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.**

116. As part of that review, the compensation team asked AON, a third-party

compensation consulting firm, to review their database to see how similar jobs were compensated

at other companies. (Ex. 55, Giuseffi Dec., at ¶ 7.)

**RESPONSE: Controverted. In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Giuseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.**

117. AON identified one position in their database that was more similar to Mangels' position than the others in its database. AON then reported that the compensation range for that similar position started at $184,000 per year. (Ex. 55, Giuseffi Dec., at ¶ 7; Ex. 56, Giuseffi Dep., at 70, 73.)

**RESPONSE: Controverted. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281.**

118. AMC did not view this information as the "minimum compensation" that such a position at AMC should be paid. Instead, AMC considered a variety of factors in setting compensation, including how that role fit into AMC's overall organization. (Ex. 56, Giuseffi Dep. at 73-74; Ex. 55, Giuseffi Dec., at ¶ 8.)

**RESPONSE: Controverted. In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Guiseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.**

119. In light of AMC's view of the overall value of the function performed by Mangels at AMC and the relatively common marketing skills an employee in this position needed for the role, AMC concluded that she was properly compensated. Ex. 3, Chavarria Dec., at ¶ 40.)

**RESPONSE: Controverted. In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary**

was \$156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Guiseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.

**Mangels' Inappropriate Behavior in August/September 2019 and AMC's Investigation into the Same.**

120.    In late summer 2019, AMC made the difficult decision that it needed to reduce its workforce at the TSC ("2019 RIF"). The 2019 RIF was announced and implemented on Tuesday August 20, 2019. (Ex. 1, Chavarria Dep., at 238:7-13; Ex. 3, Chavarria Dec., at ¶ 20.)

**RESPONSE: Uncontroverted.**

121.    AMC's Senior Leadership Team (SLT) (comprised of EVPs and SVPs) were informed of the decision and all were instructed to maintain the decision in the strictest of confidences and to only discuss with others outside the SLT on a strict need to know basis. For example, a SLT member may need to discuss with a direct report in order to ensure business needs can and could be met with a position elimination. (Ex. 4, Colanero Dep., at 337:9-15; 338:4-9; 343:11-16; 239:19-25; 240:1-13.)

**RESPONSE: Uncontroverted.**

122.    Mangels was not made aware of the 2019 RIF in advance by Colanero. (Ex. 4, Colanero Dep., at 338:10-14.)

**RESPONSE: Uncontroverted.**

123.    Mangels had a meeting with her direct reports on August 14, 2019. Mangels was the only officer present. All other attendees were non-officers. (Ex. 2, Mangels Dep., at 326:15-25; 327:1-2; Ex. 3, Chavarria Dec., at ¶ 21.)

**RESPONSE: Uncontroverted.**

124.    Colanero did inform Trotter of the 2019 RIF shortly before it occurred to discuss and assess business impacts to Trotter's team. (Ex. 4, Colanero Dep., at 338:24-25; 339:1-12; 342:13-25; 343:1.)

**RESPONSE: Uncontroverted.**

125.    On Monday August 19, 2019, SVP Cynthia Pierce reported to Colanero that a female VP, Alice Rogers, had called her over the weekend "very upset." According to Pierce, Rogers claimed she had overheard AMC associates discussing impending changes to Mangels' team—which led Rogers to be concerned for her own job. Pierce, while maintaining the confidentiality of the imminent RIF which Pierce was aware of, as part of the Senior Leadership Team but Rogers was not, tried to calm Rogers down. Based on the information provided by Rogers, Pierce concluded that Mangels was the likely source (either directly or indirectly). (Ex. 4, Colanero Dep., at 349:11-23; Ex. 5, Colanero Dec., at ¶ 20.)

**RESPONSE: Controverted. The statements attributable to Cynthia Pierce and Alice Rogers are hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speakers in support of their own statements referenced above.**

**Whether or not these witnesses' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.**

**Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred. PSOF ¶ 321. Alice Rogers was also not in the August 14 meeting because she was not on Tonya's team. PSOF ¶¶ 322-324. Rogers purportedly informed Pierce that she overheard two unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday. PSOF ¶ 322. Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team. PSOF ¶ 323. Alice Rogers also never identified Tonya as the source of any of her information; Cynthia Pierce only "surmised" that Tonya was a source of**

127

Rogers' information.  PSOF ¶ 324.  The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.

In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge).  PSOF ¶ 309.  Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya).  PSOF ¶ 310.  Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14.  PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues.  PSOF ¶ 312.  Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20.  PSOF ¶ 313.  Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred.  PSOF ¶ 314.  During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315.  Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team.  PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

126.    Colanero received a second, unsolicited complaint relating to Mangels and the

imminent layoff from another female officer, Trotter, on the same day (August 19, 2019). (Ex. 4,

Colanero Dep., at 349:11-23; Ex. 27, Trotter Dec., at ¶ 19.)

RESPONSE:  Uncontroverted that Colanero received a report, but controverted that the report was relevant or merits consideration for purposes of summary judgment.  *See* Plaintiff's response to DSOF ¶ 127 immediately below discussing the "report."  Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting and do not serve as direct witnesses to what occurred.  PSOF ¶ 321.

127. Trotter reported to Colanero that on Thursday August 15, 2019, a female associate (Sarah) on her team had reported to Trotter that she heard associates on Mangels' team discussing a team meeting Mangels held the day prior (August 14, 2019) wherein Mangels allegedly made comments that led the associates to believe a layoff was possible and that Mangels was crying. According to Trotter, Sarah stated that she then spoke to a female associate (Jillian) on Mangels' team and Jillian confirmed to Sarah that Mangels had cried in the meeting and had made statements that led Jillian to infer a layoff could be imminent. Trotter told Colanero that Sarah expressed concerns for her own job based on what she had heard. (Ex. 27, Trotter Dec., at ¶¶ 17, 19.)

**RESPONSE: Uncontroverted that Colanero received a report, but controverted in all other respects. The statements attributable to Sarah Powers are hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above.**

**Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.**

**Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred. PSOF ¶ 321. Alice Rogers was also not in the August 14 meeting because she was not on Tonya's team. PSOF ¶¶ 322-324. Rogers purportedly informed Pierce that she overheard two unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday. PSOF ¶ 322. Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team. PSOF ¶ 323. Alice Rogers also never identified Tonya as the source of any of her information; Cynthia Pierce only "surmised" that Tonya was a source of Rogers' information. PSOF ¶ 324. The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.**

In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

128. Colanero reported the concerns he received to Chavarria and was told Human Resources would conduct an investigation. (Ex. 4, Colanero Dep., at 355:24-25; 356:1-8; Ex. 1, Chavarria Dep., at 256:10-21.)

RESPONSE: Controverted. Colanero did not have a valid basis from which to initiate a legitimate investigation. AMC's "RIF investigation" was pretextual from the outset, and it was initiated by Colanero.

Colanero never told Tonya about the planned RIF before it was announced, and Colanero is not aware of anyone else that told Tonya about the RIF before it was announced. PSOF ¶ 298. According to Colanero, two individuals—Cynthia Pierce and Carrie Trotter—came to him on August 19, 2019 (i.e., one day before the RIF announcement) "because they heard secondhand information from people that were concerned about potential layoffs" based on information that Tonya allegedly shared with her team. PSOF ¶ 299. Cynthia Pierce and

Carrie Trotter were not in any of the purported meetings in which Tonya allegedly discussed this topic with anyone on Tonya's team. PSOF ¶ 300. Colanero never investigated the issue himself after it was reported to him, and he never went to Tonya prior to the RIF announcement to ask her about the issue. PSOF ¶ 301. Colanero is not aware of anyone at AMC ever learning or discovering that Tonya somehow learned about the RIF before it was announced. PSOF ¶ 302. No one on Tonya's team ever told Colanero that they heard Tonya say there was going to be RIF before it was announced. PSOF ¶ 303.

Despite the above, Colanero approached Tonya "briefly" after the RIF was announced to inform her "that he had heard these complaints [from Pierce and Trotter], that [he] had relayed [them] to human resources, and that they would be doing an investigation." PSOF ¶ 304. At the time he initiated the investigation, Colanero was unaware of Tonya ever knowing about the RIF in advance, and to this day, Colanero still believes that Tonya did not know about it in advance. PSOF ¶ 305. It is undisputed that Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. PSOF ¶ 306.

## The Investigation Quickly Revealed Nothing

When the investigation started, it went nowhere quickly. Chavarria asked a subordinate employee named Sharlynn Mutzbauer (also in Human Resources) to assist Chavarria in her efforts to investigate Tonya, and the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307. Chavarria agrees that Tonya reached out to her before Phase 1 of the investigation started, invited her to "please" speak to members of her team, and offered the following explanation in advance on August 22, 2019:

> Carla …. Earlier this week Stephen mentioned I should expect you to contact me related to a report that said layoffs were happening this week during my staff meeting the prior week.
>
> I would like to make small request that you consider taking 10-15 minutes to briefly touch base with a couple of folks on my team about the agenda and my communications, such as Lauren Doyle, Ellen Blanner, Ryan Davis, who were in my staff meeting last week. Doyle is at a shoot today and tomorrow so she'd be on cell 913-526-4754. Ellen and Ryan are in the office. Certainly welcome to speak to any others as well though Jillian is on vacation and Marti was on vacation last week so wasn't in attendance.
>
> The closing of my meeting was all in positive intention and encouraging the team. I recognized many peoples good work, the workloads, results, some new projects like NFL and the tough climate ahead which would make our efforts important to deliver. I spoke about our budget review going smoothly due in part to all of their work with me on the planning, being strategic and thinking

bottom-up. We didn't inflate estimates, were supporting many key revenue drivers and it served us well as we got most everything approved. I went on to suggest that they be aware and sensitive to others, because some had significant cuts or maybe didn't have as many growth or revenue initiatives going on. I said something to the effect that it could cause potential jealousies and anxiety given the business climate so consider being overly understanding and considerate in the coming weeks. While I like to pump my team up privately, I don't want to do that at the detriment of anyone else.

I suggested not to get caught up in speculation, rumors, keep their heads down, focus on the work, stay out of the "fray." I said be confident and feel grateful they were working on key efforts which should position them well regardless of the business climate in my own opinion. My intent was to be authentic in my communication, shift focus to what was in their control, laser in on the results but encourage compassion for others given the stressful times. I didn't have any details about lay-offs and did not tell the team lay-offs were happening.

I hope you will touch base with a few of the team and will see you Monday.

Thank you.

PSOF ¶ 308. Tonya welcomed the "investigation," and had nothing to hide.

Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred. PSOF ¶ 321. Alice Rogers was also not in the August 14 meeting because she was not on Tonya's team. PSOF ¶¶ 322-324. Rogers purportedly informed Pierce that she overheard two unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday. PSOF ¶ 322. Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team. PSOF ¶ 323. Alice Rogers also never identified Tonya as the source of any of her information; Cynthia Pierce only "surmised" that Tonya was a source of Rogers' information. PSOF ¶ 324. The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.

In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by

Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14.  PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues.  PSOF ¶ 312.  Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20.  PSOF ¶ 313.  Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred.  PSOF ¶ 314.  During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred.  PSOF ¶ 315.  Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team.  PSOF ¶ 316.

Jordan Crouch, i.e., one of the direct witnesses interviewed about the August 14 meeting, sent a lengthy description of the meeting to Mutzbauer and Chavarria explaining that Tonya "got emotional [during the meeting], choked up with tears about the team's hard work, expressed gratitude for what we've been doing as a team," that she "got emotional and teary at a -- at the challenging year ahead," and that "[s]he ended her portion of the meeting by saying it's going to be a tough few weeks, and once again thankful for our recent hard work, planning ahead, and the work that has been coming through the pipeline."  PSOF ¶ 317.

Jordan Crouch also confirmed that he ran into Vice President Pamela Sandler on August 22, and Sandler—who was not present in the August 14 meeting—suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week." PSOF ¶ 318.  Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated.  PSOF ¶ 319.  Jordan Crouch expressly <u>denied</u> the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting.  PSOF ¶ 320.

The pretextual nature of AMC's "RIF investigation" was also evidenced by the fact that AMC deliberately disregarded the ongoing reality that there was widespread rumor and speculation within AMC about possible layoffs before the August 20 RIF announcement.

<center>Widespread Rumor and Speculation</center>

During her investigation, Mutzbauer never undertook any effort to understand whether there were any widespread rumors or conversations within the company about possible layoffs between the time of an announced Profit Improvement Plan and the time of the formal announcement of the RIF.  PSOF ¶ 325.  AMC formally and publicly announced a Profit Improvement Plan in advance of the RIF announcement in a press release issued on

August 8, 2019.  PSOF ¶ 326.  The August 8 announcement described "a comprehensive profit improvement plan to enhance operational efficiency…," and stated that its "initiatives will seek to achieve cost savings across the entire income statement, including general and administrative."  PSOF ¶ 327.

It was well known within AMC that overhead expenses such as employee salaries were included within the "general and administrative" portion of the budget.  PSOF ¶ 328.  On August 13, 2019, Chief Financial Officer Craig Ramsey held a meeting with director-level and above employees at AMC's Headquarters Town Center Theater (in a large auditorium) to further discuss the Profit Improvement Plan, and the fact that it included reductions to AMC's general and administrative expenses, which necessarily entailed a reduction in employee overhead/salaries.  PSOF ¶ 329.

After the meeting, several members of Vice President Michael Pursell's team came to him with concerns about losing their job, and Pursell was also concerned about losing his own job.  PSOF ¶¶ 330-331.  Pursell testified that "several of his directors came to [him] and asked for clarity…[;] they basically all said we all know it's coming, it's just a matter of when, right?"  PSOF ¶ 332.  Pursell testified that the internal discussions about possible layoffs were widespread throughout the company after the director-level and above meeting, and Pursell recalls people using the terms "layoffs" and "reduction in force" in their conversations with him about the issue before the RIF was formally announced.  PSOF ¶ 333.

Vice President of Human Resources Rosalind Reeves also recalls that one or two of her own team members approached her after the director-level and above meeting, that they shared their concerns about the anticipated "budget cuts," that they asked her if she "thought that it would lead to a reduction in force," and that Reeves was required to engage with them on that topic due to their concerns.  PSOF ¶ 334.

Vice President Robert Kim also recalls that there were widespread discussions about possible layoffs throughout the company after the Profit Improvement Plan announcement, and Kim recalls people using the terms "layoffs" and "reduction in force" in their conversations with him about the issue before the RIF was formally announced.  PSOF ¶ 335.  Robert Kim also feared losing his own job, and he agrees that, prior to the formal RIF announcement, there was a period of "several weeks" of "rumors, speculation, [and] discussions of concerns about a reduction in force being [imminent] and people being concerned about what was going to happen."  PSOF ¶ 336.  Robert Kim recalls that members of his team approached him after the Profit Improvement Plan announcement, that they shared concerns about the impact of the announcement on their team, that they were concerned about keeping their jobs, and that he was required to engage with them on that topic due to their expressed concerns.  PSOF ¶ 337.

Vice President Frank Ybarra—who reported to Colanero—also recalls that, after the Profit Improvement Plan announcement and the director-level and above meeting, people at AMC were concerned about potential layoffs, and that he has "some recollection of employees talking about potential concerns about their jobs…."  PSOF ¶ 338.

Vice President Robert Lane also testified that a female member of his team approached him between the time of the Profit Improvement Plan announcement and the time of the RIF announcement, that she shared concerns about potentially losing her job, and that he was required to engage with her on that topic due to her expressed concerns. PSOF ¶ 339. Even though Lane did not know whether the concerned employee was actually going to lose her job (or about the planned RIF), he told her that she "didn't need to be worried" because he "need[ed] to make sure [he was] motivating [his] team" and because he "believe[d] that [his] team does important work and [his] point was we prove our value." PSOF ¶ 340.

Robert Kim and Michael Pursell also testified that, a few days in advance of the August 20 announcement, Pursell, Kim, and others became aware of the fact that all of the conference rooms at the AMC headquarters were booked by Human Resources, and that this also became an additional source of discussion and concern about what was planned for August 20. PSOF ¶ 341.

<center>**Other Vice Presidents Also Had Advance Knowledge of the RIF**</center>

AMC also disregarded the reality that several Vice Presidents may have been discussing the possibility of planned layoffs privately—even if they never admitted it Human Resources. For example, Colanero also told another Vice President on his team—Carrie Trotter—about the RIF before it was announced to "gain some guidance on specific actions that would impact her team." PSOF ¶ 342. According to Colanero, Cynthia Pierce and Carrie Trotter both already knew about the planned RIF when they originally came to him with information about Tonya on August 19, 2019. PSOF ¶ 343. Colanero also testified that "it's possible" he had a similar conversation with Julius Lai. PSOF ¶ 344.

Vice President Frank Ybarra was also aware of the planned RIF before it was formally announced on August 20. PSOF ¶ 345.

Michael Pursell and his co-worker Nels Storm were also made aware of the reduction in force before it was set to occur—even though they "[weren't] supposed to learn of it"— because their boss, Senior Vice President Jennifer Douglas, clued them in to the importance of August 20, and the fact that she was going to be in the office that day instead of being out of town for a previously scheduled vacation. PSOF ¶ 346. Pursell could not recall the exact words Douglas used, but the clear import of their conversation was that she needed to be back in town for what was coming, that she did not want her presence to be a surprise, and that she wanted them to understand that they were not in danger of losing their jobs. PSOF ¶ 347.

Pamela Sandler even apologized to Colanero at one point for her "sharing of confidential information, specifically as it applies to this week's layoffs," and for "participating in the gossip," but she never suffered any adverse employment actions due to her sharing of confidential information related to the August 20 RIF; she instead assumed most of Tonya's former responsibilities after Tonya was fired. PSOF ¶¶ 348-349.

<center>135</center>

**Tonya's Response to Her Team Was No Different Than the Others**

During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF. PSOF ¶ 350. When Tonya's team inquired about the possibility of a RIF, Tonya was required to address the issue with her team members just like Michael Pursell, Rosalind Reeves, Robert Lane, and Robert Kim were required to address that issue with their team members, but Tonya told her team that she was not aware of any upcoming RIF, and that they should "keep [their] heads down, you know, just stay out of the fray and stay focused on what you can control…." PSOF ¶ 351. Again, Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. PSOF ¶ 352.

**Tonya Alone (i.e. The Only Person with a Pending EEOC Charge)
Was Singled Out for Investigation and Termination**

In the end, no one else at AMC—other than Tonya—was ever investigated in relation to allegedly discussing the potential for layoffs within the company prior to the formal announcement of the RIF. PSOF ¶ 380. No one else at AMC—other than Tonya—was ever written up, disciplined, terminated, or suffered any other adverse employment action because they were allegedly talking about potential layoffs prior to the formal announcement of the RIF. PSOF ¶ 381.

129. On August 20, 2019, after the layoff was formally announced, Colanero met with Mangels and informed her that he had received complaints related to comments she may have made prior to the August 2019 layoff relating to the potential for a layoff. Colanero informed Mangels that Human Resources would conduct an investigation and would be in touch. (Ex. 4, Colanero Dep., at 353:4-12; 354:17-25; 356:16-24.)

**RESPONSE: Controverted. Colanero did not have a valid basis from which to initiate a legitimate investigation. As discussed *at length* in response to DSOF ¶ 128, AMC's "RIF investigation" was pretextual from the outset, and it was initiated by Colanero.**

130. All interviews during AMC's investigation were conducted by Chavarria, Sharlynn Mutzbauer, and/or Mary Melton-Miller. Neither Mutzbauer nor Melton-Miller were aware that Mangels had filed a charge of discrimination in May 2019. Colanero was not present for any

witness interviews. (Ex. 3, Chavarria Dec., at ¶ 22; Ex. 5, Colanero Dec. at ¶ 21; Ex. 57, Deposition of Sharlynn Mutzbauer ("Mutzbauer Dep."), at 75:22-25; 76:1-16.)

**RESPONSE: Uncontroverted that Chavarria and Mutzbauer conducted interviews during AMC's "RIF investigation," that Mutzbauer was not aware that Mangels had filed a charge of discrimination in May 2019, and that Colanero was not present for any witness interviews. Controverted in all other respects.**

**After the referral from Colanero, Chavarria asked a subordinate employee named Sharlynn Mutzbauer (also in Human Resources) to assist Chavarria in her efforts to investigate Tonya, and the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307. After Phase I of the investigation concluded, Mutzbauer and Chavarria's investigation broadened into a second phase that involved their inquiry into the question of whether Tonya somehow improperly "interrogated" people on her team about what occurred during the August 14 meeting. PSOF ¶ 353. Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312.**

**Chavarria never identified an investigator named Mary Melton-Miller in her deposition despite lengthy testimony on the subject. In addition, and whether or not Ms. Melton-Miller was involved, no one other than Ms. Melton-Miller would be an appropriate person to comment on what she knew, and when, in relation to Plaintiff's EEOC charge.**

131.    On August 22, 2019, AMC interviewed four (4) associates: Marti, Jordan, Sarah, and Lauren D. All were Mangels' direct reports, except for Sarah (who reported to Trotter). (Ex. 3, Chavarria Dec., at ¶ 23.)

**RESPONSE: Uncontroverted.**

132.    Marti told AMC that she was off work on August 14, 2019. However, she heard from colleagues who were present for the August 14 team meeting that Mangels was "teary" and visibly upset and that comments made by Mangels in the meeting had led two colleagues—Jordan and Lauren M.—to reach out to her and express concerns. Marti stated that Jordan said the

comments by Mangels were "awkward" and made him uncomfortable and Marti stated that she and Jordan had exchanged text messages. (Ex. 59, Declaration of Mary Melton-Miller ("Melton-Miller Dec."), at ¶ 3.)

**RESPONSE: Controverted. The statements described herein from a person identified as "Marti" are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above. In addition, this person was never identified by AMC in its Rule 26 disclosures, and it would be inappropriate for the Court to consider information from any witnesses that were never properly or fairly identified throughout the discovery phase of this case pursuant to the requirements of Rule 26.[10]**

**Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.**

**At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.**

**Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any**

---

[10] Pursuant to 28 U.S.C. § 1746, the undersigned officer of this Court signing this pleading below on behalf of the Plaintiff, declares under penalty of perjury that this individual was never identified by AMC in its Rule 26 disclosures, that this statement is true and correct, and that the undersigned has personal knowledge of this information.

instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

133. Jordan was interviewed twice on August 22, 2019 (due to inconsistent statements he made regarding text messages with Marti). Jordan was present for the August 14 team meeting. He also told AMC that Mangels had told him that someone had reported her to Human Resources and that she asked him to tell her what he recalled she said (and how he had interpreted her comments) in the August 14 team meeting. Jordan provided AMC with copies of the text messages between himself and Marti. (Ex. 1, Chavarria Dep., at 274:22-25; 275:1-21; 276:20-25; 277:1-3; 279:5-25; 280:1-20; Ex. 3, Chavarria Dec., at ¶ 24.)

RESPONSE: Controverted. The statements described herein from a person identified as "Jordan" are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above.

Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in

inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues.  PSOF ¶ 312.  Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20.  PSOF ¶ 313.  Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred.  PSOF ¶ 314.  During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred.  PSOF ¶ 315.  Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team.  PSOF ¶ 316.

Jordan Crouch, i.e., one of the direct witnesses interviewed about the August 14 meeting, sent a lengthy description of the meeting to Mutzbauer and Chavarria explaining that Tonya "got emotional [during the meeting], choked up with tears about the team's hard work, expressed gratitude for what we've been doing as a team," that she "got emotional and teary at a -- at the challenging year ahead," and that "[s]he ended her portion of the meeting by saying it's going to be a tough few weeks, and once again thankful for our recent hard work, planning ahead, and the work that has been coming through the pipeline."  PSOF ¶ 317.

Jordan Crouch also confirmed that he ran into Vice President Pamela Sandler on August 22, and Sandler—who was not present in the August 14 meeting—suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week."  PSOF ¶ 318.  Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated.  PSOF ¶ 319.  Jordan Crouch expressly denied the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting.  PSOF ¶ 320.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

134.    In the text messages between Marti and Jordan, Jordan called the August 14 team meeting "bizarre" and both Jordan and Marti expressed concern they may be laid off. Jordan stated Mangels "was crying" and that she "prefaced her speech by saying there's a lot of rumors going around" and Jordan added: "but I feel like she created even more rumors????" and later stated Mangels "worried the entire team."  (Ex. 3, Chavarria Dec., at ¶ 24.)

RESPONSE:  Controverted.  The statements described herein from the people identified as "Jordan" and "Marti" are textbook hearsay, and should not be considered when ruling on

summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speakers in support of their own statements referenced above. The text messages are also hearsay. In addition, "Marti" was never identified by AMC in its Rule 26 disclosures, and it would be inappropriate for the Court to consider information from any witnesses that were never properly or fairly identified throughout the discovery phase of this case pursuant to the requirements of Rule 26.

Whether or not these witnesses' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Jordan Crouch, i.e., one of the direct witnesses interviewed about the August 14 meeting, sent a lengthy description of the meeting to Mutzbauer and Chavarria explaining that Tonya "got emotional [during the meeting], choked up with tears about the team's hard work, expressed gratitude for what we've been doing as a team," that she "got emotional and teary at a -- at the challenging year ahead," and that "[s]he ended her portion of the meeting by saying it's going to be a tough few weeks, and once again thankful for our recent hard work, planning ahead, and the work that has been coming through the pipeline." PSOF ¶ 317.

Jordan Crouch also confirmed that he ran into Vice President Pamela Sandler on August 22, and Sandler—who was not present in the August 14 meeting—suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week." PSOF ¶ 318. Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated. PSOF ¶ 319. Jordan Crouch expressly denied the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting. PSOF ¶ 320.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

135. Sarah told AMC that Jillian came to her after the August 14 team meeting and was visibly upset, shook. Sarah stated that Jillian told her that Mangels was crying in the meeting and said words that led Jillian to believe that there would be a layoff the following the week. Sarah stated that Jillian asked for her advice on whether Jillian should cancel her vacation scheduled for the following week based on Mangels' comment/conduct. Sarah told AMC that she did not believe Jillian should have been placed in that position by Mangels and that is why she reported it to Trotter (along with Sarah's concerns for her own job security). (Ex. 60, Declaration of Sarah Powers ("Powers Dec."), at ¶ 3.)

RESPONSE: Controverted. The statements described from "Jillian" to "Sarah" are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above.

Whether or not these witnesses' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred. PSOF ¶ 321. The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.

In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

136.    Lauren D. told AMC that she recalled Mangels was choked up during the August 14 team meeting. Lauren D. further stated that Mangels had asked Lauren D. and her (Lauren D's) direct reports to come to Mangels' office sometime before August 22 and after the layoff announcement on August 20, 2019. Mangels then asked Lauren D. and the others what they recalled her saying during the August 14 team meeting and whether they recall her saying there would be a layoff or implied there would be a layoff. (Ex. 3, Chavarria Dec., at ¶ 25.)

RESPONSE: Controverted. The statements described from "Lauren D." are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statements referenced above.

143

Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

137. On Monday August 26, 2019, Chavarria and Mutzbauer met with Mangels.

Mangels made the following statements:

a. Mangels stated that she was not aware of anything she said or did in the August 14 team meeting that led her team to worry about their jobs.

b. Mangels admitted she made a reference to the "next couple of weeks being tough" but stated the reference was to personal news, and not to AMC. Mangels also denied crying but said she was "rattled" and "emotional," due to the personal news.

144

c.    Mangels did admit "layoffs" were brought up in the August 14 team meeting, but claimed her team brought the topic up.

d.    Mangels denied having any information about the layoff prior to the August 20, 2019 announcement. She did admit to being worried about layoffs because another officer, Rob Kim, had told her that conference rooms were booked for August 20 and because Colanero was slow on approving upcoming travel. Mangels stated that she could not recall speculating about a potential layoff with anyone other than Kim.

e.    Mangels admitted that on August 20, 2019, Colanero made her aware that Human Resources would be conducting an investigation relating to a complaint he received regarding the August 14 team meeting.

f.    After learning this, Mangels admitted she spoke to every member of her team and asked if they reported her to Human Resources or knew who did. When asked why she did this Mangels stated that she needed to know who to trust and because Colanero had not specifically told her not to.

(Ex. 2, Mangels Dep., at 338:16-25; 339:1-7; Ex. 3, Chavarria Dec., at ¶ 26.)

**RESPONSE:  This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").  *See* Scheduling Order [Doc. 41] at ¶ 6.  Setting that deficiency aside, sub-paragraphs (a) through (e) are generally uncontroverted, but sub-paragraph (f) is controverted.**

**Sub-paragraph (f) (Controverted)**

**Tonya denies interrogating anyone on her team, and Tonya also denies asking anyone on her team whether they reported her to Human Resources.  PSOF ¶ 359.  Tonya's deposition testimony is consistent on that point, and AMC has not cited any testimony to the contrary.**

**After Phase I of the investigation concluded, Mutzbauer and Chavarria's investigation broadened into a second phase that involved their inquiry into the question of whether Tonya somehow improperly "interrogated" people on her team about what occurred during the August 14 meeting.  PSOF ¶ 353.  Importantly, Colanero never instructed Tonya that she was not permitted to go back and speak with her team and ask them about, "hey, guys, was there anything I said to you during our August 14 meeting that was concerning to you."  PSOF ¶ 354.  Chavarria and Mutzbauer also confirmed that they were not aware of anyone at AMC telling Tonya that she was not permitted to follow up with her own team to ask about them about the August 14 meeting and whether there was anything Tonya said that was concerning to them.  PSOF ¶ 355.**

Chavarria did not conduct any interviews related to Phase 2 of the investigation aside from attending one interview with Tonya; all Phase 2 interviews were conducted by Mutzbauer. PSOF ¶ 356. During Phase 2, Mutzbauer interviewed three (3) out of the ten (10) people present for the August 14 meeting; two of them (Ellen Blanner and Lauren Doyle) said nothing about Tonya "interrogating" them, and did not use that word. PSOF ¶ 357.

According to Mutzbauer, only one employee—Jillian Knipplemeyer—allegedly said that she felt "interrogated" by Tonya during her conversation with Tonya about the August 14 meeting, and that Tonya asked Knipplemeyer if she reported her to Human Resources. PSOF ¶ 358. Tonya denies interrogating anyone on her team, and Tonya also denies asking anyone on her team whether they reported her to Human Resources. PSOF ¶ 359. Tonya simply asked members of her team whether "they had the impression" on August 14 that she suggested anything to them about planned layoffs, and if so, whether they communicated that conclusion (albeit a mistaken conclusion) to any other person at AMC. PSOF ¶ 360.

138. In addition to meeting with Mangels, AMC met with and interviewed four females on August 26, 2019—Pierce, Kaleigh, Rogers, and Trotter. (Ex. 3, Chavarria Dec., at ¶ 27.)

RESPONSE: Uncontroverted.

139. AMC met with Pierce and she reconfirmed the information she provided to Colanero on August 19, 2019. (Ex. 3, Chavarria Dec., at ¶ 28.)

RESPONSE: Controverted. The statements described from "Pierce" are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of their own statement(s) referenced above.

Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred. PSOF ¶ 321. Alice Rogers was also not in the August 14 meeting because she was not on Tonya's team. PSOF ¶¶ 322-324. Rogers purportedly informed Pierce that she overheard two unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday. PSOF ¶ 322. Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team. PSOF ¶ 323. Alice Rogers also never identified Tonya as the source

of any of her information; Cynthia Pierce only "surmised" that Tonya was a source of Rogers' information. PSOF ¶ 324. The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.

In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

140. Ms. Mutzbauer conducted the interview of Kaleigh. Ms. Mutzbauer reported to Ms. Chavarria that Kaleigh told her that she was present during the August 14 team meeting, she stated that Mangels became emotional and appeared to choke up with tears in her eyes (causing Kaleigh to look away). Ms. Mutzbauer also reported that Kaleigh told her that after the meeting others on

the team (not her) were speculating about whether Mangels' comments meant there would be a

layoff. (Ex. 3, Chavarria Dec., at ¶ 30.)

**RESPONSE: Controverted. The statements described in this paragraph from "Mutzbauer" and "Kaleigh" are textbook hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speakers in support of their own statement(s) referenced above. Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.**

**At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.**

**Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.**

**Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."**

141. During AMC's discussion with Rogers, she confirmed that she called Pierce the

weekend before the layoff concerned about her job security. Rogers stated that she overheard two

associates (not Directors or above) on August 16, 2019, discussing that Mangels was worried that she would be laid off because Mangels' travel had not been approved and contracts Mangels oversaw were being requested. Based on what Rogers heard, she assumed the information the non-management level associates were discussing had come from Mangels (who was specifically referenced/named by the associates). (Ex. 3, Chavarria Dec., at ¶ 29.)

**RESPONSE: Controverted. The statements attributable to Alice Rogers are hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of her own statements referenced above.**

**Whether or not this witness' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.**

**Alice Rogers was not in the August 14 meeting because she was not on Tonya's team. PSOF ¶¶ 322-324. Rogers purportedly informed Pierce that she overheard two unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday. PSOF ¶ 322. Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team. PSOF ¶ 323. Alice Rogers also never identified Tonya as the source of any of her information; Cynthia Pierce only "surmised" that Tonya was a source of Rogers' information. PSOF ¶ 324. The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.**

**In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.**

**Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.**

**Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."**

142. In AMC's discussion with Trotter, she reconfirmed the information she provided to Colanero on August 19, 2019. Trotter also provided the following additional information to AMC:

a. On the same day (August 15, 2019) that Sarah had come to her regarding Mangels' conduct, Sandler had also asked to speak to Trotter. Sandler told Trotter that that day Mangels had suggested to her that there was going to be a restructure or layoffs the following week. Trotter told AMC that Sandler was worried about her job based on Mangels' comments.

b. Trotter told AMC that she had also seen a LinkedIn post from Mangels (on the evening of August 16, 2019) that stated something to the effect of "ever feel like there's a lot going on behind the scenes at work… focused." When Trotter went back to Mangels' LinkedIn site to take a screenshot the week of the layoffs, it had been deleted.

c. Based on the reports from Sarah and Sandler and the LinkedIn post Trotter told AMC she knew she needed to report what she knew to Colanero.

d. She also told AMC that on August 21, 2019, she received a text message from Sandler stating that Mangels had just accused Sandler of reporting Mangels to Colanero and that Mangels told Sandler that she (Mangels) had called every member of her team in to find out who reported her.

     e.     She volunteered that she personally felt Mangels should be terminated based on the seriousness of her conduct.

(Ex. 27, Trotter Dec., at ¶ 22.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").** *See* **Scheduling Order [Doc. 41] at ¶ 6. Setting that deficiency aside, controverted.**

**The statements attributable to "Sarah" and "Sandler" in this paragraph are hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from those purported speakers in support of her own statements referenced above. Trotter is also incompetent to testify about a text message Trotter received from Sandler (hearsay) in which Sandler described a conversation between herself and Mangels (further hearsay)—a conversation that was never directly witnessed by Trotter.**

<div align="center">

**Statements About the August 14 Meeting**

</div>

**Whether or not these witnesses' statements are considered, however, they are irrelevant to the analysis, controverted, and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.**

**Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred. PSOF ¶ 321. Neither was Pamela Sandler. PSOF ¶ 515. The hearsay information in this case from Trotter, Pierce, Powers, and Sandler is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.**

**In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.**

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

### Tonya's Subsequent Discussions with her Team About AMC's "RIF investigation"

In addition, and after Phase I of the investigation concluded, Mutzbauer and Chavarria's investigation broadened into a second phase that involved their inquiry into the question of whether Tonya somehow improperly "interrogated" people on her team about what occurred during the August 14 meeting. PSOF ¶ 353. Importantly, Colanero never instructed Tonya that she was not permitted to go back and speak with her team and ask them about, "hey, guys, was there anything I said to you during our August 14 meeting that was concerning to you." PSOF ¶ 354. Chavarria and Mutzbauer also confirmed that they were not aware of anyone at AMC telling Tonya that she was not permitted to follow up with her own team to ask about them about the August 14 meeting and whether there was anything Tonya said that was concerning to them. PSOF ¶ 355.

Chavarria did not conduct any interviews related to Phase 2 of the investigation aside from attending one interview with Tonya; all Phase 2 interviews were conducted by Mutzbauer. PSOF ¶ 356. During Phase 2, Mutzbauer interviewed three (3) out of the ten (10) people present for the August 14 meeting; two of them (Ellen Blanner and Lauren Doyle) said nothing about Tonya "interrogating" them, and did not use that word. PSOF ¶ 357.

According to Mutzbauer, only one employee—Jillian Knipplemeyer—allegedly said that she felt "interrogated" by Tonya during her conversation with Tonya about the August 14 meeting, and that Tonya asked Knipplemeyer if she reported her to Human Resources. PSOF ¶ 358. Tonya denies interrogating anyone on her team, and Tonya also denies asking anyone on her team whether they reported her to Human Resources. PSOF ¶ 359. Tonya simply asked members of her team whether "they had the impression" on August 14 that she

**suggested anything to them about planned layoffs, and if so, whether they communicated that conclusion (albeit a mistaken conclusion) to any other person at AMC. PSOF ¶ 360.**

143. AMC spoke to three additional female witnesses on August 27, 2019—Ellen, Jillian, and Sandler. (Ex. 3, Chavarria Dec., at ¶ 31.)

**RESPONSE: Uncontroverted.**

144. Ellen told AMC that Mangels' comments during the August 14 team meeting surprised her. Ellen stated that Mangels had referenced "rumors," that people had "heard things" and Mangels further stated that while she (Mangels) does not have any specific information, it's going to be a "rough couple of weeks." Ellen told AMC that while Mangels made these comments she teared up. Ellen explained that while she did not believe her direct reports had been speculating regarding a potential layoff before the August 14 team meeting, she recalled anticipating (after hearing Mangels' comments) that her direct reports in the meeting would now speculate about a layoff and be concerned about their jobs. Ellen said that did happen and team members came to her with concerns based on Mangels' behavior. Ellen added that Mangels' behavior made her "uncomfortable." Ellen also reported that she was present for a meeting where Mangels informed Ellen's team that Mangels had been reported to Human Resources regarding the August 14 team meeting. And in a separate meeting between Mangels and Ellen, Mangels asked Ellen if she knew who reported Mangels and Mangels further told Ellen that Mangels thought it was Trotter. (Ex. 58, Blanner Dec., at ¶ 3.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact."). _See_ Scheduling Order [Doc. 41] at ¶ 6. Setting that deficiency aside, controverted.**

**Statements About the August 14 Meeting**

During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF. PSOF ¶ 350. When Tonya's team inquired about the possibility of a RIF, Tonya was required to address the issue with her team members just like Michael Pursell, Rosalind Reeves, Robert Lane, and Robert Kim were required to address that issue with their team members, but Tonya told her team that she was not aware of any upcoming RIF, and that they should "keep [their] heads down, you know, just stay out of the fray and stay focused on what you can control…." PSOF ¶ 351. Again, Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. PSOF ¶ 352.

The remainder of this witnesses' statements about the August 14 meeting are irrelevant and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

No direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred.

**PSOF ¶ 315.**  Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team.  PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

### Tonya's Subsequent Discussions with her Team About AMC's "RIF investigation"

In addition, and after Phase I of the investigation concluded, Mutzbauer and Chavarria's investigation broadened into a second phase that involved their inquiry into the question of whether Tonya somehow improperly "interrogated" people on her team about what occurred during the August 14 meeting.  PSOF ¶ 353.  Importantly, Colanero never instructed Tonya that she was not permitted to go back and speak with her team and ask them about, "hey, guys, was there anything I said to you during our August 14 meeting that was concerning to you."  PSOF ¶ 354.  Chavarria and Mutzbauer also confirmed that they were not aware of anyone at AMC telling Tonya that she was not permitted to follow up with her own team to ask about them about the August 14 meeting and whether there was anything Tonya said that was concerning to them.  PSOF ¶ 355.

Chavarria did not conduct any interviews related to Phase 2 of the investigation aside from attending one interview with Tonya; all Phase 2 interviews were conducted by Mutzbauer.  PSOF ¶ 356.  During Phase 2, Mutzbauer interviewed three (3) out of the ten (10) people present for the August 14 meeting; two of them (Ellen Blanner and Lauren Doyle) said nothing about Tonya "interrogating" them, and did not use that word.  PSOF ¶ 357.

According to Mutzbauer, only one employee—Jillian Knipplemeyer—allegedly said that she felt "interrogated" by Tonya during her conversation with Tonya about the August 14 meeting, and that Tonya asked Knipplemeyer if she reported her to Human Resources.  PSOF ¶ 358.  Tonya denies interrogating anyone on her team, and Tonya also denies asking anyone on her team whether they reported her to Human Resources.  PSOF ¶ 359.  Tonya simply asked members of her team whether "they had the impression" on August 14 that she suggested anything to them about planned layoffs, and if so, whether they communicated that conclusion (albeit a mistaken conclusion) to any other person at AMC.  PSOF ¶ 360.

145.    Jillian told AMC the following:

a.    During the August 14 team meeting, Mangels started crying (she reported seeing actual tears) and then Mangels stated that she wanted to acknowledge the rumors out there and, after a "really" long pause, Mangels said something to the effect of "next week will be a difficult week." Jillian also reported that Mangels also said that she was not part of any discussions and doesn't know what will happen but that she just wanted to acknowledge the rumors.

b.    Mangels' behavior led Jillian to consider cancelling her vacation scheduled for the next week and that the team appeared confused and anxious after the meeting.

155

c.    On the evening of August 21, 2019, Mangels sent Jillian a text and asked for a call (while Jillian was on vacation). Jillian described Mangels as "interrogating" her regarding what Jillian believed Mangels said during the August 14 team meeting and who reported her to Human Resources. Jillian stated that she was very uncomfortable and felt Mangels pointed the finger at her with respect to the report to Human Resources.

d.    Mangels asked Jillian to tell her what she recalled Mangels saying during the August 14 team meeting, and then Mangels spent several minutes telling Jillian what Mangels felt she had said (and did not say) during the August 14 team meeting.

e.    Mangels then told Jillian that she had talked to everyone else and they denied reporting her to Human Resources. Mangels told Jillian that she suspected that Trotter had reported her and at one point Mangels (in response to something she thought Jillian had said) snapped, "See you just told me you told Carrie!"— which Jillian denied.

f.    Mangels "dominated" the conversation.

g.    Jillian stated that Mandy (her direct report) had told her that Mangels had spoken to her individually as well regarding the August 14 team meeting.

(Ex. 57, Mutzbauer Dep., at 152:5-25; 153:1-6; Ex. 61, Declaration of Jillian Knippelmeyer, at ¶¶

6-17.)

**RESPONSE:  This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").  *See* Scheduling Order [Doc. 41] at ¶ 6.  Setting that deficiency aside, controverted.**

**Statements About the August 14 Meeting**

**During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF.  PSOF ¶ 350.  When Tonya's team inquired about the possibility of a RIF, Tonya was required to address the issue with her team members just like Michael Pursell, Rosalind Reeves, Robert Lane, and Robert Kim were required to address that issue with their team members, but Tonya told her team that she was not aware of any upcoming RIF, and that they should "keep [their] heads down, you know, just stay out of the fray and stay focused on what you can control…."  PSOF ¶ 351.  Again, Tonya never told her team about the RIF**

in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. PSOF ¶ 352.

The remainder of this witnesses' statements about the August 14 meeting are irrelevant and immaterial for purposes of summary judgment. As discussed above, when Chavarria and Mutzbauer began their investigation, the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. PSOF ¶ 307.

No direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. PSOF ¶ 316.

Thus, regardless of what this witnesses said, no witness in this case ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place."

**Tonya's Subsequent Discussions with her Team About AMC's "RIF investigation"**

In addition, and after Phase I of the investigation concluded, Mutzbauer and Chavarria's investigation broadened into a second phase that involved their inquiry into the question of whether Tonya somehow improperly "interrogated" people on her team about what occurred during the August 14 meeting. PSOF ¶ 353. Importantly, Colanero never

instructed Tonya that she was not permitted to go back and speak with her team and ask them about, "hey, guys, was there anything I said to you during our August 14 meeting that was concerning to you." PSOF ¶ 354. Chavarria and Mutzbauer also confirmed that they were not aware of anyone at AMC telling Tonya that she was not permitted to follow up with her own team to ask about them about the August 14 meeting and whether there was anything Tonya said that was concerning to them. PSOF ¶ 355.

Chavarria did not conduct any interviews related to Phase 2 of the investigation aside from attending one interview with Tonya; all Phase 2 interviews were conducted by Mutzbauer. PSOF ¶ 356. During Phase 2, Mutzbauer interviewed three (3) out of the ten (10) people present for the August 14 meeting; two of them (Ellen Blanner and Lauren Doyle) said nothing about Tonya "interrogating" them, and did not use that word. PSOF ¶ 357.

According to Mutzbauer, only one employee—Jillian Knipplemeyer—allegedly said that she felt "interrogated" by Tonya during her conversation with Tonya about the August 14 meeting, and that Tonya asked Knipplemeyer if she reported her to Human Resources. PSOF ¶ 358. Tonya denies interrogating anyone on her team, and Tonya also denies asking anyone on her team whether they reported her to Human Resources. PSOF ¶ 359. Tonya simply asked members of her team whether "they had the impression" on August 14 that she suggested anything to them about planned layoffs, and if so, whether they communicated that conclusion (albeit a mistaken conclusion) to any other person at AMC. PSOF ¶ 360.

146. Sandler told AMC the following:

a. Mangels and Sandler had a private discussion on August 15, 2019. Mangels asked Sandler something to the effect of "you know what's happening next week" to which Sandler said yes (as Sandler thought Mangels was referring to a work project). As Sandler continued speaking Sandler realized she did not know what Mangels was referring to and said so—to which Mangels asked Sandler if she did not know about the layoffs next week. When Sandler inquired of Mangels how she knew about layoffs (because Sandler did not know) Mangels replied that "not everyone is as tight lipped as Stephen." Sandler and Mangels then agreed that because Colanero had not spoken to either of them about the layoff they must both be "on the chopping block."

b. As a result of the information from Mangels, Sandler reached out to Trotter that day and told her of her concerns for her job based on what Mangels had shared. Trotter denied knowing anything about a layoff.

c. On August 21, 2019, Mangels came into Sandler's office and shut the door. Mangels asked Sandler if she had reported her to Colanero and Mangels stated that she had just asked every single member of her team and they denied reporting her. While Sandler repeatedly denied reporting Mangels, Sandler described the encounter as Mangels "let me have it," she was "mad," "pointed in her words," and used "exaggerated motions." Mangels then went through in detail what she claimed she said during the August 14 team meeting, specifically denying that she was

"emotional" (saying she was passionate) and claiming that her comments were about the budget and telling her team not to get cocky.

d.    Sandler shared that people treat Mangels cautiously because of her "retaliatory behaviors." Sandler also mentioned that she had heard negative feedback about Mangels during follow-up discussions related to the AEI survey—specifically from Carly. Sandler reported that she was reluctant to share the feedback with Mangels because of Mangels' anticipated reaction to the same.

(Ex. 52, Sandler Dec., at ¶¶ 13, 14, 17, 19.)

**RESPONSE:  This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact.").  *See* Scheduling Order [Doc. 41] at ¶ 6.  Setting that deficiency aside, controverted.**

**<u>Sub-paragraph (a)</u>:  This is not an accurate description of the conversation between Tonya and Pamela Sandler on August 15, 2019.  It would have been impossible for Tonya to tell Sandler about any planned layoffs on August 15 because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20.  PSOF ¶ 352.**

**During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF.  PSOF ¶ 350.  *See* Plaintiff's response to DSOF ¶ 128 for a lengthier discussion on that subject.**

**Tonya also explained during her deposition that, when she had a conversation with Pamela Sandler on August 15, 2019, Tonya and Sandler generally discussed the fact that there was widespread rumor and speculation throughout the company about possible layoffs and nothing more.  PSOF ¶ 516.  Tonya testified that "[i]t was just water cooler talk," and that "…it came up in a conversation with Pamela and I'm, like, yeah, there's people talking about it."  PSOF ¶ 517.  That was the extent of the conversation.**

**<u>Sub-paragraph (b)</u>:  This sub-paragraph is controverted because it once again refers to an inaccurate description of the conversation between Tonya and Pamela Sandler on August 15, 2019.**

**<u>Sub-paragraph (c)</u>:  This is not an accurate description of the conversation between Tonya and Pamela Sandler on August 21, 2019.  Tonya testified in her deposition that she "absolutely" denies "Pam's version of that conversation" in which Tonya allegedly "confronted her aggressively," "pointed [her] finger and pounded the table," and "demanded to know who reported [her] to Stephen and HR."  PSOF ¶ 518.**

Tonya testified that it was a "super casual" conversation. PSOF ¶ 519. Tonya recalls "asking Pam if she started the started the rumor" and "went to Stephen" with suggestions about how Tonya supposedly discussed the issue with her team on August 14. PSOF ¶ 520. Tonya "was emotional, but she was definitely not furious." PSOF ¶ 521.

As it turns out, Tonya's suspicions about Sandler peddling false information and rumors about Tonya's handling of the August 14 meeting were well founded. Jordan Crouch ran into Vice President Pamela Sandler on August 22, and suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week." PSOF ¶ 318. Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated. PSOF ¶ 319. Jordan Crouch expressly denied the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting. PSOF ¶ 320.

Sub-paragraph (d): This sub-paragraph is immaterial and should not be considered for purposes of summary judgment because it relies on hearsay from AEI reports and hearsay statements from a person named "Carly."

147. Following her interview, Sandler sent AMC a summary of the concerns Carly reported to her about Mangels earlier that year. (Ex. 52, Sandler Dec., at ¶ 20.)

RESPONSE: Controverted. The statements attributable to "Carly" are hearsay, and should not be considered when ruling on summary judgment. AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from the purported speaker in support of her own statements referenced above.

148. On September 11, 2019, AMC met with Mangels and she made the following statements:

a. When asked if she had a discussion with Sandler on August 15, 2019, wherein Mangels told or implied to Sandler a layoff would occur the following week, Mangels responded that in theory she did not know about the layoff.

b. When asked if she made the comment "not everyone is as tight lipped as Stephen [Colanero]," Mangels, after an extended pause, denied making the comment.

c. When asked about the LinkedIn post Trotter reported she saw on Mangels' page the week before the layoff, Mangels admitted she had posted something about things being out of your control but denied that the post had anything to do with AMC/work. Mangels admitted that she intentionally deleted the post at or around the time of the layoff announcement due to the layoff announcement.

d. Mangels admitted to having a discussion with Sandler on August 21, 2019. She described the discussion as "super casual" and stated that the discussion was about

comments Sandler made to Jordan. Mangels denied making any accusatory comments to Sandler about reporting her to.

(Ex. 2, Mangels Dep., at 355:18-25; 356; 362:12-24; 363:25; 364:1-18.)

**RESPONSE: This paragraph violates Local Rule 56.1 and this Court's Second Amended Scheduling Order which requires that "[a]ll dispositive motions shall have a separate section wherein each statement of fact is individually numbered so that any party opposing such motion may refer specifically to a genuine issue of material fact."). *See* Scheduling Order [Doc. 41] at ¶ 6. Setting that deficiency aside, each sub-paragraph is addressed individually below:**

**Sub-paragraph (a): This is generally accurate. It would have been impossible for Tonya to tell Sandler about any planned layoffs on August 15 because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. PSOF ¶ 352.**

**During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF. PSOF ¶ 350. *See* Plaintiff's response to DSOF ¶ 128 for a lengthier discussion on that subject.**

**Tonya also explained during her deposition that, when she had a conversation with Pamela Sandler on August 15, 2019, Tonya and Sandler generally discussed the fact that there was widespread rumor and speculation throughout the company about possible layoffs and nothing more. PSOF ¶ 516. Tonya testified that "[i]t was just water cooler talk," and that "…it came up in a conversation with Pamela and I'm, like, yeah, there's people talking about it." PSOF ¶ 517. That was the extent of the conversation.**

**Sub-paragraph (b): Controverted. Tonya did not deny making that statement during the investigation. SOF ¶ 522.**

**Sub-paragraph (c): Controverted. The testimony cited by AMC does not support the statement that "Mangels … intentionally deleted the [Linkedin] post at or around the time of the layoff announcement <u>due to the layoff announcement</u>." There is no reference to the reasons, if any, for which the post was deleted.**

**Sub-paragraph (d): Uncontroverted. As it turns out, Tonya's suspicions about Sandler peddling false information and rumors about Tonya's handling of the August 14 meeting were well founded. Jordan Crouch ran into Vice President Pamela Sandler on August 22, and suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week." PSOF ¶ 318. Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated. PSOF ¶ 319. Jordan Crouch expressly <u>denied</u> the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting. PSOF ¶ 320.**

149. <u>None</u> of the witnesses interviewed during the investigation—other than Mangels—had knowledge of Mangels' charge of discrimination, the allegations she made in May 2018, or any requests by Mangels to AMC to have her compensation reviewed or increased. (Ex. 2, Mangels Dep., at 81:5-11; 327:3-25; 326-328-329; Ex. 27, Trotter Dec., at ¶ 23; Ex. 52, Sandler Dec., at ¶ 22; Ex. 58, Blanner Dec., at ¶ 5; Ex. 60, Powers Dec., at ¶ 6.)

**RESPONSE: Controverted. If AMC seeks to support the broad statement that "[n]one of the witnesses interviewed during the investigation—other than Mangels—had knowledge of Mangels' charge of discrimination, the allegations she made in May 2018, or any requests by Mangels to AMC to have her compensation reviewed or increased," then AMC needs to name each person to which it refers, and AMC needs to supply a sworn declaration, sworn deposition testimony, or an affidavit from each purported witness in support of that broad assertion. None of that has been done here, and it is black letter law that witnesses cannot generally testify about the thoughts, knowledge, and insights of others. This paragraph is not properly supported, and should be disregarded for purposes of summary judgment.**

150. Based on the information learned in its investigation, AMC concluded that Mangels had violated its expectations for officers. Specifically, AMC concluded that Mangels: (1) led others to reasonably fear for their jobs; (2) interfered with AMC's investigation by conducting her own investigation and confronting multiple individuals in an effort to determine who reported her to Human Resources; (3) provided incorrect or misleading information to AMC; and (4) failed to acknowledge that anything she did was inappropriate or, at a minimum, was misguided. (Ex. 3, Chavarria Dec., at ¶ 32; Ex. 62, Audio & Transcript of September 30, 2019 recording).

**RESPONSE: Controverted. AMC's "RIF investigation" was pretextual, discriminatory, and retaliatory. Tonya felt "targeted" and "badgered" by Human Resources throughout the "RIF investigation" because, in her view, she <u>alone</u> was investigated for tactfully and professionally responding to an issue that was the subject of widespread speculation and discussion throughout the company through no fault of her own. PSOF ¶ 361. During her interview with Chavarria, Tonya told Chavarria that she felt like the investigation was a form of retaliation because she had a pending charge with the EEOC. PSOF ¶ 362. Chavarria recalls Tonya possibly referring to her pending charge during their discussion, but she refuses to admit that Tonya referenced the EEOC charge in relation to her belief that she was being subjected to retaliation. PSOF ¶ 363.**

Chavarria is not aware of anyone at AMC ever generating a written report of findings in relation to the "RIF" investigation that Chavarria conducted with Mutzbauer—even though Chavarria acknowledges that, as an HR professional, it is a "best practice" to generate such a report. PSOF ¶ 364. She instead contends that "some" of the findings are contained in an email generated by Mutzbauer, and that the termination script from Chavarria's September 30, 2019 termination meeting with Tonya also contained "part of [AMC's] findings." PSOF ¶ 365. Mutzbauer generated her recap email on September 3, 2019 containing "some" of AMC's findings from the "RIF investigation," but Tonya was not formally terminated until September 30, 2019. PSOF ¶ 366.

On September 20, 2019, Plaintiff mediated her EEOC claims against AMC with a private mediator; Colanero attended the mediation on behalf of AMC, and the matter did not resolve. PSOF ¶ 367. After the failed mediation, Tonya sent Colanero and Chavarria the email attached hereto in Exhibit 46, and said the following:

> Stephen and Carla,
>
> I have always put my heart and soul into my work at AMC and remain committed to that endeavor. I have continuously grown as an executive and leader in this Company, and, together with my team, have delivered very strong results consistently over the years with increasing breadth of impact. In addition, I continue to spearhead strategic innovations and explorations for the future growth of AMC. My relationships with internal cross-functional partners, dotted line support to Programming/F&B and key vendor partners are incredibly strong. The engagement and teamwork within my group has never been more solid. We are achieving some phenomenal accomplishments and realizing incredible synergies. I'm completely invested and have a great deal of equity built up over the last 10 years.



> I want you to know that I am committed to my career at AMC and am not looking for a path out of the company. That was fundamentally never the intent of expressing my concerns. If you are open to it, I would welcome a discussion on how to move forward.
>
> Thank you,
> Tonya Mangels

PSOF ¶ 368.

Tonya's May 6 EEOC charge was still pending at the time of her September 23 email, and it was still pending at the time of her discharge on September 30, 2019. PSOF ¶ 369.

**Tonya's Retaliatory and Discriminatory Termination**

At the conclusion of AMC's "RIF investigation," and close in time to the failed mediation, Chavarria reported to Colanero that Tonya "acted inappropriately as an officer, that she had caused fear among her team and given them reason to fear for their jobs, and that she had acted unprofessionally in conducting her own investigation, and tried to pressure witnesses, and to find out who potentially had reported her." PSOF ¶ 370. Colanero accepted Chavarria's conclusions in their entirety, and did not interview any of Tonya's team members to reach his own assessment of the allegations/conclusions. PSOF ¶ 371.

None of the employees on Tonya's team ever reached out to Colanero in order to communicate that Tonya caused them to be fearful of losing their jobs. PSOF ¶ 372. Colanero and Chavarria reached their decision to terminate Tonya before they reached out to Adam Aron on a phone call in order to advise Adam Aron of their intention to terminate. PSOF ¶ 373. Colanero spoke to Adam Aron in "broad terms of questioning [Tonya's] integrity, honesty, being forthright, and just it being the right time to separate based upon the most recent disciplinary action, coupled with past performance." PSOF ¶ 374. Chavarria verbally agreed with Colanero, and Adam Aron "told [them] if that's what you think you should do," and did not express any objections. PSOF ¶ 375.

According to Adam Aron, he was not "actively involved in the career management of Tonya Mangels." PSOF ¶ 376. Adam Aron was aware that Tonya had a pending charge of discrimination before she was terminated, but he never read it. PSOF ¶ 377. "[H]er complaint to the EEOC was not something that [he] looked at or was concerned about…in the performance of his job duties as CEO of a $5 billion company with a lot of issues on [his] plate…." PSOF ¶ 378. Chavarria was aware that Tonya's May 6 Charge was still pending with the EEOC on the date she was terminated. PSOF ¶ 379.

No one else at AMC—other than Tonya—was ever investigated in relation to allegedly discussing the potential for layoffs within the company prior to the formal announcement of the RIF. PSOF ¶ 380. No one else at AMC—other than Tonya—was ever written up, disciplined, terminated, or suffered any other adverse employment action because they were allegedly talking about potential layoffs prior to the formal announcement of the RIF. PSOF ¶ 381.

151. Colanero did not participate in witness interviews. He was advised of the determinations reached by AMC as a result of the investigation. (Ex. 4, Colanero Dep., at 351:17-19; 360:7-24.)

164

**RESPONSE: Uncontroverted that Colanero accepted Chavarria's conclusions in their entirety, and did not interview any of Tonya's team members to reach his own assessment of the allegations/conclusions. PSOF ¶ 371.**

152. AMC considered the determinations reached in the recent investigation, Mangels' prior final written warning in 2018 that also addressed poor judgment and lack of candor during an internal investigation, and concluded that it had lost trust that Mangels could/would meet its expectations for officers. (Ex. 3, Chavarria Dec., at ¶ 33; Ex. 62.)

**RESPONSE: Controverted. At the conclusion of AMC's pretextual, discriminatory, and retaliatory "RIF investigation" (as discussed in response to DSOF ¶ 151), and close in time to the failed mediation, Chavarria reported to Colanero that Tonya "acted inappropriately as an officer, that she had caused fear among her team and given them reason to fear for their jobs, and that she had acted unprofessionally in conducting her own investigation, and tried to pressure witnesses, and to find out who potentially had reported her." PSOF ¶ 370. Colanero accepted Chavarria's conclusions in their entirety, and did not interview any of Tonya's team members to reach his own assessment of the allegations/conclusions. PSOF ¶ 371.**

**Colanero and Chavarria reached their decision to terminate Tonya before they reached out to Adam Aron on a phone call in order to advise Adam Aron of their intention to terminate. PSOF ¶ 373. Colanero spoke to Adam Aron in "broad terms of questioning [Tonya's] integrity, honesty, being forthright, and just it being the right time to separate based upon the most recent disciplinary action, coupled with past performance." PSOF ¶ 374. Chavarria verbally agreed with Colanero, and Adam Aron "told [them] if that's what you think you should do," and did not express any objections. PSOF ¶ 375.**

153. Mangels agreed that it is reasonable for an employer: to expect employees to be truthful; to expect candor and forthrightness from employees during an internal investigation; to rely on information provided by employees during an investigation; to expect officers not to disclose non-public information related to a layoff before it is announced; and to expect VPs to exercise good business judgment. Mangels has admitted that "professional judgement" can be subjective and "people have varying impressions …" (Ex. 2, Mangels Dep., at 17:20-25; 18:1-2; 126:4-24; 127:12-15; 133:17-25; 134:1-3.)

**RESPONSE: Uncontroverted that "Mangels agreed that it is reasonable for an employer: to expect employees to be truthful; to expect candor and forthrightness from employees**

during an internal investigation; … to expect officers not to disclose non-public information related to a layoff before it is announced; and to expect VPs to exercise good business judgment," uncontroverted that Mangels agreed that it is "reasonable for an employer to rely on information provided by employees" depending on the "context" of each given situation (as discussed at Defts. Ex. 2, Mangels Dep., at 126:19-127:2), and uncontroverted the Tonya testified: "I believe that I tried to exhibit good professional judgment. I think that that is a subjective point of view and people have varying impressions or attitudes about that, so." (as discussed at Defts. Ex. 2, Mangels Dep., at 17:24-18:2).

Controverted in any other respects in which AMC seeks to suggest or create the inference that Tonya agreed with AMC relying on the results of its pretextual, discriminatory, and retaliatory "RIF investigation" for the same reasons discussed at length in response to DSOF ¶ 128.

154. Mangels was terminated on September 30, 2019 and was provided a summary of the reasons supporting AMC's decision. (Ex. 4, Colanero Dep., at 20:23-25; Ex. 1, Chavarria Dep., at 307:5-22; Ex. 2, Mangels Dep., at 13:19-24; 364:22-25; Ex. 62.)

RESPONSE: Uncontroverted that "Mangels was terminated on September 30, 2019," but controverted that Tonya was provided a summary of the reasons supporting AMC's decision.

Chavarria is not aware of anyone at AMC ever generating a written report of findings in relation to the "RIF" investigation that Chavarria conducted with Mutzbauer—even though Chavarria acknowledges that, as an HR professional, it is a "best practice" to generate such a report. PSOF ¶ 364. She instead contends that "some" of the findings are contained in an email generated by Mutzbauer, and that the termination script from Chavarria's September 30, 2019 termination meeting with Tonya also contained "part of [AMC's] findings." PSOF ¶ 365. Mutzbauer generated her recap email on September 3, 2019 containing "some" of AMC's findings from the "RIF investigation," but Tonya was not formally terminated until September 30, 2019. PSOF ¶ 366.

On September 20, 2019, Plaintiff mediated her EEOC claims against AMC with a private mediator; Colanero attended the mediation on behalf of AMC, and the matter did not resolve. PSOF ¶ 367. When Tonya was terminated on September 30, 2019, Chavarria read to her from a script, and never supplied her with a written explanation describing the results of AMC's "RIF investigation" or the basis for her termination. PSOF ¶ 523.

155. Following Mangels' termination, she was not replaced by AMC. Rather, Sandler took on most of the responsibilities previously performed by Mangels (and an existing female

director took on the remaining responsibilities). (Ex. 7, Jennifer Douglass Dep., at 49:16-25; 50:1-14; Ex. 52, Sandler Dec., at ¶ 23; Ex. 17, Frank Dec., at ¶ 4.)

**RESPONSE:  Controverted.  Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated.  PSOF ¶ 319.**

## III. PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS ("PSOF")[11]

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff submits the following statement of additional, controverted and uncontroverted material facts in opposition to Defendant's Motion for Summary Judgment:

1.     Tonya Mangels ("Tonya") was hired by AMC in 2009; her title was Director, Food & Beverage Programs and Promotions, and she was initially responsible for building a new role at AMC in order to grow the Food & Beverage business.  DSOF ¶ 2; (Ex. 10, dec. of Mangels, at ¶ 1).

2.     She started with no one else on her team.  (Ex. 10, dec. of Mangels, at ¶ 2).

3.     **1 Direct Report:**  Tonya added one direct report (Josh Diekman) in June 2010 due to her increased responsibilities for handling multiple Food & Beverage promotions, Coca-Cola partnership/legal approvals, AMC menu board and pricing changes, grand openings of Dine-In Theaters, and her testing/launching of new concepts and menu offerings such as Marketplace, Concession Freshen, and Made-to-Order beverages.  (Ex. 10, dec. of Mangels, at ¶ 3).

4.     Tonya began reporting to AMC's Executive Vice President ("EVP") and Chief Marketing Officer Stephen Colanero ("Colanero") in November 2010 when she was still a Director.  (Ex. 2, Colanero depo., at 100:2-14); DSOF ¶ 3 (Colanero title).

5.     Colanero does not recall Tonya ever declining a single assignment, and he agrees that Tonya is one of the hardest working employees that has ever worked for him at AMC.  (Ex. 2, Colanero depo., at 21:24-22:5).

---

11 An index of the exhibits identified by Defendant is attached as Exhibit. 53.

6.     Colanero believes that Tonya wanted AMC to succeed, that she demonstrated a positive and willing work ethic, and that she was willing to take on ambitious initiatives similar to other Vice Presidents in the organization.  (Ex. 2, Colanero depo., at 94:2-13).

7.     **2 Direct Reports:**  In 2011, Tonya added a second direct report to her team (Lauren Doyle); she also received expanded responsibilities associated with AMC's growing Dine-In Theater business and bar marketing, the launch/testing of AMC's Smart MovieSnacks offering, and a new Cafe concept.  (Ex. 10, dec. of Mangels, at ¶ 4); (Ex. 2, Colanero depo., at 100:15-22) (growth of Tonya's team).

8.     In 2012, Tonya received expanded responsibilities with AMC's aggressive, national rollout of the Coca-Cola Freestyle offering, and she was also a key contributor in AMC's efforts to launch multiple new service offerings and initiatives in many locations (e.g., Mini-Macguffin bars, Marketplace, Concession Freshen, Freestyle, Café, and Marketplace Express). (Ex. 10, dec. of Mangels, at ¶ 5).

9.     Tonya was promoted to Vice President at AMC in June 2013, and Colanero supported the promotion.  (Ex. 1, Mangels depo., at 185:21-186:9); (Ex. 2, Colanero depo., at 100:23-101:3).

10.     In 2013, Tonya received expanded responsibilities associated with AMC's efforts to move from printed/static menu boards to digital signage, and AMC's efforts to grow its alcohol/bar business (i.e., increased collaboration with AMC's alcohol vendors on promotions and menu/pricing features); she also played a key role in AMC's efforts to continually launch its newer service offerings in additional locations (e.g., Mini-Mac bars, Hot Foods menu, Marketplace, Marketplace Express, Freestyle, and Concession Freshen).  (Ex. 10, dec. of Mangels, at ¶ 6).

11.     In December 2013, one of Tonya's direct reports (Josh Diekmann) was promoted but remained on Tonya's team.  (Ex. 2, Colanero depo., at 101:4-10).

12.     Exhibit 3 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero in February 2014 for the calendar year 2013.  (Ex. 2, Colanero depo., at 105:14-106:5) (referring to Depo. Ex. 102); (Ex. 3, Depo. Ex. 102).

13.     Colanero rated Tonya with an overall rating of "successful."  (Ex. 2, Colanero depo., at 105:14-106:5) (referring to Depo. Ex. 102).

14.     Colanero described Tonya as "a strong contributor to a growing part of the business," as someone that supported "a wide range of initiatives that were in various stages of development," as someone that showed "strong leadership in her development of her team," and as "**overall a valuable member of both the marketing team and the food and beverage team**." (Ex. 2, Colanero depo., at 107:3-23) (referring to Depo. Ex. 102) (emphasis added).

15.     In 2014, Tonya received expanded responsibilities associated with AMC's effort to launch another new concept called AMC Red Kitchen (which incorporated ipad/tablet ordering and digital signage), AMC's efforts to develop the technology and user experience elements for AMC's digital ordering, and AMC's efforts to expand the installations of AMC's digital signage. (Ex. 10, dec. of Mangels, at ¶ 7).

16.     **3 Direct Reports:**   In the fall of 2014, Colanero gave Tonya additional responsibilities for departmental budgeting, "cross-marketing," and for handling AMC's "print production/supply chain;" she also added another direct report (Angela Baskins) for a total of three full-time reports.  (Ex. 2, Colanero depo., at 108:21-109:12, 112:7-11) (cross-marketing).

17.     Exhibit 4 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero in March 2015 for the calendar year 2014.  (Ex. 2, Colanero depo., at 110:5-16) (referring to Depo. Ex. 103); (Ex. 4, Depo. Ex. 103).

18.     Colanero rated Tonya with an overall rating of "successful."  (Ex. 2, Colanero depo., at 110:5-16) (referring to Depo. Ex. 103).

19.     Colanero described Tonya as someone that "continues to grow and improve as an executive officer for the company while delivering ongoing *excellent results* along the way," and as someone that was showing "early leadership and vision" in her recently added responsibilities.  (Ex. 2, Colanero depo., at 111:4-112:22) (referring to Depo. Ex. 103) (emphasis added).

20.     Tonya also received the CEO's "Playing Offense" Award in 2014, which is described internally at AMC as "the highest form of recognition and reward to a select few who went above and beyond in playing offense, delivering extra-ordinary results through discretionary effort, and/or advancing the business with innovative thought leadership."  (Ex. 10, dec. of Mangels, at ¶ 8).

### 2015 Accounting Issue

21.     Colanero had "overall responsibility" for the marketing budget.  (Ex. 2, Colanero depo., at 110:1-4).

22.     In 2015, an internal auditor at AMC named Kathy Weekley discovered an accounting issue involving expense violations from a Social Media Manager named Justin Gardner, and Exhibit 5 hereto is a true and accurate copy of the May 2015 write-up that was issued by Colanero to Tonya in relation to those accounting issues.  (Ex. 2, Colanero depo., at 113:1-7, 114:3-6, 115:12-23) (referring to Depo. Ex. 105); (Ex. 5, Depo. Ex. 105) (May 2015 write-up).

23.     Justin Gardner, i.e., the employee accused of the expense violations, reported to an AMC Director named Shane Adams, and Shane Adams reported to a different Vice President named Brent Cooke—who ultimately reported to Colanero.  (Ex. 2, Colanero depo., at 118:17-119:23).

24.     Justin Garner was not in Tonya's chain of command, and Colanero acknowledges that he never gave Tonya an instruction indicating that she could direct Brent Cooke in the way that he or his employees were spending money within the budget.  (Ex. 2, Colanero depo., at 119:15-23, 120:13-17).

25.     Colanero agrees there was no ordinary business channel through which Justin Gardner's actual expense reports would have gone up the chain to Tonya.  (Ex. 2, Colanero depo., at 132:1-6).

26.     Tonya did not have access to expense reports in order to reach determinations on the propriety of any specific expenditures that were within Colanero's budget.  (Ex. 1, Mangels depo., at 202:1-203:17).

27.     Colanero acknowledges that he failed in his "lack of oversight," and that he failed in trusting "[his] team to be following correct policies and procedures," in relation to the Justin Gardner expenditures that were the subject of Tonya's May 2015 write-up.  (Ex. 2, Colanero depo., at 127:5-11).

28.     Despite his own professed failures, Colanero was never written up for any issues related to the Justin Gardner expenditures.  (Ex. 2, Colanero depo., at 43:13-20, 127:12-128:22).

29.     According to Tonya, the May 2015 write-up was a "bogus" written warning issued by Colanero to avoid responsibility for his own mistakes, and to avoid reporting the issue to AMC's board.  (Ex. 1, Mangels depo., at 165:6-166:6, 195:22-197:7).

30. Colanero apologized to Tonya for the May 2015 warning, and he justified his effort to avoid written accountability by referring to the fact that he had three kids, college expenses, and a family for which to provide. (Ex. 1, Mangels depo., at 196:1-197:7).

31. Colanero agrees that Tonya's job description never listed her as a "controller," and Tonya was never compensated for any duties associated with being a "controller." (Ex. 2, Colanero depo., at 115:18-116:8); (Ex. 5, May 2015 write-up).

32. Colanero never gave Tonya any formal or informal training on how to perform her departmental budgeting responsibilities—aside from generally "guiding her to work with [AMC's] accounting department." (Ex. 2, Colanero depo., at 109:2-18, 125:14-24).

33. In addition to the above, a different employee named Letha Steffy was responsible for budgeting (or G&A certification) between 2010 and the fall of 2014 before Tonya assumed some of her duties. (Ex. 2, Colanero depo., at 122:9-19).

34. Tonya's May 2015 write-up concerned Justin Gardner's expense violations between January 2013 and March 2015 (which were repeat violations from 2012), and Colanero acknowledges that Tonya had no responsibility for anything that occurred in 2013 or 2014 until she ultimately assumed a portion of Letha Steffy's duties in the fall of 2014. (Ex. 2, Colanero depo., at 123:4-22); (Ex.5, May 2015 write-up).

35. Colanero was also not aware of anyone ever alerting Tonya to the fact that these types of violations were previously discovered and documented in a September 2012 audit summary at AMC well before Tonya assumed any responsibilities associated with the budget. (Ex. 2, Colanero depo., at 124:17-125:11) (Ex.5, May 2015 write-up) (referencing the September 2012 audit summary).

173

## Tonya's Additional Responsibilities and Accolades in 2015

36.     Despite the May 15 write-up, Tonya once again received the CEO's "Playing Offense" Award in 2015.  (Ex. 10, dec. of Mangels, at ¶ 9).

37.     Tonya also received additional responsibilities in 2015 associated with AMC's efforts to launch new service offerings (e.g., Mobile Ordering, Coke Teen Loyalty, Movie Feature Drinks, and Tin Merchandise), and among other new initiatives, she also worked with the Food & Beverage group, supply chain group, and pricing group to develop and launch the largest new menu overhaul in company history branded "Feature Fare" that eventually went live in nearly 400 locations.  (Ex. 10, dec. of Mangels, at ¶ 10).

38.     Between August 2015 and December 2015, Tonya also received additional responsibilities associated with the acquisition, planning, and marketing integration involved in AMC's acquisition of Starplex Cinemas.  (Ex. 2, Colanero depo., at 135:21-136:6).

39.     Tonya also assumed responsibility for managing an additional, temporary employee.  (Ex. 2, Colanero depo., at 136:7-10).

40.     Exhibit 6 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero in February 2016 for the calendar year 2015.  (Ex. 2, Colanero depo., at 136:13-22) (referring to Depo. Ex. 107); (Ex. 6, Depo. Ex. 107).

41.     Colanero rated Tonya with an overall rating of "successful."  (Ex. 2, Colanero depo., at 136:23-25) (referring to Depo. Ex. 107).

42.     Colanero did not utilize the 2015 review as an opportunity to revisit the Justin Gardner situation or the May 2015 write-up.  (Ex. 2, Colanero depo., at 137:1-8).

**AMC's Reporting Structure and its Internal Process for Adjusting Compensation**

43.     Adam Aron became the Chief Executive Officer of AMC in January 2016, and Colanero has directly reported Mr. Aron since that time.  (Ex. 2, Colanero depo., at 33:22-34:10); (Ex. 8, Aron depo., at 5:15-22, 9:24-10:8).

44.     Colanero testified that he directly interacts with Adam Aron between one and six times per week.  (Ex. 2, Colanero depo., at 36:21-25).

45.     Carla Chavarria[12] is AMC's Senior Vice President and Chief Human Resource Officer, and she has been the highest-ranking Human Resources employee at AMC since 2014. (Ex. 16, Chavarria depo., at 5:13-22, 19:20-23).

46.     Carla Chavarria also directly reports to Adam Aron, and she has done so throughout the entire time Adam Aron has been the CEO at AMC.  (Ex. 8, Aron depo., at 20:13-16).

47.     **According to Adam Aron, the only person that can adjust the compensation of a Vice President or higher within AMC is Adam Aron**.  (Ex. 8, Aron depo., at 30:20-31:18).

48.     Adam Aron testified: "The only person who can adjust the compensation of a vice president or higher in our company is me." (Ex. 8, Aron depo., at 31:6-8).

49.     Mike Giuseffi is AMC's Director of Compensation; he has served in that role, and has directly reported to Carla Chavarria, since 2006.  (Ex. 9, Giuseffi depo., at 4:11-13, 10:6-17, 11:9-21).

50.     Giuseffi directly supervises everyone else in the compensation department that falls under Chavarria.  (Ex. 9, Giuseffi depo., at 12:2-13:2).

---

12  In some of the attached emails and exhibits, Carla Chavarria is occasionally referenced as Carla "Sanders," but those two people are one in the same.

51.     According to Giuseffi, whenever a position materially changes in scope, content, expectations, or job specifications, his group works with the relevant department head in order to begin the process of evaluating whether the employee's compensation should be adjusted.  (Ex. 9, Giuseffi depo., at 16:9-17:16).

52.     That process begins with an evaluation of the job content and specifications listed in the "job questionnaire" designed to summarize the employee's role within the company, and it also necessitates conversations with the supervisor of that role in order to "really understand" their job specifications.  (Ex. 9, Giuseffi depo., at 16:9-17:16).

53.     In the case of Tonya, the expectation was for Tonya to initially address the relevant job changes and the need for increased compensation with Colanero, and for Colanero to present the issue to the compensation group for an evaluation.  (Ex. 9, Giuseffi depo., at 17:17-18:13).

54.     In the case of an officer (such as Tonya), the compensation group also "looped in" Chavarria on the process of evaluating the position and any pay adjustment recommendations. (Ex. 9, Giuseffi depo., at 18:14-20:7).

55.     Giuseffi also made clear that any recommendations from his group are not presented on a take-it-or-leave-it basis; when his group is dealing with someone at the VP level, the process is supposed to be a "collaborative effort" between Giuseffi's team, the supervisor of the role (i.e., Colanero), Chavarria, and the supervisor's supervisor, i.e., Adam Aron in this case. (Ex. 9, Giuseffi depo., at 20:8-21:1).

56.     If the compensation group fails to present satisfactory recommendations to the supervisor in charge (i.e., Colanero), the parties are expected to continue working through the process in order to reach an agreement that makes sense for the organization, and the supervisor

also has the authority to "push back" on any failure of Guiseffi's group to present satisfactory recommendations.  (Ex. 9, Giuseffi depo., at 21:2-16).

57.    Colanero agrees that, as the employee's supervisor, he always has the right to reject the recommendation of Giuseffi's group, and the right to take the position that his employee "deserves more."  (Ex. 2, Colanero depo., at 90:24-92:6).

58.    Guiseffi confirmed that his group spends 5% or less of its time analyzing specific employees in order to assess whether their job needs to be revalued within the organization; the balance of their time is spent on managing other compensation programs for theater operations, budgeting, processing employee incentives, and other responsibilities unrelated to compensation reviews.  (Ex. 9, Giuseffi depo., at 13:3-14:8).

**Additional Responsibilities, Accolades, and Tonya's Requests for Increased Compensation**

59.    Between February 2016 and December 2016, Tonya received additional responsibilities related to AMC's acquisition of Carmike Cinemas.  (Ex. 2, Colanero depo., at 137:9-25) (Carmike).

60.    She also assumed responsibility for managing an additional, temporary employee in relation to that acquisition.  (Ex. 2, Colanero depo., at 137:9-25).

61.    In March 2016, Tonya received additional responsibilities associated with transitioning AMC to a vendor called Nvision (and correcting inherited issues), and she was able to secure deal guarantees resulting in approximately $400,000.00 worth of savings for AMC.  (Ex. 2, Colanero depo., at 138:3-15, 157:24-158:3).

62.    **1st Request to Increase Compensation:**  Exhibit 7 hereto is a true and accurate copy of an email exchange between Colanero and Tonya on May 13, 2016.  (Ex. 2, Colanero depo., at 138:22-25) (referring to depo. Ex. 108); (Ex. 7, Depo. Ex. 108).

63. Colanero understood that the purpose of Tonya's May 13, 2016 email was to update her job description consistent with her increased job responsibilities, to have her updated job description reviewed by AMC's compensation department, and to seek Colanero's cooperation in advocating on her behalf for increased compensation based on her updated job description and additional responsibilities. (Ex. 2, Colanero depo., at 139:4-142:8) (referring to depo. Ex. 108).

64. Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any adjustments in Tonya's pay. (Ex. 2, Colanero depo., at 142:9-143:15).

65. Colanero agrees that, at the time of this request to revisit Tonya's compensation, Tonya's "responsibilities had continued to grow and her team was getting bigger." (Ex. 2, Colanero depo., at 146:22-147:2).

66. Colanero has no memory of what happened to the request after he submitted it, and he does not recall any conversations with Giuseffi or Chavarria about it. (Ex. 2, Colanero depo., at 143:16-23).

67. Colanero also does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya. Where does that stand?" (Ex. 2, Colanero depo., at 148:21-25).

68. Chavarria "didn't see this as a request for adjusting compensation," and does not recall whether anyone evaluated Tonya's compensation in relation to this request. (Ex. 16, Chavarria depo., at 67:11-72:19).

69. No one ever made Adam Aron aware of this request. (Ex. 8, Aron depo., at 51:15-52:8).

70. Tonya's compensation was never increased in response to this request to revisit her compensation in May 2016. (Ex. 10, dec. of Mangels, at ¶ 11).

71. **4 Direct Reports:** In July 2016, Tonya added two additional, direct reports to her team (Carli Allegri and Marti Hatridge), and had a total of four direct reports. (Ex. 2, Colanero depo., at 150:11-22).

72. **5 Direct Reports:** In September 2016, Tonya added one additional, direct report to her team (Sarah Pfeiffer), and had a total of five full-time direct reports. (Ex. 2, Colanero depo., at 150:20-151:4).

73. **2nd Request to Increase Compensation:** Exhibit 11 hereto is a true and accurate copy of an email exchange between Colanero, Rosalind Reeves (HR), Giuseffi, and Martin Stallbaumer from the October 23-26, 2016 timeframe. (Ex. 2, Colanero depo., at 151:5-152:12) (referring to depo. Ex. 110) (Ex. 11, Depo. Ex. 110).

74. Tonya had another conversation with Colanero in October 2016 in which she once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities. (Ex. 10, dec. of Mangels, at ¶ 12); (Ex. 2, Colanero depo., at 151:12-152:12) (referring to depo. Ex. 110, and confirming that he does not disagree with the fact that the emails exchanged in Exhibit 11 were a direct result of the October 2016 conversation with Tonya, and Tonya's additional request to adjust her compensation in that timeframe consistent with her increased job responsibilities.).

75. Colanero believes he informed Tonya in October 2016 that there would be no increase in her compensation because he was going to "challenge her and reward her later," and because she would have to "prove her openness and her ability" to be recognized down the road. (Ex. 2, Colanero depo., at 155:8-17).

76.     Colanero also issued a memorandum to Tonya on October 26, 2016 confirming her title change to "Vice President, Marketing – F&B and Brand Strategy" consistent with her additional responsibilities, and confirming that her "compensation remains unchanged at this time." (Ex. 2, Colanero depo., at 152:13-153:20 (discussing depo. Ex. 111)); (Exhibit 12, depo. Ex. 111).

77.     **6 Direct Reports:**  In December 2016, Tonya added one additional, direct report to her team (Lauren Makin), and had a total of six full-time direct reports.  (Ex. 10, dec. of Mangels, at ¶ 13).

78.     Exhibit 13 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero in January 2017 for the calendar year 2016.  (Ex. 2, Colanero depo., at 156:6-16) (referring to Depo. Ex. 112); (Ex. 13, Depo. Ex. 112).

79.     Colanero rated Tonya with an overall rating of **"exceeds expectations."**  (Ex. 2, Colanero depo., at 159:2-6) (referring to Depo. Ex. 112).

80.     Colanero commented about Tonya's "excellent performance" in 2016, he observed that "her area of responsibility continues to grow outside of food and beverage marketing and her contribution in these new areas has been strong," he observed that her "core food and beverage marketing remains strong," he observed that she assumed added responsibility for "print production for the company" which "has gone pretty well with no significant issues," he recognized her for her "major accomplishment" in transitioning to Nvision, he recognized her as the "point person within marketing for all mergers and acquisitions activity" and commented on her positive performance in handling the Carmike and Starplex acquisitions, and he recapped the entire year by saying: "a very nice year for Tonya where she was able to keep core activities going

in a positive way while delivering on multiple key initiatives over and above these day-to-day responsibilities." (Ex. 2, Colanero depo., at 156:21-159:1) (referring to Depo. Ex. 112).

81.     Tonya also once again received the CEO's "Playing Offense" Award in 2016. (Ex. 10, dec. of Mangels, at ¶ 14).

### Colanero Gives One of His Male VPs a Discretionary Bonus Twice as Big as Tonya's Despite Their Identical Year-End Ratings

82.     Within four days of her 2016 performance review, Colanero gave another male Vice President on his team, Julius Lai, an identical overall rating of "exceeds expectations." (Ex. 2, Colanero depo., at 163:18-166:12) (referring to Depo. Ex. 26); (Ex. 15, Depo. Ex. 26).

83.     Within a couple days of giving Tonya and Julius Lai identical ratings in their 2016 reviews, Colanero received an email from Adam Aron indicating that Mr. Aron had a bucket of approximately $300,000.00 worth of "Amazing Money" to distribute as discretionary bonuses, and he asked Colanero for recommendations related to his team. (Ex. 2, Colanero depo., at 163:18-165:2) (discussing and authenticating to Depo. Ex. 30); (Exhibit 14, depo. Ex. 30).

84.     Colanero responded with a list of six names consisting of one male Vice President, Julius Lai, and 5 females. (Ex. 2, Colanero depo., at 165:3-17); (Exhibit 14, depo. Ex. 30).

85.     Colanero recommended $███ for Julius Lai, *half* that amount for Tonya, and $███/person for the remaining females on the list. (Ex. 2, Colanero depo., at 165:3-17); (Exhibit 14, depo. Ex. 30).

### Adam Aron Distributes Additional, Discretionary Bonuses Related to AMC's Recent Cinema Chain Acquisitions; Tonya Receives Nothing and Male Executives Receive a Disproportionate Share

86.     Adam Aron also distributed additional discretionary bonuses in March 2017 to compensate employees for their efforts in connection with AMC's acquisitions of the Carmike,

Odeon, and Nordic cinema chains. (Ex. 16, Chavarria depo., at 78:17-84:6) (referring to Depo. Ex. 226) (Ex. 8, Aron depo., at 58:19-63:4).

87.     Exhibit 17 hereto is a true and accurate copy of the list created by Adam Aron reflecting the amounts of those bonuses. (Ex. 16, Chavarria depo., at 78:17-84:6) (referring to Depo. Ex. 226) (Ex. 8, Aron depo., at 58:19-63:4); (Ex. 17, Depo. Ex. 226).

88.     Adam Aron selected the names and amounts reflected in Exhibit 17 after consulting with his department heads; the unredacted portion of the list includes 18 males and 5 females. (Ex. 8, Aron depo., at 58:19-63:4); (Ex. 16, Chavarria depo., at 80:18-81:4).

89.     One female (Chavarria) received a █████ bonus, and the remainder of the females received $████ or less. (Ex. 17, Depo. Ex. 226); (Ex. 16, Chavarria depo., at 81:5-13).

90.     One male received a $████ bonus, 2 males received $████, 4 males received $████, and the remainder of the males received $████ or less. (Ex. 17, Depo. Ex. 226); (Ex. 16, Chavarria depo., at 83:19-84:14).

91.     Julius Lai once again received a discretionary bonus of $████, Michael Pursell received a discretionary bonus of $████, and Tonya received nothing. (Ex. 17, Depo. Ex. 226).

**AMC's Highest-Ranking Human Resources Employee (Chavarria) Displays a Willful Indifference Toward Equal Pay Act Complaints**

92.     Elizabeth Frank is a Senior Vice President at AMC, and she is the highest-ranking female in the company. (Ex. 47, Frank depo., at 9:24-12:19).

93.     On or about February 4, 2018, a member of Elizabeth Frank's team named Melissa Wallen raised a concern about gender pay equity at AMC, and it caused Frank to send Carla Chavarria the email attached hereto in Exhibit 48. (Ex. 47, Frank depo., at 37:16-43:12) (discussing and authenticating Depo. Ex. 115); (Ex. 48, Depo. Ex. 115).

94.     In her report of the pay equity complaint from her subordinate, Ms. Frank said:

**One of the female associates on my team stopped in last week to express concern about gender pay equity at AMC.**  A long-tenured AMC associate with broad social network in the company, **she stated that it is 'commonly understood' that AMC compensates men higher than women for similar results in similar positions.**

How should I/we respond to the concern?  I recall you having had the issue studied by an external expert … are there results we could/should share?

Thank you.
Elizabeth

(Ex. 47, Frank depo., at 37:16-43:12) (referring to Depo. Ex. 115); (Ex. 48, Depo. Ex. 115) (emphasis added).

95.     Exhibit 28 hereto is a true and accurate copy of AMC's nondiscrimination and harassment policy, and it obligates AMC to "promptly launch an investigation" into workplace allegations of discrimination, harassment, and retaliation.  (Ex. 16, Chavarria depo., at 29:14-30:24) (referring to Depo. Ex. 217); (Ex. 28, Depo. Ex. 217).

96.     Chavarria sent Frank the vague response reflected in Exhibit 48, but Chavarria never inquired to understand the identity of the complaining employee, never conducted any further investigation into the issue, never instructed anyone else to investigate the issue, and testified that she did not interpret Frank's email as containing a gender-based pay equity complaint sufficient to merit an investigation under AMC's non-discrimination policy.  (Ex. 16, Chavarria depo., at 103:14-107:24).

97.     In her response to Frank, Chavarria also referred to a formal assessment of pay equity that was conducted in 2017, (Ex. 48, Depo. Ex. 115), but Chavarria does not know whether that analysis—which was performed by an outside firm called Willis Towers Watson—involved a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity.  (Ex. 16, Chavarria depo., at 94:7-103:4).

98.     Mike Giuseffi testified, however, that the Willis Towers Watson analysis did ***not*** involve a methodology in which any roles at AMC were directly compared to any other roles at AMC; he agreed that there was "no instance, for example, that [Willis Towers Watson] would have said one VP role within AMC does this, the other one does this, they're similar but they're not being paid the same…."  (Ex. 9, Giuseffi depo., at 26:25-32:11).

**General Overview of Tonya's Role During the Final 3 Years of Her Employment**

99.     AMC has a highly complex structure with a national brand footprint in nearly every state in the United States; throughout its roughly 600 theaters, it offers 3 different brand experiences, and there are additional concept and amenity variances within each different brand experience.  (Ex. 10, dec. of Mangels, at ¶ 15).[13]

100.     There are also numerous menus, roughly twenty or more different pricing tiers, multiple sales channels, and other business considerations related to the ever-changing studio film content and geographic/demographic variances one would expect with a national brand footprint in nearly every state.  (Ex. 10, dec. of Mangels, at ¶ 16).

101.     Based on this reality, AMC operated under a hybrid or matrix structure in several departments, which is well suited for work environments that are dynamic and tend to shift from project to project.  (Ex. 10, dec. of Mangels, at ¶ 17).

102.     A matrix organizational structure is a workplace format in which employees report or partner indirectly or directly to multiple managers/teams rather than one manager overseeing every aspect of a project.  (Ex. 10, dec. of Mangels, at ¶ 18).

---

[13] The AMC theater count fluctuates as theaters are opened, closed, remodeled, purchased, or sold.

103.    One advantage of the matrix organizational structure is that people across different functional areas have a better understanding of their co-workers in other areas. (Ex. 10, dec. of Mangels, at ¶ 19).

104.    Best practices and key learnings are brought to light more effectively, and the synergies developed through this process leads to more well-rounded thought leadership and the ability to execute. (Ex. 10, dec. of Mangels, at ¶ 20).

105.    A disadvantage is that employees are responsible to their project team as well as their functional areas. (Ex. 10, dec. of Mangels, at ¶ 21).

106.    There can be overlap and shared accountability that often creates creative and strategic tension, but the improved functionality leads to superior results when done well. (Ex. 10, dec. of Mangels, at ¶ 22).

107.    In the end, cross-functional members collaborate on many aspects of the business. (Ex. 10, dec. of Mangels, at ¶ 23).

108.    During the final 3 years of her employment (and in some respects earlier), Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food & Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain. (Ex. 10, dec. of Mangels, at ¶ 24).

109.    Tonya was responsible for driving AMC product revenue, traffic, units, and attendance related to film/programming/events, Food & Beverage/menu/concept experiences, the Studio and Food & Beverage monetized partnership programs, the DINE-IN brand, Macguffin's Bars, Mobile Preorder/Kiosk, Retail Merchandise Sales, E-commerce Flash Sales, Digital Signage

strategy and vendor relationship oversight, the Coca-Cola Ring of Honor marketing partnership, targeted teen marketing, packaging, digital retail streaming movies, and test initiatives as they evolved such as NFL Sports Programming.[14]  (Ex. 10, dec. of Mangels, at ¶ 25).

110.    Essentially, her team was responsible for end-to-end collaborative planning and execution of all aspects of strategic direction, product/menu development, pricing recommendations, packaging, consumer insights, promotions, marketing, partnership management/negotiations, and sales of most products and services AMC offers to the public, and the methods or channels through which those products and services were most effectively sold to consumers (e.g., digital signage, kiosk, online ordering, mobile, in-theater, 3rd party off-site, 1:1). (Ex. 10, dec. of Mangels, at ¶ 26).

111.    In addition, and because of Tonya's growing leadership role, her broadening expertise, and her strong performance, Tonya was frequently selected to serve on special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions.  (Ex. 10, dec. of Mangels, at ¶ 27).

112.    Some examples of this included serving on the CEO's Marketshare Taskforce, the Carmike and Starplex acquisition and integration teams, IT Digital Prioritization Roadmap, and the Initiative Guest Committee.  (Ex. 10, dec. of Mangels, at ¶ 28).

113.    Tonya was also selected to the "LEAP promotion-ready officers group" in the second quarter of 2018, which was a program designed to develop employees that were identified as future leaders within the company.  (Ex. 10, dec. of Mangels, at ¶ 29).

**Additional Responsibilities, Accolades, and Tonya's Requests for Increased Compensation**

---

[14] Tonya's responsibilities associated with film marketing, digital retail, and digital streaming were not added until 2018 as discussed *infra* at PSOF ¶¶ 139-151, 238.

114.    Exhibit 18 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero in February 2018 for the calendar year 2017.  (Ex. 2, Colanero depo., at 172:7-174:20) (referring to Depo. Ex. 116); (Ex. 18, Depo. Ex. 116).

115.    Colanero rated Tonya with an overall rating of **"outstanding,"** i.e., the highest possible rating.  (Ex. 2, Colanero depo., at 172:7-174:20) (referring to Depo. Ex. 116) (emphasis added).

116.    Colanero commented that "Tonya is an integral part of the senior leadership team in the marketing department," that "it is hard not to be impressed with the volume of accomplishments Tonya achieved" during a difficult year in the movie industry, and that "she brought to fruition several key initiatives from 2016…" including the "…Carmike transition, Coca-Cola teen marketing program, as well as creating new contributors to benefit AMC, Feature Fare and movie feature drinks;" he also observed that "these are huge initiatives that drive profit for AMC and wouldn't be what they are without Tonya's significant leadership/contributions." (Ex. 2, Colanero depo., at 173:4-174:10) (referring to Depo. Ex. 116).

117.    Colanero also commented that Tonya "contributed in many other meaningful ways from daily unappreciated work like inventory risk management to high profile cross-functional assignments such as the market share task force," and he agrees that this was a "glowing" annual performance review for Tonya.  (Ex. 2, Colanero depo., at 173:4-174:20) (referring to Depo. Ex. 116).

118.    On March 12, 2018, shortly after rating Tonya as an "outstanding" employee, Colanero mistakenly emailed a spreadsheet to Tonya reflecting compensation data (salary and bonus information) applicable to other Vice Presidents on Colanero's team: Julius Lai and Frank Ybarra.  (Ex. 2, Colanero depo., at 175:21-181:3) (referring to Depo. Ex. 117).

187

119. Exhibit 19 hereto is a true and accurate copy of the spreadsheet that Colanero mistakenly emailed to Tonya. (Ex. 2, Colanero depo., at 175:21-181:3) (Ex. 19, Depo. Ex. 117).

120. This was the first time—to Colanero's knowledge—that anyone ever shared with Tonya that Julius Lai's and Frank Ybarra's salaries were $████/year and $████/year, respectively, as opposed to Tonya's salary of $153,500 according to the same document. (Ex. 2, Colanero depo., at 177:4-178:5) (Ex. 19, Depo. Ex. 117, at pages 2 and 4).

121. Colanero never realized that he mistakenly sent the spreadsheet to Tonya until she later confronted him with it *nearly a year later* on February 12, 2019. (Ex. 2, Colanero depo., at 314:5-317:4)

122. Prior to that time, Colanero consistently lied to Tonya, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents. (Ex. 1, Mangels depo., at 65:21-66:9, 67:6-69:8, 310:23-311:21); (Ex. 10, dec. of Mangels, at ¶ 30).

123. Colanero was never written up for mistakenly emailing the compensation spreadsheet to Tonya. (Ex. 2, Colanero depo., at 46:19-47:5).

124. Chavarria never knew about Colanero mistakenly sending the spreadsheet to Tonya until after Tonya was terminated. (Ex. 16, Chavarria depo., at 110:11-112:15).

125. Adam Aron does not recall whether or not he ever learned about Colanero mistakenly sending the spreadsheet to Tonya. (Ex. 8, Aron depo., at 76:14-77:11).

126. **3rd Request to Increase Compensation:** On or about the same day Colanero sent Tonya the spreadsheet, they spoke on the phone about the possibility of adjusting her compensation, and Colanero informed her that AMC was not going to adjust her salary and bonus upward apart from the routine merit increases given to most employees. (Ex. 10, dec. of Mangels,

at ¶ 31); (Ex. 2, Colanero depo., at 178:21-181:3) (confirming that he has no reason to disagree with Tonya's anticipated trial testimony on that issue).

127.    **4th Request to Increase Compensation:**  Tonya had another conversation with Colanero in the March 26, 2018 timeframe in which she once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities.  (Ex. 10, dec. of Mangels, at ¶ 32).

128.    Exhibit 20 hereto is a true and accurate copy of the meeting script that Tonya created for the purpose of assisting her in her discussion with Colanero, and the discussion tracked that script.  (Ex. 10, dec. of Mangels, at ¶ 33) (also marked as Depo. Ex. 118).

129.    Among other things, Exhibit 20 contains Tonya's description of the manner in which her role at AMC continued to expand in depth and breadth since the time of her becoming a Vice President in 2013, (Ex. 10, dec. of Mangels, at ¶ 34), and Colanero has no reason to disagree that it generally contains a description of what was discussed with Tonya in March 2018 and her "case" for requesting increased compensation.  (Ex. 2, Colanero depo., at 181:4-24, 182:14-183:19) (referring to Depo. Ex. 118).

130.    No one ever made Adam Aron or Chavarria aware of this request to adjust Tonya's compensation.  (Ex. 8, Aron depo., at 78:1-7); (Ex. 16, Chavarria depo., at 112:16-113:16).

131.    Tonya's compensation was never increased in response to this request to revisit her compensation in March 2018.  (Ex. 10, dec. of Mangels, at ¶ 35).

132.    **5th Request to Increase Compensation:**  Exhibit 21 hereto is a true and accurate copy of an email exchange between Chavarria and Tonya on April 11, 2018.  (Ex. 16, Chavarria depo., at 115:25-116:16) (referring to Depo. Ex. 120); (Ex. 21, Depo. Ex. 120).

133.    Tonya spoke with Carla Chavarria on April 11, 2018 in order to seek advice from Chavarria on the best manner in which to "tactfully" address the subject of increasing her compensation with Colanero in light of the fact that her role at AMC continued to expand in depth and breadth after becoming a Vice President in 2013.  (Ex. 10, dec. of Mangels, at ¶ 36).

134.    Exhibit 22 hereto is a true and accurate copy of the meeting script that Tonya created for the purpose of assisting her in her discussion with Chavarria, and the discussion tracked that script.  (Ex. 10, dec. of Mangels, at ¶ 37) (also marked as Depo. Ex. 119).

135.    Chavarria testified to her awareness that Tonya wanted her position to be "assessed" during the April 11 conversation, her awareness that Tonya wanted advice on how to tactfully address the issue with Colanero, and her memory of previous discussions in which Colanero discussed "revaluing" Tonya's position, **but Chavarria inexplicably denies learning that Tonya wanted to increase her pay during their April 11, 2018 discussion**.  (Ex. 16, Chavarria depo., at 117:3-121:4) (also discussing Depo. Ex. 119).

136.    Colanero does not recall any conversations with Chavarria about Tonya's interest in adjusting her compensation in the April 2018 timeframe.  (Ex. 2, Colanero depo., at 184:9-185:10).

137.    No one ever made Adam Aron aware of this discussion about adjusting Tonya's compensation.  (Ex. 8, Aron depo., at 78:8-19).

138.    Tonya's compensation was never increased in response to this discussion with Chavarria about revisiting her compensation in April 2018.  (Ex. 10, dec. of Mangels, at ¶ 38).

139.    On April 13, 2018, Tonya's position was re-titled to "Vice President, Product Marketing" effective April 20, 2018, and her compensation was not adjusted.  (Ex. 2, Colanero depo., at 185:11-186:1).

140.    On April 20, 2018, there was a re-organization that resulted in two additional reports getting added to Tonya's team (Ellen Blanner and Erin Gregory) for a total of six direct reports after two others were moved to different positions.  (Ex. 10, dec. of Mangels, at ¶¶ 39-40); (Ex. 2, Colanero depo., at 186:2-187:21).

141.    Tonya assumed film marketing responsibilities from Carrie Trotter (Ex. 1, Mangels depo., at 42:2-6, 221:8-223:20).

142.    The re-organization was by no means an equal splitting or switching of responsibilities with Carrie Trotter.  (Ex. 10, dec. of Mangels, at ¶ 41); (Ex. 1, Mangels depo., at 42:2-6, 221:8-223:20).

143.    Trotter was struggling to manage her areas of responsibility and the team was significantly under plan for film marketing at the time of the transition; the pace and complexity were too much for Trotter, and she desperately sought a slower role with less pressure.  (Ex. 10, dec. of Mangels, at ¶ 42).

144.    The bottom line was that Trotter's group was "getting by," but they were certainly not hitting their goals or growing the more complex film marketing opportunities.  (Ex. 10, dec. of Mangels, at ¶ 43).

145.    For comparison, Tonya's team lead 27 loyalty point campaigns in 2018 as compared with the 18 that occurred under Trotter in 2017.  (Ex. 10, dec. of Mangels, at ¶ 44).

146.    Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue.  (Ex. 10, dec. of Mangels, at ¶ 45).

147.    Tonya's team also added an entirely new monetization and studio marketing program, and when she partnered with the film group, AMC secured a two-year retainer (STX) for

$4M ($2M annually), and AMC executed ten test title data initiatives in 2018. (Ex. 10, dec. of Mangels, at ¶ 46).

148.    In 2018, Tonya also assumed responsibility for developing a major new initiative called AMC On Demand (digital streaming/rent or buy movies online). (Ex. 10, dec. of Mangels, at ¶ 47).

149.    Tonya and her team worked with consultants, programming, IT and studio partners to learn a new business, to define the technical requirements, user experience, and integration within AMC channels, and Tonya advocated for features, functionality, and benefits to position AMC for a successful launch. (Ex. 10, dec. of Mangels, at ¶ 48).

150.    In 2018, Tonya and her team also assumed responsibility for creating and managing a new digital Flash Sales program that generated over $5M in gross revenue. (Ex. 10, dec. of Mangels, at ¶ 49).

151.    In 2018, Tonya and her team also assumed partial responsibility for AMC's Merchandise Program, and partnered with other groups internally to advance that initiative. (Ex. 10, dec. of Mangels, at ¶ 50).

152.    **6th Request to Increase Compensation:**  Tonya had another conversation with Colanero on or around May 4, 2018 in which she once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities. (Ex. 10, dec. of Mangels, at ¶ 51).

153.    Exhibit 30 hereto is a true and accurate copy of the meeting script that Tonya created for the purpose of assisting her in her discussion with Colanero, and the discussion tracked that script. (Ex. 10, dec. of Mangels, at ¶ 52) (also marked as Depo. Ex. 124).

154.     Among other things, Exhibit 30 contains Tonya's description of the manner in which her role at AMC continued to expand in depth and breadth since the time of her becoming a Vice President in 2013.  (Ex. 10, dec. of Mangels, at ¶ 53).

155.     Colanero has no reason to disagree that he met with Tonya once again on May 4, 2018 in order to discuss Tonya's request to increase her compensation, but he does not recall the discussion.  (Ex. 2, Colanero depo., at 196:5-22).

156.     No one ever made Adam Aron or Chavarria aware of this request to adjust Tonya's compensation.  (Ex. 8, Aron depo., at 79:3-8); (Ex. 16, Chavarria depo., at 125:1-127:4).

157.     Tonya's compensation was never increased in response to this request to revisit her compensation in May 2018.  (Ex. 10, dec. of Mangels, at ¶ 54).

158.     As of May 5, 2018, Colanero identified Tonya as someone with "high potential" within AMC.  (Ex. 2, Colanero depo., at 198:7-10).

**2018 Talent Summit**

159.     Around May 8-12, 2018, Colanero attended a "Talent Summit" at AMC in which two AMC employees named Terry Crawford and Cynthia Pierce allegedly shared allegations of unprofessional conduct by Tonya.  (Ex. 2, Colanero depo., at 199:13-209:15).

160.     One of the employees—Terry Crawford— allegedly described a situation in which Tonya was observed in the act of "wild," "suggestive," or "an unprofessional level of" dancing during a rock concert.  (Ex. 2, Colanero depo., at 202:6-206:2).

161.     Colanero recalls that the other employee—Cynthia Pierce—allegedly "shared some comments that were negative about other events," but Colanero could not recall any of the specifics that were shared by Cynthia Pierce.  (Ex. 2, Colanero depo., at 206:3-207:21).

162.    No one investigated or documented the underlying issues mentioned about Tonya during the Talent Summit; it was simply a situation in which people mentioned offhand information about her.  (Ex. 2, Colanero depo., at 209:10-15).

163.    Colanero never investigated any of the issues raised during the Talent Summit on his own, and Tonya was never written up or disciplined in any way for the issues that were mentioned during the Talent Summit.  (Ex. 2, Colanero depo., at 210:25-212:8).





173.     Colanero and Chavarria conducted an initial interview with Tonya on May 21, 2018 in order to discuss the New Orleans trip and the expenses related to the trip.  (Ex. 2, Colanero depo., at 218:16-222:19); (Ex. 16, Chavarria depo., at 157:12-159:25).

174.     Colanero recalls that Tonya was nervous about being investigated, that she took the issues seriously, and that she was fearful of losing her job.  (Ex. 2, Colanero depo., at 224:16-25).



Case 4:19-cv-00834-BP   Document 111   Filed 09/14/21   Page 196 of 337

181.    Exhibit 29 hereto is a true and accurate copy of an email sent from Tonya to Colanero on May 29, 2018.  (Ex. 2, Colanero depo., at 229:15-21) (referring to Depo. Ex. 147); (Ex. 29, Depo. Ex. 147).

182.    Tonya told Colanero:

> I know this is totally awkward but I need to apologize.  I sincerely feel horrible and am physically sick.  I understand that I've had an impact on you and others.  I value your leadership, support, and mentorship over the last nearly 9 years.  I appreciate the opportunities and challenges you've afforded me which have been great.  I'm incredibly proud of the work, many accomplishments, growth and generally not letting you down. Above all, I'm sorry to have put you in situation.  I am human, I am not perfect but I'm not a bad person.  Like footprints in the sand, I hope you will have some understanding and help me now more than ever to make repair.  Please know that I'm focused on the work and doing whatever I need to do in order to move forward….

(Ex. 29, Depo. Ex. 147).

183.    Colanero understood that Tonya was "clearly apologizing," that she was expressing appreciation for the opportunities Colanero gave to her up until to that point, and that she was expressing that she wanted to do whatever it took to put the issues behind them and continue working for him.  (Ex. 2, Colanero depo., at 231:9-232:2).



███████████████████████████████████████████

███████████████████████████████████████████

██████

187.     Tonya next met with Colanero and Chavarria on June 5, 2018, and they gave her the ultimatum of either resigning and accepting a severance package or staying with the company and accepting the discipline outlined in Exhibit 23 hereto (discussed below); Tonya chose to keep her job and to try to impress Colanero.  (Ex. 2, Colanero depo., at 246:21-247:2, 249:16-250:2).

188.     Exhibit 23 hereto is a true and accurate copy of the written discipline that was ultimately administered by Colanero to Tonya on June 5, 2018.  (Ex. 2, Colanero depo., at 198:11-17) (referring to Depo. Ex. 161); (Ex. 23, Depo. Ex. 161).

189.     Exhibit 27 hereto is a true and accurate copy of the written discipline that was ultimately administered to Pursell on June 5, 2018.  (Ex. 16, Chavarria depo., at 189:16-190:1); (Ex. 27, Depo. Ex. 162).

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

194. Both of their 2018 individual bonuses were reduced by 25% under AMC's Annual Incentive Plan (AIP). (Ex. 23, Depo. Ex. 161); (Ex. 27, Depo. Ex. 162).

195. In her write-up, Tonya was criticized for "over-indulging" on alcoholic beverages at additional—and unspecified—company functions; Pursell was not criticized for any alcohol-related issues. (Ex. 23, Depo. Ex. 161); (Ex. 27, Depo. Ex. 162).

196. In her write-up, Tonya was required to complete "[m]andatory counseling for alcoholism through the Employee Assistance Program (EAP);" Pursell was not required to undergo any alcohol-related counseling. (Ex. 23, Depo. Ex. 161); (Ex. 27, Depo. Ex. 162).

197. Prior to June 5, 2018, Tonya was never written up by anyone at AMC, at any time, for any alcohol-related issues, and Colanero never witnessed Tonya consume alcohol at a work-related function in an unprofessional manner. (Ex. 25, Reeves depo., at 186:4-8); (Ex. 16, Chavarria depo., at 148:15-149:2); (Ex. 2, Colanero depo., at 257:11-20).

198. Tonya ultimately completed her alcohol counseling through the Employee Assistance Program (EAP) without any problems. (Ex. 16, Chavarria depo., at 193:4-11).

200. When AMC gives an employee their annual review, the annual review is generally broken into two component parts: (1) a section that addresses the employee's ability to satisfy the "key performance metrics" (or "KPMs") associated with their job (i.e., did they work hard, did they accomplish specific projects, did they achieve specified goals?), and (2) a section that addresses the employee's behavioral competencies. (Ex. 2, Colanero depo., at 279:4-281:1).

201. Colanero cannot recall any instance in which Tonya failed to meet the KPMs associated with her job between the time of her June 5, 2018 discipline and the date of her termination on September 30, 2019. (Ex. 2, Colanero depo., at 281:2-282:21).

## AMC's Disregard of Tonya's Complaints about Gender Discrimination and Pay Discrimination During the May/June 2018 Investigation

202. When Tonya sent the May 23, 2018 email referenced above to Colanero and Chavarria (Exhibit 26), Tonya also included the sentence: "As a female, there are many occasions I feel I've been treated differently and held to different standards than my male counterparts." (Ex. 16, Chavarria depo., at 163:9-164:11); (Ex. 26, Depo. Ex. 140).

203. When Chavarria read that sentence, she understood it "to be a pretty direct reference to [Tonya's] belief that she feels like she as a female was being singled out or treated differently from males," and it prompted Chavarria to assign Rosalind Reeves to investigate her complaint consistent with AMC's nondiscrimination and harassment policy (Exhibit 28). (Ex. 16, Chavarria depo., at 163:9-164:11).

204. Reeves held a meeting with Tonya on May 30, 2018—which was recorded by Tonya—and Reeves agrees that Tonya "very clearly rais[ed] her own internal complaints about the fact that she believes men and women are treated differently within AMC in certain respects." (Ex. 25, Reeves depo., at 157:7-158:9) (referring to the audio recording marked as Depo. Ex. 151).

205.    Tonya complained to Reeves that women are judged more harshly than men in relation to how they consume alcohol, she complained that she felt targeted and treated differently from males, and she mentioned the examples of male AMC employees inappropriately consuming alcohol at a golf tournament, male AMC employees being sent home in Ubers without consequence, a male AMC employee named George Patterson consuming alcohol inappropriately, and the example of male AMC employees engaging in pool parties in Las Vegas during a work conference.  (Ex. 25, Reeves depo., at 159:11-160:3).

206.    Reeves failed to ask Tonya for any names, or for any other further specificity, that would have been necessary in order to investigate the examples Tonya shared on the issue of men and women being treated differently in relation to their consumption of alcohol.  (Ex. 25, Reeves depo., at 161:4-163:8).

207.    Chavarria does not recall whether Reeves ever shared of any of the above information with her.  (Ex. 16, Chavarria depo., at 177:13-178:17).

208.    AMC never investigated any of the issues referenced above after Tonya complained about them on May 30, 2018.  (Ex. 25, Reeves depo., at 160:4-161:2) (confirming her lack of knowledge about any investigations into those issues); (Ex. 16, Chavarria depo., at 173:12-177:12) (same).

209.    Chavarria is not aware of anyone at AMC ever following up with Tonya in relation to the complaints referenced above—even though Chavarria acknowledges that, as an HR professional, it is a "best practice" to follow up with the complaining employee when conducting a workplace investigation.  (Ex. 16, Chavarria depo., at 31:22-33:7, 178:18-23).

210.    **7th Request to Increase Compensation:**  During the May 30, 2018 meeting, **Tonya also complained to Reeves about pay equity issues within AMC, and Reeves agrees**

**that Tonya's pay equity complaints merited an investigation.** (Ex. 25, Reeves depo., at 166:7-168:6).

211. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." (Ex. 25, Reeves depo., at 166:19-167:5).

212. Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue. (Ex. 16, Chavarria depo., at 180:21-183:20, 189:5-9).

**No One at AMC Ever Analyzed—At Any Time—Whether Tonya Was Being Paid Less Than any Other Male VP that Was Serving in a Role that Required Substantially Equal Skill, Effort, or Responsibility**

213. Exhibit 31 hereto is a true and accurate email that was sent by Reeves to Chavarria on May 30, 2018 immediately after Reeves' May 30 conversation with Tonya. (Ex. 25, Reeves depo., at 171:5-17) (discussing and authenticating Depo. Ex. 153); (Ex. 31, Depo. Ex. 153).

214. In her 5:58 p.m. email to Chavarria, Reeves summarized her 1:00 p.m. discussion the same day with Tonya. (Ex. 25, Reeves depo., at 171:18-174:9) (referring to Depo. Ex. 153).

215. Reeves told Chavarria about Tonya's belief that her pay was 45-60% lower than Frank Ybarra, Julius Lai, and Michael Pursell, and Reeves told Chavarria that Stephen Colanero and Martin Stallbaumer "confirmed that [Tonya's] job is slotted lower than theirs." (Ex. 25, Reeves depo., at 171:18-174:9) (referring to Depo. Ex. 153).

216. Mike Giuseffi supervised Martin Stallbaumer in 2018, and Giuseffi testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "[a]ny request by Plaintiff to increase her compensation prior to Plaintiff filing a charge of discrimination on May 2, 2019," the identity of all persons interviewed in relation to that issue, and the general process through which AMC investigated that issue. (Ex. 9, Giuseffi depo., at 12:11-13:2); (Ex. 16, Chavarria depo., at 7:7-9:14) (discussing Depo. Ex. 224 and counsel's previous stipulations as to AMC's designation of Chavarria and Giuseffi); (Ex. 32, Depo. Ex. 224) (30(b)(6) notice issued to AMC).

217. Mike Giuseffi never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility, and he is not aware of *anyone else* at AMC that engaged in that analysis prior to Tonya's termination. (Ex. 9, Giuseffi depo., at 47:4-11).

218. Steven Colanero never compared Tonya's Vice President role to any other male Vice President role at AMC—at any time—in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Colanero never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. (Ex. 2, Colanero depo., at 87:10-88:13, 89:21-90:3, 326:16-25).

219. Chavarria never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility, and Chavarria is not aware of anyone else at AMC that engaged in that analysis. (Ex. 16, Chavarria depo., at 188:14-189:4).

220.    Rosalind Reeves never analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility.  (Ex. 25, Reeves depo., at 80:10-16).

221.    No one ever made Adam Aron aware of Tonya's May 30 conversation with Reeves. (Ex. 8, Aron depo., at 79:9-82:5).

222.    Despite Tonya's specific complaints to Reeves on May 30, 2018 about pay equity and gender discrimination, and despite Tonya's willingness to share specific examples, Tonya was written up on June 5, 2018 because she "made allegations involving others regarding bullying, sexual harassment, and gender discrimination" and because she "declined to provide pertinent details to allow for further investigation."  (Ex. 23, Depo. Ex. 161).

**Additional Responsibilities, Accolades, and Requests for Increased Compensation**

223.    Tonya met with Colanero on July 11, 2018, i.e., a little more than one month after receiving the June 5 discipline, in order to "clear the air" with Colanero; she apologized to Colanero once again, she told him that she appreciated his support and his advocacy at the Talent Summit, and she told him that she wanted to identify a positive path forward in their working relationship.  (Ex. 10, dec. of Mangels, at ¶ 55); (Ex. 2, Colanero depo., at 260:20-263:9) (confirming that he has no reason to disagree with Tonya's characterization of the meeting).

224.    **8th Request to Increase Compensation:**  Exhibit 33 hereto is a true and accurate copy of an email exchange between Tonya and Colanero on July 24, 2018 in which she once again sought to re-raise the issue of her compensation in light of the fact that her role at AMC continued to expand in depth and breadth after becoming a Vice President in 2013.  (Ex. 2, Colanero depo., at 264:13-265:15) (referring to Depo. Ex. 166); (Ex. 33, Depo. Ex. 166).

225.     In her email, Tonya reminded Colanero that her position had not been properly reviewed—for purposes of adjusting her compensation—since her promotion to Vice President in 2013.  (Ex. 33, Depo. Ex. 166); (Ex. 10, dec. of Mangels, at ¶ 57).

226.     Colanero agrees that this request "kind of fell through the cracks" because he was "busy" and "must have missed it."  (Ex. 2, Colanero depo., at 265:16-266:22).

227.     Chavarria does not recall ever being made aware of this request to adjust Tonya's compensation.  (Ex. 8, Aron depo., at 84:10-86:7); (Ex. 16, Chavarria depo., at 200:1-202:7).

228.     No one ever made Adam Aron aware of this request to adjust Tonya's compensation.  (Ex. 8, Aron depo., at 84:10-86:7).

229.     Tonya's compensation was never increased in response to this request to revisit her compensation on July 24, 2018.  (Ex. 10, dec. of Mangels, at ¶ 58); (Ex. 2, Colanero depo., at 265:16-266:22).

230.     **9th Request to Increase Compensation:**  On August 8, 2018, Tonya met with Colanero and Jane Hermstedt (a leadership development employee within AMC) to discuss her Individual Development Plan ("IDP") with the company, and she mentioned during the meeting that one of her goals was to achieve a compensation level that was consistent with her experience, responsibilities, contributions, and value within the company.  (Ex. 10, dec. of Mangels, at ¶ 59).

231.     Tonya's compensation was not revisited or increased in response to this discussion.  (Ex. 10, dec. of Mangels, at ¶ 60).

**AMC's Highest-Ranking Human Resources Employee (Carla Chavarria)**
**References Her Concern About "Getting Hit With a Lot of Equal Pay Act" Complaints**
**During a Secretly Recorded Discussion**

232.　　On October 5, 2018, Tonya secretly recorded a conversation between herself, Chavarria, Colanero, and David Codding.  (Ex. 16, Chavarria depo., at 202:8-203:16); (Ex. 10, dec. of Mangels, at ¶ 61).

233.　　During a discussion about various, anticipated changes with subordinate employees, Chavarria began asking the group general questions "about any protected category issues [she needs] to be aware of and that kind of thing."  (Ex. 16, Chavarria depo., at 202:8-203:16); (Ex. 10, dec. of Mangels, at ¶ 62).

234.　　At one point during the secretly recorded conversation, Chavarria commented, **"One of the things we're getting hit with is a lot of Equal Pay Act."**  (Ex. 16, Chavarria depo., at 203:13-204:1) (emphasis added).

235.　　Chavarria also commented during the secretly recorded conversation about her concern **"that women generally start off making less than men, and if that carries all the way through, the gap just gets bigger."**  (Ex. 16, Chavarria depo., at 203:13-204:1) (emphasis added).

236.　　Now that Chavarria is aware of the secretly recorded conversation, she denies that she was complaining about AMC-specific concerns, and instead takes the position that she was commenting about the HR industry in general.  (Ex. 16, Chavarria depo., at 204:2-206:21).

237.　　Tonya disagrees with Chavarria's characterization of the October 5 discussion because, when those comments were made, Tonya understood them to specifically relate to AMC based on the context in which Chavarria described them, and because Chavarria made no effort to characterize her comments as applying to anything other than AMC.  (Ex. 10, dec. of Mangels, at ¶ 63).

**Additional Responsibilities, Accolades, and Tonya's Requests for Increased Compensation**

238.   **7 Direct Reports:**  On or around November 1, 2018, Tonya received expanded responsibilities associated with AMC's digital retail initiatives, and her team grew to a total of seven direct reports.  (Ex. 10, dec. of Mangels, at ¶ 64); (Ex. 2, Colanero depo., at 267:14-25) (no reason to disagree).

239.   **10th Request to Increase Compensation:**  On November 19, 2018, Tonya stopped by Colanero's office to discuss—once again—her ongoing interest in having her position reviewed and her compensation adjusted.  (Ex. 2, Colanero depo., at 268:1-270:10).

240.   She reminded him that she had not heard back from him in response to the July 24, 2018 email discussed above.  (Ex. 2, Colanero depo., at 269:5-14).

241.   Colanero agrees that she was polite and diplomatic when she sought to raise the subject with him once again.  (Ex. 2, Colanero depo., at 270:7-10).

242.   **11th Request to Increase Compensation:**  The following day, on November 20, 2018, Tonya sent Colanero the email attached hereto as Exhibit 34 in a further effort to follow up on the November 19 discussion, and to explicitly request an increase in compensation.  (Ex. 2, Colanero depo., at 270:11-272:9, 275:12-17) (discussing and authenticating Depo. Ex. 172); (Ex. 34, Depo. Ex. 172).

243.   In her email, Tonya made the following statements:

- "I would like to request my updated Job Questionnaire be reviewed and follow up on our prior direct discussions and those with human resources as I am concerned that my compensation continues to lag in relation to the changes [in my role]."

- "Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when I was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment."

- "Yet my responsibilities and contributions to the company have grown exponentially."

- "We have had several past discussions about increasing my compensation to align with my increased responsibility, strategic influence, external benchmarks, and equity with internal positions of comparable scope, leadership, oversight, and revenue contributions."

- "I have been passive in prior conversations, believing my compensation would be fairly addressed and equalized in due time."

- "My position and team continues to expand, I am asking that the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work. As examples, I believe comparable positions include: (1) VP, Communication & Events; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Programming Promotions. It is my understanding that the individuals holding these positions receive significantly higher compensation and bonus packages. And, that the Company has precedent of adjusting compensation to reflect changes in position breadth and depth or in cases of known wage gaps for similar scope roles."

(Ex. 2, Colanero depo., at 270:11-272:9) (referring to Depo. Ex. 172); (Ex. 34, Depo. Ex. 172).

244. Colanero eventually forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. (Ex. 2, Colanero depo., at 275:18-276:15).

245. Exhibit 49 is a true and accurate copy of Colanero's November 28, 2018 email to Chavarria forwarding Tonya's previous pay adjustment request from November 20, 2018. (Ex. 16, Chavarria depo., at 211:16-212:21) (discussing and authenticating Depo. Ex. 173); (Ex. 49, Depo. Ex. 173).

246. Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself. (Ex. 16, Chavarria depo., at 212:15-23).

247. No one ever made Adam Aron aware of this request to adjust Tonya's compensation. (Ex. 8, Aron depo., at 90:14-91:20).

248. Tonya's compensation was not revisited or increased in response to this discussion. (Ex. 10, dec. of Mangels, at ¶¶ 65-66).

249. **12th Request to Increase Compensation:** On December 13, 2018, during a one-on-one meeting with Colanero, Tonya once again asked about the status of her most recent request to increase her compensation, and Colanero responded to indicate that he submitted it but had not heard back. (Ex. 10, dec. of Mangels, at ¶ 67); (Ex. 2, Colanero depo., at 276:16-277:5) (no reason to disagree).

250. Tonya's compensation was not revisited or increased in response to this discussion. (Ex. 10, dec. of Mangels, at ¶ 68).

**Additional Responsibilities, Accolades, and Tonya's Requests for Increased Compensation**

251. **8 Direct Reports:** On January 4, 2019, Tonya's team grew to a total of eight direct reports with the addition of another employee (Ryan Davis) in order to grow AMC's studio/film marketing partnerships. (Ex. 10, dec. of Mangels, at ¶ 69); (Ex. 2, Colanero depo., at 278:2-17) (no reason to disagree).

252. **9 Direct Reports:** On January 11, 2019, Tonya's team grew to a total of 9 direct reports with the addition of another employee (Christine Crowley), and Tonya also received expanded marketing responsibilities related to AMC's relationship with Coca-Cola. (Ex. 10, dec. of Mangels, at ¶ 70).

253. On January 23, 2019, in preparation for generating Tonya's 2018 performance review, Colanero exchanged emails with AMC's Senior Vice President Elizabeth Frank to inquire about Tonya's job performance on a multitude of projects that Tonya and her team were supporting for Ms. Frank; a true and accurate copy of those emails are attached hereto in Exhibit 35. (Ex. 2, Colanero depo., at 291:9-293:20) (referencing Depo. Ex. 177); (Ex. 35, Depo. Ex. 177).

254.     Elizabeth Frank described Tonya as "a key contributor to the Digital Retail project, both individually and by hiring/onboarding [one of her direct reports] effectively," and she commented that Tonya "is bringing more disciplined performance measurement to film marketing activities and studio promotions, which I will believe will enable us to develop stronger capabilities going forward."  (Ex. 2, Colanero depo., at 291:9-293:20) (referencing Depo. Ex. 177); (Ex. 35, Depo. Ex. 177).

255.     Colanero testified that all of Elizabeth Frank's comments were positive, and that he could not recall any instance in which Elizabeth Frank offered negative feedback about Tonya. (Ex. 2, Colanero depo., at 291:9-293:20).

### Colanero Disparages Tonya and Perpetuates Negative Rumors
### After Getting Mad About His AEI Scores

256.     On January 23, 2019, Colanero was in a meeting with Tonya and four of his direct reports discussing the feedback received on his Marketing Department's annual associate engagement survey (referred to internally as "AEI" scores), and he read the following, disparaging remark that was an obvious reference to Tonya even though her name was not specifically mentioned: *"I love working at AMC. However, my enthusiasm suffered a major blow this year as I watched an officer of the company be discovered abusing the privileges bestowed on her. Her lack of integrity and moral standards were treated with no visible repercussions and instead, increasing responsibility and purview."*  (Ex. 4, Colanero Dep., at 293:21-295:22, 301:11-304:16; (Defts. Ex. 5, Colanero Dec., at ¶ 17.)

257.     Tonya and Colanero both assumed the comment related to Tonya. (Ex. 4, Colanero Dep., at 293:21-295:22, 301:11-304:16; (Defts. Ex. 5, Colanero Dec., at ¶ 17.)

258.     Immediately after that meeting, Tonya told Colanero that she thought it was inappropriate to read the detail because everyone in the room knew the identity of the "officer" in

question, that it was a "sucker punch" in front of her peers, and that his actions were unnecessarily perpetuating speculation and rumors.  (Ex. 4, Colanero Dep., at 299:2-3, 301:11-304:16); (Ex. 10, dec. of Mangels, at ¶¶ 71-72).

259.    Colanero admitted that he was disappointed in his AEI scores because all (or almost all) of his scores went down, and he told Tonya that he had a feeling "that there was someone real unhappy with [him]" that contributed to his lower scores.  (Ex. 4, Colanero Dep., at 303:16-304:16).

260.    Colanero also testified that he "thought it was likely" Tonya that made the negative comments about him on his own AEI report.  (Ex. 4, Colanero Dep., at 303:16-304:16).

**Additional Responsibilities**

261.    **10 Direct Reports:**  In February 2019, Tonya's team grew to a total of ten direct reports with the addition of another employee (Mandy Loya).  (Ex. 10, dec. of Mangels, at ¶ 73).

**Colanero Gives Tonya a Horrible 2018 Performance Review Despite Her Meeting or Exceeding AMC's Expectations on Every KPM Associated with Her Job**

262.    Exhibit 36 hereto is a true and accurate copy of the annual performance review given to Tonya by Colanero on February 12, 2019 for the calendar year 2018.  (Ex. 2, Colanero depo., at 305:14-23) (referring to Depo. Ex. 181); (Ex. 36, Depo. Ex. 181).

263.    Colanero agrees that Tonya worked hard in 2018.  (Ex. 2, Colanero depo., at 313:2-3).

264.    Colanero observed in his overall comments that Tonya "[t]ook on additional areas of responsibility with Film Marketing, On Demand, Flash Sales, Retail Merchandise and all digital signage," that she "[h]elped plan our team restructure, managed out under-performers, [and is] now leading a significantly larger team and promoted (3) members."  (Ex. 36, Depo. Ex. 181, at 8).

265.    Colanero commented in his overall comments that Tonya "was able to effectively complete her KPMs and she continues to grow her span of responsibility," and that her efforts "resulted in significant accomplishments in Film Marketing Programming Promotions support, Food partnerships and McGuffins marketing."  (Ex. 2, Colanero depo., at 309:4-14); (Ex. 36, Depo. Ex. 181, at 8).

266.    As reflected in the chart below, Colanero rated Tonya with an "exceeds expectations" or "meets expectations" in every category of the KPMs (key performance metrics) on which her job was measured in 2018:

| KPM CATEGORY | RATING |
|---|---|
| Providing strategic leadership to partnerships and maximize opportunities to grow mutually beneficial marketing programs that deliver incremental revenue. | Exceeds Expectations |
| Provide strategic leadership for film marketing efforts and programming promotions, studio partnerships to drive attendance guest engagement and monetization. | Exceeds Expectations |
| Planning and strategic direction of marketing efforts to support food and beverage efforts, dine-in brand and deliver to seat expansion, menu optimization, annual bucket and limited time offers to drive food and beverage revenue. | Meets Expectations |
| Support MacGuffins liquor, beer and wine business through drive in consumer awareness, promoting new bar openings, menu optimization and developing compelling drink limited time offers. | Exceeds Expectations |
| Lead advancement, marketing and launch efforts for emerging test initiatives such as flash sales, digital signage, food and beverage mobile ordering, digital retail and studio merchandise. | Meets Expectations |

(Ex. 2, Colanero depo., at 306:2-308:22).

267.    Despite the above, Colanero rated Tonya with an ***overall rating*** of ***"does not meet expectations"*** for 2018 due to behavioral considerations alone.  (Ex. 2, Colanero depo., at 309:1-3, 309:15-311:14).

268.   The only behavioral issue mentioned in Tonya's 2018 review was Colanero's revisiting of the discipline that was already administered to her on June 5, 2018. (Ex. 2, Colanero depo., at 309:15-311:14).

269.   According to Colanero, that single issue brought down her entire overall rating to "does not meet expectations," and she was not faulted for any other behavioral issues in 2018. (Ex. 2, Colanero depo., at 309:15-311:14).

270.   Tonya was upset, and told Colanero that his performance review felt like "career suicide." (Ex. 2, Colanero depo., at 311:17-23).

271.   **13th Request to Increase Compensation:**  For the very first time, Tonya told Colanero about the spreadsheet that he mistakenly sent to her in March 2018 containing the compensation data for other Vice Presidents, and she also complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. (Ex. 2, Colanero depo., at 314:5-317:4).

272.   Despite AMC's policy of promptly launching an investigation into complaints of discrimination (Exhibit 28), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." (Ex. 2, Colanero depo., at 317:5-13).

273.   Chavarria does not recall Colanero ever making her aware of the details of his conversation with Tonya, his inadvertent mistake in sending her the compensation spreadsheet, or her complaints about wage/gender discrimination. (Ex. 16, Chavarria depo., at 222:25-224:1).

274.   No one ever made Adam Aron aware of this request to adjust Tonya's compensation, the heated conversation about her 2018 review, Colanero's inadvertent mistake in sending Tonya the compensation spreadsheet, or Tonya's complaints about wage/gender

discrimination during her February 2019 discussion with Colanero. (Ex. 8, Aron depo., at 91:21-92:23).

<p style="text-align:center"><strong>AMC Gives a Disparate Review to Michael Pursell<br>With No Mention of the June 5 Discipline</strong></p>

275.    Michael Pursell, i.e., the other male Vice President that was involved in the same discipline issued to Tonya on June 5, 2018, also received a performance review for the calendar year 2018, and his supervisor gave him an overall rating of **"meets expectations."** (Ex. 24, Pursell depo., at 31:7-17, 86:21-91:6) (authenticating and later discussing Depo. Ex. 19); (Ex. 40, Depo. Ex. 19) (emphasis added).

276.    Pursell's supervisor did not revisit, or even mention, the previous June 5, 2018 discipline in Pursell's 2018 review; as far as Pursell and his supervisor were concerned, the June 5 issue was already "managed, taken care of and done." (Ex. 24, Pursell depo., at 86:21-91:6).

<p style="text-align:center"><strong>AMC Hires an Outside Expert to Evaluate Tonya's Compensation,<br>and the Expert Confirms that Tonya is Underpaid</strong></p>

277.    On rare occasions, AMC hires an outside company such as AON for assistance in valuing the appropriate compensation level for a position within AMC, and AMC did just that for Tonya's position in March 2019. (Ex. 9, Giuseffi depo., at 63:11-66:12).

278.    AMC paid AON approximately $1,000 for its analysis. (Ex. 9, Giuseffi depo., at 74:19-75:5)

279.    Exhibit 37 hereto is a true and accurate copy of the email communications between Mike Guiseffi's team, Colanero, and representatives of AON related to the process of AON evaluating the appropriate compensation level for Tonya's position in March 2019. (Ex. 9, Giuseffi depo., at 63:11-66:12) (referring to Depo. Ex. 183); (Ex. 37, Depo. Ex. 183).

280.     AON sent Colanero examples of two different types of marketing positions that were potential comparisons, and based on Colanero's input and response, AON determined that a *minimum* salary for her role would be $184,000/yr., that a *mid-point* salary for her role would be $230,000/yr., and that a *maximum* salary for her role would be $276,000/yr.  (Ex. 9, Giuseffi depo., at 66:13-72:2).

281.     At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. (Ex. 10, dec. of Mangels, at ¶ 74).

282.     Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position.  (Ex. 2, Colanero depo., at 320:7-17).

283.     Mike Guiseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis.  (Ex. 9, Giuseffi depo., at 75:12-76:4).

284.     No one ever made Adam Aron aware of the results of the AON analysis.  (Ex. 8, Aron depo., at 92:24-95:14).

285.     Tonya's compensation was never increased as a result of AMC's engagement of AON, or in response to Tonya's requests to revisit and increase her compensation in November 2018, December 2018, and February 2019 (as discussed above).  (Ex. 10, dec. of Mangels, at ¶ 75).

### Additional Responsibilities

286.     **11 Direct Reports:**  In March 2019, Tonya's team grew to a total of eleven direct reports with the addition of another employee (Kaleigh Lorenz).  (Ex. 10, dec. of Mangels, at ¶ 76).

## Tonya Files a Charge of Discrimination

287.    **14th Request to Increase Compensation:**  Exhibit 38 hereto is a true and accurate copy of the Charge of Discrimination Tonya filed with the EEOC on or around May 6, 2019.  (Ex. 10, dec. of Mangels, at ¶ 77); (Ex. 16, Chavarria depo., at 224:2-15) (discussing Depo. Ex. 184); (Ex. 38, Depo. Ex. 184).

288.    Colanero was surprised and disappointed that Tonya engaged a federal agency to report what she believed was discrimination based on sex, and retaliation for having complained about wage disparities and sex-based discrimination.  (Ex. 2, Colanero depo., at 321:21-322:4).

289.    Colanero agrees that, by the time of the May 6 Charge, Tonya had already engaged in multiple attempts to communicate with him about asking to have her compensation adjusted. (Ex. 2, Colanero depo., at 323:16-21).

290.    In her May 6 Charge, Tonya included the following allegations:

- "I have claims for violations of the Equal Pay Act, gender/sex discrimination, and claims for retaliation under Title VII and the Equal Pay Act based on AMC's actions in response to my numerous requests that my compensation be equalized with similarly situated males who perform substantially equal work."

- "I perform substantially equal work with the following VPs in the AMC organization: (1) VP, Programming Promotion; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Communication and Events; (5) VP, Pricing.  Each of these positions is held by a male employee. My job requires substantially equal skill, effort, and responsibility as the jobs of the male VPs identified above.  I have performed substantially equal work to each of these male VP for more than the past three years and have more seniority at AMC than four of these VPs.  On the AMC organization chart, my position is equal to the positions identified above."

- "I recently learned that the male VPs in the positions identified above are paid between 58% and 68% more than I am, including their base salaries and bonuses (which are based in part on base salary). This difference amounts to between $117,000 and $140,000 more dollars per year that is paid to the male employees compared to what AMC pays me."

- "Among comparable VPs, I am currently responsible for managing the second largest budget and have the second highest number of employees on my team.  My

responsibilities are extremely broad and consistently require me (like my male peers) to perform at a highly strategic and innovative level, and to generate revenue for the company."

- "I have made numerous requests that my compensation be increased in line with my duties and responsibilities."

- "In November 2018, I specifically requested that the 'Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work.' All of my requests for increased compensation have been deflected and Mr. Colanero has suggested that I should not ask for more and should be happy with what I get. On one occasion, Mr. Colanero falsely told me that my compensation was 'equal range' to the comparable male VPs. At the time he made the statement, he was not aware that I had been informed of the compensation paid to comparable male VPs."

- "My most recent performance review was conducted by my supervisor, Stephen Colanero, after he received and deflected several of my requests for increased compensation. In my most recent performance review I received ratings of 'exceeds expectations' and 'meets expectations' in all performance related categories. However Mr. Colanero gave me an overall review rating of 'does not meet expectations.' This was the lowest performance review in the entire marketing department and the only 'does not meet expectations' review. Mr. Colanero's and AMC's alleged basis for the negative review relates to an HR issue involving a male coworker who is also a VP and an anonymous allegation that I had consumed too much alcohol during a work related event. These allegations are themselves discriminatory and retaliatory for [several listed reasons]."

- "As a result of the unfair review, Mr. Colanero and AMC have now created a plausible (but false) reason for refusing to equalize my compensation."

- "When discussing this performance review, Mr. Colanero acknowledged that my performance was 'superior' but he felt that he needed to 'send a message' to me. Mr. Colanero's desire to send a message to me is both retaliatory and motivated by views that women should behave differently than men."

(Ex. 38, Depo. Ex. 184, at 1-2.)

291. Colanero and Chavarria were both aware of Tonya's pending May 6 Charge before she was terminated, and they understood that the comparator positions identified in her charge corresponded to Robert Kim, Julius Lai, Michael Pursell, Frank Ybarra, and Robert Lane. (Ex. 2, Colanero depo., at 321:9-11, 324:1-21); (Ex. 16, Chavarria depo., at 226:16-18, 226:15-228:10).

292.    Colanero and Chavarria were both identified by name in the May 6 Charge, and Chavarria clearly understood that they were both individually referenced in the charge. (Ex. 16, Chavarria depo., at 228:11-229:15).

293.    Adam Aron was aware that Tonya had a pending charge of discrimination before she was terminated, but he never read it. (Ex. 8, Aron depo., at 95:15-97:16).

294.    Chavarria read it, and she agrees that the May 6 Charge contains very clear complaints of gender discrimination and complaints of violations of the Equal Pay Act. (Ex. 16, Chavarria depo., at 226:3-11).

295.    Chavarria never performed her own factual investigation into the claims referenced in the May 6 Charge, and she is not aware of any conclusions that were ever reached by AMC regarding whether or not there was any merit to the claims referenced in the May 6 Charge. (Ex. 16, Chavarria depo., at 231:20-24, 235:4-11).

296.    Tonya's compensation was never increased as a result of Tonya filing her May 6 Charge. (Ex. 10, dec. of Mangels, at ¶ 78).

**AMC Announces a Reduction in Force ("RIF") and
Colanero Launches a Baseless Investigation into Plaintiff**

297.    AMC formally announced a reduction in force ("RIF") on August 20, 2019, and Colanero knew about the planned RIF for weeks in advance. (Ex. 2, Colanero depo., at 337:13-18); DSOF at ¶ 120.

298.    Colanero never told Tonya about the planned RIF before it was announced, and Colanero is not aware of anyone else that told Tonya about the RIF before it was announced. (Ex. 2, Colanero depo., at 338:10-21); DSOF ¶ 122.

299.    According to Colanero, two individuals—Cynthia Pierce and Carrie Trotter—came to him on August 19, 2019 (i.e., one day before the RIF announcement) "because they heard

*secondhand* information from people that were concerned about potential layoffs" based on information that Tonya allegedly shared with her team. (Ex. 2, Colanero depo., at 349:2-350:24) (emphasis added).

300.    Cynthia Pierce and Carrie Trotter were not in any of the purported meetings in which Tonya allegedly discussed this topic with anyone on Tonya's team. (Ex. 2, Colanero depo., at 350:5-351:6).

301.    Colanero never investigated the issue himself after it was reported to him, and he never went to Tonya prior to the RIF announcement to ask her about the issue. (Ex. 2, Colanero depo., at 351:17-24).

302.    Colanero is not aware of anyone at AMC ever learning or discovering that Tonya somehow learned about the RIF before it was announced. (Ex. 2, Colanero depo., at 357:19-24).

303.    No one on Tonya's team ever told Colanero that they heard Tonya say there was going to be RIF before it was announced. (Ex. 2, Colanero depo., at 349:24-350:4).

304.    Despite the above, Colanero approached Tonya "briefly" after the RIF was announced to inform her "that he had heard these complaints [from Pierce and Trotter], that [he] had relayed [them] to human resources, and that they would be doing an investigation." (Ex. 2, Colanero depo., at 353:4-15).

305.    **At the time he initiated the investigation, Colanero was unaware of Tonya ever knowing about the RIF in advance, and to this day, Colanero still believes that Tonya did not know about it in advance.** (Ex. 2, Colanero depo., at 353:16-354:1).

306.    Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of

the RIF or any planned layoffs before they were formally announced on August 20. (Ex. 10, dec. of Mangels, at ¶ 79).

## AMC Begins its Pretextual "RIF Investigation"

307. After the referral from Colanero, Chavarria asked a subordinate employee named Sharlynn Mutzbauer (also in Human Resources) to assist Chavarria in her efforts to investigate Tonya, and the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation. (Ex. 41, Mutzbauer depo., at 59:14-60:19 (both were carrying out the investigation after Chavarria asked Mutzbauer to participate), 62:7-16, 64:1-66:12, 85:17-24 (confirming the goal of the investigation)); (Ex. 16, Chavarria depo., at 267:2-268:4).

308. Chavarria agrees that Tonya reached out to her before Phase 1 of the investigation started, invited her to "please" speak to members of her team, and offered the following explanation in advance on August 22, 2019:

> Carla …. **Earlier this week Stephen mentioned I should expect you to contact me related to a report that said layoffs were happening this week during my staff meeting the prior week**.
>
> I would like to make small request that you consider taking 10-15 minutes to briefly touch base with a couple of folks on my team about the agenda and my communications, such as Lauren Doyle, Ellen Blanner, Ryan Davis, who were in my staff meeting last week. Doyle is at a shoot today and tomorrow so she'd be on cell 913-526-4754. Ellen and Ryan are in the office. **Certainly welcome to speak to any others as well though Jillian is on vacation and Marti was on vacation last week so wasn't in attendance.**
>
> The closing of my meeting was all in positive intention and encouraging the team. I recognized many peoples good work, the workloads, results, some new projects like NFL and the tough climate ahead which would make our efforts important to deliver. I spoke about our budget review going smoothly due in part to all of their work with me on the planning, being strategic and thinking bottom-up. We didn't inflate estimates, were supporting many key revenue drivers and it served us well as we got most everything approved. **I went on to suggest that they be aware and sensitive to others, because**

**some had significant cuts or maybe didn't have as many growth or revenue initiatives going on. I said something to the effect that it could cause potential jealousies and anxiety given the business climate so consider being overly understanding and considerate in the coming weeks.** While I like to pump my team up privately, I don't want to do that at the detriment of anyone else.

**I suggested not to get caught up in speculation, rumors, keep their heads down, focus on the work, stay out of the "fray." I said be confident and feel grateful they were working on key efforts which should position them well regardless of the business climate in my own opinion.** My intent was to be authentic in my communication, shift focus to what was in their control, laser in on the results but encourage compassion for others given the stressful times. **I didn't have any details about lay-offs and did not tell the team lay-offs were happening.**

I hope you will touch base with a few of the team and will see you Monday.

Thank you.

(Ex. 16, Chavarria depo., at 261:16-263:23) (discussing and authenticating Depo. Ex. 191); (Ex. 42, Depo. Ex. 191) (emphasis added); (Ex. 10, dec. of Mangels, at ¶ 80).

### Phase 1 Revealed that Tonya did not Tell Her Team about the RIF or any Layoffs Prior to the August 20 Announcement

309.    At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge).  (Ex. 16, Chavarria depo., at 268:5-271:11); (Ex. 10, dec. of Mangels, at ¶ 81).

310.    Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya).  (Ex. 16, Chavarria depo., at 271:11-22); (Ex. 41, Mutzbauer depo., at 111:13-115:9).

311.    Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14.  (Ex. 16, Chavarria depo., at 271:18-272:4).

312.    Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have

engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. (Ex. 16, Chavarria depo., at 7:7-9:14) (discussing Depo. Ex. 224 and counsel's previous stipulations as to AMC's designation of Chavarria); (Ex. 32, Depo. Ex. 224 (30(b)(6) notice issued to AMC)).

313. Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20. (Ex. 16, Chavarria depo., at 255:10-256:9).

314. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. (Ex. 16, Chavarria depo., at 253:17-254:14).

315. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. (Ex. 41, Mutzbauer depo., at 86:12-16, 89:11-24, 165:15-24, 167:25-168:12).

316. Mutzbauer and Chavarria also failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team. (Ex. 41, Mutzbauer depo., at 120:2-15); (Ex. 16, Chavarria depo., at 282:19-283:11).

317. Jordan Crouch, i.e., one of the direct witnesses interviewed about the August 14 meeting, sent a lengthy description of the meeting to Mutzbauer and Chavarria explaining that Tonya "got emotional [during the meeting], choked up with tears about the team's hard work,

expressed gratitude for what we've been doing as a team," that she "got emotional and teary at a - - at the challenging year ahead," and that "[s]he ended her portion of the meeting by saying it's going to be a tough few weeks, and once again thankful for our recent hard work, planning ahead, and the work that has been coming through the pipeline."  (Ex. 41, Mutzbauer depo., at 96:14-16, 97:25-100:22).

318.     Jordan Crouch also confirmed that he ran into Vice President Pamela Sandler on August 22, and Sandler—who was not present in the August 14 meeting—suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week."  (Ex. 41, Mutzbauer depo., at 109:10-110:11, 159:7-10); (Ex. 16, Chavarria depo., at 272:5-274:11).

319.     Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated.  (Ex. 16, Chavarria depo., at 310:21-25).

320.     Jordan Crouch expressly ***denied*** the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting.  (Ex. 41, Mutzbauer depo., at 109:10-110:11); (Ex. 16, Chavarria depo., at 272:5-281:19) (acknowledging Crouch's initial statement, taking the position that he later changed it, and then later revealing that Chavarria lacked any information suggesting that Crouch ever changed his initial statement).

321.     Chavarria and Mutzbauer also interviewed AMC employees Carrie Trotter, Cynthia Pierce, and Sarah Powers about the nature of the August 14 meeting, but none of them were present for the meeting and could not serve as direct witnesses to what occurred.  (Ex. 16, Chavarria depo., at 257:16-24, 259:1-4) (just Pierce and Trotter); (Ex. 41, Mutzbauer depo., at 115:10-24, 115:17-116:2, 121:22-125:25, 127:2-129:17, 130:7-135:2, 153:12-155:9) (Pierce, Powers, and Trotter).

322.     Cynthia Pierce told Mutzbauer and Chavarria that she spoke with an employee named Alice Rogers (not on Tonya's team), and that Alice Rogers related that she overheard two

unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday. (Ex. 41, Mutzbauer depo., at 121:22-125:25, 127:2-129:17).

323. Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team. (Ex. 41, Mutzbauer depo., at 127:2-129:17, 130:7-135:2).

324. Alice Rogers also never identified Tonya as the source of any of her information; Cynthia Pierce only "surmised" that Tonya was a source of Rogers' information. (Ex. 41, Mutzbauer depo., at 130:7-135:2).

**Phase 1 Also Ignored the Reality That There Was Widespread Rumor and Speculation within AMC about Possible Layoffs Before the RIF Announcement**

325. During her investigation, Mutzbauer never undertook any effort to understand whether there were any widespread rumors or conversations within the company about possible layoffs between the time of an announced Profit Improvement Plan and the time of the formal announcement of the RIF. (Ex. 41, Mutzbauer depo., at 93:5-13).

326. AMC formally and publicly announced a Profit Improvement Plan in advance of the RIF announcement in a press release issued on August 8, 2019. (Ex. 2, Colanero depo., at 333:5-334:3) (referring to Depo. Ex. 8); (Ex. 39, Depo. Ex. 8 (AMC press release)); (Ex. 10, dec. of Mangels, at ¶ 82); (Ex. 24, Pursell depo., at 96:20-104:4); (Ex. 1, Mangels depo., at 132:22-133:16, 335:16-338:15); (Ex. 16, Chavarria depo., at 236:14-243:25).

327. The August 8 announcement described "a comprehensive profit improvement plan to enhance operational efficiency…," and stated that its "initiatives will seek to achieve cost savings across the entire income statement, including **general and administrative**." (Ex. 39,

Depo. Ex. 8 (AMC press release) (emphasis added); (Ex. 10, dec. of Mangels, at ¶ 83); (Ex. 1, Mangels depo., at 132:22-133:16, 335:16-338:15); (Ex. 16, Chavarria depo., at 236:14-243:25).

328. It was well known within AMC that overhead expenses such as employee salaries were included within the "general and administrative" portion of the budget. (Ex. 10, dec. of Mangels, at ¶ 84); (Ex. 24, Pursell depo., at 96:20-104:4); (Ex. 1, Mangels depo., at 132:22-133:16, 335:16-338:15); (Ex. 16, Chavarria depo., at 236:14-243:25).

329. On August 13, 2019, Chief Financial Officer Craig Ramsey held a meeting with director-level and above employees at AMC's Headquarters Town Center Theater (in a large auditorium) to further discuss the Profit Improvement Plan, and the fact that it included reductions to AMC's general and administrative expenses, which necessarily entailed a reduction in employee overhead/salaries. (Ex. 10, dec. of Mangels, at ¶ 85); (Ex. 24, Pursell depo., at 96:20-104:4); (Ex. 1, Mangels depo., at 132:22-133:16, 335:16-338:15); (Ex. 16, Chavarria depo., at 244:1-10).

330. Vice President Michael Pursell attended the Craig Ramsey meeting and explained his observations this way: "When you look at the [Profit and Loss statement], labor is one of the biggest line items, you know? So if you're going to make -- if you're going to make a change to the finances of the company, you know, this is going to be probably one of the bigger ways to make a change to your P&L, right? So you know, I don't think [Craig Ramsey] needed to come out and specifically say that [at the director level and above meeting]. I think everybody was -- could read between the lines pretty easily to know that okay, something's going to happen, just nobody knew when, right? That was the wild card." (Ex. 24, Pursell depo., at 100:7-24).

331. After the meeting, several members of Pursell's team came to him with concerns about losing their job, and Pursell was also concerned about losing his own job. (Ex. 24, Pursell depo., at 101:3-103:10).

332. Pursell testified that "several of his directors came to [him] and asked for clarity…[;] they basically all said we all know it's coming, it's just a matter of when, right?" (Ex. 24, Pursell depo., at 101:3-102:7).

333. Pursell testified that the internal discussions about possible layoffs were widespread throughout the company after the director-level and above meeting, and Pursell recalls people using the terms "layoffs" and "reduction in force" in their conversations with him about the issue before the RIF was formally announced. (Ex. 24, Pursell depo., at 102:13-104:4).

334. Vice President of Human Resources Rosalind Reeves also recalls that one or two of her own team members approached her after the director-level and above meeting, that they shared their concerns about the anticipated "budget cuts," that they asked her if she "thought that it would lead to a reduction in force," and that Reeves was required to engage with them on that topic due to their concerns. (Ex. 25, Reeves depo., at 26:5-29:10 (Vice President), 217:20-222:7).

335. Vice President Robert Kim also recalls that there were widespread discussions about possible layoffs throughout the company after the Profit Improvement Plan announcement, and Kim recalls people using the terms "layoffs" and "reduction in force" in their conversations with him about the issue before the RIF was formally announced. (Ex. 43, Kim depo., at 17:19-23 (Vice President), 81:23- 86:13).

336. Robert Kim also feared losing his own job, and he agrees that, prior to the formal RIF announcement, there was a period of "several weeks" of "rumors, speculation, [and] discussions of concerns about a reduction in force being [imminent] and people being concerned about what was going to happen." (Ex. 43, Kim depo., at 82:12-14, 86:8-13).

337. Robert Kim recalls that members of his team approached him after the Profit Improvement Plan announcement, that they shared concerns about the impact of the announcement

on their team, that they were concerned about keeping their jobs, and that he was required to engage with them on that topic due to their expressed concerns. (Ex. 43, Kim depo., at 81:23-86:13).

338. Vice President Frank Ybarra—who reported to Colanero—also recalls that, after the Profit Improvement Plan announcement and the director-level and above meeting, people at AMC were concerned about potential layoffs, and that he has "some recollection of employees talking about potential concerns about their jobs…." (Ex. 45, Ybarra depo., at 18:18-24 (Vice President), 19:3-20:7, 80:16-83:10).

339. Vice President Robert Lane also testified that a female member of his team approached him between the time of the Profit Improvement Plan announcement and the time of the RIF announcement, that she shared concerns about potentially losing her job, and that he was required to engage with her on that topic due to her expressed concerns. (Ex. 51, Lane depo., at 11:15-18, 13:1-20, 67:10-14, 69:10-74:3).

340. Even though Lane did not know whether the concerned employee was actually going to lose her job (or about the planned RIF), he told her that she "didn't need to be worried" because he "need[ed] to make sure [he was] motivating [his] team" and because he "believe[d] that [his] team does important work and [his] point was we prove our value." (Ex. 51, Lane depo., at 67:10-14, 73:8-74:3).

341. Robert Kim and Michael Pursell also testified that, a few days in advance of the August 20 announcement, Pursell, Kim, and others became aware of the fact that all of the conference rooms at the AMC headquarters were booked by Human Resources, and that this also became an additional source of discussion and concern about what was planned for August 20. (Ex. 43, Kim depo., at 86:24-89:3); (Ex. 24, Pursell depo., at 107:1-108:16).

**Some AMC Employees Were also Selectively Informed About the RIF Before it Occurred**

342.     Colanero also told another Vice President on his team—Carrie Trotter—about the RIF before it was announced to "gain some guidance on specific actions that would impact her team." (Ex. 2, Colanero depo., at 338:24-339:16); DSOF 124.

343.     According to Colanero, Cynthia Pierce and Carrie Trotter both already knew about the planned RIF when they originally came to him with information about Tonya on August 19, 2019. (Ex. 2, Colanero depo., at 351:25-352:20).

344.     Colanero also testified that "it's possible" he had a similar conversation with Julius Lai. (Ex. 2, Colanero depo., at 343:2-6); DSOF 124.

345.     Vice President Frank Ybarra was also aware of the planned RIF before it was formally announced on August 20. (Ex. 45, Ybarra depo., at 84:17-86:24).

346.     Michael Pursell and his co-worker Nels Storm were also made aware of the reduction in force before it was set to occur—even though they "[weren't] supposed to learn of it"—because their boss, Senior Vice President Jennifer Douglas, clued them in to the importance of August 20, and the fact that she was going to be in the office that day instead of being out of town for a previously scheduled vacation. (Ex. 24, Pursell depo., at 104:5-106:25).

347.     Pursell could not recall the exact words Douglas used, but the clear import of their conversation was that she needed to be back in town for what was coming, that she did not want her presence to be a surprise, and that she wanted them to understand that they were not in danger of losing their jobs. (Ex. 24, Pursell depo., at 104:5-106:25).

348.     Exhibit 44 hereto is a true and accurate copy of an August 23, 2019 email exchange between Pamela Sandler, Colanero, and Chavarria in which Pamela Sandler also expressly apologized to Colanero for her "sharing of confidential information, specifically as it applies to

this week's layoffs," and for "participating in the gossip." (Ex. 16, Chavarria depo., at 309:9-310:20) (discussing Depo. Ex. 200); (Ex. 44, Depo. Ex. 200).

349.     Sandler never suffered any adverse employment actions due to her sharing of confidential information related to the August 20 RIF; she instead assumed most of Tonya's former responsibilities after Tonya was fired. (Ex. 16, Chavarria depo., at 309:9-310:25).

### Tonya's Response to Her Team Was No Different Than Others

350.     During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF. (Ex. 1, Mangels depo., at 132:22-133:16, 335:16-338:15); (Ex. 10, dec. of Mangels, at ¶ 86).

351.     When Tonya's team inquired about the possibility of a RIF, Tonya was required to address the issue with her team members just like Michael Pursell, Rosalind Reeves, Robert Lane, and Robert Kim were required to address that issue with their team members, but Tonya told her team that she was not aware of any upcoming RIF, and that they should "keep [their] heads down, you know, just stay out of the fray and stay focused on what you can control…." (Ex. 1, Mangels depo., at 335:16-338:15); (Ex. 10, dec. of Mangels, at ¶ 87).

352.     Again, Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. (Ex. 10, dec. of Mangels, at ¶ 88).

## Phase 2 of the Investigation Also Found No
## Credible Evidence of Tonya Wrongfully "Interrogating" her Team

353.    After Phase I of the investigation concluded, Mutzbauer and Chavarria's investigation broadened into a second phase that involved their inquiry into the question of whether Tonya somehow improperly "interrogated" people on her team about what occurred during the August 14 meeting. (Ex. 41, Mutzbauer depo., at 151:7-16, 159:18-25) (discussing the two phases); (Ex. 16, Chavarria depo., at 286:21-288:2, 291:4-292:13) (testifying that she does not disagree with Mutzbauer's characterization of what was investigated in Phase 2, but stating that it may have also included instances in which Tonya created "fear" with her team members).

354.    Importantly, Colanero never instructed Tonya that she was not permitted to go back and speak with her team and ask them about, "hey, guys, was there anything I said to you during our August 14 meeting that was concerning to you."  (Ex. 2, Colanero depo., at 355:14-23).

355.    Chavarria and Mutzbauer also confirmed that they were not aware of anyone at AMC telling Tonya that she was not permitted to follow up with her own team to ask about them about the August 14 meeting and whether there was anything Tonya said that was concerning to them.  (Ex. 41, Mutzbauer depo., at 96:17-97:24); (Ex. 16, Chavarria depo., at 265:23-266:11).

356.    Chavarria did not conduct any interviews related to Phase 2 of the investigation aside from attending one interview with Tonya; all Phase 2 interviews were conducted by Mutzbauer.  (Ex. 16, Chavarria depo., at 288:4-290:10, 296:13-299:18).

357.    During Phase 2, Mutzbauer interviewed three (3) out of the ten (10) people present for the August 14 meeting; two of them (Ellen Blanner and Lauren Doyle) said nothing about Tonya "interrogating" them, and did not use that word.  (Ex. 41, Mutzbauer depo., at 159:11-162:7).

358.    According to Mutzbauer, only one employee—Jillian Knipplemeyer—allegedly said that she felt "interrogated" by Tonya during her conversation with Tonya about the August 14 meeting, and that Tonya asked Knipplemeyer if she reported her to Human Resources.  (Ex. 41, Mutzbauer depo., at 152:10-153:6, 159:11-162:7).

359.    Tonya denies interrogating anyone on her team, and Tonya also denies asking anyone on her team whether they reported her to Human Resources.  (Ex. 1, Mangels depo., at 353:7-355:6); (Ex. 10, dec. of Mangels, at ¶ 89).

360.    Tonya simply asked members of her team whether "they had the impression" on August 14 that she suggested anything to them about planned layoffs, and if so, whether they communicated that conclusion (albeit a mistaken conclusion) to any other person at AMC.  (Ex. 1, Mangels depo., at 353:7-355:6); (Ex. 10, dec. of Mangels, at ¶ 90).

361.    Tonya felt "targeted" and "badgered" by Human Resources throughout the "RIF investigation" because, in her view, she *alone* was investigated for tactfully and professionally responding to an issue that was the subject of widespread speculation and discussion throughout the company through no fault of her own.  (Ex. 1, Mangels depo., at 342:24-345:4); (Ex. 10, dec. of Mangels, at ¶ 91).

362.    During her interview with Chavarria, Tonya told Chavarria that she felt like the investigation was a form of retaliation because she had a pending charge with the EEOC.  (Ex. 10, dec. of Mangels, at ¶ 92).

363.    Chavarria recalls Tonya possibly referring to her pending charge during their discussion, but she refuses to admit that Tonya referenced the EEOC charge in relation to her belief that she was being subjected to retaliation.  (Ex. 16, Chavarria depo., at 303:22-304:23).

364. Chavarria is not aware of anyone at AMC ever generating a written report of findings in relation to the "RIF" investigation that Chavarria conducted with Mutzbauer—even though Chavarria acknowledges that, as an HR professional, it is a "best practice" to generate such a report. (Ex. 16, Chavarria depo., at 305:25-309:8).

365. She instead contends that "some" of the findings are contained in an email generated by Mutzbauer, and that the termination script from Chavarria's September 30, 2019 termination meeting with Tonya also contained "part of [AMC's] findings." (Ex. 16, Chavarria depo., at 305:25-309:8).

366. Mutzbauer generated her recap email on September 3, 2019 containing "some" of AMC's findings from the "RIF investigation," but Tonya was not formally terminated until September 30, 2019. (Ex. 16, Chavarria depo., at 311:3-312:10).

367. On September 20, 2019, Plaintiff mediated her EEOC claims against AMC with a private mediator; Colanero attended the mediation on behalf of AMC, and the matter did not resolve. (Ex. 2, Colanero depo., at 361:24-362:11)' (Ex. 10, dec. of Mangels, at ¶ 93).

368. After the failed mediation, Tonya sent Colanero and Chavarria the email attached hereto in Exhibit 46, and said the following:

Stephen and Carla,

I have always put my heart and soul into my work at AMC and remain committed to that endeavor. I have continuously grown as an executive and leader in this Company, and, together with my team, have delivered very strong results consistently over the years with increasing breadth of impact. In addition, I continue to spearhead strategic innovations and explorations for the future growth of AMC. My relationships with internal cross-functional partners, dotted line support to Programming/F&B and key vendor partners are incredibly strong. The engagement and teamwork within my group has never been more solid. We are achieving some phenomenal accomplishments and realizing incredible synergies. I'm completely invested and have a great deal of equity built up over the last 10 years.

**I want you to know that I am committed to my career at AMC and am not looking for a path out of the company. That was fundamentally never the intent of expressing my concerns.** If you are open to it, I would welcome a discussion on how to move forward.

Thank you,
Tonya Mangels

(Ex. 16, Chavarria depo., at 312:25-315:1) (discussing and authenticating Depo. Ex. 207); (Ex. 46, Depo. Ex. 207) (emphasis added).

369. Tonya's May 6 EEOC charge was still pending at the time of her September 23 email, and it was still pending at the time of her discharge on September 30, 2019. (Ex. 16, Chavarria depo., at 313:3-12).

**Tonya's Retaliatory and Discriminatory Termination**

370. At the conclusion of AMC's "RIF investigation," and close in time to the failed mediation, Chavarria reported to Colanero that Tonya "acted inappropriately as an officer, that she had caused fear among her team and given them reason to fear for their jobs, and that she had acted unprofessionally in conducting her own investigation, and tried to pressure witnesses, and to find out who potentially had reported her." (Ex. 2, Colanero depo., at 360:14-22).

371. Colanero accepted Chavarria's conclusions in their entirety, and did not interview any of Tonya's team members to reach his own assessment of the allegations/conclusions. (Ex. 2, Colanero depo., at 360:23-361:11).

372. None of the employees on Tonya's team ever reached out to Colanero in order to communicate that Tonya caused them to be fearful of losing their jobs. (Ex. 2, Colanero depo., at 361:12-17).

373.     Colanero and Chavarria reached their *joint* decision to terminate Tonya before they reached out to Adam Aron on a phone call in order to advise Adam Aron of their intention to terminate.  (Ex. 16, Chavarria depo., at 315:2-316:17); (Ex. 2, Colanero depo., at 19:1-7) (joint decision).

374.     Colanero spoke to Adam Aron in "broad terms of questioning [Tonya's] integrity, honesty, being forthright, and just it being the right time to separate based upon the most recent disciplinary action, coupled with past performance."  (Ex. 16, Chavarria depo., at 317:4-24).

375.     Chavarria verbally agreed with Colanero, and Adam Aron "told [them] if that's what you think you should do," and did not express any objections.  (Ex. 16, Chavarria depo., at 317:4-24).

376.     According to Adam Aron, he was not "actively involved in the career management of Tonya Mangels."  (Ex. 8, Aron depo., at 96:9-97:6).

377.     Adam Aron was aware that Tonya had a pending charge of discrimination before she was terminated, but he never read it.  (Ex. 8, Aron depo., at 95:15-97:16).

378.     "[H]er complaint to the EEOC was not something that [he] looked at or was concerned about…in the performance of his job duties as CEO of a $5 billion company with a lot of issues on [his] plate…."  (Ex. 8, Aron depo., at 96:9-97:6).

379.     Chavarria was aware that Tonya's May 6 Charge was still pending with the EEOC on the date she was terminated.  (Ex. 16, Chavarria depo., at 235:13-18).

380.     No one else at AMC—other than Tonya—was ever investigated in relation to allegedly discussing the potential for layoffs within the company prior to the formal announcement of the RIF.  (Ex. 41, Mutzbauer depo., at 115:10-16).

381. No one else at AMC—other than Tonya—was ever written up, disciplined, terminated, or suffered any other adverse employment action because they were allegedly talking about potential layoffs prior to the formal announcement of the RIF. (Ex. 41, Mutzbauer depo., at 91:12-18); (Ex. 16, Chavarria depo., at 246:12-247:7).

## ADDITIONAL EQUAL PAY ACT INFORMATION

### Tonya's Compensation

382. Tonya's annual compensation package at AMC was as follows in each year specified below:

| YEAR | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| **BASE SALARY** | $143,500 | $153,500 | $156,570 | $159,701 |
| **BONUS INCENTIVE** | $43,050 | $46,050 | $46,950 | $47,900 |
| **EQUITY INCENTIVE** | $39,287 | $60,000 | $80,000 | $80,000 |
| **TOTAL PACKAGE** | $225,837 | $259,550 | $282,620 | $287,601 |

(Ex. 10, dec. of Mangels, at ¶ 95).

383. Exhibit 34 hereto contains a true and accurate copy of Tonya's job description as it existed in the fall of 2018. (Ex. 10, dec. of Mangels, at ¶ 96); (Ex. 34, Depo. Ex. 172).

**Skill (i.e., the experience, training, education, and ability necessary to perform the job)**

384. According to her job description, Tonya's position required a minimum of a bachelor's degree in marketing, journalism, or business, and an MBA was listed as "preferred" but not required. (Ex. 34, Depo. Ex. 172).

385. Tonya has a bachelor's degree in Business/Public Relations, and a master's degree in Integrated Marketing. (Ex. 10, dec. of Mangels, at ¶ 97).

386. According to her job description, Tonya's position at AMC required the following experience:

- 15+ years in consumer marketing – national multi-unit restaurant/QSR, retail, entertainment preferred
- 8-10 years in digital media, multi-channel marketing, IT/UX oversight, social media, merchandising
- 8-10 years integrated media planning & buying
- 8+ years product launch, concept development, brand strategy, testing
- 5-7 years in ticket sales, promotions/event management, pricing recommendations
- 5+ years in sales, sales support and monetization of marketing, media, data assets
- Prior experience leading and developing a team is required
- Prior experience managing external agencies, vendors, contractors & creative resources required
- Experience managing multiple brands & categories, varied in size, scope, and priority preferred
- Record of collaboration, innovation & understanding emerging channels and technologies
- Influencing & negotiation experience required
- Experience working with franchisees, ops partners & complex 3rd party vendor relationships preferred

(Ex. 34, Depo. Ex. 172).

387. Prior to her termination at AMC, Tonya had more than 25 years of professional experience in the field of marketing. (Ex. 10, dec. of Mangels, at ¶ 98).

388. Prior to working at AMC, Tonya worked as a National Account Director for Barkley Advertising (2008-2009), a Senior Marketing & Sales Leader for YUM! Brands—Pizza Hut, Wing Street, and Italian Bistro (2004-2008), a Marketing Manager for Godfather's Pizza, Inc. (2002-2004), a Director of Strategic Planning & Sales at Premier Sports Management (2002), a Director of Marketing for the Kansas City Royals Baseball Club (1996-2001), and an Account Coordinator for Boasberg Valentine Radford Public Relations (1994-1995). (Ex. 10, dec. of Mangels, at ¶ 99).

389. According to her job description, Tonya's position required the following training:

- Fluent in all Microsoft Office applications

- Development and implementation of multi-channel, multi-unit, national scope marketing plans
- Experience working with food and beverage marketing, product innovation, calendar strategy
- Multi-brand, franchise or complex 3rd party partner business structure experience
- Entertainment, theatrical industry experience

(Ex. 34, Depo. Ex. 172).

**Responsibility (i.e. the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation)**

390.    Tonya was responsible for a managing an annual departmental budget that grew from less than $1 million at the beginning of her employment at AMC to approximately $10 million by the time of her termination (excluding additional funds associated with monetized partnerships).  (Ex. 10, dec. of Mangels, at ¶ 100).

391.    Tonya's role at AMC was "fairly unique" because it required extensive collaboration and crossover with "multiple key functional areas" of AMC's business, especially in relation to her collaboration and crossover with the following three groups: Food & Beverage (Michael Pursell, VP), Film Marketing/Programming (Robert Kim, VP), and Pricing (Robert Lane, VP).  (Ex. 10, dec. of Mangels, at ¶ 101); (Ex. 1, Mangels depo., at 369:4-376:2).

392.    Tonya primarily reported to Colanero, but she also maintained "dotted-line" responsibility to the Senior Vice Presidents that oversaw the three groups referenced above:  Food & Beverage (George Patterson and Jennifer Douglas, Sr. VPs), Film Marketing/Programming (Elizabeth Frank, Sr. VP), and Pricing (Elizabeth Frank, Sr. VP).  (Ex. 10, dec. of Mangels, at ¶ 102); (Ex. 1, Mangels depo., at 369:4-376:2).

393.    During her deposition, Tonya offered this explanation:

As I've stated before, my role was fairly unique that I was crossing over multiple key functional areas, so, Rob Kim really only worked on film-related things and then Michael only worked on really, like, food and beverage, mobile ordering, merchandising things and then, you know, down the line.  Robert in pricing worked on --across all of those I would

237

say, you know. …but what I'm saying is that I worked with -- I had film marketing as part of my responsibility, I had food and -- so, I actually had a dotted line report to his boss, who is Elizabeth, and also to Jennifer or George. So, I reported to Stephen, but then, like, those were my two other, like, key leaders that I served, so, my job was supporting and working with all of those groups so it was really great to have that perspective of how it worked across all those; so, I would say I was more -- I had subject matter expertise across all of those varying different functional areas.

(Ex. 1, Mangels depo., at 372:4-373:3).

394.    According to her position description, Tonya was supposed to "have a seat at the table to influence strategic decision making for the marketing organization, … [and to] work[ ] in close partnership with F&B team, Alcohol team, DIT team, Procurement team, Pricing Team and Programming Promotions [i.e., Film Marketing]." (Ex. 34, Depo. Ex. 172).

395.    Tonya was also required to negotiate contracts in her role, and there were many instances in which she collaborated with Michael Pursell and Robert Kim on contractual negotiations related to initiatives undertaken in partnership with the Food & Beverage and Film Marketing/Programming groups. (Ex. 10, dec. of Mangels, at ¶ 103); (Ex. 1, Mangels depo., at 369:20-371:6).

**Effort (i.e., the physical or mental exertion necessary to the performance of a job)**

396.    Tonya was required to work on a 24/7 basis, as necessary, and she was required to make herself available to the CEO and other executives as necessary. (Ex. 10, dec. of Mangels, at ¶ 104).

397.    Tonya estimates that she spent approximately 30% of her time on her own work, and the other 70% of her time was spent coaching, leading, and developing staff in her department as well as staff in other departments (primarily Food & Beverage and Film Marketing/Programming). (Ex. 10, dec. of Mangels, at ¶ 105).

398.   Tonya estimates that she spent 25-35% of her time travelling for job-related reasons.  (Ex. 10, dec. of Mangels, at ¶ 106).

**Comparator Michael Pursell**

399.   Michael Pursell was a Vice President of Food & Beverage at AMC between February 2015 and July 2020, and his role within the company required an extensive amount of overlap and collaboration with Tonya and her team.  (Ex. 24, Pursell depo., at 20:2-21:2, 49:21-59:17).

400.   Pursell's annual compensation package at AMC was as follows in each year specified below:

| YEAR | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| BASE SALARY | ███████ | ███████ | ███████ | ███████ |
| BONUS INCENTIVE | ███████ | ███████ | ███████ | ███████ |
| EQUITY INCENTIVE | ███████ | ███████ | ███████ | ███████ |
| TOTAL PACKAGE | ███████ | ███████ | ███████ | ███████ |
| TOTAL AMOUNT MORE THAN TONYA | ███████ | ███████ | ███████ | ███████ |

(Ex. 24, Pursell depo., at 28:12-30:20).

401.   Exhibit 50 hereto is a true and accurate copy of Pursell's job description.  (Ex. 24, Pursell depo., at 31:22-37:7) (referring to Depo. Ex. 22); (Ex. 50, Depo. Ex. 22).

**Skill (i.e., the experience, training, education, and ability necessary to perform the job)**

402.   According to his job description, Pursell's position required a minimum of a bachelor's degree in business (or a related field), and an MBA was listed as a "plus."  (Ex. 50, Depo. Ex. 22).

403.     Pursell has a bachelor's degree in Marketing, an associate's degree in culinary arts, and a master's degree in Business Administration; Pursell agrees, however, that his position only required a bachelor's degree.  (Ex. 24, Pursell depo., at 10:3-14, 34:4-36:21).

404.     According to his job description, Pursell's position at AMC required the following experience:

- 10+ years multi-unit restaurant or food and beverage equivalent experience.
- 5+ years in corporate functional role with increasing responsibility.
- Franchise leadership role beneficial.

(Ex. 50, Depo. Ex. 22).

405.     Prior to working at AMC, Pursell worked at Aramark for approximately eleven years; he served as a director of development, a group director, and he spent the last six years as their **Vice President of Marketing** for their education division.  (Ex. 24, Pursell depo., at 12:9-14:2) (emphasis added).

406.     Pursell also worked as a Director of Food & Beverage at a company called Wawa for approximately two years immediately prior to joining AMC; in that role, he reported up through the **marketing** chain, and his job entailed menu strategy, managing contracts, research and development, supply chain management, and partnership with other people in the marketing department to develop offers and promotions.  (Ex. 24, Pursell depo., at 14:3-15:5).

407.     According to his job description, Pursell's position required the following training:

- Knowledge and experience with restaurant systems and processes.
- **Ability to manage and communicate up/down an organization structure.**
- **Basic understanding of contracts and experience with vendor management.**

(Ex. 50, Depo. Ex. 22) (emphasis added).

408.     Pursell was not required to understand any specialized technology or software in order to perform his job.  (Ex. 24, Pursell depo., at 66:14-67:2).

**Responsibility (i.e. the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation)**

409.    Pursell does not believe his position was any more or less important than Tonya's position at AMC, and his position was never ranked any higher or lower than Tonya's. (Ex. 24, Pursell depo., at 23:15-25).

410.    Pursell was responsible for managing an annual departmental budget of "a couple million dollars." (Ex. 24, Pursell depo., at 44:21-49:12).

411.    Pursell primarily reported to Senior Vice President George Patterson, and later reported to Senior Vice President Jennifer Douglas after Patterson retired in the fall of 2018. (Ex. 24, Pursell depo., at 25:1-24).

412.    Pursell supervised approximately 6-8 subordinate employees during George Patterson's tenure, and that number fell to approximately 2-3 subordinate employees when Jennifer Douglas assumed Patterson's role. (Ex. 24, Pursell depo., at 41:23-43:12).

413.    According to his position description, Pursell was required to "partner[ ] with other departments and key organization leaders to gain a better understanding of how they can assist in achieving department goals." (Ex. 50, Depo. Ex. 22).

414.    Pursell developed his department's strategy in conjunction with Tonya's marketing team and the purchasing group; they created a strategic plan with common objectives and tactics, and they collectively made sure that their shared initiatives were appropriately staffed. (Ex. 24, Pursell depo., at 37:14-40:2).

415.    Tonya's food and beverage team was tasked with developing unique strategies, programs, menu innovations, offers, and concept experiences across three (3) different brands to profitably drive Food & Beverage revenue growth, to increase transactions, to sell more

units/items, and to ensure guest satisfaction with the overall Food & Beverage experience. (Ex. 10, dec. of Mangels, at ¶ 107).

416. The Food & Beverage guest experience includes areas such as the appeal of the menu offering (i.e., improving taste, quality, or execution of an existing product category or adding a new product offering), understanding of ordering processes by brand (mobile, kiosk, counter, or server ordering), packaging (in terms of presentation and maintaining quality prior to consumption), packaging branding, and third-party party monetized commitments or specialty packaging vessels that were sold to guests for higher prices or creating loyalty through refillable options. (Ex. 10, dec. of Mangels, at ¶ 108).

417. Tonya and Pursell's teams directly collaborated on food and alcohol menu pricing, bundling of menu items, discounted "Limited Time Offers," product size/portion offerings, product and vendor recommendations, and ensuring that all offerings were aligned with the unique brand strategy for each of the three (3) brands. (Ex. 10, dec. of Mangels, at ¶ 109).

418. AMC's central business involved entertainment, food, and service with a very high volume of attendees, and it was very attractive for vendors to be selected for AMC's menu/product offerings, to be featured on menus, digital signage, and other merchandising elements due to the sheer volume of sales. (Ex. 10, dec. of Mangels, at ¶ 110).

419. This presented AMC (and Tonya and Pursell's teams) with a unique opportunity to monetize the opportunity for inclusion in the menus, and to further monetize direct monies or product rebates if vendors were featured or highlighted in Limited Time Offers or other bundle programs. (Ex. 10, dec. of Mangels, at ¶ 111).

420.     Tonya worked closely with Pursell to jointly approach vendors with potential partnership plans, to suggest sales forecasts, and to negotiate Food & Beverage partnerships for incremental funding.  (Ex. 10, dec. of Mangels, at ¶ 112).

421.     Tonya's team members had weekly meetings with members of the Food & Beverage team, and Tonya additionally met multiple times per week with Pursell directly.  (Ex. 10, dec. of Mangels, at ¶ 113).

422.     Given the level of Tonya's integration into the Food & Beverage business, Tonya also frequently met with Pursell's supervisor, either George Patterson or Jennifer Douglass.  (Ex. 10, dec. of Mangels, at ¶ 114).

423.     Tonya also interacted directly with members of Pursell's team, typically the Director of Alcohol, and she frequently met with John Macdonald, i.e, the supervisor to George Patterson and Jennifer Douglass when they served in their roles.  (Ex. 10, dec. of Mangels, at ¶ 115).

424.     Tonya's 1:1 time with Pursell was typically focused on strategic priorities, developing presentations for upcoming project and result updates, reviewing analytics, reviewing guest and theater team feedback, monetizing vendor opportunities, resource implications, calendar planning, developing special AMC Stubs loyalty offers, considering how to drive more sales with initiative guests, brainstorming, reviewing creative or digital signage, coaching their collective team members, and addressing periodic issues that created additional challenges for their collective teams.  (Ex. 10, dec. of Mangels, at ¶ 116).

425.     Tonya and Pursell also served on several working groups and committees together, including the POPS Committee (or Food & Beverage "Prices, Offers, Portions and Sizes"), the Food & Beverage Mobile Ordering Working Group and Steering Committee, the Food & Beverage

Digital Signage Working Group, and the Initiative Guest Taskforce. (Ex. 10, dec. of Mangels, at ¶ 117); (Ex. 24, Pursell depo., at 37:14-40:2) (discussing their joint involvement on several committees, and their joint efforts to "publish and communicate key initiative updates to various stakeholders" and provide joint direction to their teams).

426. Tonya and Pursell's teams jointly held a variety of weekly, bi-weekly, monthly, or periodic vendor summits and meetings with Coca-Cola, ICEE, Tyson, Weaver Popcorn, Conagra, Mars, Promotion in Motion, Pepsi/Frito Lay, Hershey, Taste of Nature, FunNacho, Allure Global, Gold Medal Products, AICP, Constellation Brands, MillerCoors, Nestle, PCI Packaging, Vistar, Marketeam, Culinary Edge Consultants, Lagunitas, Infinium Spirits, Boston Beer, Patron Spirits, Promixo, American Beverage Marketers, Brown-Forman, Barcardi USA, Tito's Handmade Vodka, Crown Imports, Southern Glazers Wine & Spirits, Beam Suntory, Stone Brewing Company, Pernod Ricard, Jackson Family Wines, and Francis Ford Coppola wines. (Ex. 10, dec. of Mangels, at ¶ 118); (Ex. 24, Pursell depo., at 59:18-60:9, 70:12-24) (discussing their shared responsibility for maintaining AMC's vendor relationships such as Coca-Cola, Pepsi, Tyson's, and Con-Agra, and travelling to visit important vendors such as Coca-Cola).

427. Frequently, other members of their respective teams would also join these meetings in addition to other AMC employees from purchasing (supply chain) or operations. (Ex. 10, dec. of Mangels, at ¶ 119).

428. The meetings included a range of general, project status updates, discussing upcoming products or specification changes, plan product tests, discussing menu or pricing changes, discussing celebrity integrations, sharing new strategies or capabilities, discussing consumer insights, reviewing results, conducting menu or liquor tastings, conducting innovation lab visits, and discussing monetization proposals and planning. (Ex. 10, dec. of Mangels, at ¶ 120).

429. Pursell was required to negotiate contracts in his role, but there were "lots" of instances in which Tonya was involved in negotiating the very same contracts with Coca-Cola and "a lot" of other liquor vendors. (Ex. 24, Pursell depo., at 37:14-40:2).

430. Tonya and Pursell also frequently travelled together for industry conferences, events, market visits, theater visits and grand openings, menu innovation lab sessions, competitor visits, and general business meetings; many of those meetings were followed by social outings, lunches, dinners, events, suites, client entertainment outings, cocktail parties, and so forth. (Ex. 10, dec. of Mangels, at ¶ 121).

431. Joint travel to AMC theater locations was particularly necessary when new concepts, menus, product tests, merchandising/offers, packaging, incentive contests, vendor activations, or Food & Beverage service amenities were being launched such as Feature Fare Menu, CLASSIC Value Menu Test, mobile ordering, bar openings, kiosk ordering, LTO's, Coke Freestyle or Teen Program, new film/studio themed retail, refill tests, digital signage configuration or content changes, and when the guest ordering experience changed. (Ex. 10, dec. of Mangels, at ¶ 122).

432. Joint travel was also necessary throughout AMC's acquisition of other cinema chains (e.g., Carmike Cinemas, Starplex, Keresotes, etc.) because Tonya and Pursell's teams were jointly involved in the process of evaluating and modifying the branding, signage, menus, staffing, and other characteristics associated with the legacy locations. (Ex. 10, dec. of Mangels, at ¶ 123).

433. Throughout all of this ongoing interaction between Tonya, Pursell, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC, and new methods for streamlining existing strategies. (Ex. 10, dec. of Mangels, at ¶ 124).

434. According to Pursell, the "key three" groups in his line of the business were Food & Beverage, Food & Beverage marketing, and the supply chain, and it is **"critical that all three of those work[ ] together very succinctly and tightly"** in order to achieve collective success. (Ex. 24, Pursell depo., at 16:5-18:14) (emphasis added).

### Other Major Strategic Initiatives

435. In addition to their shared responsibility of driving Food & Beverage Sales (which encompasses the numerous, shared activities described above), Tonya also shared leadership responsibility with Pursell on several strategic initiatives within AMC. (Ex. 10, dec. of Mangels, at ¶ 125).

436. **Food & Beverage Mobile Ordering/Pre-Order:** This was a joint, strategic initiative lead by Tonya and Pursell's teams, and it started before Pursell began working at AMC. (Ex. 10, dec. of Mangels, at ¶ 126).

437. The mobile ordering initiative allowed guests to order food and beverages in advance of a movie and have it delivered to their seat. (Ex. 24, Pursell depo., at 52:4-54:2).

438. As a result of their initial, combined efforts, AMC is now operating the mobile ordering program in more than 350 locations. (Ex. 24, Pursell depo., at 52:4-54:2).

439. Originally, Tonya spearheaded the effort to gather consumer insights, food concepts, and technical requirements. (Ex. 10, dec. of Mangels, at ¶ 127).

440. Tonya initially partnered with George Patterson and others in the marketing group, but when Pursell joined, Tonya and Pursell were asked to transition this into a joint initiative lead by the two them; the initiative was partially intended as a learning experience for Pursell as his first real AMC project and cross-functional effort. (Ex. 10, dec. of Mangels, at ¶ 128); (Ex. 24,

Pursell depo., at 52:4-54:2, 58:10-59:17) (generally discussing the collaboration that occurred when Tonya and Pursell shared responsibility for AMC's mobile ordering initiative).

441.     Tonya collaborated with Pursell on the "proof of concept," "test markets," and "soft launches" associated with introducing the mobile ordering service to market, and both of them were equally responsible for presenting updates to Stephen Colanero, George Patterson, Adam Aron, John MacDonald, Ed Moyer, Michael Czinege, and other members of the executive committee on this important initiative that had "tremendous visibility in the company."  (Ex. 24, Pursell depo., at 52:4-54:2, 58:10-59:17) (presentations to Colanero, Aron, and members of the executive committee); (Ex. 10, dec. of Mangels, at ¶ 129) (presentations to Patterson, MacDonald, Moyer, and Czinege).

442.     They jointly established a Mobile Ordering Work Group and a Mobile Ordering Steering Committee given the project's high visibility, complexity, and work demands.  (Ex. 10, dec. of Mangels, at ¶ 130).

443.     Tonya and Pursell worked very closely on all aspects of understanding the mobile ordering opportunity, modeling numerous business cases, fee structures, UX development, organization of products, recommending participating theaters for tests and launches, guest messaging and marketing, packaging, offers, timing, determining the execution path (i.e., guest pick-up versus delivery to reserved seats), measurement of guest satisfaction, prioritization of technology features against IT cost considerations, working through unique tax implication differences by state, guest order notification procedures, and discount and cash equivalents participation.  (Ex. 10, dec. of Mangels, at ¶ 131); (Ex. 24, Pursell depo., at 58:10-59:17) (generally discussing their collaboration on mobile ordering).

444.    **New Retail Merchandise program:** This program featured movie-themed items and convenience "grab-and-go" impulse purchases, and Tonya and Pursell handled it as a joint initiative.  (Ex. 10, dec. of Mangels, at ¶ 132).

445.    Tonya's team originally worked on the initiative with Programming Promotions and Senior Vice President Elizabeth Frank (initial program design and expectations), but Tonya quickly transitioned to partnering with Pursell and the Food & Beverage team.  (Ex. 10, dec. of Mangels, at ¶ 133).

446.    Tonya and Pursell worked together to prioritize which films they wanted carry merchandise for, to review potential, licensed product categories (toys, collectibles, wearables, concession vessels, etc), and to consider additional decisions related to expanding merchandise, vendor considerations, costs, pricing, activation plans, procedures, and communications surrounding the initiative.  (Ex. 10, dec. of Mangels, at ¶ 134).

447.    When they began testing the initiative, Tonya and Pursell analyzed results and broader Food & Beverage impacts such as average sale, erosion to other product sales, labor costs, supply chain impacts, theft, timing of offerings, and changes in results by brand or theater location in order to determine profitability and incrementality.  (Ex. 10, dec. of Mangels, at ¶ 135).

448.    They also collected and reviewed guest and theater team feedback.  (Ex. 10, dec. of Mangels, at ¶ 136).

449.    **Delivery to home/To-Go:**  Tonya originally suggested this program as a potential opportunity to expand AMC's Food & Beverage sales with the home delivery of AMC's menu offerings through third-party aggregators such as Uber Eats, Grub Hub, and Door Dash.  (Ex. 10, dec. of Mangels, at ¶ 137).

450. The idea became more appealing in light of the general growth in home delivery, and Tonya's separate efforts on AMC's digital streaming/VOD initiative. (Ex. 10, dec. of Mangels, at ¶ 138).

451. Tonya believed there were further opportunities to serve guests with movie foods while consuming movies at home. (Ex. 10, dec. of Mangels, at ¶ 139).

452. Tonya and Pursell jointly worked on developing and presenting a business case for the executive leadership team. (Ex. 10, dec. of Mangels, at ¶ 140).

453. This included reaching out to several of the third-party aggregators to determine service areas, financial terms, learnings, and trends. (Ex. 10, dec. of Mangels, at ¶ 141).

454. They also partnered to gather insights from AMC's "sister" brands Hoyts and Cineplex that already conducted limited testing on a similar program. (Ex. 10, dec. of Mangels, at ¶ 142).

455. They also jointly developed an AMC Stubs loyalty survey to understand guest interest. (Ex. 10, dec. of Mangels, at ¶ 143).

456. They also jointly explored execution questions such as operations, packaging, menu, pricing, potential technology integrations with third parties and AMC's website and mobile app, and financial models for multiple scenarios. (Ex. 10, dec. of Mangels, at ¶ 144).

457. They also jointly presented to the executive team with a comprehensive recommendation for testing the program with several different roadmap possibilities for consideration. (Ex. 10, dec. of Mangels, at ¶ 145).

458. **Feature Fare:** Pursell and Tonya also travelled together in order to collaborate on Feature Fare—which Pursell described as "the largest overhaul in the company's history on [Food & Beverage]." (Ex. 24, Pursell depo., at 69:2-70:24).

459. Feature Fare "was a 75 million dollar investment" that involved AMC putting "small kitchens in 300 theaters and really elevat[ing] the entire guest experience;" it "…generated a tremendous amount of revenue for the company and a lot of EBITDA as well." (Ex. 24, Pursell depo., at 52:4-55:11).

460. This is how Pursell described the manner in which he collaborated with Tonya on Feature Fare as a shared responsibility:

> So you know, like from a culinary development standpoint, our goal was to create things that are on trend, right? But not so on trend that they're too much of a stretch for a consumer coming in. And at the same time, you know, our teams can execute them. So -- as an example, so within our culinary team, we'll have tastings throughout the course leading up to this, right? **So with the tastings, you know there's four groups that are key instrumental**. **Tonya's team**, right, because at the end of the day I'm expecting her to bring her team's knowledge of the industry, what trends are going on out there, and then what does it look like and how do we market it to get the most out of it, right? Supply chain is there, because if we do like the product, **collectively agree** that it's a good product, we've got to be able to show we can get it there, right? So we've got to work on contracts, how does that look? Is there a marketing allowance involved that gives **Tonya** money to market it? Am I getting the best price on the product itself? So that's important. The third leg of this is the -- is what I'll say the operations, or the last leg of it is the operations side, because, you know, you need to have operations buy in, otherwise it's really tough to scale, right? So you have to make sure that your operations team can execute this and feel comfortable with it. **So we would do tastings where all four groups were represented, and we would taste products, we would beat them up, we would talk about flavors, textures, pricing, marketability, supply chain, we would talk about all these things, right? And it was important that everybody had their say at the table because you needed all four to be locked in order to have ultimate success moving forward.** So that could be something simple that we collaborated on.

(Ex. 24, Pursell depo., at 55:17-57:17) (emphasis added).

461. **Field support, "0411" Field email management, AEI Scores, and Field Communications:** Because Tonya and Pursell's teams were so intertwined, members of their teams also took turns responding to the Food & Beverage "0411" email inbox in which theater team members would submit questions related to Food & Beverage operations, menus, promotions, products, offers, digital signage, etc. (Ex. 10, dec. of Mangels, at ¶ 146).

250

462. Their teams also collectively reviewed AEI (Annual Engagement Index) survey scores every year together, and they discussed and developed joint action plans on how to improve. (Ex. 10, dec. of Mangels, at ¶ 147).

463. Their teams also co-authored several field communications for joint programs such as LTO's, digital signage, promotions, merchandising, mobile ordering, and more. (Ex. 10, dec. of Mangels, at ¶ 148).

464. **Federal Regulations and Menu Labeling:** This was also a joint and shared priority between Tonya's team and Pursell's team. (Ex. 10, dec. of Mangels, at ¶ 149).

465. Food, beverages, and alcohol are uniquely impacted by the FDA and national laws—especially for multi-unit restaurant/bar operators. (Ex. 10, dec. of Mangels, at ¶ 150).

466. The landscape is constantly changing, and Tonya was responsible for working with the Food & Beverage team, vendors, and a national trade organization in order to remain aware of legislation impacts, to ensure compliance as necessary, and to consider/adapt to challenging menu changes related calorie labeling, sugary drink size regulations, taxes, and unique food menu requirements mandated when offering alcohol. (Ex. 10, dec. of Mangels, at ¶ 151).

467. **Prescriptive Team Building:** The Food & Beverage group (headed by George Patterson and later Jennifer Douglass) typically held quarterly or biannual team-building, off-site events or activities. (Ex. 10, dec. of Mangels, at ¶ 152).

468. Almost always, Tonya's Food & Beverage team also attended and even helped plan those off-site collaboration sessions. (Ex. 10, dec. of Mangels, at ¶ 153).

469. Sometimes the business planning meetings were followed by a fun/collaborative social activities. (Ex. 10, dec. of Mangels, at ¶ 154).

470.    Recent examples during the last few years of Tonya's employment included: Top Golf, ice skating/hockey at Linn Creek, Royals suites, Breakout KC, Pickleball, bowling, happy hours, and dinners.  (Ex. 10, dec. of Mangels, at ¶ 155).

**Effort (i.e., the physical or mental exertion necessary to the performance of a job)**

471.    Pursell was required to work on a 24/7 basis, as necessary, and he was required to make himself available to the CEO and other executives as necessary.  (Ex. 24, Pursell depo., at 49:13-20).

472.    Pursell estimates that he spent approximately 30% of his time on his own work, and the other 70% of his time supervising others.  (Ex. 24, Pursell depo., at 43:22-44:14).

473.    Pursell estimates that he spent 25% of his time travelling for job-related reasons, and as discussed above, much of his travel involved joint travel with Tonya in order to visit the same people.  (Ex. 24, Pursell depo., at 68:22-70:24).

**Comparator Robert Kim**

474.    Robert Kim was a Vice President of Programming Promotions at AMC between September 30, 2016 through August 22, 2019, and his role within the company required overlap and collaboration with Tonya and her team.  (Ex. 43, Kim depo., at 11:9-11, 17:19-19:1, 47:10-51:2).

475.    Kim's annual compensation package at AMC was as follows in each year specified below:

| YEAR | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| BASE SALARY | ████ | ████ | ████ | ████ |
| BONUS INCENTIVE | ████ | ████ | ████ | ████ |
| EQUITY INCENTIVE | ████ | ████ | ████ | ████ |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TOTAL PACKAGE** | ▮▮▮▮ | | ▮▮▮▮ | | ▮▮▮▮ | | ▮▮▮▮ |
| **TOTAL AMOUNT MORE THAN TONYA** | ▮▮▮ | | ▮▮▮ | | ▮▮▮ | | ▮▮▮ |

(Ex. 43, Kim depo., at 31:21-36:7); (Ex. 55, Defts. Resp. to Pltfs. 2nd Irogs, at No. 2).

476.    AMC never produced a copy of any job descriptions applicable Kim's position throughout the discovery phase of this case.  (Ex. 10, dec. of Mangels, at ¶ 156).

**Skill (i.e., the experience, training, education, and ability necessary to perform the job)**

477.    477.    Kim has a bachelor's degree in History; he is unaware of whether his position required anything more than a bachelor's degree.  (Ex. 43, Kim depo., at 10:1-9, 36:16).

478.    Kim began working at AMC in 1995; he started as a theater manager in Philadelphia, served as a general manager in multiple theater locations between 1996 and 2006, and later became a director of operations and a film buyer before he eventually became a Vice President of Programming operations.  (Ex. 43, Kim depo., at 15:16-16:21).

479.    Kim was not required to master any specialized technology or software in order to perform his job; he was able to supervise others to complete any technology-oriented tasks.  (Ex. 43, Kim depo., at 53:25-55:22).

**Responsibility (i.e. the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation)**

480.    Kim is unable to say whether his position was any more or less important than Tonya's position at AMC, and he is not aware of any instance in which his position was ever ranked any higher or lower than Tonya's.  (Ex. 43, Kim depo., at 29:2-31:20).

481.    Kim was responsible for managing an annual departmental budget of approximately $3-4 million.  (Ex. 43, Kim depo., at 41:5-42:12).

482.    Kim reported to Senior Vice President Elizabeth Frank between 2016 and 2019. (Ex. 43, Kim depo., at 27:13-21).

483.    Kim supervised approximately 1-3 subordinate employees.  (Ex. 43, Kim depo., at 37:19-38:6).

484.    Kim's job, "in a nutshell," was to sell AMC's "marketing assets" to film studios. (Ex. 43, Kim depo., at 19:2-21:14).

485.    This initially included "on-screen advertising" (i.e. trailers or previews), but it also included other assets such as opportunities to hang posters or display cardboard advertisements within AMC theaters in order to market movies, for example.  (Ex. 43, Kim depo., at 19:2-24:19).

486.    Over time, however, "AMC began to evolve [in] how [they] marketed movies, [and they] saw an opportunity to monetize [their] member data [from their loyalty program] and [their] social online digital marketing capabilities."  (Ex. 43, Kim depo., at 19:2-21:14, 25:2-27:12).

487.    For example, AMC was able to capture data through its loyalty program in order to understand which customers attended a particular movie, and AMC could then leverage that information by selling studios the right to participate in the use of that data in order to narrowly target advertising or promotions to the same customers in order to market the sequel to that movie. (Ex. 43, Kim depo., at 19:2-21:14, 25:2-27:12).

488.    The digital marketing idea was to "pitch to the studios [ ] a smarter way to spend their marketing dollars," and this is the area in which Kim and Tonya "worked together."  (Ex. 43, Kim depo., at 21:15-22:9, 25:2-27:12).

489.    Tonya's team was first and foremost tasked with developing strategies, programs, plans, and marketing efforts to drive attendance with AMC loyalty members (and more broadly). (Ex. 10, dec. of Mangels, at ¶ 157).

490.     Tonya's team was very intertwined with Rob Kim and his Programming Promotions team, particularly on securing incremental studio funding and film rent reduction with effective marketing, analytics, and media promotions.  (Ex. 10, dec. of Mangels, at ¶ 158).

491.     Tonya's team worked closely with the Programming Promotions team and studios to aggressively market films, to create monetization opportunities, to develop engaging activations, and to increase AMC's sales.  (Ex. 10, dec. of Mangels, at ¶ 159); (Ex. 43, Kim depo., at 47:15-49:9) (discussing the manner in which Tonya and her team partnered with Kim and his team to develop, test, and execute on the digital marketing promotions requested by the studios).

492.     Tonya's team members had weekly meetings with members of the Programming Promotions team, and Tonya also met weekly with Rob Kim directly.  (Ex. 10, dec. of Mangels, at ¶ 160).

493.     Tonya's 1:1 time with Rob Kim was typically focused on strategic priorities, budget reviews, monetization goals, results, resource implications, calendar planning, coaching feedback/recognition of their team members, and sometimes addressing other challenges.  (Ex. 10, dec. of Mangels, at ¶ 161).

494.     Tonya and Kim's teams jointly held weekly, bi-weekly, monthly, and periodic meetings with Disney, Paramount, Sony, Warner Brothers, Universal, 20th Century Fox, Lionsgate, A24, Annapurna, and STX.  (Ex. 10, dec. of Mangels, at ¶ 162).

495.     These meetings included a range of general project status updates, discussing specific upcoming films, sharing new strategies or capabilities, consumer insights, reviewing results, general planning, and discussing monetization proposals.  (Ex. 10, dec. of Mangels, at ¶ 163).

496. Tonya and Kim would also occasionally travel together for industry conferences, events, market visits, visits to AMC's Los Angeles office, and visits to studio offices, and these business meetings were often followed up with social outings, lunches, dinners, events, cocktail parties, watching movie screenings, and other social activities. (Ex. 10, dec. of Mangels, at ¶ 164); (Ex. 43, Kim depo., at 50:6-51:2) (discussing their joint travel to meetings with studio executives in order to present ideas, generate new ideas, or explain how AMC's digital marketing promotions were going to work).

497. Tonya's team lead development of the proposals to the studios for the most effective strategies and activations within AMC's owned channels (email, MPN, social, website, mobile app) and theaters, loyalty member database, and supplemental paid media. (Ex. 10, dec. of Mangels, at ¶ 165); (Ex. 1, Mangels depo., at 369:4-371:6) (discussing the manner in which Tonya's team partnered with Kim's team to generate the proposals that eventually culminated into contracts between AMC and movie studios).

498. From there, the process of aligning final details with the studio took place, including monetization amounts. (Ex. 10, dec. of Mangels, at ¶ 166).

499. Throughout all of this ongoing interaction between Tonya, Kim, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC and finding new methods for streamlining proven strategies. (Ex. 10, dec. of Mangels, at ¶ 167).

500. Tonya and Kim also "[came] up with new menu items for [Kim] to go and sell to the studios." (Ex. 43, Kim depo., at 26:20-27:12).

501. Tonya and Kim were also members of AMC's digital retail/streaming task force. (Ex. 43, Kim depo., at 57:7-20).

256

502.     Tonya and Kim were also participants AMC's LEAP program, which as discussed above, was designed to develop AMC associates who were recognized as having high potential within the company.  (Ex. 43, Kim depo., at 59:6-60:11).

**Effort (i.e., the physical or mental exertion necessary to the performance of a job)**

503.     Kim was required to work on a 24/7 basis, as necessary, and he was required to make himself available to the CEO and other executives as necessary.  (Ex. 43, Kim depo., at 44:2-17).

504.     Kim estimates that he spent approximately 40% of his time on his own work or collaborating with his boss, and the other 60% of his time was spent overseeing the work of his subordinates.  (Ex. 43, Kim depo., at 38:11-41:4).

505.     Kim estimates that he was required to travel approximately every 6-8 weeks for job-related reasons.  (Ex. 43, Kim depo., at 60:22-61:1).

### MISCELLANEOUS ADDITIONAL STATEMENTS OF FACT

506.     Dr. Thornton's analysis did not involve a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. (Ex. 54, Thornton depo., at 13:17-14:7, 19:19-20:11, 25:19-26:22).

507.     Dr. Thornton never compared Tonya's Vice President role to any other male Vice President role at AMC in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Dr. Thornton never analyzed whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility.  (Ex. 54, Thornton depo., at 13:17-14:7, 19:19-20:11, 25:19-26:22).

508.     Tonya is unaware of how KPMs were specifically worded on other employees' performance reviews at AMC, but that does not mean that those employees did not share joint

responsibilities or joint goals with Tonya or others—regardless of how their KPMs were described internally on their performance reviews. (Ex. 10, dec. of Mangels, at ¶ 168).

509. There was no common method or procedure at AMC for how KPMs were worded, structured, or characterized for each individual department or position at AMC; AMC's KPM description process was disjointed, and tended to vary from manager to manager and employee to employee throughout the organization. (Ex. 10, dec. of Mangels, at ¶ 169).

510. Typically it was up to each person to author their own KPMs and measurement targets in their own words and structure; it was then approved by that person's primary supervisor. (Ex. 10, dec. of Mangels, at ¶ 170).

511. Exhibit 52 hereto is a true and accurate copy of a spreadsheet that was produced by AMC in this case reflecting the compensation data and performance ratings of AMC's Vice Presidents in 2016, 2017, 2018, and 2019 (as of October 1 each year). (Ex. 10, dec. of Mangels, at ¶ 171).

512. Colanero is unaware of any other instance in which Tonya Mangels was written-up for an alcohol-related issue prior to her June 2018 write-up for alcohol-related issues, and Colanero does not recall who counseled her on those issues previously (including whether or not it was him), does not recall on how many occasions it occurred, does not recall speaking to any other managers about those issues, never witnessed any of those issues himself, and does not recall the identity of any other person(s) who allegedly witnessed those events if they occurred. (Ex. 2, Colanero depo., at 102:16-105:2).

513. Whatever those alcohol-related issues were with Tonya Mangels, Colanero agrees that they "were probably in the rear window" after December 2013. (Ex. 2, Colanero depo., at 105:3-10).

514.     Colanero testified that he has never "seen a copy of Michael Pursell's 2018 performance review," but he also testified that "[he] believe[s] [he] did know that it was a [meets expectations] at some point[;]" he also confirmed that he does not know when he learned that information.  (Ex. 2, Colanero depo., at 289:2-25).

515.     Pamela Sandler was not in the August 14, 2019 meeting with Tonya and her team. (Ex. 41, Mutzbauer depo., at 159:7-10.)

516.     When Tonya had a conversation with Pamela Sandler on August 15, 2019, Tonya and Sandler generally discussed the fact that there was widespread rumor and speculation throughout the company about possible layoffs and nothing more.  (Ex. 1, Mangels depo., at 360:9-362:5).

517.      "It was just water cooler talk," and "…it came up in a conversation with Pamela and [Tonya was], like, yeah, there's people talking about it."  (Ex. 1, Mangels depo., at 360:9-362:5).

518.     Tonya "absolutely" denies "Pam's version of [their] conversation [on August 21, 2019]" in which Tonya allegedly "confronted [Pam] aggressively," "pointed [her] finger and pounded the table," and "demanded to know who reported [her] to Stephen and HR."  (Ex. 1, Mangels depo., at 363:16-364:18).

519.     It was a "super casual" conversation.  (Ex. 1, Mangels depo., at 363:16-364:18).

520.     Tonya recalls "asking Pam if she started the started the rumor" and "went to Stephen" with suggestions about how she supposedly discussed the issue with her team on August 14.  (Ex. 1, Mangels depo., at 351:14-352:23).

521.     Tonya "was emotional, but she was definitely not furious."  (Ex. 1, Mangels depo., at 351:14-352:23).

522.    During the "RIF investigation," Tonya was asked by Mutzbauer whether she ever made a general statement to Pamela Sandler to the effect that "not everyone is as tight-lipped as Stephen," and Tonya did not deny having made that statement. (Ex. 1, Mangels depo., at 360:9-24).

523.    When Tonya was terminated on September 30, 2019, Chavarria read to her from a script, and never supplied her with a written explanation describing the results of AMC's "RIF investigation" or the basis for her termination. (Ex. 10, dec. of Mangels, at ¶ 172).

524.    On the date of September 2018 discussion with Alicia Cook, Tonya and Alicia Cook were "hanging out" all day in a friendly manner. (Ex. 10, dec. of Mangels, at ¶ 173).

525.    The discussion occurred at nighttime after Tonya, Alicia Cook, and others decided to go out as a small group to a nightclub (or similar venue); it was late at night, and people were consuming alcohol. (Ex. 10, dec. of Mangels, at ¶ 174).

526.    Alicia and Tonya were talking and the topic came up organically during their conversation; there was no unfriendliness. (Ex. 10, dec. of Mangels, at ¶ 175).

527.    Alicia shared information about the experience of being interviewed by Human Resources with Tonya. (Ex. 10, dec. of Mangels, at ¶ 176).

528.    The group had fun that night, and Alicia came out with the group on her own free will; there was no incident or difficult interaction. (Ex. 10, dec. of Mangels, at ¶ 177).

529.    Tonya and Alicia were with the small group the entire time, and they took an Uber back to the hotel together. (Ex. 10, dec. of Mangels, at ¶ 178).

530.    Tonya also explained in her deposition what she learned from Alicia Cook. (Ex. 1, Mangels depo., at 290:16-293:9).

531.     According to Ms. Cook, the Human Resources interview was "uncomfortable," "intimidating," and "scary," and the interviewer was attempting to "plant the seed" of purported acts of wrongdoing on Tonya' behalf rather than simply asking questions in good faith to learn what Ms. Cook witnessed in her own words.  (Ex. 1, Mangels depo., at 290:16-293:9).

532.     Rosalind Reeves escalated private concerns to Chavarria after Pursell and Tonya received their 2018 performance reviews and expressed her disagreement with the June 5 discipline being revisited in one review but not the other, but nothing further was done to remedy the situation.  (Ex. 25, Reeves depo., at 201:6-205:1).

## IV.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the evidence, *viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences*, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (emphasis added) (citation omitted).  The court must not weigh the evidence or make credibility determinations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Summary judgment should not be granted if a reasonable jury could find for the nonmoving party.  *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

## V.  ARGUMENT AND AUTHORITIES

### A.  Mangles Exercised Sound Leadership and Professional Judgment at AMC, and Did Not Fail To Meet Her Performance Expectations.

Tonya began her employment with AMC in 2009 as an individual Director charged with building a new role aimed at growing AMC's Food & Beverage business, PSOF ¶¶ 1-2, and over the course of the next ten years, Tonya's team grew to a total of eleven (11) direct reports, her portfolio of responsibilities grew exponentially, and her departmental budget grew from less than $1 million to $10 million annually.  PSOF ¶ 286 (11 reports); PSOF ¶ 390 (budget growth); PSOF ¶¶ 3, 7-8, 10, 15-16, 37, 38, 59-61, 141-142, 147-151, 238, 251-252, and 264 (increases in responsibilities).

After she became a Vice President, Colanero described Tonya in her 2013 review as "a strong contributor to a growing part of the business," as someone that supported "a wide range of initiatives that were in various stages of development," as someone that showed "strong leadership in her development of her team," and as "overall a valuable member of both the marketing team and the food and beverage team."  PSOF ¶¶ 9, 12-14.  In her 2014 review, Colanero described

Tonya as someone that "continues to grow and improve as an executive officer for the company while delivering ongoing excellent results along the way," and as someone that was showing "early leadership and vision" in her recently added responsibilities.  PSOF ¶¶ 17-20 (emphasis added).

In her 2015 review, Colanero gave Tonya an overall rating of "successful," but he did not include any other comments in her review.  PSOF ¶¶ 40-42; (Ex. 6, Depo. Ex. 107).  In her 2016 review, however, Colanero rated Tonya with an overall rating of "exceeds expectations."  PSOF ¶¶ 78-79.  He commented about Tonya's "excellent performance" in 2016, he observed that "her area of responsibility continues to grow outside of food and beverage marketing and her contribution in these new areas has been strong," he observed that her "core food and beverage marketing remains strong," he observed that she assumed added responsibility for "print production for the company" which "has gone pretty well with no significant issues," he recognized her for her "major accomplishment" in transitioning to Nvision, he recognized her as the "point person within marketing for all mergers and acquisitions activity" and commented on her positive performance in handling the Carmike and Starplex acquisitions, and he recapped the entire year by saying: "a very nice year for Tonya where she was able to keep core activities going in a positive way while delivering on multiple key initiatives over and above these day-to-day responsibilities."  PSOF ¶ 80.

In her 2017 review, Colanero rated Tonya with an overall rating of "outstanding," i.e., the highest possible rating.  PSOF ¶¶ 114-115.  Colanero commented that "Tonya is an integral part of the senior leadership team in the marketing department," that "it is hard not to be impressed with the volume of accomplishments Tonya achieved" during a difficult year in the movie industry, and that "she brought to fruition several key initiatives from 2016…" including the "…Carmike transition, Coca-Cola teen marketing program, as well as creating new contributors to benefit

AMC, Feature Fare and movie feature drinks;" he also observed that "these are huge initiatives that drive profit for AMC and wouldn't be what they are without Tonya's significant leadership/contributions." PSOF ¶ 116. Tonya "contributed in many other meaningful ways from daily unappreciated work like inventory risk management to high profile cross-functional assignments such as the market share task force;" Colanero agrees that this was a "glowing" annual performance review for Tonya. PSOF ¶ 117.

████████████████████████████████████████████

██████████████████████████████████ Colanero and AMC still selected Tonya for participation in AMC's "LEAP promotion-ready officers group" during the second quarter of 2018 (i.e., a program designed to develop employees that were identified as future leaders within the company). PSOF ¶ 113. Colanero also added one more person to her team in November 2018 (a 7th direct report), and gave Tonya additional responsibility for handling: (1) film marketing; (2) a major new initiative called AMC On Demand; (3) a new digital Flash Sales program that generated over $5M in gross revenue; and, (4) partial responsibility for AMC's Merchandise Program. PSOF ¶¶ 141, 147-151 (responsibilities); PSOF ¶ 238 (7th direct report).

Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue in 2018. PSOF ¶ 146. Her team also added an entirely new monetization and studio marketing program in 2018. PSOF ¶ 147. Colanero also identified Tonya as an employee with "high potential" in 2018 prior to any

---

15 This issue is discussed at length in Section V(C)(2)(a), *infra*. It is critical to note, however, that between the date of the June 5, 2018 discipline and the date of Tonya's termination on September 30, 2019 (i.e., a period of more than 15 months), no one at AMC ever reported, investigated, or dealt with any other issue involving Tonya's use of alcohol ████████████████ PSOF ¶ 199. In other words, Tonya immediately resolved all of the allegedly problematic behaviors discussed in her June 5 warning.

of her complaints about wage discrimination.  PSOF ¶ 158 (high potential); PSOF ¶¶ 202-205, 210-212 (initial complaints between May 23-30, 2018).

In 2019, AMC and Colanero still added *four more employees* **to Tonya's team**.  PSOF ¶¶ 251-252, 261, 286.  Colanero testified that he does not recall Tonya ever declining a single assignment, and he agrees that Tonya is one of the hardest working employees that ever worked for him at AMC.  PSOF ¶ 5.  Colanero also believes that Tonya wanted AMC to succeed, that she demonstrated a positive and willing work ethic, and that she was willing to take on ambitious initiatives similar to other Vice Presidents in the organization.  PSOF ¶ 6.  Colanero cannot recall any instance in which Tonya failed to meet the KPMs associated with her job between the time of her June 5, 2018 discipline and the date of her termination in September 2019.  PSOF ¶ 200-201.

It defies logic for AMC to argue that Tonya struggled with leadership and professional judgment, or failed to meet her performance expectations.  The record in this case demonstrates that AMC and Colanero consistently trusted Tonya with *more employees* and *more responsibilities* in each passing year of her employment, awarded her multiple times with the CEO's playing offense award in 2014, 2015, and 2016, selected her for participation in AMC's "LEAP" program, and tapped her to serve on multiple, special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions such as the CEO's Marketshare Taskforce, the Carmike and Starplex acquisition and integration teams, the IT Digital Prioritization Roadmap group, and the Initiative Guest Committee.  PSOF ¶¶ 20, 36, 81 (CEO awards); PSOF ¶¶ 111, 112 (committees and advisory teams).  Many more of these issues are discussed in greater detail below.

## B.  Mangels Alleges Valid Equal Pay Act Claims (Count I)

This case is first and foremost an Equal Pay Act case.  The Equal Pay Act (the "EPA"), with certain exceptions, prohibits employers from discriminating against employees on the basis

of sex with respect to wages paid for equal work performed under similar working conditions. It is part of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219, and it provides:

> No employer having employees subject to [the minimum wage provisions of the Fair Labor Standards Act] shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1). Importantly, a plaintiff is permitted to bring a federal claim for wage discrimination on the basis of sex under either the Equal Pay Act or Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq. See, Simmons v. New Pub. Sch. Dist. No. 8*, 251 F.3d 1210, 1215 (8th Cir. 2001); *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 669 (8th Cir. 1992).

The Equal Pay Act does not require proof of intent to discriminate. *EEOC v. Delaware Dept. of Health and Social Services*, 865 F.2d 1408 (3d Cir. 1989). To establish a violation under the EPA, a plaintiff must prove that the defendant paid different wages to employees of different sexes for substantially equal work on jobs the performance of which requires substantially equal skill, effort, and responsibility, and which are performed under similar working conditions. *See, Eighth Circuit Model Jury Instruction (Civil)* 7.40; *see also, Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 421-22 (8th Cir. 2017) (quoting *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)).

The law is clear that jobs "need not be identical to be considered 'equal' under the EPA," but, must be "substantially equal," in order to establish a *prima facie* case. *Hunt*, 282 F.3d at 1029 (8th Cir. 2002) (citation omitted); *see also, See Hill v. City of Pine Bluff, Arkansas*, 696 F.3d 709,

712 (8th Cir. 2012); *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 577-78 (8th Cir. 2006). Determining whether two jobs are substantially equal requires "practical judgment on the basis of all the facts and circumstances of a particular case." *Bearden v. International Paper Co*., 628 F.Supp.2d 984, 997 (E.D. Ark. 2007) (citing *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 719 (8th Cir. 2000). In fact, "[t]wo jobs could require '[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility' and still be substantially equal." *Hunt*, 282 F.3d at 1029 (quoting 29 C.F.R. § 1620.14(a)).

"Moreover, neither job classifications nor titles are dispositive for determining whether jobs are equal for purposes of EPA and Title VII." *Id.* (citing *Orahood v. Bd. of Trustees*, 645 F.2d 651, 654 (8th Cir.1981) ("We look to the actual job requirements and performance, not on-job classifications or titles.")). "It is the specific, day-to-day content of the jobs that determines substantial equivalence." *Ewald v. Royal Norwegian Embassy*, 82 F.Supp.3d 871, 937 (D. Minn. 2014) (citing *Bearden*, 529 F.3d at 833; *Younts v. Fremont Cnty., Iowa*, 370 F.3d 748, 752–53 (8th Cir. 2004)). The EEOC's own regulations demonstrate that "equal work" is based on actual job content and performance, as opposed to job classifications or titles. 29 C.F.R. § 1620.13(e).[16]

> Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. ***In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute.***

---

[16] While regulations interpreting the EPA are not binding, they should be given great weight. *Herndon v. Wm. A. Straub, Inc.*, 17 F.Supp.2d 1056, 1060 n. 4 (E.D. Mo. 1998) (citation omitted).

*EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir.1981) (citing 29 C.F.R. §§ 800.114–.132) (emphasis added).

In its brief, AMC seems to incorrectly suggest that every EPA case should be decided as a matter of law. The truth is that, in instances in which the parties submit "conflicting evidence regarding whether [the plaintiff] and [a comparator] were similarly situated," that fact issue should be presented to the jury. *See, Grover v. Smarte Carte, Inc.,* 836 F.Supp.2d 860, 866 (D. Minn. 2011) (denying summary judgment as to plaintiff's EPA claims).

The plaintiff in *Grover* worked for Smarte Carte from 1994 to 2007. From 1999 until her termination in 2007, Grover was Vice President of Business Development and Operations of Smarte Carte's *domestic locker* and *retail* business. *Id.*at 862. Grover's first comparator was Johnny Chiu. *Id.* at 866. Chiu joined Smarte Carte in August 2000 as Vice President of Business Development and Domestic *Airport* Operations. *Id.* In this role, Chiu was responsible for business development relating to Smarte Carte's domestic *airport cart* and locker businesses. *Id.* Beginning in 2003, Chiu was also responsible for Smarte Carte's *locker* operations in China. *Id.* Thus, as the *Grover* court expressly observed, Grover and her comparator Chiu were responsible for **distinct** lines of Smarte Carte's business, and Chiu's responsibilities also spilled into China. *Id.*

"Smart Carte argue[d] that Chiu's role within the company was much more substantial because [Chiu] was responsible for the company's primary source of revenue (carts) and because he was responsible for the development of business in China [unlike Grover]." *Id.* "Indeed, [Smart Carte's corporate witness] testified that Chiu was promoted to Senior Vice President because of his work in China." *Id.* Grover countered those arguments by attacking the significance of Chiu's work in China, by arguing that that she had limited, international responsibilities in other parts of

the world, and by challenging the significance of Chiu's domestic work—albeit in a ***distinct*** line of Smart Carte's business. *Id.* at 866-67.

The *Grover* court rejected Smart Carte's arguments based on the conflicting evidence presented by the parties. *Id.* at 867. It held that "there are genuine issues of material fact surrounding the question of whether Grover and Chiu performed substantially equal work for Smarte Carte. ***They held distinct positions***, but a jury may well deem those positions to be equivalent for compensation purposes." *Id.* at 867 (emphasis added). The *Grover* court also rejected Smarte Cart's additional arguments related to Grover's second comparator Arthur Spring; Spring was based in Paris, France, and served as a Vice President responsible for Smart Carte's European business operations and development. *Id.* at 867-68.

The same process of presenting the issue of "substantial similarity" to the jury was followed in *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 577-78 (8th Cir. 2006). *Simpson* involved two bank employees with different titles but somewhat overlapping responsibilities. The female plaintiff compared her Assistant Vice President position (a role she held for approximately 13 years) to a position held by a male employee (J. Kendall Henry); his role was characterized internally as "an untitled bank officer," but he was later promoted to Vice President during the last few years of Simpson's employment. *Id.* at 575-577. The bank successfully disposed of some of Simpson's claims on summary judgment, *id.* at 581, but her Equal Pay Act claims were presented to the jury and resulted in a plaintiff's verdict. *Id.* at 574-75.

After reviewing the lengthy record in that case, and the conflicting evidence presented about their respective roles, the Eighth Circuit concluded that "a reasonable jury could have concluded that Simpson and Henry possessed the same experience, training, education, and ability to perform their jobs[,] … [that] a reasonable jury could have determined that Simpson's and

Henry's jobs required the same effort[,] … [and that] a reasonable jury could have determined that Simpson's and Henry's jobs required the same responsibility." *Id.* at 578-79.

Other courts addressing close questions of fact on the "substantial similarity" question have not hesitated to reserve the issue for the jury. *See, Dindinger v. Allsteel, Inc*., Case No. 3:11-cv-00126, 2015 WL 11143144, *12 (S.D. Iowa 2015) (denying summary judgment and holding that the plaintiffs generated genuine issues of fact regarding the question of whether "other managerial-level jobs [were] substantially equal to safety [managers] or [other types of internal] managers);[17] *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 492 (8th Cir. 2003) (holding that it was not unreasonable for a jury to conclude that two trade-show specialists were performing substantially equal work, even though the male specialist was also making outside sales); *Hunt*, 282 F.3d at 1030-31 (reversing the district court's granting of judgment as a matter of law and reinstating the jury verdict in favor of the plaintiff on her EPA claims because it was a question for the jury as to whether a difference in supervisory responsibility rendered two jobs not substantially equal); *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1073-74 (8th Cir. 2009) (reversing summary judgment on the plaintiff's EPA claims because genuine issues of fact remained on the question of substantial similarity); *Hennick v. Schwans Sales Enterps. Inc.,* 168 F. Supp. 2d 938, 950-51 (S.D. Iowa 2001) (denying summary judgment in a case involving gender-based wage discrimination brought under Title VII and the Equal Pay Act because genuine issues of material fact remained on the issue of substantial similarity between plaintiff and her comparators).

---

[17] This case ultimately resulted in a plaintiff's verdict (and willful violations of the Equal Pay Act), and the trial court outcome was affirmed on appeal. *Dindinger v. Allsteel, Inc.*, 853 F. 3d 414, 420-21 (8th Cir. 2017).

In fact, the Eighth Circuit created specific jury instructions aimed addressing the issue of substantial similarity with a jury. Model Instruction (Civil) 7.20 defines the term "Substantially equal" for the jury this way:

> "Substantially equal" means equal or nearly equal in the essential aspects of the job. In considering whether two jobs are substantially equal, you should compare the skill, effort, and responsibility required in performing the jobs. You should consider the actual job requirements, as opposed to job classifications, job descriptions, or job titles. In addition, you should consider the jobs overall, as opposed to individual segments of the jobs. You may disregard any superficial differences required to perform the jobs.

*Eighth Circuit Model Jury Instruction (Civil)* 7.20. After the jury is supplied with that definition, Model Instruction (Civil) 7.40 sets out the elements of a plaintiff's EPA claim this way:

> Your verdict must be for plaintiff [insert name] and against defendant [insert name] on plaintiff's Equal Pay Act claim, if all of the following elements have been proved:
>
> *First*, the defendant employed the plaintiff and one or more members of the opposite sex in positions requiring **substantially equal** skill, effort, and responsibility; and
>
> *Second*, the plaintiff and one or more members of the opposite sex performed their positions under similar working conditions; and
>
> *Third*, the plaintiff was paid a lower wage than [the] member[s] of the opposite sex who [(was) (were)] performing **substantially equal** work under similar working conditions.
> …

*Eighth Circuit Model Jury Instruction (Civil)* 7.40 (emphasis added). Thus, summary judgment should be denied in this case if critical issues of disputed fact remain on the issue of substantial similarity between Tonya and one or more of her comparators.

## Comparator Analysis

Now that discovery has concluded in this case, Tonya is electing to abandon any Equal Pay Act claims premised on the positions held by Julius Lai, Frank Ybarra, and Robert Lane in order

to streamline the issues for the Court and focus her Equal Pay Act claims on her two closest comparators: Michael Pursell and Robert Kim. As set forth below, Tonya shared extensive cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Critical issues of disputed fact remain on the issue of substantial similarity between their roles, and those issues should be presented to a jury. The analysis begins, however, with a discussion of how AMC mischaracterizes Tonya's role.

### 1. AMC Has Mischaracterized Tonya's Role.

In its brief, AMC mentions that "consideration of equal pay standards is based on actual job requirements and performance, not [] classifications or titles." *See*, Defts. Brief at 72 (citing *Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980)), but then it spends most of its time relying on selective and incomplete phrases from AMC's job classifications, and carefully worded declarations, in order to paint the picture that each Vice President within AMC operated as an independent "silo" with a unique set of "core responsibilities" that were shared by no one else. That effort falls short, and in the case of Tonya, AMC's description of her job responsibilities is comically anemic. AMC highlights a partial listing of three sub-paragraphs from Tonya's 7-page job description, cites to testimony from Tonya that does not contain any agreement that the activities listed in those three sub-paragraphs represent a complete listing of her responsibilities (much less her "core responsibilities"), and AMC overlooks the actual depth and breadth of Tonya's role. *See*, Pltfs. Resp. to DSOF ¶ 21. AMC's incorrect characterization is controverted.

Vice Presidents at AMC did not operate as independent "siloes" with no cross-functional reporting or cross-functional sharing of joint responsibilities.[18]  AMC has a highly complex structure with a national brand footprint in nearly every state in the United States; throughout its roughly 600 theaters, it offers 3 different brand experiences, and there are additional concept and amenity variances within each different brand experience.  PSOF ¶ 99.  There are also numerous menus, roughly twenty or more different pricing tiers, multiple sales channels, and other business considerations related to the ever-changing studio film content and geographic/demographic variances one would expect with a national brand footprint in nearly every state.  PSOF ¶ 100.  Based on this reality, AMC operated under a hybrid or matrix structure in several departments, which is well suited for work environments that are dynamic and tend to shift from project to project.  PSOF ¶ 101.  A matrix organizational structure is a workplace format in which employees report or partner indirectly or directly to multiple managers/teams rather than one manager overseeing every aspect of a project.  PSOF ¶ 102.  One advantage of the matrix organizational structure is that people across different functional areas have a better understanding of their co-workers in other areas.  PSOF ¶ 103.  A disadvantage is that employees are responsible to their project team as well as to their functional areas.  PSOF ¶ 105.  In the end, cross-functional members collaborate on many aspects of the business.  PSOF ¶ 107.

During the final 3 years of her employment (and in some respects earlier), Tonya served as a cross-functional member within AMC, and she led the product/brand business unit that most frequently worked with the functional leaders of the groups within AMC responsible for: Food &

---

[18] Notably, the Declarations supplied by Jennifer Douglas and Elizabeth Frank discuss the purported job responsibilities of Michael Pursell and Robert Kim *generically*, and there is no attempt to state that those responsibilities were *exclusive* to Messrs. Pursell or Kim.

Beverage, Bar/Alcohol, Dine-In theaters, Film/Studio/Programming, Loyalty/Shared Guest Engagement Services for Channel Management, Pricing, Communications, and Supply Chain. PSOF ¶ 108. Tonya was responsible for driving AMC product revenue, traffic, units, and attendance related to film/programming/events, Food & Beverage/menu/concept experiences, the Studio and Food & Beverage monetized partnership programs, the DINE-IN brand, Macguffin's Bars, Mobile Preorder/Kiosk, Retail Merchandise Sales, E-commerce Flash Sales, Digital Signage strategy and vendor relationship oversight, the Coca-Cola Ring of Honor marketing partnership, targeted teen marketing, packaging, digital retail streaming movies, and test initiatives as they evolved such as NFL Sports Programming. PSOF ¶ 109.

Essentially, her team was responsible for end-to-end collaborative planning and execution of all aspects of strategic direction, product/menu development, pricing recommendations, packaging, consumer insights, promotions, marketing, partnership management/negotiations, and sales of most products and services AMC offers to the public, and the methods or channels through which those products and services were most effectively sold to consumers (e.g., digital signage, kiosk, online ordering, mobile, in-theater, 3rd party off-site, 1:1). PSOF ¶ 110. According to her position description, Tonya was supposed to "have a seat at the table to influence strategic decision making for the marketing organization, … [and to] work[ ] in close partnership with F&B team, Alcohol team, DIT team, Procurement team, Pricing Team and Programming Promotions [i.e., Film Marketing]." PSOF ¶ 394; (Ex. 34, Depo. Ex. 172). In addition, and because of Tonya's growing leadership role, her broadening expertise, and her strong performance, Tonya was frequently selected to serve on special committees and strategic advisory teams that were never reflected in her day-to-day job descriptions. PSOF ¶ 111.

As set forth in detail below, Tonya shared extensive cross-functional job responsibilities and reporting obligations with Michael Pursell and Robert Kim. Tonya's annual compensation package at AMC was as follows:

| YEAR | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| BASE SALARY | $143,500 | $153,500 | $156,570 | $159,701 |
| BONUS INCENTIVE | $43,050 | $46,050 | $46,950 | $47,900 |
| EQUITY INCENTIVE | $39,287 | $60,000 | $80,000 | $80,000 |
| TOTAL PACKAGE | $225,837 | $259,550 | $282,620 | $287,601 |

PSOF ¶ 382.

## 2. Michael Pursell is a Valid Comparator for Purposes of Defeating Summary Judgment.

Michael Pursell was a Vice President of Food & Beverage at AMC between February 2015 and July 2020, and his role required an extensive amount of overlap and collaboration with Tonya and her team. PSOF ¶ 399. Between 2016 and 2019, Pursell received a higher base salary and higher bonus/equity incentives than Tonya; his annual compensation package at AMC was as follows:

| YEAR | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| BASE SALARY | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ |
| BONUS INCENTIVE | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ |
| EQUITY INCENTIVE | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ |
| TOTAL PACKAGE | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ |
| TOTAL AMOUNT MORE THAN TONYA | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ |

PSOF ¶ 400.

**Responsibility (i.e. the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation)**

Pursell does not believe his position was any more or less important than Tonya's position at AMC, and his position was never ranked any higher or lower than Tonya's. PSOF ¶ 409. Pursell was responsible for managing a smaller departmental budget than Tonya, PSOF ¶¶ 390, 410, and Pursell supervised less employees between 2016 and 2019. PSOF ¶ 411 (Pursell); PSOF ¶¶ 71, 72, 77, 238, 251, 252, 261, 286 (Tonya's growth in direct reports 2016-2019).

According to his position description, Pursell was required to "partner[ ] with other departments and key organization leaders to gain a better understanding of how they can assist in achieving department goals." PSOF ¶ 413. Pursell developed his department's strategy in conjunction with Tonya's marketing team and the purchasing group; they created a strategic plan with common objectives and tactics, and they collectively made sure that their shared initiatives were appropriately staffed. PSOF ¶ 414. Tonya's food and beverage team was tasked with developing unique strategies, programs, menu innovations, offers, and concept experiences across three (3) different brands to profitably drive Food & Beverage revenue growth, to increase transactions, to sell more units/items, and to ensure guest satisfaction with the overall Food & Beverage experience. PSOF ¶ 415. The Food & Beverage guest experience includes areas such as the appeal of the menu offering (i.e., improving taste, quality, or execution of an existing product category or adding a new product offering), understanding of ordering processes by brand (mobile, kiosk, counter, or server ordering), packaging (in terms of presentation and maintaining quality prior to consumption), packaging branding, and third-party party monetized commitments or specialty packaging vessels that were sold to guests for higher prices or creating loyalty through refillable options. PSOF ¶ 416.

Tonya and Pursell's teams directly collaborated on food and alcohol menu pricing, bundling of menu items, discounted "Limited Time Offers," product size/portion offerings, product and vendor recommendations, and ensuring that all offerings were aligned with the unique brand strategy for each of the three (3) brands. PSOF ¶ 417. AMC's central business involved entertainment, food, and service with a very high volume of attendees, and it was very attractive for vendors to be selected for AMC's menu/product offerings, to be featured on menus, digital signage, and other merchandising elements due to the sheer volume of sales. PSOF ¶ 418. This presented AMC (and Tonya and Pursell's teams) with a unique opportunity to monetize the opportunity for inclusion in the menus, and to further monetize direct monies or product rebates if vendors were featured or highlighted in Limited Time Offers or other bundle programs. PSOF ¶ 419. Tonya worked closely with Pursell to jointly approach vendors with potential partnership plans, to suggest sales forecasts, and to negotiate Food & Beverage partnerships for incremental funding. PSOF ¶ 420.

Tonya's team members had weekly meetings with members of the Food & Beverage team, and Tonya additionally met multiple times per week with Pursell directly. PSOF ¶ 421. Given the level of Tonya's integration into the Food & Beverage business, Tonya also frequently met with Pursell's supervisor, either George Patterson or Jennifer Douglass. PSOF ¶ 422. Tonya also interacted directly with members of Pursell's team, typically the Director of Alcohol, and she frequently met with John Macdonald, i.e, the supervisor to George Patterson and Jennifer Douglass when they served in their roles. PSOF ¶ 423. Tonya's 1:1 time with Pursell was typically focused on strategic priorities, developing presentations for upcoming project and result updates, reviewing analytics, reviewing guest and theater team feedback, monetizing vendor opportunities, resource implications, calendar planning, developing special AMC Stubs loyalty offers, considering how to

drive more sales with initiative guests, brainstorming, reviewing creative or digital signage, coaching their collective team members, and addressing periodic issues that created additional challenges for their collective teams.  PSOF ¶ 424.  Tonya and Pursell also served on several working groups and committees together, including the POPS Committee (or Food & Beverage "Prices, Offers, Portions and Sizes"), the Food & Beverage Mobile Ordering Working Group and Steering Committee, the Food & Beverage Digital Signage Working Group, and the Initiative Guest Taskforce.  PSOF ¶ 425.

Tonya and Pursell's teams jointly held a variety of weekly, bi-weekly, monthly, or periodic vendor summits and meetings with Coca-Cola, ICEE, Tyson, Weaver Popcorn, Conagra, Mars, Promotion in Motion, Pepsi/Frito Lay, Hershey, Taste of Nature, FunNacho, Allure Global, Gold Medal Products, AICP, Constellation Brands, MillerCoors, Nestle, PCI Packaging, Vistar, Marketeam, Culinary Edge Consultants, Lagunitas, Infinium Spirits, Boston Beer, Patron Spirits, Promixo, American Beverage Marketers, Brown-Forman, Barcardi USA, Tito's Handmade Vodka, Crown Imports, Southern Glazers Wine & Spirits, Beam Suntory, Stone Brewing Company, Pernod Ricard, Jackson Family Wines, and Francis Ford Coppola wines.  PSOF ¶ 426. Frequently, other members of their respective teams would also join these meetings in addition to other AMC employees from purchasing (supply chain) or operations.  PSOF ¶ 427.  The meetings included a range of general, project status updates, discussing upcoming products or specification changes, plan product tests, discussing menu or pricing changes, discussing celebrity integrations, sharing new strategies or capabilities, discussing consumer insights, reviewing results, conducting menu or liquor tastings, conducting innovation lab visits, and discussing monetization proposals and planning.  PSOF ¶ 428.  Pursell was required to negotiate contracts in his role, but there were

"lots" of instances in which Tonya was involved in negotiating the very same contracts with Coca-Cola and "a lot" of other liquor vendors. PSOF ¶ 429.

Tonya and Pursell also frequently travelled together for industry conferences, events, market visits, theater visits and grand openings, menu innovation lab sessions, competitor visits, and general business meetings; many of those meetings were followed by social outings, lunches, dinners, events, suites, client entertainment outings, cocktail parties, and so forth. PSOF ¶ 430. Joint travel to AMC theater locations was particularly necessary when new concepts, menus, product tests, merchandising/offers, packaging, incentive contests, vendor activations, or Food & Beverage service amenities were being launched such as Feature Fare Menu, CLASSIC Value Menu Test, mobile ordering, bar openings, kiosk ordering, LTO's, Coke Freestyle or Teen Program, new film/studio themed retail, refill tests, digital signage configuration or content changes, and when the guest ordering experience changed. PSOF ¶ 431. Joint travel was also necessary throughout AMC's acquisition of other cinema chains (e.g., Carmike Cinemas, Starplex, Keresotes, etc.) because Tonya and Pursell's teams were jointly involved in the process of evaluating and modifying the branding, signage, menus, staffing, and other characteristics associated with the legacy locations. PSOF ¶ 432.

Throughout all of this ongoing interaction between Tonya, Pursell, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC, and new methods for streamlining existing strategies. PSOF ¶ 433. According to Pursell, the "key three" groups in his line of the business were Food & Beverage, Food & Beverage marketing, and the supply chain, and it is "critical that all three of those work[ ] together very succinctly and tightly" in order to achieve collective success. PSOF ¶ 434.

## Other Major Strategic Initiatives

In addition to their shared responsibility of driving Food & Beverage Sales (which encompasses the numerous, shared activities described above), Tonya also shared leadership responsibility with Pursell on several strategic initiatives within AMC. PSOF ¶ 435.

- **Food & Beverage Mobile Ordering/Pre-Order**: This was a joint, strategic initiative lead by Tonya and Pursell's teams, and it started before Pursell began working at AMC. PSOF ¶ 436. The mobile ordering initiative allowed guests to order food and beverages in advance of a movie and have it delivered to their seat. PSOF ¶ 437. As a result of their initial, combined efforts, AMC is now operating the mobile ordering program in more than 350 locations. PSOF ¶ 438. Originally, Tonya spearheaded the effort to gather consumer insights, food concepts, and technical requirements. PSOF ¶ 439. Tonya initially partnered with George Patterson and others in the marketing group, but when Pursell joined, Tonya and Pursell were asked to transition this into a joint initiative lead by the two them; the initiative was partially intended as a learning experience for Pursell as his first real AMC project and cross-functional effort. PSOF ¶ 440.

Tonya collaborated with Pursell on the "proof of concept," "test markets," and "soft launches" associated with introducing the mobile ordering service to market, and both of them were equally responsible for presenting updates to Stephen Colanero, George Patterson, Adam Aron, John MacDonald, Ed Moyer, Michael Czinege, and other members of the executive committee on this important initiative that had "tremendous visibility in the company." PSOF ¶ 441. They jointly established a Mobile Ordering Work Group and a Mobile Ordering Steering Committee given the project's high visibility, complexity, and work demands. PSOF ¶ 442.

Tonya and Pursell worked very closely on all aspects of understanding the mobile ordering opportunity, modeling numerous business cases, fee structures, UX development, organization of

products, recommending participating theaters for tests and launches, guest messaging and marketing, packaging, offers, timing, determining the execution path (i.e., guest pick-up versus delivery to reserved seats), measurement of guest satisfaction, prioritization of technology features against IT cost considerations, working through unique tax implication differences by state, guest order notification procedures, and discount and cash equivalents participation. PSOF ¶ 443.

- **New Retail Merchandise program:** This program featured movie-themed items and convenience "grab-and-go" impulse purchases, and Tonya and Pursell handled it as a joint initiative. PSOF ¶ 444. Tonya's team originally worked on the initiative with Programming Promotions and Senior Vice President Elizabeth Frank (initial program design and expectations), but Tonya quickly transitioned to partnering with Pursell and the Food & Beverage team. PSOF ¶ 445. Tonya and Pursell worked together to prioritize which films they wanted carry merchandise for, to review potential, licensed product categories (toys, collectibles, wearables, concession vessels, etc), and to consider additional decisions related to expanding merchandise, vendor considerations, costs, pricing, activation plans, procedures, and communications surrounding the initiative. PSOF ¶ 446. When they began testing the initiative, Tonya and Pursell analyzed results and broader Food & Beverage impacts such as average sale, erosion to other product sales, labor costs, supply chain impacts, theft, timing of offerings, and changes in results by brand or theater location in order to determine profitability and incrementality. PSOF ¶ 447. They also collected and reviewed guest and theater team feedback. PSOF ¶ 448.

- **Delivery to home/To-Go**: Tonya originally suggested this program as a potential opportunity to expand AMC's Food & Beverage sales with the home delivery of AMC's menu offerings through third-party aggregators such as Uber Eats, Grub Hub, and Door Dash. PSOF ¶ 449. The idea became more appealing in light of the general growth in home delivery, and Tonya's

separate efforts on AMC's digital streaming/VOD initiative. PSOF ¶ 450. Tonya believed there were further opportunities to serve guests with movie foods while consuming movies at home. PSOF ¶ 451. Tonya and Pursell jointly worked on developing and presenting a business case for the executive leadership team. PSOF ¶ 452. This included reaching out to several of the third-party aggregators to determine service areas, financial terms, learnings, and trends. PSOF ¶ 453. They also partnered to gather insights from AMC's "sister" brands Hoyts and Cineplex that already conducted limited testing on a similar program. PSOF ¶ 454. They also jointly developed an AMC Stubs loyalty survey to understand guest interest. PSOF ¶ 455. They also jointly explored execution questions such as operations, packaging, menu, pricing, potential technology integrations with third parties and AMC's website and mobile app, and financial models for multiple scenarios. PSOF ¶ 456. They also jointly presented to the executive team with a comprehensive recommendation for testing the program with several different roadmap possibilities for consideration. PSOF ¶ 457.

- **Feature Fare:** Pursell and Tonya also travelled together in order to collaborate on Feature Fare—which Pursell described as "the largest overhaul in the company's history on [Food & Beverage]." PSOF ¶ 458. Feature Fare "was a 75 million dollar investment" that involved AMC putting "small kitchens in 300 theaters and really elevat[ing] the entire guest experience;" it "…generated a tremendous amount of revenue for the company and a lot of EBITDA as well." PSOF ¶ 459.

- **Field support, "0411" Field email management, AEI Scores, and Field Communications:** Because Tonya and Pursell's teams were so intertwined, members of their teams also took turns responding to the Food & Beverage "0411" email inbox in which theater team members would submit questions related to Food & Beverage operations, menus,

promotions, products, offers, digital signage, etc.  PSOF ¶ 461.  Their teams also collectively reviewed AEI (Annual Engagement Index) survey scores every year together, and they discussed and developed joint action plans on how to improve.  PSOF ¶ 462.  Their teams also co-authored several field communications for joint programs such as LTO's, digital signage, promotions, merchandising, mobile ordering, and more.  PSOF ¶ 463.

- **Federal Regulations and Menu Labeling:**  This was also a joint and shared priority between Tonya's team and Pursell's team.  PSOF ¶ 464.  Food, beverages, and alcohol are uniquely impacted by the FDA and national laws—especially for multi-unit restaurant/bar operators.  PSOF ¶ 465.  The landscape is constantly changing, and Tonya was responsible for working with the Food & Beverage team, vendors, and a national trade organization in order to remain aware of legislation impacts, to ensure compliance as necessary, and to consider/adapt to challenging menu changes related calorie labeling, sugary drink size regulations, taxes, and unique food menu requirements mandated when offering alcohol.  PSOF ¶ 466.

- **Prescriptive Team Building:**  The Food & Beverage group (headed by George Patterson and later Jennifer Douglass) typically held quarterly or biannual team-building, off-site events or activities.  PSOF ¶ 467.  Almost always, Tonya's Food & Beverage team also attended and even helped plan those off-site collaboration sessions.  PSOF ¶ 468.  Sometimes the business planning meetings were followed by a fun/collaborative social activities.  PSOF ¶ 469.  Recent examples during the last few years of Tonya's employment included: Top Golf, ice skating/hockey at Linn Creek, Royals suites, Breakout KC, Pickleball, bowling, happy hours, and dinners.  PSOF ¶ 470.

**Effort (i.e., the physical or mental exertion necessary to the performance of a job)**

Tonya and Pursell were both required to work on a 24/7 basis, as necessary, and they were both required to make themselves available to the CEO and other executives as necessary. PSOF ¶¶ 396, 471. Tonya and Pursell both estimate that they spent approximately 30% of their time on their own work, and 70% of their time supervising others. PSOF ¶¶ 397, 473. Tonya and Pursell also spent roughly the same amount of time traveling for job-related reasons. PSOF ¶ 398 (Tonya, 25-35%); PSOF ¶ 437 (Pursell, 25%).

**Skill (i.e., the experience, training, education, and ability necessary to perform the job)**

In terms of education, Tonya's position required a minimum of a bachelor's degree in marketing, journalism, or business, and an MBA was listed as "preferred" but not required; Tonya actually has a bachelor's degree in Business/Public Relations, and a master's degree in Integrated Marketing. PSOF ¶¶ 384-385. Pursell's position had the same educational requirements, i.e. a minimum of a bachelor's degree in business (or a related field), and an MBA was listed as a "plus;" Pursell actually has a bachelor's degree in Marketing and a master's degree in Business Administration. PSOF ¶¶ 402-403. Thus, the education requirements for both of their jobs were identical, and both of them met the requirements. No other education is relevant because only the skills and qualifications actually needed to perform the jobs are considered. *Simpson,* 441 F.3d at 578 (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir.1992).

In terms of experience, both of their roles required, and both of them had, ten or more years of experience in consumer marketing with preferred experience in the areas of "multi-unit restaurant" and/or Food & Beverage. PSOF ¶¶ 386-388, 404-407. Prior to her termination, Tonya had more than 25 years of professional experience in the field of marketing, and aside from her extensive Food & Beverage experience at AMC (10 years), Tonya also had previous experience

working as a Senior Marketing & Sales Leader for YUM! Brands—Pizza Hut, Wing Street, and Italian Bistro (2004-2008) and a Marketing Manager for Godfather's Pizza, Inc. (2002-2004). PSOF ¶¶ 386-388. Prior to working at AMC, Pursell worked at Aramark for approximately eleven years; he served as a director of development, a group director, and he spent the last six years as their **Vice President of Marketing** for their education division. (Ex. 24, Pursell depo., at 12:9-14:2) (emphasis added). PSOF ¶¶ 404-407. Thus, both of them have comparable marketing experience with an emphasis in the multi-unit restaurant and Food & Beverage environments. Importantly, "'[t]o establish a prima facie case, a plaintiff need only demonstrate that the jobs at issue are substantially similar; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent.'" *Grover,* 836 F.Supp.2d at 867 (citing *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998)).[19]

Based on the above, and after conducting a true analysis of the *actual day-to-day job content and performance* associated with the cross-functional roles performed by Tonya and Pursell, critical issues of disputed fact remain on the issue of substantial similarity between their roles, and summary judgment should be denied.

### 3. Robert Kim is a Valid Comparator for Purposes of Defeating Summary Judgment.

Robert Kim was a Vice President of Programming Promotions at AMC between September 30, 2016 through August 22, 2019, and his role within the company required overlap and

---

[19] In *Arrington*, the Eleventh Circuit relied on its previous decision in *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir.1992) in its expression of this rule. As discussed above, the Eight Circuit has already cited *Miranda* with approval in its discussion of the general rules applicable to EPA cases in *Simpson v. Merchants & Planters Bank.*

collaboration with Tonya and her team.  PSOF ¶ 474.  As discussed in response to DSOF ¶ 30, Tonya claims Kim as a comparator for only the April 2018 to September 2019 time period, i.e., when Tonya took on the "Product Marketing" function.[20]  Between 2016 and 2019, Kim received a higher base salary and higher bonus/equity incentives than Tonya; his annual compensation package at AMC was as follows:

| YEAR | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| BASE SALARY | ███ | ███ | ███ | ███ |
| BONUS INCENTIVE | ███ | ███ | ███ | ███ |
| EQUITY INCENTIVE | ███ | ███ | ███ | ███ |
| TOTAL PACKAGE | ███ | ███ | ███ | ███ |
| TOTAL AMOUNT MORE THAN TONYA | ███ | ███ | ███ | ███ |

PSOF ¶ 475.

**Responsibility (i.e. the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation)**

Kim is unable to say whether his position was any more or less important than Tonya's position at AMC, and he is not aware of any instance in which his position was ever ranked any higher or lower than Tonya's.  PSOF ¶ 480.  Kim was responsible for managing a smaller departmental budget than Tonya, PSOF ¶¶ 390, 481, and Kim supervised less employees between 2016 and 2019.  PSOF ¶ 483 (Kim); PSOF ¶¶ 71, 72, 77, 238, 251, 252, 261, 286 (Tonya's growth in direct reports 2016-2019).

---

[20] As set forth above, and in response to DSOF ¶ 21, Tonya also continued to share extensive, cross-functional job responsibilities and reporting obligations with Michael Pursell through the end of her employment.

Kim's job, "in a nutshell," was to sell AMC's "marketing assets" to film studios. PSOF ¶ 484. This initially included "on-screen advertising" (i.e. trailers or previews), but it also included other assets such as opportunities to hang posters or display cardboard advertisements within AMC theaters in order to market movies. PSOF ¶ 485.

Over time, however, "AMC began to evolve [in] how [they] marketed movies, [and they] saw an opportunity to monetize [their] member data [from their loyalty program] and [their] social online digital marketing capabilities." PSOF ¶ 486. For example, AMC was able to capture data through its loyalty program in order to understand which customers attended a particular movie, and AMC could then leverage that information by selling studios the right to participate in the use of that data in order to narrowly target advertising or promotions to the same customers in order to market the sequel to that movie. PSOF ¶ 487. The digital marketing idea was to "pitch to the studios [ ] a smarter way to spend their marketing dollars," and this is the area in which Kim and Tonya "worked together." PSOF ¶ 488.

Tonya's team was very intertwined with Rob Kim and his Programming Promotions team, particularly on securing incremental studio funding and film rent reduction with effective marketing, analytics, and media promotions. PSOF ¶ 490. Tonya's team worked closely with the Programming Promotions team and studios to aggressively market films, to create monetization opportunities, to develop engaging activations, and to increase AMC's sales. PSOF ¶ 491.

Tonya's team members had weekly meetings with members of the Programming Promotions team, and Tonya also met weekly with Rob Kim directly. PSOF ¶ 492. Tonya's 1:1 time with Rob Kim was typically focused on strategic priorities, budget reviews, monetization goals, results, resource implications, calendar planning, coaching feedback/recognition of their team members, and sometimes addressing other challenges. PSOF ¶ 493.

Tonya and Kim's teams jointly held weekly, bi-weekly, monthly, and periodic meetings with Disney, Paramount, Sony, Warner Brothers, Universal, 20th Century Fox, Lionsgate, A24, Annapurna, and STX. PSOF ¶ 494. These meetings included a range of general project status updates, discussing specific upcoming films, sharing new strategies or capabilities, consumer insights, reviewing results, general planning, and discussing monetization proposals. PSOF ¶ 495. Tonya and Kim would also occasionally travel together for industry conferences, events, market visits, visits to AMC's Los Angeles office, and visits to studio offices, and these business meetings were often followed up with social outings, lunches, dinners, events, cocktail parties, watching movie screenings, and other social activities. PSOF ¶ 496.

Tonya's team lead development of the proposals to the studios for the most effective strategies and activations within AMC's owned channels (email, MPN, social, website, mobile app) and theaters, loyalty member database, and supplemental paid media. PSOF ¶ 497. From there, the process of aligning final details with the studio took place, including monetization amounts. PSOF ¶ 498. Throughout all of this ongoing interaction between Tonya, Kim, and their teams, there was also a consistent expectation that they remained jointly responsible for developing new and innovative business opportunities for AMC and finding new methods for streamlining proven strategies. PSOF ¶ 499. Tonya and Kim also "[came] up with new menu items for [Kim] to go and sell to the studios." PSOF ¶ 500. Tonya and Kim were also members of AMC's digital retail/streaming task force. PSOF ¶ 501. Tonya and Kim were also participants AMC's LEAP program. PSOF ¶ 502. Critical issues of disputed fact remain on the issue of substantial similarity between their roles.

**Effort (i.e., the physical or mental exertion necessary to the performance of a job)**

Tonya and Kim were both required to work on a 24/7 basis, as necessary, and they were both required to make themselves available to the CEO and other executives as necessary. PSOF ¶¶ 396, 503. Tonya and Kim both divided their time roughly the same in terms or working on their own versus supervising others. PSOF ¶¶ 397 (Tonya 30% individual, 70% supervising); PSOF ¶ 504 (Kim 40% individual, 60% supervising). Both of them were also required to travel for work. Kim estimates that travelled approximately every 6-8 weeks for job-related reasons, PSOF ¶ 505, and Tonya estimates that she spent 25-35% of her time travelling for job-related reasons. PSOF ¶ 398.

**Skill (i.e., the experience, training, education, and ability necessary to perform the job)**

In terms of education, Tonya's position required a minimum of a bachelor's degree in marketing, journalism, or business, and an MBA was listed as "preferred" but not required; Tonya actually has a bachelor's degree in Business/Public Relations, and a master's degree in Integrated Marketing. PSOF ¶¶ 384-385. 477. Kim has a bachelor's degree in History; he is unaware of whether his position required anything more than a bachelor's degree. PSOF ¶ 477. Thus, Tonya met or exceeded and educational requirements for Kim's job and her own job. No other education is relevant because only the skills and qualifications actually needed to perform the jobs are considered. *Simpson,* 441 F.3d at 578 (citing *Miranda,* 975 F.2d at 1533).

In terms of experience, AMC never produced a copy of any job descriptions applicable Kim's position throughout the discovery phase of this case, so it is impossible to know whether there were any requirements whatsoever. PSOF ¶ 476. Kim was not required to master any specialized technology or software in order to perform his job; he was able to supervise others to complete any technology-oriented tasks. PSOF ¶ 479. Kim began working at AMC in 1995; he

started as a theater manager in Philadelphia, served as a general manager in multiple theater locations between 1996 and 2006, and later became a director of operations and a film buyer before he eventually became a Vice President of Programming operations. PSOF ¶ 478. From 2006 forward, Robert Kim gained experience marketing AMC's theatre assets to outside film studios, but Tonya also had extensive experience marketing AMC's theatre assets to outside vendors prior to her collaboration with Robert Kim and the Programming Promotions group. Their experiences in this regard were substantially similar even if they were not interfacing with exact same people prior to their overlap. Again, "'[t]o establish a prima facie case, a plaintiff need only demonstrate that the jobs at issue are substantially similar; a plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent.'" *Grover,* 836 F.Supp.2d at 867 (citing *Arrington,* 139 F.3d at 876).

Based on the above, and after conducting a true analysis of the *actual day-to-day job content and performance* associated with the cross-functional roles performed by Tonya and Kim between April 2018 and September 2019, critical issues of disputed fact also remain on the issue of substantial similarity between their roles, and summary judgment should be denied.

### 4. Genuine Issues of Fact Also Preclude AMC from Asserting One of the Defenses Listed in 29 U.S.C. § 206(d)(1).

AMC also seeks refuge in the exceptions outlined in 29 U.S.C. § 206(d)(1) by arguing that it "placed a higher value on the positions occupied by each of the alleged male comparators," that it considered Tonya's "role more fungible," and that the "male comparators also possessed significantly more qualifications, skills, and Mangels…." All of this is controverted. No one at AMC ever analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶¶ 216-220. As discussed above, and after conducting a true analysis of the actual day-to-

day job content and performance associated with the cross-functional roles performed by Tonya, Pursell, and Kim, critical issues of disputed fact also remain on the issue of substantial similarity between their roles.

It is also impossible for AMC to argue that it "placed a higher value on the positions occupied by each of the alleged male comparators." AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs. There is no set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC since 2014—Carla Chavarria—exhibits a willful indifference toward compliance with the Equal Pay Act.

Chavarria, i.e. the person that signed the Declaration supporting AMC's statements of fact in the paragraph discussing AMC's "process" for valuing Vice President roles, is AMC's Senior Vice President and Chief Human Resource Officer; she has been the highest-ranking Human Resources employee at AMC since 2014. PSOF ¶ 45. Chavarria directly reports to Adam Aron. PSOF ¶ 46. On October 5, 2018, Tonya secretly recorded a conversation between herself, Chavarria, Colanero, and David Codding. PSOF ¶ 232. During a discussion about various, anticipated changes with subordinate employees, Chavarria began asking the group general questions "about any protected category issues [she needs] to be aware of and that kind of thing." PSOF ¶ 233. At one point during the secretly recorded conversation, Chavarria commented, "One of the things we're getting hit with is a lot of Equal Pay Act." PSOF ¶ 234. Chavarria also commented during the secretly recorded conversation about her concern "that women generally

start off making less than men, and if that carries all the way through, the gap just gets bigger." PSOF ¶ 235 (emphasis added).

Chavarria denies in this case that she was complaining about AMC-specific concerns after she learned about the secretly recorded conversation, and she takes the position that she was commenting about the HR industry in general. PSOF ¶ 236. Tonya adamantly disagrees with Chavarria's characterization, however, because when those comments were made, Tonya understood them to specifically relate to AMC based on the context in which Chavarria described them, and because Chavarria made no effort to characterize her comments as applying to anything other than AMC. PSOF ¶ 237. One need not look any further than the facts of this case, however, to understand that Chavarria was talking about AMC.

As discussed above, Tonya began her employment with AMC in 2009 as an individual Director, PSOF ¶¶ 1-2, and her departmental budget was less $1 million annually. PSOF ¶ 390. Tonya was elevated to her Vice President Role in June 2013, and she had two people on her team at that time. PSOF ¶¶ 7, 9. Over the course of the next 6+ years, Tonya's team grew to a total of eleven (11) direct reports, her portfolio of responsibilities grew exponentially, and her departmental budget grew to $10 million annually. PSOF ¶ 286 (11 reports); PSOF ¶ 390 (budget growth); PSOF ¶¶ 3, 7-8, 10, 15-16, 37, 38, 59-61, 141-142, 147-151, 238, 251-252, and 264 (responsibility increases). She received positive performance reviews in 2013, 2014, and 2015.

In her 2016 review, Colanero rated Tonya with an overall rating of "exceeds expectations." PSOF ¶¶ 78-79. He commented about Tonya's "excellent performance" in 2016, he observed that "her area of responsibility **continues to grow** outside of food and beverage marketing and her contribution in these new areas has been strong," he observed that her "core food and beverage marketing remains strong," he observed that she assumed **added responsibility** for "print

production for the company" which "has gone pretty well with no significant issues," he recognized her for her "major accomplishment" in transitioning to Nvision, he recognized her as the "point person within marketing for all mergers and acquisitions activity" and commented on her positive performance in handling the Carmike and Starplex acquisitions, and he recapped the entire year by saying: "a very nice year for Tonya where she was able to keep core activities going in a positive way while delivering on multiple key initiatives over and above these day-to-day responsibilities." PSOF ¶ 80 (emphasis added).

Beginning in May 2016 (i.e. three years after her promotion to Vice President), Tonya began requesting an increase in her compensation consistent with her updated job description and her increased job responsibilities. PSOF ¶¶ 62-63. At the time of that initial request, Colanero agreed that Tonya's "responsibilities had continued to grow and her team was getting bigger." PSOF ¶ 65. Colanero forwarded Tonya's request to Giuseffi and Chavarria, and told them that he looked forward to their recommendations on any adjustments in Tonya's pay. PSOF ¶ 64.

### AMC's Ad-Hoc Compensation Process

Adam Aron became AMC's CEO in January 2016. PSOF ¶ 43. According to Adam Aron, the *only* person that can adjust the compensation of a Vice President or higher within AMC is Adam Aron. PSOF ¶¶ 47-48. Mike Giuseffi, AMC's Director of Compensation, reports to Chavarria, and he directly supervises everyone else in the compensation department that falls under Chavarria. PSOF ¶¶ 49-50. According to Giuseffi, whenever a position materially changes in scope, content, expectations, or job specifications, his group works with the relevant department head in order to begin the process of evaluating whether the employee's compensation should be adjusted. PSOF ¶ 51. That process begins with an evaluation of the job content and specifications listed in the "job questionnaire" designed to summarize the employee's role within the company,

and it also necessitates conversations with the supervisor of that role in order to "really understand" their job specifications.  PSOF ¶ 52.

In the case of Tonya, the expectation was for Tonya to initially address the relevant job changes and the need for increased compensation with Colanero, and for Colanero to present the issue to the compensation group for an evaluation.  PSOF ¶ 53.  In the case of an officer (such as Tonya), the compensation group also "looped in" Chavarria on the process of evaluating the position and any pay adjustment recommendations.  PSOF ¶ 54.

Giuseffi also made clear that any recommendations from his group are not presented on a take-it-or-leave-it basis; when his group is dealing with someone at the VP level, the process is supposed to be a "collaborative effort" between Giuseffi's team, the supervisor of the role (i.e., Colanero), Chavarria, and the supervisor's supervisor, i.e., Adam Aron in this case.  PSOF ¶ 55. If the compensation group fails to present satisfactory recommendations to the supervisor in charge (i.e., Colanero), the parties are expected to continue working through the process in order to reach an agreement that makes sense for the organization, and the supervisor also has the authority to "push back" on any failure of Giuseffi's group to present satisfactory recommendations.  PSOF ¶ 56.  Colanero agrees that, as the employee's supervisor, he always has the right to reject the recommendation of Giuseffi's group, and the right to take the position that his employee "deserves more."  PSOF ¶ 57.

### AMC's Ad-Hoc Compensation Process
### Consistently Fails Tonya Over the Next 3+ Years

So what happened to Tonya's first request to increase her compensation in May 2016? Colanero has no memory of what happened after he submitted it, and he does not recall any conversations with Giuseffi or Chavarria about it.  PSOF ¶ 66.  Colanero does not recall ever contacting Giuseffi to say, "Hey, look, we sent you this request a while back related to Tonya.

Where does that stand?"  PSOF ¶ 67.  When Chavarria was asked about the email exchange during her deposition, she said that she "didn't see this as a request for adjusting compensation," and she does not recall whether anyone evaluated Tonya's compensation in relation to this request.  PSOF ¶ 68.  Finally, and perhaps most importantly, no one ever made Adam Aron (i.e. the only person with authority to adjust her compensation) aware of the request.  PSOF ¶ 66.  The net result is that Tonya's first request disappeared through the cracks.  PSOF ¶ 70.

Unfortunately for Tonya, this cycle continued for the next three (3) years.  Tonya once again raised the issue of increasing her compensation at least **13 more times**—ultimately culminating in her Charge of Discrimination filed with the EEOC in May 2019—and in each instance, nothing ever happened.  PSOF ¶¶ 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296.  **Critically, no one ever made Adam Aron aware of a single request.**  PSOF ¶¶ 130, 137, 156, 221, 228, 247, 274, 284.

Highly summarized, this is what happened in each relevant year:

### 2016

- In October 2016, Tonya once again requested to increase her compensation, and Colanero believes he informed her that there would be no increase in her compensation because he was going to "challenge her and reward her later," and because she would have to "prove her openness and her ability" to be recognized down the road.  PSOF ¶¶ 73-77.

### 2017

- In early 2017, Chavarria exhibited additional indifference toward compliance with the Equal Pay Act.  Elizabeth Frank is a Senior Vice President at AMC, and she is the highest-ranking female in the company.  PSOF ¶ 92.  In February 2018, a member of Elizabeth Frank's team named Melissa Wallen raised a concern about gender pay equity at AMC, and it caused Frank

to send Chavarria the email attached hereto in Exhibit 48. PSOF ¶ 93. In her report of the pay equity complaint from her subordinate, Ms. Frank said:

> "One of the female associates on my team stopped in last week **to express concern about gender pay equity at AMC.** A long-tenured AMC associate with broad social network in the company, **she stated that it is 'commonly understood' that AMC compensates men higher than women for similar results in similar positions**."

PSOF ¶ 94 (emphasis added); (Ex. 48, Depo. Ex. 115). AMC's nondiscrimination and harassment policy obligates AMC to "promptly launch an investigation" into workplace allegations of discrimination, harassment, and retaliation. PSOF ¶ 95; (Ex. 28, Depo. Ex. 217). Chavarria sent Frank the vague response reflected in Exhibit 48, but Chavarria never inquired to understand the identity of the complaining employee, never conducted any further investigation into the issue, never instructed anyone else to investigate the issue, and testified that she did not interpret Frank's email as containing a gender-based pay equity complaint sufficient to merit an investigation under AMC's non-discrimination policy. PSOF ¶ 96. In her response to Frank, Chavarria also referred to a formal assessment of pay equity that was conducted in 2017, (Ex. 48, Depo. Ex. 115), but Chavarria does not know whether that analysis involved a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶ 97. It did not. PSOF ¶ 98.

### 2018

- In early 2018, Tonya received her 2017 review, and Colanero rated Tonya with an overall rating of "outstanding," i.e., the highest possible rating. PSOF ¶¶ 114-115. Colanero agrees that this was a "glowing" annual performance review for Tonya. PSOF ¶ 117.

- On March 12, 2018, shortly after rating Tonya as an "outstanding" employee, Colanero mistakenly emailed a spreadsheet to Tonya reflecting compensation data (salary and bonus information) applicable to other Vice Presidents on Colanero's team (Exhibit 19 hereto).

PSOF ¶¶ 118-119.  This was the first time—to Colanero's knowledge—that anyone ever shared with Tonya that Julius Lai's and Frank Ybarra's salaries were $████/year and $████/year, respectively, as opposed to Tonya's salary of $153,500 according to the same document.  PSOF ¶ 120.  Colanero never realized that he mistakenly sent the spreadsheet to Tonya until she later confronted him with it nearly a year later on February 12, 2019.  PSOF ¶ 121.  Prior to that time, Colanero consistently lied to Tonya, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents.  PSOF ¶ 122 (emphasis added).

•  In March 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero.  PSOF ¶¶ 126-131.

•  In April 2018, Tonya spoke with Chavarria on April 11, 2018 in order to seek advice on the best manner in which to "tactfully" address the subject of increasing her compensation with Colanero in light of the fact that her role at AMC continued to expand in depth and breadth after becoming a Vice President in 2013.  PSOF ¶ 133-134.  Chavarria testified to her awareness that Tonya wanted her position to be "assessed" during the April 11 conversation, her awareness that Tonya wanted advice on how to tactfully address the issue with Colanero, and her memory of previous discussions in which Colanero discussed "revaluing" Tonya's position, but Chavarria inexplicably denies learning that Tonya wanted to increase her pay during their April 11, 2018 discussion.  PSOF ¶ 135.  Colanero does not recall any conversations with Chavarria about Tonya's interest in adjusting her compensation in the April 2018 timeframe.  PSOF ¶ 136. Nothing happened as a result of the conversation with Chavarria.  PSOF ¶ 138.

•  Tonya had another conversation with Colanero around May 4, 2018 in which she once again requested to increase her compensation in a manner commensurate with her updated

job description and her increased job responsibilities.  SOF ¶ 152.  Colanero does not disagree that he met with Tonya once again on May 4, 2018 in order to discuss Tonya's request to increase her compensation, but he does not recall the discussion, and the conversation resulted in nothing.  PSOF ¶¶ 156-157.

- During a May 30, 2018 meeting with Rosalind Reeves, Tonya complained to Human Resources Vice President Rosalind Reeves about pay equity issues within AMC, and Reeves agrees that Tonya's pay equity complaints merited an investigation.  PSOF ¶ 210.  Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus."  PSOF ¶ 211.  Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue.  PSOF ¶ 212.  The complaints went nowhere.

- On July 24, 2018, Tonya once again raised the issue of her compensation in an email with Colanero.  PSOF ¶ 224.  In her email, Tonya reminded Colanero that her position had not been properly reviewed—for purposes of adjusting her compensation—since her promotion to Vice President in 2013.  PSOF ¶ 225.  Colanero agrees that this request "kind of fell through the cracks" because he was "busy" and "must have missed it."  PSOF ¶ 226.  Chavarria does not recall ever being made aware of this request, and no adjustment ever occurred.  PSOF ¶¶ 227-229.  It went nowhere.

- On August 8, 2018, Tonya met with Colanero and Jane Hermstedt (a leadership development employee within AMC) to discuss her Individual Development Plan ("IDP") with the company, and she mentioned during the meeting that one of her goals was to achieve a compensation level that was consistent with her experience, responsibilities, contributions, and value within the company. PSOF ¶ 230. Nothing happened as a result of this request. PSOF ¶ 231.

- In November 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 239-248. After a brief in-person exchange, Tonya followed up in a very clear email in which she made the following statements:

> **"I would like to request my updated Job Questionnaire be reviewed and follow up on our prior direct discussions and those with human resources as I am concerned that my compensation continues to lag in relation to the changes [in my role]."**
>
> **"Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment."**
>
> **"Yet my responsibilities and contributions to the company have grown exponentially."**
>
> **"We have had several past discussions about increasing my compensation to align with my increased responsibility, strategic influence, external benchmarks, and equity with internal positions of comparable scope, leadership, oversight, and revenue contributions."**
>
> **"I have been passive in prior conversations, believing my compensation would be fairly addressed and equalized in due time."**
>
> **"My position and team continues to expand, I am asking that the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work. As examples, I believe comparable**

**positions include: (1) VP, Communication & Events; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Programming Promotions. It is my understanding that the individuals holding these positions receive significantly higher compensation and bonus packages. And, that the Company has precedent of adjusting compensation to reflect changes in position breadth and depth or in cases of known wage gaps for similar scope roles."**

PSOF ¶¶ 239-243 (emphasis added). Colanero eventually forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. PSOF ¶ 244. Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself. PSOF ¶ 246. The request went nowhere—even after Tonya asked Colanero about it again on December 13, 2018. PSOF ¶¶ 248-250.

### 2019

- On February 12, 2019—in the context of a performance review—Tonya told Colanero for the very first time about the spreadsheet that he mistakenly sent to her in March 2018 containing the compensation data for other Vice Presidents, and she also complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. PSOF ¶¶ 262, 271. Despite AMC's policy of promptly launching an investigation into complaints of discrimination (Exhibit 28 hereto), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." PSOF ¶ 272. Chavarria does not recall Colanero ever making her aware of the details of his conversation with Tonya, his inadvertent mistake in sending her the compensation spreadsheet, or Tonya's complaints about wage/gender discrimination. PSOF ¶ 273. The conversation went nowhere.

- In March 2019, AMC hired an outside expert to evaluate Tonya's compensation and the expert confirmed that Tonya was being underpaid. PSOF ¶¶ 277-285. AMC paid the

company (AON) approximately $1,000 for its analysis. PSOF ¶ 278. AON determined that a minimum salary for her role would be $184,000/yr., that a mid-point salary for her role would be $230,000/yr., and that a maximum salary for her role would be $276,000/yr. PSOF ¶¶ 279-280. At the time of AON's analysis in March 2019, Tonya's salary was $156,570/yr. PSOF ¶ 281. Colanero does not recall ever speaking to anyone about the results of the AON analysis, or what it indicated as an appropriate range for Tonya's position. PSOF ¶ 282. Mike Guiseffi also does not recall ever speaking to anyone about the results of the AON analysis, or speaking to anyone about the possibility of adjusting Tonya's salary to an amount that was in line with AON's analysis. PSOF ¶ 283. The discussion went nowhere. PSOF ¶ 285.

- On May 6, 2019, Tonya filed a Charge of Discrimination with the EEOC, and Chavarria agrees that the May 6 Charge contains very clear complaints of gender discrimination and complaints of violations of the Equal Pay Act. PSOF ¶¶ 287, 290. Colanero agrees that, by the time of the May 6 Charge, Tonya had already engaged in multiple attempts to communicate with him about asking to have her compensation adjusted. PSOF ¶ 289. Colanero and Chavarria both understood that the comparator positions identified in her charge corresponded to Robert Kim, Julius Lai, Michael Pursell, Frank Ybarra, and Robert Lane. PSOF ¶ 291. Chavarria never performed her own factual investigation into the claims referenced in the May 6 Charge, and she is not aware of any conclusions that were ever reached by AMC regarding whether or not there was any merit to the claims referenced in the May 6 Charge. PSOF ¶ 295. Tonya's compensation was never increased as result of filing her May 6 Charge. PSOF ¶ 296.

Thus, and even after filing a charge of discrimination, no one at AMC ever analyzed whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶¶ 216-220. The record is

clear that AMC's process for valuing VP roles is rife with failures; there is no set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC exhibits a willful indifference toward compliance with the Equal Pay Act.

AMC is also incorrect in its statement that the discipline Tonya received in May/June 2018 somehow "impacted" her compensation in 2018 or 2019. Plaintiff has highlighted immediately above *six separate instances between July 2018 and May 2019* in which Tonya once again raised the issue of increasing her compensation *after* the May/June 2018 discipline. In each instance, nothing ever happened, and there was never one example of AMC sending Tonya an email, or telling her in a conversation, that her compensation was not going to be revisited because of the discipline she received in May/June 2018. The record demonstrates just the opposite. Tonya was continually led to believe that AMC was "working on" her many requests to revalue her position, and AMC continually dropped the ball. It is also absurd for AMC to argue that Tonya's May/June 2018 discipline affected her 2019 compensation when the record demonstrates that AMC collaborated with an outside expert in March 2019 (AON) in order to study the question of whether or not Tonya was being underpaid. PSOF ¶¶ 277-285.

Simply put, it is impossible for AMC to seek refuge—as a matter of undisputed fact—in the exceptions outlined in 29 U.S.C. § 206(d)(1). *See, Hennick,* 168 F. Supp. 2d at 950-51 (also denying summary judgment because genuine issues of material fact remained on the additional issue of whether defendant legitimately based any pay differentials on a factor other than sex, i.e., one of the defenses outlined in 29 U.S.C. § 206(d)(1)). Summary judgment should be denied as to Plaintiff's Equal Pay Act claims.

**Mangels Alleges Valid Retaliation Claims Under the Equal Pay Act and Title VII (Counts II and IV)**

### 1. Plaintiff Can Establish a *Prima Facie* Case of Retaliation.

Defendant correctly observes that Equal Pay Act and Title VII retaliation claims are evaluated under the same analytical framework. *See, e.g.*, *Donathan v. Oakley Grain*, Inc., 861 F.3d 735, 739-40 (8th Cir. 2017) (analyzing both in unison); *Yearns v. Koss Constr. Co.*, 964 F.3d 671 at 674 (8th Cir. 2020). To establish a *prima facie* case of retaliation, the Plaintiff must show that: (1) "[s]he engaged in protected conduct, (2) [s]he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011) (citation omitted). "To survive a motion for summary judgment on a retaliation claim, [a plaintiff] must offer direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016).

Direct evidence can be circumstantial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) (citations omitted). The term "'[d]irect' refers to the causal strength of the proof…." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Direct evidence is "'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013) (citation omitted). Direct evidence "includ[es] evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Thomas v. Heartland Emp't Servs. LLC*, 797 F.3d 527, 529-30 (8th Cir. 2015) (internal quotations omitted). Direct evidence should "reflect a

negative attitude toward [protected conduct] and ... forecast how the employer would deal with the adverse situation if it arose." *Fjelsta v. Zogg Dermatology*, 488 F.3d 804, 810 (8th Cir. 2007).

In the absence of presenting direct evidence, the plaintiff is required to create an inference of retaliation under the *McDonnell Douglas* framework. Pursuant to the burden-shifting analysis, the plaintiff bears the initial burden to establish a *prima facie* case. This burden requires the plaintiff to demonstrate she participated in protected conduct and suffered an adverse employment action. *Musolf v. J.C. Penney Co.*, 773 F.3d 916, 918 (8th Cir. 2014). The plaintiff must also demonstrate a causal connection between the protected conduct and the adverse action. *Id.* "The burden to show a prima facie case is not difficult." *Id.* at 919. Successfully doing so "creates a rebuttable presumption of discrimination" and shifts the burden to the defendant to produce "a legitimate, nondiscriminatory reason for its decision." *Pye*, 641 F.3d at 1019. If the defendant manages to do so, "the presumption disappears," and the burden returns to the plaintiff to prove "that the proffered reason was pretext for discrimination." *Id.*

In its brief, AMC acknowledges that Tonya engaged in protected activity on multiple occasions, and that she suffered a materially adverse employment action (termination), but AMC mischaracterizes the extent of Tonya's protected activity and the relevant interactions. Each interaction is summarized below:

### May 23-20, 2018

- Tonya sent Colanero and Chavarria an email on May 23, 2018, and included the sentence: "As a female, there are many occasions I feel I've been treated differently and held to different standards than my male counterparts." PSOF ¶ 202; (Ex. 26, Depo. Ex. 140). When Chavarria read that sentence, she understood it "to be a pretty direct reference to [Tonya's] belief that she feels like she as a female was being singled out or treated differently from males," and it

prompted Chavarria to assign Rosalind Reeves to investigate her complaint consistent with AMC's nondiscrimination and harassment policy (Exhibit 28). PSOF ¶ 203.

Reeves held a meeting with Tonya on May 30, 2018—which was recorded by Tonya—and Reeves agrees that Tonya "very clearly rais[ed] her own internal complaints about the fact that she believes men and women are treated differently within AMC in certain respects." PSOF ¶ 204. Tonya complained to Reeves that women are judged more harshly than men in relation to how they consume alcohol, she complained that she felt targeted and treated differently from males, and she mentioned the examples of male AMC employees inappropriately consuming alcohol at a golf tournament, male AMC employees being sent home in Ubers without consequence, a male AMC employee named George Patterson consuming alcohol inappropriately, and the example of male AMC employees engaging in pool parties in Las Vegas during a work conference. PSOF ¶ 205. Reeves failed to ask Tonya for any names, or for any other further specificity, that would have been necessary in order to investigate the examples Tonya shared on the issue of men and women being treated differently in relation to their consumption of alcohol. PSOF ¶ 206.

During the May 30, 2018 meeting, Tonya also complained to Reeves about pay equity issues within AMC, and Reeves agrees that Tonya's pay equity complaints merited an investigation. PSOF ¶ 210. Tonya complained about her belief that "[AMC] has discrepancies in [its] compensation practices for similar positions," she listed Frank Ybarra, Julius Lai, and Michael Pursell as people she believed were valid comparators, and she told Reeves that "I feel like there is a 45 percent to nearly 60 percent difference in base plus bonus." PSOF ¶ 211. Chavarria agrees that Tonya raised pay equity complaints with Reeves on May 30, 2018, and that her complaints merited a prompt investigation pursuant to AMC's nondiscrimination policy, but Chavarria does

not recall AMC investigating those complaints, and she is unaware of anyone at AMC ever following up with Tonya to discuss the results of an investigation into that issue. PSOF ¶ 212.

## November 2018

- In November 2018, on two occasions, Tonya once again requested to increase her compensation in a manner commensurate with her updated job description and her increased job responsibilities, and the conversation went nowhere with Colanero. PSOF ¶¶ 239-248. After a brief in-person exchange, Tonya followed up in an email in which she made very clear statements about her belief that she was being paid less than male Vice Presidents in comparable positions:

> "I would like to request my updated Job Questionnaire be reviewed and follow up on our prior direct discussions and those with human resources as I am concerned that my compensation continues to lag in relation to the changes [in my role]."

> "Respectfully, other than routine increases, I do not believe my salary has been adjusted since June 2013 when was promoted to VP Food & Beverage Marketing and received a $14,350 salary adjustment."

> "Yet my responsibilities and contributions to the company have grown exponentially."

> "We have had several past discussions about increasing my compensation to align with my increased responsibility, strategic influence, external benchmarks, and equity with internal positions of comparable scope, leadership, oversight, and revenue contributions."

> **"I have been passive in prior conversations, believing my compensation would be fairly addressed and equalized in due time."**

> **"My position and team continues to expand, I am asking that the Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work. As examples, I believe comparable positions include: (1) VP, Communication & Events; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Programming Promotions. It is my understanding that the individuals holding these positions receive significantly higher compensation and bonus packages. And, that the Company has precedent of adjusting compensation to reflect changes in position breadth and depth or in cases of known wage gaps for similar scope roles."**

306

PSOF ¶¶ 239-243 (emphasis added). Colanero forwarded Tonya's request to Chavarria on November 28, 2018, and later forwarded it directly to Mike Guiseffi on January 10, 2019. PSOF ¶ 244. Chavarria does not recall ever speaking to Giuseffi about this request, and has never seen an email in which she tried to send this request to Giuseffi herself. PSOF ¶ 246. The request went nowhere—even after Tonya asked Colanero about it again on December 13, 2018. PSOF ¶¶ 248-250.

### February 2019

- On February 12, 2019—in the context of a performance review—Tonya told Colanero for the very first time about the spreadsheet that he mistakenly sent her in March 2018 containing the compensation data for other Vice Presidents (i.e., Julius Lai's and Frank Ybarra's salaries of █████/year and $█████/year, respectively, as opposed to Tonya's salary of $153,500), and she also complained to Colanero that she felt like she was being compensated 60% less than her male counterparts. PSOF ¶¶ 120, 262, 271. **Prior to that time, Colanero consistently lied to Tonya, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents**. PSOF ¶ 122 (emphasis added). Despite AMC's policy of promptly launching an investigation into complaints of discrimination (Exhibit 28 hereto), Colanero did nothing with Tonya's complaint about wage/gender discrimination on February 12, 2019 because he "didn't interpret it that way." PSOF ¶ 272. Chavarria does not recall Colanero ever making her aware of the details of his conversation with Tonya, his inadvertent mistake in sending her the compensation spreadsheet, or Tonya's complaints about wage/gender discrimination. PSOF ¶ 273. The conversation went nowhere.

• On May 6, 2019, Tonya filed a Charge of Discrimination with the EEOC, and Chavarria agrees that the May 6 Charge contains very clear complaints of gender discrimination and complaints of violations of the Equal Pay Act. PSOF ¶¶ 287, 290. Colanero was surprised and disappointed that Tonya engaged a federal agency to report what she believed was discrimination based on sex, and retaliation for having complained about wage disparities and sex-based discrimination. PSOF ¶ 288. Colanero agrees that, by the time of the May 6 Charge, Tonya had already engaged in multiple attempts to communicate with him about asking to have her compensation adjusted. PSOF ¶ 289. In her May 6 Charge, Tonya included the following allegations:

> "I have claims for violations of the Equal Pay Act, gender/sex discrimination, and claims for retaliation under Title VII and the Equal Pay Act based on AMC's actions in response to my numerous requests that my compensation be equalized with similarly situated males who perform substantially equal work."

> "I perform substantially equal work with the following VPs in the AMC organization: (1) VP, Programming Promotion; (2) VP, Guest Engagement; (3) VP, Food & Beverage; (4) VP, Communication and Events; (5) VP, Pricing. Each of these positions is held by a male employee. My job requires substantially equal skill, effort, and responsibility as the jobs of the male VPs identified above. I have performed substantially equal work to each of these male VP for more than the past three years and have more seniority at AMC than four of these VPs. On the AMC organization chart, my position is equal to the positions identified above."

> "I recently learned that the male VPs in the positions identified above are paid between 58% and 68% more than I am, including their base salaries and bonuses (which are based in part on base salary). This difference amounts to between $117,000 and $140,000 more dollars per year that is paid to the male employees compared to what AMC pays me."

> "Among comparable VPs, I am currently responsible for managing the second largest budget and have the second highest number of employees on my team. My responsibilities are extremely broad and consistently require me (like my male peers) to perform at a highly strategic and innovative level, and to generate revenue for the company."

"I have made numerous requests that my compensation be increased in line with my duties and responsibilities."

"In November 2018, I specifically requested that the 'Company review and equalize my compensation and bonus target with male colleagues in comparable positions considering seniority, required skill sets, position responsibilities, and quality of work.' All of my requests for increased compensation have been deflected and Mr. Colanero has suggested that I should not ask for more and should be happy with what I get. On one occasion, Mr. Colanero falsely told me that my compensation was 'equal range' to the comparable male VPs. At the time he made the statement, he was not aware that I had been informed of the compensation paid to comparable male VPs."

"My most recent performance review was conducted by my supervisor, Stephen Colanero, after he received and deflected several of my requests for increased compensation. In my most recent performance review I received ratings of 'exceeds expectations' and 'meets expectations' in all performance related categories. However Mr. Colanero gave me an overall review rating of 'does not meet expectations.' This was the lowest performance review in the entire marketing department and the only 'does not meet expectations' review. Mr. Colanero's and AMC's alleged basis for the negative review relates to an HR issue involving a male coworker who is also a VP and an anonymous allegation that I had consumed too much alcohol during a work related event. These allegations are themselves discriminatory and retaliatory for [several listed reasons]."

"As a result of the unfair review, Mr. Colanero and AMC have now created a plausible (but false) reason for refusing to equalize my compensation."

"When discussing this performance review, Mr. Colanero acknowledged that my performance was 'superior' but he felt that he needed to 'send a message' to me. Mr. Colanero's desire to send a message to me is both retaliatory and motivated by views that women should behave differently than men."

PSOF ¶ 290; (Ex. 38, Depo. Ex. 184, at 1-2).

Colanero and Chavarria were both aware of Tonya's pending May 6 Charge before she was terminated, and they understood that the comparator positions identified in her charge corresponded to Robert Kim, Julius Lai, Michael Pursell, Frank Ybarra, and Robert Lane. PSOF ¶ 291. Despite that knowledge, no one at AMC ever analyzed—at any time—whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶¶ 216-220. **Colanero and Chavarria**

**were both identified by name** in the May 6 Charge, and Chavarria clearly understood that they were both individually referenced in the charge. PSOF ¶ 292. Chavarria never performed her own factual investigation into the claims referenced in the May 6 Charge, and she is not aware of any conclusions that were ever reached by AMC regarding whether or not there was any merit to the claims referenced in the May 6 Charge. PSOF ¶ 295. Tonya's compensation was never increased as a result of filing her May 6 Charge. PSOF ¶ 296.

### September 20, 2019

- On September 20, 2019, Plaintiff mediated her EEOC claims against AMC with a private mediator; Colanero attended the mediation on behalf of AMC, and the matter did not resolve. PSOF ¶ 367. After the failed mediation, Tonya sent Colanero and Chavarria the email attached hereto in Exhibit 46, and said the following:

> Stephen and Carla,
>
> I have always put my heart and soul into my work at AMC and remain committed to that endeavor. I have continuously grown as an executive and leader in this Company, and, together with my team, have delivered very strong results consistently over the years with increasing breadth of impact. In addition, I continue to spearhead strategic innovations and explorations for the future growth of AMC. My relationships with internal cross-functional partners, dotted line support to Programming/F&B and key vendor partners are incredibly strong. The engagement and teamwork within my group has never been more solid. We are achieving some phenomenal accomplishments and realizing incredible synergies. I'm completely invested and have a great deal of equity built up over the last 10 years.
>
> **AMC's position during mediation last Friday was a complete shock to me. I requested my compensation to be reviewed given position growth as we discussed on several occasions and to be compensated fairly, but my multiple requests were simply never even addressed. I understand this is a disruption in our relationship and we may have some different views however, we haven't yet even had any collaborative or reasonable discussion on the topic. At this point, I can't help but feel that I am being pushed out of the company, but that is the last thing I seek.**
>
> I want you to know that I am committed to my career at AMC and am not looking for a path out of the company. That was fundamentally never the intent of

expressing my concerns. If you are open to it, I would welcome a discussion on how to move forward.

Thank you,
Tonya Mangels

PSOF ¶ 368 (emphasis added). Tonya's May 6 EEOC charge was still pending at the time of her September 23 email, and it was still pending at the time of her discharge on September 30, 2019. PSOF ¶ 369.

Colanero and Chavarria reached their *joint* decision to terminate Tonya before they called Adam Aron to advise him of their intentions. PSOF ¶ 373. According to Adam Aron, he was not "actively involved in the career management of Tonya Mangels." PSOF ¶ 376. Adam Aron was aware that Tonya had a pending charge of discrimination before she was terminated, but he never read it. PSOF ¶ 377. "[H]er complaint to the EEOC was not something that [he] looked at or was concerned about…in the performance of his job duties as CEO of a $5 billion company with a lot of issues on [his] plate…." PSOF ¶ 378.

In sum, Tonya complained in very clear terms about gender discrimination and pay equity *on at least 5 separate occasions* to the very same people that ultimately decided to terminate her employment—Chavarria and Colanero. Each time she complained, Chavarria and Colanero did nothing about it, and they investigated nothing (despite AMC's policy of "promptly" launching investigations). Colanero and Chavarria were both specifically named in Tonya's charge of discrimination, and both of them had good reason to be upset about being accused of discriminatory and retaliatory conduct in a document filed with the EEOC.

By the time Tonya filed her charge, there were also two instances of Chavarria exhibiting a willful indifference toward compliance with the Equal Pay Act. In February 2018, Chavarria disregarded a pay equity complaint from an AMC employee that complained to a Senior Vice

President **"that it is 'commonly understood' that AMC compensates men higher than women for similar results in similar positions**." PSOF ¶¶ 92-94 (emphasis added). Chavarria never inquired to understand the identity of the complaining employee, never conducted any further investigation into the issue, never instructed anyone else to investigate the issue, and testified that she did not interpret the Senior Vice President's email as containing a gender-based pay equity complaint sufficient to merit an investigation under AMC's non-discrimination policy. PSOF ¶ 96.[21] The email said that the complaining employee "stopped in last week to express concern about gender pay equity at AMC." PSOF ¶ 94. What else was she supposed to say?

In October 2018, Tonya also secretly recorded a conversation between herself, Chavarria, Colanero, and David Codding in which Chavarria commented, "One of the things we're getting hit with is a lot of Equal Pay Act." PSOF ¶¶ 232-234. Chavarria also commented about her concern "that women generally start off making less than men, and if that carries all the way through, the gap just gets bigger." PSOF ¶ 235. Despite her very specific knowledge of that problem within AMC, the record in this case demonstrates that Chavarria did ***nothing*** to advocate for Tonya, and she did ***nothing*** to address Tonya's pay equity concerns. She terminated Tonya.

For his part, Colanero disregarded, ignored, or "dropped the ball" on Tonya's requests to increase her compensation ***at least 14 separate times***. PSOF ¶¶ 62-70, 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296. After he accidentally sent Tonya a spreadsheet demonstrating that she was underpaid relative to other, comparable male Vice Presidents, he consistently lied to her, and falsely represented to her that

---

[21] Chavarria also referred to a formal assessment of pay equity that was conducted in 2017, (Ex. 48, Depo. Ex. 115), but Chavarria does not know whether that analysis involved a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶ 97. It did not. PSOF ¶ 98.

her compensation was "in a similar range" with other Vice Presidents. PSOF ¶¶ 118-122. When an outside expert (AON) determined that Tonya was being underpaid in March 2019, Colanero did nothing about it. PSOF ¶¶ 277-285. **Critically, and even though Adam Aron is the *only* person that can adjust the compensation of a Vice President or higher within AMC, Colanero never made Adam Aron aware of a single request by Tonya.** PSOF ¶¶ 47-48, 130, 137, 156, 221, 228, 247, 274, 284. Colanero was never going to revalue Tonya's position. He and Chavarria terminated Tonya.

The *conduct* and *statements* from Chavarria and Colanero leading up to Tonya's termination arguably provide the Court with *direct, circumstantial evidence* of their discriminatory and retaliatory animus in deciding to terminate Tonya after she filed her charge of discrimination. Again, direct evidence "includ[es] evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude," *Thomas*, 797 F.3d at 529-30, and it should "reflect a negative attitude toward [protected conduct] and ... forecast how the employer would deal with the adverse situation if it arose." *Fjelsta*, 488 F.3d at 810. If the Court agrees that the conduct and statements from Chavarria and Colanero constitute direct, circumstantial evidence of their discriminatory and retaliatory animus, then no further analysis is necessary, and summary judgment should be denied as to Plaintiff's retaliation claims.

Alternatively, however, and even if the above evidence is not construed as "direct" evidence, it still creates a compelling inference of AMC's discriminatory and retaliatory animus, and it sufficiently satisfies Plaintiff's obligation to make a *prima facie* showing of the elements necessary for a retaliation case under the *McDonnell Douglas* framework—especially when that evidence is coupled with the fact that Chavarria and Colanero terminated Tonya within ten (10)

313

days of unsuccessfully mediating her EEOC claims (an additional act of protected activity).  PSOF

¶¶ 367-368.  Again, "'[t]he burden to show a *prima facie* case is not difficult.'"  *Donathan,* 861

F.3d at 740.[22]  It is also not difficult for Plaintiff to show pretext, if necessary, under the *McDonnell*

*Douglas* framework.

### 2.  AMC's Pretextual Arguments Also Fail.

"An employee can prove that [her] employer's articulated justification for an adverse

employment action is pretext 'either directly by persuading the court that a discriminatory reason

more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence.'"  *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1046 (8th Cir.

2010) (quoting *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 872 (8th Cir. 2008)).  "Either route

amounts to showing that a prohibited reason, rather than the employer's stated reason, actually

motivated the employer's action."  *Torgerson*, 643 F.3d at 1047.  Plaintiff has already outlined

---

[22] As discussed above, Plaintiff is relying on more than temporal proximity in order to demonstrate AMC's retaliatory animus for purposes of making her *prima facie* case.  It should be noted, however, that the Eighth Circuit has *repeatedly* held that temporal proximity alone is sometimes sufficient.  "[A]t summary judgment, a plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events."  *Wilson v. Arkansas Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (citing *Turner v. Gonzales*, 421 F.3d 688, 696-97 (8th Cir. 2005)).  A time period of six weeks between the protected activity and adverse action can support an inference of retaliation that survives summary judgment.  *See Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767 F.3d 744, 750 (8th Cir. 2014) (six weeks between employee's protected conduct and termination supports causal inference of retaliation); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 552 (8th Cir. 2013) (same); *Sellner v. MAT Holdings, Inc.*, 859 F.3d 610, 615 (8th Cir. 2017) (27-day gap between plaintiff's protected activity and his firing creates an inference of retaliation at summary judgment); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) (reversing summary judgment and the district court's incorrect holding that "temporal proximity, without more, was insufficient to establish causality"); *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1166 (8th Cir.1998) (time lapse of two months between protected activity and discharge may create inference of retaliatory motive); *Keys v. Lutheran Family and Children's Servs. of Mo.*, 668 F.2d 356, 358 (8th Cir. 1981) (less than two months between protected activity and adverse employment action).

above why a discriminatory reason more likely motivated AMC to terminate Plaintiff, but AMC's proffered explanations are also unworthy of credence.

### a. AMC's Pretextual Reliance on the May/June 2018 Investigation and Discipline

In its brief, AMC spends more than 35 paragraphs (DSOF ¶¶ 58-95) discussing the June 5, 2018 discipline administered to Tonya in an effort to attack her credibility, and to manufacture a pretextual narrative that she simply couldn't be trusted in 2019. AMC's story is—at a minimum—controverted.

For starters, there is good reason to question the quality of AMC's investigation into the Connections conference. The events at issue occurred between 11:00 p.m. and 12:00 a.m. *in New Orleans*. PSOF ¶¶ 166, 169. The principal witness—Jason Banks— ███████████████. PSOF ¶ 167. Helen Miller could not identify Tonya's companion on the evening in question. PSOF ¶ 168. Neither Chavarria nor Reeves asked Jason Banks or Helen Miller whether they were also drinking the night they allegedly witnessed the inappropriate conduct. PSOF ¶ 172. Reeves interviewed eight additional employees; none of them reported anything about Tonya appearing to be intoxicated, ████████████████████ ████████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ██████████

Colanero and Chavarria conducted an initial interview with Tonya on May 21, 2018 in order to discuss the New Orleans trip and the expenses related to the trip.  PSOF ¶ 173.  Colanero recalls that Tonya was nervous about being investigated, that she took the issues seriously, and that she was fearful of losing her job.  PSOF ¶ 174.  ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

        █████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████

                ███████████████████████████████

                ███████████████████████████████
                ███████████████████████████████
                ███████████████████████████████
                ███████████████████████████████
                ███████████████████████████████





Despite being written up on June 5, 2018, Colanero and AMC still selected Tonya for participation in AMC's "LEAP promotion-ready officers group" during the second quarter of 2018 (i.e., a program designed to develop employees that were identified as future leaders within the company). PSOF ¶ 113. Colanero also added one more person to her team in November 2018 (a 7th direct report), and gave Tonya additional responsibility for handling: (1) film marketing; (2) a major new initiative called AMC On Demand; (3) a new digital Flash Sales program that generated over $5M in gross revenue; and, (4) partial responsibility for AMC's Merchandise Program. PSOF ¶¶ 141, 147-151 (new responsibilities); PSOF ¶ 238 (7th direct report).

Tonya's team also increased the total targeted box office spend, doubled the number of digital media campaigns, and increased AMC's trackable box office revenue in 2018. PSOF ¶ 146. Her team also added an entirely new monetization and studio marketing program in 2018. PSOF ¶ 147. Colanero also identified Tonya as an employee with "high potential" in 2018 prior to any

of her complaints about wage discrimination.  PSOF ¶ 158 (high potential); PSOF ¶¶ 202-205, 210-212 (initial complaints between May 23-30, 2018).

**In 2019, AMC and Colanero still added four more employees to Tonya's team**.  PSOF ¶¶ 251-252, 261, 286.  Colanero testified that he does not recall Tonya ever declining a single assignment, and he agrees that Tonya is one of the hardest working employees that ever worked for him at AMC.  PSOF ¶ 5.  Colanero also believes that Tonya wanted AMC to succeed, that she demonstrated a positive and willing work ethic, and that she was willing to take on ambitious initiatives similar to other Vice Presidents in the organization.  PSOF ¶ 6.  Colanero cannot recall any instance in which Tonya failed to meet the KPMs associated with her job between the time of her June 5, 2018 discipline and the date of her termination on September 30, 2019.  PSOF ¶ 200-201.

Thus, it defies logic for AMC to argue that Tonya struggled with leadership and professional judgment, struggled with issues of honesty, or failed to meet her performance expectations, during the final year of her employment.  The record in this case demonstrates that AMC and Colanero consistently trusted Tonya with *more employees* and *more responsibilities* well into 2019—until she filed a charge of discrimination.

### b.  AMC's Pretextual "RIF investigation"

AMC also spends more than 60 paragraphs and sub-paragraphs (DSOF ¶¶ 120-155) discussing its August 2019 "RIF investigation" related to Tonya—after she filed her charge of discrimination in May 2019—in an additional effort to attack her credibility, and to manufacture a pretextual basis for her termination.  Much of the factual discussion in those paragraphs is hearsay, and should not be considered, because AMC has not cited a sworn declaration, sworn deposition testimony, or an affidavit from many of the purported speakers in support of their own

statements. Some of AMC's witnesses were also never identified in AMC's Rule 26 disclosures. Setting those deficiencies aside, however, AMC's "RIF investigation" was pretextual from the outset; it was initiated by Colanero, and it was supervised by Chavarria, i.e. the same two people that terminated Tonya ten (10) days after the unsuccessful mediation of her EEOC claims.

### Tonya Never Knew About the RIF In Advance

Colanero never told Tonya about the planned RIF before it was announced, and Colanero is not aware of anyone else that told Tonya about the RIF before it was announced. PSOF ¶ 298. According to Colanero, two individuals—Cynthia Pierce and Carrie Trotter—came to him on August 19, 2019 (i.e., one day before the RIF announcement) "because they heard *secondhand* information from people that were concerned about potential layoffs" based on information that Tonya allegedly shared with her team. PSOF ¶ 299. Cynthia Pierce and Carrie Trotter were not in any of the purported meetings in which Tonya allegedly discussed this topic with anyone on Tonya's team. PSOF ¶ 300. Colanero never investigated the issue himself after it was initially reported to him, and he never went to Tonya prior to the RIF announcement to ask her about the issue. PSOF ¶ 301. Colanero is not aware of anyone at AMC ever learning or discovering that Tonya somehow learned about the RIF before it was announced. PSOF ¶ 302. No one on Tonya's team ever told Colanero that they heard Tonya say there was going to be RIF before it was announced. PSOF ¶ 303.

Despite the above, Colanero approached Tonya "briefly" after the RIF was announced to inform her "that he had heard these complaints [from Pierce and Trotter], that [he] had relayed [them] to human resources, and that they would be doing an investigation." PSOF ¶ 304. At the time he initiated the investigation, Colanero was unaware of Tonya ever knowing about the RIF in advance, and to this day, Colanero still believes that Tonya did not know about it in advance.

PSOF ¶ 305.  It is undisputed that Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20.  PSOF ¶ 306.

## The Investigation Quickly Revealed Nothing

When the investigation started, it went nowhere quickly.  Chavarria asked a subordinate employee named Sharlynn Mutzbauer (also in Human Resources) to assist Chavarria in her efforts to investigate Tonya, and the initial task was to "determine whether or not Tonya shared information with her team on August 14 that a reduction in force was to take place;" during the depositions, this was referred to as "Phase 1" of their investigation.  PSOF ¶ 307.  Chavarria agrees that Tonya reached out to her before Phase 1 of the investigation started, invited her to "please" speak to members of her team, and offered the following explanation in advance on August 22, 2019:

> Carla ….  Earlier this week Stephen mentioned I should expect you to contact me related to a report that said layoffs were happening this week during my staff meeting the prior week.
>
> I would like to make small request that you consider taking 10-15 minutes to briefly touch base with a couple of folks on my team about the agenda and my communications, such as Lauren Doyle, Ellen Blanner, Ryan Davis, who were in my staff meeting last week.  Doyle is at a shoot today and tomorrow so she'd be on cell 913-526-4754.  Ellen and Ryan are in the office.  Certainly welcome to speak to any others as well though Jillian is on vacation and Marti was on vacation last week so wasn't in attendance.
>
> The closing of my meeting was all in positive intention and encouraging the team. I recognized many peoples good work, the workloads, results, some new projects like NFL and the tough climate ahead which would make our efforts important to deliver.  I spoke about our budget review going smoothly due in part to all of their work with me on the planning, being strategic and thinking bottom-up.  We didn't inflate estimates, were supporting many key revenue drivers and it served us well as we got most everything approved.  I went on to suggest that they be aware and sensitive to others, because some had significant cuts or maybe didn't have as many

growth or revenue initiatives going on.  I said something to the effect that it could cause potential jealousies and anxiety given the business climate so consider being overly understanding and considerate in the coming weeks.  While I like to pump my team up privately, I don't want to do that at the detriment of anyone else.

I suggested not to get caught up in speculation, rumors, keep their heads down, focus on the work, stay out of the "fray."  I said be confident and feel grateful they were working on key efforts which should position them well regardless of the business climate in my own opinion.  My intent was to be authentic in my communication, shift focus to what was in their control, laser in on the results but encourage compassion for others given the stressful times.  I didn't have any details about lay-offs and did not tell the team lay-offs were happening.

I hope you will touch base with a few of the team and will see you Monday.

Thank you.

PSOF ¶ 308.  Tonya welcomed the "investigation," and had nothing to hide.

Carrie Trotter, Cynthia Pierce, and Sarah Powers were not present for the August 14 meeting, and do not serve as direct witnesses to what occurred.  PSOF ¶ 321.  Alice Rogers was also not in the August 14 meeting because she was not on Tonya's team.  PSOF ¶¶ 322-324.  Rogers purportedly informed Pierce that she overheard two unidentified people talking in a back lot about changes to Tonya's team, and that she heard from a different person in a separate interaction that the conference rooms were booked for the RIF on Tuesday.  PSOF ¶ 322.  Alice Rogers never identified the individuals that she allegedly overheard talking in the parking lot, and Mutzbauer agrees that AMC does not even know if those individuals were on Tonya's team.  PSOF ¶ 323.  Alice Rogers also never identified Tonya as the source of any of her information; Cynthia Pierce only *"surmised"* that Tonya was a source of Rogers' information.  PSOF ¶ 324.  The hearsay information in this case from Trotter, Pierce, Powers, and Rogers is irrelevant and immaterial for purposes of summary judgment because it does not constitute anything close to direct evidence of what occurred in the August 14 meeting.

In addition, it is also clear that no direct witness in this case has ever confirmed that "Tonya shared information with her team on August 14 that a reduction in force was to take place." At the time of the August 14 meeting with her team, Tonya had eleven (11) direct reports on her team; ten (10) of them were in the August 14 meeting, and one (1) was not (Marti Hartidge). PSOF ¶ 309. Mutzbauer only interviewed five (5) of the ten (10) direct reports that were present for the August 14 meeting, i.e., one half of the potential witnesses (other than Tonya). PSOF ¶ 310. Chavarria sat in on one of the interviews conducted by Mutzbauer—an employee named Jordan Crouch—but did not interview any of the other direct reports that were present on August 14. PSOF ¶ 311.

Chavarria testified in this case pursuant to Fed.R.Civ.P 30(b)(6) as the AMC representative most knowledgeable regarding "any belief at any time that Plaintiff may have engaged in inappropriate behavior or violated a company policy prior to the date of her termination on September 30, 2019," "[a]ny circumstances supporting Plaintiff's termination, and that were known to AMC prior to the date of Plaintiff's termination on September 30, 2019," the identity of all persons interviewed in relation to those issues, and the general process through which AMC investigated those issues. PSOF ¶ 312. ***Chavarria testified—as AMC's most knowledgeable representative—that AMC remains unaware of any instance in which Tonya used the phrase "reduction in force" in any meeting with her team prior to the formal announcement of the RIF on August 20***. PSOF ¶ 313. Chavarria also never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 314. During her investigation, Mutzbauer never learned of any instance in which Tonya allegedly knew about—or allegedly heard about—the RIF before it occurred. PSOF ¶ 315. ***Mutzbauer and Chavarria also***

***failed to confirm a single instance of Tonya using the term "layoff" during her discussions with her team.*** PSOF ¶ 316.

Jordan Crouch, i.e., one of the direct witnesses interviewed about the August 14 meeting, sent a lengthy description of the meeting to Mutzbauer and Chavarria explaining that Tonya "got emotional [during the meeting], choked up with tears about the team's hard work, expressed gratitude for what we've been doing as a team," that she "got emotional and teary at a -- at the challenging year ahead," and that "[s]he ended her portion of the meeting by saying it's going to be a tough few weeks, and once again thankful for our recent hard work, planning ahead, and the work that has been coming through the pipeline." PSOF ¶ 317.

Jordan Crouch also confirmed that he ran into Vice President Pamela Sandler on August 22, and ***Sandler—who was not present in the August 14 meeting—suggested to Jordan Crouch that "she heard that Tonya told [her team] that layoffs were happening this week*.**" PSOF ¶ 318. Pamela Sandler is the person that eventually assumed most of Tonya's former role after Tonya was terminated. PSOF ¶ 319. Jordan Crouch expressly ***denied*** the rumor; he made clear to Sandler (his former boss) that Tonya never said anything about layoffs during the August 14 meeting. PSOF ¶ 320.

### Widespread Rumor and Speculation

The pretextual nature of AMC's "RIF investigation" is also evidenced by the fact that AMC deliberately disregarded the reality that there was widespread rumor and speculation within AMC about possible layoffs before the August 20 RIF announcement. During her investigation, Mutzbauer never undertook any effort to understand whether there were any widespread rumors or conversations within the company about possible layoffs between the time of an announced Profit Improvement Plan and the time of the formal announcement of the RIF. PSOF ¶ 325.

AMC formally and publicly announced a Profit Improvement Plan in advance of the RIF announcement in a press release issued on August 8, 2019. PSOF ¶ 326. The August 8 announcement described "a comprehensive profit improvement plan to enhance operational efficiency…," and stated that its "initiatives will seek to achieve cost savings across the entire income statement, including general and administrative." PSOF ¶ 327. It was well known within AMC that overhead expenses such as employee salaries were included within the "general and administrative" portion of the budget. PSOF ¶ 328. On August 13, 2019, Chief Financial Officer Craig Ramsey held a meeting with director-level and above employees at AMC's Headquarters Town Center Theater (in a large auditorium) to further discuss the Profit Improvement Plan, and the fact that it included reductions to AMC's general and administrative expenses, which necessarily entailed a reduction in employee overhead/salaries. PSOF ¶ 329.

After the meeting, several members of Vice President Michael Pursell's team came to him with concerns about losing their job, and Pursell was also concerned about losing his own job. PSOF ¶¶ 330-331. Pursell testified that "several of his directors came to [him] and asked for clarity…[;] they basically all said we all know it's coming, it's just a matter of when, right?" PSOF ¶ 332. Pursell testified that the internal discussions about possible layoffs were widespread throughout the company after the director-level and above meeting, and Pursell recalls people using the terms "layoffs" and "reduction in force" in their conversations with him about the issue before the RIF was formally announced. PSOF ¶ 333.

Vice President of Human Resources Rosalind Reeves also recalls that one or two of her own team members approached her after the director-level and above meeting, that they shared their concerns about the anticipated "budget cuts," that they asked her if she "thought that it would

lead to a reduction in force," and that Reeves was required to engage with them on that topic due to their concerns. PSOF ¶ 334.

Vice President Robert Kim also recalls that there were widespread discussions about possible layoffs throughout the company after the Profit Improvement Plan announcement, and Kim recalls people using the terms "layoffs" and "reduction in force" in their conversations with him about the issue before the RIF was formally announced. PSOF ¶ 335. Robert Kim also feared losing his own job, and he agrees that, prior to the formal RIF announcement, there was a period of "several weeks" of "rumors, speculation, [and] discussions of concerns about a reduction in force being [imminent] and people being concerned about what was going to happen." PSOF ¶ 336. Robert Kim recalls that members of his team approached him after the Profit Improvement Plan announcement, that they shared concerns about the impact of the announcement on their team, that they were concerned about keeping their jobs, and that he was required to engage with them on that topic due to their expressed concerns. PSOF ¶ 337.

Vice President Frank Ybarra—who reported to Colanero—also recalls that, after the Profit Improvement Plan announcement and the director-level and above meeting, people at AMC were concerned about potential layoffs, and that he has "some recollection of employees talking about potential concerns about their jobs…." PSOF ¶ 338.

Vice President Robert Lane also testified that a female member of his team approached him between the time of the Profit Improvement Plan announcement and the time of the RIF announcement, that she shared concerns about potentially losing her job, and that he was required to engage with her on that topic due to her expressed concerns. PSOF ¶ 339. Even though Lane did not know whether the concerned employee was actually going to lose her job (or about the planned RIF), he told her that she "didn't need to be worried" because he "need[ed] to make sure

[he was] motivating [his] team" and because he "believe[d] that [his] team does important work and [his] point was we prove our value."  PSOF ¶ 340.

Robert Kim and Michael Pursell also testified that, a few days in advance of the August 20 announcement, Pursell, Kim, and others became aware of the fact that all of the conference rooms at the AMC headquarters were booked by Human Resources, and that this also became an additional source of discussion and concern about what was planned for August 20.  PSOF ¶ 341.

**Other Vice Presidents Also Had Advance Knowledge of the RIF**

AMC also disregarded the reality that several Vice Presidents may have been discussing the possibility of planned layoffs privately—even if they never admitted it Human Resources.  For example, Colanero also told another Vice President on his team—Carrie Trotter—about the RIF before it was announced to "gain some guidance on specific actions that would impact her team." PSOF ¶ 342.  According to Colanero, Cynthia Pierce and Carrie Trotter both already knew about the planned RIF when they originally came to him with information about Tonya on August 19, 2019.  PSOF ¶ 343.  Colanero also testified that "it's possible" he had a similar conversation with Julius Lai.  PSOF ¶ 344.  Vice President Frank Ybarra was also aware of the planned RIF before it was formally announced on August 20.  PSOF ¶ 345.  Michael Pursell and his co-worker Nels Storm were also made aware of the reduction in force before it was set to occur—even though they "[weren't] supposed to learn of it"—because their boss, Senior Vice President Jennifer Douglas, clued them in to the importance of August 20, and the fact that she was going to be in the office that day instead of being out of town for a previously scheduled vacation.  PSOF ¶ 346.  Pursell could not recall the exact words Douglas used, but the clear import of their conversation was that she needed to be back in town for what was coming, that she did not want her presence to be a

surprise, and that she wanted them to understand that they were not in danger of losing their jobs. PSOF ¶ 347.

Pamela Sandler even apologized to Colanero at one point for her "sharing of confidential information, specifically as it applies to this week's layoffs," and for "participating in the gossip," but she never suffered any adverse employment actions due to her sharing of confidential information related to the August 20 RIF; she instead assumed most of Tonya's former responsibilities after Tonya was fired. PSOF ¶¶ 348-349.

### Tonya's Response to Her Team Was No Different Than the Others

During her deposition, Tonya explained that there was widespread rumor and speculation throughout the company immediately prior to the RIF due to a series of events that occurred in advance of the RIF announcement (i.e. the Profit Improvement Plan and the Craig Ramsey meeting); this led to Tonya's team inquiring about whether there was any possibility of a RIF. PSOF ¶ 350. When Tonya's team inquired about the possibility of a RIF, Tonya was required to address the issue with her team members just like Michael Pursell, Rosalind Reeves, Robert Lane, and Robert Kim were required to address that issue with their team members, but Tonya told her team that she was not aware of any upcoming RIF, and that they should "keep [their] heads down, you know, just stay out of the fray and stay focused on what you can control…." PSOF ¶ 351. Again, Tonya never told her team about the RIF in advance of the August 20 announcement, or the fact that there were any planned layoffs, because Tonya was never aware of the RIF or any planned layoffs before they were formally announced on August 20. PSOF ¶ 352.

### Tonya Alone (i.e. The Only Person with a Pending EEOC Charge) Was Singled Out for Investigation and Termination

In the end, no one else at AMC—other than Tonya—was ever investigated in relation to allegedly discussing the potential for layoffs within the company prior to the formal announcement

of the RIF. PSOF ¶ 380. No one else at AMC—other than Tonya—was ever written up, disciplined, terminated, or suffered any other adverse employment action because they were allegedly talking about potential layoffs prior to the formal announcement of the RIF. PSOF ¶ 381.

At bottom, AMC's "RIF investigation" was a pretextual basis for Tonya's termination. Plaintiff has successfully created a rebuttable presumption of AMC's discriminatory and retaliatory animus, and Plaintiff has adequately demonstrated that AMC's proffered reasons for termination were pretext for discrimination and retaliation. Summary judgment should be denied as to Plaintiff's EPA and Title VII retaliation claims.

### D. Mangels Alleges Valid, Gender-Based Wage Discrimination Claims Pursuant to Title VII (Count III).

Defendant begins the legal argument portion of its brief by seeking to dismiss what it describes as "Mangels' ***Title VII Gender Discrimination Claim Contained in Count III***." Defts. Brief at 57 (emphasis added). For some reason, however, AMC fails to acknowledge Plaintiff's Title VII *gender-based wage discrimination* claims in that section. AMC eventually discusses that issue, however, 24 pages later in its brief. Defts. Brief at 81.

In an effort to streamline the issues on summary judgment, and to simplify the remaining issues for trial, Plaintiff will confirm to the Court that those are the *only* Title VII gender-based discrimination claims Plaintiff is pursuing in this case; Plaintiff agrees to forego any other gender-based discrimination claims she may have under Title VII.[23]

---

23 To be clear on this issue, Plaintiff is retaining her Title VII retaliation claims (as discussed above in Section V(C)), and Plaintiff is retaining her Title VII gender-based wage discrimination claims as discussed in this section.

Gender-based wage discrimination claims brought pursuant to the Equal Pay Act and Title VII are evaluated according to the exact same standards. "A successful gender-based wage discrimination claim under Title VII requires the plaintiff to prove that her employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 683 (8th Cir. 2001) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (Equal Pay Act); *Delight Wholesale Co.*, 973 F.2d at 669 (holding that same standard applies to Equal Pay Act and Title VII wage-discrimination claims)); *see also, Simmons,* 251 F.3d at 1215 ("[W]hen a plaintiff alleges that her employer provides 'unequal pay for equal work on the basis of sex, the standards are the same whether the plaintiff proceeds under Title VII or the Equal Pay Act.'") (citation omitted). Plaintiff submits that the Court should also refer to the insightful and well-reasoned opinion in *Hennick v. Schwans Sales Enterps. Inc.,* 168 F. Supp. 2d 938 (S.D. Iowa 2001) for its discussion of Eighth Circuit law in this area, and the general process of evaluating gender-based wage discrimination claims asserted under both the Equal Pay Act and Title VII.

As discussed at length in Section V(B)(1)-(3), *supra*, and after conducting a true analysis of the *actual day-to-day job content* and *performance* associated with the cross-functional roles performed by Tonya, Michael Pursell, and Robert Kim, critical issues of disputed fact remain on the issue of substantial similarity between Tonya and both of her two male comparators in this case. Plaintiff will avoid repeating the same, lengthy analysis here (18 pages). Plaintiff is therefore capable of making a *prima facie* case of gender-based wage discrimination pursuant to both the Equal Pay Act and Title VII—which are evaluated according to the same standards.

"Once the plaintiff has proven her *prima facie* case, the employer then bears the burden of coming forward with a legitimate nondiscriminatory factor upon which it based the wages paid [per the defenses in 29 U.S.C. § 206(d)(1)]."  *Sowell,* 251 F.3d at 683 (citations omitted).  As discussed at length in Section V(B)(4), *supra*, it is also impossible for AMC to seek refuge—as a matter of undisputed fact—in the exceptions outlined in 29 U.S.C. § 206(d)(1) because Plaintiff has successfully controverted AMC's arguments that it "placed a higher value on the positions occupied by each of the alleged male comparators," that it considered Tonya's "role more fungible," and that the "male comparators also possessed significantly more qualifications, skills, and Mangels…."  As discussed above, AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs.  There is no set formula or process capable of ensuring that male and female VPs who serve in company roles that require substantially equal skill, effort, and responsibility are paid equally for their work, and the highest-ranking Human Resources employee at AMC since 2014—Carla Chavarria—exhibits a willful indifference toward compliance with the Equal Pay Act.

As explained in Section V(C)(1), *supra*, Tonya secretly recorded a conversation between herself, Chavarria, Colanero, and David Codding in which Chavarria commented, "One of the things we're getting hit with is a lot of Equal Pay Act."  PSOF ¶¶ 232-234.  Chavarria also commented about her concern "that women generally start off making less than men, and if that carries all the way through, the gap just gets bigger."  PSOF ¶ 235.  Despite her very specific knowledge of that problem within AMC, the record in this case demonstrates that Chavarria did **nothing** to advocate for Tonya, and she did **nothing** to address Tonya's pay equity concerns.

Colanero also disregarded, ignored, or "dropped the ball" on Tonya's requests to increase her compensation *at least 14 separate times*. PSOF ¶¶ 62-70, 73-77, 126, 127-131, 132-138, 152-157, 210-212, 224-229, 230-231, 239-248, 249-250, 271-274, 287-296. After he accidentally sent Tonya a spreadsheet demonstrating that she was underpaid relative to other, comparable male Vice Presidents, he consistently lied to her, and falsely represented to her that her compensation was "in a similar range" with other Vice Presidents. PSOF ¶¶ 118-122. When an outside expert (AON) determined that Tonya was being underpaid in March 2019, Colanero did nothing about it. PSOF ¶¶ 277-285. **Critically, and even though Adam Aron is the *only* person that can adjust the compensation of a Vice President or higher within AMC, Colanero never made Adam Aron aware of a single request by Tonya.** PSOF ¶¶ 47-48, 130, 137, 156, 221, 228, 247, 274, 284.[24]

### AMC Also Raises Two Additional Arguments That Fail

In a final effort to resuscitate its Title VII arguments, AMC also raises two additional arguments that are not raised in relation to Plaintiff's Equal Pay Act claims. Both of those arguments also fail.

First, AMC cites the Eighth Circuit's decision in *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003) for the proposition that, "unlike the EPA, a plaintiff asserting a compensation

---

[24] Plaintiff also explained in Section V(B)(4), *supra*, that AMC is incorrect in its statement that the discipline Tonya received in May/June 2018 somehow "impacted" her compensation in 2018 or 2019. Plaintiff highlighted *six separate instances between July 2018 and May 2019* in which Tonya once again raised the issue of increasing her compensation *after* the May/June 2018 discipline. In each instance, nothing ever happened, and there was never one example of AMC sending Tonya an email, or telling her in a conversation, that her compensation was not going to be revisited because of the discipline she received in May/June 2018. The record demonstrates just the opposite, and it is absurd for AMC to argue that Tonya's May/June 2018 discipline affected her 2019 compensation when the record demonstrates that AMC collaborated with an outside expert in March 2019 (AON) in order to study the question of whether or not Tonya was being underpaid. PSOF ¶¶ 277-285.

discrimination claim under Title VII has ***the additional burden of proving*** that the employer 'intentionally depresse[d] wages on account of sex and there were no employees of the opposite sex doing equal work for more pay.'" Defs. Brief at 81-82 (emphasis added). **This is—at best—a glaring misstatement of the law.**

In the passage cited by AMC, the Eighth Circuit is discussing the fact that, while the Equal Pay Act and Title VII both prevent against wage discrimination in the circumstance where a plaintiff is capable of proving that a member of the opposite sex (i.e., a comparator) is performing substantially equal work for more pay, Title VII also recognizes an ***additional*** and ***alternative*** theory of gender-based wage discrimination in the circumstance where no comparators exist. The Eighth Circuit correctly observed that, under this *additional* and *alternative* theory of Title VII wage discrimination "the Supreme Court has held that an employer violates Title VII, but not the Equal Pay Act, if it intentionally depresses wages on account of sex and there [are] no employees of the opposite sex doing equal work for more pay." *Tenkku*, 348 F.3d at 741-42 (citing *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)).

The plaintiffs in *County of Washington v. Gunther* were a group of four female prison guards that brought claims of gender-based wage discrimination under Title VII against their employer, and they alleged that their employer paid "substantially lower wages to female guards in the female section of the county jail than it paid to male guards in the male section of the jail." *Gunther*, 452 U.S. at 164-65. "They alleged that they were paid unequal wages for work substantially equal to that performed by male guards, and ***in the alternative***, that part of the pay differential was attributable to intentional sex discrimination." *Id.* (emphasis added). "The latter allegation was based on a claim that, because of intentional discrimination, the county set the pay

scale for female guards, but not for male guards, at a level lower than that warranted by its own survey of outside markets and the worth of the jobs." *Id.*

After trial, the district court found that the male guards supervised more than 10 times as many prisoners per guard as did the female guards, and that the females devoted much of their time to less valuable clerical duties. *Id.* It therefore held that their jobs were not substantially equal to those of the male guards, and that they were not entitled to equal pay under the traditional Equal Pay Act/Title VII analysis (i.e., the comparator theory being pursued in this case). *Id.* The district court also dismissed the plaintiffs' alternative claim that the discrepancy in pay between the male and female guards was attributable in part to intentional sex discrimination. *Id.* It held as a matter of law that a sex-based wage discrimination claim cannot be brought under Title VII unless it would satisfy the equal work standard of the Equal Pay Act, 29 U.S.C. § 206(d). *Id.*

The court of appeals reversed the district court's decision on the alternative theory, and it held "that persons alleging sex discrimination 'are not precluded from suing under Title VII to protest ... discriminatory compensation practices' merely because their jobs were not equal to higher paying jobs held by members of the opposite sex." *Id*. at 165-66. The Supreme Court was therefore asked to resolve the question of whether or not Title VII affords an *additional* and *alternative* theory of gender-based wage discrimination in circumstances where no comparators exist, i.e., the circumstance where an employer depresses the wages of a particular sex because of intentional sex discrimination. *Id.* at 166. The Supreme Court answered that question in the affirmative, and it recognized the existence of this separate and distinct theory of Title VII wage discrimination where no comparators exist. *Id.* at 180-81.

Tonya is not presenting a claim in this case based on the *alternative* theory discussed in *County of Washington v. Gunther;* the standards referenced in that case do not have any application

to this case. It is a glaring misstatement of the law for AMC to conflate the burdens associated with that unrelated theory and the burdens applicable to this "equal work for equal pay" case.

Second, AMC also argues that it "proactively monitored whether the compensation paid to male and female employees was meaningfully different," and it points to a 2017 study conducted by Willis Towers Watson, and the separate work of labor economist hired by AMC well after Plaintiff was terminated. Defts. Brief at 82-83. For starters, Plaintiff has already controverted—at length in Section v(B)(4), *supra*—any suggestion that AMC "proactively monitored" the compensation paid to its Vice Presidents; as discussed above, AMC's process for compensating VPs is rife with inconsistencies, communications failures, and internal complications that create pay disparities between male and female VPs.

Setting that issue aside, the analyses performed by Willis Towers Watson and AMC's labor economist are also irrelevant to the wage discrimination theory alleged in this single-plaintiff case. Mike Giuseffi testified in this case that the Willis Towers Watson analysis did ***not*** involve a methodology in which any roles at AMC were directly compared to any other roles at AMC; he agreed that there was "no instance, for example, that [Willis Towers Watson] would have said one VP role within AMC does this, the other one does this, they're similar but they're not being paid the same…." PSPF ¶¶ 98, 216. Similarly, Dr. Thornton's analysis did not involve a methodology in which any roles at AMC were directly compared to any other roles within AMC for an internal assessment of pay equity. PSOF ¶ 506. Dr. Thornton never compared Tonya's Vice President role to any other male Vice President role at AMC in order to determine whether Tonya's role required substantially equal skill, effort, or responsibility, and Dr. Thornton never analyzed whether Tonya was being paid less than any other male Vice Presidents that were serving in a role that required substantially equal skill, effort, or responsibility. PSOF ¶ 507.

At bottom, it is impossible for AMC to seek refuge—as a matter of undisputed fact—in the exceptions outlined in 29 U.S.C. § 206(d)(1) because a genuine factual dispute remains on critical question of whether "there was a legitimate nondiscriminatory factor upon which [AMC] based the wages paid." *See, Hennick,* 168 F. Supp. 2d at 950-51) (denying summary judgment in a Title VII and the Equal Pay Act case because genuine issues of material fact remained on the issue of whether defendant legitimately based any pay differentials on a factor other than sex consistent with the defenses outlined in 29 U.S.C. § 206(d)(1)); *see also*, *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071 (8th Cir. 2009) (reversing summary judgment in a Title VII case because genuine issues of material fact remained on the issue of whether defendant legitimately based any pay differentials on a factor other than sex consistent with the defenses outlined in 29 U.S.C. § 206(d)(1)). Summary judgment should be denied as to Plaintiff's gender-based wage discrimination claims brought pursuant to Title VII (Count III).

## CONCLUSION

Based on the foregoing, and because genuine issues of material fact remain on Counts I through IV in Plaintiff's First Amended Complaint, the Court should deny Defendant's Motion for Summary Judgment in all respects.

WHEREFORE, for the aforementioned reasons, Plaintiff respectfully requests this Court's order denying Defendant's Motion for Summary Judgment in all respects, and granting such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully submitted,

**BEAVER LAW FIRM, LLC**

/s/ Chad C. Beaver

_____
Chad C. Beaver        MO Bar No. 54141
Beaver Law Firm, LLC
(816) 226-7750 | Office
(816) 817-0540 | Fax
cbeaver@beaver-law.com
1600 Genessee Street, Suite 920
Kansas City, Missouri 64102
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2021, a copy of the above and foregoing document was served by:

(_X_) Filing it with the Court's CM/ECF system;
(__) U.S. Mail, postage-prepaid;
(__) Facsimile;
(_X_) Email;
(__) Federal Express; and/or,
(__) Hand delivery, upon:

Kerri S. Reisdorff
Chris R. Pace
Michael L. Matula
AnnRene Coughlin
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, MO 64111
(816) 471-1301
(816) 471-1303 (Facsimile)
kerri.reisdorff@ogletree.com
chris.pace@ogletree.com
annrene.coughlin@ogletree.com
**ATTORNEYS FOR DEFENDANT**

/s/ Chad C. Beaver

_____
**ATTORNEY FOR PLAINTIFF**

337