# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| TONYA MANGELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00834-BP |
| | ) | |
| AMERICAN MULTI-CINEMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT AMERICAN MULTI-CINEMA, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Submitted by:

Kerri S. Reisdorff    MO #51423
Chris R. Pace    MO #47344
Michael L. Matula,    MO #47568
AnnRene Coughlin    MO #67962
4520 Main Street, Suite 400
Kansas City, MO 64111
(816) 471-1301
(816) 471-1303 (Facsimile)
kerri.reisdorff@ogletree.com
chris.pace@ogletree.com
annrene.coughlin@ogletree.com
michael.matula@ogletree.com

**ATTORNEYS FOR DEFENDANT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

    I.    The Material Facts are Undisputed ................................................... 4

ARGUMENTS AND AUTHORITIES ............................................................................ 5

    II.    Mangels Admits She has Insufficient Evidence to Support the Majority of Her Legal Claims Against AMC and Formally Abandons Those Claims .................................................................. 5

    III.    Mangels' Unlawful Retaliation Claims in Counts II and IV Fail as Matter of Law for Multiple, Independent Reasons ........................... 6

        A.    Summary of Material Undisputed Facts *Before* Any Alleged Protected Activity ............................................... 6

        B.    Mangels Cannot Establish a "But For" Causal Connection Between Her Termination and Any Protected Activity ...................... 9

            1.    There is No Direct Evidence of a "But For" Retaliatory Intent ................................................... 9

            2.    Mangels Cannot Establish a Temporal Connection Between Protected Activity Where Intervening Events Resulted in Mangels' Termination and Therefore, cannot Meet the Causation Element of Her *Prima Facie* Case .......................................... 16

        C.    AMC Terminated Mangels' Employment for Legitimate Non-Retaliatory Reasons and There is No Evidence of Pretext ................................................................... 18

    IV.    Summary Judgment is Appropriate on Mangels' Wage Discrimination Claims ................................................................ 32

        A.    The EPA Requires – "Emphatically" – *Equal,* Not "Similar," Work ................................................... 32

        B.    Mangels' Opposition Confirms that She and Her Handpicked Comparators did not have the Same Functions ............................................................... 34

        C.    Mangels' Authority Does Not Prevent Summary Judgment ............................................................... 38

D.      Mangels Has Not Rebutted AMC's "Reasonable Factor
        Other Than Sex" Defense .................................................................. 39

E.      AMC is also Entitled to Summary Judgment on Mangels'
        Title VII Wage Claim ....................................................................... 40

CONCLUSION ................................................................................................ 46

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bassett v. City of Minneapolis*,
  211 F.3d 1098 (8th Cir. 2000) ...............................................................17

*Bauer v. Curators of Univ. of Missouri*,
  680 F.3d 1043 (8th Cir. 2012) ...............................................41, 42, 43

*Bennett v. Riceland Foods*,
  721 F.3d 546 (8th Cir. 2013) ...............................................................17

*Brunckhorst v City of Oak Park Heights*,
  914 F.3d 1177 (8th Cir. 2019) .............................................................16

*Buettner v. Arch Coal Sales Co.*,
  216 F.3d 707 (8th Cir. 2000) ...............................................................41

*Chavez-Lavagnino v. Motivation Educ. Training, Inc.*,
  767 F.3d 744 (8th Cir. 2014) ...............................................................17

*Chiaramonte v. Animal Med. Cent.*,
  677 Fed. Appx. 689 (2d Cir. 2017) ................................................33, 34

*Clearwater v. Indep. Sch. Dist. No. 166*,
  231 F.3d 1122 (8th Cir. 2000) .............................................................10

*EEOC v. Port Auth. of New York & New Jersey*,
  768 F.3d 247 (2d Cir. 2014)................................................................34

*EEOC v. Universal Underwriters Ins. Co.*,
  653 F.2d 1243 (8th Cir. 1981) .............................................................33

*Fercello v. County of Ramsey*,
  612 F.3d 1069 (8th Cir. 2010) .............................................................16

*Flyod-Gimon v. University of Arkansas for Med. Scis. ex rel. Bd. of Trustees of
    University of Arkansas*,
  716 F.3d 1141 (8th Cir. 2013) .............................................................10

*Gagnon v. Sprint Corp.*,
  284 F.3d 839 (8th Cir. 2002) ...............................................................16

iii

*Green v. Franklin Nat. Bank of Minneapolis*,
    459 F.3d 903 (8th Cir. 2006) ................................................................. 16

*Griffith v. City of Des Moines*,
    387 F.3d 733 (8th Cir. 2004) ......................................................... 9, 10, 17

*Grover vs. Smarte Carte Inc*,
    836 F.Supp.2d 860 (D. Minn. 2011) ....................................................... 38

*Hervey v. Cnty. of Koochiching*,
    527 F.3d 711 (8th Cir. 2008) ................................................................... 9

*Horn vs. University of Minn.*,
    362 F.3d 1042 (8th Cir. 2004) ..................................................... 33, 35, 40

*Hutton v. Maynard*,
    812 F.3d 679 (8th Cir. 2016) ................................................................. 19

*Keys v. Lutheran Family & Children's Servs. of Mo.*,
    668 F.2d 356 (8th Cir. 1981) ................................................................. 17

*Kindred v. Northome/Indus. Sch. Dist. No. 363*,
    154 F.3d 801 (8th Cir. 1998) ..................................................... 40, 41, 42

*Liles v. C.S. McCrossan, Inc. et al*,
    851 F.3d 810 (8th Cir. 2017) ................................................................... 6

*Macias Soto v. Core-Mark Int'l, Inc*,
    521 F.3d 837 (8th Cir. 2008) ................................................................. 27

*Mathews v. Trilogy Communications, Inc.*,
    143 F3d 1160 (8th Cir. 1998) ................................................................. 17

*McLaughlin v. Esselte Pendaflex*,
    50 F.3d 507 (8th Cir. 1995) ....................................................... 32, 33, 35, 40

*Noyes v. American Tissue Serv. Foundation*,
    310 Fed. Appx. 52 (8th Cir. 2009) ........................................................ 16

*Pulczinski v. Trinity Structural Towers, Inc.*,
    691 F.3d 996 (8th Cir. 2012) ................................................................. 27

*Scarborough v. Federated Mut. Ins. Co.*,
    996 F.3d 499 (8th Cir. 2021) ........................................................... 23, 25

*Sellner v. MAT Holdings, Inc.*,
    859 F.3d 610 (8th Cir. 2017) ................................................................. 17

Case 4:19-cv-00834-BP   Document 117   Filed 10/13/21   Page 5 of 52

*Stuart v. General Motors Corp.*,
  217 F.3d 621 (8th Cir. 2000) ....................................................................17

*Taylor v. White*,
  321 F.3d 715 (8th Cir. 2003) ...............................................................39, 40

*Tolen v. Ashcroft*,
  377 F.3d 879 (8th Cir. 2004) ....................................................................27

*Torgeson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) .............................................................10, 42

*Turner v. Gonzalez*,
  421 F3d 688 (8th Cir. 2005) .....................................................................16

*Wilson v. Arkansas Dep't of Human Servs.*,
  850 F.3d 368 (8th Cir. 2017) ....................................................................16

*Wright v. St. Vincent Health Sys.*,
  730 F.3d 732 (8th Cir. 2013) ......................................................................6

**Statutes and Rules**

Title VII of the Civil Rights Act of 1964.................................2, 3, 5, 6, 40, 41, 42, 44, 45

Equal Pay Act, 29 U.S.C. §206(d) ...............2, 3, 5, 6, 12, 13, 32, 33, 34, 36, 37, 38, 40, 41, 42, 45

Local Rule 56.1(c) ................................................................................................4

# INTRODUCTION

Plaintiff Tonya Mangels ("Mangels") began this lawsuit with the proverbial "bang." Mangels' First Amended Complaint (Doc. 5) contains one hundred and forty three (143) paragraphs alleging numerous and serious accusations against American Multi-Cinema, Inc. ("AMC"). Mangels alleged that <u>each</u> negative or adverse decision by AMC beginning in at least 2015 was motivated by her gender, including two disciplinary warnings (2015 and 2018), her 2018 annual performance review, the determinations/conclusions of two internal investigations, and ultimately her termination. She also alleged that she and unnamed witnesses were subjected to "scary" and "bullying" behavior during the internal investigations into Mangels' misconduct in 2018 and 2019. And she claimed that five male Vice Presidents ("VPs") all performed "substantially equal" work as her.

Discovery was *extensive*. Mangels demanded AMC conduct broad and costly ESI searches covering over four years and more than ten custodians. Mangels served two sets of interrogatories and requests for admissions and four sets of document requests (totally over seventy individual requests and resulting in the production of almost six thousand pages of documents). She deposed fourteen facts witnesses, including AMC's Chief Executive Officer, and conducted a corporate representative deposition (covering a number of topics). If there were a rabbit hole, she descended it. As a result, there are no unknowns and there are no material facts in dispute.

Some of these undisputed facts forced Mangels to abandon the majority of her legal claims and allegations. Mangels abandoned her claim in Count II that she was disciplined, evaluated, and terminated by AMC (Colanero and Chavarria as the decision-makers) on the basis of her gender. This is a crucial admission by Mangels: no non-wage related decision made by Colanero and/or Chavarria was motivated by her gender. Mangels also abandoned three of her five male putative

comparators (Robert Lane, Julius Lai, and Frank Ybarra) – ultimately conceding that these individuals did not perform "equal" work.

Despite her significant concessions, Mangels still bombards the Court with hundreds of immaterial facts and arguments, perhaps in an effort to mask the reality that this case is now an uncomplicated shell of where it began.[1]  All that now remains for the Court's decision is:

    **(1)    Whether unlawful retaliatory bias was the "but for" reason for Mangels' termination in September 2019;**

    **(2)    Whether Robert Kim and Michael Pursell performed "equal" work as Mangels as defined by the Equal Pay Act, 29 U.S.C. §206(d) (the "EPA") and, if so, whether Mangles was paid differently based on a reasonable factor other than sex; and**

    (3)    Whether there is evidence to support Mangles claims that she was intentionally discriminated against on the basis of her sex in connection with her compensation under Title VII of the Civil Rights Act.

With respect to the EPA claim, Mangels' Opposition attempts to overcome with verbosity what her argument lacks in substance. Despite the morass of words, the Opposition is remarkable for what it does not say. Mangels never claims – and the record would not allow her to claim – that she has the same actual job content as her (now) two alleged comparators. Rather, her demur rests on the unremarkable proposition that in a modern American business, employees are expected to communicate and work together to achieve corporate goals. But, the EPA does not conflate the obligation of employees to cooperate with each other, or work on different aspects of the same initiatives, with the actual responsibilities and "content" of their jobs. Mangels does not, and could

---

[1] Mangels included over 130 additional statements of fact that she never referenced in her legal argument, repeated a number of AMC's facts, and even burdened the Court with 12 exhibits that were already before the Court with AMC's filing. She also included a number of facts that have absolutely no relevance to the non-abandoned claims (such as her written discipline in 2015). Finally, had Mangels timely abandoned these claims AMC could have imposed materially less burden on the Court in its original Motion for Summary Judgment.

2

not, claim she and Michael Pursell performed the same work. Indeed, she admitted she had "different" duties than Pursell (he was operations, she was marketing). Mangels does not, and could not, claim that she and Rob Kim, who was responsible for business development, both negotiated contracts with movie studies for AMC to display film trailers (the largest portion of Kim's job). Indeed, she admits that she did not do so. Rather, she repeatedly asserts that she "collaborated" (she uses that word 27 times in her Opposition) with Kim and Pursell and their teams "worked together" in achieving corporate aims. That is true –Mangels' team did the marketing, Pursell's team ran operations, and Kim's team handled the sales and negotiated the contracts. But these unremarkable, and uncontested, facts do not mean that these three employees had the same "actual job content." They mean the opposite.

Mangels' unlawful retaliation claims under Title VII of the Civil Rights Act, 42 U.S.C. §2000e, et seq. ("Title VII," Count IV) and the EPA (Count II) founders on two separate shores. Mangels has not produced evidence of "but for" causation of retaliatory intent, nor has she produced evidence that AMC's reasons for her termination are pretexts for discrimination. Mangels' offer of immaterial denials, unsubstantiated speculation and inferences, and her own subjective impressions of business judgment and professionalism (which undeniably, AMC did not share) satisfy neither burden. As such, Mangels' Opposition fails to controvert properly that she was formally disciplined for, among others, not being forthright during an internal investigation and misusing AMC business expenses a little over a year before her termination (June 2018), at which time AMC *seriously* considered terminating her employment. Nor has she controverted that, fourteen months later (August 2019), two unbiased AMC officers – <u>neither of whom knew of Mangels' prior complaints or her EEOC charge</u> – reported new potential misconduct and poor judgment by Mangels that was *reported* to them by three unbiased witnesses.

AMC conducted an investigation and AMC's conclusions were corroborated by multiple, unbiased witnesses and contemporaneous text messages. Not only were multiple instances of poor judgment and misconduct by Mangels corroborated, but Mangels' statements to AMC during its investigation were materially different than other witnesses (including an officer) – meaning, if AMC believed the other witnesses it necessarily followed that Mangels *again* provided false or misleading information to AMC during an investigation. Mangels offers no sworn testimony from any witness interviewed (or not interviewed) to support her denials or to suggest that AMC did not genuinely believe the overwhelming evidence of her misconduct. For example, Mangels fails to offer the Court anything to support her original accusations in her lawsuit that witnesses were bullied, intimated, and subjected to "scary" behavior by AMC. She offers nothing because there is none. Bottom-line: AMC's conclusions were reasonable and honest (if not entirely 100% correct) and it had ample, indeed compelling, reasons for her discharge.

Mangels' lawsuit certainly began with a "bang"; but, borrowing a literary sentiment from T.S. Eliot, "[t]his is the way the [lawsuit] ends, not with a bang but a whimper." Extensive discovery disproved Mangels' claims of unlawful discrimination and retaliation. The same discovery established that AMC reached honest and reasonable conclusions and those conclusions were the basis for Mangels' termination (not any alleged but unsupported retaliatory bias). And that same discovery demonstrated that Mangels' subjective impressions of her work quantity and quality do not, as a matter of law, meet her burden of showing that she performed "equal" work.

## I.     The Material Facts are Undisputed

In accordance with Local Rule 56.1(c), AMC incorporates the documents attached as Exhibits 1 and 2, specifically, its Replies to Plaintiff's Responses to AMC's Statements of Fact (Exhibit 1) and its Responses to Plaintiff's Additional Material Facts (Exhibit 2).

4

## ARGUMENTS AND AUTHORITIES

**II.     Mangels Admits She has Insufficient Evidence to Support the Majority of Her Legal Claims Against AMC and Formally Abandons Those Claims**

Buried in the final sentence of Mangels' four (4) page "Introduction" to her Opposition is her admission that after extensive (literally grueling) discovery, she is formally abandoning her claim that any decision made by AMC during her employment was motivated by her gender (other than the amount of her compensation). (Doc. 111, p. 10.) This admission is in sharp contrast to her Amended Complaint wherein Mangels claimed that every instance of discipline and ultimately her termination, was motivated by her gender. (Doc. 5.) Mangels' admission is quite telling[2] as it is an admission that she lacks evidence of gender bias for any non-wage decision made by AMC about or impacting her (including decisions made by Colanero and/or Chavarria). This, of course, includes AMC's decision to discipline her in June 2018 (or any of the supporting reasons), her annual performance review for 2018, and her termination in September 2019 (or any of the supporting reasons).

Mangels also formally abandoned three (3) of her five (5) alleged comparators (Robert Lane, Julius Liu, and Frank Ybarra), conceding what AMC has known all along that they are not proper comparators for purposes of her wage claims under Title VII and the EPA in Counts II and IV.

---

[2] While Mangels attempts to down-play her decision to abandon these claims, the record before the Court clearly demonstrates that Mangels left no stone unturned in her dogged pursuit of evidence to support her non-wage related gender discrimination claims. This pursuit came up empty. Moreover, and while AMC appreciates even an untimely abandonment of unsupportable claims, Mangels' assertion that she abandoned these claims "to streamline the issues for summary judgement" is disingenuous. If that were truly Mangels' rationale she would have notified AMC and this Court at the close of discovery or prior to AMC filing its Motion for Summary Judgment. Mangels' delay resulted in AMC unnecessarily including numerous statements of fact (and supporting record) and substantial legal argument in its summary judgment briefing currently in front of the Court.

5

Mangels' only remaining causes of action are as follows: (1) her claim that she was unlawfully retaliated against in violation of Title VII and the EPA; and (2) her claim that she was paid less on the basis of her gender in violation of Title VII and the EPA.

## III. Mangels' Unlawful Retaliation Claims in Counts II and IV Fail as Matter of Law for Multiple, Independent Reasons

While Mangels correctly identified the *prima facie* elements of her unlawful retaliation claims, she incorrectly[3] articulated her burden of proof relating to the "causation" element of her *prima facie* burden. "To establish the causation element of a *prima facie* case of retaliation under Title VII, **it is not enough that retaliation was a "substantial" or "motivating" factor** in the **employer's decision"; rather, "the retaliation must be the 'but for' cause of the adverse employment action."** *Liles v. C.S. McCrossan, Inc. et al*, 851 F.3d 810, 819 (8th Cir. 2017) (citations omitted) (emphasis added); Civil Rights Act of 1964 § 704, 42 U.S.C.A. § 2000e-3(a). Mangels acknowledges that the same burden of proof applies in EPA cases. (Doc. 111, p. 303.) As such, Mangels must prove "the desire to retaliate was the but for cause of" her termination –that is, her termination would not have occurred in the absence of the alleged wrongful action or actions of the [defendant]." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013) (*citing Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). As a matter of law, Mangels cannot meet this burden.

### A. Summary of Material Undisputed Facts *Before* Any Alleged Protected Activity

In any case, it is imperative to review both material events that occurred before any protected activity and after. That is especially true here. As the below summary shows, Mangels was counseled on the same or similar behavior both before and after her protected activity.

---

[3] Mangels incorrectly asserts that her burden is the lower (albeit, still substantial) "motivating factor" standard. (Doc. 111, p. 314).

Mangels' statements of fact ("PSOF") and her First Amended Complaint also make clear that Mangels had an issue with AMC's decisions for years before her May 23, 2018 email (her first alleged act of protected activity). Mangels, by her own admission, also made numerous requests for more compensation before May 23, 2018, that were not addressed to Mangels' satisfaction. And AMC's responses to those requests were the same before and after her protected activity.

In summary, each of the below material facts are undisputed and occurred *before* (or contemporaneously with) Mangels' May 23, 2018 email:

- For at least two (2) years prior to Mangels' protected activity, Mangels had repeatedly requested that her compensation be increased and her position reviewed by AMC's Compensation Department ("Compensation"). While Mangels did receive annual increases and bonuses, Mangels never subjectively considered the increases/payments sufficient and she expressed the same to AMC. (DSOF ¶¶43, 45, 48, 56.)

- Prior to her protected activity, Mangels had been verbally counseled on her over-intoxication at AMC events and she had been counseled on her leadership and judgment. To address the latter, AMC provided Mangels with an outside coach in 2015. (DSOF ¶¶86(a), 89.)

- Based on feedback from subordinates, peers, and other officers, in May 2018 Mangels received a Hogan 360 overall score that was in the bottom 25th benchmarking percentile. Mangels had also been provided an outside coach to assist with her failure to meet AMC's expectations related to leadership and judgment. (DSOF ¶¶42, 50.)

- At least as early as January 2017, AMC had a written policy clearly stating that employees are expected to cooperate and not provide false statements/information in an internal investigation. The Policy also states that employees are prohibited from impeding an investigation. (DSOF ¶69 citing AMC Ex. 34.)

- REDACTED

- At the Talent Summit two Senior VPs ("SVPs") informed Colanero (and the others present) that they each had personally observed Mangels at AMC events in 2018 where she appeared overly-intoxicated. (DSOF ¶59.)

- REDACTED

- REDACTED

- REDACTED

- REDACTED

- REDACTED

Finally, while Mangels identifies her first alleged act of protected activity as her May 23, 2018 email wherein she made generalized statements of disparate treatment between men and women (with no specifics), the Court must consider that email in the context in which it was sent. Specifically, Mangels' email was sent only *after* she was on clear notice that her job was in serious jeopardy REDACTED and *after* she was not forthright in her initial interview. (DSOF ¶¶69.) The May 30, 2018 interview with Reeves to discuss Mangels' generalized

---

[4] REDACTED

allegations was after that notice as well – and a week after all witness interviews were completed. (DSOF ¶¶64, 65, 69, 77.) Mangels does not address AMC's argument that her clear post-hoc attempt to insulate herself from discipline or discharge is insufficient to establish causation. *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) ("Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action."). Indeed, the Eighth Circuit has described such post-hoc complaints as an "abuse" of anti-retaliation laws. *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004).

### B. Mangels Cannot Establish a "But For" Causal Connection Between Her Termination and Any Protected Activity

Mangels makes two primary arguments in support of her assertion that she can establish a "but for" causal link between her termination and her protected activity – a necessary element of her *prima facie* burden. First, Mangels claims that she has direct evidence of retaliatory bias. Second, Mangels claims that the almost five (5) months between her EEOC charge and her termination is sufficient, alone, to establish the causation element of her *prima facie* burden. Both arguments are frivolous.

#### 1. There is No Direct Evidence of a "But For" Retaliatory Intent

Mangels relies on conduct and statements by Colanero and Chavarria to support her assertion that she has direct evidence of a "but for" causal connection between her termination and her complaints that she believed she was paid less than comparable males. But, Mangels fails to offer any admissible evidence of a statement or conduct by either Colanero or Chavarria evidencing a retaliatory intent. Moreover, she also fails to offer any admissible evidence that any innocuous non-retaliatory conduct or statement relied upon by Mangels is causally connected in

any way with the decision to terminate Mangels' employment – let alone evidence of a "but for" link.

The Eighth Circuit has identified what is direct evidence and, equally important, what is not direct evidence of unlawful bias. Direct evidence requires a showing of "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action (in this case, termination). *See Torgeson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011) (concluding the plaintiff failed to establish direct evidence of retaliation). The term "direct" refers to the causal strength of the proof and evidence that "***clearly point[s] to the presence of an illegal motive.***" *Griffith*, 387 F.3d at 736 (emphasis added); *see also Flyod-Gimon v. University of Arkansas for Medical Sciences ex rel. Bd. of Trustees of University of Arkansas*, 716 F.3d 1141, 1149 (8th Cir. 2013) (*citing McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009)). Consistent with this jurisprudence, the Eighth Circuit has held that direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000) (emphasis added) (*quoting Fast v. S. Union Co.*, 149 F.3d 885, 890 (8th Cir.1998)). No Eighth Circuit legal authority relieves a plaintiff of the burden to demonstrate the alleged "direct evidence" meets these standards.

Mangels principally argues that because she made repeated requests that AMC increase her compensation beginning in at least 2016 and her compensation was not increased (to her satisfaction), that fact is direct evidence of a "but for" causal connection between her termination and retaliatory bias. Contrary to Mangels' argument, it is not direct evidence of retaliation, and instead, actually proves the *absence* of retaliatory bias. AMC's position was consistent both before

and after Mangels' first instance of protected activity in late May 2018. It is undisputed that in 2016 and again in April 2018 – <u>before</u> any protected activity by Mangels – Compensation conducted a review of Mangels' position. And while Compensation approved a title changed in both instances, Compensation concluded that no compensation change was warranted (outside of AMC's normal annual merit review process). (DSOF ¶¶ 43, 56.) This is particularly compelling given that Compensation's review in April 2018 (a little over one (1) month before Mangels' protected activity) was done in connection with the Marketing Department reorganization, and Mangels' core responsibilities did not change between then and her termination in September 2019. (DSOF ¶56.) Thus, when Compensation looked again at Mangels' position (at her request) in early 2019, Mangels' core responsibilities were the same as they were in April 2018. Unsurprisingly, Compensation reached the *same* conclusion it reached before any protected activity by Mangels. (DSOF ¶¶115, 119.)

Mangels also unpersuasively argues that two comments by Chavarria (in 2018) –unrelated to Mangels in any way – constitute direct evidence of retaliatory bias in Chavarria's and Colanero's decision to terminate Mangels a year later in September 2019. In February 2018 Executive VP Elizabeth Frank made Chavarria aware in an email of a verbal discussion Frank had with a member of her team wherein the employee commented to Frank that "it is commonly understood" that AMC compensates women less than men. (PSOF ¶94.) Chavarria did not ignore Frank's email. Rather, she *thanked* Frank for letting her know of the discussion and provided Frank details to share with the employee relating to a pay equity audit that AMC commissioned an outside third party to perform just months before Frank's email. (P's Ex. 48.) Chavarria also specifically invited the employee to contact herself or Giuseffi (AMC's Director of Compensation). (*Id*; DSOF ¶12.) Frank communicated the message to the employee and there is nothing to suggest Frank (someone

not alleged by Mangels to have any bias at all) thought anything more needed to be done. It is undisputed that the employee never reached out again and there is absolutely nothing in the record suggesting that this employee (or any employee) was chastised or treated badly because they raised a concern about pay equity at any time. Put simply, there is: (1) no evidence of retaliatory bias (inferred or actual); and (2) no connection at all between this email exchange and Mangels' termination over a year and a half later. Moreover, the fact that AMC commissioned an expensive pay equity audit in 2017 <u>directly</u> belies Mangels' claim of indifference by Chavarria.

Mangels' further reliance on three sentences made by Chavarria in a discussion with four people, which was secretly recorded by Mangels on October 5, 2018, is equally frivolous. (PSOF ¶232.) *Tellingly*, Mangels did not provide the Court with either the transcript or the recording of this discussion to allow the Court to consider the full context. (AMC Ex. 41.) Instead, Mangels picked three sentences – out of a 53-minute discussion – and asked the Court to infer retaliatory bias (and even willful indifference) on the part of Chavarria. *Id.* Mangels acknowledges that Chavarria's comments came in the 39th minute of a discussion about personnel changes. But what Mangels does not say is telling. Mangels *does not* allege that any discriminatory personnel action was discussed, taken, or recommended by Chavarria (or anyone) in this meeting. Indeed, other than noting that the discussion related to personnel changes, Mangels offers the Court no other context. (PSOF ¶233.) All Mangels says is that Chavarria – <u>a HR professional</u> – asked about the EEO categories of employees being impacted by personnel decisions (recommended by Mangels and VP David Codding and seeking approval by Chavarria) and noted that if women start off their careers making less than men the gap could widen (a common sense statement for a HR professional). At the same time, Chavarria also made the statement that "one of the things we're getting hit with is a lot of Equal Pay Act." While Mangels assumed Chavarria was referencing

AMC, Chavarria testified that she was referring to employers in general (based on her education on trends in the HR field). (P's Ex. 16, 204-206.) Not only is there no evidence to refute Chavarria's testimony regarding what she meant, but – importantly – there is no evidence (after substantial discovery by Mangels) that AMC was, in fact, "getting hit with a lot" of EPA claims. Finally, Chavarria testified that her statements in this meeting were in relation to making sure AMC followed the laws and as a learning opportunity for the attendees. (*Id.*) Mangels offers the Court nothing to dispute Chavarria's testimony, nothing to show that the comments were evidence of a retaliatory bias, or that the comments related in any way to Mangels' separation a year later. Put simply, Chavarria's comment, of which Mangels disregards the context, is not direct evidence of retaliation.

Mangels' attempts to illustrate a retaliatory bias on the part of Colanero are equally unavailing. Mangels inaccurately claims that Colanero "disregarded," "ignored," or "dropped the ball" on Mangels' fourteen requests to have her compensation increased. (Doc. 111, p. 312.) But, the record shows otherwise, containing example after example[5] of Colanero passing on Mangels' requests to Compensation and following up on the same (*both before and after* Mangels' protected activity). (DSOF ¶¶43, 45, 48, 56, 102.) The record is also clear that prior to Mangels' serious

---

[5] The only instance when Colanero could not recall what he did with a request from Mangels to have her compensation reviewed was in relation to an email Mangels sent in July 2018 – only a few weeks after she was issued a final written warning for serious misconduct. While Colanero could not recall what he did with the request he testified that he had decided in June 2018 that it would be "inappropriate" to review Mangels' compensation for a while as the investigation had "complicated things dramatically." (DSOF ¶97.) Moreover, Mangels tries to infer bias because Colanero did not make Aron aware of Mangels' requests for more money. Again – Mangels offers no evidence that Colanero responded to Mangels' requests for more money differently than he did anyone else (including those who did not engage in protected activity) – *and his response was consistent both before and after her protected activity.* Colanero followed AMC's procedure and sent the request to Chavarria and Compensation. (DSOF ¶¶9-11; 102.) It is undisputed that Aron (the CEO) reviewed Mangels' compensation on an annual basis and there are multiple examples of Colanero requesting and obtaining compensation increases for Mangels in the annual review process. (DSOF ¶¶8; 10; 43, 45, 48, 56.)

misconduct addressed in June 2018, Colanero recommended Mangels for compensation increases and bonuses. (DSOF ¶¶45, 48.) Mangels' assertion that nothing was done after her November 2018 request for her compensation to be reviewed is also belied by the record. Colanero timely passed on her request to Chavarria, followed up on the request, and it is undisputed that Compensation did, in fact, review her compensation in 2019 (and that review continued after Mangels' discussion with Colanero on February 12, 2019).[6] (DSOF ¶¶ 100, 102, 103, 119.) Again, Mangels did not get the increase she wanted; but, the record does not support the unvarnished assertion that Colanero ignored her request. Mangels' assertion that Colanero "lied" to her in February 2019 by stating that Mangels' compensation was "in a similar range" with "comparable" Marketing VPs is also simply wrong. Colanero had six (6) VPs in Marketing and: Mangels made the <u>same</u> amount as VP David Codding; made <u>more</u> than two other VPs, and made less than 2 VPs (Lai and Ybarra). (P's Ex. 17.) Mangels now agrees with Colanero (and AMC) that neither Lai nor Ybarrra are "comparable" VPs. (Doc. 111, p. 8.) Again, this is not direct (or even indirect) evidence of retaliation.

Mangels' final attempts to manufacture direct evidence of retaliatory bias (where there is none) are meritless. Mangels infers that because Chavarria did not *personally* conduct an investigation into the allegations in Mangels' EEOC charge, AMC must not have conducted an investigation (because it/Chavarria simply did not care). As this Court is well aware, AMC did

---

[6] Mangels also inexplicably misleads the Court with respect to Colanero's knowledge of information provided by Aon during Compensation's review of Mangels' position in early 2019. Colanero unequivocally testified that he had never seen the salary information provided by Aon. And when Mangels' counsel disingenuously (and repeatedly) introduced an exhibit wherein he had attached the Aon information to an email chain – inferring that it was attached to an email to Colanero – AMC clearly informed Mangels' counsel that the document he attached to the exhibit was not an exhibit to the email to Colanero (and specifically pointed out that the email clearly showed there was no attachment). Mangels has continued to assert this false claim. (P's Ex. 8, 93:22-25; 94:1-11.)

conduct a thorough investigation – however, that investigation was conducted by counsel and is privileged. (Doc. 80.) Mangels also asks the Court to infer bias because AMC's CEO was advised of the decision to terminate Mangels after it was made (but before it was carried out). There is no evidence that this violated an AMC past practice with respect to an officer's termination who had not engaged in protected activity – or that it violated the CEO's expectations (indeed, the CEO confirmed that his expectations were met).[7]  (P's Ex. 8, 101:10-25; 111:1-12.)

Finally, Mangels nitpicks Reeves' investigation into Mangels' concerns discussed in their May 30, 2018 interview and claims Reeves' "shortcomings" are direct evidence of retaliation. Specifically, she argues that Reeves should have done more to pull details/specific examples from Mangels. Reeves' attempts to draw specific examples from Mangels is demonstrated in the transcript of the meeting. (AMC Ex. 14.) Moreover, there is absolutely no evidence that what Reeves did or did not do (or what she chose to communicate to Chavarria or Colanero) was a result of "but for" retaliatory bias. And there is no evidence that Reeves (who was no longer employed by AMC at the time of Mangels' separation) or her actions in 2018 are connected in any way to Mangels' separation in September 2019. (P's Ex. 25, 4:24-25; 4:1.)

Mangels has failed to identify any conduct by AMC that "clearly points to an illegal" retaliatory bias. Nor has Mangels presented evidence of a "but for" causal connection between any of the conduct she relies on and her termination. As a matter of law, Mangels does not have direct evidence of unlawful retaliation.

––––––––––––––––––––––––––––

[7] Mangels also misrepresents AMC's CEO's testimony regarding Mangels' charge and attempts to infer that the CEO was indifferent towards the charge. The record shows otherwise. The CEO testified in relation to Mangels' charge: **"I do believe that AMC should comply with the law, and at all times I would have instructed … the General Counsel … to make sure we comply with the law … I am not aware of any instance when we were in violation of the law."** (P's Ex. 8, 98:2-9.)

> ### 2. Mangels Cannot Establish a Temporal Connection Between Protected Activity Where Intervening Events Resulted in Mangels' Termination and Therefore, cannot Meet the Causation Element of Her *Prima Facie* Case

Mangels' only remaining attempt to demonstrate she has evidence of a causal connection between her protected activity and her termination (a necessary element of her *prima facie* case) is her assertion that "temporal proximity alone is sometimes sufficient." (Doc. 111, n. 22.) The Eighth Circuit has held that "[g]enerally, more than a temporal connection between the protected conduct and adverse employment action is required to present a genuine factual issue on retaliation." *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006). Indeed, it is well settled that a several month gap between protected activity and an adverse action "weakens the inference of causation" and "eliminates [the employee's] ability to prove causation based on temporal proximity alone." *See Fercello v. County of Ramsey*, 612 F.3d 1069, 1079-80 (8th Cir. 2010); *see also Brunckhorst v City of Oak Park Heights,* 914 F.3d 1177, 1184 (8th Cir. 2019) (finding that without more, the four-month period between plaintiff's first complaint of discrimination and plaintiff's termination is not sufficient to establish causation through temporal proximity).[8] Moreover, a careful reading of the cases cited by Mangels in footnote 22 of her Opposition demonstrate that courts consider the relevant context, not simply the amount of time between the protected activity and an adverse action alone.[9]

---

[8] *See also Fercello*, 612 F.3d at 1080 (finding a six month gap insufficient on its own to establish a *prima facie* case); *Noyes v. American Tissue Services Foundation,* 310 Fed. Appx. 52, 53 (8th Cir. 2009) (affirming district court's refusal to speculate causation where plaintiff's causation argument was premised on fact that approximately four to five months separated plaintiff's protected activity and adverse employment action); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 51-52 (8th Cir. 2002) (one months' time between protected activity and adverse action did not establish causation).

[9] *Wilson v. Arkansas Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (while finding that 6-week period between plaintiff's EEOC charge and her termination "plausibly" supported a causal connection, court principally relied on evidence of pretext to deny summary judgment); *Turner v. Gonzalez,* 421 F3d 688, 696-97 (8th Cir. 2005) (finding plaintiff satisfied *prima facie* causation burden where plaintiff received

16

Most importantly, even if the almost five (5) months[10] between Mangels' protected activity (her charge) and her termination was sufficient to suggest a link between the two (which it does not), any inference was destroyed by the intervening act of Trotter's and Pierce's *independent* reports to AMC of inappropriate behavior by Mangels (which was then substantiated by multiple witnesses). Put simply, both Trotter and Pierce reached independent, <u>professional</u> decisions that, based on what they knew, they were compelled to report it to Colanero (Mangels' supervisor). (DSOF ¶¶125-127, 142.) There is no evidence that any witness interviewed in AMC's investigation was aware of Mangels' charge (or any other complaint she made). (DSOF ¶149.) Mangels cannot (and makes no attempt to) distinguish the cases cited by AMC, including *Stuart*

---

positive performance review 2 months before protected activity and 5 days after protected activity received negative review in all rated areas and where no evidence of intervening act presented); *Chavez-Lavagnino v. Motivation Educ. Training, Inc.*, 767 F.3d 744, 750 (8th Cir. 2014) (finding that 6 weeks between protected activity – refusing to commit unlawful act - and adverse action supported *prima facie* causation showing where decisionmaker made statement threatening plaintiff's job shortly after protected activity); *Bennett v. Riceland Foods*, 721 F.3d 546, 552 (8th Cir. 2013) (plaintiff established causal connection where decisionmaker admitted that plaintiff would not have been terminated but for protected activity); *Sellner v. MAT Holdings, Inc.*, 859 F.3d 610, 615 (8th Cir. 2017) (plaintiff had sufficient evidence causal connection where decisionmaker threatened plaintiff with termination for engaging in protected activity); *Bassett v. City of Minneapolis*, 211 F.3d 1098, 1099 (8th Cir. 2000) (plaintiff had sufficient evidence of causal connection where in at least six instances alleged retaliatory conduct (within 1-day to 1 month) followed plaintiff's alleged protected activity); *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1166 (8th Cir. 1998) (plaintiff did not establish evidence of causal connection where adverse action occurred 2 months after protected activity because the employer had put forth two legitimate, non-discriminatory reasons accounting for the timing of plaintiff's termination; *Keys v. Lutheran Family and Children's Servs. of Mo.*, 668 F.2d 356, 358 (8th Cir. 1981) (finding evidence of causation relying on both a "clear" dispute of fact as to the reason for plaintiff's dismissal and 2-month timeframe between filing of charge and termination).

[10] Mangels suggests that an email she sent on September 20, 2019, is also "protected activity." It is undisputed that this email was sent as Mangels was waiting to learn the determination and consequences related to her conduct on August 14, 2019 and her behavior during AMC's investigation. Not only was this email <u>not</u> protected activity, the Eighth Circuit has held that complaining of retaliation in response to an investigation or allegation of misconduct by the plaintiff is "***an abuse of the anti-retaliation remedy***." (*Griffith v. City of Des Moine*s, 387 F.3d 733, 738 (8th Cir. 2004) (emphasis added). Mangels also alleges that her participation in a voluntary mediation relating to her EEO charge on September 19, 2019, was protected activity. The voluntary mediation was scheduled in July 2019 (as represented to the Court by AMC's counsel) – weeks before the complaints related to Mangels' termination. This fact, alone, demonstrates the complete lack of any connection between her termination and the parties' voluntary mediation.

*v. General Motors Corp.*, 217 F.3d 621, 636) (8th Cir. 2000) (holding no causal connection between protected activity and plaintiff's termination where unbiased individual reported concerns about plaintiff and after an investigation employer terminated plaintiff based on its reasonable belief plaintiff had engaged in inappropriate conduct). (Doc. 98, pp. 77-78.) Nor does Mangels even attempt to reconcile the fact (because she cannot) that Mangels was not selected by Colanero (or Chavarria or AMC) for layoff in August 2019 when a number of her peers and co-workers were. (DSOF ¶120.) If Chavarria and Colanero harbored any retaliatory bias – let alone bias that would meet the exacting "but for" standard, it stands to reason they would have taken advantage of the layoff to retaliate. They did not.

Put simply, Mangels cannot meet the third element of her *prima facie* burden: producing probative evidence of a causal "but for" connection between her protected activity and her termination. Mangels failed to establish direct evidence of a causal connection and the almost five months between her charge and termination is not enough to establish a causal connection alone, and certainly not where undisputed intervening acts (multiple people reporting inappropriate behavior by Mangels) occurred and where those reports and witness statements were the "but for" reason for Mangels' termination. Accordingly, Mangels' retaliation claims (Count II and IV) must be dismissed for failure to meet her *prima facie* burden (the "but for" causation element) on summary judgment.

### C.    AMC Terminated Mangels' Employment for Legitimate Non-Retaliatory Reasons and There is No Evidence of Pretext

Regardless of whether Mangels can establish a *prima facie* case of retaliation (she cannot), AMC terminated her employment for legitimate, non-retaliatory reasons: AMC's honest and good-faith determination that Mangels violated its expectations for officers on multiple occasions and that termination was ultimately warranted after she had been formally warned, failed to correct her

behavior, and failed to see any need for change to her behavior. Accordingly, Mangels' only avenue to survive summary judgment on her retaliation claims is to "**both** discredit defendant['s] asserted reasons for [her] termination **and** show that the circumstances permit drawing a reasonable inference that the real reason for [her] termination was retaliation." *Hutton v. Maynard*, 812 F.3d 679, 684-85 (8th Cir. 2016) (emphasis added). Put simply, Mangels must show that AMC's stated reason for her termination was false and that retaliatory bias was the real reason.

In an attempt to shift the Court's focus from her own bad behavior, Mangels tries to show proof of pretext by critiquing AMC's investigations into her misconduct.[11] But none of Mangels' subjective critiques are evidence of pretext. With respect to her behavior in August/September 2019, it is clear Mangels accepts no responsibility (but there is no evidence of pretext). With respect to AMC's May/June 2018 investigation – and her behavior at issue – it remains a mystery as to what point Mangels attempts to make. REDACTED

. Even though she has since abandoned that claim for lack of evidence, she still asserts that her 11th hour post-hoc complaint somehow insulated her from the consequences of her misconduct despite offering absolutely no evidence of retaliatory bias.[12] Moreover, the only relevance of the 2018 investigation is that it

---

[11] In addition to abandoning a number of her legal claims, Mangels has also abandoned her claim that her 2018 performance review score was motivated by anti-retaliatory bias. Nowhere in her twenty-six (26) page legal argument in support of her unlawful retaliation claims does she refute AMC's arguments in its Suggestions in Support of its Motion for Summary Judgment that she cannot show a retaliatory bias was the "but for" reason for her annual review score. (Doc. 98, pp. 75-76.)

[12] Mangels disingenuously attacks AMC for detailing its 2018 investigation in its Suggestions in Support of its Motion for Summary Judgment. Mangels did not abandon her claim that her June 2018 warning was motivated by her gender until almost two months *after* AMC filed its brief. And Mangels is still asserting that her 11th hour complaint at the end of AMC's investigation is the "but for" reason for the discipline she

informed AMC's ultimate decision to terminate Mangels in September 2019. This is precisely why Mangels is unwilling (or more accurately, unable) to outwardly concede to this Court that the discipline was warranted. If she did, it would be a concession that at the time AMC considered Mangels' misconduct in 2019 – she had already been warned for not being honest in an internal investigation and for engaging in various serious misconduct for an officer. Mangels' unwillingness to concede is irrelevant, and is certainly not evidence of pretext.

**May/June 2018 Investigation**

Mangels' vehement complaints about this investigation do not undermine the reasonableness of AMC's conclusions, and hence are not evidence of pretext. First, it is undisputed that the investigation began and witness interviews were all but completed *before* her post-hoc complaint. (DSOF ¶¶69, 73 77.) Second, Mangels cannot (and does not) dispute what each witness told AMC during its investigation.[13] (DSOF ¶¶69-71, 73, 77.) REDACTED

---

received – not her misconduct. Hence, AMC is forced to show that it had a good faith basis to discipline Mangels (and REDACTED.

[13] REDACTED

REDACTED

---

[14] REDACTED

Case 4:19-cv-00834-BP   Document 117   Filed 10/13/21   Page 27 of 52

REDACTED

(DSOF ¶¶88, 92, 93, 95.) Nonetheless, Mangels still takes issue with AMC's decision to also find that Mangels: (1) REDACTED

; (2) that after making a serious accusation of sexual harassment and bullying she failed to provide any supporting facts; and (3) despite being counseled for over-intoxication at AMC events in the past, she was observed by multiple people at multiple AMC events over-intoxicated. (DSOF ¶89.) Again, the record illustrates that Mangels' critique of these conclusions is not evidence of pretext.

Mangels admits she was previously counseled for over-intoxication at AMC events. (DSOF ¶¶86(a), 89.) She cannot (and does not) dispute that four different witnesses (including two Senior VPs) reported personally seeing Mangels over-intoxicated at AMC events in 2018 – and these reports were made two weeks *before* her May 23, 2018 email. (DSOF ¶¶58, 59, 64, 65.) She does not (and cannot) claim that REDACTED .

Mangels has even formally abandoned any assertion that AMC's concerns with respect to her over-intoxication at AMC events was based on her gender. (Doc. 111, p. 10.) Put simply, there is absolutely no evidence of retaliatory bias associated with this finding.

Likewise, it is undisputed that in her May 23, 2018 email, Mangels stated: "We have instances of sexual harassment in the building. I've personally experienced sexual harassment on two occasions . . . ." (AMC Ex. 40.) When asked in her interview with Reeves for the specifics supporting those serious accusations, Mangels admitted she was not aware of any unaddressed instance of harassment towards others, refused to provide Reeves with information regarding an instance she claimed had been resolved by Chavarria (involving someone else), and she refused to provide any information related to alleged harassment towards herself. (DSOF ¶82(c).)

Bottom-line, Mangels cannot point to any evidence undermining the reasonableness of AMC's conclusions.  REDACTED

*Scarborough v. Federated Mut. Ins. C*o., 996 F.3d 499, 507 (8th Cir. 2021) (noting the plaintiff's duty to come forward on summary judgment to show and offer plausible evidence that the decision makers did not in good faith believe the results of any such investigation). She also offers absolutely no evidence of retaliatory bias by anyone. Thus, she cannot as a matter of law meet her burden of showing *both* that AMC's reasons for disciplining Mangels in June 2018 were false and that the real "but for" reason was retaliatory bias from her post-hoc complaint.[15]

**August/September 2019 Investigation**

Mangels' subjective critiques of AMC's investigation in August/September 2019 are equally unavailing. Mangels' behavior *during* the investigation – towards her direct reports, peers, and statements to AMC – was certainly more serious than her conduct on August 14, 2019. (Doc. 98, p. 64.) Inexplicably, Mangels all but ignores her more serious conduct and AMC's overwhelming evidence regarding the same. Instead, she focuses almost exclusively on her conduct in the August 14, 2019 meeting. Mangels' silence is not surprising; she cannot dispute what AMC was told in its investigation or the seriousness of the conduct that was reported. <u>There is no evidence that any witness interviewed had knowledge of any protected activity by Mangels.</u>

---

[15] Mangels claims that because she continued working as a VP and was expected to continue meeting the expectations of a VP, including taking on new projects and assignments, that fact somehow casts doubt on AMC's findings. Such an assertion is meritless. It is undisputed that while Colanero's trust in Mangels took a serious hit as a result of her misconduct in 2018, he was willing to, and did in fact, give her a chance to improve. (DSOF ¶¶93, 94, 96.) REDACTED

(DSOF ¶¶51-56.) She also attempts to mislead this Court into believing she was selected to AMC's LEAP program after her misconduct was discovered. It is undisputed that the selection occurred *before* the misconduct was discovered. (DSOF ¶¶49, 96.)

(DSOF ¶149.) Nothing in Mangels' Opposition purports to undermine the overwhelming evidence

supporting each of the conclusions reached in its investigation:

**Finding #1: Mangels led others to reasonably fear for their jobs**.

| Witness | Undisputed Statements to AMC During Investigation |
|---|---|
| Carrie Trotter (VP) | Reported that Sarah Powers came to her concerned about her (Sarah's) own job because she overheard associates on Mangels' team discussing their fears about a layoff based on Mangels' conduct on August 14. Sarah also told Trotter that she spoke to Jillian who confirmed that Mangels' behavior made Jillian fear a layoff was imminent. (DSOF ¶127.) <br><br> Reported that VP Pam Sandler had told her on August 15 that Mangels had told Sandler that there were going to be layoffs the next week. Stated that Sandler came to Trotter expressing concerns for her job. (DSOF ¶142(b).) <br><br> Told AMC that, in her professional judgment, Mangels should be fired for her behavior. (DSOF ¶142(e). |
| Marti | Reported that, while she was not in the August 14 meeting, two associates who were present reached out to her to share their concerns based on Mangels' conduct. (DSOF ¶132.) |
| Jordan | Provided AMC with text messages between himself and Marti wherein both Marti and Jordan expressed concerns about their job security based on Mangels' conduct and comments in the August 14 meeting. In texts, Jordan stated that Mangels " …created even more rumors????" and ""worried the entire team." (DSOF ¶¶133, 134.) |
| Sarah | Reported that Jillian came to her after the August 14 meeting and was visibly upset. Jillian told Sarah that Mangels made comments that led her to assume a layoff would happen the following week. Jillian asked Sarah if she should cancel her vacation for the following week (based on Mangels' conduct). <br><br> Sarah stated that she did not believe Mangels should have placed Jillian in that position and that is why she reported it to Trotter. (DSOF ¶135.) |
| Kaleigh | Stated that members of Mangels' team who were in the August 14 meeting were speculating whether there would be a layoff based on Mangels' conduct/comments. (DSOF ¶140.) |
| Alice Rogers (VP) | Stated that she overheard two associates discussing that Mangels was worried she would be laid off (referencing issues specific to Mangels). Rogers became concerned for her own job and called Pierce (Senior VP). (DSOF ¶141.) |

| Witness | Undisputed Statements to AMC During Investigation |
|---|---|
| Ellen | Told AMC that after hearing and seeing Mangels' conduct and comments in the August 14 meeting she anticipated that her direct reports would be worried about their jobs. Reported that her direct reports did come to her with concerns about their jobs based on Mangels' conduct. (DSOF ¶144) |
| Jillian | Stated that Mangels' conduct and comments in the August 14 meeting made her "uncomfortable" and led her to believe that a layoff could happen the next week. Jillian considered cancelling her vacation scheduled for the following week and reported that others in the meeting appeared confused and anxious. (DSOF ¶145.) |
| Pam Sandler (VP) | Reported that she had a private discussion with Mangels on August 15 wherein Mangels told her that a layoff was occurring the following week. As a result, Sandler became very concerned about her job security and reached out to Trotter (DSOF ¶¶149(a)-(b)). <br><br> Text messages confirm that Sandler reached out to Trotter after meeting with Mangels asking Trotter to "talk me off the ledge." (*Id.* citing AMC Ex. 52, ex. A.) |

There is absolutely no dispute that multiple individuals reported to AMC that Mangels' conduct[16] caused them to not only worry about their job security but to express those concerns to others, who in turn worried about their jobs. The ripple impact of Mangels' poor judgment is illustrated by the fact that two officers of AMC (VP Trotter and SVP Pierce) were approached by worried subordinate employees who were not even in the August 14 meeting (Trotter was actually

---

[16] Mangels spends an inordinate amount of time in her Opposition arguing first, that Mangels did not know about the layoff so how could she tell anyone about the layoff. And then apparently contradicting herself, arguing that "everyone" knew about the layoff. Mangels has offered this Court absolutely no evidence that anyone in the August 14 meeting had advance notice of the layoff before that meeting. Indeed, there were no other officers in that meeting other than Mangels. (DSOF ¶¶ 131, 138.) She has offered no evidence that any attendee of the August 14 meeting was present for the CFO Director and above meeting (other than her). She has offered no evidence that anyone in the August 14 meeting read AMC's SEC filing (including the small font language she bases her speculation on). Indeed, there's no evidence that *anyone* read the SEC filing other than Mangels and her counsel. What's more, the undisputed evidence is that two officers who were in the CFO meeting – Sandler and Rogers – did not know about a layoff and were not afraid of losing their jobs until they either learned about conduct/statements by Mangels (Rogers) or were told by Mangels that a layoff was happening (Sandler). (DSOF ¶¶125, 141, 146(a)-(b).)

contacted by both Powers <u>and</u> Sandler). Mangels cannot (and does not) dispute this. Thus, AMC's finding is not only reasonable and honest; <u>it is the truth</u>.

Mangels offers the Court only excuses and deflection, not evidence suggesting AMC's conclusions were implausible. First, Mangels argues that no one actually told AMC she used the precise words "reduction in force" in the August 14 meeting. AMC never claimed otherwise. What AMC did show, and Mangels has not disputed, is that Mangels' language and conduct reasonably led others to fear for their jobs and that a layoff was happening *the following week*. And Sandler told AMC (and has testified to the same) that Mangels very directly told her on August 15 that a "layoff" was happening the next week. (DSOF ¶¶146(a).)

The uncontroverted facts show that AMC reached a conclusion that Mangels caused her team to fear for their jobs and told at least one other officer that a layoff was happening the following week. So Mangels tries to change the subject by asserting other officers had employees come to *them* to express concerns about job security based on messaging in the CFO Director and above meeting and those officers sought to calm their fears. But, the undisputed record shows this is wholly different than Mangels' conduct. First is the evidence that these other officers *were the recipients* of concerns about job security, *not the source of the concern*. Conversely, the witnesses reported that Mangels broached or inferred imminent job losses, not the other way around.[17] Second, the individuals who expressed concern to these officers were either a Director or above at AMC (or Mangels has not identified how or what lead these unnamed individuals to express

---

[17] Mangels told AMC in its investigation that some unnamed person in the meeting brought up the layoff, not her. (DSOF ¶138(c).) Mangels' claim is <u>directly contrary</u> to every other witness interviewed. (*See supra*, pp. 27-28.) Moreover, Mangels' comments to Sandler on August 21 directly contradicts this claim. Mangels told Sandler that she never made any reference to the layoff; instead, her comments were about the "budget" and telling her team not to get cocky. (DSOF ¶146(c).)

concern). For Directors and above, these individuals were privy to information lower level employees were not privy to. Conversely, there is no evidence that anyone present at Mangels' August 14 meeting was present at the CFO meeting or privy to that information (other than Mangels). Third, there is no evidence that any of these officers (or <u>any</u> officer) – other than Mangels – made anyone fear for their job (in fact, it's the opposite). Fourth and finally, there is <u>no evidence</u> that either Colanero or Chavarria knew about any of these discussions (relied upon by Mangels) prior to discovery in this lawsuit.[18]

Finally, Mangels argues that AMC did not interview all ten of the individuals in the August 14 meeting, but this is not evidence of pretext either. It is well settled that decisions such as who to interview in an internal investigation are within the sound discretion of an employer. *See, e.g. Pulczinski v. Trinity Structural Towers, Inc.,* 691 F.3d 996, 1005 (8th Cir. 2012) (rejecting plaintiff's argument that employer's failure to interview every single employee with relevant information showed pretext and finding that the appropriate scope of an internal investigation, is a business judgment that the court does not review); *Macias Soto v. Core-Mark Int'l, Inc*, 521 F.3d 837, 842 (8th Cir. 2008). Mangels also offers absolutely no evidence – nor does she even infer - that certain attendees were *intentionally* not interviewed because of a retaliatory bias. And despite

_____

[18] Mangels argues that because no one else was investigated or disciplined that is evidence of pretext. For the reasons set forth above, <u>none</u> of the individuals she named are similarly situated with her as a matter of law (indeed, she does not even formally make such an allegation or cite the applicable legal standard to support such an assertion). *See Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004) ("the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") Their responses to discreet concerns raised by individual employees are materially different then Mangels' behavior in the August 14 meeting reported and corroborated by multiple witnesses. For example, Mangels claims that all Jennifer Douglass did was tell two direct reports that she would be in the office the following Tuesday (and there is absolutely no evidence that Colanero or Chavarria was aware of this comment by Douglass prior to depositions in this case). Moreover, there is no allegation that any of these officers – or anyone else for that matter – engaged in the same or similar behavior as Mangels during AMC's investigation and was not disciplined or terminated.

substantial discovery she has offered no evidence that had AMC interviewed the other five attendees it would have heard a different story than what was already well documented.

**Finding #2:  Mangels interfered with AMC's investigation by conducting her own and confronting multiple individuals in an effort to determine who reported her to Human Resources.**

Mangels admits that she spoke to every member of her team *after* she was notified AMC was conducting an investigation and *before* anyone was interviewed by AMC. She did this to determine "who she could trust." (DSOF ¶¶129, 137(e), 137(f).) She admits asking her subordinate team members about the August 14 meeting and whether they believed she said or did anything to suggest there would be a layoff and whether they communicated that impression to anyone. (PSOF ¶360.) Multiple witnesses reported a more troubling account of their individual meetings with Mangels:

| Witness | Undisputed Statements to AMC During Investigation |
|---|---|
| Jordan | Reported that Mangels asked him to tell her what he recalled Mangels saying in the August 14 meeting and how he had interpreted her comments. Mangels also told Jordan that someone reported her to HR. (DSOF ¶133.) |
| Lauren D. | Reported that Mangels asked Lauren and her direct reports to tell Mangels what they recall Mangels saying in the August 14 meeting and specifically, whether they recall her saying or implying there would be a layoff. (DSOF ¶136.) |
| Ellen | Reported that Mangels advised Ellen and her direct reports that Mangels had been reported to HR. In a private meeting, Mangels asked Ellen if she knew who reported her and Mangels told Ellen that she thought VP Trotter reported her. (DSOF ¶144.). |

| Witness | Undisputed Statements to AMC During Investigation |
|---------|---------------------------------------------------|
| Jillian | Reported that Mangels called Jillian on vacation and "interrogat[ed]" her regarding what Jillian recalled Mangels saying in the August 14 meeting and who reported Mangels to HR. Jillian reported that Mangels told Jillian her version of the meeting – after Jillian told Mangels what she recalled. Jillian also stated that Mangels told her that she [Mangels] had talked to everyone else on the team and they denied reporting her. Jillian felt that Mangels was accusing her and at one point said "See, you just told me you told Carrie [Trotter]!" Jillian stated that Mangels told her that she suspected VP Trotter reported her. (DSOF ¶¶145(c)-(g).) |
| Pam Sandler | Reported that on August 21 Mangels came into Sandler's office, shut the door, and told Sandler that she had just asked every single member of her team if they reported her and they denied reporting her. According to Sandler, Mangels accused her of reporting Mangels and described the encounter as Mangels "let me have it," Mangels was "mad," "pointed in her words," and she used "exaggerated motions." (DSOF ¶¶146(c).) <br><br> Text messages confirm that Sandler reached out to Trotter immediately <u>with a warning</u>: ***"Heads up. [Colanero] told [Mangels] that someone told him about her comments in the staff meeting last week. She's furious. She just grilled her team asking who told and then she came in here and accused me. She denies the whole thing and told me her team also denies telling anyone anything."*** (DSOF ¶142(d); AMC Ex. 52, ex. B.) |

The above summary demonstrates that AMC had multiple subordinate employees, and a fellow VP, report intimidating and inappropriate questioning by Mangels before witnesses were interviewed by AMC. Mangels' denials and equivocations about her demeanor – <u>which is all she offers this Court</u> – are immaterial. What matters is whether AMC had a reasonable basis for concluding that Mangels interfered with the investigation, and she offers no evidence suggesting a reasonable employer would have discounted the testimony of five witnesses, which was uniform and compelling on this matter.[19]

---

[19] For example, for AMC to have credited Mangels' version of her August 21 discussion with Sandler (which Mangels described as "super casual"), AMC would have had to believe that Sandler – for some unknown, nefarious purpose – created a false contemporaneous text to Trotter.

**Finding #3: Mangels provided incorrect or misleading information to AMC during its investigation.**

The following chart summarizes the material differences between Mangels' representations to AMC during its investigation and what other witnesses told AMC:

| Mangels' Statement to AMC | Other Witness Statements to AMC |
|---|---|
| An unnamed person during the August 14 meeting brought up the topic of layoffs and her comments were in response to that concern. (DSOF ¶137(c).) | No witness claimed or reported that someone else brought up "layoffs". Witnesses reported that Mangels initiated her statements and conduct that led them to believe there would be a layoff the following week. No one – other than Mangels – claimed that someone else in the meeting brought up the topic of layoffs. (DSOF ¶¶134, 145(a).)<br><br>Sandler stated that Mangels told her that her statements in the August 14 meeting had nothing to do with a layoff (they had to do with budgets). (DSOF ¶146(c).) |
| Mangels only recalled speculating about a RIF with Rob Kim (in advance of layoff). (DSOF ¶137(d).) | Sandler stated that Mangels told her on August 15 that there would be a layoff the following week. Sandler sent a text to Trotter and told Trotter what Mangels had said. (DSOF ¶¶142(a); 146(a)-(b).) |

| Mangels' Statement to AMC | Other Witness Statements to AMC |
|---|---|
| Mangels did not ask any witness if they reported her to HR. (PSOF ¶359.) | Jillian, Sandler, and Ellen all reported that Mangels asked them if they knew who reported her to HR. (DSOF ¶¶144, 145(c)-(e), 146(c)<br><br>Jillian reported that she felt accused by Mangels and felt Mangels "interrogat[ed]" her. (DSOF ¶145(c), (e).)<br><br>Jillian reported that Mangels told her that she had spoken to everyone else on the team and they denied reporting her. (*Id.*)<br><br>Sandler reported that Mangels directly accused her of reporting her in an intimidating and angry manner. (DSOF ¶¶146(c).)<br><br>Sandler reported that Mangels told her she had asked her entire team who reported her. And she sent Carrie a text stating Mangels: "***…just grilled her team asking who told and then she came in here and accused me." (DSOF ¶146(c); AMC 52, ex. B.)*** |
| Mangels did not make a post on LinkedIn the week before the layoff referencing work. She did admit to deleting the post. (DSOF ¶148(c).) | Trotter reported seeing a post on Mangels' LinkedIn® page on August 16 stating something to the effect of: "Ever feel like there's a lot going on behind the scenes at work … focused." Trotter told AMC she tried to go back and take a screen shot of the post after the layoffs and saw Mangels had deleted the post. |
| Mangels' discussion with Sandler on September 21 was "super casual.". (DSOF ¶148(d).) | Sandler described the encounter as Mangels "let me have it," Mangels was "mad," "pointed in her words," and she used "exaggerated motions." Sandler's version was confirmed in a text to Trotter. (DSOF ¶¶146(c), AMC Ex. 52, Ex. B.) |

Mangels does not (and cannot) dispute that there were material differences between what she told AMC during its investigation and what other witnesses told AMC. Mangels' self-serving denials are each uncorroborated. In sharp contrast, <u>multiple</u> witnesses (and text messages) corroborated the information that directly contradicts the story Mangels told AMC. Mangels offers

no evidence of bias by any witness, nor does she even infer that AMC had any basis to believe any witness (let alone multiple witnesses) were lying. There is no evidence that any of the witnesses had been disciplined or engaged in dishonest behavior prior to (or even after) the investigation. Conversely, it is undisputed that Mangels had been formally disciplined for not being forthright in an internal investigation and misusing AMC business expense just one year prior (and Mangels admits she did lie to AMC during its 2018 investigation). (DSOF ¶¶88, 89, AMC Ex. 45.) Mangels has not come forward with any evidence that this finding by AMC was anything but honest and reasonable.

**Finding #4: Mangels failed to acknowledge that anything she did was inappropriate, or at a minimum, was misguided.**

Not only was AMC's finding reasonable and honest, <u>it is not disputed by Mangels</u>. Even with the benefit of hindsight and reviewing the evidence establishing how employees were impacted by her conduct/statements, Mangels continues to deny any poor judgement or inappropriate behavior.

Mangels has failed, as a matter of law, to come forward with probative evidence of pretext. With no evidence to discredit AMC's findings informing its decision to terminate, and none to support an inference that the real reason for AMC's decision was "but for" retaliatory bias, Mangels cannot demonstrate pretext and AMC is entitled to summary judgment on Count II and IV of Mangels' First Amended Complaint.

## IV. Summary Judgment is Appropriate on Mangels' Wage Discrimination Claims

### A. The EPA Requires – "Emphatically" – *Equal,* Not "Similar," Work

Mangels "has the burden of establishing that [her position and those of her alleged comparators] involve *equal* work." *McLaughlin v. Esselte Pendaflex,* 50 F.3d 507, 513 (8th Cir. 1995) (citing *Corning Glass Works v. Brennan*, 417 US 188 (1974)) (emphasis supplied). The

standard is not, as Mangels asserts in her Opposition,[20] "substantially similar" work. *Id.* The "focus of the equal work inquiry is 'on the congruity and equality of actual job content between the plaintiff and comparator.'" *Chiaramonte v. Animal Med. Cent.,* 677 Fed. Appx. 689, 691 (2d Cir. 2017) (citations omitted).[21] It is *not* on whether a plaintiff and alleged comparator have common goals, share "responsibility" for the success of the same initiative or goal, or "collaborate" with one another to achieve corporate objectives.

For example, in *Horn vs. University of Minn.,* 362 F.3d 1042 (8th Cir. 2004), a university hired two assistant coaches for a hockey team. Both coaches were hired under the same job posting, both "shared a number of basic duties of organizing daily practices and developing game plans," both "expended equal amounts of time and effort," and both shared responsibility for the ultimate success of the team. 362 F.3d at 1044-45. However, the university assigned some different tasks to each coach. One had responsibility for organizing team travel, maintaining ties with a booster club, and maintaining a database of recruits. *Id.* at 1044. The other was responsible for coordinating with the conditioning staff, preparing game videotapes, and *evaluating* potential recruits. The two assistants each played a role in recruiting, and they shared duties for practice and game plans; however, the 8th Circuit readily concluded that their different discrete tasks rendered their positions "unequal" for purposes of the EPA. *Id.* at 1046. *See also EEOC v. Universal Underwriters Ins. Co.,* 653 F.2d 1243, 1248 (8th Cir. 1981)(court must look at entire job content; overlap in "segments" of the job is insufficient).

---

[20] Mangels' Opposition, Doc. 111 at 269.

[21] As noted in AMC's moving papers, courts in the Eighth Circuit look to the large body of Second Circuit EPA jurisprudence when assessing EPA cases. *See* Doc. 94 at 71, n. 49. Mangels does not claim to the contrary.

Similarly, in *Chiaramonte v. Animal Med. Center,* the plaintiff and her putative male comparators were (as in this case) head of their respective departments at an animal medical center. The court acknowledged that, as department heads, the positions in question "share some common responsibilities," but because each department had a particular specialty or focus area, the plaintiff and her comparators did not perform "equal work." 677 Fed. Appx. at 691-92.

"From the first, the EPA concerned equal pay for – emphatically – equal work. To that end, Congress rejected statutory language encompassing 'comparable work'…." *See EEOC v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 244 (2d Cir. 2014). *Sharing* duties, such as the coaching duties shared in *Horn,* isn't the standard. Much less so is it relevant those two employees "collaborated" or "worked together" to achieve broad corporate objectives. It is the *functions* performed by Mangels, Pursell, and Kim that matter. Mangels' Opposition confirms that they did not perform the same functions. Mangels' team did the marketing; Kim's team generated the business from movie studios; and Pursell's team operated the food and beverage business.

### B. Mangels' Opposition Confirms that She and Her Handpicked Comparators did not have the Same Functions

Mangels was a vice-president of Marketing. She and her team provided the marketing components for AMC's products and services, like food and beverage, and she "supported" Kim's efforts to monetize AMC's screens and other theater assets. *Mangels does not claim to the contrary,* and her prolix protests that she, Kim, and Pursell, "collaborated" and communicated with each other do not render these jobs "emphatically equal."

*The Unique Role of Each Vice-President.* The record shows that each AMC vice-president leads an organization with a unique set of responsibilities, that no two vice-presidents have the same set of functions, and AMC's shareholders expect it to staff efficiently its officer positions. (DSOF ¶7.) Mangels does not controvert these facts.

34

Similarly, Mangels does not controvert AMC's Statement of Fact 19, supported by sworn testimony by AMC's senior HR official, that each vice-president has a unique set of responsibilities tailored to their position and their KPMs. Instead of controverting this statement, Mangels changes the subject. Vice-presidents, she says, must collaborate and communicate with one another "across functions;"[22] they are not "independent silos." She should therefore receive an "inference," she suggests, that they perform the same work. But Mangels cannot create a fact question regarding whether each vice-president has unique responsibilities by repeatedly noting that AMC expects its business development team (Kim), food and beverage operations team (Pursell) and marketing team (Mangels) to work together. It is *Mangels* who "has the burden of establishing that the positions involve *equal* work," not simply that their occupants "collaborate" "across functions." *McLaughlin,* 50 F.3d at 513. She has failed to do so here.

*Rob Kim.* The record shows that Kim was responsible for sales/business development and the company's relationship with 15 movie studios. (DSOF's ¶30.) His job was to propose new agreements with studios under which the studios would pay AMC for various services, and then negotiate those agreements to execution. *Id.* The largest portion of this job – which Kim estimates comprised up to 90% of his work – was negotiating studio payments for movie trailers. *Id.*; AMC's Response to PSOF ¶485.) Mangels *admits* that she did not negotiate trailer contacts with movie studios. (Doc. 111, at 33.) As a matter of law, then, Kim's position is not equal to hers. Even if the *rest* of Mangels' job were identical to Kim's (it is not; see below), the fact that Kim had additional or different duties renders their positions *un*equal. *McLaughlin,* 50 F.3d at 513 (additional duties performed by alleged comparable render positions unequal); *Horn,* 362 F.3d at 1044, 1046

---

[22] *See, e.g., PSOF ¶107, in which she states that "cross-functional members collaborate on many aspects of the business." (Doc. 111, at p. 185.)

(coaching positions not equal, despite sharing duties for practices and game plans, when two positions had different additional duties).

The point is underscored by Mangels' own self-created job description that she prepared once she began supporting Kim's group in April 2018. (Doc. 94, Ex. 9.) In this document, Mangels states the unremarkable: as a marketing vice-president, she provides "strategic *marketing* plans" in support of Kim's film/programing group. *Id.* Moreover, she does so with only 35% of her time. *Id.* Mangels does not claim otherwise. She does not, and could not, deny that Kim was responsible for pitching and negotiating the contracts while Mangels was responsible for the marketing. Rather, she intones that her team and Kim's team had "weekly meetings" and collaborated in achieving the company's objectives. No doubt, they did, just as the coaches in *Horn* collaborated (*e.g.,* one maintained the database for recruits; one evaluated the recruits). But, just as in *Horn,* that does not render Mangels' job and Kim's job equal under the EPA. It proves them *un*equal. The Court should grant AMC summary judgment on Mangels' claim that she and Kim held "equal" positions.

*Michael Pursell.* Mangels' proffer of Pursell as a comparable fares no better. Mangels admits in an audio recording she made that she and Pursell have "different" responsibilities. (DSOF ¶29.) He was responsible for the "operational strategy" and she was responsible for the "marketing strategy." *Id.* AMC's Statement of Fact 23 notes that Mangels was *not* responsible for food and beverage operations. And while Mangels purports to controvert this paragraph, nowhere in the 24 single-spaced dense paragraphs of her Opposition does she claim she *did* have responsibility for food and beverage operations. (Doc. 111, at pp. 33-40.) In fact, despite 24 paragraphs of opportunity to do so, she does not even mention food and beverage operations. *Id.*

While Mangels has not properly controverted Defendant's Statement of Fact 23, she *has* asserted that her team and Pursell's team "directly collaborated" and "had weekly meetings." (Doc. 111, at 277.) She notes that she and Pursell "travelled together" and repeats (22 times) that her team and Pursell's had "ongoing interaction." (Doc. 111, at 279.) These facts are neither surprising nor relevant to the EPA analysis.

To the contrary, the record shows conclusively that her team was responsible for marketing support of Pursell's group (and others), not the functions actually being performed by Pursell's group. On a recording, Mangels told AMC:

> A: So I work with food and beverage, the programming promotions team a lot and other cross functional groups on almost all of our projects. . . . So I would say there is a lot of collaboration on the different projects.
>
> Q. Okay.
>
> A. Our role is to help inform some of those and then how to bring them to life and *do the marketing* and packaging and things like that.

(Doc. 94, Ex. 44 at 26:15-27:16.)

Pursell agrees. He describes three separate functions related to the food and beverage business: "F&B [his group], the F&B marketing [Mangels' group], and the supply chain [a function performed by another female VP]." (P's Ex. 24 at 16:5-17:12.) "Tonya was my partner in this . . . because of the marketing piece of it, where I managed more of the – kind of the operations side of it and how it's going to work and connect with operations…." (P's Ex. 24 at 52:4-54:2.)

Mangels admits that she and Pursell had different duties. She does not deny that she did not have responsibilities for operations, but she admits, repeatedly, that her role was to "do the marketing" for Pursell's group, which had responsibility for operating the food and beverage business. Pursell concurs. There is no question of fact; Mangels and Pursell had different functions

and different actual job content. Their positions were not emphatically equal.[23] The Court should grant summary judgment.

### C. Mangels' Authority Does Not Prevent Summary Judgment

As with Mangels' voluminous statements of fact, the cases upon which she relies are notable for what they do *not* say. None of the authority she invokes purports to support her premise that corporate officers responsible for different functions become "equal" for EPA purposes when they collaborate on a corporate project or initiative.

Mangels relies most heavily on *Grover vs. Smarte Carte Inc,* 836 F.Supp.2d 860 (D. Minn. 2011), but it does not support her argument. In *Grover,* the court found the plaintiff carried her burden to show equal work because the plaintiff and her proffered comparators (1) had "employment agreements [that] contain[ed] nearly identical job descriptions," (2) they all had the same supervisors, and they each (3) had responsibility for the company's development of "business strategy and business expansion." *See id.* at 866-67. In other words, the employees in question in *Grover* performed the same job, albeit for different geographic areas.

That is not the case here. Mangels and her comparators do not have the same job in different geographic areas (nor did they have the same supervisors). She was not, for example, VP of Sales – West Coast while her comparator is VP of Sales – East Coast. She is, uncontrovertibly, responsible for an entirely different function (marketing) than her putative comparators (business development, food and beverage operations). The only "overlap" between Mangels' job and those of Pursell and Kim is that they each played different roles around the same corporate objectives

---

[23] Notably, Mangels does not claim that Pursell and Kim perform equal work relative to one another – something that would necessarily be true if they both perform equal work relative to her. And there is no dispute at all that Kim, who was responsible for movie studio relationships and developing additional lines of revenue from those studios, did not perform the same work as Pursell, who was responsible for food and beverage operations.

held by every for-profit corporation in the United States: generating revenue. And even if they had *true* overlap in job functions (they do not), Mangels admits that Kim and Pursell had *different* (i.e. additional) responsibilities than she did – an undisputed fact that is dispositive under *Horn*. The Court should grant AMC's Motion.

### D.  Mangels Has Not Rebutted AMC's "Reasonable Factor Other Than Sex" Defense

AMC is entitled to summary judgment on its reasonable factor other than sex defense. Even if Mangels had carried her burden of showing that she, Kim, and Pursell performed equal work (she has not) she would still have to overcome AMC's reasonable factor other than sex defense. *See, e.g. Taylor v. White,* 321 F.3d 715 (8th Cir. 2003). She has not done so here.

Courts interpret reasonable factor other than sex defenses "broad[ly]." *Id.* at 717-18. AMC produced evidence that it values vice-president's roles based on the uniqueness of the skills necessary to perform the role, the difficulty of filling the position and the VP's performance history. (DSOF ¶32.) In response to this statement, Mangels offered 30 single-spaced paragraphs of prose about how AMC "failed" Mangels when she asked for a compensation increase. But Mangels nowhere suggests that AMC does not, in fact, value VP roles based on these factors, nor does she offer any evidence that her marketing role was equally hard to fill as the roles occupied by Pursell or Kim. Similarly, AMC's Statement of Fact 33 notes that AMC valued the job performed by Mangels differently because experience in the discipline of marketing is more easily obtained on the job market than experience in the area of food and beverage operations and film studio business development. Again, Mangels does not offer contrary evidence, but rather reverts to her story that she and her team collaborated with Kim and Pursell's teams with the goal of obtaining corporate aims – the same argument she deploys in an attempt to establish "equal work." But the Court need only evaluate a reasonable factor other than sex defense if it has concluded that

Mangels has met her burden of establishing that the work that she and her comparators perform is "equal" under the EPA. To overcome the defense, Mangels must do more – she most show that there is evidence AMC *really* evaluated Mangels', Kim's, and Pursell's positions equally. *See Kindred v. Northome/Indus. Sch. Dist. No. 363,* 154 F.3d 801, 803-804 (8th Cir. 1998) (*McDonnell Douglas* burden-shifting applies to EPA claims). She has not done so here.

In evaluating a reasonable factor other than sex defense, courts may not assess "the wisdom or reasonableness of" the factor, *Taylor,* 321 F.3d at 719, nor do they "engage in a subjective assessment of the [employer's] decision to value the duties of [putative comparator positions] differently." *Horn,* 362 F.3d at 1046. Mangels plainly strongly believes that her work was just as unique and just as important as that performed by Pursell or Kim. But even if the Court were to sympathize with her position, what matters is how AMC viewed the skills necessary to perform Mangels' job and AMC's assessment of the ease of replacing those skills on the job market, not whether Mangels, or anyone else, would assess the market differently. AMC is entitled to summary judgment on this defense.[24]

**E.    AMC is also Entitled to Summary Judgment on Mangels' Title VII Wage Claim**

Mangels urges denial of AMC's request for summary judgment on her Title VII compensation claim based on one legal defense and one factual defense. Neither have merit.

First, Mangels claims that a Title VII plaintiff pursuing a claim for discriminatory compensation under a disparate treatment theory – as she does here – need not offer evidence of

---

[24] Nor has Mangels offered evidence that her performance history did not actually negatively impact her compensation level. To the contrary, before she abandoned her Title VII claims not related to compensation, she complained about that very thing. Discipline is a reasonable factor other than sex. *See, e.g., McLaughlin,* 50 F.3d at 513. Mangels' failure to offer evidence that her compensation was *not* affected by her disciplinary history – indeed, her *acknowledgment* that it did – is an additional reason to grant AMC's Motion.

intentional discrimination. (Doc. 111, at 333.) According to Mangels, one need only offer evidence of intent when she is claiming she was paid less than that which she deserves because she is female and there *are* no comparably situated males. *Id.* But this is not the law. While it is correct that courts use the same standards to determine whether a plaintiff has established that she and a comparator are performing "equal work on jobs the performance of which requires equal skill, effort and responsibility" under both Title VII and the EPA,[25] a plaintiff seeking to invoke Title VII, and the non-pecuniary damages it affords, must also offer evidence of what every other Title VII plaintiff must offer: <u>intent</u>.

In *Kindred v. Northome/Indus. Sch. Dist.*, 154 F.3d 801 (8th Cir. 1998), a female bus driver brought claims under both the EPA and Title VII asserting she was paid less than male bus drivers. The 8th Circuit explained that both statutes employ the same standards to assess whether a plaintiff and a comparator are performing "equal work," but then noted that a plaintiff seeking to assert a Title VII compensation claim must *also* satisfy the familiar Title VII burden-shifting framework. 154 F.3d at 803-804. And when such a plaintiff fails to offer evidence that *intentional* discrimination was the motivating factor for the compensation difference, the defendant is entitled to summary judgment. *Id.* at 804.

The plaintiff in *Kindred* identified male comparators, yet the court still assessed evidence of intent to evaluate the Title VII claim. *Id.* Similarly, in *Bauer v. Curators of Univ. of Missouri,* 680 F.3d 1043 (8th Cir. 2012), the plaintiff, a female nurse, identified a more highly paid male nurse as an alleged comparable and asserted claims for compensation discrimination under both Title VII and the EPA. The 8th Circuit noted that while gender discrimination claims may be

---

[25] Hence, if a plaintiff fails to show that she and an alleged comparator are performing "equal work" under the EPA, her claim also fails under Title VII. *See, e.g., Buettner v. Arch Coal Sales Co.,* 216 F.3d 707, 719 (8th Cir. 2000).

brought under both Title VII and the EPA, "the laws differ." 680 F.3d at 1045. The EPA does not require a showing of intent, Title VII does.[26] *Id.*

Mangels has not offered genuine evidence that AMC intended to discriminate against Mangels based on her gender. Instead, she complains that her boss "disregarded" her requests for an evaluation of her compensation because she did not receive the salary increase she sought. According to Mangels, if she did not *receive* her requested pay increase, then AMC *must* have intended to discriminate against her *because she is a woman.* But she offers no evidence to support this inference. She does not, for example, assert that *men* made such requests and they were always approved. Nor does she offer any other circumstantial evidence that would support such an inference. In fact, she notably has *abandoned* her claims that AMC's managers intentionally discriminated against her because she was a woman in connection with the discipline she received and her termination, presumably because the record is so clear that her managers advocated on her behalf and sought to provide her with additional opportunities. The record reflects, then, the *absence* of any intent by AMC to discriminate against Mangels *because* she is a woman.

---

[26] The Eighth Circuit in *Kindred* states the obvious: absent direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies to Mangels' Title VII wage discrimination claims – even when asserted alongside EPA discrimination claims. Like her retaliation claims, Mangels does not identify any "direct evidence" in support of her Title VII wage discrimination claims. "Direct evidence" is a comment from a decision maker linking the protected class (here, female) to an alleged adverse employment action (here, making less than two hand-picked comparators) sufficient to reflect the bias of the decision maker. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011) (citing *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017–18 (8th Cir.1999)). Mangels identifies only one comment in her Opposition – her secretly recorded statement of Chavarria referencing "getting hit with Equal Pay Act claims." But Mangels does not claim this is "direct evidence" of bias; nor could she. To qualify as direct evidence, the comment would have to relate to her specifically *and* be indexed to her own compensation. *See id.* at 1046. Chavarria's comment, which she explained at deposition as relating to the prevalence of equal pay claims against companies *in general,* is not the equivalent of saying "you are being paid less because you are female." Because Mangels has not presented direct evidence of pay discrimination, burden shifting applies and she is obligated to offer evidence of pretext.

While Mangels has not offered evidence, circumstantial or otherwise, that AMC paid Mangels less *because* she was a woman, AMC has offered evidence illustrating the *absence* of such intent. Plaintiffs frequently offer evidence of what an employer pays other employees who are also female to support an inference of gender-related animus. Mangels is not the only female VP who worked for AMC, and if her theory of intentional compensation discrimination *because she is a woman* were true, then evidence of the compensation of other women compared to men is highly probative. But Mangels offers no such evidence for good reason – it reflects that there are no meaningful differences between male and female VP compensation at AMC. (*See* D's Ex. 6.) Indeed, there are many instances of women making more than male VPs. *Id.* This is highly relevant evidence. The *only* evidence probative of an intent to pay female VPs, like Mangels, less than alleged male comparators shows its complete absence.

Mangels must offer evidence of intent. She has not. And the only evidence that might reflect a bias against female VPs in connection with compensation shows that there is nothing of the kind. But even if the Court were to conclude that Mangels had offered some evidence of intent, she must still "present evidence that the employer's reasons are pretextual." *Bauer,* 680 F.3d at 1045.

In its moving papers, AMC offered legitimate non-discriminatory reason for Mangels' compensation level: each VP at AMC has a unique set of responsibilities and because AMC valued the unique marketing function differently than other functions, in large part because the skills necessary to perform the job are more fungible and easy to replace, AMC paid Mangels differently than it paid Pursell and Kim. (DSOF ¶¶32, 33.) Mangels must, therefore, offer evidence of pretext. But she nowhere asserts that AMC *truly* believed her job function should be paid more highly than it was, or that AMC did not *actually* believe that it was less difficult to staff the type of marketing

43

position Mangels held. In fact, **Mangels does not even mention pretext in the portion of her Opposition discussing her claims of Title VII compensation discrimination**. Instead, she relies upon her erroneous argument that she does not have to prove intent (and hence pretext) to prevail.

Mangels was obligated to offer evidence of pretext. She has not done so. The Court's analysis could end there. But even if the Court were inclined to review some of the claims she makes in other portions of her Opposition to search for evidence of pretext, it would conclude summary judgment is appropriate.

First, while she does not offer it as evidence of pretext, Mangels suggests that a report issued by a third-party compensation consultant, Aon, "determined that Tonya was being underpaid." (Doc. 111, at 301.) **But that is not what the uncontroverted facts show.**

The record shows that this was a report from Aon regarding the compensation range afforded to a job with similar duties that was contained in its library of positions. (AMC's Response to PSOF ¶ 280.) It was not an assessment of what Mangels' position "should be paid at AMC." To the contrary, the only evidence in the record shows that AMC did not believe this report reflected the appropriate compensation for Mangels. AMC's Director of Compensation testified that the Aon report did not reflect AMC's view of what it would "need to pay that position." (*Id.*) Rather, the report reflected only one data point among a series of considerations regarding how AMC "need[ed] to level set that role within our organization . . . how it should fit within our organization." (*Id.*) Adam Aron, too, testified that the Aon report was inconsistent with how AMC viewed the position. (AMC's Response to PSOF ¶ 280.)

The fact that a third-party compensation consultant concluded that a job similar to that in its inventory of positions would be paid more at other companies does not suggest that AMC's legitimate, non-discriminatory reasons for Mangels' compensation are pretextual. To the contrary,

AMC's reasons for not simply paying Mangels the compensation associated with a marketing job in Aon's inventory are the *same* reasons it identifies here – marketing skills like those possessed by Mangels are more common than those possessed by others, and AMC did not view the marketing function the same as it viewed those functions performed by other VPs. *All* of the evidence illustrates that AMC saw the Aon report as one data point regarding compensation, and that it gave that point very little weight. Mangels has offered no evidence to the contrary. She has not, for example, offered evidence that AMC outsourced its compensation decisions to Aon, or that it set other VPs' compensation based exclusively on a report from a third party about jobs performing similar functions at other companies. Because she has offered no evidence that AMC's assessment of the value of the Aon report is unworthy of credence, the Aon report is not evidence of pretext.[27]

To survive summary judgment on her Title VII compensation discrimination claim, Mangels must offer evidence of intent, and she must offer evidence that AMC's non-discriminatory reasons for paying her less than the alleged comparators are pretexts. She has not done so. Nor do her other sundry allegations about AMC's compensation process undermine AMC's legitimate reasons for paying her differently than her comparators. The Court should grant AMC summary judgment on Mangels Title VII compensation claims.

---

[27] Mangels also mischaracterizes the record to suggest that a comment captured by Mangels' secret recording of a conversation including AMC's SVP of HR, Carla Chavarria, about the prevalence of pay equity claims somehow supports her claims here. But Chavarria explained this statement under oath by noting that she was referring to the prevalence of compensation claims in general, not the frequency of such claims at AMC. And while Mangels does not offer this statement as evidence of pretext, it would not serve in that capacity if she had. Mangels does not explain how the general statement that employees in the U.S. in general are asserting EPA claims undermines AMC's legitimate, non-discriminatory reason for paying Mangels less than Kim and Pursell.

## CONCLUSION

For the reasons stated above and its previously submitted Suggestions in Support of its Summary Judgment Motion, Defendant AMC requests that the Court enter summary judgment in its favor on all claims asserted in the Complaint, and award any other appropriate relief.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ *Kerri S. Reisdorff*
Kerri S. Reisdorff    MO #51423
Chris R. Pace    MO #47344
Michael L. Matula,    MO #47568
AnnRene Coughlin    MO #67962
4520 Main Street, Suite 400
Kansas City, MO 64111
(816) 471-1301
(816) 471-1303 (*Facsimile*)
kerri.reisdorff@ogletree.com
chris.pace@ogletree.com
annrene.coughlin@ogletree.com
michael.matula@ogletree.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 30th day of September, 2021, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Chad C. Beaver
Beaver Law Firm, LLC
1600 Genessee Street, Suite 920
Kansas City, MO 64102
(816) 226-7750
(816) 817-0540 (*Facsimile*)
cbeaver@beaver-law.com

**ATTORNEY FOR PLAINTIFF**

/s/ *Kerri S. Reisdorff*
**ATTORNEY FOR DEFENDANT**

48752039.2

46