# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

TONYA MANGELS,             )
)
          Plaintiff,      )
    v.                        )         No. 19-00834-CV-W-BP
)
AMERICAN MULTI-CINEMA, INC.,  )
)
          Defendant.   )

## <u>ORDER DENYING MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, a former Vice President for Defendant American Multi-Cinema, Inc. ("AMC" or "Defendant"), has filed suit asserting claims of disparate pay and retaliation. Pending is Defendant's Motion for Summary Judgment. (Doc. 93.) For the following reasons, the Motion is **DENIED**.

## I.  BACKGROUND

The Court concludes that there are disputed issues of material fact that preclude entry of summary judgment on the claims Plaintiff intends to pursue. Because a jury must resolve the factual disputes, the Court will not detail all the evidence; instead, it will briefly summarize relevant facts in the light most favorable to Plaintiff and provide citations to the Record only as necessary.[1]

Plaintiff began working for AMC as a Director in the Marketing Department in 2009. From 2010 through the end of her employment, Plaintiff's direct supervisor was Stephen Colanero, who was Defendant's Chief Marketing Officer. Colanero promoted Plaintiff to Vice President in 2013. Throughout her time as a Vice President, Plaintiff repeatedly requested that she be reviewed for a

---

[1] Because the Court is viewing the Record in the light most favorable to Plaintiff, the Court's description of the evidence should not be construed as findings of fact.

compensation increase, believing that she was paid less than similarly situated male Vice Presidents. For purposes of this suit, Plaintiff has limited her pay-related claims to a comparison of her pay to two male Vice Presidents: Michael Pursell and Robert Kim. (Doc. 105, p. 8.)[2]

At various times, Plaintiff served as the Vice President of: (1) Product Marketing, (2) Marketing – Food and Beverage and Brand Strategy, and (3) Food and Beverage Marketing. These jobs required, at minimum, a bachelor's degree in marketing or a related field; Plaintiff has a bachelor's degree in business/public relations, and a master's degree in marketing. In addition to holding varying titles, Plaintiff's responsibilities grew and changed throughout her time at AMC. In 2013, Plaintiff assumed responsibilities related to AMC's efforts to grow its alcohol revenues and transition to digital signage; in 2014, she assumed additional marketing responsibilities and received an award for going "above and beyond"; in 2015 and 2016, she assumed responsibilities related to AMC's acquisition of two other cinema companies, and in 2016, she helped handle a major shift in vendors. During her final three years at AMC, Plaintiff was at least partly responsible for increasing food and beverage product revenue, revamping AMC's menu, implementing a mobile ordering option, and various promotional efforts. The number of individuals who directly reported to Plaintiff also consistently increased during her time at AMC.

One way AMC measures its officers' performance is "Key Performance Metrics," or KPMs. Typically, each officer wrote his or her own KPMs and targets; Plaintiff is unaware of any standard format for identifying or phrasing KPMs. (Doc. 105-10, ¶¶ 169–70.) While Plaintiff was a Vice President at AMC, no Vice President had the exact same job title or KPMs. This is in part because AMC uses a "matrix structure" for many of its departments, which requires the heads of those departments to engage in "cross-functional" work with other departments to execute large

---

[2] Unless otherwise indicated, all page numbers are those generated by the Court's CM/ECF system.

projects. While Plaintiff was at AMC, several Vice Presidents had "cross-functional" responsibilities that significantly overlapped with Plaintiff's, and who performed work substantially similar to Plaintiff's; these include Plaintiff's alleged comparators, Pursell and Kim.

Pursell served as a Vice President of Food and Beverage at AMC between 2015 and 2020. That position required, at minimum, a bachelor's degree in business; Pursell had a bachelor's degree in Marketing, an associate's degree in culinary arts, and an MBA. There was a "tremendous amount of collaboration" between Pursell and Plaintiff due to their overlapping responsibilities. (Doc. 105-24, p. 15 (Pursell Dep., p. 50).) For instance, Pursell and Plaintiff together headed an initiative to allow AMC patrons to order food and beverages via a mobile app, and jointly presented the initiative's progress on several occasions. (*Id*. at pp. 15–17 (Pursell Dep., pp. 52–59).) Plaintiff and Pursell also collaborated extensively on "Feature Fare," an effort to revamp AMC's food and beverage menu. (*Id*.) The two also jointly negotiated contracts with food and drink vendors. (*Id*. at pp. 17–18 (Pursell Dep., pp. 59–65).) In the course of collaborating on these initiatives, Plaintiff met with Pursell several times a week, and also often had discussions with Pursell's supervisor and members of his team.

Kim served as a Vice President of Programming Promotions between 2016 and 2019. This position required a bachelor's degree, and Kim has a bachelor's degree in history. Kim's main responsibility was handling relationships with major film studios. Kim and Plaintiff collaborated extensively on new marketing initiatives for AMC; Plaintiff's team would develop new promotions, and then Kim and Plaintiff would meet with studio executives to get feedback on the promotional ideas. (Doc. 105-43, p. 14 (Kim Dep., pp. 47–48).) Plaintiff routinely met with Kim himself and members of his team, and their teams jointly met with significant film studios on multiple occasions. (Doc. 105-10, ¶¶ 160–63 (Mangels Dec.).)

3

Pursell did not believe his role was more important than Plaintiff's, or vice versa. (Doc. 105-24, p. 8 (Pursell Dep., p. 24).) Neither did Kim. (Doc. 105-43, p. 10 (Kim Dep., pp. 30–31).) Pursell directly supervised between six and eight subordinates for the first part of his tenure at AMC, and two to three for the second part, and Kim directly supervised between one and three subordinates. Plaintiff supervised between one and eleven subordinates during her time at AMC; the number consistently grew throughout Plaintiff's tenure.

Defendant performs some sort of annual review of how its employees are paid, but the details of the review process are unclear and contested. (*See, e.g.,* Doc. 98-1, p. 9 (Chavarria Dep., p. 93).) Additionally, Defendant has a "Compensation Department," which plays a role in determining the compensation for specific positions within the company; the Director of Compensation was Michael Giuseffi. If an employee wishes to request a compensation increase, she must typically raise the issue with her immediate supervisor, who will then consult with the Compensation Department to evaluate the request based on the scope of the employee's position. (*Id.*) However, according to Defendant's CEO, Adam Aron, if the employee at issue is a Vice President or higher, Aron himself must approve any compensation increase to that employee. (Doc. 105-8, p. 7 (Aron Dep., pp. 30–31).) Overall, compensation decisions for high-level employees appear to result from collaborative and ongoing discussions involving (1) the Compensation Department, (1) the employee's supervisor (for Plaintiff, Stephen Colanero), (3) the supervisor of the employee's supervisor (who, in Plaintiff's case, was Aron), and (4) Carla Chavarria,[3] AMC's highest-ranking human resources employee. (*See* Doc. 98-56, pp. 6–8 (Giuseffi Dep., pp. 19–21).)

---

[3] Chavarria's last name was, at some point, "Sanders," and the record contains numerous references to "Carla Sanders." (*E.g.* Doc. 98-48.) Carla Sanders and Carla Chavarria are the same person.

In 2016,[4] Plaintiff received a base salary of $143,500, a bonus of $43,050, and an equity incentive of $39,287, for a total of $225,837. In 2017, she received a base salary of $153,500, a bonus of $46,050, and an equity incentive of $60,000. In 2018, she received a base salary of $156,570, a bonus incentive of $46,950, and an equity incentive of $80,000. In 2019, she received a base salary of $159,701, a bonus of $47,900, and an equity incentive of $80,000. (Doc. 105-10, ¶ 95 (Mangels Dec.).) Plaintiff's earnings were appreciably less than Pursell's and Kim's. Accounting for all compensation components, Pursell made $109,550 more than Plaintiff in 2016, $155,093 more than Plaintiff in 2017, $138,313 more than Plaintiff in 2018, and $144,598 more than Plaintiff in 2019. (Doc. 105-24, pp. 9–10 (Pursell Dep., pp. 28–31).) For his part, Kim made $87,340 more than Plaintiff in 2016, $103,406 more than Plaintiff in 2017, $85,978 more than Plaintiff in 2018, and $88,201 more than Plaintiff in 2019. (Doc. 105-55, p. 4.)

On March 12, 2018, Colanero mistakenly emailed Plaintiff a spreadsheet containing compensation data for all marketing department employees, including several other Vice Presidents whom Colanero supervised. Upon discovering that several Vice Presidents had higher salaries than she did, Plaintiff had several conversations with Colanero and Chavarria about the possibility of increasing her compensation, but despite their promises to review the matter, it does not appear that Colanero or Chavarria did so until November of 2018.

In early 2019, Giuseffi and the Compensation Department undertook a review of Plaintiff's role at AMC. (Doc. 98-56, pp. 9–11 (Giuseffi Dep., pp. 59–62).) The Compensation Department hired a third-party consultant called "AON" to assess Plaintiff's compensation relative to similar positions at other companies. (Doc. 105-37.) AON found that, among similar officers, the 25th percentile earned about $185,000 in base salary and a $52,000 bonus; the 50th percentile earned

---

[4] Plaintiff does not assert claims based on events before 2016.

about $230,000 in base salary and a $67,000 bonus; and the 75th percentile earned about $285,000 in base salary and a $86,000 bonus. (*Id.* at p. 6.) By contrast, at the time of the analysis, Plaintiff earned about $160,000 in base salary with a $48,000 bonus, placing her below the 25th percentile. (*Id.*) (The Court notes that, based on these categories, Pursell's compensation was within the 50th percentile, and Kim's compensation was between the 25th and 50th percentiles.) However, Giuseffe did not inform Colanero, Chavarria, or Aron about these results, and in fact, Colanero never reviewed the AON study. Plaintiff's compensation was not increased.[5]

On May 2, 2019, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Opportunities and Employment Commission ("EEOC"). (Doc. 105-38 (the Charge).) The Charge asserts, as relevant to this case, claims for violations of the Equal Pay Act and sex discrimination under Title VII. (*Id.* at p. 2.) The Charge identifies Colanero and Chavarria by name, and Colanero, Chavarria, and Aron were aware that Plaintiff had filed the Charge. It is unclear whether AMC ever conducted a formal legal investigation of the claims in the Charge; Chavarria was unaware of any such investigation. (Doc. 105-16, p. 60 (Chavarria Dep., pp. 232–33).) AMC and Plaintiff attended a private mediation regarding the allegations Plaintiff raised in the Charge on September 20, 2019, with Colanero representing AMC. (Doc. 105-2, pp. 92–93 (Colanero Dep., pp. 361–64).) The mediation did not resolve the dispute. (*Id.*)

---

[5] AMC commissioned two other pay studies. In 2017, an outside firm called Willis Towers Watson assessed AMC's procedures for ensuring that there are no pay equity issues. (Doc. 98-1, pp. 10–12 (Chavarria Dep., pp. 94–98).) The study found, generally, that there were no pay equity issues at AMC. (*Id.*) However, the Willis Towers Watson study was "done in the aggregate," and did not "specifically compar[e] one job to another." (Doc. 105-9, p. 10 (Giuseffe Dep., pp. 30–32).) After this lawsuit began, Defendant enlisted Janet Thornton, Ph.D., the managing director of the Berkeley Research Group, to perform a statistical analysis to determine whether men at AMC are generally paid more than women. (Doc. 98-6 (Dr. Thornton's report).) Dr. Thornton's report indicates that there is no statistically significant difference in pay between female and male Vice Presidents at AMC. (Doc. 98-6, pp. 8–9.) However, like the Willis Towers Watson study, Dr. Thornton did not directly compare Plaintiff's role and responsibilities to male Vice Presidents with comparable jobs.

Meanwhile, in August 2019, AMC commenced an investigation into Plaintiff's alleged misconduct in connection with a planned Reduction in Force, ("RIF").[6]  In summer 2019, Defendant announced to its senior leadership team that the company would be undergoing a reduction in workforce ("RIF") and instructed the team not to inform more junior employees except on a need-to-know basis.  Plaintiff was not on the senior leadership team, and Colanero did not tell her about the RIF before it occurred.  To this day, Colanero does not believe that Plaintiff knew about the RIF in advance.  (Doc. 105-2, p. 90 (Colanero Dep., p. 353).)  Nonetheless, Colanero received reports that one of Plaintiff's subordinates had been talking about possible layoffs, which led him to suspect that Plaintiff had discussed the RIF with her team.  (Doc. 98-4, pp. 79–80 (Colanero Dep., pp. 349–51).)  After the RIF was officially announced, Colanero met with Plaintiff and told her that Human Resources would investigate whether Plaintiff shared information about the RIF before it occurred.

Chavarria, and two other members of AMC's Human Resources department—Sharlynn Mutzbauer, and Mary Melton-Miller—interviewed several employees.  All of the interviewees told a similar story: that in a team meeting on August 14, 2019, Plaintiff was crying and made statements that led some of her subordinates to believe that there would be a round of layoffs in the near future.  (*E.g.,* Doc. 98-59, ¶ 3 (Melton-Miller Dec.) (interviewee heard from coworker that Plaintiff was "'teary' and visibly upset and that comments made by [Plaintiff] in the meeting

---

[6] During her time at AMC, there were at least two other investigations into alleged misconduct by Plaintiff.  The first of these investigations resulted from an accounting issue in 2015; although Plaintiff initially asserted a gender-based discrimination claim related to this investigation, in her opposition to summary judgment she formally abandons that claim.  (Doc. 105, p. 10.)  The second investigation occurred in 2018 and involved allegations of misconduct by both Plaintiff and Pursell.  Plaintiff has not presented an independent claim based on this investigation, and in light of the Court's holding, it is not necessary to discuss this investigation in detail.  Ultimately, both Plaintiff and Pursell received a "Final Disciplinary Warning" for their behavior.  (Docs. 94-45, 94-47.)  Both Warnings indicated that Plaintiff and Pursell "impeded the investigation by failing to provide forthright information," "engaged in inappropriate behavior," and undertook "concerning" travel expenses "due to increased travel with a peer."  (*Id.*)  Plaintiff's Warning also included charges of "over-indulging on alcoholic beverages at [] company functions" and making allegations of harassment and discrimination but "declin[ing] to provide pertinent details."  (Doc. 94-45, p. 2.)

had led two colleagues . . . to . . . express concerns about their jobs); Doc. 98-3, ¶¶ 24–30 (Chavarria Dec.); Doc. 98-60, ¶ 3 (Powers Dec.).)

On August 26, an employee reported to Chavarria and Mutzbauer that she learned from another employee that Plaintiff had "grilled her team" to determine who had informed Colanero that she had leaked the RIF information.  (Doc. 98-27, p. 13.)  Human Resources employees spoke to three additional individuals on August 27, all of whom indicated that, after the investigation had begun, Plaintiff had interrogated them trying to ascertain who had informed on her.  (Doc. 98-52, ¶ 17 (Sandler Dec.); Doc. 98-58, ¶ 3(e) (Blanner Dec.) ("[Plaintiff] asked me directly if I knew who reported her"); Doc. 98-61, ¶ 15 (Knippelmeyer Dec.) ("I also felt like [Plaintiff] was interrogating me to try to figure out if I reported her to Human Resources . . . .").)  Chavarria and Mutzbauer also interviewed Plaintiff twice, on August 26 and September 11; in both interviews, she generally denied sharing anything about the RIF to her team, but admitted that she had asked at least some members of her team whether they had "started the rumor" that she had discussed the RIF at the August 14 meeting.  (*See* Doc. 105-1, pp. 38, 42 (Mangels Dep., pp. 338–39, 353) (admitting that Plaintiff "asked Jillian if she had shared the information—if she thought that I said that and if she had shared the information with anyone else").)

There is evidence in the Record that there were widespread rumors about the RIF before it took place, and that several employees were concerned about losing their jobs.  (*E.g.,* Doc. 105-24, p. 27 (Pursell Dep., p. 101) (Pursell was concerned for his job, as were several of his subordinates).)  There is also evidence that several AMC executives discussed the RIF, in more or less definite terms, before it occurred—but no one else suffered any sort of investigation or punishment for these discussions.

On September 30, 2019, AMC terminated Plaintiff's employment. The reasons for the termination, according to Chavarria, were that Plaintiff had "led others in the organization to reasonably fear for their jobs," "interfered with AMC's investigation by questioning your team," and "provided misleading information to AMC during its investigation." (Doc. 98-62, p. 4 (transcript of meeting).) Plaintiff brought this case in October 2019, shortly after she was terminated. (*See* Doc. 1.)

As indicated earlier, in her opposition to AMC's Motion for Summary Judgment Plaintiff has narrowed the scope of some of her claims and clarified others. Plaintiff asserts the following claims against AMC:

- Count I asserts that AMC violated the Equal Pay Act, relying on Michael Pursell and Robert Kim as comparators.

- Count III asserts the same gender-based wage discrimination claim under Title VII.

- Counts II and IV assert that Defendant unlawfully retaliated against Plaintiff under the Equal Pay Act and Title VII, respectively, by terminating her employment.

(*See* Doc. 105, p. 2.)

## II. DISCUSSION

Summary judgment should be granted when—viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences—the record shows that there is no genuine issue of material fact." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (citing FED. R. CIV. P. 56(c)). "A fact is material if it might affect the outcome of the suit," and a genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (cleaned up; citations omitted). "The party opposing summary judgment cannot rest solely

on . . . [m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions," *Morgan v. A.G. Edwards & Sons*, Inc., 486 F.3d 1034, 1039 (8th Cir. 2007), but must instead point to evidence in the record demonstrating the existence of a factual dispute. FED. R. CIV. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10 (8th Cir. 2010). With these principles in mind, the Court turns to Defendant's with respect to each Count in turn.

### 1. Count I: Equal Pay Act Claim

To establish a *prima facie* case of wage discrimination under the Equal Pay Act, Plaintiff must show that "(1) she was paid less than a male employed in the same establishment, (2) for equal work on jobs requiring equal skill, effort, and responsibility, (3) which were performed under similar working conditions." *Dindinger v. Allsteel, Inc*., 853 F.3d 414, 422 (8th Cir. 2017) (citation omitted). If she makes this showing, Defendant may then avoid liability by showing that any differential in payment was made due to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id*. (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974) and 29 U.S.C. § 206(d)(1)).

### a. *Prima Facie* Case

It is undisputed that Plaintiff received less pay during all of the years in question than the two alleged comparators, Pursell and Kim. It is also undisputed that both men were, at all relevant times, Vice Presidents—just like Plaintiff—but that their precise job titles and performance metrics were different from Plaintiff's. Defendant's first argument to support summary judgment on this Count is that Plaintiff's work was not "equal" to the work performed by the alleged comparators. (Doc. 94, p. 80.)

10

Generally, two "jobs need not be identical to be considered 'equal' under the EPA; they need only be substantially equal." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002); *see also Lawrence v. CNF Transp., Inc.*, 340 F.3d 486 (8th Cir. 2003) (holding that two trade show specialists performed "substantially equal" work even though the plaintiff's comparator managed more accounts). Neither "job titles [n]or classifications" are dispositive for determining whether two individuals performed "equal work"; instead, "[a]pplication of the Equal Pay Act depends . . . on the actual requirements and performance of the job." *EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir. 1981). For example, two employees might have the same job title and "common core of duties," but if one of them performs significant "additional duties," their work may be unequal. *Simpson v. Merchs. & Planters Bank*, 441 F.3d 572, 577 (8th Cir. 2006); *see also Horn v. Univ. of Minn.*, 362 F.3d 1042, 1045–46 (8th Cir. 2004) (where a female hockey coach worked served as a public representative for the team and a male coach did not, the two coaches did not perform equal work). But for the same reason, a plaintiff can make out a *prima facie* case even when she does "not attempt to prove that she [and an alleged comparator] had the *same* job and that he had no additional duties," so long as she "prove[s] the jobs were *equal*" despite their differences. *Simpson*, 441 F.3d at 578 (emphasis added) (holding that an "Assistant Vice President" could use a "Vice President" as a comparator even though the two had somewhat different backgrounds and responsibilities).

"Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case." *EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir. 1981). Moreover, "the overall job, not individual segments of the job, determine whether two groups of employees perform substantially equal work." *Id.* at 1248. "[I]nsubstantial or minor differences in the degree or

amount of skill, effort, or responsibility" do not render two jobs substantially unequal for purposes of the Equal Pay Act. *Hunt*, 282 F.3d at 1030 (citations omitted) (holding that the plaintiff's former supervisor was a valid comparator despite even though he "performed supervisory responsibilities which [the plaintiff] never performed"). In evaluating the substantial equality of two jobs, a factfinder may consider "factors such as level of experience, training, education, ability, effort, and responsibility." *Id*. Because this is a fact-intensive determination, it is often impossible to decide as a matter of law that two jobs are not "substantially equal," *id*.; thus, a jury must often decide the issue, and in fact, there is a detailed model jury instruction on the subject. *See* Eighth Circuit Model Jury Instructions (Civil) 7.20 (defining "substantially equal").

Defendant argues that Pursell and Kim—the comparators Plaintiff has identified—did not perform "substantially equal" work to Plaintiff as a matter of law. (Doc. 94, pp. 81–83.) Specifically, Defendant contends that Plaintiff's main role throughout her tenure as Vice President was "directing the creation and overseeing implementation of marketing programs for AMC's food and beverage brands and AMC's dine-in theatre concepts." (*Id*.) Pursell, by contrast, was "responsible for AMC's food and beverage operations and financial performance," which included "customer experience with food and beverage products." (*Id*. at p. 82.) And Kim was responsible for "business development and shaping AMC's relationship with over 15 movie studios." (*Id*. at pp. 82–83.) Because each Vice President at AMC had unique responsibilities, Defendant contends that they cannot have performed "equal work." (*Id*. at pp. 85–86; *see also* Doc. 115, pp. 40–41.)

The Court disagrees with Defendant's analysis. As Plaintiff points out, AMC has chosen to create different Vice President positions for different areas of its business, such that *no* two Vice Presidents share identical job titles or KPMs; in fact, because each Vice President writes his or her own KPMs, even if two Vice Presidents had extremely similar jobs, they might conceptualize them

12

differently, resulting in differently-worded KPMs. (Doc. 105, p. 273.) However, two Vice Presidents with different job titles may, for a period of time, engage in a "tremendous amount of collaboration"—which is how Pursell described his joint efforts with Plaintiff, (Doc. 105-24, p. 15 (Pursell Dep., p. 50))—or spend much of their time meeting with one another or one another's team members, or jointly meeting third parties to accomplish a particular objective, which apparently occurred between Plaintiff and Kim. (Doc. 105-43, p. 14 (Kim Dep., pp. 47–48).) In sum, Defendant's Vice Presidents spend much of their time working on cross-functional projects, which a factfinder may determine indicates overlap or equality of job responsibilities and duties.

Thus, the proper question is whether a reasonable factfinder could determine—after comparing Plaintiff's job to Pursell's and Kim's "overall"—that the jobs required "equal skill, equal effort, or equal responsibility" under "all the facts and circumstances of [the] particular case." *Universal Underwriters Ins. Co.*, 653 F.2d at 1245. And there is ample evidence to support Plaintiff's position on that front.

The "responsibility" factor, for instance, "concerns the degree of accountability required in performing a job," *Universal Underwriters*, 653 F.2d at 1245, especially the supervisory duties the job requires. *Krenik v. County of Le Sueur*, 47 F.3d 953, 961 (8th Cir. 1995) (a co-worker was not a valid comparator when he engaged in "full time supervisory duties . . . of the maintenance engineer position"). Here, Plaintiff managed a departmental budget of $10 million and directly supervised up to 11 employees; on both fronts, Plaintiff's responsibility was at least as great as Pursell's and Kim's. Moreover, both Pursell and Kim indicated in their deposition testimony that they did not believe their jobs were more important than Plaintiff's, or vice versa. (Doc. 105-24, p. 8 (Pursell Dep., p. 24); (Doc. 105-43, p. 10 (Kim Dep., pp. 30–31).) The "skill" factor "includes such considerations as experience, training, education, and ability." *Universal Underwriters*, 653

F.2d at 1245. Here, Plaintiff, Pursell, and Kim all began working as Vice Presidents at AMC around the same time. All three jobs required a bachelor's degree in business or a related field, and Plaintiff, Pursell, and Kim each had bachelor's degrees; Plaintiff and Pursell also had advanced degrees. The "effort" factor "refers to the physical or mental exertion necessary to the performance of a job." *Universal Underwriters Ins. Co.*, 653 F.2d at 1245. It is undisputed that Plaintiff and both of her alleged comparators were required to work, or be available to work, on a 24/7 basis if necessary. Moreover, there is significant evidence that she spent a large amount of time *doing the exact same thing* as Pursell and Kim, in that she jointly managed large and time-consuming initiatives with each of them. (*See generally* Doc. 105, pp. 277–90 (summarizing Plaintiff's collaborative efforts with Pursell and Kim).)

In sum, there are many facts in the record from which a factfinder could permissibly conclude that Plaintiff performed substantially *equal* work to Pursell and Kim, even though their jobs were not "identical." *Simpson*, 441 F.3d at 578. Of course, there is also evidence in the record to suggest that Plaintiff's role was less valuable than Pursell's or Kim's, as Defendant argues. (Doc. 94, pp. 83–84.) But because there is sufficient evidence for a reasonable factfinder to agree with Plaintiff, she has set out a *prima facie* wage discrimination claim that survives summary judgment.

b. "Other Factors" Defense

In the alternative, Defendant argues that even if Plaintiff performed "equal work" to Pursell and Kim, the uncontroverted facts show that the pay differential was based on a factor other than sex. (Doc. 94, pp. 86–87.) Specifically, Defendant points to evidence that AMC executives valued the roles performed by Pursell and Kim more than the role performed by Plaintiff because "it was

14

easier to find a replacement for [Plaintiff's] duties" than it would be for the alleged comparators. (*Id*. at p. 87.)[7]

The primary evidence to support this assertion, however, is a declaration from one of Defendant's officers prepared after this litigation began. (*See* Doc. 94-3, ¶ 39 (Chavarria Dec.) (opining that "individuals with skills and experience in [marketing] are more plentiful than those performed by the males" Plaintiff identified as comparators).) While this evidence supports Defendant's position, a reasonable factfinder could certainly disbelieve it in light of the facts that (1) AMC does not have an overall policy of compensating marketing employees less than employees in other areas, (2) the statement was made after litigation began and is self-serving, (3) Plaintiff worked on the same projects as the males with who supposedly possessed more rare or valuable skills, and (4) there is ample evidence that Plaintiff made significant contributions to AMC during the course of her employment. In the case Defendant cites to support its argument, *Hutchins v. International Bhd. of Teamsters*, the facts showed that "each of the male comparators possessed . . . more experience in organizing; more formal education . . . ; more union experience; and union experience at higher levels." 177 F.3d 1076, 1081 (8th Cir. 1999). Here, by contrast, there are no objective indicia that Kim or Pursell had more "education or experience" than Plaintiff; in fact, Plaintiff has an advanced degree, while Kim does not, suggesting that she has *more* education.

None of this is to suggest that a fact finder could not agree with AMC that Plaintiff's role was less valuable than the comparators. However, there are also ample facts supporting Plaintiff's

---

[7] Defendant also suggests that Plaintiff's pay in 2018 suffered due to the events that led to the investigation (referenced in footnote 6, *supra*) into her (and Pursell's) conduct. (Doc. 94, p. 88.) But the pay differential between Plaintiff and Pursell began before then and persisted thereafter, even though Pursell was involved in the same alleged misconduct. Thus, even if reducing Plaintiff's bonus incentives in 2018 was a reasonable response to her alleged misconduct, a factfinder could still conclude that she was paid less than one of her comparators for equal work.

position, so the uncontroverted facts do not establish as a matter of law that the differential in Plaintiff's pay is attributable to non-gender factors. Defendant's Motion for Summary Judgment is therefore **DENIED** with respect to Count I.

## 2. Count III: Title VII Wage Discrimination Claim

Originally, Plaintiff raised several Title VII gender discrimination claims; in her opposition to Defendant's Motion for Summary Judgment, Plaintiff abandoned all Title VII claims except those claims premised on gender-based wage discrimination. (Doc. 105, p. 329.) Generally, the "same standard applies to Equal Pay Act and Title VII wage-discrimination claims." *Sowell v. Alumina Ceramics, Inc*., 251 F.3d 678, 683 (8th Cir. 2001) (citing *EEOC v. Delight Wholesale Co*., 973 F.2d 664, 669 (8th Cir. 1992)). Like an Equal Pay Act plaintiff, a plaintiff advancing a Title VII wage-discrimination claim must "prove that her employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Id*. (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). And like an EPA defendant, an employer facing a *prima facie* Title VII wage-discrimination claim "bears the burden of coming forward with a legitimate nondiscriminatory factor upon which it based the wages paid." *Id*. (citing 29 U.S.C. § 206(d)(1)). Because the elements of Plaintiff's *prima facie* case and AMC's possible defenses are the same under her EPA claim and her Title VII claim, the Court's analysis rejecting Defendant's Motion for Summary Judgment on Count I also applies to Count III. *E.g., Price v. N. States Power Co.,* 664 F.3d 1186, 1191 (8th Cir. 2011).

Defendant, however, contends that Title VII imposes an additional requirement that the EPA does not: it argues that a plaintiff must show that the employer "intentionally depresse[d] wages on account of sex." (Doc. 94, pp. 88–89 (quoting *Tekknu v. Normandy Bank*, 348 F.3d 747,

741 (8th Cir. 2003)).)  The Court agrees with Plaintiff that Defendant misreads *Tekknu*.  (Doc. 105,

pp. 332–33.)  *Tekknu* indicated that there are two ways a Plaintiff can advance a Title VII wage

discrimination claim.  One way entails asserting the same elements as an EPA claim, as Plaintiff

has in this case.  But separately, "the Supreme Court has held that an employer violates Title VII,

*but not the Equal Pay Act*, if it intentionally depresses wages on account of sex *and there were no*

*employees of the opposite sex doing equal work for more pay*."  *Tekknu*, 348 F.3d at 741 (emphasis

added) (*citing County of Washington v. Gunther*, 452 U.S. 161 (1981)).  Thus, in context, *Tekknu*'s

discussion of "intentional" wage discrimination concerns a second and alternative method to

asserting a Title VII claim—one not available under the EPA, and one that Plaintiff is not asserting

here.[8]

Defendant also cites the two studies it commissioned on whether its female Vice Presidents

are, on the whole, paid less than their male counterparts.  (Doc. 94, pp. 89–90.)  However, there is

ample evidence to support the opposite conclusion—in particular, the AON study (also

commissioned by Defendant) that indicated that Plaintiff's pay was below the 25th percentile for

her role, while Kim's was above the 25th percentile and Pursell's was at the 50th percentile.  (Doc.

105-37, p. 6 (communications with AON).)  Although Defendant attempts to discredit this study

---

[8] The cases Defendant cites in its reply brief do not support Defendant's theory that Title VII requires "direct proof" of discriminatory intent by the employer in the form of "a comment from a decision maker linking the protected class (here, female) to an alleged adverse employment action (here, making less than two hand-picked comparators) sufficient to reflect the bias of the decision maker."  (*See* Doc. 115, pp. 46–48.)  In *Kindred v. Northome/Indus. Sch. Dist. No. 363*, the plaintiff failed to identify any specific male comparators who received greater pay for equal work, and in the absence of such comparators, the court turned to whether there was evidence of "intentional discrimination." 154 F.3d 801, 804 (8th Cir. 1998).  Here, Plaintiff has identified two comparators.  In *Bauer v. Curators of the Univ. of Mo.*, the Court discussed the differences between the EPA and Title VII—but only in terms of who bears the burden of proof: "An employer under the EPA carries the burden of persuasion and must prove an affirmative defense; a Title VII defendant need only articulate a defense," at which point the burden shifts to Plaintiff to *disprove* the defense. *Bauer v. Curators of the Univ. of Mo.*, 680 F.3d 1043, 1045–46 (8th Cir. 2012).  In fact, the issue in *Bauer* was not whether the defendant was entitled to summary judgment, but whether the district court should have given a business-judgment instruction in an EPA case.  *Id.*  That is not at issue here, and as discussed in the section on Plaintiff's EPA claim, there is sufficient evidence in the record for a reasonable factfinder to reject Defendant's asserted non-discriminatory reasons for the wage differential.

17

in its Reply Suggestions, (Doc. 115, pp. 50–51), the Court's role is not to weigh the parties' evidence, but to ascertain whether a reasonable factfinder could side with Plaintiff. And a reasonable factfinder could determine that Defendant paid Plaintiff less than male employees who performed equal work.

Because the Court has found that Plaintiff has advanced an EPA claim that survives summary judgment, and because the Court rejects Defendant's attempt to insert additional requirements into Title VII, Defendant's Title VII wage discrimination claim also survives summary judgment. Defendant's motion is therefore **DENIED** with respect to Count III.

### 3. Counts II and IV: Retaliation Claims

Counts II and IV advance retaliation claims under the Equal Pay Act and Title VII, respectively. Under both statutes, "a plaintiff may survive the defendant's motion for summary judgment in one of two ways." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). The first way requires the plaintiff to introduce "direct evidence" of discrimination—which means evidence "showing a specific link between the alleged discriminatory animus and the challenged decision" that "clearly points to the presence of an illegal motive." *Id*. (citation omitted). In the absence of direct evidence, a plaintiff must navigate the *McDonnell Douglas* burden-shifting framework. Under that framework, a plaintiff must first advance a *prima facie* case of retaliation by showing that: (1) "she participated in protected conduct," (2) she "suffered an adverse employment action," and (3) there was "a causal connection between the protected conduct and the adverse action." *Donathan v. Oakley Grain, Inc*., 861 F.3d 735, 739–40 (8th Cir. 2017) (setting out framework for both EPA and Title VII retaliation claims). If a plaintiff sets out a *prima facie* case, "the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. at 740. If the employer does so, "the plaintiff may create a

18

triable question as to retaliation by showing the employer's articulated reason was not the true reason for the adverse action." *Id.* The Court concludes that Plaintiff has satisfied the *McDonnell Douglas* requirements, making it unnecessary to consider the parties' arguments regarding whether the Record contains direct evidence of discrimination.

The parties agree on many of the facts underlying the retaliation claims. They agree that Plaintiff engaged in protected activity by complaining about pay disparities between herself and male employees, and that this activity began in May 2018 and culminated in her May 2019 EEOC charge. (Doc. 94, pp. 75–78; Doc. 105, pp. 304–09 (both summarizing facts).) They also agree that Plaintiff suffered an adverse employment action in the form of her September 2019 termination. (*Id.*) And they agree that Colanero and Chavarria were primarily responsible for the decision to terminate Plaintiff, and that both were aware of the protected activity. (*Id.*) So Defendant does not dispute that Plaintiff has presented evidence of two of the three elements of her *prima facie* case—engaging in protected activity and suffering an adverse employment action. Instead, Defendant argues that Plaintiff has not presented evidence of any sort of causal link—whether direct or indirect, but sufficient to raise an inference of retaliation—between the protected activity and the adverse action. (Doc. 94, pp. 73–78.)

a.   Inference of Discrimination

The first question is whether Plaintiff has presented enough evidence to suggest "a causal connection between" her complaints about pay equity and her ultimate termination. *Donathan,* 861 F.3d at 739–40. The Court finds that there is enough evidence for a reasonable factfinder to infer that Defendant terminated Plaintiff in retaliation for her pay equity complaints.[9] Plaintiff began complaining about pay equity in early 2018 and persisted for over a year, repeatedly asking

---

[9] Admittedly, it is a close call, but the Court is mindful that "[t]he burden to show a *prima facie* case is not difficult." *Donathan*, 861 F.3d at 740 (citation omitted).

19

Colanero and Chavarria to reassess her position's compensation. Defendant paid an independent consultant to evaluate Plaintiff's compensation level, and the consultant found that Plaintiff's compensation was well below the 25th percentile for similar positions—yet none of the individuals who could have changed Plaintiff's salary investigated the issue or even reviewed the study. In May 2019, Plaintiff escalated her concerns by filing the Charge. Three months later, the August 2019 investigation began. Shortly thereafter, on September 20, Plaintiff and Defendant unsuccessfully mediated the allegations in the Charge—and ten days after that, Defendant terminated Plaintiff.

"Viewed within the context of the overall record, temporal proximity may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1122 (8th Cir. 2006), *abrogated in part on other grounds, Torgerson v. City of Rochester*, 643 F.3d 1031, 1058 (8th Cir. 2011). While an exceptionally long gap between the protected activity and the adverse employment action "weakens the inference of causation," *Fercello v. County of Ramsey*, 612 F.3d 1069, 1080 (8th Cir. 2010) (discussing a six-month gap), when the events are "extremely close in time," the temporal connection alone can sustain a *prima facie* case. *Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002) (discussing two-week gap).

Here, the record shows that Plaintiff engaged in a lengthy campaign to get Colanero or Chavarria to reevaluate her compensation in light of her pay equity concerns, culminating in her filing the Charge in May 2019. After that, there was a three-month gap before Defendant began the investigation that resulted in Plaintiff's termination; about a month later, Defendant (represented by Colanero) and Plaintiff unsuccessfully mediated the Charge, and ten days after that, Defendant fired Plaintiff. The Court finds that this is sufficient to support an inference of

retaliation, albeit a weak one. *Fercello*, 612 F.3d at 1080. Moreover, "[v]iewed in the context of the overall record," this inference strengthens the "reasonableness of inferences drawn from other evidence." *Wallace*, 442 F.3d at 1122. For instance, a reasonable factfinder could interpret Colanero's and Chavarria's repeated failures to act on Plaintiff's requests to reevaluate her compensation to indicate that they had no intention of reevaluating her pay and were simply waiting for an excuse to fire her.

Defendant argues that even if these facts, standing alone, might support an inference of retaliatory intent, Plaintiff is not entitled to that inference here because independent intervening acts—namely, reports that Plaintiff had breached AMC policy by discussing the RIF in August 2019—occurred between her protected activity and her termination. (Doc. 115, pp. 23–24.) Unlike the cases Defendant cites on this subject, here, Plaintiff's protected conduct and her allegedly intervening wrongdoing are temporally intertwined. *See, e.g., Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 822 (8th Cir. 2013) (plaintiff who engaged in protected conduct in September, and displayed "poor work performance and insubordination in November and December" could not show a causal inference); *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999) (ruling for the employer where the employee had engaged in protected conduct before without suffering any consequences, and subsequently "indulg[ed] in an angry outburst in the presence of co-workers"). Moreover, as will be discussed below, there are facts in the Record that cast doubt on the sincerity of this explanation for Plaintiff's termination.

### b. Legitimate, Non-Pretextual Reason for Plaintiff's Termination

Having found that Plaintiff has presented a *prima facie* case of retaliation, the Court now turns for the non-discriminatory reasons AMC presents to justify its decision to terminate her. As explained in its briefing, AMC's theory is as follows. In 2018, AMC conducted a good-faith

investigation into allegations that Plaintiff (1) overindulged on alcohol at company functions and (2) engaged in inappropriate touching with Pursell on a work trip. (Doc. 115, p. 26.) The investigation substantiated those allegations, and also revealed that Plaintiff and Pursell had used company money to take trips together. (*Id*. at p. 27.) Moreover, Plaintiff was not forthright about her relationship with Pursell, and also attempted to divert attention from her wrongdoing by raising unsubstantiated allegations of sexism. (*Id*.) AMC then issued an appropriate punishment for both Plaintiff and Pursell—and Plaintiff's punishment was slightly more severe because Pursell had been more forthright about the relationship and had not tried to divert attention. (*Id*.) As a result of that investigation, Plaintiff received a Final Disciplinary Warning. When further allegations about her behavior emerged in 2019, AMC again conducted a good-faith investigation, which revealed that Plaintiff had breached AMC policy by discussing the RIF with her subordinates. (*Id*. at p. 115.) AMC then terminated Plaintiff for repeatedly violating its policies.

The Court finds that Defendant's explanation constitutes a legitimate reason for terminating Plaintiff's employment. When Plaintiff signed the Warning following the investigation into her and Pursell, she acknowledged that she had (1) impeded the investigation, (2) engaged in inappropriate behavior with Pursell, and (3) made allegations that she later refused to substantiate, all in violation of company policy. (Doc. 94-45, p. 2.) The Warning also indicated that "further violations of AMC policy, standards or practices will result in termination." (*Id*.) And the August 2019 investigation revealed at least some evidence that Plaintiff disclosed confidential information that led other employees to fear for their jobs and interfered with the resulting investigation. "[V]iolating a company policy is a legitimate, non-discriminatory rationale for terminating an employee," *Twymon v. Wells Fargo & Co*., 462 F.3d 925, 935 (8th Cir. 2006), and so the Court finds that AMC has satisfied its burden at this step.

The burden now shifts to Plaintiff to introduce evidence that could lead a reasonable factfinder to include that these were simply pretexts. To do so, Plaintiff must "produce admissible evidence debunking the asserted rationale for her termination." *Twymon*, 462 F.3d at 935.

Plaintiff offers several arguments to this effect regarding the 2018 investigation. The Court need not consider them in detail, because regardless of any alleged defects of the 2018 investigation, there is evidence that would allow a factfinder to conclude that the 2019 investigation—which followed Plaintiff's EEOC Charge and repeated complaints about pay equity—was pretextual. The investigation apparently began after Colanero heard (second- or third-hand) that someone on Plaintiff's team was talking about potential layoffs. (Doc. 105-2, pp. 89–90 (Colanero Dep., pp. 349–50).) Colanero quickly reported to Human Resources that Plaintiff was responsible for the leak, without asking Plaintiff beforehand—even though it is uncontested that *Plaintiff was not informed of the RIF in advance*, and that Colanero *did not believe Plaintiff knew about the RIF in advance*. (*Id.*) A reasonable factfinder might question why Colanero jumped to the conclusion that Mangels had talked to her team about the RIF when he did not believe Plaintiff even knew about the RIF. (Doc. 105, p. 321.) And the investigation itself was unusual, in that most of the people with whom the investigators spoke were not actually at the meeting where Plaintiff supposedly disclosed the RIF.[10] One of the few people who was, in fact, at the meeting expressly denied that Plaintiff had mentioned anything about layoffs or a Reduction in Force. (Doc. 105-16, p. 71 (Chavarria Dep., p. 274).) A reasonable factfinder might wonder why AMC interviewed so many people who were not at the meeting where Plaintiff's alleged misconduct occurred—and seemed to ignore the testimony of one of the people who *was* at the

---

[10] Defendant has provided a table of all the individuals who testified regarding the investigation, but the table does not support Defendant's position. (Doc. 115, pp. 30–31.) Of the nine individuals identified, five were not even at the meeting. "Marti," for example "[r]eported that, *while she was not in the August 14 meeting*, two associates who were present reached out to her to share their concerns based on Mangels' conduct." (*Id.* (emphasis added).)

meeting.  Further, given that there is evidence of widespread rumors about layoffs—rumors which other Vice Presidents apparently addressed with their teams—a reasonable factfinder might wonder why only Plaintiff was investigated or punished.

It is also, of course, quite possible to interpret the evidence the other way.  But on a motion for summary judgment, the Court must draw *all* reasonable inferences in favor of the non-moving party, and interpret *all* evidence in the light most favorable to her.  And the Court finds that there is enough evidence to create a triable issue of fact on Plaintiff's retaliation claims.  Defendant's Motion for Summary Judgment is therefore **DENIED** with respect to Counts II and IV.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, (Doc. 93), is **DENIED**.

**IT IS SO ORDERED.**

 /s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: October 22, 2021          UNITED STATES DISTRICT COURT

24