# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **TONYA MANGELS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:19-cv-00834-BP** |
| | ) | |
| **AMERICAN MULTI-CINEMA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS</u>

Respectfully submitted,
**BEAVER LAW FIRM, LLC**

/s/ Chad C. Beaver

_____

Chad C. Beaver      MO Bar No. 54141
Beaver Law Firm, LLC
(816) 226-7750 | Office
(816) 817-0540 | Fax
cbeaver@beaver-law.com
1600 Genessee Street, Suite 920
Kansas City, Missouri 64102
**ATTORNEY FOR PLAINTIFF**

**TABLE OF CONTENTS**

**Page(s)**

I.      **INTRODUCTION** ................................................................................................**4**

II.     **DISCOVERY TIMELINE** .................................................................................**7**

III.    **ARGUMENT**......................................................................................................**17**

IV.    **CONCLUSION** .................................................................................................**21**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

None.

**Statutes**

None.

**Other Authorities**

None.

Case 4:19-cv-00834-BP   Document 132   Filed 12/09/21   Page 3 of 23

## I.    INTRODUCTION

As discussed in detail below, the timeline in this case adequately demonstrates that Plaintiff never engaged in any form of sanctionable conduct.  Prior to wading into those issues, however, the Court should bear in mind that this entire exercise is premised on a discovery initiative that Defendant started on the last day of discovery in this case—with no chance of being completed on the last day of discovery—despite the opportunity to raise and address these issues *several months earlier*.

Discovery in this case closed on June 4, 2021.  In each of the three (3) Scheduling Orders entered by the Court [Docs. 19, 25, and 41], the Court made clear: "**All pretrial discovery authorized by the Federal Rules of Civil Procedure shall be completed on or before [the discovery deadline].  This means that all discovery shall be *completed*, not simply submitted, on the date specified by this paragraph**." *Id.* (emphasis added).

AMC never embarked on an effort to subpoena Michael Pursell's phone records from T-Mobile until ten (10) days prior to *third and last* discovery deadline established in this case. Exhibit 1 (Decl. of Beaver) at ¶ 1.  In its initial subpoena, AMC sought compliance by the June 4, 2021 deadline.  *Id.*  That never happened.  *Id.*  AMC then abandoned its initial subpoena, and issued a revised subpoena *on the date of the June 4, 2021 deadline* in clear violation of the Scheduling Orders entered by the Court.  Exhibit 1 (Decl. of Beaver) at ¶ 1; Exhibit 2 (Defts. Notice of Intent).  There was no chance of compliance on the very same date it was issued.

We now know that AMC received its initial response to the subpoena sixty-nine (69) days after the close of discovery on August 12, and AMC continued receiving information in a rolling production.  Exhibit 1 (Decl. of Beaver) at ¶ 2.  It sent Plaintiff "supplemental" information eighty-eight (88) days after the close of discovery on August 31.  *Id.*  Defendant fails

to acknowledge its disregard of the express language in the Court's Scheduling Orders in its brief (or even acknowledge the existence of that language).

The undersigned attended the Heartland Labor & Employment CLE conference in May of this year in which Your Honor spoke as a panelist in order to share "views from the bench" to an employment law/HR audience. *Id.* at ¶ 3. Toward the end of the program, Your Honor mentioned that a significant pet peeve involves parties grasping at irrelevant or harassing discovery objectives at the tail end of the discovery phase of a case rather than focusing on the next stage of the case in order to prepare for trial based on what they have already secured. *Id.* This situation goes even further because it involves brand new initiatives and disputes raised several months after the close of discovery, and there is no evidentiary record demonstrating the significance of any entries in the T-Mobile records attached to Defendant's brief which are re-summarized with Defendant's own self-serving assumptions.[1]

In addition, and prior to addressing the discovery timeline, it is also important for the Court to understand the disingenuous nature of AMC focusing this debate on Michael Pursell. Michael Pursell was employed at AMC between February 2015 and July *2020*. Exhibit 3 (Depo. of M. Pursell) at 11:3-7, 15:11-21. This lawsuit was filed on October 16, *2019*, and AMC returned a waiver of service of summons on November 19, 2019. Exhibit 4 (waiver). Based on these dates, AMC exercised continuous and exclusive control over Mr. Pursell (and his text messages) for at least *8 months* after this lawsuit was filed. AMC has produced text messages from its own employees in this case, but it has never produced a single text message from Michael Pursell. Exhibit 1 (Decl. of Beaver) at ¶ 4.

---

[1] This argument is further addressed at page 17, *infra*.

When Plaintiff requested Mr. Pursell's deposition in December 2020, counsel for AMC (Mr. Pace) was still capable of coordinating directly with Mr. Pursell in order to voluntarily produce and represent him for purposes of his deposition. Exhibit 1 (Decl. of Beaver) at ¶ 5. At the time of his deposition, Mr. Pursell acknowledged meeting with Mr. Pace on at least one occasion after the lawsuit was filed, and engaging in additional dialogue with Mr. Pace over the phone. Exhibit 3 (Depo. of M. Pursell) at 7:14-8:16. During his deposition, Plaintiff expressly avoided asking Mr. Pursell about the content of his conversations with Mr. Pace based on the belief that any such conversations may be privileged. Exhibit 3 (Depo. of M. Pursell) at 8:8-20. At the conclusion of Mr. Pursell's deposition, Mr. Pace acknowledged his (apparent) continuing control over Mr. Pursell by electing to not ask any questions at the time of his deposition. Mr. Pace said: "Mr. Pursell, the plaintiff noticed your deposition today and if we have any questions for you, we'll procure your testimony at a different time, but we don't have anything for you." Exhibit 3 (Depo. of M. Pursell) at 114:22-115:2. In other words, AMC and its counsel remained confident that they would continue exercising control over Mr. Pursell for purposes of presenting him at trial.

Thus, it makes no sense for AMC to argue that it was somehow prejudiced by its failure to secure text message information from Mr. Pursell—especially during the critical period of his continued employment with AMC. AMC had exclusive access to Mr. Pursell and his text messages for at least *8 months* after this lawsuit was filed, and it enjoyed continuing access to that information through at least December 2020 (and perhaps beyond). Defendant also fails to acknowledge this reality in its brief.

## II. DISCOVERY TIMELINE

The discovery timeline in this case also demonstrates that Plaintiff acted reasonably, and did not engage in any form of sanctionable conduct. Plaintiff sent its opening discovery requests to AMC in February 2020 and requested text messages in at least *eleven (11) separate instances* concerning various aspects of this case and its subject matter (Request Nos. 9, 10, 33, 35, 37, 39, 41, 42, 48, 49, and 50). Exhibit 1 (Decl. of Beaver) at ¶ 6; Exhibit 5 (Defts. 7/10/2020 Resp. to Pltfs. 1st RFPDS). Request No. 39 also referenced at least 21 potential custodians for this information. *Id.* When AMC responded in July 2020, AMC objected to producing ESI in every instance (other than email), and it further cautioned that it would only respond subject to the mutual agreements and further discussions of counsel. *Id.* Plaintiff noted the July 2020 objections and responses at that time, and elected to focus on email and other discovery initiatives. Exhibit 1 (Decl. of Beaver) at ¶ 6.

***Importantly, Defendant did exactly the same thing***. In July 2020, Plaintiff raised legitimate breadth and relevance objections to AMC's written discovery, including Defendant's requests for text messages, and Defendant never commenced golden rule discussions on those objections until *8 months later* in March 2021. *Id.* at ¶ 7.

On March 2, 2021, Plaintiff took the deposition of fact witness Kathy Weekley. *Id.* at ¶ 8. On cross-examination, Ms. Weekley testified to engaging in periodic text message contact with Tonya Mangels. *Id.* Two days later, on March 4, 2021, AMC sent Plaintiff a letter complaining—for the very first time—about Plaintiff's purported failure to produce text messages with Kathy Weekley. Exhibit 6 (3/4/2021 letter).

Plaintiff responded four (4) days later in a letter that was not attached to Defendant's brief. *See,* Exhibit 7 (3/8/2021 letter). Plaintiff explained to AMC that she found AMC's

position on text messages to be "inconsistent at best." *Id.* Plaintiff highlighted the eleven (11) separate instances (discussed above) in which Plaintiff requested text messages from Defendant, and the fact that AMC objected to producing ESI (other than email) *in every instance*. *Id.* Plaintiff also explained that, "[a]fter taking a look at AMC's document productions, it appears that AMC produced text messages in this case from collateral witnesses that AMC believes will assist in supporting its various defenses, but it does not appear that AMC ever undertook any serious effort to search or produce the text messages requested by Plaintiff … includ[ing text messages from] many of the key witnesses AMC intends to call at trial." *Id.* Plaintiff said: "We believe that any exchange of text messages in this case should be based on a mutually agreeable process that applies equally to Plaintiff and Defendant. If you would like to resolve each parties' respective positions concerning text messages on a global basis, please contact me for further discussion." *Id.*

During a subsequent email exchange on March 15, 2021 (also not attached to AMC's brief), Plaintiff pressed Defendant for a better understanding of the process it followed in order to search for text messages from AMC's own employees, and AMC responded:

> …**Personal text messages are not in the possession of AMC (the defendant in this action).** Conversely, Ms. Mangels' (the plaintiff) personal text messages are in her possession. **Nonetheless, as in any lawsuit we defend, any investigation we conduct on behalf of our clients related to locating and producing responsive documents in discovery involves a reasonable inquiry into whether any responsive information is in the personal possession of key witnesses (as opposed to AMC). This inquiry is how we discovered and produced the text messages from individuals.**

*See,* Exhibit 8 (3/15/2021 email exchange) (emphasis added). In other words, AMC disavowed its obligation to produce text messages generally, but then stated that it sometimes "reasonably" looks for text messages that may be helpful to its defenses and then produces those. That is not how discovery works.

8

After this exchange, the parties spoke on the phone, and AMC agreed to narrow its previous requests aimed at discovering text messages to any text messages in Plaintiff's possession that directly concern or reference the allegations in this case and/or the affirmative defenses raised in Defendant's Answer.  Exhibit 1 (Decl. of Beaver) at ¶ 9.  Consistent with that narrowing, Plaintiff then produced a copy of all text messages exchanged with Ms. Weekley, and Plaintiff further agreed to provide all Weekley information regardless of whether it directly concerned or referenced any issues germane to the case.  *Id.*  That information was provided before AMC took plaintiff's deposition on March 25, 2021.  *Id.*

Importantly, at this stage of the case, Plaintiff never agreed to preserve or produce every text message ever exchanged with any current or former AMC employee regardless of whether it directly concerned or referenced the allegations in this case.  *Id.* at ¶ 10.  Based on the clear and unequivocal nature of the parties' text message agreement, Plaintiff remained well within her rights to delete (or not retain) any text messages exchanged with current or former employees that had nothing to do with this case.  *Id.*

AMC then waited until mid-April (i.e., 1.5 months prior to the close of discovery) to serve a new set of discovery requesting an invasive forensic examination of plaintiff's electronic devices.  Exhibit 1 (Decl. of Beaver) at ¶ 11; Exhibit 9 (Defts. 2nd Doc. Requests).  Even at that time, however, the express language of AMC's new document request was *still limited* to text messages "**about topics related to Plaintiff's claims and/or Defendant's defenses from January 1, 2018 to present**."  *Id.*  In other words, Defendant was still not requesting text messages exchanged with current or former AMC employees that had nothing to do with this case, and Plaintiff remained well within her rights to delete (or not retain) any such messages.  **Importantly, Defendant never argued that it is somehow entitled to every single text**

**message ever exchanged between Tonya Mangels and Michael Pursell—regardless of content—until after discovery was closed in this case.** Exhibit 1 (Decl. of Beaver) at ¶ 12.

Plaintiff eventually objected to the new document request because an invasive forensic examination would clearly violate Plaintiff's privacy interests, because it would capture items that were irrelevant to any party's claim or defense, because it was not proportional to the needs of the case, because any possible benefit was outweighed by the burden or expense of attempting compliance, because it was over broad in time and scope, and because it implicated a significant amount of privileged discussions with Plaintiff's own counsel. In order to put AMC at ease, however, Plaintiff once again diligently worked to re-review every text message exchange in her phone with any current or former AMC employee, and Plaintiff once again confirmed her belief that she did not possesses any responsive text messages *consistent with the agreements of counsel*. Exhibit 1 (Decl. of Beaver) at ¶ 13; Exhibit 10 (Decl. of Mangels) at ¶ 1.

In light of Defendant's invasive request for a forensic examination, however, Plaintiff also elected on May 6, 2021 to simply produce all text messages on plaintiff's phone with any current or former AMC employees regardless of whether those communications had anything to do with this case. Exhibit 1 (Decl. of Beaver) at ¶ 14; Exhibit 10 (Decl. of Mangels) at ¶ 2. That production consisted of *274 pages worth of information*. *Id.* The undersigned also explained the process of how Plaintiff professionally downloaded that information from her phone using extraction software specifically designed for that purpose, and how Plaintiff produced it to AMC in a cleaner/sequential format. Exhibit 1 (Decl. of Beaver) at ¶ 14.

At the time Plaintiff made her decision to voluntarily produce the information on May 6, 2021, Plaintiff did not undertake any effort to delete any existing text messages on her phone with Michael Pursell or any other current or former AMC employees (whether or not relevant to

the case).  Exhibit 10 (Decl. of Mangels) at ¶ 3.  Plaintiff simply downloaded all of the potential information from her phone using the extraction software, and provided it to counsel for production in a .pdf format.  *Id.*  It should also be noted that Plaintiff produced that information on May 6 *one (1) week prior* to when Plaintiff was actually required to respond to Defendant's second document requests on May 13.  *Id.*  Defendant then waited until May 25, 2021 (i.e. ten (10) days prior to the close of discovery) to express dissatisfaction with the production, and to insist, once again, on a forensic examination.  Exhibit 1 (Decl. of Beaver) at ¶ 15; Exhibit 11 (5/25/2021 email exchange).

The parties next spoke on May 28, 2021.  Exhibit 1 (Decl. of Beaver) at ¶ 16.  During the call, counsel for Plaintiff rehashed much of the above, and Plaintiff also inquired as to whether—in the spirit of cooperation—the parties could agree on a simple solution in order to avoid the necessity of any Court involvement.  *Id.*  Plaintiff suggested, for example, the possibility of Plaintiff stipulating to no longer rely on Kathy Weekley as a witness at trial due to AMC's dissatisfaction with the manner in which the Weekley emails were produced.  *Id.*  AMC's counsel (Ms. Braun) agreed to give that idea some thought with her client and respond.  *Id.*

On June 2, AMC's counsel followed up with a proposal containing six (6) separate demands that went well beyond anything Plaintiff suggested on the May 28 call.  *See*, Exhibit 1 (Decl. of Beaver) at ¶ 17; Exhibit 12 (6/2/2021-6/3/2021 email exchange).  Plaintiff responded the following day, and in addition to outlining much of the history outlined above, Plaintiff said:

> AnnRene-
>
> I've taken a look at your proposal. When I inquired about a practical proposal to resolve the issues, I suggested a possible stipulation on a trial witness as an example. AMC's proposal below goes well beyond what any civil litigant should be required to do in a case such as this. I feel we've already gone above and beyond here to put AMC at ease on the question of whether or not plaintiff is withholding any AMC-related text messages in this case.

…

My hope is that AMC will accept what has already been provided and represented to date and move on. **We have not asked AMC to: (1) subpoena the cell providers for its own witnesses, (2) execute any affidavits related to the discovery of text messages, (3) produce witnesses a second time to discuss text messages, or (4) have its counsel provide written affirmations related to text messages.** We've been abundantly patient in indulging AMC's decision to depose additional witnesses, and [previously] subpoena additional [hotel and private investigator] records, in its pursuit of finding [ ] irrelevant details concerning the personal relationship between plaintiff and Michael Pursell (which will inevitably be the subject of lengthy and well-justified motion in limine), and I think we need to end the discovery phase of this case and move on.

*See, id.* (emphasis added).

Defendant responded the same day (through Ms. Reisdorff), and submitted a modified proposal that, among other things, included a trial stipulation for eliminating evidence pertaining to Kathy Weekley or Ms. Weekley's Equal Pay Act allegations. *See*, Exhibit 13 (6/2/2021-6/3/2021 email exchange). Four (4) days later, Plaintiff agreed in principle to that stipulation, and between June 11 and June 21, the parties exchanged several emails in order to negotiate the terms of that stipulation. Exhibit 1 (Decl. of Beaver) at ¶ 18. On June 17, Ms. Reisdorff said, "Chad - Good afternoon. I accepted the changes you made in the Weekley declaration and added a short sentence at the end confirming that in the event of a trial the parties will submit the joint stipulation to the court for approval. I signed it on behalf of AMC. Please send back a signed copy when you have a chance." *See*, Exhibit 14 (6/17/2021-6/21/2021 email exchange).

When Plaintiff received Ms. Reisdorff's email above, Plaintiff was pleased to see AMC's willingness to enter into a practical compromise in order to eliminate any further debate or Court involvement, but just to be sure, Plaintiff sent *one more email* in order to clarify the parties' collective understanding on the stipulation. Exhibit 1 (Decl. of Beaver) at ¶ 19. Plaintiff said: "Kerri- Please confirm that this agreement resolves all remaining discovery disputes regarding

AMC's request for a forensic exam of Plaintiff's phone, etc., and I will be happy to sign and send back. I assumed we are on the same page after receiving your email, but I want to make sure. Thanks, ccb". *See*, Exhibit 14 (6/17/2021-6/21/2021 email exchange). ***Thereafter, Defendant never responded.*** Exhibit 1 (Decl. of Beaver) at ¶ 20. In other words, Defendant never intended for the stipulation to resolve the outstanding discovery issues, but Defendant was more than happy to continue negotiating for it under false pretenses. Defendant also fails to mention this aspect of the parties' discussion in its brief.

Plaintiff did not hear from Defendant again until August 30, 2021, i.e. more than *two (2) months later*, when Mr. Matula—who was never involved in any of the previous discovery conversations—emailed the undersigned. *Id.* at ¶ 21; Exhibit 15 (August 30 email). Plaintiff responded with a lengthy letter on September 7. Exhibit 16 (September 7 letter). Once again, Defendant failed to attach that important communication to its brief. Plaintiff said:

Dear Mike:

This responds to your August 30 email, which seeks to raise discovery disputes well after the June 4, 2021 discovery deadline in this case. In each of the three (3) Scheduling Orders entered by the Court in this matter [Docs. 19, 25, and 41], Judge Phillips made clear: "All pretrial discovery authorized by the Federal Rules of Civil Procedure shall be completed on or before [the discovery deadline]. This means that all discovery shall be completed, not simply submitted, on the date specified by this paragraph." Discovery in this case closed more than three (3) months ago.

AMC never embarked on an effort to subpoena Michael Pursell's phone records from T-Mobile until ten (10) days prior to third discovery deadline in this case. In its initial subpoena, AMC sought compliance by the June 4, 2021 deadline. That never happened. AMC then abandoned its initial subpoena, and issued a revised subpoena on June 4, 2021 in clear violation of the Scheduling Orders entered by the Court. There was no chance of compliance on the very same date it was issued. We now know that AMC received its initial response to the subpoena sixty-nine (69) days after the close of discovery on August 12, and it also appears that AMC is still receiving information in a rolling production because it recently sent us "supplemental" information eighty-eight (88) days after the close of discovery on August 31.

13

AMC never requested to extend the discovery deadline in this case, and AMC has no basis for relying on information secured well after the close of discovery—in violation of the Court's three (3) Scheduling Orders—to re-litigate previous discovery disputes or manufacture new ones. When AMC decided to embark on its 11th Hour subpoena to T-Mobile, we chose to disregard it at the time and address it as a pretrial matter because it was clearly undertaken in violation of the Court's previous orders. If you will recall, AMC was also in the process of securing an 11th Hour deposition of Michael Pursell's ex-wife, and hotel blueprints from California, in an apparent effort to locate as much [ ] irrelevant detail as possible in relation to the personal relationship between Michael Pursell and Tonya Mangels. We continue to believe that this entire exercise is calculated to annoy, harass, and embarrass Tonya Mangels on the subject of her previous personal relationship with Michael Pursell.

**In addition to AMC's disregard of the Court's previous Scheduling Orders, your August 30 email mischaracterizes the interactions and agreements between the parties on the issue of text messages. I note that, prior to your email on August 30, you were not personally involved in any of the phone conversations or substantive discussions in which discovery stipulations were reached.**

At the outset of this case—in July 2020—we raised legitimate objections to your client's written discovery. AMC did not commence any golden rule discussions on the subject of text messages until after Kathy Weekley's deposition on March 3, 2021. Following those discussions, AMC agreed to narrow its previous requests aimed at discovering text messages to any text messages in Plaintiff's possession that directly concern or reference the allegations in this case and/or the affirmative defenses raised in Defendant's Answer. Consistent with that narrowing, we produced a copy of all text messages exchanged with Kathy Weekley, and we further agreed to provide all Kathy Weekley information regardless of whether it directly concerned or referenced the allegations in this case and/or the affirmative defenses raised in Defendant's Answer. That information was provided before AMC took plaintiff's deposition on March 25, 2021.

AMC then waited until mid-April (i.e., 1.5 months prior to the close of discovery) to serve a new set of discovery requesting an invasive forensic examination of plaintiff's electronic devices. In order to put AMC at ease, plaintiff once again diligently worked to re-review every text message exchange in her phone with any current or former AMC employee, and Plaintiff once again confirmed her belief that she did not possesses any other responsive information consistent with the agreements of counsel.

In light of Defendant's invasive request for a forensic examination, however, we also elected on May 6, 2021 to simply produce all text messages on plaintiff's

phone with any current or former AMC employees regardless of whether those communications had anything to do with this case. See MANGELS 001704-001978. All of that information was provided months ago. We also assured you—at that time—that Plaintiff did not possess any other text messages with current or former AMC employees other than what was provided in Plaintiff's May 6 production. I explained the process of how we professionally downloaded that information from Plaintiff's phone using extraction software specifically designed for that purpose, and how we produced it to you in a cleaner/sequential format.

**None of the above has changed. In your August 30 email, you suggest several times that Plaintiff remains obligated to respond to AMC's original discovery requests as worded, and that Plaintiff somehow has an ongoing obligation to provide every text message exchanged with any current or former AMC employees regardless of the subject matter. Those obligations do not exist. Our discovery obligations to AMC—on the issue of text messages—are founded on the parties' previous stipulations, and not on your original discovery requests. There would be no point in discussing or agreeing to a stipulation if one side was going to later take the position that they remain entitled to complete responses irrespective of any stipulations aimed at narrowing the requests. Plaintiff also never agreed at any time that Plaintiff has an ongoing obligation to provide AMC with every text message ever exchanged with any current or former AMC employee regardless of the subject matter.**

Now that discovery has concluded, it appears no one will have the benefit of deposition testimony from the T-Mobile witness(es) capable of explaining the entries noted in the recent records you sent. However, in light of your questions, I revisited these issues once again with Tonya. **Tonya confirmed—once again— that the process she followed in order to professionally download text messages from her phone and produce them in a cleaner/sequential format yielded every text message in her phone at that time. That includes Michael Pursell.** *Tonya also explained that she has never deleted any text messages in her phone from Michael Pursell that directly concerned or referenced the allegations in this case and/or the affirmative defenses raised in Defendant's Answer.* **There are no other "new" text messages meeting that definition that exist to produce.**

**When I asked about the T-Mobile records suggesting an exchange of data between their two phones, Tonya acknowledged that she has spoken with Mr. Pursell on several occasions. Tonya also explained that she has "direct messaged" with Mr. Pursell through one or more social media platforms (Twitter, for example). She explained, however, that none of that "direct messaging" communication with Mr. Pursell ever directly concerned or referenced the allegations in this case and/or the affirmative defenses raised in Defendant's Answer.**

Based on the above, we believe we have already provided AMC with all text messages that have any conceivable bearing on this case. AMC's delinquent request for additional information: (1) violates the Court's previous Scheduling Orders, (2) seeks irrelevant and personal information without adequate justification, and (3) appears calculated to annoy, harass, and embarrass Tonya Mangels on the subject of her previous personal relationship with Michael Pursell.

…

My hope is that AMC will accept what has already been provided and represented to date and move on. **We have not asked for forensic examinations of the phones owned by AMC's witnesses. We have accepted AMC's representations about the content of their text messages, and we have moved on.** Please call me if you have any additional questions or wish to discuss further. Thank you.

*Id.* (emphasis added).

Undeterred, AMC (through Mr. Matula) continued to ask for additional clarification.

Plaintiff provided additional clarification on September 14 in another email that was not attached

to Defendant's brief:

Mike-

Your email seems to assume that Tonya had an ongoing duty—since 2017—to save every text message with Michael Pursell regardless of whether those text messages have anything to do with this case. No such obligation ever existed. **Is it possible that Tonya exchanged a text message that was personal in nature with Michael Pursell in 2019 that had nothing to do with this case, and that she deleted it in 2019 prior to the point in time that she decided to turn over every other remaining text message in her phone in May 2021? Yes. As we have explained at length, however, Tonya appropriately discharged and complied with her agreement to produce all text messages in her possession that directly concern or reference the allegations in this case and/or the affirmative defenses raised in Defendant's Answer. That was done in relation to ALL of AMC's witnesses—not just Michael Pursell. You told us the exact same thing in relation to AMC's MANY witnesses, and we accepted that representation.**

Your email and your questions also incorrectly assume that text messages were exchanged. We explained to you why T-Mobile records likely contain entries reflecting the exchange of data between the two phones even if no text messages were exchanged. Again, when I asked about the T-Mobile records suggesting an

16

exchange of data between their two phones, Tonya acknowledged that she has spoken with Mr. Pursell on several occasions. Tonya also explained that she has "direct messaged" with Mr. Pursell through one or more social media platforms (Twitter, for example). She explained, however, that none of that "direct messaging" communication with Mr. Pursell ever directly concerned or referenced the allegations in this case and/or the affirmative defenses raised in Defendant's Answer.

**Simply put, there is no basis for arguing that Tonya ever deleted any text messages in her phone related to this case, and there is no basis for arguing that she ever failed to produce that information if it existed. There is no basis for arguing a spoliation issue, and as I explained in my September 7 letter, we are well beyond AMC's deadline for addressing discovery issues. If you would like to get on the phone and discuss these issues further, I am happy to do so. I am unwilling, however, to continue spending unnecessary time and effort on a protracted letter-writing campaign.** We believe our explanations have been thorough and consistent. Please call me at (816) 579-1800 to address anything else. Thanks, ccb

Exhibit 17 (9/14/2021 email exchange) (emphasis added).

Counsel for the parties met once again on these issues—in person—on September 30, and AMC continued to insist (incorrectly) that Plaintiff somehow engaged in discovery violations. Exhibit 1 (Decl. of Beaver) at ¶ 22. Defendant then waited two (2) additional months to raise these issues with the Court.

## III. ARGUMENT

At bottom, Defendant is complaining about two groups of purported "text messages" reflected in the T-Mobile records. The first group of "769 texts" spans between May 29, 2017 and March 26, 2019. Defts. Brief at 11. Tonya Mangels was terminated on September 30, 2019, and her lawsuit was not filed until October 16, 2019. There is no logical argument capable of suggesting that Tonya Mangels would have ever appreciated any possible need to save text messages with *anyone* from AMC six (6) months prior to her unlawful termination (and years earlier). It is ridiculous to suggest that it would have been improper to delete those items when they were received—regardless of what they concerned. There is also no evidence to suggest

how long they were retained, or what they concerned. The first group of purported "text messages" should be disregarded entirely for these simple reasons.

The second group of "700 texts" spans between July 28, 2020 and May 7, 2021. Defts. Brief at 11-12. Here, it is first critical to point out that, between July 28, 2020 and immediately prior to Plaintiff's May 6, 2021 document production, Plaintiff had no obligation to preserve or produce any text messages with Michael Pursell (or any other current or former AMC employees) if they did not "directly concern or reference the allegations in this case and/or the affirmative defenses raised in Defendant's Answer." *That was the agreement of counsel*, and Tonya Mangels never assumed a preservation obligation broader than that agreement. **Again, the discovery AMC submitted to Plaintiff in April 2021 remained consistent with that agreement, and Defendant never argued that it is somehow entitled to every single text message ever exchanged between Tonya Mangels and Michael Pursell—regardless of content—until after discovery was closed in this case.**

As discussed above, Tonya Mangels has consistently searched her phone for text messages meeting the criteria associated with counsels' agreement in order to produce any such messages (if they exist), and Tonya Mangels has never abandoned her obligation to preserve those text communications (it they ever existed). AMC is incapable of demonstrating otherwise.

At best, Defendant's entire argument is focused on a handful of communications that allegedly occurred in the early May 2021 timeframe immediately prior to Plaintiff's May 6 production. On this point, it is critical to point out that AMC has not presented any evidence demonstrating that the entries in the T-Mobile records actually correspond to "text messages." As Plaintiff explained to AMC back in September, no one in this case has ever received the benefit of any deposition testimony from T-Mobile witness(es) capable of explaining the entries

noted in the T-Mobile records because AMC never secured that testimony before the June 4, 2021 discovery deadline.  Defendant makes several self-serving statements in its brief that the SMS and/or SMSC entries in the T-Mobile records correspond to "text messages," but there is no actual evidence in the record confirming that to be true.

Tellingly, Exhibits 13 and 14 attached to Defendant's motion (which are explanatory items provided by T-Mobile) do not explain whether "SMS" or "SMSC" entries correspond to "text messages," or any other form(s) of data sent or received between two telephone numbers. Exhibit 14 actually says that "[f]or SMSc messaging, T-Mobile provides record of ***any activity*** between the requested target number and any other customers utilizing the T-Mobile network for the time and date range requested regardless if the target number currently is/was assigned to T-Mobile or a T- Mobile wholesale partner."  *Id.* (emphasis added).  Thus, an open and unanswered question remains as to whether this "activity" involves a traditional "text message" sent from the main texting app on an IOS or Android device, whether it concerns some other form of "direct messaging" through a social media platform (Twitter, for example), or whether it includes any other exchange of data from one phone to another.  AMC has not presented any evidence to resolve those questions, and the discovery period in this case closed months before the records were ever obtained.

The Court can and should take judicial notice of the fact that Twitter's own website acknowledges the possibility of sending and receiving "direct messages" through the Twitter app using SMS on a person's phone.  Here is a snapshot from Twitter's website:

## To send and receive Direct Messages on your phone via SMS

If your Twitter account is connected to your mobile phone, you can send and receive Direct Messages via SMS.

- Haven't added your mobile phone yet? Find out how to add your phone number to your account.
- Added your mobile phone already? Find out what text commands to use to send Direct Messages via SMS.
- Read this article about setting up your mobile preferences to learn more about how to receive Direct Messages via SMS.

Note: **A note about Direct Message failures: Please be careful to ensure that Direct Messages you send via SMS are under 160 characters, including the d command and username.** Your service provider may split SMS messages greater than 160 characters into multiple SMS messages. In this case, the second and any subsequent SMS messages will post as public Tweets because they don't begin with the appropriate text command (**d username**) that tells Twitter they are Direct Messages, as the first SMS message did.

*See,* "About Direct Messages" at https://help.twitter.com/en/using-twitter/direct-messages#via-sms.  Candidly, the technology possibilities are beyond the comprehension of the undersigned counsel, but the only relevant question for the Court is whether AMC has ruled out—through a valid, evidentiary showing—the possibility that these "SMS" and "SMSC" entries were generated by platforms that were separate and apart from traditional "text messages."  AMC has failed to secure or present that evidence.

AMC's evidentiary failure is important because, as Tonya has already admitted in her previous communications with Defendant, she occasionally "direct messaged" with Mr. Pursell through one or more social media platforms (Twitter, for example).  Exhibit 10 (Decl. of Mangels) at ¶ 4.  Importantly, however, she also made clear that none of that "direct messaging" communication with Mr. Pursell ever directly concerned or referenced the allegations in this case and/or the affirmative defenses raised in Defendant's Answer.  *Id.*

## IV.     CONCLUSION

At bottom, and prior to the timeframe immediately preceding her May 6 production, Tonya never had an obligation to preserve text messages with Michael Pursell, or anyone else, if those text messages were not related to the claims or defenses in this case.  As discussed above, at the time Plaintiff made her decision to voluntarily produce the information on May 6, 2021, Plaintiff did not undertake any effort to delete any existing text messages on her phone with Michael Pursell or any other current or former AMC employees (whether or not relevant to the case).  Plaintiff simply downloaded all of the potential information from her phone using the extraction software, and provided it for production in a .pdf format.

With respect to any text messages that met the criteria associated with the agreements of counsel, Tonya appropriately discharged and complied with her agreement to produce all text messages in her possession that directly concern or reference the claims or defenses in this case. That was done in relation to all of AMC's witnesses—not just Michael Pursell.  AMC told Plaintiff the exact same thing in relation to AMC's many, many witnesses, and Plaintiff has accepted that representation without requesting forensic examinations of a multitude of AMC phones.  AMC has not presented any evidence demonstrating that the entries in the T-Mobile records actually correspond to traditional "text messages" as opposed to some other form of data "activity" exchanged between two phones.  We lack that record because AMC violated this Court's three separate Scheduling Orders when it decided to commence this entire exercise on the last day of discovery in this case.  There is also no evidence suggesting that the data "activity" had anything to do with this case.  For all of the above reasons, the Court should deny Defendant's motion in its entirety.

WHEREFORE, for the aforementioned reasons, Plaintiff prays for an order of this Court denying Defendant's motion in its entirety, and for such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully submitted,

**BEAVER LAW FIRM, LLC**

/s/ Chad C. Beaver

_____
Chad C. Beaver         MO Bar No. 54141
(816) 226-7750 | Office
(816) 817-0540 | Fax
cbeaver@beaver-law.com
1600 Genessee Street, Suite 920
Kansas City, Missouri 64102
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2021, a copy of the above and foregoing document

was served by:

    (_X_) Filing it with the Court's CM/ECF system;
    (__) U.S. Mail, postage-prepaid;
    (__) Facsimile;
    (__) Email;
    (__) Federal Express; and/or,
    (__) Hand delivery, upon:

Kerri S. Reisdorff
Michael L. Matula
Chris R. Pace
AnnRene Coughlin
Rebecca J. Bennett
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, MO 64111
(816) 471-1301
(816) 471-1303 (Facsimile)
ATTORNEYS FOR DEFENDANT

                /s/ Chad C. Beaver

                _____

                  ATTORNEYS FOR PLAINTIFF